## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LEO DORRELL and
4608 Watson Way
Chesapeake, VA 23321

JOHN DUNN,
1318 Browns Mill Court
Herndon, VA 20170

on behalf of themselves and all others
similarly situated,

                              Plaintiffs,

    v.

CONSTELLATION ENERGY
CORPORATION,
1310 Point Street
Baltimore, Maryland 21231
County of Residence: Baltimore County

AMEREN CORPORATION,
1901 Chouteau Avenue
St. Louis, Missouri 63103

AMERICAN ELECTRIC POWER
COMPANY INC.,
1 Riverside Plaza
Columbus, Ohio 43215

ARIZONA PUBLIC SERVICE COMPANY,
400 North 5th Street
Phoenix, Arizona 85004

DOMINION ENERGY, INC.,
600 East Canal Street
Richmond, Virginia 23219

DTE ENERGY COMPANY,
One Energy Plaza
Detroit, Michigan 48226

DUKE ENERGY CORPORATION,
525 South Tryon Street
Charlotte, North Carolina 28202

CIVIL ACTION NO. 1:25-CV-2251

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

PROGRESS ENERGY, INC.,
411 Fayetteville Street
Raleigh, North Carolina 27601

ENERGY NORTHWEST,
76 North Power Plant Loop
Richland, Washington 99354

ENTERGY CORPORATION,
639 Loyola Avenue
New Orleans, Louisiana 70113

EXELON CORPORATION,
10 South Dearborn Street
Chicago, Illinois 60603

FIRSTENERGY CORPORATION,
76 South Main Street
Akron, Ohio 44308

NEXTERA ENERGY, INC.,
700 Universe Boulevard
Juno Beach, Florida 33408

FLORIDA POWER & LIGHT COMPANY,
700 Universe Boulevard
Juno Beach, Florida 33408

OMAHA PUBLIC POWER DISTRICT,
1919 Aksarben Drive
Omaha, Nebraska 68106

PACIFIC GAS & ELECTRIC COMPANY,
300 Lakeside Drive
Oakland, California 94612

PUBLIC SERVICE ENTERPRISE GROUP
INC.,
80 Park Plaza
Newark, New Jersey 07102

SOUTHERN CALIFORNIA EDISON
COMPANY,
2244 Walnut Grove Avenue
Rosemead, California 91770

THE SOUTHERN COMPANY,
30 Ivan Allen Jr. Boulevard, N.W.
Atlanta, Georgia 30308

STP NUCLEAR OPERATING COMPANY,
12090 FM-521
Wadsworth, Texas 77483

TALEN ENERGY CORPORATION,
2929 Allen Parkway, Suite 2200
Houston, Texas 77019

TENNESSEE VALLEY AUTHORITY,
400 West Summit Hill Drive
Knoxville, Tennessee 37902

VISTRA CORPORATION,
6555 Sierra Drive
Irving, Texas 75039

LUMINANT GENERATION COMPANY,
LLC,
6555 Sierra Drive
Irving, Texas 75039

WOLF CREEK NUCLEAR OPERATING
CORPORATION,
1550 Oxen Lane
Burlington, Kansas 66839

XCEL ENERGY, INC.,
414 Nicollet Mall
Minneapolis, Minnesota 55401

ACCELERANT TECHNOLOGIES LLC, and
1715 Indian Wood Circle, Suite 200
Maumee, Ohio 43537

HUMAN RESOURCE CONSULTANTS,
LLC,
2204 North Steele
Mesa, Arizona 85207

                              Defendants.

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION AND VENUE ........................................................................ 7

III.   PARTIES .............................................................................................................. 8

     A.     Plaintiffs ................................................................................................... 8

     B.     Defendants ................................................................................................ 8

         1.     Constellation ................................................................................ 8

         2.     Ameren ....................................................................................... 10

         3.     AEP ............................................................................................ 12

         4.     APS ............................................................................................ 13

         5.     Dominion .................................................................................... 15

         6.     DTE ............................................................................................ 17

         7.     Duke Energy Defendants ........................................................... 19

         8.     EnergyNW ................................................................................. 21

         9.     Entergy ...................................................................................... 23

         10.    Exelon ....................................................................................... 25

         11.    FirstEnergy................................................................................. 27

         12.    NextEra Defendants ................................................................... 29

         13.    OPPD ......................................................................................... 32

         14.    PG&E ......................................................................................... 33

         15.    PSEG ......................................................................................... 35

         16.    SCE ............................................................................................ 36

         17.    Southern .................................................................................... 37

         18.    STP............................................................................................. 39

19. Talen Energy ................................................................................................ 41

20. TVA .......................................................................................................... 42

21. Vistra Defendants ...................................................................................... 44

22. Wolf Creek ................................................................................................ 47

23. Xcel .......................................................................................................... 48

24. Accelerant Solutions ................................................................................. 50

25. Human Resource Consultants ................................................................... 51

IV. AGENTS AND COCONSPIRATORS ..................................................................... 51

1. Constellation Co-Conspirators .................................................................. 52

2. Ameren Co-Conspirators .......................................................................... 52

3. AEP Co-Conspirators ................................................................................ 52

4. Dominion Co-Conspirators ........................................................................ 53

5. DTE Co-Conspirators ................................................................................ 53

6. Duke Co-Conspirators ............................................................................... 54

7. Entergy Co-Conspirators ........................................................................... 54

8. NextEra Co-Conspirators .......................................................................... 55

9. PSEG Co-Conspirators .............................................................................. 55

10. Southern Co-Conspirators ......................................................................... 56

11. Talen Co-Conspirators .............................................................................. 56

12. Vistra Co-Conspirators ............................................................................. 57

13. Xcel Co-Conspirators ................................................................................ 57

14. Bruce Power .............................................................................................. 57

15. Nebraska Public Power District ................................................................ 57

16. Ontario Power Generation ......................................................................... 58

17. WTW ......................................................................................................... 58

18.  WEC ....................................................................................... 58

19.  ScottMadden ....................................................................... 59

V.  TRADE AND COMMERCE ............................................................. 59

VI.  FACTUAL ALLEGATIONS .............................................................. 60

A.  Background ......................................................................... 60

1.  The Commercial Nuclear Power Industry ................................. 60

2.  Nuclear Power Plants ................................................................. 60

3.  The Nuclear Power Industry's History and Culture of
Collaboration ............................................................................ 61

4.  Nuclear Power Generation Workers ......................................... 63

5.  Compensating Nuclear Power Generation Workers ................. 64

6.  Centralized Determination of Compensation for Nuclear
Power Generation Workers ....................................................... 65

7.  Nuclear Power Generation Employment Qualifications ........... 66

B.  Conspiracy to Align Worker Compensation ........................ 67

1.  The Nuclear Human Resources Group ..................................... 69

2.  The Nuclear Defendants Unlawfully Exchanged
Compensation Information through a Collective Bargaining
Agreement Repository ............................................................... 72

3.  The Nuclear Defendants Unlawfully Exchanged
Compensation Information through Compensation
Comparison Reports ................................................................. 76

4.  The Nuclear Defendants Discussed and Suppressed
Compensation at Annual Meetings ........................................... 78

a.  NHRG Annual Conferences ....................................... 78

b.  The Labor Relations Project and Meetings ................ 81

c.  The Total Rewards Project and Meetings .................. 82

5.    The Nuclear Defendants Discussed and Suppressed Compensation through Direct Email and Telephone Communications ................................................................. 85

6.    The Conspiracy Resulted in Parallel Limits on Defendants' Wage Increases and Harmonization of Defendants' Wages .................... 88

7.    Plus Factors That Render the Nuclear Power Industry Susceptible to Collusion ................................................................. 89

C.    Market Power of the Nuclear Defendants and Coconspirators ............................ 93

1.    Direct Evidence of Market Power ................................................................. 93

2.    Indirect Evidence of Market Power ................................................................. 95

a.    Product or Services Market ................................................................. 95

b.    Geographic Market ................................................................. 98

c.    Collective Market Share and Monopsony Power ........................ 99

D.    Anticompetitive Effects and Injury Suffered by Class Members ........................ 99

VII.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ................. 101

A.    Continuing Violation ................................................................. 101

B.    Fraudulent Concealment ................................................................. 101

1.    Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct ................................................................. 101

2.    Defendants Actively Concealed the Conspiracy .................................... 102

VIII.    CLASS ACTION ALLEGATIONS ................................................................. 110

IX.    CAUSES OF ACTION ................................................................. 112

X.    PRAYER FOR RELIEF ................................................................. 120

XI.    JURY TRIAL DEMAND ................................................................. 121

Based on the investigation of counsel, Plaintiffs Leo Dorrell and John Dunn (collectively, "Plaintiffs") bring this action on behalf of themselves individually and on behalf of a class (the "Class") consisting of all persons employed in nuclear power generation by the Nuclear Defendants[1] and their subsidiaries and related entities in the United States from May 1, 2003 to the present day (the "Class Period").

## I.    INTRODUCTION

1.    Since at least May 2003, Defendants have conspired and combined to fix and suppress the compensation paid to persons employed in nuclear power generation in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

2.    Defendants consist of the 26 Nuclear Defendants, which operate nuclear power plants that collectively produce all the nuclear-generated electricity sold to consumers in the United States, and two consulting companies, Accelerant Technologies LLC and Human Resource Consultants, LLC (collectively, the "Consultant Defendants"), which helped the Nuclear Defendants exchange compensation data and conduct in-person meetings to align compensation.

3.    The Nuclear Defendants, coconspirators, and their related entities own and/or operate all 54 commercial nuclear power plants in the United States. During the Class Period, the Nuclear Defendants employed hundreds of thousands of Class Members at those plants. Those

---

[1] The term "Nuclear Defendants" refers to the following companies: Constellation Energy Corporation; Ameren Corporation; American Electric Power Company Inc.; Arizona Public Service Company; Dominion Energy, Inc.; DTE Energy Company; Duke Energy Corporation; Progress Energy, Inc.; Energy Northwest; Entergy Corporation; Exelon Corporation; FirstEnergy Corporation; NextEra Energy, Inc.; Florida Power & Light Company; Omaha Public Power District; Pacific Gas & Electric Company; Public Service Enterprise Group Inc.; Southern California Edison Company; The Southern Company; STP Nuclear Operating Company; Talen Energy Corporation; Tennessee Valley Authority; Vistra Corporation; Luminant Generation Company, LLC; Wolf Creek Nuclear Operating Corporation; and Xcel Energy, Inc.

Class Members worked in various positions in nuclear power generation, including as nuclear operators, nuclear engineers, and nuclear technicians.

4.      The Nuclear Defendants compensated Class Members with hourly wages or annual salaries, supplemental forms of monetary compensation such as shift premiums and bonuses, and employment benefits. During the Class Period, each Nuclear Defendant established schedules for hourly wages, annual salaries, other monetary compensation, and employment benefits based on the specific positions and years of experience of the Class Members. This regimented process for determining compensation allowed the Nuclear Defendants to compare compensation rates—and collectively suppress compensation—across their workforces.

5.      The Defendants and coconspirators engaged in a multi-faceted conspiracy to align, fix, and suppress Class Members' compensation. The conspiracy and its objectives were confirmed by multiple confidential witnesses. For example, according to a former HR executive employed by Progress and Duke, the Nuclear Defendants "collaborated" and compensation decisions were "never made in a silo." The witness said that nuclear power companies would ***"all work together to make sure [they] were in alignment"*** on compensation. The explicit purpose of this coordination was to avoid paying higher-than-necessary compensation to employees. The witness explained: "we didn't want to pay outrageous salaries." Similarly, a former HR executive at Exelon said: "There's no doubt in my mind there was a lot of collaboration and information sharing between many big nuclear companies in regards to union details." He explained that nuclear power companies exchanged compensation information "all the time" and did so "to screw the union." Another witness who was a former Labor Relations Manager at Entergy noted that an investigation into wage-fixing in the nuclear power industry was warranted because "there's something going on here."

6.      Each Nuclear Defendant was a member of the Nuclear Human Resources Group ("NHRG"), which was a human-resources association that consisted of all the nuclear power companies in the United States and Canada. NHRG provided the organizational structure through which the Nuclear Defendants and coconspirators implemented the conspiracy, including facilitating information exchanges, organizing conferences, and maintaining contact lists.

7.      Defendants implemented, monitored, and enforced their conspiracy to fix and suppress compensation paid to Class Members through a series of overt acts, including:

8.      *Secret Collective Bargaining Agreement Repository*. From at least May 2003 to the present, the Nuclear Defendants *directly exchanged* highly sensitive compensation data—including the amount and dates of planned *future* wage increases—through a digital repository of union collective bargaining agreements ("CBA Repository"). The CBA Repository was organized, hosted, and updated by the Consultant Defendants and the now-defunct consultancy HR Strategies & Solutions, Inc. ("HRS&S"), which collected current CBAs from each Nuclear Defendant and coconspirator and posted them to a password-protected website accessible only to participating Nuclear Defendants and coconspirators. A former Workforce Relations Manager at Nuclear Management Company stated that "one of the big projects" of the NHRG "was to put together a library of CBAs that were part of the group." He said, "[w]e shared our collective bargaining agreements among ourselves" so "we had an idea of what other companies were doing outside of our own" regarding compensation and knew "what was going on at facilities as far as negotiations w[ere] concerned." The CBAs exchanged between Nuclear Defendants were highly confidential and inaccessible to the Nuclear Defendants absent the unlawful exchange.

9.      *Compensation Comparison Reports*. Defendant Exelon, Rick Habegger (who operated HRS&S), and the Consultant Defendants created and updated spreadsheets containing

nuclear power companies' compensation rates ("Compensation Comparison Reports") that were provided to the Nuclear Defendants and coconspirators. Critically, the Compensation Comparison Reports included disaggregated and deanonymized information about Nuclear Defendants' *current* wages and *future* wage increases. During the Class Period, the Compensation Comparison Reports were accessible only to Defendants and coconspirators through a password-protected website. The Compensation Comparison Reports allowed the Nuclear Defendants to easily compare and coordinate their current and future compensation rates at each unionized nuclear power plant and provided them with a significant bargaining advantage when negotiating wages and benefits with unions.

10.    *Annual Meetings to Exchange Compensation Information and Suppress Wages.* Each year, the Nuclear Defendants held in-person meetings at or before the NHRG conference in, for example, Palm Beach, Florida, or Phoenix, Arizona, where they discussed, suppressed, and fixed Class Members' compensation. NHRG operated two Project Teams that involved compensation: the Labor Relations Project and the Total Rewards Project. Before or during annual NHRG conferences, those Project Teams held meetings in which participants discussed compensation for nuclear power generation employees.

11.    During Labor Relations Project meetings, the Nuclear Defendants collectively reviewed the CBA Repository and the Compensation Comparison Reports, and then used that data to discuss and agree on how to negotiate with the union and what wage rates to set. A former Labor Relations Manager of Entergy said that a central purpose of meetings of the Labor Relations Project was to report "data points" and "outcomes" of recent and ongoing labor negotiations. She explained that members of the Labor Relations Project "would share what those outcomes were," such as the amount that a particular plant's bonuses would increase. She said, "[o]f course, wages

would be discussed" at the meetings. A former Workforce Relations Manager at Nuclear Management Company stated that one key purpose of the NHRG conference was to compare compensation across nuclear power companies.

12.     During Total Rewards Project meetings, the Nuclear Defendants and coconspirators reviewed surveys of hourly and salaried compensation in the nuclear power industry administered by Willis Towers Watson ("WTW Surveys"). The WTW Surveys displayed aggregated compensation information, including a median wage for various positions and experience levels. During the meetings, the Nuclear Defendants and coconspirators went over the WTW Surveys to coordinate compensation increases and suppress their employees' salaries and wages. At the Total Rewards Project meetings, representatives from the Nuclear Defendants and coconspirators spent the majority of their time discussing compensation trends across the nuclear industry, including average wage and salary increases based on the WTW Survey. The survey data provided context for Nuclear Defendants to compare their compensation schedules.

13.     *Direct Telephone and Email Coordination Concerning Compensation.* The Nuclear Defendants directly exchanged compensation information and stabilized wages through telephone and email communications during the Class Period. Corporate executives and plant-level human resources personnel at the Nuclear Defendants and coconspirators frequently contacted one another to exchange current and future compensation information and to agree on and suppress the wages of Class Members.

14.     According to an HR executive formerly employed by a Nuclear Defendant, human resources personnel at the Nuclear Defendants had special "relationships" with personnel at other nuclear power companies through which they exchanged compensation information and ensured alignment. She explained that she would regularly "pick up the phone" and ask her human

resources counterparts at other nuclear power companies to provide "average salary, minimum and maximum, and incentives" data for specific positions, and that her counterparts readily provided that information.

