**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| Leo Dorrell, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | **No. 25-cv-2251-ABA** |
| | ) | |
| Constellation Energy Corporation, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' OMNIBUS MOTION TO DISMISS PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.     The Plaintiffs' Claims .......................................................................... 3

II.    Publicly available information about Nuclear Power Generation Employee
Compensation ........................................................................................ 7

III.   The Nuclear Power Industry's Culture of Collaboration .................................. 10

LEGAL STANDARD .......................................................................................... 15

I.     Motion to Dismiss Pursuant to federal rule of civil procedure 12(b)(6) ........... 15

II.    Per se and Rule of Reason Claims Brought Pursuant to Section 1 of the Sherman
Act.......................................................................................................... 15

ARGUMENT ..................................................................................................... 17

I.     Plaintiffs Have Failed to State a Per Se Claim for a Compensation-Fixing
Conspiracy Under Section 1 of the Sherman Act ................................. 17

    A.    Plaintiffs Do Not Allege Direct Evidence of a Conspiracy to Suppress
Compensation .......................................................................... 18

    B.    Plaintiffs Do Not Sufficiently Allege Circumstantial Evidence of an
Agreement to Suppress Compensation ..................................... 21

        1.    Plaintiffs Do Not Allege Parallel Conduct By Defendants....................... 22

        2.    Plaintiffs Have Failed to Allege "Plus Factors" That Plausibly
Show a Conspiracy to Suppress Wages ..................................... 27

II.    Count 2 Fails to State a Claim Under the Rule of Reason ................................. 33

    A.    The Complaint Fails to Plead a Plausible Relevant Market ............... 34

    B.    Because Plaintiffs Fail to Allege a Plausible Relevant Market, They Have
Not Adequately Pled Market Power ......................................... 39

    C.    Plaintiffs Have Failed to Allege Anticompetitive Effects Caused by the
Purported Information Exchange ............................................. 40

        1.    The Complaint Fails to Allege the Type of Information That Was
Allegedly Exchanged Would Tend to Suppress Wages ......................... 40

        2.    The Complaint Fails to Allege Facts Showing Wages Were in Fact
Suppressed ............................................................................. 44

III.   Plaintiffs' Claims Are Time-Barred........................................................ 45

    A.    The Continuing Violation Doctrine Does Not Apply Because Plaintiffs
Fail to Allege an Overt Act During the Four-Year Limitations Period. ............ 46

  B.    Plaintiffs Fail to Adequately Plead Fraudulent Concealment. .............................. 48

CONCLUSION ............................................................................................................................ 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
367 F.3d 212 (4th Cir. 2004) .........................................................................................18, 20

*Am. Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010) ...............................................................................................32

*Anand v. Ocwen Loan Servicing, LLC*,
754 F.3d 195 (4th Cir. 2014) ...................................................................................................15

*In re Animation Workers Antitrust Litig.*,
87 F. Supp. 3d 1195 (N.D. Cal. 2015) ....................................................................................48

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................................15

*Barry v. Novartis Pharms. Corp.*,
No. 3:22-cv-196 (DJN), 2022 WL 2373452, at *5 (E.D. Va. June 30, 2022) ..........................8

*In re Beef Indus. Antitrust Litig.*,
713 F. Supp. 971 (N.D. Tex. 1988), *aff'd*, 907 F.2d 510 (5th Cir. 1990)................................41

*Bell Atl. Corp. v. Twombly*,
550 U.S. 554 (2007)...........................................................................................18, 21, 27, 30

*In re Broiler Chicken Antitrust Litig.*,
702 F. Supp. 3d 635 (N.D. Ill. 2023) ......................................................................................43

*Brown v. JBS USA Food Co.*,
773 F. Supp. 3d 1193 (D. Colo. 2025).....................................................................................33

*Chapman v. N. Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008)...............................................................................................34, 39

*Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*,
546 F.2d 570,573 (4th Cir. 1976) ............................................................................................47

*In re Citric Acid Litig.*,
996 F. Supp. 951 (N.D. Cal. 1998), *aff'd*, 191 F.3d 1090 (9th Cir. 1999) .............................41

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) .....................................................................................................8

*In re Concrete & Cement Additives Antitrust Litig.*,
　　No. 24-md-3097(LJL), 2025 WL 1755193 (S.D.N.Y. June 25, 2025)...................................23

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
　　858 F.2d 499 (9th Cir. 1988) ........................................................................................50

*CSX Trans., Inc. v. Norfolk S. Ry. Co.*,
　　114 F.4th 280 (4th Cir. 2024) ...................................................................................46, 47

*Dickson v. Microsoft Corp.*,
　　309 F.3d 193 (4th Cir. 2002) ...............................................................................15, 34, 40

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
　　504 U.S. 451 (1992).........................................................................................................39

*Eichorn v. AT&T Corp.*,
　　248 F.3d 131 (3d Cir. 2001).............................................................................................35

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*,
　　733 F.3d 393 (2d Cir. 2013).............................................................................................28

*Erie Cnty., Ohio v. Morton Salt, Inc.*,
　　702 F.3d 860 (6th Cir. 2012) ...........................................................................................31

*Five Smiths, Inc. v. Nat'l Football League*,
　　788 F. Supp. 1042 (D. Minn. 1992)..................................................................................33

*Garling v. U.S. Env't Prot. Agency*,
　　849 F.3d 1289 (10th Cir. 2017) .........................................................................................4

*Garrison v. Oracle Corp.*,
　　159 F. Supp. 3d 1044 (N.D. Cal. 2016) ...........................................................................49

*Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*,
　　128 F.3d 1074 (7th Cir. 1997) ...........................................................................................6

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
　　386 F.3d 485 (2d Cir. 2004)............................................................................................16

*Haley Paint Co. v. E.I. Dupont De Nemours & Co.*,
　　804 F. Supp. 2d 419 (D. Md. 2011).................................................................................23

*Hall v. Virginia*,
　　385 F.3d 421, 424 n.3 (4th Cir. 2004) ...............................................................................4

*Hanson v. Shell Oil Co.*,
　　541 F.2d 1352 (9th Cir. 1976) .........................................................................................41

*Hayes v. Maryland Transit Admin.*,
  708 F. Supp. 3d 683 (D. Md. 2023), *aff'd*, 2024 WL 4262786 (4th Cir. Sept.
  23, 2024) ........................................................................................................10

*Imaging Ctr., Inc. v. W. Maryland Health Sys., Inc.*,
  158 F. App'x 413 (4th Cir. 2005) ...................................................................16

*Jeandron v. Bd. of Regents of Univ. Sys. of Md.*,
  510 F. App'x 223 (4th Cir. 2013) ...................................................................50

*Jien v. Perdue Farms, Inc.*,
  No. 1:19-CV-2521-SAG, 2020 WL 5544183 (D. Md. Sept. 16. 2020)................18, 21, 22, 27

*Jones v. Micron Tech. Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. 2019) .............................................................32

*Just Puppies, Inc., v. Frosh*,
  565 F. Supp. 3d 665 (D. Md. 2021) *aff'd sub nom. Just Puppies, Inc. v. Brown*,
  123 F.4th 652 (4th Cir. 2024) ....................................................................8, 24

*Kadel v. Folwell*,
  100 F.4th 122 (4th Cir. 2024), *cert. granted, judgment vacated sub nom.*
  *Crouch v. Anderson*, 145 S. Ct. 2835 (2025), *and cert. granted, judgment*
  *vacated*, 145 S. Ct. 2838 (2025) ......................................................................6

*Kleen Prods. LLC v. Int'l Paper*,
  276 F. Supp. 3d 811 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v.*
  *Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) .................................................31

*Klehr v. A.O. Smith. Corp.*,
  521 U.S. 179 (1997)......................................................................................47

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)......................................................................................15

*Little Rock Cardiology Clinic PA v. Baptist Health*,
  591 F.3d 591 (8th Cir. 2009) .........................................................................39

*Llacua v. W. Range Ass'n*,
  930 F.3d 1161 (10th Cir. 2019) ......................................................................16

*Loftus v. F.D.I.C.*,
  989 F. Supp. 2d 483 (D.S.C. 2013).....................................................................6

*Loren Data Corp. v. GXS, Inc.*,
  501 F. App'x 275 (4th Cir. 2012) ....................................................................16

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*,
　　624 F. App'x 23 (2d Cir. 2015) ...................................................................35

*Maple Flooring Mfrs.' Ass'n v. United States*,
　　268 U.S. 563 (1925).............................................................................33, 40, 43

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
　　709 F.3d 129 (2d Cir. 2013).......................................................................18

*Merck-Medco Managed Care, Inc. v. Rite Aid Corp.*,
　　22 F. Supp. 2d 447 (D. Md. 1998) .............................................................22

*Miller v. Pac. Shore Funding*,
　　224 F. Supp. 2d 977 (D. Md. 2002), *aff'd*, 92 F. App'x 933 (4th Cir. 2004) .........................46

*In re Musical Instruments and Equip. Antitrust Litig.*,
　　798 F.3d 1186 (9th Cir. 2015) .............................................................28, 32

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
　　419 F.3d 462 (6th Cir. 2005) ....................................................................35

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
　　513 F.3d 1038 (9th Cir. 2008) ..................................................................34

*Nucor Steel v. S.C. Pub. Serv. Comm'n.*,
　　426 S.E.2d 319 (S.C. 1992) ......................................................................30

*O'Toole v. Northrop Grumman Corp.*,
　　499 F.3d 1218 (10th Cir. 2007) ..................................................................8

*Ogden v. Little Caeser Enters., Inc.*,
　　393 F. Supp. 3d 622 (E.D. Mich. 2019).....................................................17

*Ohio v. Am. Express Co.*,
　　585 U.S. 529. (2018)...........................................................................16, 40

*Oksanen v. Page Mem'l Hosp.*,
　　945 F.2d 696 (4th Cir. 1991) ...............................................................16, 34

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
　　629 F.3d 697 (7th Cir. 2011) ....................................................................43

*Orji v. Citadel Sec., LLC*,
　　No. 8:23-CV-02986-LKG, 2025 WL 860178 (D. Md. Mar. 19, 2025)..................16

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
　　911 F.3d 505 (8th Cir. 2018) ....................................................................27

*Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co. of Phil.*,
   517 F. Supp. 3d 458 (D. Md. 2021) ...................................................43

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
   998 F.2d 1224 (3d Cir. 1993)..........................................................32

*Polk Bros. v. Forest City Enters., Inc.*,
   776 F.2d 185 (7th Cir. 1985) ...........................................................16

*In re Pork Antitrust Litig.*,
   781 F. Supp. 3d 758 (D. Minn. 2025).............................................34

*In re Pork Antitrust Litig.*,
   No. 18-1776-JRT, 2019 WL 3752497 (D. Minn. Aug. 8, 2019)..........23

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
   615 F.3d 412 (5th Cir. 2010) ...........................................................39

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997)........................................................34, 39

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. 2)*,
   709 F. Supp. 3d 478 (M.D. Tenn. 2023)..........................................45

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
   471 F. Supp. 3d 981 (N.D. Cal. 2020) ..............................................50

*Robertson v. Sea Pines Real Estate Cos., Inc.*,
   679 F.3d 278 (4th Cir. 2012) .......................................................17, 40

*Rutledge v. Boston Woven Hose & Rubber Co.*,
   576 F.2d 248 (9th Cir. 1978) ...........................................................50

*Scharpf v. Gen. Dynamics Corp.*,
   137 F.4th 188 (4th Cir. 2025) ...........................................................48

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ..................................................... *passim*

*South Carolina v. United States*,
   No. 1:16-cv-00391-JMC, 2017 WL 976298 (D.S.C. Mar. 14, 2017).................4, 11

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997)..............................................................................15

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,
   71 F.3d 119 (4th Cir. 1995) ..............................................................48

*Swindol v. Aurora Flight Scis. Corp.*,
   805 F.3d 516 (5th Cir. 2015) ................................................................4

*Tellabs v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................4

*Tera Group, Inc. v. Citigroup, Inc.*,
   No. 24-135, 2024 WL 4501967 (2d Cir. Oct. 16, 2024) ..........................28

*Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*,
   763 F.2d 604 (4th Cir. 1985) ..............................................................34

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ..............................................................18

*In re Text Messaging Antitrust Litig.*,
   782 F.3d 867 (7th Cir. 2015) ..............................................................31

*Tinsley v. OneWest Bank*,
   FSB, 4 F. Supp. 3d 805 (S.D. W.Va. Mar. 14, 2014) ...............................9

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) (Sotomayor, J.) ................................ *passim*

*U.S. v. Garcia*,
   855 F.3d 615 (4th Cir. 2017) ................................................................4

*United Gov't Sec. Officers of Am., Int'l Union Loc. 22 v. Tennessee Valley Auth.*,
   No. 5:16-CV-00271-MHH, 2020 WL 1285920 (N.D. Ala. Mar. 17, 2020) ..........14

*United States v. Bertelsmann SE & Co. KGaA*,
   646 F. Supp. 3d 1 (D.D.C. 2022) ..............................................34, 35, 37

*United States v. Booz Allen Hamilton Inc.*,
   No. CCB-22-1603, 2022 WL 9976035 (D. Md. Oct. 17, 2022) ..................16

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978) ..............................................................18, 33, 41

*Va. Elec. & Power Co. v. State Corp. Comm'n.*,
   735 S.E.2d 684 (Va. 2012) ................................................................29

*Valuepest.com of Charlotte, Inc. v. Bayer Corp.*,
   561 F.3d 282 (4th Cir. 2009) ..............................................................33

*Whateley v. Lackey*,
   785 F. Supp. 3d 149 (W.D. Va. 2025) ....................................................8

*Williamson Oil Co., Inc., v. Philip Morris USA,*
    346 F.3d 1287 (11th Cir. 2003) ...................................................................31

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.,*
    401 U.S. 321 (1971)...................................................................................46, 47

*In re Zinc Antitrust Litig.,*
    155 F. Supp. 3d 337 (S.D.N.Y. 2016)...........................................................31

**Statutes**

15 U.S.C. § 15b ................................................................................................46

16 U.S.C. §§ 831a(i)(2), 831b(b) ....................................................................14

N.C. Gen. Stat. § 62-133(b) .............................................................................14

Va. Code Ann. § 56-585 ...................................................................................29

Va. Code Ann. § 56-585.1 ..........................................................................14, 30

**Rules**

Fed. R. Evid. 201(b)........................................................................................4, 8

Fed. R. Civ. P. 12(b)(6)............................................................................4, 15, 34

## INTRODUCTION

Plaintiffs allege a sprawling, secret conspiracy to suppress compensation for virtually every single employee working in nuclear power generation. This alleged conspiracy supposedly involved 23 nuclear power company defendants[1] (the "Nuclear Defendants") and a consulting company, lasted over 22 years, impacted hundreds of thousands of employees in hundreds of different jobs, and went completely undiscovered until now. Plaintiffs' conspiracy theory is rendered all the more implausible by the fact that it supposedly occurred in one of the most heavily regulated industries in the world, on the watch of the federal government, state governments, various watchdog groups, and dozens of unions.