15.    The Nuclear Defendants typically contacted each other directly to exchange compensation information at least once per year, and they often did so before their human resources personnel proposed adjustments to salary ranges. In these communications, the Nuclear Defendants shared the salary range adjustments they planned to implement in the future and confirmed their alignment with the rest of the industry before finalizing the salary ranges. This facilitated Nuclear Defendants' and coconspirators' scheme to keep compensation—in the words of one HR executive formerly employed by a Nuclear Defendant—"in line" across the industry.

16.    The nuclear power industry has numerous characteristics that facilitated the formation and implementation of this conspiracy. These characteristics include but are not limited to: (1) extraordinarily high barriers to entry; (2) industry concentration; (3) fungibility of nuclear power generation labor; (4) inelastic labor supply; (5) numerous opportunities to collude; and (6) a history and culture of collaboration across the industry.

17.    The Nuclear Defendants engaged in the conspiracy to increase their profits by reducing labor costs. The intended and actual effect of Defendants' conspiracy has been to reduce and suppress the compensation paid to Class Members since May 2003 to levels materially lower than they would have been in a competitive market.

18.    The agreement entered by Defendants to fix and suppress compensation paid to employees who worked in nuclear power generation has unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. § 1. Plaintiffs, on their own behalf and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful agreement and to recover

actual, compensatory, and treble damages, as well as costs, attorneys' fees, and interest. Plaintiffs demand a trial by jury.

## II.    JURISDICTION AND VENUE

19.    The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

20.    This Court has personal jurisdiction over each of the Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1) and (3). Defendant Constellation Energy Corporation ("Constellation") resides in this District and used its headquarters in Baltimore, Maryland, to implement and coordinate the restraints of trade described below. In addition, Defendants (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, Class Members located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District. For example:

- Each Nuclear Defendant regularly sold electricity on wholesale or regional markets in the United States, and Defendants Constellation, Dominion, PSEG, and Vistra sold electricity on the PJM wholesale market, which serves consumers in the state of Maryland;

- Defendant Constellation is headquartered in the state of Maryland;

- Defendant Constellation owns and operates a nuclear power plant in the state of Maryland;

- Defendant Exelon owned and operated a nuclear power plant in the state of Maryland during the Class Period;

- Each Nuclear Defendant attended the 2012 NHRG annual conference in Maryland;

- Each Consultant Defendant provided services to Nuclear Defendants in the state of Maryland during the Class Period, including Constellation.

21.    Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)–(d) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein was carried out in this District.

### III.    PARTIES

**A.    Plaintiffs**

22.    Leo Dorrell was employed by Dominion during the Class Period. As an employee, he was paid an hourly wage and benefits by Virginia Electric & Power Company, a wholly owned subsidiary of Dominion. He is a resident of the state of Virginia.

23.    John Dunn was employed by Entergy during the Class Period. As an employee, he was paid an hourly wage and benefits by Entergy Nuclear Operations, Inc., a wholly owned subsidiary of Entergy. He is a resident of the state of Virginia.

**B.    Defendants**

**1.    Constellation**

24.    Constellation Energy Corporation ("Constellation") is a publicly traded Pennsylvania corporation headquartered in Baltimore, Maryland.

25.    During the Class Period, Constellation and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

26.     During the Class Period, Constellation directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Constellation directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Employees of Exelon Corporation who oversaw assets now owned by Constellation implemented the Compensation Comparison Reports. Constellation knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Constellation exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Constellation exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Constellation knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Constellation employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Constellation employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Constellation employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- As part of the conspiracy, Constellation established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

27.     Constellation was formed through a Separation Agreement from Exelon Corporation. As part of the Separation Agreement, Constellation assumed some or all of the liabilities associated with Exelon's former nuclear power subsidiary, Exelon Generation Company, LLC, and agreed to indemnify Exelon for pre-transaction liabilities associated with Exelon Generation Company, LLC's business.

**2.     Ameren**

28.     Ameren Corporation ("Ameren") is a publicly traded Missouri corporation headquartered in St. Louis, Missouri.

29.     During the Class Period, Ameren and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

30.     During the Class Period, Ameren directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Ameren directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Ameren knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Ameren exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Ameren exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Ameren knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Ameren employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Ameren employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear

utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Ameren executives directly contacted other Nuclear Defendants' and coconspirators' executives through email and telephonic communications to exchange compensation data and discuss, compare, and fix compensation.

- As part of the conspiracy, Ameren established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**3.     AEP**

31.     American Electric Power Company Inc. ("AEP") is a publicly traded New York corporation headquartered in Columbus, Ohio.

32.     During the Class Period, AEP and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

33.     During the Class Period, AEP directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- AEP directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. AEP knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. AEP exchanged

compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- AEP exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. AEP knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, AEP employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, AEP employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, AEP established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**4.    APS**

34.    Arizona Public Service Company ("APS") is an Arizona corporation headquartered in Phoenix, Arizona. APS operates, and jointly owns, the Palo Verde Generating Station in Wintersburg, Arizona.

35.    During the Class Period, APS and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

36.    During the Class Period, APS directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- APS directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. APS knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. APS exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- APS exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. APS knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, APS employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially

depressed levels. For example, APS hosted the 2000 Annual NHRG Conference in April 2000 in Phoenix, Arizona; the 2011 NHRG, EU-HRMG & EU-TAG Joint Conference in May 2011 in Phoenix, Arizona; and the 2019 NHRG-HR Metric and OR Working Group Annual Meetings from May 20 to May 22, 2019 at the Kimpton Hotel in Phoenix, Arizona.

- During the Class Period, APS employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, APS employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- As part of the conspiracy, APS established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**5.    Dominion**

37.    Dominion Energy, Inc. ("Dominion") is a publicly traded Virginia corporation headquartered in Richmond, Virginia.

38.    During the Class Period, Dominion and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

39. During the Class Period, Dominion directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Dominion directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Dominion knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Dominion exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Dominion exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Dominion knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Dominion employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Dominion employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear

utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Dominion employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions at nuclear power plants.

- As part of the conspiracy, Dominion established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**6.    DTE**

40.    DTE Energy Company ("DTE") is a publicly traded Michigan corporation headquartered in Detroit, Michigan.

41.    During the Class Period, DTE and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

42.    During the Class Period, DTE directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- DTE directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. DTE knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. DTE exchanged

compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- DTE exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. DTE knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, DTE employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, DTE employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, DTE executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, DTE established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

7.    **Duke Energy Defendants**

43.    Duke Energy Corporation ("Duke") is a publicly traded Delaware corporation headquartered in Charlotte, North Carolina.

44.    During the Class Period, Duke and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

45.    During the Class Period, Duke directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- During the Class Period, Duke employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- Duke hosted the 1999 Annual NHRG Conference in April 1999 in Charlotte, North Carolina, and the 2010 NHRG, EU-HRMG & EU-TAG Joint Conference in May 2010 in Charlotte, North Carolina.

- During the Class Period, Duke employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, Duke executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Duke established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

46. Progress Energy, Inc. ("Progress") is a North Carolina corporation headquartered in Raleigh, North Carolina. Progress was an independent company until it merged with and became a wholly owned subsidiary of Duke in July 2012. During the Class Period, Progress employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

47. During the Class Period, Progress directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Progress directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Progress knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Progress exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Progress exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Progress knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Progress employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-

person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Progress employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Progress employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, Progress executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Progress established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**8.      EnergyNW**

48.      Energy Northwest ("EnergyNW") is a municipal corporation and joint operating agency of the state of Washington. EnergyNW owns and operates the Columbia Generating Station in Richland, Washington.

49.      During the Class Period, EnergyNW and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

50. During the Class Period, EnergyNW directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- EnergyNW directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. EnergyNW knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. EnergyNW exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- EnergyNW exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. EnergyNW knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, EnergyNW employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, EnergyNW employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, EnergyNW employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- As part of the conspiracy, EnergyNW established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**9.    Entergy**

51.    Entergy Corporation ("Entergy") is a publicly traded Delaware corporation headquartered in New Orleans, Louisiana.

52.    During the Class Period, Entergy and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

53.    During the Class Period, Entergy directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Entergy directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Entergy knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Entergy exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Entergy exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Entergy knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Entergy employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- Entergy hosted the 2004 Annual NHRG Conference in April 2004 in New Orleans, Louisiana and the 2018 NHRG-HR Metric and OR Working Group Annual Meetings from May 7 to May 10, 2018 at the Hyatt Regency in New Orleans, Louisiana.

- During the Class Period, Entergy employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Entergy employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, Entergy executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Entergy established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**10.    Exelon**

54.    Exelon Corporation ("Exelon") is a publicly traded Pennsylvania corporation headquartered in Chicago, Illinois. Exelon is the former parent of Exelon Generation Company, LLC ("EGC") which owned and operated Exelon's nuclear power plant assets until EGC's legal and structural separation from Exelon in February 2022. EGC was renamed Constellation Energy Generation, LLC, or CEG, under a newly formed corporate parent, Constellation Energy Corporation, or Constellation.

55.    During the Class Period, Exelon and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

56.    During the Class Period, Exelon directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Exelon directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Exelon knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Exelon exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Employees of Exelon implemented the Compensation Comparison Reports and exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Exelon knew and understood, when it shared its current and future compensation data, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Exelon employees regularly attended annual NHRG Conferences where executives from competing nuclear utilities gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- Exelon hosted the 2007 Annual NHRG Conference in May 2007 in Chicago, Illinois, and the 2012 NHRG, EU-HRMG & EU-TAG Joint Conference in May 2012 in Baltimore, Maryland.

- During the Class Period, Exelon employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear power companies gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Exelon employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, Exelon executives discussed, compared, and fixed compensation through email and telephonic communications directly with other

Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Exelon established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**11.    FirstEnergy**

57.    FirstEnergy Corporation ("FirstEnergy") is a publicly traded Ohio corporation headquartered in Akron, Ohio. FirstEnergy, through its prior subsidiary FirstEnergy Nuclear Operating Company ("FENOC"), operated three nuclear power plants in the United States: Beaver Valley Power Station in Shippingport, Pennsylvania; Davis-Besse Nuclear Power Station in Oak Harbor, Ohio; and Perry Nuclear Power Plant in Perry, Ohio.

58.    During the Class Period, FirstEnergy and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

59.    During the Class Period, FirstEnergy directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- FirstEnergy directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. FirstEnergy knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. FirstEnergy exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- FirstEnergy exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. FirstEnergy knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, FirstEnergy employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, FirstEnergy employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, FirstEnergy employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, FirstEnergy executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, FirstEnergy established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

### 12.    NextEra Defendants

60.    NextEra Energy, Inc. ("NextEra") is a publicly traded Florida corporation headquartered in Juno Beach, Florida. During the Class Period, NextEra and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

61.    During the Class Period, NextEra directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- NextEra directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. NextEra knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. NextEra exchanged compensation data through the CBA Repository during the Class Period.

- NextEra exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. NextEra knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, NextEra employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, NextEra employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, NextEra employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, NextEra executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, NextEra established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

62.     Florida Power & Light Company ("FPL") is a Florida corporation headquartered in Juno Beach, Florida. FPL is a wholly owned subsidiary of NextEra which owns and operates the St. Lucie Nuclear Power Plant in Jensen Beach, Florida and the Turkey Point Nuclear Power Plant in Florida City, Florida. During the Class Period, FPL employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

63.     During the Class Period, FPL directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- FPL directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison

Reports. FPL knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. FPL exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- During the Class Period, FPL employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- FPL hosted the 2006 Annual NHRG Conference in May 2006 in Palm Beach, Florida, and the 2017 NHRG-HR Metric and OR Working Group Annual Meetings from May 1 to May 4, 2017 at the Wyndham Grand Jupiter in Jupiter, Florida.

- During the Class Period, FPL employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, FPL employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, FPL executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, FPL established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**13.    OPPD**

64.    Omaha Public Power District ("OPPD") is a public corporation and political subdivision of the state of Nebraska. OPPD previously owned and operated the Fort Calhoun Nuclear Generating Station in Fort Calhoun, Nebraska, which ceased operations in October 2016.

65.    During the Class Period, OPPD and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

66.    During the Class Period, OPPD directly participated in the conspiracy to fix and depress compensation to nuclear power generation workers by, among other things, doing the following:

- OPPD directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. OPPD knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. OPPD exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- OPPD exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. OPPD knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, OPPD employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, OPPD employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, OPPD established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**14.  PG&E**

67.    Pacific Gas & Electric Company ("PG&E") is a California corporation headquartered in Oakland, California. PG&E owns and operates the Diablo Canyon Nuclear Power Plant in Avila Beach, California.

68.    During the Class Period, PG&E and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

69.    During the Class Period, PG&E directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- PG&E directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. PG&E knew and understood that when it shared its CBAs with

NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. PG&E exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- PG&E exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. PG&E knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, PG&E employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels. For example, PG&E hosted the 1997 Annual NHRG Conference in April 1997 in San Francisco, California.

- During the Class Period, PG&E employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, PG&E employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- As part of the conspiracy, PG&E established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**15. PSEG**

70.    Public Service Enterprise Group Inc. ("PSEG") is a publicly traded New Jersey corporation headquartered in Newark, New Jersey.

71.    During the Class Period, PSEG and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

72.    During the Class Period, PSEG directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- PSEG directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. PSEG knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. PSEG exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- PSEG exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. PSEG knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, PSEG employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, PSEG employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, PSEG established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**16.    SCE**

73.    Southern California Edison Company ("SCE") is a California corporation headquartered in Rosemead, California. SCE previously substantially owned and operated the San Onofre Nuclear Generating Station in San Clemente, California. The San Onofre facility ceased operations in June 2013 and is currently being decommissioned.

74.    During the Class Period, SCE and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

75.    During the Class Period, SCE directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- SCE directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison

Reports. SCE knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. SCE exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- SCE exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. SCE knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, SCE employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, SCE employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers. -

- As part of the conspiracy, SCE established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**17.    Southern**

76.    The Southern Company ("Southern") is a publicly traded Delaware corporation headquartered in Atlanta, Georgia.

77.    During the Class Period, Southern and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

78.    During the Class Period, Southern directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Southern directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Southern knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Southern exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Southern exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Southern knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Southern employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Southern employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Southern employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, Southern executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Southern established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**18.    STP**

79.    STP Nuclear Operating Company ("STP") is a Texas corporation headquartered in Wadsworth, Texas. STP operates the South Texas Project Electric Generating Station in Bay City, Texas.

80.    During the Class Period, STP and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

81.    During the Class Period, STP directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- STP and its predecessors, wholly owned and/or controlled subsidiaries, and/or other affiliates directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. STP knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. STP exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- STP exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. STP knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, STP employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- STP co-hosted the 2008 NHRG & EU-TAG Joint Conference in May 2008 in Fort Worth, Texas, and hosted the 2013 NHRG, EU-HRMG & EU-TAG Joint Conference in May 2013 in Houston, Texas.

- During the Class Period, STP employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, STP established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**19.    Talen Energy**

82.    Talen Energy Corporation ("Talen") is a publicly traded Delaware corporation headquartered in Houston, Texas. PPL Corporation established Talen when it spun off its competitive energy business to form a new independent company in June 2015.

83.    During the Class Period, Talen and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

84.    During the Class Period, Talen directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Talen directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Talen knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Talen exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Talen exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Talen knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Talen employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Talen employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, Talen established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**20.    TVA**

85.    Tennessee Valley Authority ("TVA") is a corporate agency of the United States headquartered in Knoxville, Tennessee. TVA owns and operates three nuclear power plants in the United States: Browns Ferry Nuclear Plant in Athens, Alabama; Sequoyah Nuclear Plant in Soddy-Daisy, Tennessee; and Watts Bar Nuclear Plant in Spring City, Tennessee.

86.    During the Class Period, TVA and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

87.    During the Class Period, TVA directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- TVA directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison

Reports. TVA knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. TVA exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- TVA exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. TVA knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, TVA employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- TVA hosted the 2015 Annual NHRG Conference from May 18 to 21, 2015 in Chattanooga, Tennessee.