Cynically seeking to spin beneficial information sharing among nuclear power generators that prioritize safety—a priority that was heightened following the Three Mile Island incident in 1979—Plaintiffs allege that benchmarking and information sharing related to employee benefits and compensation was all part of a secret, nationwide conspiracy to fix and/or suppress the pay of every worker at every nuclear power generation facility. But benchmarking can serve the public interest and facilitate efficient economic activity. That logic clearly applies to the nuclear power industry, where there is an indisputable public interest in ensuring the safe operation of nuclear power plants and that the persons who work at those plants are compensated fairly. But, regardless, at the motion to dismiss stage Plaintiffs must plead much more to state a conspiracy claim than they have pled here.

Plaintiffs' conspiracy theories fail as a matter of law. Plaintiffs' allegations, viewed in the light most favorable to them, amount to, at most, compensation benchmarking. Plaintiffs allege

---

[1] Plaintiffs originally named 26 Nuclear Defendants but voluntarily dismissed three—Omaha Public Power District (OPPD), Exelon Corporation, and Talen Energy Corporation. *See* ECF Nos. 268, 291, 295. The Court granted these dismissals. *See* ECF Nos. 269, 292, 297.

two distinct claims: that Defendants (i) agreed to actually fix the compensation of their nuclear power generation employees, and (ii) agreed to exchange compensation-related information for the purpose of suppressing worker compensation. Neither survives scrutiny.

*The Compensation-Fixing Claim.* Plaintiffs attempt to bring a compensation-fixing claim, alleging that 20+ companies entered into a conspiratorial agreement to set compensation for employees working in nuclear power generation for 20+ years. Compl. ¶¶ 346-51. The Complaint fails to plausibly allege such a conspiracy. Despite Plaintiffs' access to numerous purported "confidential witnesses," no one is alleged to have said there was an "agreement" to fix compensation. Moreover, the Complaint is devoid of factual allegations as to how the alleged conspiracy started, who agreed to it, or how it was implemented across 50+ nuclear power plants. In fact, in their sprawling 372-paragraph, 121-page complaint, Plaintiffs say very little about the main event: wages. They merely allege that two of the 23 Nuclear Defendants had matching general wage increases (*i.e.*, annual wage increases) for three of the 22 years and that two of the 23 Nuclear Defendants had matching hourly rates for two jobs (out of hundreds) in just two of the 22 years. *Id.* ¶¶ 262-63. That's it. This is not enough to plead facts showing Defendants' compensation moved in "parallel"—which is necessary (but not sufficient) to plausibly plead a compensation-fixing conspiracy. For that and other reasons explained below, this claim should be dismissed as a matter of law.

*The Information Sharing Claim.* Plaintiffs also attempt to bring a claim alleging an information sharing conspiracy intended to suppress compensation, but here too they have failed to state a claim. Among other defects, Plaintiffs have not pled a plausible market. To state this claim, Plaintiffs must allege the conspiracy caused harm in a specific labor market. Here, Plaintiffs' putative class covers every nuclear operator, security guard, bookkeeper, chemistry

technician, crane operator, customer service clerk, equipment repairman, electrician, handyman, instrument and control technician, journeyman, radiation protection technician, stockman, and many other employees in nuclear power generation across the entire United States. The notion that all of those jobs are in the same labor market, or that individuals holding those jobs would not have alternatives outside of the nuclear power industry, is patently implausible. The Complaint contains no well pled factual allegations to the contrary. Because of these flaws, Plaintiffs' information sharing claim also fails as a matter of law.

*Statute of Limitations.* Plaintiffs' claims also fail for the independent reason that any claim for harm alleged to have occurred prior to July 11, 2021—four years before this action was initiated—is time-barred. Plaintiffs attempt to plead around the statute of limitations by asserting that Defendants' conspiracy was continuing in nature and Defendants fraudulently concealed their purported conspiracy. But those assertions are not adequately supported by the allegations in the Complaint.

Accordingly, Plaintiffs' claims should be dismissed with prejudice.

**BACKGROUND**

## I.    THE PLAINTIFFS' CLAIMS

This case arises out of employment practices within the nuclear power generation industry—an industry that spans the nation and is comprised of a diverse group of companies. The United States is currently home to 54 nuclear power plants that collectively contain 94 operating commercial nuclear reactors. Compl. ¶ 145. According to the federal body overseeing these 54 plants—the United States Nuclear Regulatory Commission (NRC)—there are 25 different companies that operate these plants (one of which was never named a Defendant in this case). *Id.*

¶ 146; *List of Power Reactor Units*, NRC (Feb. 21, 2025). ("NRC Reactor List").[2] Some entities operate a single plant, whereas others operate as many as 12. NRC Reactor List.

Plaintiffs allege a conspiracy "to fix and suppress the compensation paid to persons employed in nuclear power generation in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1." Compl. ¶ 1. Count 1 of the Complaint alleges a "conspiracy to suppress compensation" through an agreement to fix compensation levels, and Count 2 alleges a "conspiracy to exchange compensation information" to suppress wages. *Id*. ¶¶ 346-72.

**The Plaintiffs.** The Complaint's specific allegations relating to named Plaintiffs John Dorrell and Leo Dunn are sparse. The Complaint alleges that one (Dorrell) was formerly employed by "Dominion," and one (Dunn) by "Entergy,"[3] but it does not include their job titles or tenures.

---

[2] https://www.nrc.gov/reactors/operating/list-power-reactor-units.html. "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A court "may judicially notice a fact that is not subject to reasonable dispute because it" either (1) "is generally known within the trial court's territorial jurisdiction," or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The Fourth Circuit, "and numerous others[,] routinely take judicial notice of information contained on state and federal government websites." *U.S. v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (collecting cases). Official publications publicly available online or upon request are "properly the subject of judicial notice." *South Carolina v. United States*, No. 1:16-cv-00391-JMC, 2017 WL 976298 at * 5 (D.S.C. Mar. 14, 2017). *See also Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) ("Voting-age population statistics, however, are publicly available on the official redistricting website of the Virginia Division of Legislative Services. We may properly take judicial notice of this information in reviewing the dismissal of the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure."); *Garling v. U.S. Env't Prot. Agency*, 849 F.3d 1289, 1297 n.4 (10th Cir. 2017) (permitting judicial notice of facts on government websites and collecting citations); *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 519 (5th Cir. 2015) (holding that "the accuracy of these public records contained on the Mississippi Secretary of State's and the Virginia State Corporation Commission's websites cannot reasonably be questioned.").

[3] Complaint paragraph 22's first sentence references "Dominion," apparently as shorthand for Dominion Energy, Inc., a parent company with subsidiaries that may be relevant here. The second sentence of paragraph 22 correctly acknowledges that it was "Virginia Electric & Power Company" that "paid an hourly wage and benefits" to Plaintiff Dorrell. Likewise, Complaint paragraph 23's first sentence's reference to "Entergy" appears to refer to Entergy Corporation, which is also a parent company that has subsidiaries. Only some of those subsidiaries employed Plaintiff Dunn and certain other putative class members and were involved in determining their compensation. In the second sentence of the paragraph, Plaintiffs correctly acknowledge that Dunn "was paid an hourly wage and benefits by Entergy Nuclear Operations, Inc., a wholly owned subsidiary of Entergy [Corporation]." Compl. ¶ 23.

Compl. ¶¶ 22-23. Plaintiffs allege they were both paid hourly wages and benefits, but they do not include their union status (despite their allegation that "[a]pproximately one third of workers in nuclear power generation are union members."). *Id*. ¶¶ 22-23, 157. And Plaintiffs allege **no facts** about their actual wages or benefits—not what they were, whether they were parallel, whether they were suppressed by the alleged conspiracy, nor what they might have been absent the alleged conspiracy.

**The Defendants.** The remaining Defendants include 23 Nuclear Defendants, as well as a consulting company, Accelerant Technologies.[4] *Id*. ¶ 2. Plaintiffs allege that over the 22+ year Class Period, all Defendants, along with their various affiliates and other entities (the dozens of "co-conspirators") "performed acts and made statements in furtherance of the conspiracy to fix and suppress compensation." *Id.* ¶ 107. These so-called "co-conspirators" include the Nuclear Defendants' alleged subsidiaries, *id.* ¶¶ 110-29, nuclear power operators based outside the United States, *id.* ¶¶ 130, 132, and third-party consultants that allegedly offered benchmarking services to Nuclear Defendants, *id.* ¶¶ 133, 135.

Each of these nuclear power operators is unique. To start, corporate structure and organization varies widely. As Plaintiffs acknowledge, some are "publicly owned utilities," while others are "investor-owned utilities." Compl. ¶ 147; *see generally Glossary*, U.S. Energy Information Administration ("EIA") (defining "publicly-owned utilities" and "investor-owned

---

In Paragraph 23 of the Complaint, the first sentence's reference to "Entergy" appears to refer to Entergy Corporation, which is a parent company that has subsidiaries. Only some of those subsidiaries employed Plaintiff Dunn and certain other putative class members and were involved in determining their compensation. In the second sentence of the paragraph, Plaintiffs correctly acknowledge that Dunn "was paid an hourly wage and benefits by Entergy Nuclear Operations, Inc., a wholly owned subsidiary of Entergy [Corporation]." Compl. ¶ 23.

[4] In addition to OPPD, Exelon, and Talen, Plaintiffs moved to voluntarily dismiss without prejudice another Defendant, Human Resource Consultants, LLC. ECF No. 249. The Court granted the dismissal. ECF No. 269.

utilities").[5] Further, investor-owned utilities span two distinct groups: regulated public utilities, certain of which may recover their operating expenses—including labor costs—through state-approved rate setting, and merchant generators, who set their own rates for the power they supply to "power exchanges whereby electricity c[an] be bought and sold in a market environment." Compl. ¶ 149; *see also* Jim Lazar, *Electricity Regulation in the US: A Guide* at 190 (2d ed. 2016) ("*Electricity Regulation*").[6] Each type of utility has different financial incentives and is subject to different regulatory and legal requirements—yet all these different types of nuclear power operators are included as a supposed monolith.

The plants are unique as well. Some plants are jointly owned—some by both publicly owned utilities and investor-owned utilities and others by multiple investor-owned utilities. *See generally Nuclear Reactor Ownership*, EIA (Aug. 2025).[7] Some have boiling water reactors, and others have pressurized water reactors. NRC Reactor List. What's more, the 54 nuclear power plants are spread out across 28 different states—operating in distinct geographies and, thus, distinct job markets. *See Nuclear Reactor, State, and Net Capacity*, EIA (Jul. 2025).[8]

***The Class.*** Plaintiffs purport to represent a putative class of "all persons employed in nuclear power generation by the Nuclear Defendants and co-conspirators, their subsidiaries, and/or related entities in the United States from May 1, 2003 until the present." Compl. ¶¶ 22-23, 331.

---

[5] https://www.eia.gov/tools/glossary/ (last visited September 8, 2025). *See* n.2*, supra*.

[6] https://www.raponline.org/knowledge-center/electricity-regulation-in-the-us-a-guide-2/. *See Kadel v. Folwell*, 100 F.4th 122, 137 n.5 (4th Cir. 2024), *cert. granted, judgment vacated sub nom. Crouch v. Anderson*, 145 S. Ct. 2835 (2025), *and cert. granted, judgment vacated*, 145 S. Ct. 2838 (2025) (upholding judicial notice of the DSM-5 treatise). *Accord Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1084 (7th Cir. 1997) (noting the inherent "indicia of trustworthiness found in a public record or a well-established learned treatise like Gray's Anatomy."). Defendants cite to this treatise for "particular statements contained therein" and not for its entirety. *Cf. Loftus v. F.D.I.C.*, 989 F. Supp. 2d 483, 490 (D.S.C. 2013). *See* n.2, *supra*.

[7] https://www.eia.gov/nuclear/reactors/ownership.php. *See* n.2, *supra*.

[8] https://www.eia.gov/nuclear/reactors/reactorcapacity.php. *See* n.2, *supra*.

This class includes a broad range of varied qualifications, responsibilities, expectations, wages, union representations, and attributes among different types of employees. Plaintiffs allege that there are "approximately 40,000 to 50,000 workers at [Nuclear Defendants'] U.S. nuclear power plants." Compl. ¶ 156. And as Plaintiffs' own allegations concede, these tens of thousands of workers fill many roles, including "nuclear operators, nuclear engineers, nuclear technicians, and other staff" like electricians and those working in "nuclear security." *Id*. ¶¶ 154, 233. Some employees "work at nuclear power plants," others "in central offices." *Id.* ¶ 154. Some are "hourly paid workers," while "others receive a salary"—and even among similar positions, Plaintiffs acknowledge factors such as skill, experience, licensing, and education levels result in different wages. *Id.* ¶¶ 154, 165.

Crucially, only about "one third of workers in nuclear power generation are union members," with "most" represented by "the International Brotherhood of Electrical Workers ('IBEW')," which allegedly negotiates compensation on their behalf "with the Nuclear Defendants." *Id.* ¶ 157. But not all nuclear power plants even *have* "a unionized workforce." *Id.* ¶ 194; *see also id.* ¶¶ 197, 202. Plaintiffs acknowledge that collective bargaining agreements ("CBAs") set compensation *only* for union employees, though they assert that Nuclear Defendants "paid attention" to union rates when separately setting non-union rates. *Id.* ¶¶ 205-06. In other words, the CBAs that form a central basis for Plaintiffs' claims directly set compensation rates only for one-third of putative class members.

## II.    PUBLICLY AVAILABLE INFORMATION ABOUT NUCLEAR POWER GENERATION EMPLOYEE COMPENSATION

Contrary to Plaintiffs' assertion, compensation within the nuclear power generation industry is not a closely guarded secret: significant information regarding wages and benefits in the industry is easily found in publicly available sources published by employers, unions, and

government entities.

First and foremost, Plaintiffs' assertion that all CBAs in the nuclear industry are "highly confidential," Compl. ¶ 8, is contradicted by the judicially noticeable fact that many such CBAs are publicly available online.[9] Many CBAs—which include wage and benefit information—are freely available to the public. *See* Exhibits 1-3 (identifying 80 publicly available Nuclear Generation CBAs).[10] Compl. ¶ 8. All public employers, and many private employers, disclose their CBAs in the Department of Labor's Office of Labor-Management Standards ("OLMS") Online Public Disclosure Room. *CBA File: Online Listings of Private and Public Sector Agreements*, Dep't of Lab. (Oct. 21, 2024).[11] The University of California at Berkeley and Cornell each have separate CBA repositories, as do commercial vendors such as Bloomberg and Westlaw.[12] And

---

[9] "It is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) (taking judicial notice of defendant's "own website's posting of historical retirement fund earnings"); *see also*, *Just Puppies, Inc., v. Frosh*, 565 F. Supp. 3d 665, 705 (D. Md. 2021) *aff'd sub nom. Just Puppies, Inc. v. Brown*, 123 F.4th 652 (4th Cir. 2024) (taking judicial notice of pages from a non-party's website because they were "publicly available"). This includes the websites of trade associations. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005) (granting motion to dismiss and taking judicial notice of a term defined on the website of "the National Association of Securities Dealers, Inc.").