- During the Class Period, TVA employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, TVA employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, TVA executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, TVA established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**21.    Vistra Defendants**

88.    Vistra Corporation ("Vistra") is a publicly traded Delaware corporation headquartered in Irving, Texas.

89.    During the Class Period, Vistra and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

90.    During the Class Period, Vistra directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Vistra directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Vistra knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Vistra exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Vistra exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Vistra knew and understood, when it shared its current and future compensation data with Exelon, that

its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Vistra employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Vistra employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, Vistra established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

91.    Luminant Generation Company, LLC ("Luminant") is a Texas limited liability company headquartered in Irving, Texas. Luminant is an indirect, wholly owned subsidiary of Vistra which previously operated the Comanche Peak Nuclear Power Plant. During the Class Period, Luminant employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

92.    During the Class Period, Luminant directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Luminant directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Luminant knew and understood that when it shared its CBAs with

NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Luminant exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Luminant exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Luminant knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Luminant employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- Luminant co-hosted the 2008 NHRG & EU-TAG Joint Conference in May 2008 in Fort Worth, Texas.

- During the Class Period, Luminant employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, Luminant established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**22.    Wolf Creek**

93.    Wolf Creek Nuclear Operating Corporation ("Wolf Creek") is a Delaware corporation headquartered in Burlington, Kansas. Wolf Creek operates the Wolf Creek Generating Station in Burlington, Kansas.

94.    During the Class Period, Wolf Creek and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

95.    During the Class Period, Wolf Creek directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Wolf Creek directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Wolf Creek knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Wolf Creek exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Wolf Creek exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Wolf Creek knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Wolf Creek employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Wolf Creek employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensations information for their unionized nuclear power generation workers.

- During the Class Period, Wolf Creek executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Wolf Creek established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**23.    Xcel**

96.    Xcel Energy, Inc. ("Xcel") is a publicly traded Minnesota corporation headquartered in Minneapolis, Minnesota.

97.    Nuclear Management Company, LLC ("NMC") was a Wisconsin limited liability company headquartered in Hudson, Wisconsin. NMC was established by four upper Midwestern utility companies in 1999 to operate five nuclear power plants in Wisconsin, Minnesota, and Iowa. Xcel was one of the founding utilities of NMC and NMC operated its Monticello and Prairie Island nuclear plants from 2000 to 2007. Xcel maintained ownership of the plants and Xcel employees continued to operate the plants.

98.    Xcel acquired 100 percent ownership of NMC in September 2007 as a result of the other utilities exiting the partnership. The results of NMC's operations, and the estimated fair value of assets and liabilities, were consolidated into Xcel's consolidated financial statements as of the September 2007 transaction date. Xcel resumed operations of its two nuclear power plants thereafter.

99.    During the Class Period, Xcel and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

100.    During the Class Period, Xcel directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Xcel directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Xcel knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Xcel exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Xcel exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Xcel knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Xcel employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Xcel employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, Xcel established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**24. Accelerant Solutions**

101.    Accelerant Technologies LLC d/b/a Accelerant Solutions ("Accelerant") is an Ohio limited liability company headquartered in Maumee, Ohio. In 2023, Accelerant managed NHRG and facilitated its conferences, including the Labor Relations Project and Total Rewards Project sessions.

102.    During the Class Period, Accelerant directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, facilitating the NHRG Labor Relations Project and Total Rewards Project meetings where executives from competing nuclear utilities discussed, compared, and fixed the compensation paid to nuclear generation workers.

103.    In 2024, Accelerant hosted the nuclear-hr.com website, which provided an overview of the NHRG and a list of nuclear company members. The website included sections for

"Labor Management" and "Total Rewards," which could only be accessed with a username and password.

### 25. Human Resource Consultants

104.    Human Resource Consultants, LLC ("HRC") is an Arizona limited liability company headquartered in Mesa, Arizona. From 2015 to 2019, HRC and its principal officer, David Heler, managed NHRG and facilitated its conferences, including the Labor Relations Project and Total Rewards Project sessions.

105.    During the Class Period, HRC directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, facilitating the NHRG Labor Relations Project and Total Rewards Project meetings where executives from competing nuclear utilities discussed, compared, and fixed the compensation paid to nuclear generation workers.

106.    David Heler was the Manager of NHRG from 2014 to September 2021 while also serving as Principal Advisor to HRC. He also served as an Independent Consultant to Accelerant, which assumed management of NHRG in 2019.

## IV.    AGENTS AND COCONSPIRATORS

107.    The entities named below participated as coconspirators with Defendants and performed acts and made statements in furtherance of the conspiracy to fix and suppress compensation alleged herein.

108.    Defendants are jointly and severally liable for the acts of the coconspirators named below, whether or not those coconspirators are named as defendants in this Complaint.

109.    Each Defendant and coconspirator named below acted as the agent or joint-venturer of, or for, the other Defendants and coconspirators with respect to the acts, violations, and common course of conduct alleged herein.

### 1.    Constellation Co-Conspirators

110.    Constellation Energy Generation, LLC ("CEG") (formerly Exelon Generation Company, LLC) is a Pennsylvania limited liability company headquartered in Kennett Square, Pennsylvania. CEG is a wholly owned subsidiary of Constellation which owns and/or operates 12 nuclear power plants in the United States: Braidwood Clean Energy Center in Braceville, Illinois; Byron Clean Energy Center in Byron, Illinois; Calvert Cliffs Clean Energy Center in Lusby, Maryland; Clinton Clean Energy Center in Clinton, Illinois; Dresden Clean Energy Center in Morris, Illinois; James A. FitzPatrick Clean Energy Center in Scriba, New York; LaSalle Clean Energy Center in Marseilles, Illinois; Limerick Clean Energy Center in Limerick, Pennsylvania; Nine Mile Point Clean Energy Center in Oswego, New York; Peach Bottom Clean Energy Center in Delta, Pennsylvania; R.E. Ginna Clean Energy Center in Ontario, New York; and Quad Cities Clean Energy Center in Cordova, Illinois. During the Class Period, CEG employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 2.    Ameren Co-Conspirators

111.    Union Electric Company (doing business as Ameren Missouri) is a Missouri corporation headquartered in St. Louis, Missouri. Union Electric Company is a wholly owned subsidiary of Ameren which owns and operates the Callaway Energy Center in Fulton, Missouri. During the Class Period, Union Electric Company employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 3.    AEP Co-Conspirators

112.    Indiana Michigan Power Company ("IMPC") is an Indiana corporation headquartered in Columbus, Ohio. IMPC is a wholly owned subsidiary of AEP which owns and operates the Donald C. Cook Nuclear Plant in Bridgman, Michigan. During the Class Period,

IMPC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 4. Dominion Co-Conspirators

113.    Dominion Energy Nuclear Connecticut, Inc. ("DENC") is a Delaware corporation headquartered in Manchester, Connecticut. DENC is a wholly owned subsidiary of Dominion which owns and operates the Millstone Power Station in Waterford, Connecticut. During the Class Period, DENC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

114.    Virginia Electric & Power Company ("VEPCO") is a Virginia corporation headquartered in Richmond, Virginia. VEPCO is a wholly owned subsidiary of Dominion which owns and operates the North Anna Power Station in Louisa, Virginia, and the Surry Power Station in Surry, Virginia. During the Class Period, VEPCO employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

115.    Dominion Energy South Carolina, Inc. ("DESC") is a South Carolina corporation headquartered in Cayce, South Carolina. DESC is a wholly owned subsidiary of SCANA Corporation, which is a wholly owned subsidiary of Dominion. DESC owns and operates the Virgil C. Summer Power Station in Jenkinsville, South Carolina. During the Class Period, DESC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 5. DTE Co-Conspirators

116.    DTE Electric Company ("DTE Electric") is a Michigan corporation headquartered in Detroit, Michigan. DTE Electric is a wholly owned subsidiary of DTE which owns and operates the Fermi 2 Power Plant in Newport, Michigan. During the Class Period, DTE Electric employed

and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 6.    Duke Co-Conspirators

117.    Duke Energy Carolinas, LLC ("DEC") is a North Carolina limited liability company headquartered in Charlotte, North Carolina. DEC is a wholly owned subsidiary of Duke which owns and operates three nuclear power plants in the United States: Catawba Nuclear Station in York, South Carolina; McGuire Nuclear Station in Huntersville, North Carolina; and Oconee Nuclear Station in Seneca, South Carolina. During the Class Period, DEC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

118.    Duke Energy Progress, LLC ("DEP") is a North Carolina limited liability company headquartered in Raleigh, North Carolina. DEP is a wholly owned subsidiary of Progress which owns and operates three nuclear power plants in the United States: Brunswick Nuclear Plant in Southport, North Carolina; Shearon Harris Nuclear Plant in New Hill, North Carolina; and H.B. Robinson Nuclear Plant in Hartsville, South Carolina. During the Class Period, DEP employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 7.    Entergy Co-Conspirators

119.    Entergy Operations, Inc. ("EOI") is a Delaware corporation headquartered in Jackson, Mississippi. EOI is a wholly owned subsidiary of Entergy which operates four nuclear power plants in the United States: Arkansas Nuclear One in Russellville, Arkansas; Grand Gulf Nuclear Station in Port Gibson, Mississippi; River Bend Station in St. Francisville, Louisiana; and Waterford Steam Electric Station in Killona, Louisiana. During the Class Period, EOI employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

120.    Entergy Nuclear Operations, Inc. ("ENOI") is a Delaware corporation headquartered in Jackson, Mississippi. ENOI is a wholly owned subsidiary of Entergy which formerly operated five nuclear power plants in the United States: Indian Point Energy Center in Buchanan, New York; Palisades Nuclear Plant in Covert, Michigan; Pilgrim Nuclear Power Station in Plymouth, Massachusetts; Vermont Yankee Nuclear Power Plant in Vernon, Vermont; and James A. Fitzpatrick Nuclear Power Plant in Scriba, New York. All the nuclear power plants operated by ENOI, with the exception of James A. Fitzpatrick, are currently being, or have been, decommissioned. The James A. Fitzpatrick Nuclear Power Plant was acquired by Exelon Generation Company, LLC in 2017 and is currently part of the Constellation nuclear fleet. During the Class Period, ENOI employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 8.    NextEra Co-Conspirators

121.    NextEra Energy Capital Holdings, Inc. ("NEECH") is a Florida corporation headquartered in Juno Beach, Florida. NEECH is a wholly owned subsidiary of NextEra.

122.    NextEra Energy Resources, LLC ("NEER") is a Delaware corporation headquartered in Juno Beach, Florida. NEER is a wholly owned subsidiary of NEECH which owns and operates the Point Beach Nuclear Plant in Two Rivers, Wisconsin, and the Seabrook Station in Seabrook, New Hampshire. NEER previously owned and operated the Duane Arnold Energy Center in Palo, Iowa, which ceased operations in August 2020. During the Class Period, NEER employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 9.    PSEG Co-Conspirators

123.    PSEG Power LLC ("PSEG Power") is a Delaware limited liability company headquartered in Newark, New Jersey. PSEG Power is a wholly owned subsidiary of PSEG.

124.    PSEG Nuclear LLC ("PSEG Nuclear") is a Delaware limited liability company headquartered in Newark, New Jersey. PSEG Nuclear is a wholly owned subsidiary of PSEG Power which owns and operates the Hope Creek Generating Station in Hancock's Bridge, New Jersey, and the Salem Generating Station also in Hancock's Bridge, New Jersey. During the Class Period, PSEG Nuclear employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 10.    Southern Co-Conspirators

125.    Southern Nuclear Operating Company, Inc. ("SNOC") is a Delaware corporation headquartered in Birmingham, Alabama. SNOC is a wholly owned subsidiary of Southern which operates three nuclear power plants in the United States: Joseph M. Farley Nuclear Plant in Columbia, Alabama; Edwin I. Hatch Nuclear Plant in Baxley, Georgia; and Alvin W. Vogtle Electric Generating Plant in Waynesboro, Georgia. During the Class Period, SNOC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 11.    Talen Co-Conspirators

126.    Talen Energy Supply, LLC ("TES") is a Delaware limited liability company headquartered in Houston, Texas. TES is a wholly owned subsidiary of Talen.

127.    Susquehanna Nuclear, LLC ("Susquehanna") is a Delaware limited liability company headquartered in Berwick, Pennsylvania. Susquehanna is a wholly owned subsidiary of TES which operates the Susquehanna Steam Electric Station in Salem Township, Pennsylvania. Prior to PPL Corporation's spinoff of its competitive energy business into TEC, the Susquehanna Steam Electric Station was operated by PPL Susquehanna, LLC. During the Class Period, Susquehanna employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 12. Vistra Co-Conspirators

128. Vistra Operations Company, LLC ("VOC") is a Delaware limited liability company headquartered in Irving, Texas. VOC is an indirect, wholly owned subsidiary of Vistra which operates four nuclear power plants in the United States: Beaver Valley Power Station in Shippingport, Pennsylvania; Comanche Peak Nuclear Power Plant in Glen Rose, Texas; David-Besse Nuclear Power Station in Oak Harbor, Ohio; and Perry Nuclear Power Plant in Perry, Ohio. During the Class Period, VOC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 13. Xcel Co-Conspirators

129. Northern States Power Company ("NSPC") is a Minnesota corporation headquartered in Minneapolis, Minnesota. NSPC is a wholly owned subsidiary of Xcel which owns and operates the Monticello Nuclear Generating Plant in Monticello, Minnesota, and the Prairie Island Nuclear Generating Plant in Welch, Minnesota. During the Class Period, NSPC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 14. Bruce Power

130. Bruce Power L.P. ("Bruce") is a Canadian limited partnership headquartered in Tiverton, Ontario. Bruce operates the Bruce A and B Nuclear Generating Stations in Kincardine, Ontario. During the Class Period, Bruce was a member of NHRG and participated in Labor Relations and Total Rewards Project sessions.

### 15. Nebraska Public Power District

131. Nebraska Public Power District ("NPPD") is a public corporation and political subdivision of the State of Nebraska. NPPD owns and operates the Cooper Nuclear Station in Brownville, Nebraska. During the Class Period, NPPD and/or its predecessors, wholly owned or

controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States. During the Class Period, NPPD was a member of NHRG and its employees attended NHRG conferences.

### 16.    Ontario Power Generation

132.    Ontario Power Generation, Inc. ("OPG") is a Canadian public corporation headquartered in Toronto, Ontario. OPG owns and operates Pickering Nuclear Generating Station in Pickering, Ontario, and the Darlington Nuclear Generating Station in Clarington, Ontario. During the Class Period, OPG was a member of NHRG and participated in Labor Relations and Total Rewards Project sessions.

### 17.    WTW

133.    Willis Towers Watson PLC ("WTW") is an Ireland public limited company headquartered in London, England. During the Class Period, WTW administered the WTW Surveys utilized by Defendants to fix and suppress the compensation paid to employees of the Nuclear Defendants and coconspirators, their subsidiaries, and related entities at commercial nuclear power plants in the United States.

### 18.    WEC

134.    WEC Energy Group, Inc. ("WEC Energy") is a publicly traded Wisconsin corporation headquartered in Milwaukee, Wisconsin. Wisconsin Electric Power Company ("WEP") is a wholly owned subsidiary of WEC Energy which previously owned the Point Beach nuclear power plant in Two Rivers, Wisconsin. The plant was operated by NMC, but most plant workers were employed by WEP. WEP sold the Point Beach nuclear power plant to FPL in September 2007. During the Class Period, WEP and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 19. ScottMadden

135.    ScottMadden, Inc. ("ScottMadden") is a North Carolina corporation headquartered in Raleigh, North Carolina. During the Class Period, ScottMadden served as a consultant to the NHRG and its members. ScottMadden participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, facilitating the electronic exchange of nuclear power plant CBAs between the Nuclear Defendants.

## V.    TRADE AND COMMERCE

136.    The conspiracy formed, implemented, and enforced by Defendants was intended to suppress, and did in fact suppress, the compensation of Class Members nationwide.

137.    The conspiracy restrained competition between the Nuclear Defendants for the payment of wages, salaries, benefits, and other compensation to, and the hiring of, Class Members nationwide, including Class Members located in states other than the states in which the nuclear power plants that employed them were located.

138.    The Nuclear Defendants made payments to Class Members by mailing or transmitting funds across state lines.

139.    The Nuclear Defendants employed Class Members to generate electricity for sale in interstate and foreign commerce.