[10] These 80 publicly available CBAs were located in the following publicly available repositories: (1) the DOL (OLMS) Online Public Disclosure Room, *see* n.11 *infra*, (2) Bloomberg Law's Labor and Employment Practice Center (3) Thompson Reuters Practical Law; (4) Bloomberg Law's Dockets search feature (which pulls court records including filed documents), and publicly available union local websites. *See* n.2, *supra*; *Just Puppies, Inc.*, 565 F. Supp. 3d at 705 (taking judicial notice of pages from a non-party's website because they were "publicly available"); *see also* n.9, *supra*. As further explained below, Argument Section I, *infra*, the Court need not take judicial notice of these CBAs to find that the complaint fails to allege parallel conduct.

[11] https://www.dol.gov/agencies/olms/regs/compliance/cba. Courts in this circuit take judicial notice of publicly accessible agency documents and guidance. *See Whateley v. Lackey*, 785 F. Supp. 3d 149, 158 n.4 (W.D. Va. 2025) (taking judicial notice of publicly available guidelines on a Virginia Department of Motor Vehicles website); *Barry v. Novartis Pharms. Corp.*, No. 3:22-cv-196 (DJN), 2022 WL 2373452, at *5 (E.D. Va. June 30, 2022) ("Because these documents constitute FDA publications that the public can access via the FDA website, they satisfy Rule 201, and the Court will judicially notice them as it considers the Motion to Dismiss."). *See* nn.2, 9 *supra*.

[12] *See Berkeley Labor Contracts Repository (Closed, contract dates:1987-2004,* https://escholarship.org/uc/iir_library_contracts (last visited Oct. 14, 2025); *Collective Bargaining Center, Cornell eCommons,* https://ecommons.cornell.edu/communities/238ac4af-d447-4653-98d2-3c8d453d794e (last visited Oct. 14, 2025); *Collective Bargaining Agreements – Practical Law WestLaw,* https://content.next.westlaw.com/practical-law/whats-market/collective-bargaining-agreements?transitionType=Default&contextData=(sc.Default) (last visited

unions—in addition to distributing CBAs to all of their members—often share their own CBAs with the public as well, describing their key terms (including wages) or posting the CBAs directly to union websites. *See, e.g.*, *Union Documents*, IBEW Local 15 (showcasing CBAs for various bargaining units within the energy sector, including nuclear generation)[13]; *Braidwood Nuclear Security Officers Ratify Its First Contract with NUNSO*, Nat'l Union of Nuclear Sec. Officers (Aug. 13, 2021).[14]

The U.S Bureau of Labor Statistics (BLS) also maintains compensation information for pertinent roles. For example, the BLS provides publicly available, detailed employment and wage information for nuclear reactor operators as a whole; this data is accessible not only to Defendants but to any interested observer. Occupational Employment and Wage Statistics, U.S. Bureau of Lab. Stat. (Apr. 3, 2024).[15] Many states have gone even further, enacting pay transparency laws that require job postings to provide salary or wage ranges to the public. For instance, Illinois now requires employers with more than 15 employees to include pay scale and benefit information in job postings, Equal Pay Act-Pay Scale, Public Act 103-0539, 103rd General Assemb. (Ill. 2023), and Minnesota does the same for employers with 30 or more employees, Labor and Industry Policy Omnibus, S.F.No. 3852, 93rd Legislature (Minn. 2023). Through such postings, government statistics, and CBAs, a large amount of data regarding nuclear generation employee compensation

---

Oct.14,    2025);    Bloomberg    Law   –   Labor   and   Employment   Law, https://www.bloomberglaw.com/product/labor/search/results/8fe297333804c149b256171a801fa5e8;    Bloomberg Law, Dockets, https://www.bloomberglaw.com/help/dockets. *See* nn.9-10 *supra*.

[13] https://www.ibewlocal15.org/union-documents (last visited Oct. 6, 2025). The Court may also take judicial notice of documents that are "central" or "integral" to Plaintiffs' claims. *See Tinsley v. OneWest Bank*, FSB, 4 F. Supp. 3d 805, 819 (S.D. W.Va. Mar. 14, 2014). Here, the Complaint references CBAs or the repositories in which they were "secretly" held nearly 150 times. *See* n.9, *supra*.

[14] https://www.nunso.org/post/braidwood-nuclear-security-officers-ratify-its-first-contract-with-nunso.    *See*    n.13, *supra*.

[15] https://www.bls.gov/oes/2023/may/oes518011.htm#(2). *See* n.2, *supra*.

is publicly available. Plaintiffs' conclusory suggestion that compensation information for employees in the nuclear power industry is "secret" and could only be accessed through a "secret" conspiracy cannot be accepted even on a motion to dismiss.

## III.    THE NUCLEAR POWER INDUSTRY'S CULTURE OF COLLABORATION

Plaintiffs' entire Complaint suggests that collaboration—and specifically the nuclear power industry's "unique culture of collaboration"—is nefarious, in the hopes that the Court will overlook the Complaint's pleading deficiencies. Compl. ¶ 273. One such example is when the Plaintiffs selectively quote, out of context, a single podcast episode discussing industrywide information sharing. *Id.* ¶ 151. But in that podcast episode, Maria Korsnick, a former Constellation executive who now leads the Nuclear Energy Institute ("NEI")—a policy-focused nuclear energy interest group—explained that the purpose of collaboration in the nuclear power industry is to ensure that all nuclear energy providers "benefit from the experience of other utilities and other power plants." Titans of Nuclear, *Episode 368: Maria Korsnick – President and CEO, Nuclear Energy Institute*, Energy Impact Center (Oct. 13, 2022) ("Titans of Nuclear").[16] She elaborated: "[W]hy are we being so transparent? Why do we share that information? It is literally because, yeah, we might be competing in the marketplace, but you know what? I want you to have a really effective and efficiently-running power plant." Compl. ¶ 151.

Far from supporting Plaintiffs' implausible conspiracy theory, Ms. Korsnick's statements are consistent with the views of the NRC. The NRC publicly issued a final report following the Three Mile Island incident, concluding that nuclear power providers would "achiev[e] a significant

---

[16] https://podcasts.apple.com/us/podcast/ep-368-maria-korsnick-president-and-ceo-nuclear/id1331598443?i=1000582549577. Plaintiffs' Complaint incorporates this podcast episode by reference, *see* Compl. ¶ 151. *See Hayes v. Maryland Transit Admin.*, 708 F. Supp. 3d 683, 689 (D. Md. 2023), *aff'd*, 2024 WL 4262786 (4th Cir. Sept. 23, 2024) (noting a court may properly consider a document referenced in the Complaint at the motion to dismiss stage, particularly where a plaintiff has incorporated a portion of the document by reference).

improvement in operational safety" with the establishment of the Institute of Nuclear Power Operations ("INPO"), an industry group designed to "[c]oordinate information reporting and analysis with other organizations," "[e]xchange information and experience with operators of nuclear power plants" (including those in other countries), and "[e]stablish industry-wide benchmarks." Nuclear Regulatory Committee, TMI-2 Task Force Final Report at 2-4 (Oct. 1979).[17] The NRC's publication "Trait Talk" (provided on its website) explains that the NRC continues to encourage "benchmarking as an avenue for acquiring innovative ideas to improve nuclear safety." *Continuous Learning*, NRC Trait Talk at 2 (Feb. 2015).[18]

To comply with the government's directives, the nuclear industry has established several organizations dedicated to disseminating relevant knowledge. The most prominent of these organizations is INPO. INPO requires its members to "share best practices and lessons learned with fellow members" and "serves as a clearinghouse for the industry's largest repository of operating experience data." INPO, *Partnering with Members* (2025) at 1-2.[19] This information sharing and benchmarking is explicitly tied to safety and effectiveness. For instance, INPO instructs its members in an "open distribution" document that benchmarking "promotes continuous improvement," "allow[s] the opportunity to learn from errors and to take corrective actions to prevent recurrences," and "improve[s] human performance throughout the organization." INPO,

---

[17] https://www.nrc.gov/docs/ML0614/ML061430367.pdf. Press releases and other information posted to government agency websites may be judicially noticed. *South Carolina v. United States*, 2017 WL 976298, at *5. *See also* n.2, *supra*.

[18] https://www.nrc.gov/docs/ML1505/ML15050A092.pdf. *See* n.17, *supra*.

[19] https://www.inpo.info/s/INPOBRIEF-The-Value-of-Membership-8nhm.pdf. *See* n.9, *supra*. Moreover, Plaintiffs own allegations (1) explicitly reference INPO and (2) acknowledge its information sharing function. Compl. ¶ 218. *See* n.16, *supra*.

*Principles for Excellence in Nuclear Supplier Performance*, at 10 (Oct. 2014).[20] For INPO, information sharing is designed to help nuclear power providers "identify solutions to problems and opportunities to emulate best practices." INPO, *Performance Objectives and Criteria for Operating Nuclear Electric Generating Stations*, at 11 (Nov. 1996 General Distribution document).[21]

 Similarly, NEI also "facilitates networking and knowledge sharing that collectively shapes the nuclear energy landscape," using benchmarking to "compare performance across the industry . . . to monitor the safe and reliable operation of nuclear power plants." *About NEI*, NEI, https://www.nei.org/about-nei (last visited Oct. 14, 2025); NEI, *Efficiency Bulletin 17-24: Industry Standardized Performance Indicators*, at 1-2 (Dec. 18, 2017).[22] Because "[s]haring operating experience is a factor in the continuous improvement of nuclear plant operating practices," NEI supports a "comprehensive benchmarking effort" across the entire industry. NEI, *Safety: The Nuclear Energy Industry's Highest Priority* (June 2015).[23]

 NEI has particularly emphasized that benchmarking compensation and benefits information—what Plaintiffs allege the Defendants did here—fosters more attractive workplaces for employees and improves retention. NEI, *Nuclear Energy Industry Workforce Strategic Plan* at

---

[20]https://www.brucepower.com/wp-content/uploads/2023/04/14-05_Principles_for_Excellence_in_Nuclear_Supplier_Performance-AX.pdf; *See* n.9, *supra*.

[21] Accessible at https://www.nrc.gov/docs/ML2013/ML20133C719.pdf. *See* nn.2, 9, *supra*.

[22]https://www.nei.org/CorporateSite/media/filefolder/resources/delivering-nuclear-promise/2017/eb-17-24-standard-performance-indicators-1.pdf. *See* n.9, *supra*. *See also* Compl. ¶¶ 150, 272(c) (alleging that NEI is a "U.S. policy and technical organization focused on the commercial nuclear power industry" that advocates "for the interests of Nuclear Defendants").

[23] https://www.nei.org/resources/fact-sheets/safety-nuclear-energy-industry-highest-priority. See n.9, *supra*.

27 (Oct. 2023) ("*NEI Workforce Strategic Plan*").[24] As NEI explained, "[I]t is imperative that the industry ensures an adequate supply of fully qualified and diverse workers to meet the demand of all industry segments." *Id.* at 2. In other words, nuclear power plants cannot operate at their highest level (or at all) without fully qualified workers to work at these plants. But for the industry to attract the right workers and "be perceived as highly competitive, it needs to pay fair wages." *Id.* at 27. So, NEI proposed "industry benchmarking opportunities where possible (e.g., compensation studies, benefits benchmarking data)" to promote retention and fair wages. *Id.*

Another industry group Plaintiffs single out, the Nuclear Human Resources Group ("NHRG"), is also focused on creating attractive workplaces and improving retention. The NHRG was formed in 1988 and began hosting annual conferences in 1995. Compl. ¶ 181. NHRG allegedly operated several projects, including one focused on labor relations (the "Labor Relations Project") and one focused on compensation generally (the "Total Rewards Project"). *Id.* ¶ 187. NHRG allegedly served as "a forum for human resources executives to communicate . . . regarding compensation and other issues relating to labor relations." *Id.* ¶ 192. NHRG's Labor Relations Project allegedly provided a repository of nuclear power companies' CBAs with unions, *id.* ¶ 8, many of which are publicly available, *see supra* Background Section II. And the NHRG regularly worked with other industry organizations focused on collaboration across the nuclear power generation industry: for example, NHRG's annual conferences in both 2005 and 2009 were hosted by INPO. *Id.* ¶ 218.

Not only has the NRC recognized the benefits of the benchmarking that Plaintiffs challenge, but the federal and state governments sometimes *require* such benchmarking. Nowhere

---

[24] https://www.nei.org/getmedia/c0802a32-be56-4bac-b62a-81cab624fd1e/Workforce-Strategic-Plan.pdf. *See* n.9, *supra*.

is this more obvious than the TVA—a Nuclear Defendant and wholly-owned corporate entity and instrumentality of the United States governed directly by federal statute. The Tennessee Valley Authority Act of 1933, 16 U.S.C. § 831 et seq., requires the TVA to establish an employee compensation plan "based on an annual survey of the prevailing compensation for similar positions in private industry" and to pay its laborers and mechanics wages that are "not less than the prevailing rate of wages for work of a similar nature prevailing in the vicinity." *See* 16 U.S.C. §§ 831a(i)(2), 831b(b); *United Gov't Sec. Officers of Am., Int'l Union Loc. 22 v. Tennessee Valley Auth.*, No. 5:16-CV-00271-MHH, 2020 WL 1285920, at *2 (N.D. Ala. Mar. 17, 2020) (hereinafter "*Loc. 22*"). Similarly, Energy Northwest, a government agency created by the Washington state legislature, is required by statute to compare "the wages, benefits, hours of work, and working conditions" of its collective bargaining employees "with those of like personnel in relevant Washington labor markets" or "with similar personnel in the states of California and Arizona." Wash. Rev. Code. § 41.56.575(2)(c).[25] Many other states likewise demand that regulated utilities produce wage benchmarks during rate-setting proceedings to demonstrate the "reasonableness [and] prudence" of labor costs "incurred or projected to be incurred." Va. Code Ann. § 56-585.1; *see also, e.g.*, N.C. Gen. Stat. § 62-133(b) (fixing a rate of return based on "public utility's reasonable operating expenses").

These requirements, in turn, necessitate collecting information about wages paid by other nuclear power operators. Accordingly, courts have recognized that TVA's collection of wage information in the nuclear context is required to satisfy this statutory mandate. *See Loc. 22*, 2020 WL 1285920, at *2. That Defendants allegedly reached the same conclusion as Congress that

---

[25]Energy Northwest is also required to share its own compensation information under Washington's Public Records Act. *See* Wash. Rev. Code. § 42.56.001 et seq.

benchmarking compensation would be beneficial in the nuclear power industry is not a plausible basis on which to allege an illegal compensation-fixing conspiracy.

## LEGAL STANDARD

### I.    MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

To survive a motion to dismiss under Rule 12(b)(6), Plaintiffs' Complaint must contain "well-pled facts," *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 418 (4th Cir. 2015) (citation omitted), sufficiently specific for the court to determine whether a claim is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although courts must "accept as true" a complaint's factual allegations, courts can "put aside" any "naked assertions devoid of further factual enhancement," *SD3, LLC*, 801 F.3d at 422, and courts must reject mere "legal conclusion[s] couched as a factual allegation." *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014) (citation omitted). In determining whether a claim is plausible, courts need not set aside their "experience and common sense." *Iqbal*, 556 U.S. at 663-64. Courts routinely dismiss complaints that rely on "unwarranted inferences" or "unreasonable conclusions," *SD3, LLC,* 801 F.3d at 422 (citation omitted), particularly where, as here, plaintiffs seek to assert antitrust claims under Section 1 of the Sherman Act.