140.    The Consultant Defendants provided services to the Nuclear Defendants located in multiple different states and exchanged confidential, proprietary, and competitively sensitive data among the Nuclear Defendants across state lines.

141.    Defendants' activities were carried out within the flow of interstate commerce of the United States and were intended to have, and did have, direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## VI.    FACTUAL ALLEGATIONS

**A.    Background**

### 1.    The Commercial Nuclear Power Industry

142.    The United States is the world's largest producer of nuclear power, generating approximately 30% of all nuclear power. In 2022, the United States's nuclear reactors produced 772 terawatt-hours of energy.

143.    Each commercial nuclear power plant in the United States is operated by and at least partially owned by a Nuclear Defendant or coconspirator. All full-time commercial nuclear power generation workers in the United States are employed by the Nuclear Defendants or coconspirators.

144.    The Nuclear Defendants earn billions of dollars in annual revenue from generating and selling electricity. For example, Constellation alone generated 182 terawatt-hours of zero-emissions electricity, enough to power 16 million homes, resulting in sales of $23.6 billion in 2024.

### 2.    Nuclear Power Plants

145.    There are 94 operating commercial nuclear reactors at 54 nuclear power plants in the United States.

146.    The Nuclear Defendants and coconspirators collectively operate and control all of the nuclear power plants in the United States.

147.    Some nuclear power plants are investor-owned utilities which issue stocks to investors, sell bonds, and are regulated by state regulatory commissions. Other nuclear power plants are publicly owned utilities (though most publicly owned nuclear power plants are operated by an investor-owned operating company). And others are partly owned by governments and partly by for-profit companies.

3.      **The Nuclear Power Industry's History and Culture of Collaboration**

148.    Utilities that transmit electricity to homes and businesses are regulated natural monopolies because of the high cost of distribution infrastructure. Historically, electric utilities were vertically integrated and owned most of the generation, transmission, and distribution functions of the electricity supply chain. Because particular utilities owned the only transmission and distribution lines within particular areas, these utilities enjoyed an exclusive right to sell electricity to retail customers in those areas. In other words, electric utilities did not compete with other electric utilities for the sale of electricity to consumers.

149.    Beginning in the early 1990s, certain states deregulated the electricity markets by giving consumers direct access to wholesale suppliers. Deregulation created power exchanges whereby electricity could be bought and sold in a market environment. It also required that electricity generators be given open access to transmission lines so they could be connected to buyers. As a result of deregulation in some states, nuclear power companies became competitors with one another and with other electric utilities for the sale of electricity to consumers.

150.    Prior to deregulation, the nuclear power companies extensively collaborated with each other as non-competitors, especially through various organizations, such as the Edison Electric Institute and the Nuclear Energy Institute ("NEI"). According to a former Utility Department Director for the International Brotherhood of Electrical Workers, in the pre-deregulation era, nuclear power companies worked closely together within the industry.

151.    As a legacy of its natural monopoly status in which market participants did not compete for consumers, the commercial nuclear power industry is still characterized by an extraordinary culture of cooperation. In 2022, Maria Korsnick, the president and CEO of NEI, former Senior Vice President of Operations at Exelon, and former Chief Nuclear Officer at

Constellation, stated on the "Titans of Nuclear" podcast that the nuclear power industry is unique in its industry-wide collaboration:

> Maria Korsnick: I could say, send some people to my plant and evaluate what we're doing and insert problem here, maintenance, operations, etc. Or I could say, I want to send some of my guys to your plant. I have a question on this. Or I could say, I have some procedures for how we do X, Y, Z. Can I see yours and I'll send you mine and I'd like to do some benchmarking. That's the kind of camaraderie, if you will, or sort of transparency that we have today amongst our nuclear plants.

> Interviewer: And I'm just going to remind everyone, these are separate companies, like competitors, one might even say.

> Maria Korsnick: That's right.

> Interviewer: And yet they're just opening the books, collaborating.

> Maria Korsnick: That's right.

> Interviewer: Isn't that, I mean, that's incredible. Does any other industry do this? I think nuclear's got to be the best.

> Maria Korsnick: I don't know of another industry that does that.

> . . .

> Maria Korsnick: At the heart of this is we appreciate, you know, if you're running a nuclear plant, I want you to run that nuclear plant the best way that you can, right? And so it's at the heart of why are we being so transparent? Why do we share that information? It is literally because, yeah, we might be competing in the marketplace, but you know what? I want you to have a really effective and efficiently running power plant.

> Interviewer: Yeah, a rising tide floats all boats, makes everyone look good.

> Maria Korsnick: That's right. And we're willing to help each other out.

152.    A former HR executive at FPL said the nuclear industry was "very open as far as sharing" information and that she was "blown away" by how much the nuclear industry "helped each other." According to a former HR executive at NextEra, the nuclear power industry is one of the only industries in which "information sharing is not only encouraged but mandatory." And

according to Paula Maguire, a former Training Manager at Ontario Power Generation, "there is a lot of sharing." It is a "big world but a small community." A former Labor Relations Manager at Entergy explained that "external partnerships" and "sharing knowledge" with other nuclear utilities in the industry was "encouraged" and "an advantage for companies when done right." A former Entergy HR employee who was responsible for organizing and hosting the 2018 NHRG conference said that attendees "made relationships" with one another at the conference and called each other "to ask for advice."

**4.   Nuclear Power Generation Workers**

153.   The largest recurring cost at nuclear power plants is labor. According to Ed Kee, an economist at the Nuclear Economics Consulting Group: "If you look at the cost of nuclear power . . . O&M is by far the largest part of that. . . . operations and maintenance is mostly people." David Heler, the manager of NHRG and Principal Advisor at Human Resource Consultants, LLC, said that the nuclear power industry is "about 60% people heavy . . . whereas in almost every other industry it's about 20% people 80% capex [capital expenditure] . . . it's just flip-flopped here in the nuclear industry . . . so it's unique and we have to continue to ask our questions about why is that what can we do about that."

154.   Each Nuclear Defendant and coconspirator employs nuclear operators, nuclear engineers, nuclear technicians, and other staff who work at nuclear power plants or in central offices. Some of these staff are hourly paid workers and others receive a salary.

155.   The Class is comprised of such workers employed in nuclear power generation by the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States.

156.    Each year during the Class Period, the Nuclear Defendants and coconspirators, their subsidiaries and related entities employed approximately 40,000 to 50,000 workers at their U.S. nuclear power plants.

157.    Approximately one third of workers in nuclear power generation are union members, and the International Brotherhood of Electrical Workers ("IBEW") represents most of them. The IBEW bargained for workers' wages with the Nuclear Defendants' and coconspirators' labor relations representatives.

158.    Because the Nuclear Defendants and coconspirators, their subsidiaries, and related entities generate electricity in a similarly efficient manner, their nuclear power plants were and are characterized by highly similar operations and thus similar labor requirements. Accordingly, the nuclear power generation workers employed by the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States during the Class Period—i.e., Class Members—were easily categorized into a limited set of discrete job positions.

159.    For example, in their nuclear power plants, each Nuclear Defendant and coconspirator employs "nuclear engineers" and "nuclear operators" or equivalent positions.

160.    In a competitive labor market, many employees of the Nuclear Defendants and coconspirators could and would switch their employment to rival nuclear power companies when offered higher wages, higher salaries, and/or superior benefits.

**5.    Compensating Nuclear Power Generation Workers**

161.    Nuclear power generation employees of the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States were paid either hourly wages or annual salaries, depending on their position.

162.    Most nuclear power generation employees operated nuclear power plants or performed maintenance. These workers were generally paid hourly wages according to their specific position and experience level and were categorized into different positions.

163.    Some nuclear power generation employees were paid annual salaries. These employees included management-level employees and certain engineers or scientists.

164.    Both hourly paid and salaried nuclear power generation employees of the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States received a similar set of employment benefits. Those benefits typically included health insurance, paid time off, a retirement-savings plan, disability insurance, and life insurance.

165.    Some positions in nuclear power generation at the Nuclear Defendants and coconspirators, their subsidiaries, and related entities were paid higher wages than other positions at the same nuclear power companies, largely due to the greater skill, experience, licensing and/or education required for those higher-paying positions. For example, licensed nuclear operators— who are required to take classes and acquire a license from the Nuclear Regulatory Commission— are generally paid higher wages than unlicensed nuclear operators. Nonetheless, each Nuclear Defendant and coconspirator systematically determined the compensation for all positions in nuclear power generation that they, their subsidiaries, and related entities owned and/or operated using compensation schedules or salary ranges that accounted for workers' skill, experience, licensing, and/or education. Those schedules were aligned with compensation schedules that other Nuclear Defendants and coconspirators had established for the same positions.

**6.    Centralized Determination of Compensation for Nuclear Power Generation Workers**

166.    Decisions regarding the compensation of nuclear power generation workers employed by the Nuclear Defendants and coconspirators were made by and at each Nuclear

Defendant or coconspirator's corporate headquarters during the Class Period. For example, a former HR Manager at Ameren's Callaway power plant stated that salary decisions were made by the company's corporate offices in St. Louis, Missouri. While plant-level employees sometimes made recommendations and participated in union negotiations, senior executives at the Nuclear Defendants and coconspirators' corporate headquarters ultimately determined and approved workers' hourly wages, annual salaries, other compensation, and employment benefits.

167.    During the Class Period, the Nuclear Defendants' and coconspirators' senior executives determined the hourly wages, annual salaries, bonuses, premium and shift pay, employment benefits, and other compensation for Class Members across the country in a formulaic way, establishing schedules that compensated employees according to their specific positions in nuclear power generation at the Nuclear Defendants or coconspirators and their levels of proficiency, experience, licensure, and education.

168.    Many Nuclear Defendants maintained separate compensation departments dedicated solely to nuclear power generation employees, which facilitated the conspiracy to suppress wages. According to a former HR executive at Progress Energy and Duke, Progress had a "separate compensation function" from the rest of the company that "collaborated" with other nuclear power companies concerning the compensation offered to employees. FPL similarly had a compensation division for FPL's employees that was handled by an entirely separate department from the company's human resources department.

### 7.    Nuclear Power Generation Employment Qualifications

169.    To obtain a position in nuclear power generation, an applicant must satisfy certain education, licensing, and/or experience requirements.

170.    For example, when recruiting applicants for a position as a nuclear operator, the Nuclear Defendants often sought the following qualifications: a bachelor of science degree in

engineering, engineering technology, or related science program, or advanced math, physics, chemistry, and/or engineering coursework; and one year power plant experience or two years of non-generating nuclear power facility experience.

171.    When recruiting applicants for a position as a nuclear engineer, the Nuclear Defendants often required a bachelor of science degree in engineering and several years of related engineering experience.

172.    Nuclear power experience was generally a prerequisite for positions in nuclear power generation. For that reason, nuclear power companies often needed to recruit employees from other nuclear power companies because the only workers with necessary skills and experience worked in nuclear power generation. A former labor manager at Exelon stated that "the only way to get experienced nuclear operators" was to recruit them from other nuclear facilities. He explained that nuclear operators were "not a dime a dozen."

173.    As a result of the Nuclear Defendants' strong interest in recruiting and hiring each other's employees, Class Members' wage rates would have been substantially higher during the Class Period absent Defendants' and their coconspirators' conspiracy to suppress and stabilize compensation.

**B.    Conspiracy to Align Worker Compensation**

174.    Beginning by at least May 2003 and continuing to the present day, Defendants and their coconspirators have conspired with each other to fix and suppress the compensation paid to nuclear power generation employees of the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States.

175.    A former Progress and Duke HR executive stated that the nuclear division at Progress had a "separate compensation function" from the rest of the company that "collaborated" with other Nuclear Defendants. She explained that compensation decisions at Progress were "never

made in a silo"—i.e. they were made in partnership with other nuclear power companies. According to the former HR executive: "We would all work together to make sure we were ***in alignment***" on compensation.

176.    The former Progress HR executive explained that coordination of compensation in the nuclear power industry was necessary because the nuclear power companies in her region "were all competing for the same talent." She explained that Progress's goal in collaborating with other nuclear power companies was to pay just the industry average salary and no greater. And she stated that the goal was to avoid paying nuclear power generation employees more than was necessary: "We didn't want to pay outrageous salaries."

177.    The former Progress HR executive described examples of how Nuclear Defendants "work[ed] together" to harmonize compensation. She explained that HR personnel at Progress had "relationships" with counterparts at other nuclear utilities "where we could pick up the phone" and ask them to "share with us your average salary, minimum and maximum, and incentives." She contacted her counterparts at other nuclear utilities once a year "before we did our proposal for salary range adjustments" and, during those calls, "we would talk about what we were proposing." She also explained that Progress and the other Nuclear Defendants participated in detailed compensation surveys, covering a range of positions, so that the nuclear company participants could "make sure they were in line with other nuclear utilities."

178.    The Nuclear Defendants and coconspirators carried out their conspiracy to suppress compensation through several mutually reinforcing overt acts, including:

- Directly exchanging confidential union CBAs containing current and future wages and benefits information through a CBA Repository only accessible to Nuclear Defendants and coconspirators;

- Directly exchanging current and future wage and benefits information for unionized employees through Compensation Comparison Reports that were coordinated by Defendant Exelon;

- Conducting annual in-person meetings between Nuclear Defendants' senior executives, during which they reviewed compensation survey results, CBAs, and the Compensation Comparison Reports and discussed and fixed the compensation paid to Class Members; and

- Engaging in direct bilateral and multilateral email and telephonic communications among the Nuclear Defendants' and coconspirators' executives to exchange current and future compensation data and align Class Members' compensation.

179.    Defendants formed and implemented the conspiracy in order to reduce the Nuclear Defendants' labor costs and maximize their profits. In the absence of the conspiracy, the Nuclear Defendants, their subsidiaries, and related entities would have competed with each other for labor during the Class Period by offering higher wages, higher salaries, and superior benefits to Class Members. The conspiracy permitted the Nuclear Defendants to restrain competition for nuclear power generation workers and thus reduce labor costs.

### 1.    The Nuclear Human Resources Group

180.    During the Class Period, each Nuclear Defendant was an active member of NHRG, an industry organization that consists of all the commercial nuclear power companies in the United States and Canada. NHRG provided the organizational structure through which the Nuclear Defendants and coconspirators implemented the conspiracy.

181.    NHRG was originally formed in 1988 by Rick Habegger, then a Human Resources Manager at FPL, as a committee of the industry association Edison Electric Institute ("EEI"). In

1995, NHRG separated from EEI, and Habegger's consulting firm, HRS&S, was retained to manage NHRG. That same year, NHRG began hosting annual benchmarking conferences. In 2014, David Heler, head of the consultancies Human Resource Consultants, LLC and Accelerant, took over as manager of NHRG.

182.    NHRG was designed in part to coordinate the previously disparate compensation practices of the Nuclear Defendants and coconspirators. According to a former Senior Compensation Analyst at Southern who was an NHRG member for approximately 20 years, when NHRG was formed as an independent organization in 1995, "everybody [was] all over the board with recertification pay, license renewal pay, and shift pay." She stated that NHRG was "designed to improve pay practices." Improving pay practices meant aligning compensation practices across the industry: she explained that "harmoniz[ing]" pay practices "sort of is the goal" of NHRG. She added: "You don't want one person doing what the others aren't."

183.    During the Class Period, each Nuclear Defendant or one of its affiliates was a member of NHRG and routinely participated in NHRG's surveys, projects, and meetings.

184.    Each member of NHRG paid to participate in the group and its annual conference.

185.    NHRG is governed by an executive committee (also referred to as a "steering committee") composed only of executives employed by Nuclear Defendants and coconspirators. NHRG executive committee membership includes only the highest-level human resources personnel, such as vice presidents, directors, or managers at the Nuclear Defendants and coconspirators. According to a former executive at Southern Company, the NHRG Steering Committee determined the location and "overarching theme" for the following year's conference. The steering committee also "hash[ed] out ideas for roundtables" and sent out proposed topics for

the conference. NHRG members voted on which topics were to be discussed at that year's conference.

186.    The steering committee met independently of the NHRG "to establish the purpose" of the group and determine what they "were going to try to accomplish" for the group.

187.    NHRG operated multiple "Project Teams." Two of those teams—the "Labor Relations Project" and the "Total Rewards Project"—played instrumental roles in implementing the conspiracy. The Labor Relations Project relied on CBAs and data contained therein to harmonize hourly wages across the industry, and the Total Rewards Project relied on surveys to align both hourly wages and salaries. Both the Labor Relations Project and the Total Rewards Project conducted (at least) annual in-person meetings, during which Nuclear Defendants' executives discussed and aligned compensation rates.