### II.    PER SE AND RULE OF REASON CLAIMS BROUGHT PURSUANT TO SECTION 1 OF THE SHERMAN ACT

Count 1 of Plaintiffs' Complaint is styled as a "per se" compensation-fixing claim brought pursuant to Section 1 of the Sherman Act, while Count 2 of Plaintiffs' Complaint purports to assert a "rule of reason" claim based on alleged information sharing for the purpose of suppressing compensation. Both are brought pursuant to Section 1 of the Sherman Act, which requires Plaintiffs to allege "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002).

While a small number of restraints are deemed illegal per se, most alleged restraints are analyzed under the rule of reason. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) ("The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of § 1."). Under the rule of reason, the plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior "had an *actual* adverse effect on competition as a whole in the relevant market." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 506-07 (2d Cir. 2004); *Imaging Ctr., Inc. v. W. Maryland Health Sys., Inc.*, 158 F. App'x 413, 419 (4th Cir. 2005) ("[T]he reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." (quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991)). Defining a relevant market is a prerequisite to defining market power, which is "[t]he first step in any Rule of Reason case." *Polk Bros. v. Forest City Enters., Inc.*, 776 F.2d 185, 191 (7th Cir. 1985). If the plaintiff meets its initial burden of showing market-wide anticompetitive harm, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *United States v. Booz Allen Hamilton Inc.*, No. CCB-22-1603, 2022 WL 9976035, at *5 (D. Md. Oct. 17, 2022); *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42. (2018).

Under either analytical framework, the conspiracy alleged must be plausible. Dismissal is required even if Plaintiffs' allegations are conceivable, so long as they are not plausible in light of the context of the case. *See, e.g.*, *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 281 (4th Cir. 2012) (affirming dismissal where alleged conspiracy "simply makes no practical or economic sense"); *Orji v. Citadel Sec., LLC*, No. 8:23-CV-02986-LKG, 2025 WL 860178, at *17 (D. Md.

Mar. 19, 2025) (granting defendant's motion to dismiss after concluding plaintiff's complaint "fails to state plausible claims . . . under the Sherman Act"); *Llacua v. W. Range Ass'n*, 930 F.3d 1161, 1181 (10th Cir. 2019) (affirming dismissal of alleged wage-fixing conspiracy where allegations did "not . . . plausibly suggest individual [members] entered into any agreement with the [Defendants] or among themselves to establish and adhere to a specific wage"); *Ogden v. Little Caeser Enters., Inc.*, 393 F. Supp. 3d 622, 635 (E.D. Mich. 2019) ("[T]he plaintiff has failed sufficiently to allege the sort of explicit, comprehensive wage-fixing compact that has been found to sustain claims.").

## ARGUMENT

Plaintiffs' claims should be dismissed as a matter of law. Plaintiffs have failed to state a per se claim for a compensation-fixing conspiracy (Count 1) and have also failed to state a claim based on information sharing under the rule of reason (Count 2). Not only that, but Plaintiffs' claims are barred by the statute of limitations. For these reasons, the Court should grant Defendants' motion.

## I.    PLAINTIFFS HAVE FAILED TO STATE A PER SE CLAIM FOR A COMPENSATION-FIXING CONSPIRACY UNDER SECTION 1 OF THE SHERMAN ACT

Count 1 alleges a per se compensation-fixing claim, contending that Defendants conspired to fix compensation for "[a]ll persons employed in nuclear power generation by the Nuclear Defendants and coconspirators, their subsidiaries, and/or related entities in the United States from May 1, 2003 until the present." Compl. ¶ 331; *see also id.* ¶ 333 (excluding only "human-resources executives, labor managers, human-resources managers, human-resources staff, officers, and directors"). Merely asserting such a far-reaching, lengthy, and highly complex conspiracy is not enough. Rather, Plaintiffs must adequately allege either "direct" or "circumstantial" evidence that an unlawful agreement to suppress compensation existed. *Robertson v. Sea Pines Real Estate Cos.*,

*Inc.*, 679 F.3d 278, 289 (4th Cir. 2012) (citation omitted). Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (citation omitted). To proceed based on circumstantial evidence, "a plaintiff must plead parallel conduct *and* something 'more.'" *SD3, LLC*, 801 F.3d at 424 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557 (2007) (emphasis in original)).

Plaintiffs have done neither. Instead, Plaintiffs repackage the allegations of their Count 2 rule of reason claim—which amounts to ordinary-course compensation benchmarking and information sharing—as a per se compensation-fixing claim, an approach courts categorically reject. *See*, *e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (explaining that even "[e]xchanges of current price information" are "not per se unlawful"); *Jien v. Perdue Farms, Inc.*, No. 1:19-CV-2521-SAG, 2020 WL 5544183, at *9 (D. Md. Sept. 16, 2020) ("[I]nformation exchanges are not per se unlawful.").[26] Therefore, Count 1 fails as a matter of law and should be dismissed.

### A.    Plaintiffs Do Not Allege Direct Evidence of a Conspiracy to Suppress Compensation.

Direct evidence of an agreement requires no inferences. Rather, it is the proverbial "smoking gun." *Am. Chiropractic Ass'n*, 367 F.3d at 226. Courts have held, for example, that direct evidence includes "an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price," *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010), or "a recorded phone call in which

---

[26] Defendants in no way concede that an alleged agreement to fix compensation or wages should be evaluated under the per se standard, but do not address the issue because Plaintiffs have failed to allege any agreement to fix compensation, which dooms Count 1 under any standard.

two competitors agreed to fix prices at a certain level." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). Here, Plaintiffs have alleged nothing close to direct evidence that Defendants agreed to fix employee compensation.

Rather, Plaintiffs invoke a number of "confidential witnesses," but nothing those alleged witnesses say supplies the smoking gun Plaintiffs need to allege direct evidence. The Complaint contains some 60 paragraphs of quotes attributed to these witnesses. Those paragraphs are designed to create the illusion that there is evidentiary support for Plaintiffs' compensation-fixing conspiracy allegations. But those quotes contravene—rather than support—the existence of any conspiracy. For example, certain quotes describe alleged efforts by Defendants to pay compensation at or near the preexisting market median. *See, e.g.*, Compl. ¶ 242 ("A former compensation employee at STP stated that she would never 'exceed a certain percentage of the midpoint' established by the WTW Survey when recommending salary adjustments."). Such allegations, taken as true, would establish that certain Nuclear Defendants made independent decisions within their own companies to attempt to match the market median—to offer *competitive* compensation, not to collude with other Nuclear Defendants. Other allegations make clear that the CBAs the Nuclear Defendants allegedly shared had already been negotiated and signed, further undermining the notion of a multilateral conspiracy to fix compensation. *See, e.g.*, *id.* ¶ 227 ("A former Entergy Labor Relations Manager who participated in the Labor Relations Project meetings said . . . the purpose of meetings was to report 'data points' and ***'outcomes' of labor negotiations***." (emphasis added)); *id.* ¶ 256 ("A former labor manager for the Callaway Energy Center said that he 'typically called' competing nuclear plants to 'ask for a copy' of their union contracts 'to get a sense of their wages and benefits.'").

If anything, the alleged witnesses' statements are most notable for what they **_do not_** say. Not a single witness claims that there was any kind of "agreement" or "understanding" between the Defendants to suppress wages—for any job, in any year. And nowhere in the Complaint is the alleged agreement even precisely articulated. For example, it remains unclear whether the alleged agreement was to keep wages flat for a certain time period, to grow only by certain amounts each year, or to pay only certain rates for certain types of workers. And it also remains unclear whether an alleged agreement even concerned benefits or other forms of compensation. The Complaint's silence on these questions is as telling as it is fatal. Despite purported access to over a dozen employees in senior ranking roles, such as "HR executive," "Director of Compensation," and "compensation executive," Plaintiffs have not found one person who admitted to reaching an agreement or reported an agreement, an understanding, or even a knowing wink. The most Plaintiffs allege is that Defendants collaborated and shared compensation information.

- **Information Sharing:** Plaintiffs allege that compensation decisions were "'never made in a silo'" and that "'there was a lot of collaboration and information sharing between many big nuclear companies in regards to union details.'" Compl. ¶ 5.

- **Calls About Wage Statistics:** One witness "formerly employed by a Nuclear Defendant"[27] allegedly stated that she "would regularly 'pick up the phone' and ask her human resources counterparts at other nuclear power companies to provide 'average salary, minimum and maximum, and incentives' data for specific positions and that her counterparts readily provided that information." _Id._ ¶ 14.

- **Sharing Knowledge (About Undefined Topics):** Witnesses explained "the nuclear industry was 'very open as far as sharing' information" and that "'external partnerships' and 'sharing knowledge' with other nuclear utilities in the industry was 'encouraged' and 'an advantage for companies when done right.'" _Id._ ¶ 152.

---

[27] Because the former employer of this alleged informant is unknown, it is unknown whether this alleged informant was employed by a current Defendant or one of the three Nuclear Defendants that have been voluntarily dismissed by Plaintiffs.

Allegations of "contact between two independent economic actors" are "insufficient evidence [of] an anticompetitive conspiracy," *Am. Chiropractic Ass'n*, 367 F.3d at 227 (quotation omitted), and none of the contacts alleged here evince an agreement to do what Count 1 alleges: suppress compensation. Moreover, ***none*** of this indicates an ***agreement on what wages or benefits should be or will be***; at most, they reflect information benchmarking to aid in Defendants' independent decision-making about employee compensation levels. These allegations are a far cry from a "smoking gun" reflecting a 20+ year compensation-fixing conspiracy.

Contrasting the instant Complaint with a complaint in another compensation-fixing case in this District further underscores the point. In *Jien v. Perdue Farms, Inc.*, plaintiffs relied on confidential witness statements to allege compensation fixing. 2020 WL 5544183, at *5. The Court concluded that plaintiffs in that case sufficiently alleged that the Defendants were collaborating in an "intentional way" to "depress wages," and explained "the most important direct evidence" was "a statement by a senior Tyson executive" who said that "discussions about wages, salaries and benefits at the 'off the books' meetings held at the Hilton Sandestin Resort Hotel & Spa in Destin, Florida were so inappropriate and improper that the company would no longer attend [the secret meetings]." *Id.* at *5-6. The court noted "this statement is precisely the sort of 'smoking gun' that makes [p]laintiffs' *per se* antitrust claim plausible." *Id.* at *5. Plaintiffs allege nothing like that here. Not a single confidential witness has provided statements that would amount to direct evidence of a compensation fixing conspiracy. Accordingly, Plaintiffs cannot meet the high bar of alleging direct evidence of any compensation-fixing agreement.

### B.    Plaintiffs Do Not Sufficiently Allege Circumstantial Evidence of an Agreement to Suppress Compensation.

A plaintiff who lacks direct evidence of an antitrust conspiracy must rely instead on circumstantial evidence—specifically, parallel conduct combined with "plus factors" that make an

inference of agreement **plausible**, not merely possible. *Twombly*, 550 U.S. at 556-57; *SD3, LLC*, 801 F.3d at 424. Here, Plaintiffs sufficiently allege neither parallel conduct nor plus factors. As to parallel conduct, Plaintiffs offer just *two* allegations about comparable wages relating to only *three* of the 23 remaining Nuclear Defendants. As explained below, these allegations do not show parallel conduct by the three referenced Defendants—much less all 23 remaining Nuclear Defendants. As a matter of law, that ends the analysis. But additionally, Plaintiffs' plus factors fall well short of plausibly showing a conspiracy to fix compensation. Again, Plaintiffs fail in trying to convert standard collaboration and benchmarking into a compensation-fixing conspiracy.

### 1.     Plaintiffs Do Not Allege Parallel Conduct By Defendants.

Parallel conduct is not optional in an antitrust conspiracy case premised on circumstantial evidence; it is foundational. Without alleging parallel conduct, there is no basis from which the Court could plausibly infer the existence of the alleged agreement. To allege parallel conduct, Plaintiffs must "plead[] facts indicating that the [D]efendants acted 'similarly,'" or that their "actions were uniform." *SD3, LLC*, 801 F.3d at 427 (citation omitted); *Merck-Medco Managed Care, Inc. v. Rite Aid Corp.*, 22 F. Supp. 2d 447, 467 (D. Md. 1998) (The "existence of an antitrust conspiracy may be inferred from evidence of . . . a 'pattern of uniform conduct among competitors.'"). In a compensation-fixing case, pleading parallel conduct requires more than "conclusory group pleadings" about "alignment of compensation"—it requires allegations of specific facts such as "comparative wage levels" and "other specific compensation data" connected to the alleged conspirators. *Jien*, 2020 WL 5544183, at *8. Plaintiffs include no such allegations here.

Despite having access to large swaths of publicly available wage data, including CBAs, Plaintiffs fail to provide the Court with allegations concerning wages that are or were parallel.

Instead, Plaintiffs' 372-paragraph, 121-page Complaint contains only *two* paragraphs that discuss specific wage elements of compensation paid by only *three* Defendants:

(1) Paragraph 262, in which Plaintiffs allege that in 2015 and 2018, the general wage increase for union employees (*i.e.*, their annual wage increase) at Exelon's plants in Illinois and its Oyster Creek plant in New Jersey matched PPL's Susquehanna plant, and that in 2014, the general wage increase applicable to Exelon's Illinois plants matched PPL's Susquehanna plant.

(2) Paragraph 263, in which Plaintiffs allege the hourly rate of non-licensed nuclear operators at Exelon's Oyster Creek plant in New Jersey in 2020 matched the hourly rate of non-licensed nuclear operators in two FPL plants in Florida in 2020, and that in 2019 the hourly rate of electrical maintenance workers at those same three plants also matched.

That's it. At the threshold, the lack of *any* parallel conduct allegations as to 20 of the 23 remaining Nuclear Defendants is fatal to Plaintiffs' attempt to plausibly plead circumstantial evidence of a compensation fixing conspiracy among all Defendants. *In re Pork Antitrust Litig.*, No. 18-1776-JRT, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) ("Without specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply of pork. And that type of information is vital to pleading parallel conduct.").

Nor do these two paragraphs in the Complaint plausibly allege parallel conduct even as to the three referenced Defendants. Each of the examples relates to only a few cherry-picked jobs, a few cherry-picked plants, in a few cherry-picked years, out of the 22 years and hundreds of potential job categories at issue. *See In re Concrete & Cement Additives Antitrust Litig.*, No. 24-md-3097(LJL), 2025 WL 1755193, at *16 (S.D.N.Y. June 25, 2025) ("The fact that out of the alleged Class Period of over one hundred months, the Plaintiffs are able to isolate a ten-month period during which most of the Defendants raised prices does little to establish parallel conduct."). These limited allegations are insufficient to show the "similar[ity]" and "uniform[ity]" required to

demonstrate parallel conduct. *SD3, LLC*, 801 F.3d at 427; *Cf. Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 804 F. Supp. 2d 419, 422-23 (D. Md. 2011) (parallel conduct sufficiently alleged through detailed allegations of simultaneous, lock-step price increase announcements by all defendants at 14 specific times over six years).

These deficiencies are not due to a lack of available information. Indeed, Defendants have identified 81 publicly available CBAs since the Complaint was filed (*see* Exhibits 1-3),[28] demonstrating that CBAs are not "highly confidential and inaccessible to the Nuclear Defendants absent the unlawful exchange," as Plaintiffs contend. Compl. ¶ 8.[29] Even worse for Plaintiffs, a closer look at these CBAs reveals why Plaintiffs did not rely on them: they disprove Plaintiffs' allegations of parallel conduct.