188.    During part or all of the Class Period, all Nuclear Defendants had at least one representative who served on both the Labor Relations and Total Rewards Project Teams.

189.    The Labor Relations Project and the Total Rewards Project have their own steering committees and establish their own agendas, objectives, and programs.

190.    NHRG—and its Labor Relations Project and Total Rewards Project—facilitated Defendants' conspiracy to suppress compensation in the following manner:

- Creating and maintaining a password-protected online repository of CBAs containing current and future compensation data that was only accessible to NHRG members;

- Maintaining and distributing confidential Compensation Comparison Reports among NHRG members to facilitate the alignment of wages;

- Managing compensation surveys, which were only accessible to NHRG members, to assist with the benchmarking of wages and to help monitor the conspiracy;

- Coordinating annual in-person meetings among NHRG members' executives, during which they reviewed compensation data and fixed compensation rates; and

- Maintaining a contact list of executives responsible for compensation at each NHRG member to facilitate bilateral and multilateral compensation discussions between them.

### 2. The Nuclear Defendants Unlawfully Exchanged Compensation Information through a Collective Bargaining Agreement Repository

191. During the Class Period, Defendants maintained a repository of current collective bargaining agreements that contained current *and future* wages and benefits for positions in nuclear power generation at the Nuclear Defendants and coconspirators ("CBA Repository"). The goal and result of the CBA Repository was to stabilize and suppress Class Members' compensation.

192. NHRG's Labor Relations Project maintained the CBA Repository. The Labor Relations Project was designed to establish and maintain the CBA Repository and provide a forum for human resources executives to communicate among each other regarding compensation and other issues relating to labor relations.

193. All Nuclear Defendants participated in the Labor Relations Project.

194. The CBA Repository maintained by the Labor Relations Project was a digital collection of CBAs for nuclear power plants with a unionized workforce. Each CBA contained detailed information concerning wages and benefits paid to employees in specific positions at specific nuclear power plants.

195. During the Class Period, the CBA Repository was accessible on NHRG's or its consultants' websites only with a confidential password that was distributed to participating Nuclear Defendants.

196. Each Nuclear Defendant participated in the CBA Repository.

197.    The CBA Repository allowed the Nuclear Defendants to readily identify current and future hourly wages paid by a particular Nuclear Defendant or coconspirator at each of its individual unionized nuclear power plants. A former Workforce Relations Manager at NMC stated that the CBAs in the Repository were current, updated contracts and reported "benefits and hourly wages paid to their employees."

198.    The compensation information contained in the CBA Repository was competitively sensitive and confidential. According to a former Director of Compensation at Exelon, information about employees' compensation was sensitive because the nuclear power industry was a smaller industry with a dearth of qualified candidates. The CBA Repository was restricted only to Nuclear Defendants and coconspirators, and the information contained in the CBA Repository was proprietary and could only be used with the participants' permission.

199.    The Nuclear Defendants and coconspirators maintained a give-to-get policy for the CBA Repository. Habegger restricted access to the CBA Repository only to the participating Nuclear Defendants and coconspirators, each of which provided (and was required to provide) updated CBAs to Habegger.

200.    The CBA Repository was also restricted only to select personnel at each Nuclear Defendant and coconspirator. A former HR executive at FPL who was unaware that his former employer participated in the CBA Repository stated that sharing collective bargaining agreements with other nuclear power companies was a "no go" and "the line" that should not be crossed. Likewise, a former Compensation and Benefits Manager at PSEG, who was also unaware that his former employer participated in the CBA Repository, stated that union CBAs were "maintained internally" and "never shared . . . with anyone else."

201.    A former director at the International Brotherhood of Electrical Workers ("IBEW"), the largest union representing nuclear power generation workers, who was responsible for nuclear bargaining units during the Class Period, explained that the IBEW does not share union contracts or wage information contained in union CBAs with nuclear power companies who were not parties to the CBA. The IBEW "understood that you don't share information outside of your negotiations" because it was both confidential and advantageous to the utility negotiating against the union. The director explained that "[i]f I give that information to another company that's negotiating with a different local, then I'm giving that company an advantage over the brothers and sisters in that local." There is "no reason for someone to do that," and the policy within the IBEW of declining to share nuclear CBAs with nuclear power companies was "absolute." This was confirmed by a former HR executive at FirstEnergy, who stated that "unions aren't very sharing with management." When a labor manager at FirstEnergy needed a union agreement from another plant, she contacted her human resources counterpart at the other nuclear power company and asked for it.

202.    The compensation information exchanged through the CBA Repository was immensely useful to the Nuclear Defendants. It allowed the Nuclear Defendants and coconspirators to exchange confidential data regarding current *and future* wages at their respective nuclear power plants that otherwise was not practically accessible to their competitors. Indeed, collective bargaining agreements that contained compensation information for unionized plants were not publicly disclosed and were closely guarded until the data became outdated.

203.    A former Workforce Relations Manager at Nuclear Management Company stated that "one of the big projects" of the NHRG "was to put together a library of CBAs that were part of the group." He said, "[w]e shared our collective bargaining agreements among ourselves" so

"we had an idea of what other companies were doing outside of our own" and knew "what was going on at facilities as far as negotiations w[ere] concerned." His role involved "gathering a bunch of contracts so that [NMC] could compare and contrast."

204.    The Nuclear Defendants and coconspirators routinely relied on the CBA Repository to determine and stabilize hourly wages for nuclear power generation workers. Specifically, the Nuclear Defendants used the CBA Repository both when they were conducting internal wage reviews to modify their compensation schedules and also when establishing wage schedules in collective bargaining agreements.

205.    The CBA Repository impacted non-unionized employees because each Nuclear Defendant sought to maintain wage parity across the company. When the Nuclear Defendants employed both unionized and non-unionized employees in the same position, they sought to keep compensation levels the same or similar—i.e. maintain internal equity. A former labor manager at Entergy explained that Entergy "kept a careful eye on bargaining and non-bargaining wages to the extent we didn't want to disenfranchise our non-bargaining workers." According to a former HR executive at FirstEnergy, FirstEnergy carefully reviewed compensation across the country to ensure that non-union employees were paid commensurately with union employees. When a negotiated wage increase would apply to unionized employees based on their CBA, FirstEnergy imposed a commensurate increase in wages for non-unionized employees.

206.    Compensation offered for unionized positions also informed non-union compensation for supervisory positions. According to a former labor manager at Ameren, non-bargaining "exempt" salaried employees were impacted by negotiated CBA wages because Ameren "would look to those nonexempt people as a feeder for [non-union] supervisor jobs." This was confirmed by a former compensation executive at Exelon who stated that Exelon paid

attention to compensation paid to union employees when setting compensation for supervisor positions.

### 3. The Nuclear Defendants Unlawfully Exchanged Compensation Information through Compensation Comparison Reports

207. Using data obtained from the CBA Repository and directly from other Nuclear Defendants, Defendant Exelon created Compensation Comparison Reports, which included tables in an Excel spreadsheet that compared nuclear power generation employees' wages and benefits across the industry. The Compensation Comparison Reports were published twice per year.

208. The Compensation Comparison Reports created by Exelon not only displayed Nuclear Defendants' current and future wages, but also provided an analysis of industry-wide wages and identified compensation trends across the nuclear power industry.

209. During the Class Period, the Compensation Comparison Reports were accessible on NHRG's or its consultants' websites only with a confidential password that was exclusively distributed to participating Nuclear Defendants.

210. Each Nuclear Defendant participated in the Compensation Comparison Reports.

211. For each nuclear power plant, the Compensation Comparison Reports identified: current wages for key positions, future percentage increases for those wages, and detailed benefits information.

212. The wage increase information contained in the Compensation Comparison Reports included planned wage increases up to six years into the future. Accordingly, the Compensation Comparison Reports allowed the Nuclear Defendants not only to compare their *current* hourly wages at each of their respective nuclear power plants, but also to compare planned *future* wage increases at those plants.

213.    Like the CBA Repository, the compensation information included in the Compensation Comparison Reports was competitively sensitive and confidential. As explained by a former HR executive at FPL, the information contained in the Compensation Comparison Reports about ongoing negotiations was especially sensitive: "Whatever is going on from a negotiation standpoint is confidential information." Union negotiations were so sensitive and private at FPL that non-compensation human resources employees were not informed of the terms until a CBA was ratified. According to the former HR executive, any nuclear power company that shared information about ongoing negotiations with the union outside of the company showed "poor judgment."

214.    The Compensation Comparison Reports allowed the Nuclear Defendants and coconspirators to easily compare current and future wage information when setting wages and negotiating with unions. The compensation analysis presented by Exelon facilitated coordination and stabilization of compensation by the Nuclear Defendants and coconspirators.

215.    The Compensation Comparison Reports allowed the Nuclear Defendants to readily identify the current and future hourly wages paid by a particular Nuclear Defendant or coconspirator at each of its individual unionized nuclear power plants. A former labor manager at Exelon explained that the Compensation Comparison Reports provided "unblinded" compensation data, including the "hourly rate for each [job] classification."

216.    The Nuclear Defendants used compensation information exchanged through the Compensation Comparison Reports to implement their conspiracy to suppress wages, both when conducting internal wage reviews to modify their compensation schedules and when negotiating with unions to establish wage schedules in collective bargaining agreements. According to a

former labor manager at Exelon, Exelon "relied" on the Compensation Comparison Reports when negotiating its own wages with unions because Exelon knew "that info [was] pretty accurate."

### 4. The Nuclear Defendants Discussed and Suppressed Compensation at Annual Meetings

217. The Nuclear Defendants and coconspirators exchanged confidential current and future compensation data, and discussed and aligned compensation rates, during three in-person meetings, each of which was held at least annually: NHRG's annual conferences, NHRG's Labor Relations Project meetings, and NHRG's Total Rewards Project meetings.

### a. NHRG Annual Conferences

218. Since 1995, NHRG has held annual conferences that facilitated the sharing of competitive compensation information between Nuclear Defendants and the suppression of compensation. The annual conference was usually hosted by a Nuclear Defendant, as set forth below:

| Conference Date | Host | Location |
| --- | --- | --- |
| April 1995 | CP&L (predecessor to Duke Energy Carolinas) | Raleigh, North Carolina |
| April 1996 | PECO (predecessor to Exelon) | Philadelphia, Pennsylvania |
| April 1997 | PG&E | San Francisco, California |
| April 1998 | Consumers Energy & DTE | Ypsilanti, Michigan |
| April 1999 | Duke | Charlotte, North Carolina |
| April 2000 | APS | Phoenix, Arizona |
| March 2001 | NEI | Orlando, Florida |
| May 2002 | TVA | Nashville, Tennessee |
| May 2003 | Southern Company | Mobile, Alabama |

| Conference Date | Host | Location |
|---|---|---|
| April 2004 | Entergy | New Orleans, Louisiana |
| April 2005 | Institute of Nuclear Power Operations ("INPO") | Atlanta, Georgia |
| May 2006 | FPL | Palm Beach Gardens, Florida |
| May 2007 | Exelon | Chicago, Illinois |
| May 2008 | Luminant / STP | Fort Worth, Texas |
| May 2009 | INPO | Atlanta, Georgia |
| May 2010 | Duke | Charlotte, North Carolina |
| May 2011 | APS | Phoenix, Arizona |
| May 2012 | Constellation | Baltimore, Maryland |
| May 2013 | STP | Houston, Texas |
| May 2014 | FirstEnergy | Cleveland, Ohio |
| May 18-21, 2015 | TVA | The Chattanoogan Hotel, Chattanooga, TN |
| May 1-4, 2017 | NextEra | Wyndham Grand Jupiter, Jupiter, Florida |
| May 7-10, 2018 | Entergy | Hyatt Regency Hotel, New Orleans |
| May 21-22, 2019 | APS | Kimpton Hotel, Phoenix, Arizona |

219.    At annual conferences held during the Class Period, NHRG held round table sessions during which the Nuclear Defendants and coconspirators discussed compensation in the nuclear power industry.

220.    A former Senior Compensation Analyst at Southern who led the compensation round table session at NHRG annual conferences stated that the conversation during the session

was "pay-focused" and the members would review survey results (including the WTW Surveys) during the session. She stated that participants would confirm whether their compensation practices aligned with the survey results: "If we were reviewing survey results, people might say 'That's in line with what we do.'"

221.     The annual NHRG conference also involved job matching sessions in which members would compare the job requirements and responsibilities of particular positions and confirm that positions reported to WTW for inclusion in its surveys were sufficiently similar across the industry. This allowed the NHRG members to ensure that WTW Survey results provided useful compensation information for each participant.

222.     Compensation was regularly discussed at NHRG conferences. According to a former compensation executive at Exelon, NHRG members would frequently ask other members to share their starting wage rates during the conference. And a former Senior Compensation Analyst at Southern stated that nuclear-specific compensation surveys were a topic of group discussion at the NHRG conference every year. A former HR executive at FirstEnergy said that during the annual conferences, members were "pretty open to shar[ing] data and best practices" on HR policies, compensation, and benefits. And a former HR executive at APS stated that NHRG members discussed general merit increases for salaried employees during the annual conference.

223.     A former Workforce Relations Manager at NMC stated that one purpose of the NHRG conference was to compare compensation across the nuclear power companies. He confirmed that current CBAs for both hourly and salaried employees were exchanged and reviewed during NHRG conferences.

224.     A former HR executive at FirstEnergy said that the information obtained from the annual NHRG conferences was "invaluable" to FirstEnergy's compensation team.

### b.        The Labor Relations Project and Meetings

225.    NHRG's Labor Relations Project conducted its own meetings between Nuclear Defendants' executives to discuss and align wage rates.

226.    Participants in the Labor Relations Project met each year for benchmarking and to exchange nuclear power CBAs and review the Compensation Comparison Reports. The Labor Relations Project meetings took place in-person each year during the Class Period, prior to or during the annual NHRG conference. During the NHRG annual conference, members of the Labor Relations Project "would break off into subgroups" or "subcommittees" to conduct their meetings.

227.    Members of the Labor Relations Project discussed compensation during their annual meetings. A former Entergy Labor Relations Manager who participated in the Labor Relations Project meetings said, "[o]f course, wages would be discussed" and that the purpose of meetings was to report "data points" and "outcomes" of labor negotiations. The Labor Relations Manager said that "it mattered" to Entergy when other utilities "negotiated new bonuses with reactor operators." She said, "[w]e paid a lot of attention to that and made decisions accordingly." She also stated that members of the Labor Relations Project "would share what those outcomes were" including decisions regarding pay, such as the amount that a particular plant's bonuses would increase.

228.    A former HR executive at FirstEnergy stated that the CBAs contained in the CBA Repository were discussed during Labor Relations Project meetings. The Project members were "asked to share their collective bargaining agreements so [conference participants] could look at them."

229.    Wage discussions during Labor Relations Project meetings were not limited to executed union contracts and addressed future wages in *draft* CBAs that were not yet final or approved by the unions. According to a former labor manager at Entergy, "[e]very time we met

there was some cluster of [nuclear] plants that would have contract expirations come up and new negotiations happening," and members of the Labor Relations Project would discuss and coordinate the anticipated compensation outcomes of "pending" labor negotiations that were not yet complete.

230.    The former Entergy labor manager further stated that the Labor Relations Project discussed other methods to improve the employers' negotiating positions during union bargaining sessions, including topics relating to "arbitration," "union organizing," and general "lessons learned" from negotiating with unions.

### c.    The Total Rewards Project and Meetings

231.    NHRG's Total Rewards Project conducted its own meetings between Nuclear Defendants' executives to discuss and align compensation rates.

232.    The Total Rewards Project provided a forum for nuclear power companies to benchmark and discuss current and future compensation for nuclear power positions, including with the assistance of compensation surveys.

233.    NHRG first commissioned WTW to benchmark compensation in the nuclear industry in 2001. NHRG and its members developed and designed these compensation surveys and WTW implemented them. For example, according to a Senior Compensation Analyst at Southern, before the nuclear-specific WTW Surveys, "there was nothing out there that addressed . . . pay for [nuclear] operators." So, the Senior Compensation Analyst "helped to design" the nuclear pay practices survey, which focused on compensation for "nuclear operators" and "nuclear security."

234.    WTW conducted surveys of hourly paid workers, exempt salaried employees, and non-exempt salaried employees. The WTW Surveys included entry level positions such as mechanics, as well as control room operators, site vice presidents, and executive roles. A former

Progress and Duke HR executive stated that the Surveys pertained to "whatever classifications" Progress employed at the time, including engineering positions and nuclear technicians.