As an example, with respect to the allegations in paragraph 263, Plaintiffs fail to inform the Court that the wages referenced in the Complaint were not the *only* hourly wages available for "non-licensed nuclear operators" or "electrical maintenance workers" at Exelon's Oyster Creek plant or FPL's plants.[30] Plaintiffs appear to have omitted that critical information because the other wage rates were not in fact aligned. In fact, the Exelon Oyster Creek CBA referenced in paragraph 263 includes *twelve* different hourly rates for nuclear plant operators that differ by level of seniority

---

[28] *See* n.10, *supra* (summarizing sources for all 81 identified publicly available CBAs); *see also* Exhibit 3 ("Bibliography").

[29] Moreover, while these 81 have been identified to-date, it is currently unknown what additional CBAs were publicly available over the last 22 years.

[30] By referencing the wages of unionized positions at specific plants in 2019 and 2020 and alleging that union compensation is set by CBAs, the Complaint incorporates by references the CBAs that set these wages. *See* n.15, *supra*. Moreover, these CBAs are publicly hosted online by the very union locals that *negotiated* these CBAs with Exelon and FPL, respectively. *See* IBEW-Local 1289, https://www.local1289ibew.org/wp-content/uploads/2022/04/oyster_creek_2015-2021.pdf; IBEW Local U-4; http://scu4ibew.unionactive.com/2020-2022%20FPL%20SC%20U-4%20MOA%20FINAL.pdf. *See generally Just Puppies, Inc.,* 565 F. Supp. 3d at 705 (taking judicial notice of pages from a non-party's website because they were "publicly available"); *see* nn. 9, 16, *supra*.

and time in the job. The FPL CBA, on the other hand, identifies a minimum and maximum hourly rate for non-licensed operators specifically, and then provides for a 20-cent increase in base-pay every six months of employment. The tables below reflect these varying wage rates, and the highlighted wages are the only ones Plaintiffs chose to include in the Complaint.

| Exelon Oyster Creek Wage Rate Schedule, Effective Feb. 1, 2020 (Exhibit 4 at 119) | | | |
|---|---|---|---|
| Job Title | Rate 1 (0-6 months of employment) | Rate 2 (7-12 months of employment) | Job Rate |
| Nuclear Plant Operator | $47.87 | $53.86 | $59.86 |
| Step 3 | $43.11 | $48.50 | $53.86 |
| Step 2 | $39.00 | $43.84 | $48.69 |
| Step 1 | $35.03 | $39.45 | $43.84 |

| FPL Hourly Wages Schedule, Effective Oct. 24, 2020 (Exhibit 5 at 21) | | | |
|---|---|---|---|
| Job Title | Min | Max | Increase Every 6 Months |
| Non-Licensed Operator | $43.84 | $49.68 | $0.20 |

The Exelon Oyster Creek CBA does not even have a job title called "non-licensed nuclear plant operator." Moreover, $43.84 is the minimum rate for a non-licensed nuclear operator at FPL, but this hourly rate does not match the minimum hourly rates for any level of nuclear plant operator at Exelon's Oyster Creek plant. In fact, FPL offers a *higher* minimum hourly rate for all but one tier of the nuclear plant operators at Exelon's Oyster Creek plant. And none of the other hourly rates referenced in Exelon's Oyster Creek CBA match the maximum rate for a non-licensed nuclear operator at FPL.

CBAs referenced in paragraph 263 reveal the same problem with respect to electrical

maintenance workers.[31] The Exelon Oyster Creek CBA includes two different job titles for electrical maintenance workers and six different hourly wages based on the time spent in the job. In contrast, the FPL CBA identifies three categories of electrical maintenance and construction workers, each with a minimum and a maximum base wage, for a total of six different hourly wages in 2019. The FPL CBA states that there will be a $0.20 increase every six months for one of these roles and a $0.25 increase every six months for another one of these roles. Once again, Plaintiffs' Complaint refers only to the highlighted wage in each table.

| Exelon Oyster Creek Wage Rate Schedule, Effective Feb. 1, 2019 (Exhibit 4 at 115) | | | |
|---|---|---|---|
| Job Title | Rate 1 (0-6 months of employment) | Rate 2 (7-12 months of employment) | Job Rate |
| Electrical Maintenance "A" – Nuclear | $38.79 | $43.63 | $48.48 |
| Electrical Maintenance "B" – Nuclear | $34.88 | $39.28 | $43.64 |

| FPL Hourly Wages Schedule, Effective Oct. 26, 2019 (Exhibit 5 at 21) | | | |
|---|---|---|---|
| Job Title | Min | Max | Increase Every 6 Months |
| Gen Maint LDR | $49.57 | $49.57 | N/A |
| Elect Plant – N | $43.63 | $44.43 | $0.20 |
| Appr Elect - N | $34.56 | $35.61 | $0.25 |

Like the prior example, the job titles between the two CBAs do not match, so the wages may not even be tied to the same roles. And like the prior example, the minimum hourly rate highlighted

---

[31] See n.30, supra.

by Plaintiffs for FPL's "Elect Plant – N" position is higher than any of the minimum rates offered at Exelon's Oyster Creek plant for electrical maintenance workers, suggesting that FPL was paying these workers *more* than Exelon was paying their counterparts at Oyster Creek. Finally, outside of the two highlighted wages, *none* of the other wages for electrical maintenance workers in the Exelon Oyster Creek CBA match any of the hourly wages for any of the electrical maintenance and construction job titles in the FPL CBA.

Given the breadth of job categories included in the putative Class, the many Defendants, and the lengthy alleged Class Period, Plaintiffs should have had an abundance of data points to choose from. The fact that they only alleged a tiny handful is telling. The data points Plaintiffs do allege are woefully inadequate to allege a conspiracy to fix compensation based on parallel wages among *any* of the Defendants during the Class Period. They do not even specify compensation paid by the vast majority of Nuclear Defendants, and the Complaint's few isolated examples do not actually show parallel wages between any set of Defendants, let alone *all* of them.

> 2.    Plaintiffs Have Failed to Allege "Plus Factors" That Plausibly Show a Conspiracy to Suppress Wages.

When Plaintiffs fail to "plausibly allege the requisite parallel conduct, their collusion *per se* claims based on circumstantial evidence fail, and no discussion of 'plus factors' is required." *Jien*, 2020 WL 5544183, at *9 (citing *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018)). Accordingly, Plaintiffs' failure to allege parallel conduct dooms their compensation-fixing claim. That is because the purpose of plus factors is to "demonstrate[] that the parallel behavior 'would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" *SD3, LLC*, 801 F.3d at 424 (quotation omitted). Thus, pleading plus factors

alone does not plausibly allege a conspiracy. Even so, Plaintiffs' allegations of plus factors also fail to "raise[] a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557.

Plaintiffs' attempt to plead plus factors cannot make it off the starting line. Plaintiffs allege that the "Defendants formed and implemented the conspiracy in order to reduce the Nuclear Defendants' labor costs and maximize their profits." Compl. ¶ 179. A "common motive to conspire" is often alleged in Section 1 cases, though it is typically viewed as a weak plus factor because "common motive does not suggest an agreement." *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). This is because "[a]ny firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors." *Id.* So as a "plus factor standing alone," common motive "does not lead to an inference of conspiracy." *Tera Group, Inc. v. Citigroup, Inc.*, No. 24-135, 2024 WL 4501967, at *3 (2d Cir. Oct. 16, 2024) (quotation omitted).

But Plaintiffs cannot even allege *that* plausibly. As set forth above, their Complaint takes aim at publicly owned utilities who operate under direct government control, traditional investor-owned utilities whose allowed rates of return are set by state public service commissions, and companies known as merchant generators. Merchant generators, as the products of industry deregulation, operate independently and sell electricity at "wholesale across state lines." *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 412 (2d Cir. 2013). They "sell[] power in a competitive market to recover both investment costs and operating costs." *Electricity Regulation* at 190.[32] And they earn rates that are supposed to be established by competition, not regulation, bearing the risks and reaping the rewards associated with that traditional market structure. Publicly owned and traditional investor-owned utilities, by contrast, operate under far

---

[32] *See* n.6, *supra*.

more regulation. For example, Energy Northwest, an agency of the state of Washington, provides all its nuclear power to the Bonneville Power Administration, a federal agency, which purchases and resells this power at the cost of generation. *Columbia Generating Station*, Bonneville Power Administration.[33] Traditional investor-owned utilities sell electricity to retail customers within defined areas, and they do so at rates established by public service commissions. *See, e.g.*, Va. Code Ann. § 56-585 ("A distributor shall have the obligation and right to be the supplier of default services in its certificated service territory, and shall do so, in a safe and reliable manner, at rates determined pursuant to subsection C."); *id.* § 581 ("The Commission shall regulate the rates of investor-owned incumbent electric utilities for . . . the distribution of electric energy to retail customers.").

The specifics of these commissions' regulatory schemes vary. But by and large, they are "supposed to set rates that provide utilities an opportunity to earn a reasonable rate of return of and on prudent investments, and *recovery* of reasonable expenses." *Electricity Regulation* at 47 (emphasis added). Expenses are the "costs that are directly associated with providing service"— costs like "labor, fuel, materials, and outside services"—and they are used only to calculate how much revenue a utility's rate structure must yield. *Id.* at 58. Regulations typically permit utilities to earn a profit on *investments (also known as rate base)*—subject to an authorized rate of return— but a utility's *operating expenses (including wages paid to employees)* play no role in that calculus. *See id.* at 60 (distinguishing between a utility's "rate base, rate of return, and operating expenses"); *see also Va. Elec. & Power Co. v. State Corp. Comm'n.*, 735 S.E.2d 684, 688 (Va. 2012) (regulations designed to prevent utilities from "reaping a windfall if market conditions, such as

---

[33] https://www.bpa.gov/energy-and-services/power/columbia-generating-station (last visited Oct. 15, 2025). *See* n.2, *supra*.

cost of fuel, consumer demand, and other variables, are more favorable than anticipated").

In this way, the nature of the industry renders Plaintiffs' suggestion that regulated utilities and merchant generators alike would bind together in a nationwide scheme to drive down labor costs *less* plausible, not more. Under the regulatory schemes in many states, utilities' incentive is to ensure their labor expenses are deemed reasonable and prudent by their regulators. *See, e.g.*, Va. Code § 56-585.1 ("The Commission may determine, during any proceeding authorized or required by this section, the reasonableness or prudence of any cost incurred or projected to be incurred, by a utility in connection with the subject of the proceeding."); *see also Nucor Steel v. S.C. Pub. Serv. Comm'n.*, 426 S.E.2d 319, 321 (S.C. 1992) (under South Carolina law, "when higher fuel costs are incurred, and there is a finding of imprudence, the utility should not be allowed to pass on the additional fuel costs to their customers"). This may help explain why many have gravitated toward what benchmarks reveal is the median pay but does not serve to sustain the plus factor allegations. *See, e.g.*, Compl. ¶¶ 176, 242.

Plaintiffs' other plus factors similarly fall flat. They allege six: "(1) extraordinarily high barriers to entry; (2) industry concentration; (3) fungibility of nuclear power plant labor; (4) inelastic labor supply; (5) numerous opportunities to collude, and (6) a history and culture of collaboration among the Nuclear Defendants." Compl. ¶ 264. As discussed below, Plaintiffs' plus factors amount to insisting that normal business behavior, including compensation benchmarking, is somehow sufficient to "raise[] a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 557. It is not.

***Market Conditions:*** Four of the alleged plus factors—namely, "extraordinarily high barriers to entry," "industry concentration," "fungibility of nuclear power plant labor," and "inelastic labor supply," Compl. ¶¶ 264-70—merely describe market conditions. Courts have held

that such "descriptions of the market . . . do not give rise to an inference of unlawful agreement." *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012). *See also Williamson Oil Co., Inc., v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003) (rejecting argument that high concentration, inelastic demand, high barriers to entry, and a fungible product are plus factors). Without more, these "plus factors" would essentially always presume an antitrust conspiracy in any market with these characteristics. *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 823 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) ("[B]y itself, details of an industry structure cannot show that Defendants conspired during the Class Period any more than they can show that [all the firms in the market] conspired at all times.").

At the threshold, it is facially implausible that an industry with over two dozen competitors is concentrated, even before considering the commonsense experience that nuclear power generation competes with other forms of power generation like gas-fired plants, coal plants, wind farms, solar facilities, and hydropower facilities. To the extent market structure is relevant at all, it is because "if a small number of competitors dominates a market, they will find it safer and easier to fix prices than if there are many competitors of more or less equal size." *Kleen Prods. LLC*, 910 F.3d at 935 (quoting *In re Text Messaging*, 782 F.3d at 871). In other words, "[f]ewer 'minds' must 'meet.'" *SD3, LLC*, 801 F.3d at 432. But here, Plaintiffs' so-called plus factor is contradicted by their claim that the dozens of remaining Defendants and related co-conspirators participated in the alleged conspiracy. When the "scheme alleged is so broad with so many participants over so much time," there is "just too little to push this conspiracy over the line into plausibility." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 369 (S.D.N.Y. 2016). Indeed, "a cartel cannot survive absent some enforcement mechanism," which is not alleged here. *Petruzzi's*

*IGA Supermarkets, Inc. v. Darling-Delaware Co*., 998 F.2d 1224, 1233 (3d Cir. 1993).

But more importantly, some of these plus factors relate to the *wrong* market. A plus factor that bears on the wrong market cannot support an inference that any parallel conduct in the relevant market was conscious. Plaintiffs' "relevant market" is "the *labor market* for employment in commercial nuclear power generation in the United States," Compl. ¶ 280 (emphasis added)—*i.e.,* the market where *labor is bought*. Thus, those of Plaintiffs' "plus factors" that relate only to the market where *nuclear power is sold*—"extraordinary high barriers to entry" and "industry concentration"—are irrelevant. *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (Sotomayor, J.) (explaining that the factors that indicate market power in a monopsony are the reverse of those in a seller-side monopoly).

**Opportunity to Collude:** Plaintiffs allege that Defendants had "numerous opportunities to collude," pointing to their varying levels of involvement with a litany of trade associations. *See* Compl. ¶¶ 271-72. But "mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement." *In re Musical Instruments & Equip. Antitrust Litig.,* 798 F.3d at 1196. Rather, "[d]ata-gathering and information sharing are perfectly legitimate objectives of trade associations. To hold otherwise would be to discourage legitimate market behavior, which courts are loathe to do." *Jones v. Micron Tech. Inc*., 400 F. Supp. 3d 897, 918 (N.D. Cal. 2019); *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295-96 (11th Cir. 2010).