235. The WTW Surveys provided percentile and average compensation information for various positions in the nuclear power industry. Each reported position had a specific letter code and number assigned to it such that different "tiers" of each position were reported by respondents, depending on seniority level. The WTW Surveys also provided detailed benefits information.

236. The WTW Surveys were relied upon for benchmarking compensation in the nuclear power industry. In a February 2024 report to the Minnesota Public Utilities Commission, Xcel Energy stated that "[t]he nuclear industry standard compensation benchmarking survey is the Willis Towers Watson Energy survey." A former labor manager at Entergy stated that the WTW Surveys were a "big value" to Entergy's compensation and benefits team.

237. The WTW Surveys were discussed during annual dedicated compensation sessions of the Total Rewards Project.

238. The Total Rewards Project held annual meetings in the same location as the NHRG annual conference, and sometimes held additional meetings in between NHRG conferences. In some years, the Total Rewards Project meetings occurred just before the NHRG annual conference; in other years, they occurred during the conference.

239. The Nuclear Defendants relied on the survey data secured by the Total Rewards Project, in combination with the related compensation discussions conducted at the Project's annual meetings, to set salaries and other compensation rates.

240. According to a former HR executive at Progress and Duke, survey administrators "massage[d]" data from the Nuclear Defendants into a survey report so that each Nuclear Defendant could "make sure they were *in line* with other nuclear utilities."

241.    In a February 2024 report to the Minnesota Public Utilities Commission, Xcel Energy stated that when setting compensation it "leverages a membership through the Nuclear Human Resource Group (NHRG) for survey participation and industry peer benchmarking." Specifically, Xcel Energy set compensation rates that "matched to the market median, or 50th percentile" of the WTW Surveys. PSEG likewise kept their salaries to the survey median, stating that they, "benchmark our industry peers to ensure we are within five percent of the group average and adjust as the market changes."

242.    STP used WTW Survey data to establish "midpoints" aligned with the average salary reported in the WTW Surveys. A former compensation employee at STP stated that she would never "exceed a certain percentage of the midpoint" established by the WTW Survey when recommending salary adjustments. At STP, "[a] lot of time and effort went into survey analysis."

243.    A former HR executive at Duke stated that compensation within the nuclear power industry was "probably . . . fairly consistent" across companies because each "look[ed] at the same survey data to determine market rates" for their positions.

244.    A former compensation employee at DTE adhered to the company's practice of "controlling to the midpoint," which was a "euphemism" for not paying more than the midpoint of a specific salary range. For example, if the salary range was $20 per hour to $40 per hour, "you weren't supposed to rise above 30."

245.    A former Senior Compensation Analyst at Southern also explained that she used nuclear-specific compensation survey results and insights gathered from in-person meetings to inform her negotiations with labor unions.

5.  **The Nuclear Defendants Discussed and Suppressed Compensation through Direct Email and Telephone Communications**

246.  Throughout the Class Period, the Nuclear Defendants' senior executives with the authority to determine or influence compensation of Class Members directly contacted one another to obtain information about and align their current and future compensation rates and practices.

247.  A central benefit of NHRG was a robust contact list, designed to facilitate communications and benchmarking throughout the year by NHRG and individual nuclear power companies. According to a former HR executive at FPL, NHRG's contact list was created so that human resources executives could reach out to one another.

248.  A former labor manager at Exelon stated: "there's no doubt in my mind that there was a lot of collaboration and information sharing between many big nuclear companies in regards to union details." He stated that nuclear power companies shared information "all the time," and they did so for the "specific reason" of "trying to screw the union."

249.  The Nuclear Defendants and coconspirators had a give-to-get policy for exchanging compensation information. A former compensation executive at DTE stated that DTE agreed with other nuclear power companies: "We'll share information if you'll share with us."

250.  A former HR executive at Progress and Duke stated that Progress contacted human resources representatives at other nuclear power companies directly to obtain compensation information. Compensation and human resources personnel at Progress had "relationships" with personnel at other nuclear power companies where they would "pick up the phone" and call their counterpart at another Nuclear Defendant or coconspirator. The Progress representatives asked the other Nuclear Defendants and coconspirators whether they would be willing to share "average salary, minimum and maximum, and incentives" information. The other Nuclear Defendants and coconspirators readily shared critical salary information with Progress, and in exchange, Progress

shared its compensation information with them. When exchanging compensation data with other nuclear power companies, Progress shared the salary range adjustments that it planned to propose in the future (i.e., non-finalized changes to Progress's salary ranges). Progress typically conducted these compensation data exchanges once per year before its human resources personnel proposed "salary range adjustments." This and similar practices allowed Progress and other Nuclear Defendants to confirm alignment with other industry participants before finalizing their compensation changes.

251. According to a former labor manager at Exelon, he would contact executives at other nuclear power companies prior to union negotiations to "gather" confidential wage information. He stated that he "would literally call up HR folks at all nuclear facilities . . . and ask them their rates." Often, the executives at other nuclear power companies provided this information to him orally over the telephone.

252. A former compensation executive at DTE stated that he contacted other nuclear power companies to inquire about pay for specific positions. He explained that he would ask another nuclear power company, "What are you paying your operators?" The other company would respond, "We are paying x." The former compensation executive stated that he would obtain from other nuclear power companies: the number of full-time employees the other plant had in a position at a particular level (e.g., nuclear operator 1), and the pay range for those jobs (e.g., $22 per hour minimum to $54 per hour maximum). The former compensation executive stated that he would typically report to his superiors that he "had a conversation with someone in St. Louis [where Ameren is headquartered] or Chicago [where Exelon is headquartered] and their ranges are similar to ours."

253.    A former labor manager at Ameren stated that he would "get copies of [union] contracts from other utilities to get a sense of their wages and benefits." To obtain another company's CBA, he would "call the plant up and ask for a copy." Among others, the former HR manager stated that he obtained union CBAs containing wage and benefits information from Wolf Creek, WEC Energy, and plants formerly operated by Commonwealth Edison (a predecessor to Exelon). He used the wages and benefits information from these other plants to inform his own labor negotiations.

254.    A former HR executive at FirstEnergy stated that labor managers at FirstEnergy contacted counterpart labor managers at other nuclear power companies to ask them directly to share union CBAs. According to this former executive, members of the NHRG corresponded regularly by phone and email to exchange best practices and data.

255.    A former labor manager at STP stated that he "would interface with other HR managers" and "sometimes exchanged copies of our [collective bargaining] agreements." Another employee at STP "would sometimes poll [competing] plants for their bargaining unit compensation" and that information was shared with the "corporate labor relations people" at STP. This employee "contact[ed] her compensation peers at other plants" for both bargaining unit and non-bargaining unit compensation information.

256.    A former labor manager for the Callaway Energy Center said that he "typically call[ed]" competing nuclear plants to "ask for a copy" of their union contracts "to get a sense of their wages and benefits."

257.    A former labor manager at Exelon, who was familiar with the nuclear-specific compensation survey results provided by WTW and other third-party consultants, said that the

reports included a "combination" of both blinded and unblinded data but "the bottom line" was that "if you called" participating companies, "you could get" which data they reported.

258.    According to Maria Korsnick, former Senior Vice President of Operations at Exelon and Chief Nuclear Officer ("CNO") at Constellation, "you have all the CNOs on speed dial. And that's sort of one compliment that I would give sort of the US and the whole US fleet is that at any moment, I could call another CNO."

259.    Outside of the conspiratorial agreement to exchange information and stabilize wages, the compensation information shared in these direct exchanges was highly confidential. According to a former HR employee at Talen, sharing compensation information would be "divulging confidential or proprietary information" and he would "question whether [it] was appropriate" to "divulge[] rates to someone else."

**6.    The Conspiracy Resulted in Parallel Limits on Defendants' Wage Increases and Harmonization of Defendants' Wages**

260.    As a direct consequence of their conspiracy to suppress compensation, the Nuclear Defendants simultaneously and in parallel limited their annual wages and wage increases to Class Members employed in nuclear power generation. Absent this conspiracy in a competitive market, Defendants would not have aligned their compensation and compensation increases and would have paid higher annual wages and wage increases to Class Members.

261.    At this preliminary stage, Nuclear Defendants' compensation data is not public. But based on the small amount of information available to the Plaintiffs at this stage, Defendant Processors' wage alignment is evidence of the conspiracy.

262.    For example, in 2015 and 2018, Exelon paid wage increases of 2.5% to nuclear power plant workers at its Illinois plants and Oyster Creek plant. These 2.5% increases matched

*exactly* the increases at PPL's Susquehanna plant in 2015 and 2018. And in 2014, Exelon's Illinois plants and PPL's Susquehanna plants also increased in parallel and were limited to 2.5%.

263.    As a further example, in 2020, Exelon paid non-licensed nuclear operators at its Oyster Creek plant $43.84 per hour, which is exactly the same rate—to the penny—as FPL paid its non-licensed nuclear operators at its Saint Lucie and Turkey Point plants. And, in 2019, Exelon paid electrical maintenance workers $43.63 per hour, which is exactly the same rate—to the penny—as FPL paid its electrical maintenance workers that year.

### 7.    Plus Factors That Render the Nuclear Power Industry Susceptible to Collusion

264.    The nuclear power industry is characterized by numerous features, or plus factors, that render the industry particularly susceptible to collusion and bolster the plausibility of the conspiracy alleged herein. These include: (1) extraordinarily high barriers to entry; (2) industry concentration; (3) fungibility of nuclear power plant labor; (4) inelastic labor supply; (5) numerous opportunities to collude, and (6) a history and culture of collaboration among the Nuclear Defendants.

265.    The nuclear power industry is characterized by extraordinarily high barriers to entry. To construct a new nuclear power plant, a company must engage in an arduous and bureaucratic process before regulatory agencies approve the plant. Nuclear power plants are licensed and regulated by the Nuclear Regulatory Commission (the "NRC"). To obtain a license for a new plant, the NRC requires that a nuclear power company complete a safety review, an environmental review, and an antitrust review. After the NRC receives an application to license a new power plant, it holds several public meetings and hearings. Depending on the type of plant, license applications take approximately 42 months to be approved by the NRC. Even after the

NRC grants a license, it continues to oversee the construction and operation of the plant for its entire lifetime.

266.    A nuclear power plant is also extremely costly to build, and capital costs can generally only be recouped after decades of operations. The cost of constructing a single nuclear reactor is approximately $5 to $10 billion. As a result, only three new nuclear power reactors and no new nuclear power plants have been built in the last two decades in the United States.

267.    Other barriers to entry include the high costs of operating nuclear power plants; intense competition from increasingly efficient non-nuclear power sources, including natural gas, coal, wind, and solar; the challenge of finding a workforce that requires extensive and specific training; and compliance with onerous federal and state government mandates and regulations. It is exceptionally expensive and logistically complex for new nuclear power companies to emerge and compete with the Nuclear Defendants.

268.    The nuclear power industry is highly concentrated. The top ten nuclear power companies control more than 70 percent of the market for nuclear-generated electricity. Those ten companies correspondingly demand approximately 75 percent of the total demand for nuclear power generation labor.

269.    Because nuclear power generation workers possess specialized knowledge and skills specific to the nuclear power industry, nuclear power companies view the power generation workers that comprise the Class as fungible within the industry. Workers within the same positions are generally treated as interchangeable among Nuclear Defendants, permitting the Nuclear Defendants to readily compare and match each other's compensation levels.

270.    The market for nuclear power generation workers is characterized by inelastic labor supply. Industry-wide changes in compensation rates do not substantially affect the rate of

participation in nuclear power positions. Nuclear power jobs are highly specialized to the operations of nuclear power plants in particular, which makes the skills possessed by a nuclear engineer or nuclear operator non-transferable to other types of employment. Many of the jobs in nuclear power generation also require nuclear-specific licenses, which command a premium in pay that cannot be transferred to other types of employment.

271.    The nuclear power industry is ripe with opportunities for Defendants to collude. The nuclear power industry coordinates extensively on matters of operating nuclear plants, complying with laws and regulations, and lobbying government decision-makers. Its executives maintain frequent contact in connection with these joint efforts, which gives rise to countless opportunities for collusion.

272.    In addition to attending the annual NHRG conferences and the regular meetings of the Labor Relations Project and Total Rewards Project, the senior executives of Nuclear Defendants responsible for determining compensation attended multiple other in-person meetings during the Class Period. Many of those meetings were sponsored by trade associations that advocate for the interests of the Nuclear Defendants. Those meetings include:

a.    *American Nuclear Society:* American Nuclear Society ("ANS") is an organization that advocates for using nuclear science and technology for civilian purposes. ANS hosts several meetings and conferences every year. Defendants Constellation, Duke, Vistra, and Southern are members of ANS. ANS hosts the annual Utility Working Conference and Vendor Technology Expo, which is attended by human resources executives from many of the Nuclear Defendants and coconspirators. Beginning in 2022, NHRG began hosting meetings in conjunction with ANS at this annual conference. On August 9, 2022, NHRG hosted a roundtable discussion titled

"Nuclear Pay & Benefits / Roundtable Discussion." The description of the event states: "Industry standards, aging and inflation are causing changes to pay and benefits within the nuclear industry." In 2023, NHRG hosted a session titled "Total Rewards Roundtable" during the UWC annual conference. This session included presentations on "competitive salaries, and hiring strategies."

b.    *Edison Electric Institute:* Edison Electric Institute ("EEI") is a trade association that represents all U.S. investor-owned electric companies. EEI hosts several meetings and conferences every year that are attended by executives of the Nuclear Defendants and coconspirators. For example, Steve Powell, President and CEO of SCE; Patti Poppe, CEO of PG&E; Calvin Butler, CEO of Exelon; Chris Womack, Chairman President and CEO of Southern; and Jose Esparza, Senior Vice President of Public Policy of APS, attended EEI's 2024 annual conference. Nearly all Nuclear Defendants are also members of EEI.

c.    *Nuclear Energy Institute:* NEI is a U.S. policy and technical organization focused on the commercial nuclear power industry. NEI hosts several meetings and conferences every year that are attended by executives of the Nuclear Defendants and coconspirators. Some of those meetings are focused on compensation. All the Nuclear Defendants are also members of NEI.

d.    *United States Nuclear Industry Council:* the United States Nuclear Industry Council ("USNIC") is a business advocate for advanced nuclear energy and promotion of the American supply chain. USNIC has several working groups, congresses, and conferences, some of which may only be attended by members,

every year. Defendants Constellation, Duke, Southern, Xcel, and TVA are members of USNIC.

273. The nuclear power industry is characterized by a unique culture of collaboration across its operations and management functions. Before deregulation, each nuclear power utility was entitled to an exclusive monopoly on the provision of electricity in their allotted region. For that reason, nuclear power plants historically did not compete in the product market for electricity. This culture of cooperation throughout the nuclear power industry persists and remains strong. As explained by Maria Korsnick, former Chief Nuclear Officer at Constellation, there is a "camaraderie" among nuclear power companies: "If you're running a nuclear plant, I want you to run that nuclear plant the best way that you can, right? And so it's at the heart of why are we being so transparent? Why do we share that information? It is literally because, yeah, we might be competing in the marketplace, but you know what? I want you to have a really effective and efficiently running power plant."

## C.    Market Power of the Nuclear Defendants and Coconspirators

### 1.    Direct Evidence of Market Power

274. The strongest evidence that the Nuclear Defendants and coconspirators collectively possessed the requisite *power* to suppress compensation for nuclear power generation workers is that they *actually* suppressed such compensation during the Class Period. As detailed above in section VI.B, numerous former employees confirmed that Defendants used a multi-faceted strategy—including the CBA Repository, Compensation Comparison Reports, three annual in-person meetings, compensation surveys, and direct communications between executives—to suppress wages, salaries, benefits, and other compensation paid to nuclear power generation workers.

275.    The Nuclear Defendants regularly participated in and accessed the CBA Repository to exchange detailed current and future information about, and facilitate the fixing of, compensation provided to their nuclear power generation workers in the United States.

276.    The Nuclear Defendants regularly participated in Compensation Comparison Reports organized by Exelon to exchange detailed current and future information about, and facilitate the fixing of, compensation provided to their nuclear power generation workers in the United States.

277.    The Nuclear Defendants convened annual NHRG conferences and annual meetings of the Total Rewards Project and Labor Relations Project, where their executives exchanged and discussed current and future compensation rates and reached agreements to suppress Class Members' compensation.

278.    Executives from the Nuclear Defendants discussed, compared, and further suppressed compensation through direct communications. Those conspiratorial communications consisted of telephonic discussions between the Nuclear Defendants' executives to disclose and harmonize their current compensation rates and projected compensation increases.