**Culture of Collaboration:** In addition to pointing to allegations of benchmarking and collaboration as direct or circumstantial evidence of the alleged conspiracy, Plaintiffs also point to the same conduct as a plus factor. Compl. ¶ 273. But benchmarking is a normal, ordinary course business activity that courts have long recognized is procompetitive. *See e.g.*, *U.S. Gypsum*, 438

U.S. at 441 n.16; *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 582-83 (1925) ("[T]he public interest is served by the gathering and dissemination, in the widest possible manner, of information with respect to the production and distribution, cost and prices in actual sales, of market commodities."); *Five Smiths, Inc. v. Nat'l Football League*, 788 F. Supp. 1042, 1052-53 (D. Minn. 1992) ("[T]he exchange of price and other market information is generally benign conduct that facilitates efficient economic activity."). Because Plaintiffs fail to plead an agreement, either through direct or circumstantial evidence, the Court should dismiss Count I.

## II.     COUNT 2 FAILS TO STATE A CLAIM UNDER THE RULE OF REASON

In Count 2 of the Complaint, Plaintiffs advance a separate and distinct claim challenging an agreement "to exchange compensation information." Compl. ¶¶ 352-72. This claim, which must be analyzed under the more searching "rule of reason" standard, also fails as a matter of law.

As the Supreme Court long ago recognized, "[t]he exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *U.S. Gypsum Co.*, 438 U.S. at 443 n.16. Accordingly, "exchanges of information do not constitute a *per se* violation of the Sherman Act." *Id.* Information exchanges must instead be evaluated under the rule of reason, which requires an examination of "all of the circumstances to determine whether a practice unreasonably restrains competition." *Valuepest.com of Charlotte, Inc. v. Bayer Corp.*, 561 F.3d 282, 287 (4th Cir. 2009). It is blackletter law that this standard applies to a mere agreement to exchange wage information as well. *See Todd*, 275 F.3d at 199 (holding that an agreement to exchange wage information must be evaluated under the rule of reason); *Brown v. JBS USA Food Co.*, 773 F. Supp. 3d 1193, 1223 (D. Colo. 2025) (evaluating wage exchange allegations under the rule of reason); *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 791 (D. Minn. 2025) (same).

33

To sustain their rule of reason claim at the pleading stage, Plaintiffs must plausibly allege that (1) Defendants have market power within a properly defined relevant antitrust market, *Oksanen*, 945 F.2d at 709; and (2) that the challenged conduct caused "anticompetitive effects," *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002); *see also Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 763 F.2d 604, 610 n.10 (4th Cir. 1985). Plaintiffs fail to do both. While market definition can sometimes be a fact-dependent inquiry, "a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable," as it is here. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *Chapman v. N. Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (an alleged market is "legally insufficient and a motion to dismiss may be granted" where plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute[s]"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (same).

### A.    The Complaint Fails to Plead a Plausible Relevant Market.

Plaintiffs' rule of reason claim fails on its face because their alleged "relevant market"—"the labor market for employment in nuclear power generation in the United States," Compl. ¶ 280—fails to account for alternative employers outside the nuclear power industry.

In cases where a group of sellers challenges the exercise of monopsony power by a group of buyers, the boundaries of the relevant product market are "determined by the reasonable interchangeability of use or the cross-elasticity of supply between the product's buyers . . . and the substitutes for such buyers." *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 34 (D.D.C. 2022). In labor markets, this means that the relevant product market must include all reasonable substitute purchasers of workers' labor services—that is, all reasonable alternative employers. *See Eichorn v. AT&T Corp.*, 248 F.3d 131, 147 (3d Cir. 2001) (rejecting an alleged labor market because it failed to include substitute employers for plaintiffs-employees' skills and

training); *see also Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 29 (2d Cir. 2015) (dismissing complaint because the alleged relevant market for "labor services provided by nonmanagerial Hotel employees working or seeking work in Marriott-managed hotels in New York City" was too narrow); *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472-73 (6th Cir. 2005) (affirming dismissal of complaint and concluding that various alternative market definitions alleged by plaintiffs excluded obvious alternative employers). To assess "reasonable interchangeability," courts evaluate whether employees would substitute to alternative employers in response to a decrease in wages; if they would, those alternative employers must be included in the relevant market. *See Bertelsmann*, 646 F. Supp. 3d at 34.

It is readily apparent from the face of the Complaint that a large number of persons working in the nuclear power industry would substitute to employers outside of the industry if the Nuclear Defendants reduced wages. The Plaintiffs' alleged relevant market includes a wide array of sellers (employees) with fundamentally different jobs and skills, ranging from NRC-licensed nuclear reactor operators, Compl. ¶¶ 3, 154, 159, to "entry level positions such as mechanics," to "control room operators," to "site vice presidents, and executive roles," to "engineering positions and nuclear technicians," *id.* ¶ 234, to "electrical maintenance workers," and other employees in nuclear power generation not specifically discussed. *See id.* ¶ 263. By contrast, the Complaint's description of the buyers in the alleged market (the "Nuclear Defendants") inexplicably excludes many (if not most) of these workers' potential substitute employers outside of the nuclear power industry, such as fossil-fuel fired power plants, manufacturers, commercial construction firms, contractors, and telecommunications firms, among others. This exclusion is unjustified, because while ***some*** workers in the alleged market may "possess specialized knowledge and skills specific

to the nuclear industry," *Id.* ¶ 269, that is facially implausible for *all* of them. Electricians, mechanics, chemists, and countless other employees in Plaintiffs' putative class possess skills that are readily transferrable to many industries outside of the nuclear power industry.

Plaintiffs attempt to plead around this deficiency with a conclusory claim that "[t]here are no close economic and/or functional substitutes for employment in nuclear power generation from the perspective of nuclear power generation workers." Compl. ¶ 282. But each of the conclusory and formulaic allegations Plaintiffs posit fail support this claim.

*First*, even accepting Plaintiffs' claim that "[m]any nuclear power generation employees require specialized, advanced scientific or technical degrees before they are hired," *Id.* ¶ 283, the fact remains that employees could easily apply these specialized, advanced or technical degrees to jobs in other industries. Plaintiffs' own allegations support this fact: they allege that employees such as nuclear operators and nuclear engineers must have experience *outside* of the industry as a prerequisite for employment *within* the nuclear power industry. *Id.* ¶ 170 (nuclear operators must have "one year power plant experience or *two years of non-generating nuclear power facility experience*") (emphasis added); *id.* ¶ 171 (for nuclear engineers, "the Nuclear Defendants often required a bachelor of science degree in engineering *and several years of related engineering experience*") (emphasis added). And the named Plaintiffs (whose job category is undisclosed in the Complaint) are not even alleged to still be employed in the nuclear power industry. *Id.* ¶¶ 22-23. As such, Plaintiffs' own allegations *undermine* their alleged relevant labor market. Further, in cherry-picking out-of-context sentence fragments from the Titans of Nuclear podcast episode, Plaintiffs ignore that the speaker on that podcast agreed that many workers at fossil-fueled power plants and coal plants can also work at nuclear power plants. Titans of Nuclear ("You've got a lot of workers there who . . . know how to fix up a thermal power plant, a nuclear plant and a coal

plant. Not that dissimilar after you get past the hot rock.").

*Second*, Plaintiffs' claims that nuclear power employees face rigorous job-screening procedures and undergo extensive job-specific training, Compl. ¶¶ 285, 286, reveal nothing unique about the nuclear power industry. Many employers across industries vet future employees, and nearly every employer provides "job-specific training." *Id.* These allegations have nothing to do with employees' ability to transfer their skills to adjacent industries.

*Third*, Plaintiffs' allegation that "[t]he wage premium associated with greater skill and experience reduces the substitutability of jobs outside of the Relevant Market and makes remaining in nuclear power generation positions more attractive to workers," *id.* ¶ 293, falls flat. This allegation, even if true, does not establish that positions outside of the industry are not ***reasonable*** substitutes for many members of the proposed class. The question of reasonable interchangeability that underpins market definition analysis here is whether an employee would accept employment outside of the industry ***in response to a reduction in wages within the nuclear power industry***. *See Bertelsmann*, 646 F. Supp. at 34. Allegations that employment options outside of the industry may be less desirable do not answer that question.

*Finally*, Plaintiffs' allegation that "[u]nskilled and low-skilled jobs are not reasonable substitutes for work in nuclear power generation[,]" Compl. ¶ 286, says nothing about the scope of the properly defined market. Whether ***skilled*** workers within the nuclear power industry could reasonably substitute to ***skilled*** positions in other industries is not addressed in the Complaint at all. Nor do Plaintiffs explain why employees with "unskilled and low-skilled jobs" *within* the nuclear industry, who are also purported members of the putative class, could not find substitute employment elsewhere in response to a change in wages.

These defects are not cured by Plaintiffs' conclusory claim that "[n]uclear power

37

generation employees make well above the national median pay and could not move to employment at non-nuclear companies without an appreciable drop in pay." Compl. ¶ 286. The only support Plaintiffs offer for this proposition is a comparison of "[t]he annual mean wage for all occupations in the United States as of May 2023" to the "annual mean wage for nuclear operators in the United States as of May 2023." *Id*. But that allegation says nothing about the reasonable substitute employers available to all members of the proposed class, and in fact provides no information at all that is relevant to assessing the scope of the relevant market.

Applying Plaintiffs' logic to another industry illustrates this point and the implausibility of their conclusory market allegations. Consider, for example, a comparison of the mean wage for all persons employed by teams in the National Football League (NFL) to the mean wage for all occupations in the United States. Under Plaintiffs' reasoning, this would lead to the conclusion that, for example, security officers employed by NFL teams have no reasonable employment options outside of professional football. That is clearly wrong. But even that example understates the flaws underlying Plaintiffs' allegations. The Complaint compares the wages for one highly skilled position (nuclear reactor operators) to a mean wage generated from a host of positions of various skill levels (all occupations in the United States). That is more similar to comparing the mean wage for NFL starting quarterbacks to the mean wage for all occupations in the United States and then leaping to the conclusion that all security officers employed by NFL teams have no reasonable employment options outside of the NFL. Again, that is clearly wrong.

In sum, Plaintiffs' market definition excludes reasonable alternative employers, and is thus facially unsustainable. *Chapman*, 546 F.3d at 238 (rejecting plaintiffs' proposed market definition because it failed to account for obvious substitutes); *Queen City Pizza*, 124 F.3d at 436 (same); *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 601 (8th Cir. 2009) (same);

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) (same).

**B.     Because Plaintiffs Fail to Allege a Plausible Relevant Market, They Have Not Adequately Pled Market Power.**

Plaintiffs' failure to adequately allege a relevant market topples their allegations of market power as well. Market power is a necessary element of a rule of reason claim. Market power is "the power to force a purchaser to do something that he would not do in a competitive market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 452 (1992). In other words, without market power, Defendants would not have the ability to suppress compensation.

Courts "have ordinarily inferred the existence of such power from the seller's possession of a predominant share" of the relevant market. *Id.* Therefore, the market definition exercise "serves as a tool to determine the defendant's market power." *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, Inc., 637 F.3d 435, 441 (4th Cir. 2011); *see also Meijer, Inc. v. Barr Pharms.*, Inc., 572 F. Supp. 2d 38, 54-55 (D.D.C. 2008) ("Antitrust plaintiffs generally prove a defendant's market power by defining a relevant market and indicating the percentage share of the market possessed by the defendant.").

Because Plaintiffs do not adequately define the relevant market, their allegations of the Nuclear Defendants' market power are inherently unreliable. Plaintiffs' bald assertion that "[t]he Nuclear Defendants and coconspirators pay compensation to nuclear power generation workers that comprise 100% percent of the Relevant Market," Compl. ¶ 298, can *only* be true if no reasonable substitute purchasers for employees' (sellers') labor services exist. On its face, that cannot possibly be true given the broad range of employees and skillsets in the Plaintiffs' putative class.

Because Plaintiffs have failed to plead a plausible product market, and as result, have also failed to allege Defendants collectively possess market power, Count 2 must be dismissed as a

matter of law.

**C.    Plaintiffs Have Failed to Allege Anticompetitive Effects Caused by the Purported Information Exchange.**

Even if Plaintiffs alleged a plausible relevant market—and they do not—pleading an unreasonable restraint of trade would still require them to plausibly allege "a substantial anticompetitive effect within [that] relevant market. *Ohio v. Am. Express, Co.*, 585 U.S. at 541-42. Count 2 fails to do so. Anticompetitive effects can take the form of market-wide price increases (or, in a labor market, decreased wages), reduced output, or reduced quality. *See id.* But to plead this element of a rule of reason claim, a plaintiff must do more than allege market-wide anticompetitive impacts in conclusory terms. *Dickson*, 309 F.3d at 212-13 (rejecting the plaintiff's invitation to "accept its conclusory assertion that Microsoft's agreements with Compaq and Dell … created a likelihood of significant anticompetitive effects in the relevant software markets"). A plaintiff must instead allege ***facts*** that suggest "the alleged anticompetitive effects are economically plausible." *Robertson*, 679 F.3d at 291. Plaintiffs have not done so.

1.    <u>The Complaint Fails to Allege the Type of Information That Was Allegedly Exchanged Would Tend to Suppress Wages.</u>

"Public dissemination is a primary way for data exchange to realize its procompetitive potential," *id*. at 213, and as a result, exchanges of public information generally are not actionable. *See Maple Flooring Mfrs.' Ass'n*, 268 U.S. at 573-74 (no violation found where "[t]he statistics gathered by the defendant association are given wide publicity").[34] This principle is particularly

---

[34] S*ee also Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1360 (9th Cir. 1976) (information exchange was not evidence of an unlawful conspiracy where "[t]he information was not secret and was available to anyone requesting it"); *In re Citric Acid Litig.*, 996 F. Supp. 951, 959 (N.D. Cal. 1998), *aff'd*, 191 F.3d 1090 (9th Cir. 1999) ("the exchange of publicly available information does not support an inference of conspiracy."); *In re Beef Indus. Antitrust Litig.*, 713 F. Supp. 971, 974 (N.D. Tex. 1988), *aff'd*, 907 F.2d 510 (5th Cir. 1990) ("a statistical report on past average price to all customers" containing "information [that] is public . . . constitutes reasonable business behavior [and] is not an illegal agreement.").

important for exchanges of wage information because "dissemination of the information to the employees could [help] mitigate any effects of the exchange and possibly enhanced market efficiency by making employees more sensitive to salary increases." *Todd*, 275 F.3d at 213. Thus, in information-exchange cases, the court must consider "the nature of the information exchanged," *U.S. Gypsum Co.*, 438 U.S. at 443 n.16, to determine whether the challenged exchange is likely to have potential anticompetitive effects. The "well-established criteria" to ascertain "the anticompetitive potential of information exchanges" include: (1) whether the information exchanged is current or forward-looking data; (2) whether the information at issue identifies "particular parties, transactions, and prices;" and (3) whether "the data are made publicly available." *Todd*, 275 F.3d at 211-13. The application of these criteria to the Plaintiffs' Complaint shows that the Complaint fails to establish a likelihood of anticompetitive effects.

*Much of the wage information Nuclear Defendants allegedly shared is publicly available.* Plaintiffs allege that Defendants "directly exchanged" certain wage information through a "digital repository of union collective bargaining agreements," Compl. ¶ 8, and a "Compensation Comparison Report" that "allowed the Nuclear Defendants to easily compare and coordinate their current and future compensation rates at each *unionized* nuclear power plant." *Id.* ¶ 9 (emphasis added); *see also id.* ¶¶ 214-215. Plaintiffs also allege that Defendants discussed CBAs and related wages during in-person meetings. *Id.* ¶ 226 (members of the NHRG Labor Relations Committee met each year "for benchmarking and to exchange nuclear power CBAs and review the Compensation Comparison Reports").