279.    Finally, the Nuclear Defendants' and coconspirators' meetings and data exchanges were costly: they paid for membership in NHRG, the annual conference, and the WTW survey; spent time and money answering detailed survey questions, exchanging CBAs, and calling each other on the phone to solicit compensation information; and exposed themselves to legal liability. The Nuclear Defendants and coconspirators would not have assumed these costs and legal risks unless they collectively had the power to use these meetings and data exchanges to suppress compensation. This indicates that the Nuclear Defendants and coconspirators believed and acted

as though they had the market power to profitably suppress salaries, wages, benefits, and other compensation.

### 2. Indirect Evidence of Market Power

#### a. Product or Services Market

280. The relevant market is the labor market for employment in commercial nuclear power generation in the United States ("Relevant Market").

281. A cartel that controlled all of the Relevant Market, as the Nuclear Defendants and coconspirators collectively do here, could profitably suppress compensation paid to nuclear power generation workers to levels below those that a competitive labor market would set. In such circumstances, nuclear power generation workers would not be able to defeat artificial compensation suppression by switching their employment to other non-conspiring nuclear power companies, as there are no such companies.

282. There are no close economic and/or functional substitutes for employment in nuclear power generation from the perspective of nuclear power generation workers.

283. Nuclear power generation jobs are highly specialized and require extensive training. Many nuclear power generation employees require specialized, advanced scientific or technical degrees before they are hired.

284. Every nuclear power plant has site access standards that a prospective employee must satisfy to even gain access to the nuclear power plant. To gain access, nuclear power plants typically require an employment history review, military history review, criminal history review, credit history review, education history review, interviews with provided references, drug and alcohol screening, and psychological screening.

285.    Once they are hired, nuclear power generation employees must undergo extensive security training and job-specific training. Some nuclear power generation positions, such as licensed nuclear officers, require licenses from the Nuclear Regulatory Commission.

286.    Unskilled and low-skilled jobs are not reasonable substitutes for work in nuclear power generation. Nuclear power generation employees make well above the national median pay and could not move to employment at non-nuclear companies without an appreciable drop in pay. The annual mean wage for all occupations in the United States as of May 2023 was $65,470. The annual mean wage for nuclear operators in the United States as of May 2023 was $121,240. This wage premium reflects the extensive education, licensure, training, and security requirements of working in nuclear power generation.

287.    The Nuclear Defendants and coconspirators value the skills possessed by nuclear power generation workers and recognize that such skills are differentiated from those necessary for other jobs. Hiring labor from unskilled or low-skilled positions was not desirable or feasible because of the highly technical requirements of working in nuclear power generation.

288.    A former HR executive at FirstEnergy stated that FirstEnergy was not interested in benchmarking its positions against non-utility employers such as Walmart or Amazon. And nuclear power companies do not tend to hire engineers from other types of electric utilities. According to Bryan Hanson, Executive Vice President and Chief Generation Officer at Constellation, "we have a propensity to hire nuclear engineers."

289.    Nuclear power companies needed to recruit employees from other nuclear power companies because only such workers possessed the necessary skills and experience. A former labor manager at Exelon stated that "the only way to get experienced nuclear operators" was to recruit them from other nuclear facilities. He explained that nuclear operators were "not a dime a

dozen" and were recruited from other nuclear plants throughout the United States "as long as they had experience."

290.    A former compensation employee at DTE explained that DTE, a Michigan-based utility, wanted to know the compensation for nuclear operators around the country, including in Minnesota, Arizona, and Florida. He explained that DTE "used that data" to determine compensation for nuclear workers because "there aren't that many nuclear plants" in the country.

291.    In setting compensation for their employees, the focus of the Nuclear Defendants was on compensation paid to employees at other nuclear power companies.

292.    The nuclear power generation employee compensation departments at Nuclear Defendants and coconspirators were siloed from the rest of the companies both to keep the conspiratorial conduct a secret and because of the unique and specialized nature of nuclear power positions. A former HR executive at Progress stated that the nuclear division had a "separate compensation function" from the rest of the company that "collaborated" with other nuclear companies. As a former labor manager at Entergy put it, the nuclear power industry was "such a specific, specialized world," which naturally resulted in a nuclear-specific human resources organization (i.e., NHRG).

293.    Each Nuclear Defendant materially increases wages to nuclear power generation workers as they gain greater skill levels. For example, the Nuclear Defendants increase wages systematically for unionized nuclear power generation employees upon reaching certain levels of seniority. The Nuclear Defendants also pay a premium for nuclear operators who are licensed compared to nuclear operators who are not licensed. The wage premium associated with greater skill and experience reduces the substitutability of jobs outside of the Relevant Market and makes remaining in nuclear power generation positions more attractive to workers. In other words, those

higher wages make it costly for a nuclear power generation worker to seek a position outside the Relevant Market, where a prospective employer would not value the skills the worker obtained while working in nuclear power generation.

### b.    Geographic Market

294.    The relevant geographic market is the United States. A small but significant decrease in compensation from the competitive level could be profitably imposed collectively by the nuclear power companies in the United States without causing too many nuclear power generation workers to leave the United States or move to a different occupation.

295.    The Nuclear Defendants set their compensation and recruiting policies for nuclear power generation workers largely on a nationwide basis, and therefore treat such workers as if they were participating in a nationwide labor market. Each Nuclear Defendant establishes compensation for nuclear power generation workers at identical or near identical levels, regardless of the region, state, county, or locality in which those workers are located. Because each Nuclear Defendant and coconspirator establishes the same, or nearly the same, compensation for nuclear power generation workers regardless of geographic region, state, county or locality, conduct that suppresses compensation for those nuclear power generation workers in one location would necessarily suppress compensation for nuclear power generation workers employed by all of the other Nuclear Defendants and coconspirators, their subsidiaries, and related entities throughout the United States.

296.    The nationwide geographic market is further supported by Nuclear Defendants' practice of seeking wage information on a nationwide basis. For example, a former labor manager at Exelon explained that he would contact other executives at nuclear power companies throughout the United States to obtain wage information. A former compensation employee at DTE stated that the survey data DTE used to compare its own employees' compensation to other nuclear

companies reflected nationwide data. A former HR employee at Talen stated that nuclear engineers were recruited from around the country. And a former HR executive at APS stated that nuclear power companies competed for nuclear operators on a nationwide basis.

### c. Collective Market Share and Monopsony Power

297.    The Nuclear Defendants collectively possess market and monopsony power in the Relevant Market in that they have the power, collectively, and through the challenged conduct, to profitably suppress compensation to nuclear power generation workers below competitive levels.

298.    The Nuclear Defendants and coconspirators pay compensation to nuclear power generation workers that comprise 100% percent of the Relevant Market. Every company that hires commercial nuclear power generation labor in the United States participated in the conspiracy.

## D.    Anticompetitive Effects and Injury Suffered by Class Members

299.    As a result of Defendants' anticompetitive conduct alleged herein, competition between the Nuclear Defendants over compensation was restrained or eliminated in the market for workers in nuclear power generation in the United States during the Class Period.

300.    As a result of Defendants' anticompetitive conduct alleged herein, the compensation of workers in nuclear power plants in the United States was fixed, stabilized, or maintained at artificially suppressed levels during the Class Period.

301.    The purpose of the conspiratorial conduct of Defendants was to suppress, fix, or maintain the compensation of workers in nuclear power plants in the United States and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiffs and the Class received compensation at artificially suppressed rates during the Class Period.

302.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having received lower compensation during

the Class Period than they would have received in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiffs and the Class have suffered damages.

303.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

304.    In a competitive market, the Nuclear Defendants and coconspirators would have competed to recruit, hire, and retain workers during the Class Period by offering higher wages, higher salaries, and superior benefits, and many more Class Members would have switched employment to other nuclear power companies as a result of that competition for labor. Yet by entering into the alleged conspiracy and suppressing competition on compensation, the Nuclear Defendants and coconspirators were able to reduce and stabilize the number of Class Members switching employment to other Defendants. Defendants' scheme harmonized compensation to Class Members across the nuclear power industry and thus reduced the incentives for Class Members to switch employment between Nuclear Defendants or coconspirators.

305.    The effects and injuries caused by Defendants' anticompetitive agreement commonly impacted all nuclear power generation workers employed by the Nuclear Defendants and the coconspirators, their subsidiaries, and related entities in the United States because the Nuclear Defendants valued internal equity, the principle that similarly situated employees should be compensated similarly. Each Nuclear Defendant and coconspirator established a pay structure to accomplish internal equity. Each Nuclear Defendant and coconspirator established narrow compensation ranges for nuclear power generation workers in the United States with similar job positions and similar levels of experience and also maintained certain compensation differentials between different nuclear power generation positions.

## VII.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    Continuing Violation

306.    During the Class Period, Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreement described herein.

307.    Defendants' continuing adherence to, enforcement of, and reaffirmation of the anticompetitive agreement throughout the Class Period was and is consummated through, among other conspiratorial acts: direct exchanges of current and future compensation data in fully disaggregated form through the CBA Repository and Compensation Comparison Reports; regular, in-person NHRG conferences, Labor Relations Project meetings, and Total Rewards Project meetings during which the Nuclear Defendants discussed and fixed compensation to Class Members; email and telephonic communications between Defendants to exchange and discuss compensation information and align compensation; and continuing to pay artificially-suppressed compensation to Class Members.

### B.    Fraudulent Concealment

#### 1.    Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct

308.    Plaintiffs and other Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.

309.    Defendants engaged in a secret conspiracy. No facts were revealed publicly or to Plaintiffs that would have put them or the Class on inquiry notice that they were the victims of a conspiracy to suppress compensation paid to nuclear power generation workers.

310.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Commercial nuclear power companies are not exempt from antitrust regulation concerning their conduct in the labor market, and thus Plaintiffs reasonably considered the market for labor in the nuclear power industry to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of wages, salaries, benefits, and other compensation paid by the Nuclear Defendants and coconspirators to nuclear power generation workers in the United States.

311.    Plaintiffs exercised reasonable diligence. Plaintiffs and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and coconspirators to conceal their combination.

312.    Nuclear power generation workers and their union representatives did not believe that the Nuclear Defendants and coconspirators were sharing wage information. In 2025, a former Director of the Utility Department at the International Brotherhood of Electrical Workers who was responsible for supporting over 200,000 utilities workers, stated that the hourly wages and benefits included in union CBAs were highly confidential. He stated in 2025 that, to his knowledge, nuclear power companies did not share wages or benefits information with their competitors because they were concerned that they may lose valuable employees to other companies.

**2.    Defendants Actively Concealed the Conspiracy**

313.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the other Class Members.

314.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to: requiring a username and

confidential password limited to NHRG members to access the CBA Repository; requiring a username and confidential password limited to NHRG members to access Compensation Comparison Reports; requiring a username and confidential password limited to NHRG members to access the web pages for the Labor Relations Project and the Total Rewards Project; conducting secret meetings that excluded non-conspirators; engaging in surreptitious communications that did not create or involve written records; instituting give-data-to-get-data requirements so that no company could access the sensitive compensation data exchanges unless it provided data of its own; and concealing the existence and results of compensation surveys.

315.    During the Class Period, Defendants affirmatively and falsely represented that the nuclear power industry paid wages, salaries, benefits, and other compensation reflecting a competitive market for labor. For example, in a February 2024 report to the Minnesota Public Utilities Commission, Xcel Energy claimed: "[t]he compensation levels necessary to recruit and retain experienced nuclear employees are increasing due to the limited number of nuclear plants in the United States and the highly competitive practices employed by other nuclear companies in pursuit of the same experienced personnel."

316.    The Nuclear Defendants also advertised to potential nuclear power generation employees that the compensation offered and provided was "competitive"—i.e., the result of competition in the labor market for nuclear power generation employees. The examples below were promoted on the Nuclear Defendants' websites and in job postings for nuclear power generation positions:

- *AEP.* AEP's Careers website states: "AEP is a premier place to work, with great jobs, competitive pay and benefits, and an inclusive culture that encourages diversity."

- *Ameren*. Ameren's Careers website states: "Ameren's co-workers are our most valuable resource. We offer a competitive and comprehensive benefits package as well as a variety of programs to support work-life balance, well-being and flexible and collaborative work environments for our co-workers."

- *APS*. APS's Careers website states: "APS employees deliver extraordinary service to our customers and communities every day. We do what's right for the people and prosperity of our state. We recognize these efforts by offering competitive compensation packages, in addition to an array of employee benefits and rewards."

- *Constellation.* Constellation's job postings state: "We provide competitive compensation and benefits that support both employees and their families, helping them prepare for the future."

- *Dominion*. Dominion's job postings state: "We offer excellent plans and programs for employees. Employees are rewarded with a competitive salary and comprehensive benefits package which may include: health benefits with coverage for families and domestic partners, vacation, retirement plans, paid holidays, tuition reimbursement, and much more."

- *DTE*. DTE's Employees website states: "To maintain our high-performing workforce now and into the future, we offer our employees a competitive compensation and benefits package."

- *Duke*. Duke's Careers website states: "We know the strength of our company depends upon a high-performing, diverse workforce. That's why we offer a comprehensive rewards package of competitive pay and benefits that allows us to attract the talent we need to succeed."

- *Entergy*. Entergy's Jobs website states: "For our employees, we create value by achieving top-quartile organizational health, providing a safe, rewarding, engaging, diverse and inclusive work environment, fair compensation and benefits, and opportunities to advance their careers."

- *FirstEnergy*. FirstEnergy's Careers website states: "Our employees make important contributions to meeting the challenges of our changing business environment. We are committed to rewarding individual and business unit efforts through our compensation program that includes competitive base and incentive pay."

- *SCE*. SCE's Careers website states: "We offer a competitive Total Rewards Package including a wide selection of health plans, preventive health reimbursement, 401(k) savings plan with company match and automatic company contributions, wellness programs and initiatives, tuition reimbursement, competitive vacation/holiday program, professional development, volunteer programs, employee assistance program, philanthropy and matching contribution program, electric service discount, and many other perks!"

- *Southern*. Southern's job postings state: "Southern Company invests in the well-being of its employees and their families through a comprehensive total rewards strategy that includes competitive base salary, annual incentive awards for eligible employees and health, welfare and retirement benefits designed to support physical, financial, and emotional/social well-being."

- *STP*. STP's Opportunities website states: "STP offers a competitive salary and comprehensive benefits program."

- *Talen*. Talen's job postings state: "Talen Energy offers its employees a generous and progressive array of compensation, benefits and growth opportunities."

- *Xcel*. Xcel's Total Rewards website states: "Our employees are critical to our success. That's why we offer a competitive pay package based on performance, skills and experience for contributions aligned with our values and goals."

317. Defendants took affirmative and specific steps to fraudulently conceal each component of the compensation-suppressing conspiracy. Defendants formed and implemented the combination and conspiracy in a manner specifically designed to avoid detection.

318. *Insular Compensation Departments Designed to Keep the Conspiracy Secret.* The Nuclear Defendants and coconspirators kept their nuclear power generation compensation departments entirely siloed from the rest of the company to keep their conspiratorial conduct a secret. For example, a former HR executive at Progress stated that the nuclear division had a "separate compensation function" from the rest of the company that "collaborated" with other nuclear companies, including Southern, FPL, Entergy, and TVA.

319. Nuclear Defendants also affirmatively restricted access to the confidential compensation information on a need-to-know basis to conceal the conspiracy. Only specific personnel at each Nuclear Defendant were told about or given access to the exchanges of confidential compensation information. The CBA Repository, Compensation Comparison Reports, and direct exchanges of wage information were restricted only to select compensation personnel at each Nuclear Defendant and coconspirator, and other human resources personnel at Nuclear Defendants were not told about those exchanges. For example, one former HR executive at FPL was completely unaware of FPL's longtime participation in the CBA Repository, stating that while she worked at FPL from 2012 through 2024, she had believed that sharing collective

bargaining agreements with other nuclear power companies was a "no go" and "the line" that should not be crossed when sharing information with other nuclear power companies. FPL's participation in the CBA Repository was so restricted to other personnel that this former HR executive did not even know that FPL's contracts were shared outside of the company. Similarly, PSEG's restrictions on access to the CBA repository were so effective that a former Compensation and Benefits Manager at PSEG stated he believed that union CBAs were "maintained internally" and "never shared . . . with anyone else."