All of these exchanges involved information that may have been publicly available. While wages established through CBAs are—by definition—publicly available, importantly, they were in the hands of the union leadership and union employees who are putative class members and

broadly disseminated by the unions and other public sources—including the Internet.[35] *Supra*

Background Section II. They along with the other compensation terms purportedly shared also

related to terms of compensation that were already agreed to by the unions and the Nuclear

Defendants. Thus, employees (and their representatives in wage negotiations) have or had equal

access to the information that was allegedly exchanged through the "digital repository" maintained

by NHRG and the information reflected in the alleged Compensation Comparison Reports.

Because much of this information is or was publicly available (or at least available to union class

members), there is no reason to believe the exchange of union wage data would likely lead to

anticompetitive effects. And because much of the information was publicly available and

concerned existing CBAs, unions could also use it to negotiate on behalf of members, which has

procompetitive effects because it can lead to enhanced market efficiency. *See Todd*, 275 F.3d at

213.

       *The exchange of aggregated information is not inherently suspect.* The mere exchange

of aggregated information, absent additional specific allegations of an agreement to fix prices, is

not unlawful. *Maple Flooring Mfrs.' Ass'n*, 268 U.S. at 586 (the exchange of average statistics and

discussion of such information was not illegal); *Todd*, 275 F.3d at 212 ("Courts prefer that

information be aggregated in the form of industry averages, thus avoiding transactional

specificity"); *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 679 (N.D. Ill. 2023)

---

[35] Plaintiffs' claim that "collective bargaining agreements that contained compensation information for unionized plants were not publicly disclosed and were closely guarded until the data became outdated," Compl. ¶ 202, is conclusory and cannot be credited as it lacks factual allegations to support that conclusion and is contravened by Complaint allegations and public record information of which this Court can take judicial notice. A simple Internet search will reveal, among other things, IBEW Local No. 647's **current** CBA at the Arkansas Nuclear One plant, which reflects wages to be paid between March 1, 2024 and February 28, 2029. The CBA was published by IBEW. Arkansas Nuclear One IBEW Agreement, *available at* http://www.ibew647.org/wp-content/uploads/2024/10/ANO-Craft-CBA-2024-2029-1.pdf. Likewise, **all of Florida Power & Light Company's** CBAs from 2001 to the present are publicly available on IBEW System Council U-4's website. *See* n.13, *supra*.

(reports comparing a supplier's production to industry averages are not an illegal information exchange); *see also Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 720 (7th Cir. 2011) ("circulation of generalized and averaged high-level pricing data" is not evidence of a "conspiratorial information exchange").

Accordingly, Plaintiffs' allegations that Defendants received and discussed surveys administered by Willis Towers Watson ("WTW") that "displayed aggregated compensation information," Compl. ¶ 12, and "provided percentile and average compensation information for various positions in the nuclear power industry," *id*. ¶ 235, do not, standing alone, support an inference that their alleged exchange suppressed wages. Nor are competitive concerns raised by the alleged in-person discussions of this aggregated information, to "compare the job requirements and responsibilities of particular positions and confirm that positions reported to WTW for inclusion in its surveys were sufficiently similar across the industry," *id*. ¶ 221, resulting in generic comments, *id*. ¶ 220 ("That's in line with what we do"). The provision of information to a third-party, which aggregates the information before further distribution "for benchmarking compensation" *id*. ¶ 236, is pro-competitive and does not plausibly suggest that an information exchange caused anticompetitive effects. *See Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co. of Phil.*, 517 F. Supp. 3d 458, 464 (D. Md. 2021) ("[T]here is nothing inherently anticompetitive or illegal about . . . benchmarking.").

***Plaintiffs do not allege facts suggesting direct, bilateral exchanges of wage data that were anticompetitive.*** Plaintiffs generally aver that "Defendants directly exchanged compensation information and stabilized wages through telephone and email communications," Compl. ¶ 13, but these sweeping allegations are not supported by well-pleaded facts.

At most, Plaintiffs allege that one, unnamed former Progress employee would purportedly call some of her counterparts to request "average salary, minimum and maximum, and incentives" data for certain positions, and that "at least once a year," human resources personnel would share "salary range adjustments," *id*. ¶¶ 14-15, 177. Exchanges of averages and ranges, however, is not inherently anticompetitive. At best, these allegations suggest that exchanges may have occurred, resulting in one Defendant using the information to "pay just the industry average salary and no greater, *id*. ¶ 176. But that hardly suggests bilateral exchanges were used to suppress wages. By definition, the choice to pay an "average salary" meant that Progress elected to pay its employees *more* than many Nuclear Defendants. And Progress's independent decisions about how to set compensation say nothing at all about how more than two dozen other companies may have used the information that was exchanged, including when deciding whether to increase wages.

The remaining allegations concerning bilateral discussions allege, at most, that some Defendants directly exchanged publicly available collective bargaining agreements or aggregated survey information, *id*. ¶¶ 253-57, or "sometimes" gathered wage information from other Defendants, *id.* ¶¶ 251-52, 255. None of those allegations, however, suggests how the information that was gathered was used to suppress wages. Indeed, according to the Complaint, the information was used for benchmarking, which, as discussed *supra*, is pro-competitive. *See id*. ¶ 252 ("The former compensation executive stated that he would typically report to his superiors that he 'had a conversation with someone in St. Louis [where Ameren is headquartered] or Chicago [where Exelon is headquartered] and their ranges are similar to ours.').

2.    The Complaint Fails to Allege Facts Showing Wages Were in Fact Suppressed.

Nor do Plaintiffs offer any further allegations plausibly suggesting an anticompetitive effect in the alleged market. Despite alleging a sprawling, industry-wide conspiracy, which

spanned more than two decades and involved more than two dozen defendants, Plaintiffs have offered no factual allegations to substantiate their claim that wages for employees in the nuclear power industry have been suppressed. Indeed, with a handful of exceptions, Plaintiffs do not allege any facts concerning the wages paid by particular Defendants, how wages varied between Defendants, how Defendants' wages compare to those paid by other employers, or why Defendants' wages were plausibly set below competitive levels—*even with access* to publicly available compensation data. That is a fatal defect in their Complaint.

As discussed *supra,* Argument Section I.B.1., the Complaint includes anecdotes about the wages just two Defendants paid employees and no mention of their benefits. But even for Exelon and FPL, these isolated examples do not plausibly establish that wages were suppressed in any way. Without allegations demonstrating that wage levels were actually below what a competitive market would produce absent the alleged information exchange, the isolated examples provide no basis for inferring anticompetitive, market-wide effects, for a decades-long conspiracy. *See In re RealPage, Inc., Rental Software Antitrust Litig. (No. 2)*, 709 F. Supp. 3d 478, 533 (M.D. Tenn. 2023) ("[Three isolated] allegations [concerning purported overcharges] are far too narrow to plausibly support Plaintiffs' claims of a 13-year conspiracy occurring in college towns and cities across the United States.").

In sum, Plaintiffs have failed to plausibly allege that the alleged information exchanges resulted in lower wages, reduced employment opportunities, or caused other harms to workers that would establish the substantial, market-wide anticompetitive effects required to state a rule of reason claim.

## III.    PLAINTIFFS' CLAIMS ARE TIME-BARRED

Plaintiffs' claims relating to conduct predating July 11, 2021 independently fail because they are time-barred. *See* 15 U.S.C. § 15b (identifying a four-year statute of limitations for

Sherman Act violations); *see also Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 985 (D. Md. 2002) ("When it appears on the face of the complaint that the limitation period has run, a defendant may properly assert a limitations defense through a Rule 12(b)(6) motion to dismiss."), *aff'd*, 92 F. App'x 933 (4th Cir. 2004). Plaintiffs allege that Defendants began conspiring in 2003, but Plaintiffs inexplicably waited over two decades to bring this lawsuit. Plaintiffs attempt to invoke two exceptions to the statute of limitations, alleging that Defendants (1) engaged in a "continuing violation"; and (2) fraudulently concealed the conspiracy. Neither applies here.

### A.   The Continuing Violation Doctrine Does Not Apply Because Plaintiffs Fail to Allege an Overt Act During the Four-Year Limitations Period.

"Generally, a [federal antitrust] cause of action accrues and the statute [of limitations] begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). The continuing violation doctrine is an exception to this rule and provides that "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *CSX Trans., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 283 (4th Cir. 2024) (citing *Zenith*, 401 U.S. at 338).[36] But this doctrine only applies if Plaintiffs allege "an affirmative act committed within the limitations period in furtherance of the conspiracy." *Id.* at 290.

Plaintiffs' Complaint does not allege an overt act after the limitations date of July 11, 2021 for either claim. An overt act is conduct that actually furthers the conspiracy. *See Charlotte Telecasters, Inc.* v. *Jefferson-Pilot Corp.,* 546 F.2d 570,573 (4th Cir. 1976) (in refusal-to-deal case,

---

[36] Continuing violation is an accrual theory, not a tolling theory, and therefore "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith. Corp.*, 521 U.S. 179, 189 (1997).

last overt act was active consideration of a request to deal, not period of silence after doing so). With respect to Count 1, Plaintiffs allege no evidence of wage suppression (including of the wages Plaintiffs received) during the Class Period, and even their cherry-picked examples of purported wage parity date most recently to 2020. Compl. ¶¶ 262-263; *see* Argument Section I.B.1., *supra*. With respect to Count 2, Plaintiffs' only allegations during the limitations period relate to strictly managerial aspects of the NHRG conference and other industry meetings, Compl. ¶¶ 101, 103, 105, 272; statements in 2022 by the President and CEO of NEI about generalized, non-wage industry collaboration, *id.* ¶ 151; and statements in a 2024 regulatory filing from Xcel Energy to the Minnesota Public Utilities Commission ("MPUC") about benchmarking, compensation and employee retention, *id.* ¶¶ 236, 241, 315. None of these allegations reflects overt acts in furtherance of an alleged agreement to exchange compensation information during the limitations period. Moreover, although many of Plaintiffs' information-sharing allegations focus on "a repository of current [CBAs]" *id.* ¶ 191, and "Compensation Comparison Reports," *id.* ¶ 209, the Complaint is silent about the use of these tools after July 11, 2021.

To be sure, Plaintiffs allege in conclusory fashion that the conspiracy "was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreement." *Id*. ¶ 306. But a Court considering nearly the exact same allegation concluded this "bald assertion" was "insufficient to show a continuing violation" absent specific allegations of overt conduct during the limitations period. *In re Animation Workers Antitrust Litig.,* 87 F. Supp. 3d 1195, 1212 (N.D. Cal. 2015). So too here, where there is a "rather conspicuous absence of specific dates for many of [the] factual allegations" and even "those allegations that do contain specific dates all pre-date" the limitations period. *Id.*

**B.     Plaintiffs Fail to Adequately Plead Fraudulent Concealment.**

Nor can Plaintiffs rely on the doctrine of fraudulent concealment to escape the statute of limitations.[37] To do so, Plaintiffs must allege: "(1) [Defendants] fraudulently concealed facts that are the basis of [Plaintiffs'] claim, and (2) [Plaintiffs] failed to discover those facts within the statutory period, despite (3) the exercise of due diligence.'" *Scharpf v. Gen. Dynamics Corp.*, 137 F.4th 188, 195 (4th Cir. 2025) (quoting *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995)). Plaintiffs do not come close to pleading these elements.

***No affirmative acts of concealment.*** Plaintiffs here have not "'provid[ed] evidence of affirmative acts of concealment,'" *Scharpf,* 137 F.4th at 195 (quoting *Marlinton*, 71 F.3d at 126), which requires more than "self-concealing" behavior—Plaintiffs must allege Defendants actively took "steps to avoid detection." *Id.* at 199. But the Complaint's only allegations of "concealment" describe ordinary business practices like password-protecting information and maintaining separate human resources departments. Compl. ¶¶ 314, 318-19. Similarly, Plaintiffs' allegations that Defendants corresponded via "[r]egular email . . . regarding compensation practices and plans" and "conduct[ed] secret meetings that excluded non-conspirators," *id*. ¶¶ 314, 359, do not suffice because "choosing not to publicize a meeting is neither fraudulent nor concealment." *SD3, LLC*, 215 F. Supp. 3d at 497. Also inadequate are Plaintiffs' allegations that Defendants' websites contain general statements about competitive pay. *See* Compl. ¶¶ 315-316. Indeed, courts have held that routine public statements that companies "participate[] in a competitive market" do not "suffice to show fraudulent concealment, absent other evidence that the defendant attempted to

---

[37] It appears that Plaintiffs allege fraudulent concealment only with respect to Count 1; there is no similar allegation with respect to Count 2. *See* Compl. ¶ 309 ("No facts were revealed publicly or to Plaintiffs that would have put them or the Class on inquiry notice that they were victims *of a conspiracy to suppress compensation* paid to nuclear power generation workers.") (emphasis added).

conceal its alleged antitrust behavior." *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1078 (N.D. Cal. 2016).

*No due diligence despite being on notice.* Plaintiffs contend that "[n]o facts were revealed publicly or to Plaintiffs that would have put them or the Class on inquiry notice that they were the victims of a conspiracy to suppress compensation paid to nuclear power generation workers," Compl. ¶ 309, but that is implausible. Here, numerous sources of compensation information for nuclear workers are, and have consistently been, publicly available. *See* pp. 7-10, *supra*. Plaintiffs could have evaluated the wages paid to employees in nuclear generation at any point in time to assess the appropriateness of these wages. And to the extent the Complaint alleges Defendants' industry conference participation formed the core of the purported conspiracy, Plaintiffs were on inquiry notice of that conduct as well. For example, a summary of the 2019 NHRG Conference on Accelerant's website described the involvement of "some 150 nuclear Human Resources professionals and high-level executives from across both the United States and Canada" and included a list of break-out discussions, including "Towers Job Matches Nuclear Pay Practice Report," "Compensation Round Table," and "Nuclear Job Matching." Blog Post, NHRG (National Human Resources Group) 2019 Conference (June 5, 2019). [38] *See also* Compl. ¶¶ 101, 105. "Where [Plaintiffs'] suspicions . . . should have been excited, there can be no fraudulent concealment where [they] 'could have then confirmed [their] earlier suspicion by a diligent pursuit' of further information." *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 504 (9th Cir. 1988) (quoting *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th

---

[38] https://discoveraccelerant.com/nhrg-conference-2019/. Courts in this circuit also take judicial notice of the websites of parties to the case. *See Jeandron v. Bd. of Regents of Univ. Sys. of Md.*, 510 F. App'x 223, 227 (4th Cir. 2013) ("A court may take judicial notice of information publicly announced on a party's website, so long as the website's authenticity is not in dispute and it is capable of accurate and ready determination."). *See also* Compl. ¶ 106 ("Accelerant … assumed management of NHRG in 2019"); n.16, *supra*.

Cir. 1978)); *see also Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 993-94 (N.D. Cal. 2020) (rejecting fraudulent concealment argument at the pleading stage where the alleged conspiracy was publicly announced online). Plaintiffs thus cannot allege fraudulent concealment here.