320.    The select compensation executives who participated in these exchanges hid from other human resources personnel at the Nuclear Defendants that they discussed ongoing union negotiations and not-yet-ratified wage schedules. For example, union negotiations were so sensitive and private at FPL that non-compensation human resources employees were not informed until a CBA was ratified. According to the former FPL HR executive, "Whatever is going on from a negotiation standpoint is confidential information."

321.    *CBA Repository and Compensation Comparison Reports*. The Nuclear Defendants took great care to ensure that the information exchanges through the CBA Repository and Compensation Comparison Reports were kept secret and operated secretly.

322.    To conceal the CBA Repository and Compensation Comparison Reports, the Nuclear Defendants provided their sensitive compensation information directly to Rick Habegger while he managed NHRG from 2003 through 2014, who then uploaded the data into a protected electronic file that could only be accessed with a confidential password. After Habegger was replaced as manager of NHRG through the present, the Nuclear Defendants provided their compensation information directly to the Consultant Defendants, including to David Heler, who

also uploaded the sensitive data into a protected electronic file that could only be accessed with a confidential password.

323.    Habegger and the Consultant Defendants shared the confidential password only with human resources executives at Nuclear Defendants and coconspirators. It was a policy of the NHRG that the CBA Repository and Compensation Comparison Reports were only available to plants that participated in the CBA Repository.

324.    Throughout the Class Period, the CBA Repository and Compensation Comparison Reports were only accessible online through a confidential, password-protected web page made available only to the Defendants.

325.    *NHRG, Labor Relations Project, and Total Rewards Meetings*. NHRG is highly secretive. The NHRG website contains only three pages accessible to the public: a "home" page providing a brief description of the organization; a "contact us" page with an email address for Shane Camp, Vice President of Human Resources at Defendant Southern; and a page to pay membership dues. The rest of NHRG's website is hidden from the public through a login link requiring a username and password restricted to members.

326.    Each annual NHRG conference and each meeting of the Labor Relations Project and Total Rewards Project from 2003 through the present were limited to NHRG members who were employed by the Nuclear Defendants and coconspirators and paid dues to participate. The exchange of current and future compensation information and related discussions about optimal compensation rates at those annual conference and meetings were highly secretive and undertaken behind closed doors. Total Rewards Project presentations were not posted on NHRG's website due to confidentiality.

327.    The Nuclear Defendants also hired third-party WTW in part to conceal their misconduct. The retention of WTW imparted a veneer of legality to the Nuclear Defendants' illicit exchange of compensation data. Despite hiring third-party WTW throughout the Class Period to conduct compensation surveys, the Nuclear Defendants used those surveys as benchmarks to facilitate and guide their unlawful discussions conducted during the NHRG conference and meetings of the Total Rewards Project. During those discussions, the Nuclear Defendants readily disclosed and exchanged company-specific compensation information that had been concealed in the WTW surveys themselves.

328.    *Direct Communications among Nuclear Defendants and coconspirators*. The Nuclear Defendants frequently exchanged compensation data through telephone communications to avoid the creation of a paper trail and thus avoid detection. A former employee of Exelon, who was familiar with the nuclear-specific compensation survey results, said that during his tenure at Exelon from 2009 through 2015, "if you called" participating companies (i.e., all Nuclear Defendants), "you could get" their confidential data.

329.    The Nuclear Defendants adopted a give-data-to-get-data policy on their provision of compensation information. A former compensation employee at DTE confirmed that DTE would only share salary information with other nuclear power companies if DTE also received salary information in return.

330.    By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## VIII.  CLASS ACTION ALLEGATIONS

331.    Plaintiffs bring this action on behalf of themselves, and on behalf of the members of the following class, under Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3):

> All persons employed in nuclear power generation by the Nuclear Defendants and coconspirators, their subsidiaries, and/or related entities in the United States from May 1, 2003 until the present.

332.    The claims of the Class are brought against all the Defendants.

333.    Persons currently or formerly employed in the following positions by Defendants, co-conspirators or any of their subsidiaries or predecessors are excluded from the proposed Class: human-resources executives, labor managers, human-resources managers, human-resources staff, officers, and directors.

334.    The Class definition provides clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Class.

335.    Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

336.    The Class is so numerous that joinder of all members of the Class in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains tens of thousands of similarly situated workers.

337.    The Class is readily identifiable and is one for which records should exist.

338.    Plaintiffs' claims are typical of those of the Class. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

339.    Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in compensation for working in nuclear power generation than they would have in a competitive market.

340.     Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are aligned with, and not antagonistic to, the Class.

341.     Questions of law and fact common to Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to Class Members.

342.     Questions of law and fact common to the Class include:

a.      Whether Defendants engaged in an agreement, combination, or conspiracy to fix, suppress, maintain, or stabilize the compensation paid to Class Members;

b.      Whether Defendants' exchange of nonpublic, competitively sensitive information about compensation paid to Class Members constituted, or furthered, an agreement, combination, or conspiracy in restraint of trade;

c.      Whether such agreements constituted violations of the Sherman Antitrust Act;

d.      The identity of the participants of the alleged conspiracy;

e.      The duration of the conspiracy alleged herein and the acts performed by Defendants and their coconspirators in furtherance of the conspiracy;

f.      Whether Defendants fraudulently concealed their misconduct;

g.      Whether and to what extent Defendants' anticompetitive scheme suppressed compensation paid to Class Members below competitive levels;

h.      The nature and scope of injunctive relief necessary to restore competition; and

i.      The measure of damages suffered by Plaintiffs and the Class.

343.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

344.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other benefits, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Furthermore, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that is not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

345.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## IX.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### CONSPIRACY TO SUPPRESS COMPENSATION IN VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT
### (Against All Defendants)

346.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

347.     Beginning as of May 1, 2003, and continuing through the present, Defendants and their coconspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, suppress, maintain, and stabilize the compensation paid to nuclear power generation workers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

348.     In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their coconspirators did those things that they combined and conspired to do, including but not limited to:

- Reached agreements—through exchanges of information, in-person meetings, and other communications—to fix, suppress, maintain, and stabilize the compensation paid to nuclear power generation workers in the United States;

- Implemented, monitored, and enforced that conspiracy to suppress compensation through the regular exchange of competitively sensitive, nonpublic, and detailed compensation data; and

- Paid the fixed, suppressed, and stabilized compensation to nuclear power generation employees in the United States.

349.     The conspiracy to fix, suppress, maintain, and stabilize compensation is a *per se* violation of Section 1 of the Sherman Act.

350.     The combination and conspiracy alleged herein has had the following effects, among others:

- Competition for the hiring and retaining of nuclear power generation workers employed by the Nuclear Defendants, coconspirators, their subsidiaries, and/or related entities has been restrained, suppressed, and/or eliminated in the United States; and

- Compensation paid to nuclear power generation workers employed by the Nuclear Defendants, coconspirators, their subsidiaries, and/or related entities has been fixed, suppressed, maintained, and stabilized at artificially low, noncompetitive levels throughout the United States.

351.    Plaintiffs and the other Class Members have been injured in their business and property by receiving less compensation from the Nuclear Defendants and coconspirators, their subsidiaries, and/or related entities than they would have in the absence of the combination and conspiracy.

## SECOND CLAIM FOR RELIEF

### CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT
(Against All Defendants)

352.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

353.    Beginning as of May 1, 2003, and continuing through the present, Defendants and their coconspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their nuclear power generation employees in the United States. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

354.    The relevant market is the labor market for employment in nuclear power generation in the United States, and the relevant geographic market is the United States.

355.    The Nuclear Defendants and coconspirators collectively possess market power in the Relevant Market. The Nuclear Defendants and coconspirators together control 100 percent of the Relevant Market. The Nuclear Defendants' and coconspirators' collective market power includes the power to jointly set compensation for nuclear power generation workers in the United

States below competitive levels. This joint power clearly exists because it has been used by the Nuclear Defendants and coconspirators to pay Class Members sub-competitive compensation.

356.    Defendants could and did profitably suppress compensation paid to nuclear power generation workers in the United States below competitive levels. In such circumstances, nuclear power generation workers would not be able, and were not able, to defeat such artificial compensation suppression by switching their employment to non-conspiring nuclear power companies, as there were no such companies.

357.    A slight decrease in compensation to nuclear power generation workers in the United States from a competitive level could be imposed collectively by the Nuclear Defendants without causing too many such workers to switch employment to non-nuclear occupations.

358.    The Nuclear Defendants view workers that comprise the Class as fungible. Workers within the same positions are generally interchangeable, permitting the Nuclear Defendants to readily compare and match each other's compensation.

359.    The information regularly exchanged by and between the Nuclear Defendants pursuant to the agreement has consisted of detailed, competitively sensitive, and non-public information about current and future compensation to nuclear power generation workers. The information exchanges specifically included:

- The exchange multiple times per year, through the CBA Repository and Compensation Comparison Reports, of current and future salaries, wages and benefits provided to positions in nuclear power generation in the United States by the Nuclear Defendants and coconspirators;

- The oral exchange at annual in-person NHRG Conferences, annual Labor Relations Project meetings, and annual Total Rewards Project meetings, of current and future

compensation rates, including the scope and timing of future compensation increases, paid to nuclear power generation workers employed by the Nuclear Defendants and coconspirators; and

- Regular email and telephonic exchanges directly between the Nuclear Defendants' executives regarding compensation practices and plans, including current and future compensation rates, including the scope and timing of future compensation increases, paid to nuclear power generation workers employed by the Nuclear Defendants and coconspirators.

360.    The Nuclear Defendants' regular compensation information exchanges (directly and through Accelerant, HRC, ScottMadden, and WTW) reflected concerted action between horizontal competitors in the Relevant Market.

361.    Each Nuclear Defendant furnished competitively sensitive information to other Nuclear Defendants with the understanding that it would be reciprocated. That is, one Nuclear Defendant would not have provided information to Accelerant, HRC, ScottMadden, WTW, or directly to another Nuclear Defendant without the understanding that it would receive comparable information from other Nuclear Defendants.

362.    The exchanging of such compensation information by Nuclear Defendants is inconsistent with the joint guidance during the Class Period provided by the DOJ and the FTC. In October 2016, the two agencies issued a joint "Antitrust Guidance for Human Resource Professionals," updating and building upon the Safe Harbor guidelines issued in 1996. That 2016 Antitrust Guidance states:

> Sharing information with competitors about terms and conditions of employment can also run afoul of the antitrust laws. Even if an individual does not agree explicitly to fix compensation or other terms of employment, exchanging competitively sensitive information could serve as evidence of an implicit illegal

agreement. While agreements to share information are not per se illegal and therefore not prosecuted criminally, they may be subject to civil antitrust liability when they have, or are likely to have, an anticompetitive effect. Even without an express or implicit agreement on terms of compensation among firms, evidence of periodic exchange of current wage information in an industry with few employers could establish an antitrust violation because, for example, the data exchange has decreased or is likely to decrease compensation. …

However, not all information exchanges are illegal. It is possible to design and carry out information exchanges in ways that conform with the antitrust laws. For example, an information exchange may be lawful if:

- a neutral third party manages the exchange,

- the exchange involves information that is relatively old,

- the information is aggregated to protect the identity of the underlying sources, and

- enough sources are aggregated to prevent competitors from linking particular data to an individual source.

363.    The compensation information exchanges by the Nuclear Defendants did not comply with the above criteria established by the DOJ and FTC and violated the federal antitrust laws. The exchanged compensation information was not "relatively old" or historical; rather; the information concerned current and future compensation. The exchanged compensation information was not "aggregated to protect the identity of the underlying sources"; rather, the information was disaggregated, as distinct compensation information was provided for nuclear power plants operated by each Nuclear Defendant and coconspirator. The exchanged compensation information was not presented in a manner "to prevent competitors from linking particular data to an individual source"; rather, the information was shared in a manner that identified the wages paid by particular Nuclear Defendants and coconspirators at particular nuclear power plants. The information exchanges were not managed by a neutral third party; rather, they were managed by the Nuclear Defendants themselves or the NHRG, which the Nuclear Defendants fully controlled.

364.    In January 2025, the DOJ and FTC strengthened their antitrust guidelines in publishing a new version titled "Antitrust Guidelines for Business Activities Affecting Workers" which omits the above Safe Harbor carve-out. This omission confirms that even information-exchange conduct concerning compensation that complies with the former Safe Harbor Guidelines may nevertheless violate federal antitrust law.

365.    The agreement to exchange compensation information eliminated a major incentive for the Nuclear Defendants and coconspirators to increase compensation to nuclear power generation workers in the United States during the Class Period. The advantage of raising compensation is to retain and attract more such workers by exceeding the compensation paid by competing nuclear power companies.

366.    The agreement to regularly exchange detailed and non-public information about current and prospective compensation to nuclear power generation workers in the United States assured that the provision of superior compensation by any Nuclear Defendant or coconspirator would be timely and specifically known by its competitors. Such an agreement, therefore, eliminated the incentive of each Nuclear Defendant or coconspirator to outbid its competitors during the Class Period.

367.    When nuclear power companies that are competing for the same workers exchange their compensation plans and levels, comfort replaces uncertainty and reduces incentives to raise wages, salaries, other compensation, or benefits. Accordingly, each Nuclear Defendant and coconspirator used the compensation data obtained through the information exchanges to reduce the uncertainty that they should have faced from not knowing what their competitors were offering and providing in the labor market. This strategic information was a material factor in the Nuclear

Defendants' and coconspirators' decisions to suppress and stabilize compensation paid to nuclear power generation workers in the United States during the Class Period.

368.    The exchange of compensation information between the Nuclear Defendants during the Class Period increased their relative bargaining power in setting wages, salaries, benefits, and other compensation for nuclear power generation workers employed by Defendants, coconspirators, their subsidiaries, and related entities in the United States.

369.    The regularity and detail of the compensation information exchanged, the related communications about compensation between individuals exchanging the information, the relationships of trust developed among the individuals exchanging the information, and the pervasive desire to control and restrain labor costs, allowed Defendants and their coconspirators to use the information to suppress each other's compensation levels for nuclear power generation workers in the United States during the Class Period.

370.    Defendants' unlawful agreement to exchange, and the actual exchanges of, nonpublic, timely, and detailed compensation data was not reasonably necessary to further any procompetitive purpose. The information exchanged between the Nuclear Defendants and their high-level executives was disaggregated, company-specific, current and forward-looking, deanonymized, confidential, and related to a core characteristic of competition between them.

371.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among the Nuclear Defendants, their subsidiaries, and related entities for the compensation of nuclear power generation workers in the United States and (2) suppressing the compensation of such employees.

372.    As a result of the unlawful agreement alleged herein to exchange compensation information during the Class Period, Plaintiffs and the other Class Members have been injured in their business or property by receiving artificially suppressed compensation.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.    The Court declare, adjudge, and decree this action to be a proper class action under Rule of Civil Procedure 23 on behalf of the Class defined herein, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class once certified;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Plaintiffs and the other Class Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled under 15 U.S.C. § 15(a);

D.    Plaintiffs and the other Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, and from entering into any other conspiracy or combination having a similar purpose or effect;

F.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information concerning compensation, benefits, or the hiring or recruiting of employees;

G.     Plaintiffs and the other Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

H.     Plaintiffs and the other Class Members be granted such other relief as the case may require and deemed proper to this Court.

## XI.    JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: July 11, 2025                Respectfully submitted,

   /s/ *Matthew K. Handley*
Matthew K. Handley (D. Md. Bar # 18636)
HANDLEY FARAH & ANDERSON PLLC
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036
Telephone: (202) 559-2433
mhandley@hfajustice.com

George F. Farah (*pro hac vice* forthcoming)
Nicholas J. Jackson (*pro hac vice* forthcoming)
Rebecca P. Chang *(pro hac vice* forthcoming)
Simon Wiener (*pro hac vice* forthcoming)
HANDLEY FARAH & ANDERSON PLLC
33 Irving Place
New York, NY 10003
Telephone: (212) 477-8090
gfarah@hfajustice.com
njackson@hfajustice.com
rchang@hfajustice.com
swiener@hfajustice.com

William H. Anderson (*pro hac vice* forthcoming)
HANDLEY FARAH & ANDERSON PLLC
1434 Spruce Street, Suite 301
Boulder, CO 80302
Telephone: (202) 559-2433
wanderson@hfajustice.com

Shana E. Scarlett (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

Steve W. Berman (*pro hac vice* forthcoming)
Breanna Van Engelen (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

Brent W. Johnson (*pro hac vice* forthcoming)
Daniel H. Silverman (*pro hac vice* forthcoming)
Alison S. Deich (*pro hac vice* forthcoming)
Sabrina Merold (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
bjohnson@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com
smerold@cohenmilstein.com

*Counsel for Plaintiffs and the Proposed Class*