## CONCLUSION

Plaintiffs have failed to plausibly plead a compensation-fixing or an information sharing conspiracy. Plaintiffs' allegations reflect, at most, nothing more than lawful benchmarking. Plaintiffs' effort to turn this lawful, procompetitive conduct into a Sherman Act violation fails for the reasons described in this motion. For these reasons, the Court should dismiss Plaintiffs' Complaint in its entirety with prejudice.

Date: October 15, 2025

Respectfully submitted,

*/s/ Catie Ventura*
Catie Ventura (D. Md. Bar No. 19848)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 389-5000
Fax: (202) 389-5200
catie.ventura@kirkland.com

Daniel E. Laytin, P.C. (*pro hac vice*)
Christa C. Cottrell, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Phone: (312) 862-2000
Fax: (312) 862-2200
dlaytin@kirkland.com
ccottrell@kirkland.com

*Attorneys for Defendant Constellation Energy Corporation*

*/s/ Douglas E. Litvack*
(signed by Catie Ventura with permission of Douglas E. Litvack)
Douglas E. Litvack (D. Md. Bar No. 31773)
Jariel A. Rendell (*pro hac vice*)
Joshua J.W. Armstrong (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
Phone: (202) 639-6000
Fax: (202) 639-6066
dlitvack@jenner.com
jrendell@jenner.com
jarmstrong@jenner.com

Nicole A. Allen (*pro hac vice* forthcoming)
JENNER & BLOCK LLP
353 N. Clark Street

*/s/ Wendell Taylor*
(signed by Catie Ventura with permission of Wendell Taylor)
Arthur E. Schmalz (D. Md. Bar No. 20359)
Wendell Taylor (*pro hac vice*)
Leslie Kostyshak (*pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
wtaylor@hunton.com
lkostyshak@hunton.com
aschmalz@hunton.com

Richard B. Walsh (*pro hac vice*)
Winthrop B. Reed III (*pro hac vice*)
Edward T. Pivin (*pro hac vice*)
LEWIS RICE LLC
600 Washington Avenue, Suite 2500
St. Louis, MO 63101
Phone: (314) 444-7600
rwalsh@lewisrice.com
wreed@lewisrice.com
epivin@lewisrice.com

*Attorneys for Defendant Ameren Corporation*

*/s/ Stacey VanBelleghem*
(signed by Catie Ventura with permission of Stacey VanBelleghem)
Stacey VanBelleghem (D. Md. Bar No. 28893)
Marguerite Sullivan (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Phone: (202) 637-2200
stacey.vanbelleghem@lw.com
marguerite.sullivan@lw.com

Lawrence E. Buterman (*pro hac vice*)
LATHAM & WATKINS LLP

Chicago, IL 60654
Phone: (312) 222-9350
Fax: (312) 527-0484
nallen@jenner.com

*Attorneys for Defendant American Electric
Power Company Inc.*

/s/ Lindsey T. Levy
(signed by Catie Ventura with permission of
Lindsey T. Levy)
Lindsey T. Levy (D. Md. Bar No. 22144)
Joshua M. Goodman (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 739-3000
Fax: (202) 739-3001
lindsey.levy@morganlewis.com
joshua.goodman@morganlewis.com

R. Brendan Fee (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market St.
Philadelphia, PA 19103
Phone: (215) 963-5136
Fax: (215) 963-5001
brendan.fee@morganlewis.com

*Attorneys for Defendant DTE Energy
Company*

/s/ Andrew S. Tulumello
(signed by Catie Ventura with permission of
Andrew W. Tulumello)
Andrew S. Tulumello (D. Md. Bar
No.15494)
Chantale Fiebig (*pro hac vice*)
Meagan K. Bellshaw (*pro hac vice*)
Daniel J. Nadratowski (*pro hac vice*
forthcoming)
Brian F. Williamson (*pro hac vice*
forthcoming)
WEIL, GOTSHAL & MANGES LLP

1271 Avenue of the Americas
New York, NY 10020
Phone: (212) 906-1200
lawrence.buterman@lw.com

Meaghan Thomas-Kennedy (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Phone: (415) 391-0600
meaghan.thomas-kennedy@lw.com

*Attorneys for Defendant Arizona Public Service
Company*

/s/ Nicholas J. Giles
(signed by Catie Ventura with permission of
Nicholas J. Giles)
Nicholas J. Giles (Fed. Bar No. 12725)
J. Brent Justus (*pro hac vice*)
Rebecca Jewel Watson (*pro hac vice*)
George E. Rudebusch (*pro hac vice*)
MCGUIRE WOODS LLP
800 East Canal Street
Richmond, VA 23219
Phone: (804) 775-1018
Fax: (804) 698-2026
ngiles@mcguirewoods.com
bjustus@mcguirewoods.com
rwatson@mcguirewoods.com
grudebusch@mcguirewoods.com

Megan S. Lewis (*pro hac vice*)
MCGUIRE WOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 857-1700
Fax: (202) 857-1737
mlewis@mcguirewoods.com

*Attorneys for Defendant Dominion Energy, Inc.*

/s/ Alvin Dunn
(signed by Catie Ventura with permission of
Alvin Dunn)

2001 M Street NW, Suite 600
Washington, DC 20036
Phone: (202) 682-7000
Fax: (202) 857-0940
drew.tulumello@weil.com
chantale.fiebig@weil.com
meagan.bellshaw@weil.com
daniel.nadratowski@weil.com
brian.f.williamson@weil.com

Diane P. Sullivan (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Phone: (212) 310-8000
Fax: (212) 310-8007
diane.sullivan@weil.com

*Attorneys for Defendants Duke Energy*
*Corporation and Progress Energy, Inc.*

/s/ Sanford I. Weisburst
(signed by Catie Ventura with permission of
Sanford I. Weisburst)
Sanford I. Weisburst (admitted *pro hac*
*vice*)
Anne R. Goodman (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
Phone: (212) 849-7000
Fax: (212) 849-7100
sandyweisburst@quinnemanuel.com
anniegoodman@quinnemanuel.com

Michael D. Bonanno (admitted *pro hac*
*vice*)
Ryan T. Andrews (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street NW
Washington, DC 20005
Phone: (202) 538-8000
Fax: (202) 538-8100

Alvin Dunn (D. Md. Bar No. 29068)
PILLSBURY WINTHROP SHAW PITTMAN
LLP
1200 Seventeenth Street NW
Washington, DC 20036
Phone: (202) 663-8000
Fax: (202) 663-8007
alvin.dunn@pillsburylaw.com

Jacob R. Sorensen (*pro hac vice*)
Lee Brand (*pro hac vice*)
PILLSBURY WINTHROP SHAW PITTMAN
LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
Phone: (415) 983-1000
Fax: (415) 983-1200
jake.sorensen@pillsburylaw.com
lee.brand@pillsburylaw.com

*Attorneys for Defendants Energy Northwest and*
*Pacific Gas & Electric Company*

/s/ Amanda Flug Davidoff
(signed by Catie Ventura with permission of
Amanda Flug Davidoff)
Amanda Flug Davidoff (D. Md. Bar No. 20125)
Daniel J. Richardson (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW, Suite 700
Washington, DC 20006
Phone: (202) 956-7570
Fax: (202) 293-6330
davidoffa@sullcrom.com
richardsond@sullcrom.com

Kyle W. Mach (*pro hac vice*)
SULLIVAN & CROMWELL LLP
550 Hamilton Avenue
Palo Alto, CA 94301
Phone: (650) 461-5787
Fax: (650) 461-5700
machk@sullcrom.com

mikebonanno@quinnemanuel.com
ryanandrews@quinnemanuel.com

Philip M. Andrews (Federal Bar No. 00078)
Justin A. Redd (Federal Bar No. 18614)
KRAMON & GRAHAM, P.A.
750 East Pratt Street, Suite 1100
Baltimore, MD 21202
Phone: (410) 752-6030
Fax: (410) 539-1269
pandrews@kg-law.com
jredd@kg-law.com

*Attorneys for Defendant Entergy
Corporation*

/s/ Sonia K. Pfaffenroth
(signed by Catie Ventura with permission of
Sonia K. Pfaffenroth)
Sonia K. Pfaffenroth (*pro hac vice*)
Ryan Z. Watts (*pro hac vice*)
Jonathan I. Gleklen (D. Md. Bar No. 21350)
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
Phone: (202) 942-5000
Fax: (202) 942-5999
sonia.pfaffenroth@arnoldporter.com
ryan.watts@arnoldporter.com
jonathan.gleklen@arnoldporter.com

C. Scott Lent (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019-9710
Phone: (212) 836-8000
Fax: (212) 836-8689
scott.lent@arnoldporter.com

*Attorneys for Defendant Public Service
Enterprise Group Incorporated*

*Attorneys for Defendant FirstEnergy
Corporation*

/s/ Paul A. Solomon
(signed by Catie Ventura with permission of
Paul A. Solomon)
Paul A. Solomon (D. Md. Bar No. 19920)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
Phone: (202) 371-7000
Fax: (202) 393-2760
paul.solomon@skadden.com

Karen Hoffman Lent (*pro hac vice*)
Boris Bershteyn (*pro hac vice*)
Thomas J. Smith (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
karen.lent@skadden.com
boris.bershteyn@skadden.com
thomas.smith@skadden.com

*Attorneys for Defendants NextEra Energy, Inc.,
and Florida Power & Light Company*

/s/ William S. D. Cravens
(signed by Catie Ventura with permission of
William S. D. Cravens)
William S. D. Cravens (D. Md. Bar No. 17342)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 739-3000
Fax: (202) 739-3001
william.cravens@morganlewis.com

Brian C. Rocca (*pro hac vice*)
Rishi P. Satia (*pro hac vice*)

*/s/ M. Sean Royall*
(signed by Catie Ventura with permission of
M. Sean Royall)
Ross E. Elfand (*pro hac vice*)
Sean Murray (*pro hac vice*)
KING & SPALDING LLP
1290 Avenue of the Americas, 14th Floor
New York, NY 10104
Phone: (212) 556-2100
relfand@kslaw.com
smurray@kslaw.com

Robert K. Hur (D. Md. Bar No. 04761)
M. Sean Royall (*pro hac vice*)
Robert M. Cooper (*pro hac vice*)
Emily Blackburn (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, DC 20006
Phone: (202) 737-0500
rhur@kslaw.com
sroyall@KSLAW.com
rcooper@kslaw.com
eblackburn@kslaw.com

*Attorneys for Defendant The Southern*
*Company*


*/s/ Craig Seebald*
(signed by Catie Ventura with permission of
Craig Seebald)
Craig Seebald (*pro hac vice*)
Stephen Medlock (*pro hac vice*)
Marisa (Reese) Poncia (*pro hac vice*)
Hannah Flesch (D. Md. Bar No. 31153)
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW, Suite 500
West
Washington, DC 20037
Phone: (202) 639-6585
cseebald@velaw.com
smedlock@velaw.com
rponcia@velaw.com
hflesch@velaw.com

MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Phone: (415) 442-1000
Fax: (415) 442-1001
brian.rocca@morganlewis.com
rishi.satia@morganlewis.com

*Attorneys for Defendant Southern California*
*Edison Company*


*/s/ Colin S. Harris*
(signed by Catie Ventura with permission of
Colin S. Harris)
Colin S. Harris (D. Md. Bar No. 30603)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Phone: (202) 739-3000
Fax: (202) 739-3001
colin.harris@morganlewis.com

Daniel S. Savrin (*pro hac vice*)
Noah J. Kaufman (*pro hac vice*)
Stephen LaBrecque (*pro hac vice*)
Caitlin Zeytoonian (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Phone: (617) 341-7700
Fax: (617) 341-7701
daniel.savrin@morganlewis.com
noah.kaufman@morganlewis.com
stephen.labrecque@morganlewis.com
caiti.zeytoonian@morganlewis.com

*Attorneys for Defendant STP Nuclear Operating*
*Company*


*/s/ Indira K. Sharma*
(signed by Catie Ventura with permission of
Indira K. Sharma)
Indira K. Sharma (D. Md. Bar No. 28269)
Christy A. Matelis (*pro hac vice*)

Mackenzie Newman (*pro hac vice*)
VINSON & ELKINS LLP
1114 Avenue of the Americas
32nd Floor
New York, NY 10036
mnewman@velaw.com

*Attorneys for Defendant Talen Energy
Corporation*


/s/ Jacquelyn E. Fradette
(signed by Catie Ventura with permission of
Jacquelyn E. Fradette)
Jacquelyn E. Fradette (D. Md. Bar No.
20884)
Carrie C. Mahan (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Phone: (202) 736-8000
Fax: (202) 736-8711
jfradette@sidley.com
carrie.mahan@sidley.com


Yvette Ostolaza (*pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Phone: (214 981-3300
Fax: (214) 981-3400
yvette.ostolaza@sidley.com


Benjamin R. Nagin (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Phone: (212) 839-5300
Fax: (212) 839-5599
bnagin@sidley.com


*Attorneys for Defendants Vistra Corp. and
Luminant Generation Company, LLC*

/s/ Jason R. Scherr
(signed by Catie Ventura with permission of
Jason R. Scherr)
Jason R. Scherr (D. Md. Bar No. 25633)

TROUTMAN PEPPER LOCKE LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
Phone: (202) 274-2950
indira.sharma@troutman.com
christy.matelis@troutman.com
Bradley C. Weber (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Phone: (214) 740-8497
brad.weber@troutman.com


Jason D. Evans (*pro hac vice*)
Anna C. Yarbrough (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
301 S. College Street, 34th Floor
Charlotte, North Carolina 28202
Phone: (704) 998-4050
jason.evans@troutman.com
anna.yarbrough@troutman.com


*Attorneys for Defendant Tennessee Valley
Authority*


/s/ Brian P. Quinn
(signed by Catie Ventura with permission of
Brian P. Quinn)
Brian P. Quinn (D. Md. Bar No. 31847)
Emily Murphy (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
Phone: (202) 383-5300
bquinn@omm.com
emurphy@omm.com


Michael F. Tubach (*pro hac vice*)
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Phone: (415) 984-8700
mtubach@omm.com


Alexandra Wolter (*pro hac vice*)

MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 200004
Phone: (202) 739-6000
jr.scherr@morganlewis.com

Steven A. Reed (*pro hac vice*)
Zachary M. Johns (*pro hac vice*)
Olanike A. Steen (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
Phone: (215) 963-5000
steven.reed@morganlewis.com
zachary.johns@morganlewis.com
nicky.steen@morganlewis.com

*Attorneys for Defendant Xcel Energy, Inc.*

O'MELVENY & MYERS LLP
400 S. Hope Street, 19th Floor
Los Angeles, CA 90071
Phone: (213) 430-6000
awolter@omm.com

*Attorneys for Defendant Wolf Creek Nuclear Operating Corporation*


/s/ Stephen J. Marshall
(signed by Catie Ventura with permission of Stephen J. Marshall)
Stephen J. Marshall, Esq (Fed Bar No.: 29632)
Bruce S. Schoenberger (*pro hac vice*)
Samuel R. Harden (*pro hac vice*)
Ali A. Nour (*pro hac vice*)
The B&O Building
Two North Charles Street, Suite 600
Baltimore, Maryland 21201
Phone: (410) 752-8700
Fax: (410) 752-6868
smarshall@fandpnet.com

*Attorneys for Defendant Accelerant Technologies LLC*