## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

LEO DORRELL,
4608 Watson Way
Chesapeake, VA 23321

JOHN DUNN, and
1318 Browns Mill Court
Herndon, VA 20170

DAVION CHAPEL,
24481 Broad Creek Drive
Hollywood, MD 20636

on behalf of themselves and all others similarly
situated,

                      Plaintiffs,

   v.

CONSTELLATION ENERGY
CORPORATION,
1310 Point Street
Baltimore, Maryland 21231
County of Residence: Baltimore County

CONSTELLATION ENERGY
GENERATION, LLC,
1310 Point Street
Baltimore, Maryland 21231
County of Residence: Baltimore County

AMEREN CORPORATION,
1901 Chouteau Avenue
St. Louis, Missouri 63103

UNION ELECTRIC COMPANY (d/b/a
AMEREN MISSOURI),
1901 Chouteau Avenue
St. Louis, Missouri 63103

AMEREN SERVICES COMPANY,
1901 Chouteau Avenue
St. Louis, Missouri 63103

CIVIL ACTION NO. 1:25-CV-2251

**AMENDED CLASS ACTION
COMPLAINT**

JURY TRIAL DEMANDED

AMERICAN ELECTRIC POWER COMPANY
INC.,
1 Riverside Plaza
Columbus, Ohio 43215

INDIANA MICHIGAN POWER COMPANY,
1 Riverside Plaza
Columbus, Ohio 43215

AMERICAN ELECTRIC POWER SERVICE
CORPORATION,
1 Riverside Plaza
Columbus, Ohio 43215

ARIZONA PUBLIC SERVICE COMPANY,
400 North 5th Street
Phoenix, Arizona 85004

DOMINION ENERGY, INC.,
600 East Canal Street
Richmond, Virginia 23219

VIRGINIA ELECTRIC & POWER
COMPANY,
600 East Canal Street
Richmond, Virginia 23219

DOMINION ENERGY SERVICES, INC.,
600 East Canal Street
Richmond, Virginia 23219

DTE ENERGY COMPANY,
One Energy Plaza
Detroit, Michigan 48226

DTE ELECTRIC COMPANY,
One Energy Plaza
Detroit, Michigan 48226

DTE ENERGY CORPORATE SERVICES,
LLC,
One Energy Plaza
Detroit, Michigan 48226

DUKE ENERGY CORPORATION,
525 South Tryon Street
Charlotte, North Carolina 28202

DUKE ENERGY CAROLINAS, LLC,
525 South Tryon Street
Charlotte, North Carolina 28202

DUKE ENERGY BUSINESS SERVICES,
LLC,
525 South Tryon Street
Charlotte, North Carolina 28202

PROGRESS ENERGY, INC.,
411 Fayetteville Street
Raleigh, North Carolina 27601

ENERGY NORTHWEST,
76 North Power Plant Loop
Richland, Washington 99354

ENTERGY CORPORATION,
639 Loyola Avenue
New Orleans, Louisiana 70113

ENTERGY OPERATIONS, INC.,
1340 Echelon Parkway
Jackson, MS 39213

ENTERGY NUCLEAR OPERATIONS, INC.,
1340 Echelon Parkway
Jackson, MS 39213

FIRSTENERGY CORPORATION,
341 White Pond Drive
Akron, Ohio 44320

FIRSTENERGY SERVICE COMPANY,
341 White Pond Drive
Akron, Ohio 44320

NEXTERA ENERGY, INC.,
700 Universe Boulevard
Juno Beach, Florida 33408

NEXTERA ENERGY RESOURCES, LLC,
700 Universe Boulevard
Juno Beach, Florida 33408

FLORIDA POWER & LIGHT COMPANY,
700 Universe Boulevard
Juno Beach, Florida 33408

PG&E CORPORATION,
300 Lakeside Drive
Oakland, California 94612

PACIFIC GAS & ELECTRIC COMPANY,
300 Lakeside Drive
Oakland, California 94612

PUBLIC SERVICE ENTERPRISE GROUP
INC.,
80 Park Plaza
Newark, New Jersey 07102

PSEG POWER LLC,
80 Park Plaza
Newark, New Jersey 07102

PSEG NUCLEAR, LLC,
80 Park Plaza
Newark, New Jersey 07102

PSEG SERVICES CORPORATION,
80 Park Plaza
Newark, New Jersey 07102

SOUTHERN CALIFORNIA EDISON
COMPANY,
2244 Walnut Grove Avenue
Rosemead, California 91770

THE SOUTHERN COMPANY,
30 Ivan Allen Jr. Boulevard, N.W.
Atlanta, Georgia 30308

SOUTHERN NUCLEAR OPERATING
COMPANY, INC.,
3535 Colonnade Parkway
Birmingham, Alabama 35243

STP NUCLEAR OPERATING COMPANY,
12090 FM-521
Wadsworth, Texas 77483

TENNESSEE VALLEY AUTHORITY,
400 West Summit Hill Drive
Knoxville, Tennessee 37902

VISTRA CORPORATION,
6555 Sierra Drive
Irving, Texas 75039

LUMINANT GENERATION COMPANY,
LLC,
6555 Sierra Drive
Irving, Texas 75039

WOLF CREEK NUCLEAR OPERATING
CORPORATION,
1550 Oxen Lane
Burlington, Kansas 66839

XCEL ENERGY, INC.,
414 Nicollet Mall
Minneapolis, Minnesota 55401

NORTHERN STATES POWER COMPANY,
414 Nicollet Mall
Minneapolis, Minnesota 55401

XCEL ENERGY SERVICES, INC., and
414 Nicollet Mall
Minneapolis, Minnesota 55401

ACCELERANT TECHNOLOGIES LLC,
1715 Indian Wood Circle, Suite 200
Maumee, Ohio 43537

Defendants.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 8

III.    PARTIES ............................................................................................................. 10

        A.      Plaintiffs ................................................................................................. 10

        B.      Defendants .............................................................................................. 10

                1.      Constellation Defendants ............................................................ 10

                2.      Ameren Defendants ..................................................................... 14

                3.      AEP Defendants .......................................................................... 17

                4.      APS .............................................................................................. 20

                5.      Dominion Defendants .................................................................. 22

                6.      DTE Defendants .......................................................................... 25

                7.      Duke Energy Defendants ............................................................. 28

                8.      EnergyNW .................................................................................... 33

                9.      Entergy Defendants ..................................................................... 35

                10.     FirstEnergy Defendants ............................................................... 38

                11.     NextEra Defendants ..................................................................... 41

                12.     PG&E Defendants ........................................................................ 44

                13.     PSEG Defendants ......................................................................... 48

                14.     SCE .............................................................................................. 51

                15.     Southern Company Defendants .................................................... 52

                16.     STP ............................................................................................... 55

                17.     TVA .............................................................................................. 57

                18.     Vistra Defendants ........................................................................ 59

|  | 19. | Wolf Creek | 62 |
|  | 20. | Xcel Defendants | 64 |
|  | 21. | Accelerant Solutions | 67 |
| IV. | AGENTS AND COCONSPIRATORS | | 68 |
|  | 1. | Dominion Co-Conspirators | 68 |
|  | 2. | Duke Co-Conspirators | 69 |
|  | 3. | Vistra Co-Conspirators | 69 |
|  | 4. | Exelon Business Services Company | 69 |
|  | 5. | Bruce Power | 70 |
|  | 6. | Nebraska Public Power District | 70 |
|  | 7. | Ontario Power Generation | 70 |
|  | 8. | OPPD | 70 |
|  | 9. | Talen Energy | 71 |
|  | 10. | WEC | 71 |
|  | 11. | Human Resource Consultants | 71 |
|  | 12. | WTW | 72 |
|  | 13. | ScottMadden | 72 |
| V. | TRADE AND COMMERCE | | 72 |
| VI. | FACTUAL ALLEGATIONS | | 73 |
|  | A. | Background | 73 |
|  | 1. | The Commercial Nuclear Power Industry | 73 |
|  | 2. | Nuclear Power Plants | 73 |
|  | 3. | The Nuclear Power Industry's History and Culture of Collaboration | 74 |
|  | 4. | Nuclear Power Generation Workers | 76 |
|  | 5. | Compensating Nuclear Power Generation Workers | 77 |

6.     Nuclear Power Companies Aimed to Reduce Labor Costs ...................... 78

7.     Centralized Determination of Compensation for Nuclear Power Generation Workers ........................................................ 79

8.     Nuclear Power Generation Employment Qualifications........................ 80

B.     Conspiracy to Align Worker Compensation....................................... 80

1.     The Nuclear Human Resources Group ..................................... 83

2.     The Nuclear Defendants Unlawfully Exchanged Compensation Information through a Collective Bargaining Agreement Repository ................................................. 85

3.     The Nuclear Defendants Unlawfully Exchanged Compensation Information through Compensation Comparison Reports................................................ 90

4.     The Nuclear Defendants Discussed and Suppressed Compensation at Annual Meetings ....................................... 93

    a.     NHRG Annual Conferences ...................................... 94

    b.     The Labor Relations Project and Meetings................... 96

    c.     The Total Rewards Project and Meetings..................... 97

5.     The Nuclear Defendants Discussed and Suppressed Compensation through Direct Email and Telephone Communications .................................................. 100

6.     The Conspiracy Resulted in Parallel Limits on Defendants' Wage Increases and Harmonization of Defendants' Wages.................. 104

7.     Plus Factors That Render the Nuclear Power Industry Susceptible to Collusion ....................................... 107

C.     Market Power of the Nuclear Defendants and Coconspirators.......................... 111

1.     Direct Evidence of Market Power........................................ 111

2.     Indirect Evidence of Market Power ..................................... 112

    a.     Product or Services Market....................................... 112

    b.     Geographic Market ................................................ 115

    c.     Collective Market Share and Monopsony Power ..................... 116

D.    Anticompetitive Effects and Injury Suffered by Class Members ........................ 117

VII.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS.................. 118

A.    Continuing Violation ........................................................................... 118

B.    Fraudulent Concealment ..................................................................... 119

1.    Plaintiffs Did Not and Could Not Have Discovered
Defendants' Misconduct ......................................................... 119

2.    Defendants Actively Concealed the Conspiracy.................................... 120

VIII.    CLASS ACTION ALLEGATIONS ............................................................ 127

IX.    CAUSES OF ACTION ........................................................................... 130

X.    PRAYER FOR RELIEF .......................................................................... 137

XI.    JURY TRIAL DEMAND ......................................................................... 138

Based on the investigation of counsel, Plaintiffs Leo Dorrell, John Dunn, and Davion Chapel (collectively, "Plaintiffs") bring this action on behalf of themselves individually and on behalf of a class (the "Class") consisting of all persons employed in nuclear power generation by the Nuclear Defendants[1] and their subsidiaries and related entities in the United States from May 1, 2003 to the present day (the "Class Period").

## I.    INTRODUCTION

1.    Since at least May 2003, Defendants have conspired and combined to fix and suppress the compensation paid to persons employed in nuclear power generation in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

2.    Defendants consist of the 45 Nuclear Defendants, which operate nuclear power plants that produce nuclear-generated electricity sold to consumers in the United States, and a consulting company, Accelerant Technologies LLC ("Accelerant"), which helped the Nuclear Defendants exchange compensation data and conduct in-person meetings to align compensation.

---

[1] The term "Nuclear Defendants" refers to the following companies: Constellation Energy Corporation; Constellation Energy Generation, LLC; Ameren Corporation; Union Electric Company; Ameren Services Company; American Electric Power Company Inc.; Indiana Michigan Power Company; American Electric Power Service Corporation; Arizona Public Service Company; Dominion Energy, Inc.; Virginia Electric & Power Company; Dominion Energy Services, Inc.; DTE Energy Company; DTE Electric Company; DTE Energy Corporate Services, LLC; Duke Energy Corporation; Duke Energy Carolinas, LLC; Duke Energy Business Services, LLC; Progress Energy, Inc.; Energy Northwest; Entergy Corporation; Entergy Operations, Inc.; Entergy Nuclear Operations, Inc.; FirstEnergy Corporation; FirstEnergy Service Company; NextEra Energy, Inc.; NextEra Energy Resources, LLC; Florida Power & Light Company; PG&E Corporation; Pacific Gas & Electric Company; Public Service Enterprise Group Inc.; PSEG Power LLC; PSEG Nuclear LLC; PSEG Services Corporation; Southern California Edison Company; The Southern Company; Southern Nuclear Operating Company, Inc.; STP Nuclear Operating Company; Tennessee Valley Authority; Vistra Corporation; Luminant Generation Company, LLC; Wolf Creek Nuclear Operating Corporation; Xcel Energy, Inc.; Northern States Power Company; and Xcel Energy Services, Inc.

3.      The Nuclear Defendants, coconspirators, and their related entities own and/or operate all 54 commercial nuclear power plants in the United States. During the Class Period, the Nuclear Defendants employed hundreds of thousands of Class Members at those plants. Those Class Members worked in various positions in nuclear power generation, including as nuclear operators, nuclear engineers, and nuclear technicians.

4.      The Nuclear Defendants compensated Class Members with hourly wages or annual salaries, supplemental forms of monetary compensation such as shift premiums and bonuses, and employment benefits. During the Class Period, each Nuclear Defendant established schedules for hourly wages, annual salaries, other monetary compensation, and employment benefits based on the specific positions and years of experience of the Class Members. This regimented process for determining compensation allowed the Nuclear Defendants and coconspirators to readily compare compensation rates—and collectively suppress compensation—across their workforces.

5.      The Defendants and coconspirators engaged in a multi-faceted conspiracy to align, fix, and suppress Class Members' compensation. The conspiracy and its objectives were confirmed by multiple witnesses. For example, according to a former HR executive employed by Progress Energy, Inc. and Duke Energy Corporation, the Nuclear Defendants "collaborated" and compensation decisions were "never made in a silo." The witness said that nuclear power companies would ***"all work together to make sure [they] were in alignment"*** on compensation. She routinely contacted her counterparts at other nuclear power companies "before we did our proposal for salary range adjustments" and, during those calls, "we would talk about what we were proposing." The explicit purpose of this coordination was to avoid paying higher-than-necessary compensation to employees. The witness explained: "we didn't want to pay outrageous salaries."

6.     Another witness who was a former labor manager at Exelon Generation Company, LLC ("Exelon") attested that "there was significant collaboration and information sharing between nuclear power companies . . . with regards to compensation rates and union contracts." He stated that "***multiple nuclear power companies, including Exelon, directly exchanged current and future compensation information with one another on a regular basis***." He explained: "During my tenure at Exelon, I initiated and conducted bi-annual surveys to gather current and future compensation data from, and exchange current and future compensation data between, approximately 20 other companies in the nuclear power generation industry." He further elaborated: "Twice a year, I disseminated the results of the surveys to each of the participating nuclear power companies in the form of excel spreadsheets that contained detailed disaggregated and deanonymized current and future compensation data, organized by both company and plant." He stated that the compensation data he gathered and distributed "was highly valuable to Exelon and was routinely used by Exelon to determine the compensation rates it paid nuclear power generation employees." He attested that "[o]btaining compensation data directly from competing nuclear power companies allowed Exelon to avoid paying higher hourly wages than it actually paid its nuclear power generation employees."

7.     Each Nuclear Defendant or one of its affiliates was a member of the Nuclear Human Resources Group ("NHRG"), which was a human-resources association that consisted of all the nuclear power companies in the United States and Canada. NHRG provided the organizational structure through which the Nuclear Defendants and coconspirators implemented the conspiracy, including facilitating information exchanges, organizing in-person meetings, and maintaining contact lists.

8.     Defendants implemented, monitored, and enforced their conspiracy to fix and suppress compensation paid to Class Members through a series of mutually reinforcing overt acts, including:

9.     *Secret Collective Bargaining Agreement Repository*. From at least May 2003 to the present, the Nuclear Defendants *directly exchanged* highly sensitive compensation data— including the amount and dates of planned *future* wage increases—through a digital repository of union collective bargaining agreements ("CBA Repository"). The CBA Repository was organized and updated by NHRG with the assistance of Defendant Accelerant Technologies, LLC, coconspirator Human Resource Consultants, LLC and the now-defunct consultancy HR Strategies & Solutions, Inc., which collected current CBAs from the Nuclear Defendants and coconspirators and posted them to a password-protected website accessible only to participating Nuclear Defendants and coconspirators.

10.     A former Workforce Relations Manager at Nuclear Management Company, which was owned by Xcel Energy, Inc. and operated multiple nuclear power plants until 2008, stated that "one of the big projects" of NHRG "was to put together a library of CBAs that were part of the group." He said, "We shared our collective bargaining agreements among ourselves" so that "we had an idea of what other companies were doing outside of our own" regarding compensation and knew "what was going on at facilities as far as negotiations w[ere] concerned." The CBAs exchanged between Nuclear Defendants were highly confidential and inaccessible to the Nuclear Defendants absent the unlawful exchange.

11.     *Compensation Comparison Reports.* Defendant Constellation Energy Generation, LLC (f/k/a Exelon Generation Company, LLC) collected detailed compensation data directly from the Nuclear Defendants and created spreadsheets containing plant-specific compensation rates

("Compensation Comparison Reports") that were distributed to participating nuclear power companies twice a year. Critically, the Compensation Comparison Reports included disaggregated and deanonymized information about Nuclear Defendants' *current* wages and *future* wage increases. Consistent with the competitively sensitive nature of the wage data, the Compensation Comparison Reports were accessible only to Defendants and coconspirators through a password-protected website. The Compensation Comparison Reports allowed the Nuclear Defendants to easily compare and coordinate their current and future compensation rates at each unionized nuclear power plant and provided them with a significant bargaining advantage when negotiating wages and benefits with unions.

12.     *Annual Meetings to Exchange Compensation Information and Suppress Wages.* Each year, the Nuclear Defendants held in-person meetings at or immediately before the annual NHRG conference to extensively discuss, suppress, and fix Class Members' compensation. NHRG operated two Project Teams that involved compensation: the Labor Relations Project and the Total Rewards Project. Immediately before or during annual NHRG conferences, each of those Project Teams held meetings in which participants discussed compensation for nuclear power generation employees.

13.     During Labor Relations Project meetings, the Nuclear Defendants collectively reviewed the CBA Repository and Compensation Comparison Reports, and used that data to discuss and agree on how to negotiate with unions and what wage rates to set. A former Labor Relations Manager of Entergy Operations, Inc. said, "[o]f course, wages would be discussed" at those meetings. She stated that a central purpose of the Labor Relations Project meetings was to report "data points" and "outcomes" of recent and ongoing labor negotiations. She explained that members of the Labor Relations Project "would share what those outcomes were," such as the

specific amount that a particular plant's bonuses would increase. Similarly, a former Workforce Relations Manager at Nuclear Management Company stated that one key purpose of the NHRG conference was to compare compensation across nuclear power companies.

14.    During Total Rewards Project meetings, the Nuclear Defendants and coconspirators reviewed surveys of hourly and salaried compensation in the nuclear power industry administered by Willis Towers Watson ("WTW Surveys"). The WTW Surveys displayed aggregated compensation information, including a median wage for various positions and experience levels. During the Total Rewards Project meetings, the Nuclear Defendants and coconspirators extensively discussed the WTW Surveys to coordinate their compensation increases and suppress their employees' salaries and wages.

15.    *Direct Telephone and Email Coordination Concerning Compensation.* The Nuclear Defendants directly exchanged compensation information and stabilized wages through telephone and email communications during the Class Period. Corporate executives and human resources personnel at the Nuclear Defendants and coconspirators frequently contacted one another to exchange current and future compensation information and to agree on and suppress the wages of Class Members.

16.    According to an HR executive formerly employed by Progress Energy, Inc. and Duke Energy Corporation, human resources personnel at the Nuclear Defendants had special "relationships" with personnel at other nuclear power companies through which they exchanged compensation information and ensured alignment. She explained that she would regularly "pick up the phone" and exchange "average salary, minimum and maximum, and incentives" data with her human resources counterparts at other nuclear power companies.

17.     A former labor manager at Exelon stated that "there was a lot of collaboration and information sharing between many big nuclear companies in regards to union details" in particular. He stated that nuclear power companies shared information "all the time" and did so for the "specific reason" of "trying to screw the union."

18.     The Nuclear Defendants typically contacted each other directly to exchange compensation information at least once per year, and they often did so before their human resources personnel proposed adjustments to salary ranges. During these communications, the Nuclear Defendants shared the salary range adjustments they were contemplating implementing in the future and confirmed their alignment with the rest of the industry before finalizing the salary ranges. This facilitated Nuclear Defendants' scheme to keep compensation—in the words of one HR executive formerly employed by Progress Energy, Inc. and Duke Energy Corporation—"in line" across the industry.

19.     The nuclear power industry has numerous characteristics that facilitated the formation and implementation of this conspiracy. These characteristics include but are not limited to: (1) extraordinarily high barriers to entry; (2) industry concentration; (3) fungibility of nuclear power generation labor; (4) inelastic labor supply; (5) numerous opportunities to collude; and (6) a history and culture of collaboration across the industry.

20.     The Nuclear Defendants engaged in the conspiracy to increase their profits by reducing labor costs. The intended and actual effect of Defendants' conspiracy has been to reduce and suppress the compensation paid to Class Members since May 2003 to levels materially lower than they would have been in a competitive market.

21.     The agreement entered by Defendants to fix and suppress compensation paid to employees who worked in nuclear power generation has unreasonably restrained trade in violation

of the Sherman Act, 15 U.S.C. § 1. Plaintiffs, on their own behalf and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful agreement and to recover actual, compensatory, and treble damages, as well as costs, attorneys' fees, and interest. Plaintiffs demand a trial by jury.

## II.    JURISDICTION AND VENUE

22.    The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

23.    This Court has personal jurisdiction over each of the Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1) and (3). Defendants Constellation Energy Corporation ("Constellation") and Constellation Energy Generation, LLC ("CEG") reside in this District and used their headquarters in Baltimore, Maryland, to implement and coordinate the restraints of trade described below. In addition, Defendants (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, Class Members located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District. For example:

- Each Nuclear Defendant regularly generated electricity to be sold on wholesale or regional markets in the United States, and Defendants CEG, Indiana Michigan Power Company, PSEG Nuclear LLC, and Virginia Electric & Power Company generated electricity to be sold on the PJM wholesale market, which serves consumers in the state of Maryland;

- Defendants Constellation and CEG are headquartered in the state of Maryland;

- Defendant CEG operates a nuclear power plant in the state of Maryland;

- Each Nuclear Defendant attended the 2012 NHRG annual conference in Maryland;

- The Nuclear Energy Institute held a Regulatory Affairs Forum at the Bethesda North Marriott in Maryland from September 12 to September 14, 2023. Representatives from the following Nuclear Defendants attended the meeting: Arizona Public Service Company; CEG; Dominion Energy, Inc.; Duke Energy Corporation; Energy Northwest; Entergy Operations, Inc.; Florida Power & Light Company; NextEra Energy, Inc.; Pacific Gas & Electric Company; PSEG Nuclear LLC; Southern Nuclear Operating Company; STP Nuclear Operating Company; Tennessee Valley Authority; and Xcel Energy, Inc.

- Accelerant Technologies, LLC provided services to Nuclear Defendants in the state of Maryland during the Class Period, including Constellation and CEG;

- Each Defendant conspired with the other Defendants, including Constellation and CEG located in Maryland, to fix and suppress the compensation paid to persons employed in nuclear power generation, including such person employed in Maryland;

- Each Nuclear Defendant transmitted confidential compensation information to Defendants in Maryland, including Constellation and CEG;

- Each Defendant reasonably expected that the conspiracy would result in the suppression of the compensation of nuclear power generation workers in Maryland;

- The non-resident Defendants' overt acts subject them to personal jurisdiction under Maryland's long-arm statute.

24.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)–(d) because one or more of the Defendants transacted business, was found, and/or resided in this

District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein was carried out in this District.

### III.    PARTIES

#### A.    Plaintiffs

25.    Leo Dorrell was employed by Virginia Electric & Power Company during the Class Period. As an employee, he was paid an hourly wage and benefits by Virginia Electric & Power Company. He is a resident of the state of Virginia.

26.    John Dunn was employed by Entergy Nuclear Operations, Inc. during the Class Period. As an employee, he was paid an hourly wage and benefits by Entergy Nuclear Operations, Inc. He is a resident of the state of Virginia.

27.    Davion Chapel was employed by Entergy Nuclear Operations, Inc., Florida Power & Light, and CEG during the Class Period. As an employee, he was paid an hourly wage and benefits by Entergy Nuclear Operations, Inc., Florida Power & Light Company, and CEG. He is a resident of the state of Maryland.

#### B.    Defendants

##### 1.    Constellation Defendants

28.    Constellation Energy Corporation ("Constellation") is a publicly traded Pennsylvania corporation headquartered in Baltimore, Maryland.

29.    Constellation was formed in 2021 when Exelon Corporation elected to spin off its nuclear power generation division. As part of a "Separation Agreement By and Between Exelon Corporation and Constellation Energy Corporation" dated January 31, 2022 ("Separation Agreement"), Exelon Corporation transferred ownership of subsidiary Exelon Generation

Company, LLC to Constellation, and Exelon Generation Company, LLC was renamed "Constellation Energy Generation, LLC."

30.     Constellation Energy Generation, LLC ("CEG"), formerly known as Exelon Generation Company, LLC, is a Pennsylvania limited liability company headquartered in Baltimore, Maryland. CEG is a wholly owned subsidiary of Constellation. In documents filed with the U.S. Department of Energy in 2024, CEG stated that its "principal executive offices" and "principal place of business" were located in Baltimore, Maryland. In a document submitted to the Maryland Department of the Environment in 2023, CEG stated that it "recently chose to locate its headquarters in Baltimore."

31.     CEG owns and/or operates 12 nuclear power plants in the United States: Braidwood Clean Energy Center in Braceville, Illinois; Byron Clean Energy Center in Byron, Illinois; Calvert Cliffs Clean Energy Center in Lusby, Maryland; Clinton Clean Energy Center in Clinton, Illinois; Dresden Clean Energy Center in Morris, Illinois; James A. FitzPatrick Clean Energy Center in Scriba, New York; LaSalle Clean Energy Center in Marseilles, Illinois; Limerick Clean Energy Center in Limerick, Pennsylvania; Nine Mile Point Clean Energy Center in Oswego, New York; Peach Bottom Clean Energy Center in Delta, Pennsylvania; R.E. Ginna Clean Energy Center in Ontario, New York; and Quad Cities Clean Energy Center in Cordova, Illinois. During the Class Period, CEG employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

32.     As part of the Separation Agreement, Constellation and CEG each assumed liability associated with Exelon Corporation's former nuclear power generation subsidiary, Exelon Generation Company, LLC, and Constellation agreed to indemnify Exelon Corporation for pre-separation liabilities associated with Exelon Generation Company, LLC's business.

33.     According to Constellation's website, the Executive Committee of Constellation "sets strategy and direction for the company." The Executive Committee includes Susie Kutansky, Executive Vice President and Chief Human Resources Officer for Constellation and CEG. According to Constellation's website, Ms. Kutansky is "responsible for the company's human resource operations, compensation, benefits, employee and labor relations, respect, belonging, diversity and inclusion, workforce development, talent management, human resources systems, recruiting, and organizational effectiveness." In addition to her current role, Kutansky was formerly Director of Employee and Labor Relations at Exelon and a member of NHRG. Kutansky is a signatory to collective bargaining agreements between Exelon and the union responsible for negotiating wages and benefits for nuclear generation workers at Exelon's Illinois nuclear plants. Ms. Kutansky has directed and supervised compensation practices at Constellation and CEG.

34.     Two other members of Constellation's Executive Committee—Bryan C. Hanson, Executive Vice President and Chief Generation Officer, and David O. Daris, Executive Vice President and General Counsel—serve as Principal Officers of CEG.

35.     CEG (f/k/a Exelon) negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, CEG relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

36.     Multiple former or current employees of CEG (f/k/a Exelon) were members of NHRG during the Class Period, including: Ann Marie Harris, former Talent Management and Organizational Development Specialist; Jaime Parsons, Vice President of Employee and Labor Relations; Philip Brzozowski, former Director of Employee and Labor Relations; Scott Bartnick, former Director and Senior Manager of Employee and Labor Relations; Mark Gridley, former

Labor Relations Liaison; Alan Siegman, former Labor Relations Principal; Julie Jacovec, HR Director; Lisa Ross, former Senior HR Business Partner; LeAnn Vizza, Senior Manager of HR; Kimberly Seymour, former Senior HR Generalist; Katie Manis, Director of HR; and Karen Greig, Vice President of HR.

37.     During each year of the Class Period, CEG, which was previously known as Exelon Generation Company, LLC until 2022, directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- CEG directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Employees of Exelon implemented the Compensation Comparison Reports. CEG knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. CEG exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- CEG exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. CEG knew and understood that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, CEG employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class

Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, CEG employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, CEG employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- As part of the conspiracy, CEG established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

38.    After the Separation Agreement was executed, CEG participated in the conspiracy to fix and suppress compensation to nuclear power generation workers at the direction of Constellation.

## 2.    Ameren Defendants

39.    Ameren Corporation ("Ameren") is a publicly traded Missouri corporation headquartered in St. Louis, Missouri.

40.    Union Electric Company (doing business as "Ameren Missouri") is a Missouri corporation headquartered in St. Louis, Missouri. Ameren Missouri is a wholly owned subsidiary of Ameren which owns and operates the Callaway Energy Center in Fulton, Missouri. During the Class Period, Ameren Missouri employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

41.     Ameren Services Company ("Ameren Services") is a Missouri corporation headquartered in St. Louis, Missouri. Ameren Services is a wholly owned subsidiary of Ameren.

42.     According to documents filed with the United States Nuclear Regulatory Commission, Ameren "exercises control and oversight of Ameren Missouri and its subsidiaries through its holding company structure, including appointing the directors and officers of its subsidiaries."

43.     According to Ameren's 2024 10-K, Ameren's Chief Executive Officer, Martin J. Lyons, Jr., and Chief Human Resources Officer, Mark C. Lindgren, "with the support of other leaders of the Ameren Companies, are responsible for developing and executing [Ameren's] workforce strategy."

44.     Mark C. Lindgren is Executive Vice President of Communications and Chief Human Resources Officer for Ameren and Ameren Services. He serves on Ameren's Executive Leadership Team and, according to Ameren's website, is "responsible for Ameren's workforce strategy, human resources, and corporate communications." He has directed and supervised compensation practices at Ameren, Ameren Missouri, and Ameren Services.

45.     Michael L. Moehn is Senior Executive Vice President and Chief Financial Officer of Ameren; President of Ameren Services; and Interim Chairman and President of Ameren Missouri.

46.     Ameren Missouri and Ameren Services negotiate collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, Ameren Missouri and Ameren Services relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

47.    The following employees of Ameren Missouri were members of NHRG: John Neudecker, former Superintendent of Labor Relations; and Jay Quattlebaum, former Manager of Labor Relations.

48.    Ameren was a member of NHRG.

49.    During the Class Period, Ameren, Ameren Missouri, and Ameren Services directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Ameren, Ameren Missouri, and Ameren Services directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Ameren, Ameren Missouri and Ameren Services knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Ameren, Ameren Missouri and Ameren Services exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Ameren, Ameren Missouri and Ameren Services exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Ameren, Ameren Missouri and Ameren Services knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Ameren and Ameren Missouri employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Ameren and Ameren Missouri employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Ameren and Ameren Missouri executives directly contacted other Nuclear Defendants' and coconspirators' executives through email and telephonic communications to exchange compensation data and discuss, compare, and fix compensation.

- As part of the conspiracy, Ameren, Ameren Missouri and Ameren Services established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

### 3.    AEP Defendants

50.    American Electric Power Company Inc. ("AEP") is a publicly traded New York corporation headquartered in Columbus, Ohio.

51.    Indiana Michigan Power Company ("IMPC") is an Indiana corporation headquartered in Columbus, Ohio. IMPC is a wholly owned subsidiary of AEP, and IMPC owns and operates the Donald C. Cook Nuclear Plant in Bridgman, Michigan. During the Class Period,

IMPC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

52.    American Electric Power Service Corporation ("AEPSC") is a New York corporation headquartered in Columbus, Ohio. AEPSC is a wholly owned subsidiary of AEP. The executive officers of AEP are employees of AEPSC.

53.    According to AEP's website, Phil Ulrich, Executive Vice President and Chief Human Resources Officer at AEP, "is responsible for aligning human resources functions, processes, and company culture to support AEP's overall business strategy including oversight of labor and employee relations, leadership and organizational development, benefits and compensation, culture and well-being for AEP's employees." Mr. Ulrich has directed and supervised compensation practices at AEP, IMPC, and AEPSC.

54.    William J. Fehrman is Chairman of the Board of Directors, President and Chief Executive Officer for AEP, IMPC and AEPSC. Trevor I. Mihalik is Executive Vice President and Chief Financial Officer for AEP, IMPC, and AEPSC. Matthew Fransen is Senior Vice President and Treasurer for AEP, IMPC and AEPSC.

55.    IMPC and AEPSC negotiate collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, IMPC and AEPSC relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

56.    The following employees of IMPC were members of NHRG: Kathryn Wozniak, Director of Business HR, and Tiffany Rydwelski, former Organizational Development Leader and Senior HR Consultant.

57.    AEP was a member of NHRG.

58.    During the Class Period, AEP, IMPC, and AEPSC directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- AEP, IMPC, and AEPSC directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. AEP, IMPC, and AEPSC knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. AEP, IMPC, and AEPSC exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- AEP, IMPC, and AEPSC exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. AEP, IMPC, and AEPSC knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, AEP and IMPC employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, AEP and IMPC employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, AEP, IMPC, and AEPSC established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**4.    APS**

59.    Arizona Public Service Company ("APS") is an Arizona corporation headquartered in Phoenix, Arizona. APS operates, and jointly owns, the Palo Verde Generating Station in Wintersburg, Arizona.

60.    During the Class Period, APS and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

61.    APS is responsible for negotiating collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, APS relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

62.    The following employees of APS were members of NHRG: Tony Marco, former Director of Nuclear HR; James Hettel, HR Operations Director; and David DuBey, former HR Manager of Employee and Labor Relations.

63.    During the Class Period, APS directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- APS directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. APS knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. APS exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- APS exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. APS knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, APS employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels. For example, APS hosted the 2000 Annual NHRG Conference in April 2000 in Phoenix, Arizona; the 2011 NHRG, EU-HRMG & EU-TAG Joint Conference in May 2011 in Phoenix, Arizona; and the 2019 NHRG-HR Metric and

OR Working Group Annual Meetings from May 20 to May 22, 2019 at the Kimpton Hotel in Phoenix, Arizona.

- During the Class Period, APS employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, APS employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- As part of the conspiracy, APS established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**5.      Dominion Defendants**

64.     Dominion Energy, Inc. ("Dominion") is a publicly traded Virginia corporation headquartered in Richmond, Virginia.

65.     Virginia Electric & Power Company ("VEPCO") is a Virginia corporation headquartered in Richmond, Virginia. VEPCO is a wholly owned subsidiary of Dominion, and VEPCO owns and operates the North Anna Power Station in Louisa, Virginia, and the Surry Power Station in Surry, Virginia. During the Class Period, VEPCO employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

66.     Dominion Energy Services, Inc. ("DES") is a Virginia corporation headquartered in Richmond, Virginia. DES is a wholly owned subsidiary of Dominion.

67.     Regina J. Elbert is Senior Vice President and Chief Legal and Human Resources Officer for Dominion, DES and VEPCO. She oversees the human resources functions for Dominion and its nuclear operating subsidiaries, including "employee and labor relations, employee compensation and payroll, benefits design and administration, talent acquisition, learning and development, and human resources information systems." Ms. Elbert has directed and supervised compensation practices at Dominion, DES, and VEPCO.

68.     Steven D. Ridge is Executive Vice President and Chief Financial Officer for Dominion, DES and VEPCO. Carlos M. Brown is Executive Vice President, Chief Administrative and Projects Officer, and Corporate Secretary for Dominion, DES and VEPCO. Eric S. Carr is Chief Nuclear Officer and President of Nuclear Operations and Contracted Energy for Dominion, DES and VEPCO.

69.     VEPCO negotiates collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, VEPCO relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

70.     Christina Spence, Director of Compensation & Payroll at DES, was a member of NHRG.

71.     The following individuals who identified Dominion as their employer were members of NHRG: Kathy Payne, Senior HR Specialist of Labor Relations, and Calvin Callahan, former HR Manager and Employee Relations Consultant.

72.     During the Class Period, Dominion, DES, and VEPCO directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Dominion and VEPCO directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Dominion and VEPCO knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Dominion and VEPCO exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Dominion and VEPCO exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Dominion and VEPCO knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Dominion and DES employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Dominion and DES employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Dominion and DES employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions at nuclear power plants.

- As part of the conspiracy, Dominion, DES, and VEPCO established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**6.    DTE Defendants**

73.    DTE Energy Company ("DTE Energy") is a publicly traded Michigan corporation headquartered in Detroit, Michigan.

74.    DTE Electric Company ("DTE Electric") is a Michigan corporation headquartered in Detroit, Michigan. DTE Electric is a wholly owned subsidiary of DTE Energy, and DTE Electric owns and operates the Fermi 2 Power Plant in Newport, Michigan. During the Class Period, DTE Electric employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

75.    DTE Energy Corporate Services, LLC ("DTE Services") is a Michigan limited liability company headquartered in Detroit, Michigan. DTE Services is a wholly owned subsidiary of DTE Energy.

76.    Diane Antishin is Senior Vice President of Human Resources and Chief Diversity, Equity & Inclusion Officer at DTE Energy and DTE Electric. She is a member of DTE Energy's Executive Committee and, according to DTE Energy's website, "responsible for the design, development, and execution of enterprise-wide strategy for workforce planning and development, talent acquisition, talent and succession planning, executive and employee compensation and

benefits, payroll, health and wellness, and labor and employee relations." She is a signatory to collective bargaining agreements between DTE Electric, DTE Services and local unions. She has directed and supervised compensation practices at DTE Energy, DTE Electric and DTE Services.

77.     JoAnn Chavez is Senior Vice President and Executive Committee member at DTE Energy, and she is also a Director at DTE Electric. Lisa A. Muschong is Vice President and Executive Committee member at DTE Energy, and she is also a Director at DTE Electric and Manager at DTE Services. Matthew Paul is an Executive Committee member at DTE Energy and also President & Chief Operating Officer of DTE Electric. David Ruud is Executive Vice President, Chief Financial Officer, and Executive Committee member at DTE Energy, and he is also a Treasurer and Director at DTE Electric. Peter Dietrich is a Corporate Officer at DTE Energy and also Senior Vice President and Chief Nuclear Officer at DTE Electric.

78.     DTE Electric and DTE Services negotiate collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, DTE Electric and DTE Services relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

79.     DTE Energy was a member of NHRG.

80.     The following individuals who identified DTE Energy as their employer were members of NHRG: Amy Zangara, former HR Manager and HR Client Relations Consultant; Mary Ann Casha, Chief of Staff; and Laurie Washington, former Program Manager of Workforce Development.

81.     Emily Wood-Keel, former Nuclear HR Manager and Nuclear Principal Planning Analyst at DTE Electric, was a member of NHRG.

82.    During the Class Period, DTE Energy, DTE Electric, and DTE Services directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- DTE Energy, DTE Electric, and DTE Services directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. DTE Energy, DTE Electric, and DTE Services knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. DTE Energy, DTE Electric, and DTE Services exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- DTE Energy, DTE Electric, and DTE Services exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. DTE Energy, DTE Electric, and DTE Services knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, DTE Energy and DTE Electric employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, DTE Energy and DTE Electric employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, DTE Energy and DTE Electric executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, DTE Energy, DTE Electric, and DTE Services established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

### 7. Duke Energy Defendants

83.     Duke Energy Corporation ("Duke Energy") is a publicly traded Delaware corporation headquartered in Charlotte, North Carolina.

84.     Duke Energy Carolinas, LLC ("DEC") is a North Carolina limited liability company headquartered in Charlotte, North Carolina. DEC is a wholly owned subsidiary of Duke Energy, and DEC owns and operates three nuclear power plants in the United States: Catawba Nuclear Station in York, South Carolina; McGuire Nuclear Station in Huntersville, North Carolina; and Oconee Nuclear Station in Seneca, South Carolina. During the Class Period, DEC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

85.     Duke Energy Business Services, LLC ("DEBS") is a Delaware limited liability company headquartered in Charlotte, North Carolina. DEBS is a wholly owned subsidiary of Duke Energy.

86. According to its 2024 10-K, Duke Energy's "Human Resources organization is responsible for … human capital management strategy, which includes recruiting and hiring, onboarding and training, diversity and inclusion, workforce planning, talent and succession planning, performance management and employee development."

87. Cameron D. McDonald is Senior Vice President and Chief Human Resources Officer for Duke Energy and Senior Vice President of DEC and DEBS. She is a member of Duke Energy's Senior Management Committee and, according to Duke Energy's website, "responsible for human resources policy and strategy, leadership and talent development, diversity and inclusion, employee and labor relations, total rewards strategies and programs, and delivery of business partner services." She has directed and supervised compensation practices at Duke Energy, DEC, and DEBS. She was also a member of NHRG.

88. Kodwo Ghartey-Tagoe is a member of Duke Energy's Senior Management Committee, and also Executive Vice President and Chief Executive Officer for DEC and an Executive Officer for DEBS. T. Preston Gillespie is Executive Vice President, Chief Generation Officer, and Senior Management Committee member at Duke Energy, and he is also an Executive Officer of DEC and DEBS. R. Alexander Glenn is Executive Vice President, Chief Legal Officer and Senior Management Committee member at Duke Energy, and he is also an Executive Officer of DEC and DEBS. Brian L. Savoy is Executive Vice President, Chief Financial Officer, and Senior Management Committee member at Duke Energy, and he is also an Executive Officer of DEC and DEBS. Bonnie Titone is Executive Vice President, Chief Administrative Officer, and Senior Management Committee member at Duke Energy, and he is also a Senior Vice President of DEC and DEBS. Kelvin Henderson is Senior Vice President and Chief Nuclear Officer for Duke Energy, and also a Senior Vice President of DEC and DEBS.

89.     The following employees of Duke Energy, DEC, and DEBS were members of NHRG: Anthony Rose, HR Director at Duke Energy; Jake Stewart, Managing Director of Executive Compensation, Compensation & HR Integration at Duke Energy; Lori Ingle, former Director of HR Business Partners at Duke Energy; Carla Deck, HR Business Partners at Duke Energy; Angela Waters, Senior Manager of HR Business Partners at Duke Energy; Phyllis Ivey, Director of Nuclear HR at Duke Energy; Jay Alvaro, Vice President of Employee and Labor Relations at DEC; Shannon Caldwell, Director of HR Operations at DEBS; and Misty Easton, Director of HR Consulting Services at DEBS.

90.     During the Class Period, Duke Energy, DEC, and DEBS directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- During the Class Period, Duke Energy, DEC, and DEBS employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- Duke Energy hosted the 1999 Annual NHRG Conference in April 1999 in Charlotte, North Carolina, and the 2010 NHRG, EU-HRMG & EU-TAG Joint Conference in May 2010 in Charlotte, North Carolina.

- During the Class Period, Duke Energy, DEC, and DEBS employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, Duke Energy, DEC, and DEBS executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Duke Energy, DEC, and DEBS established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

91.    Progress Energy, Inc. ("Progress") is a North Carolina corporation headquartered in Raleigh, North Carolina. Progress was an independent company until it merged with and became a wholly owned subsidiary of Duke Energy in July 2012. During the Class Period, Progress employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

92.    During the Class Period, Progress directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Progress directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Progress knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Progress exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Progress exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Progress knew

and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Progress employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Progress employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Progress employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, Progress executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Progress established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

8.    **EnergyNW**

93.    Energy Northwest ("EnergyNW") is a municipal corporation and joint operating agency of the state of Washington. EnergyNW owns and operates the Columbia Generating Station in Richland, Washington.

94.    During the Class Period, EnergyNW and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

95.    EnergyNW negotiates collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, EnergyNW relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

96.    The following employees of EnergyNW were members of NHRG: Juliet Gaffney, HR Director; Diane Draper, HR Professional; Cindy Way, former Senior Compensation and Benefits Administrator; Julie Marboe, Manager of Employee and Labor Relations; Kim Morris, former Supervisor of HR, Compensation and Benefits; and Steve Lorence, former Vice President of Corporate Support Services and HR Manager.

97.    During the Class Period, EnergyNW directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- EnergyNW directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. EnergyNW knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. EnergyNW exchanged compensation

data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- EnergyNW exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. EnergyNW knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, EnergyNW employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, EnergyNW employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, EnergyNW employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- As part of the conspiracy, EnergyNW established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

9.      **Entergy Defendants**

98.      Entergy Corporation ("Entergy") is a publicly traded Delaware corporation headquartered in New Orleans, Louisiana.

99.      Entergy Operations, Inc. ("EOI") is a Delaware corporation headquartered in Jackson, Mississippi. EOI is a wholly owned subsidiary of Entergy, and it operates four nuclear power plants in the United States: Arkansas Nuclear One in Russellville, Arkansas; Grand Gulf Nuclear Station in Port Gibson, Mississippi; River Bend Station in St. Francisville, Louisiana; and Waterford Steam Electric Station in Killona, Louisiana. During the Class Period, EOI employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

100.      Entergy Nuclear Operations, Inc. ("ENOI") is a Delaware corporation headquartered in Jackson, Mississippi. ENOI is a wholly owned subsidiary of Entergy, and it operated five nuclear power plants in the United States during the Class Period: Indian Point Energy Center in Buchanan, New York; Palisades Nuclear Plant in Covert, Michigan; Pilgrim Nuclear Power Station in Plymouth, Massachusetts; Vermont Yankee Nuclear Power Plant in Vernon, Vermont; and James A. Fitzpatrick Nuclear Power Plant in Scriba, New York. All the nuclear power plants operated by ENOI, with the exception of James A. Fitzpatrick, are currently being, or have been, decommissioned. The James A. Fitzpatrick plant was acquired by Exelon in 2017 and is currently part of the CEG nuclear fleet. During the Class Period, ENOI employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

101.      According to Entergy's 2024 10-K, the "Office of the Chief Executive, which includes Entergy's Chief Human Resources Officer, ensures annual business plans are designed to support Entergy's talent objectives, reviews workforce-related metrics, and regularly discusses the development, succession planning, and performance of their direct reports and other company

officers." Kathryn Collins, Senior Vice President and Chief Human Resources Officer for Entergy, is a member of the Office of the Chief Executive, and according to Entergy's website, she "oversees human resources strategy, including talent management, talent acquisition, business partnership, compensation, benefits, labor relations and workforce strategies." She has directed and supervised compensation practices at Entergy, EOI, and ENOI.

102.    Kimberly Cook-Nelson is Executive Vice President and Chief Operating Officer for Entergy and also President and Chief Executive Officer for EOI and ENOI. John Dinelli is Executive Vice President, Chief Nuclear Officer, and Office of the Chief Executive member for Entergy, and he is also a Director at EOI and ENOI. Marcus Brown is Executive Vice President and General Counsel for Entergy and also Vice President for EOI and ENOI. David Hahn is Senior Vice President of Engineering and Technical Services for Entergy, and also a Director and Vice President at EOI and ENOI.

103.    Both EOI and ENOI negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, EOI and ENOI relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

104.    The following employees of EOI and ENOI were members of NHRG: Allison Brewer Thurman, former Manager of HR and Labor Relations at EOI; and Brenda Gailes, former HR Manager at the Pilgrim Nuclear Power Station for ENOI.

105.    Kim Dargin, who listed her position as Manager of HR Business Partners at Entergy, was a member of NHRG.

106.    During the Class Period, Entergy, EOI, and ENOI directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Entergy, EOI, and ENOI directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Entergy, EOI, and ENOI knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Entergy, EOI, and ENOI exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Entergy, EOI, and ENOI exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Entergy, EOI and ENOI knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Entergy, EOI, and ENOI employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- Entergy hosted the 2004 Annual NHRG Conference in April 2004 in New Orleans, Louisiana and the 2018 NHRG-HR Metric and OR Working Group Annual Meetings from May 7 to May 10, 2018 at the Hyatt Regency in New Orleans, Louisiana.

- During the Class Period, Entergy, EOI, and ENOI employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Entergy, EOI, and ENOI employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, Entergy, EOI, and ENOI executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Entergy, EOI, and ENOI established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**10.    FirstEnergy Defendants**

107.    FirstEnergy Corporation ("FirstEnergy") is a publicly traded Ohio corporation headquartered in Akron, Ohio. FirstEnergy, through its former subsidiary FirstEnergy Nuclear Operating Company, operated three nuclear power plants in the United States: Beaver Valley Power Station in Shippingport, Pennsylvania; Davis-Besse Nuclear Power Station in Oak Harbor, Ohio; and Perry Nuclear Power Plant in Perry, Ohio.

108.    FirstEnergy Service Company ("FESC") is an Ohio corporation headquartered in Akron, Ohio. FESC is a wholly owned subsidiary of FirstEnergy, and it provided human resources services, including compensation and benefits administration, to FENOC.

109.    During the Class Period, Charles E. Jones was President and Chief Executive Officer for both FirstEnergy and FESC; James F. Pearson was Executive Vice President and Chief Financial Officer for both FirstEnergy and FESC; K. Jon Taylor was Vice President, Controller and Chief Accounting Officer for both FirstEnergy and FESC; Leila L. Vespoli was Executive Vice President of Corporate Strategy, Regulatory Affairs and Chief Legal Officer for both FirstEnergy and FESC; and Ebony Yeboah-Amankwah was Vice President, Corporate Secretary and Chief Ethics Officer for both FirstEnergy and FESC.

110.    FESC negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, FESC relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

111.    The following employees of FESC were members of NHRG: Margaret Breetz, former Director of Generation HR, and Ryan Clegg, Manager of Talent Acquisition.

112.    FirstEnergy was a member of NHRG.

113.    During the Class Period, FirstEnergy and FESC directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- FirstEnergy and FESC directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. FirstEnergy and FESC knew and understood

that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. FirstEnergy and FESC exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- FirstEnergy and FESC exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. FirstEnergy and FESC knew and understood, when they shared their current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, FirstEnergy and FESC employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, FirstEnergy and FESC employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, FirstEnergy and FESC employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, FirstEnergy and FESC executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, FirstEnergy and FESC established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**11.    NextEra Defendants**

114.    NextEra Energy, Inc. ("NextEra") is a publicly traded Florida corporation headquartered in Juno Beach, Florida.

115.    NextEra Energy Resources, LLC ("NEER") is a Delaware limited liability company headquartered in Juno Beach, Florida. NEER is an indirect wholly owned subsidiary of NextEra, and it indirectly owns and operates the Point Beach Nuclear Plant in Two Rivers, Wisconsin, and the Seabrook Station in Seabrook, New Hampshire. NEER previously owned and operated the Duane Arnold Energy Center in Palo, Iowa, which ceased operations in August 2020. During the Class Period, NEER employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

116.    Florida Power & Light Company ("FPL") is a Florida corporation headquartered in Juno Beach, Florida. FPL is a wholly owned subsidiary of NextEra, and it owns and operates the St. Lucie Nuclear Power Plant in Jensen Beach, Florida and the Turkey Point Nuclear Power Plant in Florida City, Florida. During the Class Period, FPL employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

117.    John W. Ketchum is Chairman, President and Chief Executive Officer of NextEra and Chairman of FPL. Michael Dunne is Executive Vice President of Finance and Chief Financial Officer for NextEra and Vice President, Director and Treasurer for FPL. Nicole J. Daggs is

Executive Vice President of Human Resources and Corporate Services for NextEra and Vice President of FPL. Mark Lemasney is Executive Vice President of the Power Generation Division for NextEra and, according to NextEra's website, "directs power production activities for all renewable and clean-energy powerplants of NextEra Energy's principal subsidiaries, FPL and NEER." Bob Coffey is Executive Vice President of the Nuclear Division for NextEra and Vice President of FPL.

118. NEER and FPL negotiate collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, NEER and FPL relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

119. The following employees of NEER and FPL were members of NHRG: Karen Sprang, former Senior Compensation Consultant at NEER; Christine Cassina, former HR Labor Relations Manager at NEER; Lisa Perino, former Senior HR Business Partner and Director of Human Resources Operations at FPL; Kelly Tveter, Director of Labor Relations at FPL; and Brendan Callaghan, Director of Corporate Safety and Labor Relations at FPL.

120. Tim Garman, who listed his position as former Senior HR Business Partner for the Nuclear Fleet at NextEra, was a member of NHRG.

121. Ms. Tveter and Mr. Callaghan are signatories to collective bargaining agreements between FPL and the union local responsible for negotiating wages and benefits for nuclear generation workers at FPL's nuclear plants in Florida.

122. During the Class Period, NextEra, NEER, and FPL directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- NextEra, NEER, and FPL directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. NextEra, NEER, and FPL knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. NextEra, NEER, and FPL exchanged compensation data through the CBA Repository during the Class Period.

- NextEra, NEER, and FPL exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. NextEra, NEER, and FPL knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, NextEra, NEER, and FPL employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- FPL hosted the 2006 Annual NHRG Conference in May 2006 in Palm Beach, Florida, and the 2017 NHRG-HR Metric and OR Working Group Annual Meeting in May 2017 in Jupiter, Florida.

- During the Class Period, NextEra, NEER, and FPL employees regularly attended meetings of the Labor Relations Project, where labor relations executives from

competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, NextEra, NEER, and FPL employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, NextEra, NEER, and FPL executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, NextEra, NEER, and FPL established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**12.    PG&E Defendants**

123.    PG&E Corporation is a publicly traded California corporation headquartered in Oakland, California.

124.    Pacific Gas & Electric Company ("PG&E Company") is a California corporation headquartered in Oakland, California. PG&E Company is a wholly owned subsidiary of PG&E Corporation, and it owns and operates the Diablo Canyon Nuclear Power Plant in Avila Beach, California. During the Class Period, PG&E Company employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

125.    According to PG&E Corporation's 2024 Form 10-K, "PG&E [Corporation's] and [PG&E Company's] executive teams meet regularly to discuss and evaluate the state of employee

talent, determine which programs are driving engagement and performance, and clarify the specific skills, behaviors, and virtues that should be cultivated."

126.    Alejandro T. Vallejo is Executive Vice President and Chief People Officer for both PG&E Corporation and PG&E Company. According to PG&E Corporation's website, he is "responsible for attracting, cultivating, and retaining a high-performing workforce" as well as "labor relations." Mr. Vallejo has directed and supervised compensation practices at PG&E Corporation and PG&E Company.

127.    Ajay Waghray is Executive Vice President and Chief Information Officer for both PG&E Corporation and PG&E Company. Maureen R. Zawalick is Chief Risk Officer and Senior Vice President for both PG&E Corporation and PG&E Company. Mari Becker is Vice President, Internal Audit and Treasurer for both PG&E Corporation and PG&E Company. Matt Hayes is Vice President and Chief Safety Officer for both PG&E Corporation and PG&E Company. Stephanie Williams is Vice President and Controller for PG&E Corporation and also Vice President, Chief Financial Officer and Controller for PG&E Company. Brian M. Wong is Vice President, Deputy General Counsel and Corporate Secretary for PG&E Corporation and also Vice President, General Counsel, and Corporate Secretary for PG&E Company.

128.    PG&E Company negotiates collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, PG&E Company relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

129.    PG&E Corporation and PG&E Company were members of NHRG.

130.    During the Class Period, PG&E Corporation and PG&E Company directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- PG&E Corporation and PG&E Company directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. PG&E Corporation and PG&E Company knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. PG&E Corporation and PG&E Company exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- PG&E Corporation and PG&E Company exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. PG&E Corporation and PG&E Company knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, PG&E Corporation and PG&E Company employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels. For example, PG&E Company hosted the 1997 Annual NHRG Conference in April 1997 in San Francisco, California.

- During the Class Period, PG&E Corporation and PG&E Company employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, PG&E Corporation and PG&E Company employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- As part of the conspiracy, PG&E Corporation and PG&E Company established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

131.    PG&E Corporation and PG&E Company commenced Chapter 11 bankruptcy proceedings in the United State Bankruptcy Court for the Northern District of California on January 29, 2019. On July 1, 2020, the court discharged claims against PG&E Corporation and PG&E Company that arose before the petition date and for which proofs of claim were not filed. PG&E Corporation and PG&E Company participated in the conspiracy alleged herein throughout the Class Period, including before and after the January 29, 2019 petition date. Neither PG&E Corporation nor PG&E Company withdrew from the conspiracy after the bar date.

132.    This Complaint seeks to recover damages from PG&E Corporation and PG&E Company only for the post-petition-date conduct of PG&E Corporation and PG&E Company. However, by operation of law, the damages arising from the post-petition-date conduct of PG&E Corporation and PG&E Company include damages incurred by Plaintiffs and other Class Members throughout the Class Period, including from before the petition date. In addition, this Complaint

also seeks to recover damages from other Defendants for pre-petition-date conspiratorial conduct of PG&E Corporation and PG&E Company throughout the Class Period.

### 13.    PSEG Defendants

133.    Public Service Enterprise Group Inc. ("PSEG") is a publicly traded New Jersey corporation headquartered in Newark, New Jersey.

134.    PSEG Power LLC ("PSEG Power") is a Delaware limited liability company headquartered in Newark, New Jersey. PSEG Power is a wholly owned subsidiary of PSEG.

135.    PSEG Nuclear LLC ("PSEG Nuclear") is a Delaware limited liability company headquartered in Newark, New Jersey. PSEG Nuclear is a wholly owned subsidiary of PSEG Power, and it owns and operates the Hope Creek Generating Station in Hancock's Bridge, New Jersey, and the Salem Generating Station also in Hancock's Bridge, New Jersey. During the Class Period, PSEG Nuclear employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

136.    PSEG Services Corporation ("PSEG Services") is a New Jersey corporation headquartered in Newark, New Jersey. PSEG Services is a wholly owned subsidiary of PSEG that provides PSEG and its "operating subsidiaries with certain management, administrative and general services at cost."

137.    Sheila J. Rostiac is a member of the PSEG Senior Executive Team and the Senior Vice President, Chief Human Resources Officer and Chief Diversity Officer for PSEG Services. According to PSEG's website, she "leads the Human Resources team" and "serves as a strategic partner to the business in developing a talent pipeline to drive organizational success." Ms. Rostiac has directed and supervised compensation practices at PSEG, PSEG Services, and PSEG Nuclear.

138.    Ralph A. LaRossa is Chair of the Board, President and Chief Executive Officer of both PSEG and PSEG Power. Daniel J. Cregg is Executive Vice President and Chief Financial

Officer of both PSEG and PSEG Power and a member of the PSEG Senior Executive Team. Grace H. Park is Executive Vice President and General Counsel for both PSEG and PSEG Power and a member of the PSEG Senior Executive Team. Rose M. Chernick is Vice President and Controller for both PSEG and PSEG Power.

139.    Charles V. McFeaters is a member of the PSEG Senior Executive Team and serves as President and Chief Nuclear Officer for PSEG Nuclear.

140.    PSEG Power and PSEG Services negotiate collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, PSEG Power and PSEG Services relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

141.    The following employees of PSEG Power, PSEG Nuclear, and PSEG Services were members of NHRG: Mark Relken, HR Director for PSEG Power; Sharon Rhoads, HR Manager at PSEG Nuclear; Terri Robinson, former Senior Recruiter at PSEG Nuclear; Christopher Munyan, Labor Relations Manager at PSEG Services; and Christine Kenny, former Nuclear HR Business Partner at PSEG Services.

142.    During the Class Period, PSEG Power, PSEG Nuclear, and PSEG Services, at the direction of PSEG, directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- PSEG Power and PSEG Services directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. PSEG Power and PSEG Services knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and

coconspirators. PSEG Power and PSEG Services exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- PSEG Power and PSEG Services exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. PSEG Power and PSEG Services knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, PSEG Power, PSEG Nuclear, and PSEG Services employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, PSEG Power, PSEG Nuclear, and PSEG Services employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, PSEG Power, PSEG Nuclear, and PSEG Services established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**14.    SCE**

143.    Southern California Edison Company ("SCE") is a California corporation headquartered in Rosemead, California. SCE previously substantially owned and operated the San Onofre Nuclear Generating Station in San Clemente, California. The San Onofre facility ceased operations in June 2013 and is currently being decommissioned.

144.    During the Class Period, SCE and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

145.    SCE was responsible for negotiating collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, SCE relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

146.    SCE was a member of NHRG.

147.    During the Class Period, SCE directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- SCE directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. SCE knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. SCE exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- SCE exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. SCE knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, SCE employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, SCE employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, SCE established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**15.     Southern Company Defendants**

148.    The Southern Company ("Southern Company") is a publicly traded Delaware corporation headquartered in Atlanta, Georgia.

149.    Southern Nuclear Operating Company, Inc. ("Southern Nuclear") is a Delaware corporation headquartered in Birmingham, Alabama. Southern Nuclear is a wholly owned subsidiary of Southern Company, and it operates three nuclear power plants in the United States: Joseph M. Farley Nuclear Plant in Columbia, Alabama; Edwin I. Hatch Nuclear Plant in Baxley, Georgia; and Alvin W. Vogtle Electric Generating Plant in Waynesboro, Georgia. During the Class

Period, Southern Nuclear employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

150.    Southern Nuclear negotiates collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, Southern Nuclear relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports. Mark Wolfe, former Labor Relations Manager at Southern Nuclear and former Chair of the NHRG Labor Relations Committee, was signatory to agreements between Southern Nuclear and the local union.

151.    Shane Camp is Vice President of Human Resources for Southern Nuclear and has served as chair of NHRG.

152.    The following employees of Southern Company and Southern Nuclear were members of NHRG: Joshua Burroughs, former Compensation Manager at Southern Company; Paul Mullen, former HR Business Consultant and HR Manager for Southern Company; David Slicker, Talent Acquisition Operations Manager at Southern Company; Kevin Gillenwater, Labor Relations Consultant at Southern Nuclear; Lisa Kidd, former Senior Compensation Analyst at Southern Company; David Bandy, Regional Manager of Labor Relations at Southern Company; Sharon Dawkins, former Labor Relations Coordinator at Southern Nuclear; and Marty Ingels, former Regional HR Labor and Relations Manager at Southern Nuclear.

153.    During the Class Period, Southern Company and Southern Nuclear directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Southern Company and Southern Nuclear directly exchanged current and future compensation information with competing nuclear power companies through the CBA

Repository and Compensation Comparison Reports. Southern Company and Southern Nuclear knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Southern Company and Southern Nuclear exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Southern Company and Southern Nuclear exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Southern Company and Southern Nuclear knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Southern Company and Southern Nuclear employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Southern Company and Southern Nuclear employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Southern Company and Southern Nuclear employees regularly attended meetings of the Total Rewards Project, where compensation

executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, Southern Company and Southern Nuclear executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Southern Company and Southern Nuclear established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**16.    STP**

154.    STP Nuclear Operating Company ("STP") is a Texas corporation headquartered in Wadsworth, Texas. STP operates the South Texas Project Electric Generating Station in Bay City, Texas.

155.    During the Class Period, STP and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

156.    STP negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, STP relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

157.    The following employees of STP were members of NHRG: Kevin Knox, Senior Compensation Analyst and Strategic HR Business Partner; and Shawn Flaherty, former HR Manager.

158.    During the Class Period, STP directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- STP and its predecessors, wholly owned and/or controlled subsidiaries, and/or other affiliates directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. STP knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. STP exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- STP exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. STP knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, STP employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- STP co-hosted the 2008 NHRG & EU-TAG Joint Conference in May 2008 in Fort Worth, Texas, and hosted the 2013 NHRG, EU-HRMG & EU-TAG Joint Conference in May 2013 in Houston, Texas.

- During the Class Period, STP employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, STP established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**17.    TVA**

159.    Tennessee Valley Authority ("TVA") is a corporate agency of the United States headquartered in Knoxville, Tennessee. TVA owns and operates three nuclear power plants in the United States: Browns Ferry Nuclear Plant in Athens, Alabama; Sequoyah Nuclear Plant in Soddy-Daisy, Tennessee; and Watts Bar Nuclear Plant in Spring City, Tennessee.

160.    During the Class Period, TVA and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

161.    TVA negotiates collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, TVA relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

162.    The following employees of TVA were members of NHRG: Audreial Beard, former HR Generalist; Haleigh Maynor, HR Director; Tara Crane, HR Business Partner; Glen

Powell, former Senior Project Manager and former Senior Compensation Consultant; Tina Shelton, former Director of HR; Matthew Faulkner, Director of Labor Relations; Kim McCormick, Program Manager for HR Support Services; Wes Wingo, Labor Relations Manager; Debra Keil, former Senior Manager of Nuclear HR and former HR Manager; Sue Collins, former Executive Vice President, Chief Human Resources Officer and Chief Administrative Officer; and Megan Flynn, former Vice President of HR.

163. During the Class Period, TVA directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- TVA directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. TVA knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. TVA exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- TVA exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. TVA knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, TVA employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-

person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- TVA hosted the 2015 Annual NHRG Conference from May 18 to 21, 2015 in Chattanooga, Tennessee.

- During the Class Period, TVA employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, TVA employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare compensation for positions in nuclear power generation.

- During the Class Period, TVA executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, TVA established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

### 18. Vistra Defendants

164.    Vistra Corporation ("Vistra") is a publicly traded Delaware corporation headquartered in Irving, Texas.

165.    Luminant Generation Company, LLC ("Luminant") is a Texas limited liability company headquartered in Irving, Texas. Luminant is an indirect, wholly owned subsidiary of Vistra, and Luminant previously operated the Comanche Peak Nuclear Power Plant. During the

Class Period, Luminant employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

166.    Carrie Kirby is Executive Vice President and Chief Administrative Officer for Vistra and an Officer of Luminant. According to Vistra's website, she has "oversee[n] the functions of human resources" at Vistra and Vistra's predecessor, Energy Future Holdings Corp. ("EFHC"), "leading the human resources functions across EFH corporate and its subsidiaries, Luminant." Ms. Kirby has directed and supervised compensation practices at Vistra and Luminant.

167.    James Burke is President and Chief Executive Officer of Vistra and a Manager and Officer of Luminant. Stacey Dore is Chief Strategy & Sustainability Officer and Executive Vice President of Public Affairs for Vistra and an Officer of Luminant. Carrie Kirby is Executive Vice President and Chief Administrative Officer for Vistra and an Officer of Luminant. Kris Moldovan is Executive Vice President and Chief Financial Officer for Vistra and a Manager and Officer of Luminant. Stephanie Zapata Moore is Executive Vice President and General Counsel for Vistra and an Officer of Luminant.

168.    Luminant negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, Luminant relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

169.    The following employees of Luminant were members of NHRG: Curtis Willmon, HR Manager; Christopher Tackett, former HR Director; and Justin McCloskey, former HR Manager.

170.    During the Class Period, Luminant, at the direction of Vistra, directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Luminant directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Luminant knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Luminant exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Luminant exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Luminant knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Luminant employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- Luminant co-hosted the 2008 NHRG & EU-TAG Joint Conference in May 2008 in Fort Worth, Texas.

- During the Class Period, Luminant employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities

gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, Luminant established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

171. Vistra and Luminant commenced voluntary Chapter 11 bankruptcy proceedings in the United State Bankruptcy Court for the District of Delaware on April 29, 2014. On October 3, 2016, the court established a November 2, 2016 bar date for filing proofs of claim against Vistra and Luminant. Vistra and Luminant participated in the conspiracy alleged herein throughout the Class Period, including before and after the November 2, 2016 bar date. Neither Vistra nor Luminant withdrew from the conspiracy after the bar date.

172. This Complaint seeks to recover damages from Vistra and Luminant only for the post-bar-date conduct of Vistra and Luminant. However, by operation of law, the damages arising from the post-bar-date conduct of Vistra and Luminant include damages incurred by Plaintiffs and other Class Members throughout the Class Period, including from before the bar date. In addition, this Complaint also seeks to recover damages from other Defendants for pre-bar-date conspiratorial conduct of Vistra and Luminant throughout the Class Period.

**19. Wolf Creek**

173. Wolf Creek Nuclear Operating Corporation ("Wolf Creek") is a Delaware corporation headquartered in Burlington, Kansas. Wolf Creek operates the Wolf Creek Generating Station in Burlington, Kansas.

174. During the Class Period, Wolf Creek and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

175.    Wolf Creek negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, Wolf Creek relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

176.    Kelly Ledom, HR Staff Specialist at Wolf Creek, was a member of NHRG.

177.    During the Class Period, Wolf Creek directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Wolf Creek directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Wolf Creek knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Wolf Creek exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Wolf Creek exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Wolf Creek knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Wolf Creek employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-

person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Wolf Creek employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensations information for their unionized nuclear power generation workers.

- During the Class Period, Wolf Creek executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Wolf Creek established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

### 20.    Xcel Defendants

178.    Xcel Energy, Inc. ("Xcel Energy") is a publicly traded Minnesota corporation headquartered in Minneapolis, Minnesota.

179.    Northern States Power Company ("NSPC") is a Minnesota corporation headquartered in Minneapolis, Minnesota. NSPC is a wholly owned subsidiary of Xcel Energy, and it owns and operates the Monticello Nuclear Generating Plant in Monticello, Minnesota, and the Prairie Island Nuclear Generating Plant in Welch, Minnesota. During the Class Period, NSPC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

180.    Xcel Energy Services, Inc. ("XES") is a Delaware corporation headquartered in Minneapolis, Minnesota. XES is a wholly owned subsidiary of Xcel Energy.

181.    Patricia Correa is Senior Vice President of Human Resources & Employee Services and Chief Human Resources Officer for Xcel Energy and NSPC. According to Xcel Energy's website, she "leads Human Resources & Employee Services functions including human resources, workforce relations, safety, enterprise learning and technical training." She has directed and supervised compensation practices at Xcel Energy, NSPC, and XES.

182.    Robert Frenzel is Chairman, President and Chief Executive Officer of Xcel Energy, NSPC, and XES. Brian Van Abel is Executive Vice President and Chief Financial Officer for Xcel Energy and NSPC and Director of XES. According to Xcel Energy's website, he "leads the finance functions of Xcel Energy and its subsidiary companies." Amy Schneider is Vice President and Corporate Secretary for Xcel Energy and NSPC and Secretary and Director of XES. Scott Sharp is Executive Vice President and Chief Generation Officer for Xcel Energy and, according to Xcel Energy's website, "responsible for the operations of electric production and energy trading across Xcel Energy's eight-state footprint."

183.    NSPC negotiated collective bargaining agreements, including wages and benefits, with union representatives. According to Xcel Energy's 2012 response to the South Dakota Public Utilities Commission, NSPC's "negotiating committee for each contract is usually led by an Xcel Energy Workforce Relations Consultant and also includes the site Plant Manager and the department manager. Representatives from other Xcel Energy areas (i.e., Legal, Benefits, Human Resources and Finance) may be brought in to support the negotiations team as needed." During collective bargaining negotiations, NSPC relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

184.    Christine Cocchiarella, former HR Director and Director of EEO & Employee Relations at XES, was a member of NHRG.

185.    The following individuals who identified themselves as employees of Xcel Energy were members of NHRG: Nancy Diekmann, former Compensation Consultant at Xcel Energy; Ann Shama, former Senior Compensation Consultant; Michael Deselich, Senior Compensation Consultant; Jeremy May, former Senior Workforce Analytics & Planning Consultant; and Valorie Vasquez, former Director of Workforce Strategy and Consulting.

186.    During the Class Period, Xcel Energy, NSPC and XES directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Xcel Energy and NSPC directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Xcel Energy and NSPC knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Xcel Energy and NSPC exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Xcel Energy and NSPC exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Xcel Energy and NSPC knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Xcel Energy and XES employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies

gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, Xcel Energy and XES employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- As part of the conspiracy, Xcel Energy, NSPC, and XES established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**21.    Accelerant Solutions**

187.    Accelerant Technologies LLC d/b/a Accelerant Solutions ("Accelerant") is an Ohio limited liability company headquartered in Maumee, Ohio. In 2023, Accelerant managed NHRG and facilitated its conferences, including the Labor Relations Project and Total Rewards Project sessions.

188.    During the Class Period, Accelerant directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, facilitating the NHRG Labor Relations Project and Total Rewards Project meetings where executives from competing nuclear utilities discussed, compared, and fixed the compensation paid to nuclear generation workers.

189.    In 2024, Accelerant hosted the nuclear-hr.com website, which provided an overview of the NHRG and a list of nuclear company members. The website included sections for

"Labor Management" and "Total Rewards" that could only be accessed with a username and password.

## IV.    AGENTS AND COCONSPIRATORS

190.    The entities named below participated as coconspirators with Defendants and performed acts and made statements in furtherance of the conspiracy to fix and suppress compensation alleged herein.

191.    Defendants are jointly and severally liable for the acts of the coconspirators named below, whether or not those coconspirators are named as defendants in this Complaint.

192.    Each coconspirator named below acted as the agent or joint-venturer of, or for, the other Defendants and coconspirators with respect to the acts, violations, and common course of conduct alleged herein.

### 1.    Dominion Co-Conspirators

193.    Dominion Energy Nuclear Connecticut, Inc. ("DENC") is a Delaware corporation headquartered in Manchester, Connecticut. DENC is a wholly owned subsidiary of Dominion, and DENC owns and operates the Millstone Power Station in Waterford, Connecticut. During the Class Period, DENC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

194.    Dominion Energy South Carolina, Inc. ("DESC") is a South Carolina corporation headquartered in Cayce, South Carolina. DESC is an indirect, wholly owned  subsidiary of Dominion, and DESC owns and operates the Virgil C. Summer Power Station in Jenkinsville, South Carolina. During the Class Period, DESC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

2.    **Duke Co-Conspirators**

195.    Duke Energy Progress, LLC ("DEP") is a North Carolina limited liability company headquartered in Raleigh, North Carolina. DEP is a wholly owned subsidiary of Progress, and DEP owns and operates three nuclear power plants in the United States: Brunswick Nuclear Plant in Southport, North Carolina; Shearon Harris Nuclear Plant in New Hill, North Carolina; and H.B. Robinson Nuclear Plant in Hartsville, South Carolina. During the Class Period, DEP employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

3.    **Vistra Co-Conspirators**

196.    Vistra Operations Company, LLC ("VOC") is a Delaware limited liability company headquartered in Irving, Texas. VOC is an indirect, wholly owned subsidiary of Vistra, and VOC operates four nuclear power plants in the United States: Beaver Valley Power Station in Shippingport, Pennsylvania; Comanche Peak Nuclear Power Plant in Glen Rose, Texas; David-Besse Nuclear Power Station in Oak Harbor, Ohio; and Perry Nuclear Power Plant in Perry, Ohio. During the Class Period, VOC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

4.    **Exelon Business Services Company**

197.    Exelon Business Services Company, LLC ("Exelon BSC") is a Delaware limited liability company headquartered in Chicago, Illinois. Exelon BSC provided human resources support services to CEG after its separation from Exelon Corporation. During the Class Period, employees of Exelon BSC regularly attended meetings of the Total Rewards Project at NHRG, where executives from competing nuclear utilities gathered in-person to review and discuss the WTW Surveys and compare compensation for positions in nuclear power generation.

### 5.    Bruce Power

198.    Bruce Power L.P. ("Bruce") is a Canadian limited partnership headquartered in Tiverton, Ontario. Bruce operates the Bruce A and B Nuclear Generating Stations in Kincardine, Ontario. During the Class Period, Bruce was a member of NHRG.

### 6.    Nebraska Public Power District

199.    Nebraska Public Power District ("NPPD") is a public corporation and political subdivision of the State of Nebraska. NPPD owns and operates the Cooper Nuclear Station in Brownville, Nebraska. During the Class Period, NPPD and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States. During the Class Period, NPPD was a member of NHRG.

### 7.    Ontario Power Generation

200.    Ontario Power Generation, Inc. ("OPG") is a Canadian public corporation headquartered in Toronto, Ontario. OPG owns and operates Pickering Nuclear Generating Station in Pickering, Ontario, and the Darlington Nuclear Generating Station in Clarington, Ontario. During the Class Period, OPG was a member of NHRG.

### 8.    OPPD

Omaha Public Power District ("OPPD") is a public corporation and political subdivision of the state of Nebraska. OPPD previously owned and operated the Fort Calhoun Nuclear Generating Station in Fort Calhoun, Nebraska, which ceased operations in October 2016. During the Class Period, OPPD and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States. During the Class Period, OPPD was a member of NHRG.

### 9.    Talen Energy

201.    Talen Energy Corporation ("Talen") is a publicly traded Delaware corporation headquartered in Houston, Texas. During the Class Period, Talen and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States. During the Class Period, Talen was a member of NHRG.

202.    Susquehanna Nuclear, LLC ("Susquehanna") is a Delaware limited liability company headquartered in Berwick, Pennsylvania. Susquehanna is an indirect wholly owned subsidiary of Talen, and Susquehanna operates the Susquehanna Steam Electric Station in Salem Township, Pennsylvania. During the Class Period, Susquehanna employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 10.    WEC

203.    WEC Energy Group, Inc. ("WEC Energy") is a publicly traded Wisconsin corporation headquartered in Milwaukee, Wisconsin. Wisconsin Electric Power Company ("WEP") is a wholly owned subsidiary of WEC Energy, and WEP previously owned the Point Beach nuclear power plant in Two Rivers, Wisconsin. WEP sold the Point Beach nuclear power plant to FPL in September 2007. During the Class Period, WEP and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

### 11.    Human Resource Consultants

204.    Human Resource Consultants, LLC ("HRC") is an Arizona limited liability company headquartered in Mesa, Arizona. From 2015 to 2019, HRC and its principal officer, David Heler, managed NHRG and facilitated its conferences, including the Labor Relations Project and Total Rewards Project sessions, during which executives from competing nuclear

utilities discussed, compared, and fixed the compensation paid to nuclear generation workers. After Accelerant assumed management of NHRG in 2019, Heler served as a consultant to Accelerant.

### 12.    WTW

205.    Willis Towers Watson PLC is an Ireland public limited company headquartered in London, England. During the Class Period, WTW administered the WTW Surveys utilized by Defendants to help fix and suppress the compensation paid to employees of the Nuclear Defendants, their subsidiaries, and related entities at commercial nuclear power plants in the United States.

### 13.    ScottMadden

206.    ScottMadden, Inc. ("ScottMadden") is a North Carolina corporation headquartered in Raleigh, North Carolina. During the Class Period, ScottMadden served as a consultant to NHRG and its members. ScottMadden participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, facilitating the electronic exchange of nuclear power plant CBAs between the Nuclear Defendants.

## V.    TRADE AND COMMERCE

207.    The conspiracy formed, implemented, and enforced by Defendants was intended to suppress, and did in fact suppress, the compensation of Class Members nationwide.

208.    The conspiracy restrained competition between the Nuclear Defendants for the payment of wages, salaries, benefits, and other compensation to, and the hiring of, Class Members nationwide, including Class Members located in states other than the states in which the nuclear power plants that employed them were located.

209.    The Nuclear Defendants made payments to Class Members by mailing or transmitting funds across state lines.

210.    The Nuclear Defendants employed Class Members to generate electricity for sale in interstate and foreign commerce.

211.    Accelerant provided services to the Nuclear Defendants located in multiple different states and exchanged confidential, proprietary, and competitively sensitive data among the Nuclear Defendants across state lines.

212.    Defendants' activities were carried out within the flow of interstate commerce of the United States and were intended to have, and did have, direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## VI.    FACTUAL ALLEGATIONS

### A.    Background

#### 1.    The Commercial Nuclear Power Industry

213.    The United States is the world's largest producer of nuclear power, generating approximately 30% of all nuclear power. In 2022, the United States's nuclear reactors produced 772 terawatt-hours of energy.

214.    Each commercial nuclear power plant in the United States is operated by and at least partially owned by a Nuclear Defendant or coconspirator. All full-time commercial nuclear power generation workers in the United States are employed by the Nuclear Defendants or coconspirators.

215.    The Nuclear Defendants earn billions of dollars in annual revenue from generating and selling electricity. For example, Constellation alone generated 182 terawatt-hours of zero-emissions electricity, enough to power 16 million homes, resulting in sales of $23.6 billion in 2024.

#### 2.    Nuclear Power Plants

216.    There are 94 operating commercial nuclear reactors at 54 nuclear power plants in the United States.

217.    The Nuclear Defendants and coconspirators collectively operate and control all of the nuclear power plants in the United States.

218.    Some nuclear power plants are investor-owned utilities which issue stocks to investors, sell bonds, and are regulated by state regulatory commissions. Other nuclear power plants are publicly owned utilities (though most publicly owned nuclear power plants are operated by an investor-owned operating company). And others are partly owned by governments and partly by for-profit companies.

### 3.    The Nuclear Power Industry's History and Culture of Collaboration

219.    Utilities that transmit electricity to homes and businesses are regulated natural monopolies. Historically, electric utilities were vertically integrated and owned most of the generation, transmission, and distribution functions of the electricity supply chain. Because particular utilities owned the only transmission and distribution lines within particular areas, these utilities enjoyed an exclusive right to sell electricity to retail customers in those areas. In other words, electric utilities did not compete with other electric utilities for the sale of electricity to consumers.

220.    Beginning in the early 1990s, certain states deregulated the electricity markets by giving consumers direct access to wholesale suppliers. Deregulation created power exchanges whereby electricity could be bought and sold in a market environment. It also required that electricity generators be given open access to transmission lines so they could be connected to buyers. As a result of deregulation in some states, nuclear power companies became competitors with one another and with other electric utilities for the sale of electricity to consumers.

221.    Prior to deregulation, the nuclear power companies extensively collaborated with each other as non-competitors, especially through various organizations, such as the Edison Electric Institute and the Nuclear Energy Institute ("NEI").

222. As a legacy of its natural monopoly status in which market participants did not compete for consumers, the commercial nuclear power industry is still characterized by an extraordinary culture of cooperation. In 2022, Maria Korsnick, the president and CEO of NEI, former Senior Vice President of Operations at Exelon, and former Chief Nuclear Officer at Constellation Energy Nuclear Group, LLC, stated on the "Titans of Nuclear" podcast that the nuclear power industry is unique in its industry-wide collaboration:

> Maria Korsnick: I could say, send some people to my plant and evaluate what we're doing and insert problem here, maintenance, operations, etc. Or I could say, I want to send some of my guys to your plant. I have a question on this. Or I could say, I have some procedures for how we do X, Y, Z. Can I see yours and I'll send you mine and I'd like to do some benchmarking. That's the kind of camaraderie, if you will, or sort of transparency that we have today amongst our nuclear plants.

> Interviewer: And I'm just going to remind everyone, these are separate companies, like competitors, one might even say.

> Maria Korsnick: That's right.

> Interviewer: And yet they're just opening the books, collaborating.

> Maria Korsnick: That's right.

> Interviewer: Isn't that, I mean, that's incredible. Does any other industry do this? I think nuclear's got to be the best.

> Maria Korsnick: I don't know of another industry that does that.

> . . .

> Maria Korsnick: At the heart of this is we appreciate, you know, if you're running a nuclear plant, I want you to run that nuclear plant the best way that you can, right? And so it's at the heart of why are we being so transparent? Why do we share that information? It is literally because, yeah, we might be competing in the marketplace, but you know what? I want you to have a really effective and efficiently running power plant.

> Interviewer: Yeah, a rising tide floats all boats, makes everyone look good.

> Maria Korsnick: That's right. And we're willing to help each other out.

223.    A former HR executive at FPL said the nuclear industry was "very open as far as sharing" information and that she was "blown away" by how much the nuclear industry "helped each other." According to a former HR executive at APS, the nuclear power industry is one of the only industries in which "information sharing is not only encouraged but mandatory." And according to Paula Maguire, a former Training Manager at Ontario Power Generation, "there is a lot of sharing" and it is a "big world but a small community." A former Labor Relations Manager at Entergy Operations, Inc. explained that "external partnerships" and "sharing knowledge" with other nuclear utilities in the industry was "encouraged" and "an advantage for companies when done right." A former Entergy HR employee who was responsible for organizing and hosting the 2018 NHRG conference said that attendees "made relationships" with one another at the conference and called each other "to ask for advice."

### 4.    Nuclear Power Generation Workers

224.    Each Nuclear Defendant and coconspirator employs nuclear operators, nuclear engineers, nuclear technicians, and other staff who work at nuclear power plants or in central offices. Some of these staff are hourly paid workers and others receive a salary.

225.    The Class is comprised of such workers employed in nuclear power generation by the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States.

226.    Each year during the Class Period, the Nuclear Defendants and coconspirators, their subsidiaries and related entities employed tens of thousands of workers at their U.S. nuclear power plants.

227.    Approximately one third of workers in nuclear power generation are union members, and the International Brotherhood of Electrical Workers ("IBEW") represents most of

them. The IBEW bargained for workers' wages with the Nuclear Defendants' and coconspirators' labor relations representatives.

228.    Because the Nuclear Defendants and coconspirators, their subsidiaries, and related entities generate electricity in a similarly efficient manner, their nuclear power plants were and are characterized by highly similar operations and thus similar labor requirements. Accordingly, the nuclear power generation workers employed by the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States during the Class Period—i.e., Class Members—were easily categorized into a limited set of discrete job positions.

229.    For example, in their nuclear power plants, each Nuclear Defendant and coconspirator employs "nuclear engineers" and "nuclear operators" or equivalent positions.

230.    In a competitive labor market, many employees of the Nuclear Defendants and coconspirators could and would switch their employment to rival nuclear power companies when offered higher wages, higher salaries, and/or superior benefits.

## 5.    Compensating Nuclear Power Generation Workers

231.    Nuclear power generation employees of the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States were paid either hourly wages or annual salaries, depending on their position.

232.    Most nuclear power generation employees operated nuclear power plants or performed maintenance. These workers were generally paid hourly wages according to their specific position and experience level and were categorized into different positions.

233.    Some nuclear power generation employees were paid annual salaries. These employees included management-level employees and certain engineers or scientists.

234.    Both hourly paid and salaried nuclear power generation employees of the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States received

a similar set of employment benefits. Those benefits typically included health insurance, paid time off, a retirement-savings plan, disability insurance, and life insurance.

235.    Some positions in nuclear power generation at the Nuclear Defendants and coconspirators, their subsidiaries, and related entities were paid higher wages than other positions at the same nuclear power companies, largely due to the greater skill, experience, licensing and/or education required for those higher-paying positions. For example, licensed nuclear operators—who are required to take classes and acquire a license from the Nuclear Regulatory Commission—are generally paid higher wages than unlicensed nuclear operators. Nonetheless, each Nuclear Defendant and coconspirator systematically determined the compensation for all positions in nuclear power generation that they, their subsidiaries, and related entities owned and/or operated using compensation schedules or salary ranges that accounted for workers' skill, experience, licensing, and/or education. Those schedules were aligned with compensation schedules that other Nuclear Defendants and coconspirators had established for the same positions.

### 6.    Nuclear Power Companies Aimed to Reduce Labor Costs

236.    The largest recurring cost at nuclear power plants is labor. According to Ed Kee, an economist at the Nuclear Economics Consulting Group: "If you look at the cost of nuclear power . . . O&M is by far the largest part of that. . . . operations and maintenance is mostly people." David Heler, the manager of NHRG and Principal Advisor at Human Resource Consultants, LLC, said that the nuclear power industry is "about 60% people heavy . . . whereas in almost every other industry it's about 20% people 80% capex [capital expenditure] . . . it's just flip-flopped here in the nuclear industry . . . so it's unique and we have to continue to ask our questions about why is that what can we do about that."

237.    All Nuclear Defendants, regardless of whether they are private entities or government entities, sought to reduce labor costs during the Class Period. For example, TVA

employees stated in news articles that TVA engaged new technologies in part to "save[] labor costs."

### 7. Centralized Determination of Compensation for Nuclear Power Generation Workers

238. Decisions regarding the compensation of nuclear power generation workers employed by the Nuclear Defendants and coconspirators were made by and at each Nuclear Defendant or coconspirator's corporate headquarters during the Class Period. For example, a former labor manager at Ameren Missouri's Callaway power plant stated that salary decisions were made by the company's corporate offices in St. Louis, Missouri. Senior executives at the Nuclear Defendants and coconspirators' corporate headquarters ultimately determined and approved workers' hourly wages, annual salaries, other compensation, and employment benefits.

239. During the Class Period, the Nuclear Defendants' and coconspirators' senior executives determined the hourly wages, annual salaries, bonuses, premium and shift pay, employment benefits, and other compensation for Class Members across the country in a formulaic way, establishing schedules that compensated employees according to their specific positions in nuclear power generation at the Nuclear Defendants or coconspirators and their levels of proficiency, experience, licensure, and education.

240. Many Nuclear Defendants maintained separate compensation departments dedicated solely to nuclear power generation employees, which facilitated the conspiracy to fix and suppress wages. According to a former HR executive at Progress and Duke Energy, Progress had a "separate compensation function" from the rest of the company that "collaborated" with other nuclear power companies concerning the compensation offered to employees. FPL similarly had a compensation division for FPL's employees that was handled by an entirely separate department from the company's human resources department.

8.    **Nuclear Power Generation Employment Qualifications**

241.    To obtain a position in nuclear power generation, an applicant must satisfy certain education, licensing, and/or experience requirements.

242.    For example, when recruiting applicants for a position as a nuclear operator, the Nuclear Defendants often sought the following qualifications: a bachelor of science degree in engineering, engineering technology, or related science program, or advanced math, physics, chemistry, and/or engineering coursework; and one year power plant experience or two years of non-generating nuclear power facility experience.

243.    When recruiting applicants for a position as a nuclear engineer, the Nuclear Defendants often required a bachelor of science degree in engineering and several years of related engineering experience.

244.    Nuclear power experience was generally a prerequisite for positions in nuclear power generation. For that reason, nuclear power companies often needed to recruit employees from other nuclear power companies because the only workers with necessary skills and experience worked in nuclear power generation. A former labor manager at Exelon stated that "the only way to get experienced nuclear operators" was to recruit them from other nuclear facilities. He explained that nuclear operators were "not a dime a dozen."

245.    As a result of the Nuclear Defendants' strong interest in recruiting and hiring each other's employees, Class Members' wage rates would have been substantially higher during the Class Period absent Defendants' and their coconspirators' conspiracy to suppress and stabilize compensation.

B.    **Conspiracy to Align Worker Compensation**

246.    Beginning by at least May 2003 and continuing to the present day, Defendants and their coconspirators have conspired with each other to fix and suppress the compensation paid to

nuclear power generation employees of the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States.

247.    A former Progress and Duke Energy HR executive stated that compensation decisions at Progress were "never made in a silo"—i.e. they were made in partnership with other nuclear power companies. According to the former HR executive: "We would all work together to make sure we were ***in alignment***" on compensation. The former Progress HR executive explained that coordination of compensation in the nuclear power industry was necessary because the nuclear power companies in her region "were all competing for the same talent." She stated that Progress's goal in collaborating with other nuclear power companies was to pay just the industry average salary and no greater. She explained: "We didn't want to pay outrageous salaries."

248.    The former Progress HR executive described examples of how Nuclear Defendants "work[ed] together" to harmonize compensation. She explained that HR personnel at Progress had "relationships" with counterparts at other nuclear utilities "where we could pick up the phone" and ask them to "share with us your average salary, minimum and maximum, and incentives." She contacted her counterparts at other nuclear utilities once a year "before we did our proposal for salary range adjustments" and, during those calls, "we would talk about what we were proposing." She also explained that Progress and the other Nuclear Defendants participated in detailed compensation surveys, covering a range of positions, so that the nuclear company participants could "make sure they were in line with other nuclear utilities."

249.    A former labor manager at Exelon (now CEG) stated that "there was significant collaboration and information sharing between nuclear power companies, including Exelon, with regards to compensation rates and union contracts." He stated that "multiple nuclear power companies, including Exelon, directly exchanged current and future compensation information

with one another on a regular basis." The compensation data obtained "from competing nuclear power companies was highly valuable to Exelon and was routinely used by Exelon to determine the compensation rates it paid nuclear power generation employees." The goal and result of the collaboration was lower compensation for nuclear power generation workers: the labor manager stated that "*[o]btaining compensation data directly from competing nuclear power companies allowed Exelon to avoid paying higher hourly wages than it actually paid its nuclear power generation employees.*"

250.    Another witness who was a former Labor Relations Manager at Entergy noted that an investigation into wage-fixing in the nuclear power industry was warranted because "there's something going on here."

251.    The Nuclear Defendants and coconspirators carried out their conspiracy to suppress compensation through several mutually reinforcing overt acts, including:

- Directly exchanging confidential union CBAs containing current and future wages and benefits information through a CBA Repository only accessible to Nuclear Defendants and coconspirators;

- Directly exchanging current and future wage and benefits information for unionized employees through Compensation Comparison Reports that were coordinated by Defendant CEG (formerly Exelon);

- Conducting annual in-person meetings between Nuclear Defendants' senior executives, during which they reviewed compensation survey results, CBAs, and the Compensation Comparison Reports and discussed and fixed the compensation paid to Class Members; and

- Engaging in direct bilateral and multilateral email and telephonic communications among the Nuclear Defendants' and coconspirators' executives to exchange current and future compensation data and align Class Members' compensation.

252. Defendants formed and implemented the conspiracy in order to reduce the Nuclear Defendants' labor costs and maximize their profits. In the absence of the conspiracy, the Nuclear Defendants, their subsidiaries, and related entities would have competed with each other for labor during the Class Period by offering higher wages, higher salaries, and superior benefits to Class Members. The conspiracy permitted the Nuclear Defendants to restrain competition for nuclear power generation workers and thus reduce labor costs.

### 1.    The Nuclear Human Resources Group

253. During the Class Period, each Nuclear Defendant or one of its affiliates was an active member of NHRG, an industry organization that consists of all the commercial nuclear power companies in the United States and Canada. NHRG provided the organizational structure through which the Nuclear Defendants and coconspirators implemented the conspiracy.

254. NHRG was originally formed in 1988 by Rick Habegger, then a Human Resources Manager at FPL, as a committee of the industry association Edison Electric Institute ("EEI"). In 1995, NHRG separated from EEI, and Habegger's consulting firm, HRS&S, was retained to manage NHRG. That same year, NHRG began hosting annual benchmarking conferences. In 2014, David Heler, head of the consultancies Human Resource Consultants, LLC and Accelerant, took over as manager of NHRG.

255. NHRG was designed in part to coordinate the previously disparate compensation practices of the Nuclear Defendants and coconspirators. According to a former Senior Compensation Analyst at Southern Company who was an NHRG member for approximately 20 years, when NHRG was formed as an independent organization in 1995, "everybody [was] all over

the board with recertification pay, license renewal pay, and shift pay." She stated that NHRG was "designed to improve pay practices." Improving pay practices meant aligning compensation practices across the industry: she explained that "harmoniz[ing]" pay practices "sort of is the goal" of NHRG. She added: "You don't want one person doing what the others aren't."

256.    During the Class Period, each Nuclear Defendant or one of its affiliates was a member of NHRG and routinely participated in NHRG's surveys, projects, and meetings.

257.    Each member of NHRG paid to participate in the group and its annual conference.

258.    NHRG is governed by an executive committee (also referred to as a "steering committee") composed only of executives employed by Nuclear Defendants and coconspirators. NHRG executive committee membership includes only the highest-level human resources personnel, such as vice presidents, directors, or managers at the Nuclear Defendants and coconspirators. According to a former executive at Southern Company, the NHRG Steering Committee determined the location and "overarching theme" for the following year's conference. The steering committee also "hash[ed] out ideas for roundtables" and sent out proposed topics for the conference. NHRG members voted on which topics were to be discussed at that year's conference.

259.    The steering committee met independently of the NHRG "to establish the purpose" of the group and determine what they "were going to try to accomplish" for the group.

260.    NHRG operated multiple "Project Teams." Two of those teams—the "Labor Relations Project" and the "Total Rewards Project"—played instrumental roles in implementing the conspiracy. The Labor Relations Project relied on CBAs and data contained therein to harmonize hourly wages across the industry, and the Total Rewards Project relied on surveys to align both hourly wages and salaries. Both the Labor Relations Project and the Total Rewards

Project conducted (at least) annual in-person meetings, during which Nuclear Defendants'
executives discussed and aligned compensation rates.

261.    During part or all of the Class Period, all Nuclear Defendants or one of their
affiliates had at least one representative who served on both the Labor Relations and Total Rewards
Project Teams.

262.    The Labor Relations Project and the Total Rewards Project have their own steering
committees and establish their own agendas, objectives, and programs.

263.    NHRG—and its Labor Relations Project and Total Rewards Project—facilitated
Defendants' conspiracy to suppress compensation in the following manner:

- Creating and maintaining a password-protected online repository of CBAs containing
  current and future compensation data that was only accessible to NHRG members;

- Maintaining and distributing confidential Compensation Comparison Reports among
  NHRG members to facilitate the alignment of wages;

- Managing compensation surveys, which were only accessible to NHRG members, to
  assist with the benchmarking of wages and to help monitor the conspiracy;

- Coordinating annual in-person meetings among NHRG members' executives, during
  which they reviewed compensation data and fixed compensation rates; and

- Maintaining a contact list of executives responsible for compensation at each NHRG
  member to facilitate bilateral and multilateral compensation discussions between them.

**2.    The Nuclear Defendants Unlawfully Exchanged Compensation Information
through a Collective Bargaining Agreement Repository**

264.    During the Class Period, Defendants maintained a repository of current collective
bargaining agreements that contained current *and future* wages and benefits for positions in nuclear

power generation at the Nuclear Defendants and coconspirators ("CBA Repository"). The goal and result of the CBA Repository was to stabilize and suppress Class Members' compensation.

265.    NHRG's Labor Relations Project maintained the CBA Repository. The Labor Relations Project was designed to establish and maintain the CBA Repository and provide a forum for human resources executives to communicate among each other regarding compensation and other issues relating to labor relations.

266.    Each of the following Nuclear Defendants participated in the Labor Relations Project: CEG, Ameren, Ameren Missouri, AEP, IMPC, APS, Dominion, DES, DTE Energy, DTE Electric, Progress, EnergyNW, Entergy, EOI, ENOI, FirstEnergy, FESC, NextEra, NEER, FPL, PG&E Corporation, PG&E Company, PSEG Power, PSEG Nuclear, PSEG Services, SCE, Southern Company, Southern Nuclear, STP, TVA, Luminant, Wolf Creek, Xcel Energy, and XES.

267.    The CBA Repository maintained by the Labor Relations Project was a digital collection of CBAs for nuclear power plants with a unionized workforce. Each CBA contained detailed information concerning wages and benefits paid to employees in specific positions at specific nuclear power plants.

268.    During the Class Period, the CBA Repository was accessible on NHRG's or its consultants' websites only with a confidential password that was distributed to participating Nuclear Defendants.

269.    Each of the following Nuclear Defendants participated in the CBA Repository during the Class Period: CEG, Ameren, Ameren Missouri, Ameren Services, AEP, IMPC, AEPSC, APS, Dominion, VEPCO, DTE Energy, DTE Electric, DTE Services, Progress, EnergyNW, Entergy, EOI, ENOI, FirstEnergy, FESC, NextEra, NEER, and FPL, PG&E Corporation, PG&E

Company, PSEG Power, PSEG Services, SCE, Southern Company, Southern Nuclear, STP, TVA, Luminant, Wolf Creek, Xcel Energy, and NSPC.

270.    The CBA Repository allowed the Nuclear Defendants to readily identify current and future hourly wages paid by a particular Nuclear Defendant or coconspirator at each of its individual unionized nuclear power plants. A former Workforce Relations Manager at Nuclear Management Company stated that the CBAs in the Repository were current, updated contracts and reported "benefits and hourly wages paid to their employees."

271.    The compensation information contained in the CBA Repository was competitively sensitive and confidential. According to a former Director of Compensation at Exelon BSC, information about employees' compensation was sensitive because the nuclear power industry was a smaller industry with a dearth of qualified candidates. The CBA Repository was restricted only to Nuclear Defendants and coconspirators, and the information contained in the CBA Repository was proprietary and could only be used with the participants' permission.

272.    The Nuclear Defendants and coconspirators maintained a give-to-get policy for the CBA Repository. Habegger restricted access to the CBA Repository only to participating Nuclear Defendants and coconspirators, each of which provided (and was required to provide) updated CBAs to Habegger for inclusion in the Repository.

273.    The CBA Repository was also restricted only to select personnel at each Nuclear Defendant and coconspirator. A former HR executive at FPL who was unaware that her former employer participated in the CBA Repository stated that sharing collective bargaining agreements with other nuclear power companies was a "no go" and "the line" that should not be crossed. Likewise, a former Compensation and Benefits Manager at PSEG Nuclear, who was also unaware

that his former employer participated in the CBA Repository, stated that union CBAs were "maintained internally" and "never shared . . . with anyone else."

274.    A former director at IBEW, who was responsible for nuclear bargaining units during the Class Period, explained that IBEW does not share CBAs or wage information contained in CBAs with nuclear power companies that are not parties to the CBA. According to the former IBEW director, IBEW "understood that you don't share information outside of your negotiations" because it was both confidential and advantageous to the utility negotiating against the union. He explained that "[i]f I give that information to another company that's negotiating with a different local, then I'm giving that company an advantage over the brothers and sisters in that local." There is "no reason for someone to do that," and the policy within IBEW of declining to share nuclear CBAs with nuclear power companies was "absolute." This was confirmed by a former HR executive at FirstEnergy Service Company, who stated that "unions aren't very sharing with management." When a labor manager at FirstEnergy needed a CBA from another plant, she contacted her human resources counterpart at the other nuclear power company and asked for it.

275.    The compensation information exchanged through the CBA Repository was immensely useful to the Nuclear Defendants. It allowed the Nuclear Defendants and coconspirators to exchange confidential data regarding current *and future* wages at their respective nuclear power plants that otherwise was not practically accessible to their competitors.

276.    Indeed, CBAs that contained compensation information for unionized nuclear plants were not publicly disclosed and were closely guarded until the data became outdated. For example, the website of the Department of Labor's Office of Labor-Management Standards ("OLMS"), which maintains a publicly accessible database of CBAs from a wide range of industries, only contains a limited number of CBAs from the nuclear industry, and each one of

them expired years ago. Even when collective bargaining agreements are made publicly available, the appendices containing sensitive wage schedules are frequently omitted.

277.    A former Workforce Relations Manager at Nuclear Management Company stated that "one of the big projects" of the NHRG "was to put together a library of CBAs that were part of the group." He said, "[w]e shared our collective bargaining agreements among ourselves" so "we had an idea of what other companies were doing outside of our own" and knew "what was going on at facilities as far as negotiations w[ere] concerned." His role involved "gathering a bunch of contracts so that [NMC] could compare and contrast."

278.    The Nuclear Defendants and coconspirators routinely relied on the CBA Repository to determine and stabilize hourly wages for nuclear power generation workers. Specifically, the Nuclear Defendants used the CBA Repository both when conducting internal wage reviews to modify their compensation schedules and also when establishing wage schedules in collective bargaining agreements.

279.    The CBA Repository impacted non-unionized employees because each Nuclear Defendant sought to maintain wage parity across the company. When the Nuclear Defendants employed both unionized and non-unionized employees in the same position, they sought to keep compensation levels the same or similar—i.e. maintain internal equity. A former labor manager at Entergy Operations, Inc. explained that Entergy "kept a careful eye on bargaining and non-bargaining wages to the extent we didn't want to disenfranchise our non-bargaining workers." According to a former HR executive at FirstEnergy Service Company, FirstEnergy carefully reviewed compensation across the country to ensure that non-union employees were paid commensurately with union employees. When a negotiated wage increase would apply to

unionized employees based on their CBA, FirstEnergy imposed a commensurate increase in wages for non-unionized employees.

280.    Compensation offered for unionized positions also informed non-union compensation for supervisory positions. According to a former labor manager at Ameren Missouri, non-bargaining "exempt" salaried employees were impacted by negotiated CBA wages because Ameren "would look to those nonexempt people as a feeder for [non-union] supervisor jobs." This was confirmed by a former compensation executive at Exelon BSC who stated that Exelon paid attention to compensation paid to union employees when setting compensation for supervisor positions.

### 3.    The Nuclear Defendants Unlawfully Exchanged Compensation Information through Compensation Comparison Reports

281.    Using data obtained directly from other Nuclear Defendants and from the CBA Repository, Defendant CEG (formerly Exelon) created Compensation Comparison Reports, which included tables in an Excel spreadsheet that compared nuclear power generation employees' current and future wages and benefits across the industry. The Compensation Comparison Reports were published twice per year.

282.    A former labor manager at Exelon stated that he personally "initiated and conducted bi-annual surveys to gather current and future compensation data from, and exchange current and future compensation data between, approximately 20 other companies in the nuclear power generation industry." After collecting the data, he stated that twice per year, he "disseminated the results of the surveys to each of the participating nuclear power companies in the form of excel spreadsheets that contained detailed disaggregated and deanonymized current and future compensation data, organized by both company and plant."

283.    The former Exelon labor manager stated that he assembled the Compensation Comparison Reports by "directly contact[ing] labor relations and human resources personnel at approximately 20 other competing nuclear power companies, both by phone and email, to request current and future hourly wage rates and benefits data." The specific nuclear power companies that the labor manager recalls contacting "to obtain those companies' current and future compensation rates" included: "Ameren, American Electric Power, Arizona Public Service, Dominion Energy, DTE Energy, Duke Energy, Entergy, FirstEnergy, NextEra Energy, Pacific Gas & Electric, Southern California Edison, Southern Company, Tennessee Valley Authority, Wolf Creek Nuclear, and Xcel Energy." He stated that, in response, "those human resources and labor relations personnel at competing nuclear power companies supplied the requested current and future hourly wage rates and benefits data to me, knowing that such data would subsequently be included in excel spreadsheets distributed to all participating nuclear power companies."

284.    The Compensation Comparison Reports created by Exelon not only displayed Nuclear Defendants' current and future wages, but also provided an analysis of industry-wide wages and identified compensation trends across the nuclear power industry.

285.    During the Class Period, the Compensation Comparison Reports were accessible on NHRG's or its consultants' websites only with a confidential password that was exclusively distributed to participating Nuclear Defendants.

286.    Each of the following Nuclear Defendants participated in the Compensation Comparison Reports: CEG, Ameren, Ameren Missouri, Ameren Services, AEP, IMPC, AEPSC, APS, Dominion, VEPCO, DTE Energy, DTE Electric, DTE Services, Progress, EnergyNW, Entergy, EOI, ENOI, FirstEnergy, FESC, NextEra, NEER, and FPL, PG&E Corporation, PG&E

Company, PSEG Power, PSEG Services, SCE, Southern Company, Southern Nuclear, STP, TVA, Luminant, Wolf Creek, Xcel Energy, and NSPC.

287.    For each nuclear power plant, the Compensation Comparison Reports identified: current wages for key positions, future percentage increases for those wages, and detailed benefits information. A former labor manager at Exelon explained that the Reports "contained detailed compensation data points concerning numerous job classifications in the nuclear power generation industry, including hourly wages, health insurance premiums, number of sick days, call out pay, overtime pay, travel pay, shift differential pay, and the expiration date for active union contracts."

288.    The wage increase information contained in the Compensation Comparison Reports included planned wage increases up to six years into the future. Accordingly, the Compensation Comparison Reports allowed the Nuclear Defendants not only to compare their *current* hourly wages at each of their respective nuclear power plants, but also to compare planned *future* wage increases at those plants.

289.    Like the CBA Repository, the compensation information included in the Compensation Comparison Reports was competitively sensitive and confidential. As explained by a former HR executive at FPL, the information contained in the Compensation Comparison Reports about ongoing negotiations was especially sensitive: "Whatever is going on from a negotiation standpoint is confidential information." Union negotiations were so sensitive and private at FPL that non-compensation human resources employees were not informed of the terms until a CBA was ratified. According to the former HR executive, any nuclear power company that shared information about ongoing negotiations with the union outside of the company showed "poor judgment."

290.    The Compensation Comparison Reports allowed the Nuclear Defendants and coconspirators to easily compare current and future wage information when setting wages and negotiating with unions. The compensation analysis presented by Exelon facilitated coordination and stabilization of compensation by the Nuclear Defendants and coconspirators.

291.    The Compensation Comparison Reports allowed the Nuclear Defendants to readily identify the current and future hourly wages paid by a particular Nuclear Defendant or coconspirator at each of its individual unionized nuclear power plants. A former labor manager at Exelon explained that the Compensation Comparison Reports provided "unblinded" compensation data, including the "hourly rate for each [job] classification." He stated that the Compensation Comparison Reports he generated "did not anonymize or aggregate the compensation data obtained from the survey participants." He confirmed that the Compensation Comparison Reports "identified current and future compensation data on a per company and per plant basis, and specific compensation data was provided for each participating nuclear power company."

292.    The Nuclear Defendants used the data exchanged through the Compensation Comparison Reports to implement their conspiracy to suppress wages, both when conducting internal wage reviews to modify their compensation schedules and when negotiating with unions to establish wage schedules in collective bargaining agreements. According to a former labor manager at Exelon, Exelon "relied" on the Compensation Comparison Reports when negotiating its own wages with unions because Exelon knew "that info [was] pretty accurate."

### 4.    The Nuclear Defendants Discussed and Suppressed Compensation at Annual Meetings

293.    The Nuclear Defendants and coconspirators exchanged confidential current and future compensation data, and discussed and aligned compensation rates, during three in-person

meetings, each of which was held at least annually: NHRG's annual conferences, NHRG's Labor Relations Project meetings, and NHRG's Total Rewards Project meetings.

> ### a.     NHRG Annual Conferences

294.     Since 1995, NHRG has held annual conferences that facilitated the sharing of competitive compensation information between Nuclear Defendants and the suppression of compensation. The annual conference was usually hosted by a Nuclear Defendant, as set forth below:

| Conference Date | Host | Location |
|---|---|---|
| April 1995 | CP&L (predecessor to Duke Energy Carolinas) | Raleigh, North Carolina |
| April 1996 | PECO (predecessor to CEG) | Philadelphia, Pennsylvania |
| April 1997 | PG&E Company | San Francisco, California |
| April 1998 | Consumers Energy & DTE | Ypsilanti, Michigan |
| April 1999 | Duke Energy | Charlotte, North Carolina |
| April 2000 | APS | Phoenix, Arizona |
| March 2001 | NEI | Orlando, Florida |
| May 2002 | TVA | Nashville, Tennessee |
| May 2003 | Southern Company | Mobile, Alabama |
| April 2004 | Entergy | New Orleans, Louisiana |
| April 2005 | Institute of Nuclear Power Operations ("INPO") | Atlanta, Georgia |
| May 2006 | FPL | Palm Beach Gardens, Florida |
| May 2007 | Exelon | Chicago, Illinois |
| May 2008 | Luminant / STP | Fort Worth, Texas |
| May 2009 | INPO | Atlanta, Georgia |

| Conference Date | Host | Location |
| --- | --- | --- |
| May 2010 | Duke Energy | Charlotte, North Carolina |
| May 2011 | APS | Phoenix, Arizona |
| May 2012 | Constellation | Baltimore, Maryland |
| May 2013 | STP | Houston, Texas |
| May 2014 | FirstEnergy | Cleveland, Ohio |
| May 18-21, 2015 | TVA | The Chattanoogan Hotel, Chattanooga, TN |
| May 1-4, 2017 | NextEra | Wyndham Grand Jupiter, Jupiter, Florida |
| May 7-10, 2018 | Entergy | Hyatt Regency Hotel, New Orleans |
| May 21-22, 2019 | APS | Kimpton Hotel, Phoenix, Arizona |

295.    At annual conferences held during the Class Period, NHRG held round table sessions during which the Nuclear Defendants and coconspirators discussed compensation in the nuclear power industry.

296.    Compensation was regularly discussed at NHRG conferences. According to a former compensation executive at Exelon BSC, NHRG members would frequently ask other members to share their starting wage rates during the conference. And a former Senior Compensation Analyst at Southern Company stated that nuclear-specific compensation surveys were a topic of group discussion at the NHRG conference every year. A former HR executive at FirstEnergy Service Company said that during the annual conferences, members were "pretty open to shar[ing] data and best practices" on HR policies, compensation, and benefits. And a former HR

executive at APS stated that NHRG members discussed general merit increases for salaried employees during the annual conference.

297.    A former Workforce Relations Manager at Nuclear Management Company stated that one purpose of the NHRG conference was to compare compensation across the nuclear power companies. He confirmed that current CBAs for both hourly and salaried employees were exchanged and reviewed during NHRG conferences.

298.    A former HR executive at FirstEnergy Service Company said that the information obtained from the annual NHRG conferences was "invaluable" to FirstEnergy's compensation team.

299.    The annual NHRG conference also involved job matching sessions in which members would compare the job requirements and responsibilities of particular positions and confirm that positions reported to WTW for inclusion in its surveys were sufficiently similar across the industry. This allowed the NHRG members to ensure that WTW Survey results provided useful information for each participant.

### b.    The Labor Relations Project and Meetings

300.    NHRG's Labor Relations Project conducted its own meetings between Nuclear Defendants' executives to discuss and align wage rates.

301.    Participants in the Labor Relations Project met each year for benchmarking and to exchange nuclear power CBAs and review Compensation Comparison Reports. The Labor Relations Project meetings took place in-person each year during the Class Period, prior to or during the annual NHRG conference.

302.    Members of the Labor Relations Project discussed compensation during their annual meetings. A former Labor Relations Manager of Entergy Operations, Inc., who participated in the Labor Relations Project meetings, said: "Of course, wages would be discussed" and that the

purpose of meetings was to report "data points" and "outcomes" of labor negotiations. The Labor Relations Manager said that "it mattered" to Entergy when other utilities "negotiated new bonuses with reactor operators." She said, "[w]e paid a lot of attention to that and made decisions accordingly." She also stated that members of the Labor Relations Project "would share what those outcomes were" including decisions regarding pay, such as the amount that a particular plant's bonuses would increase.

303.    A former HR executive at FirstEnergy Service Company stated that the CBAs contained in the CBA Repository were discussed during Labor Relations Project meetings. The Project members were "asked to share their collective bargaining agreements so [conference participants] could look at them."

304.    Wage discussions during Labor Relations Project meetings were not limited to executed union contracts and addressed future wages in *draft* CBAs that were not yet final or approved by the unions. According to a former labor manager at Entergy Operations, Inc., "[e]very time we met there was some cluster of [nuclear] plants that would have contract expirations come up and new negotiations happening," and members of the Labor Relations Project would discuss and coordinate the anticipated compensation outcomes of "pending" labor negotiations that were not yet complete.

305.    The former Entergy Operations, Inc. labor manager further stated that the Labor Relations Project discussed other methods to improve the employers' negotiating positions during union bargaining sessions, including topics relating to "arbitration," "union organizing," and general "lessons learned" from negotiating with unions.

### c.    The Total Rewards Project and Meetings

306.    NHRG's Total Rewards Project conducted its own meetings between Nuclear Defendants' executives to discuss and align compensation rates.

307.    The Total Rewards Project held annual meetings in the same location as the NHRG annual conference, and sometimes held additional meetings in between NHRG conferences. In some years, the Total Rewards Project meetings occurred just before the NHRG annual conference; in other years, they occurred during the conference.

308.    The Total Rewards Project provided a forum for nuclear power companies to benchmark and discuss current and future compensation for nuclear power positions, including with the assistance of compensation surveys.

309.    NHRG first commissioned WTW to conduct a compensation survey in the nuclear power industry in 2001. NHRG and its members developed and designed these compensation surveys, and WTW implemented them. For example, a Senior Compensation Analyst at Southern Company said she "helped to design" the nuclear pay practices survey, which focused on compensation for "nuclear operators" and "nuclear security."

310.    WTW conducted surveys of hourly paid workers, exempt salaried employees, and non-exempt salaried employees. The WTW Surveys included entry level positions such as mechanics and more senior level positions such as control room operators and site vice presidents. A former Progress and Duke Energy HR executive stated that the WTW Surveys pertained to "whatever classifications" Progress employed at the time, including engineering positions and nuclear technicians.

311.    The WTW Surveys provided percentile and average compensation information for various positions in the nuclear power industry. Each reported position had a specific letter code and number assigned to it such that different "tiers" of each position were reported by respondents, depending on seniority level. The WTW Surveys also provided detailed benefits information.

312.    The WTW Surveys facilitated Nuclear Defendants' efforts to align compensation in the nuclear power industry. The WTW Survey results were extensively discussed by Nuclear Defendants for purposes of harmonizing compensation during annual sessions of the Total Rewards Project.

313.    A former Senior Compensation Analyst at Southern Company who led a compensation round table session at NHRG annual conferences stated that the conversation during the session was "pay-focused" and that members would review survey results, including the WTW Surveys, during the session. She stated that participants would confirm whether their compensation practices aligned with the survey results: "If we were reviewing survey results, people might say 'That's in line with what we do.'"

314.    According to a former HR executive at Progress and Duke Energy, survey administrators "massage[d]" data from the Nuclear Defendants into a survey report so that each Nuclear Defendant could "make sure they were *in line* with other nuclear utilities."

315.    The Nuclear Defendants relied on survey data secured by the Total Rewards Project, in combination with the related extensive discussions focused on aligning compensation conducted at the Project's annual meetings, to set salaries and other compensation rates.

316.    In a February 2024 report to the Minnesota Public Utilities Commission, Xcel Energy stated that when setting compensation Xcel Energy "leverages a membership through the Nuclear Human Resource Group (NHRG) for survey participation and industry peer benchmarking." Specifically, Xcel Energy set compensation rates that "matched to the market median, or 50th percentile" of the WTW Surveys. PSEG likewise kept their salaries to the survey median, stating that they, "benchmark our industry peers to ensure we are within five percent of the group average and adjust as the market changes."

317.    STP used WTW Survey data to establish "midpoints" aligned with the average salary reported in the WTW Surveys. A former compensation employee at STP stated that she would never "exceed a certain percentage of the midpoint" established by the WTW Survey when recommending salary adjustments.

318.    A former compensation employee at DTE Energy adhered to the company's practice of "controlling to the midpoint," which was a "euphemism" for not paying more than the midpoint of a specific salary range. For example, if the salary range was $20 per hour to $40 per hour, "you weren't supposed to rise above 30."

319.    A former Senior Compensation Analyst at Southern Company also explained that she used nuclear-specific compensation survey results and insights gathered from compensation discussions at in-person meetings to inform her negotiations with labor unions.

### 5.    The Nuclear Defendants Discussed and Suppressed Compensation through Direct Email and Telephone Communications

320.    Throughout the Class Period, the Nuclear Defendants' senior executives with the authority to determine or influence compensation of Class Members directly contacted one another to obtain information about and align their current and future compensation rates and practices.

321.    NHRG provided members with a robust contact list, designed to facilitate communications and benchmarking throughout the year by NHRG and between individual nuclear power companies. According to a former HR executive at FPL, NHRG's contact list was created so that human resources executives could reach out to one another.

322.    A former labor manager at Exelon stated: "there's no doubt in my mind that there was a lot of collaboration and information sharing between many big nuclear companies in regards to union details." He stated that nuclear power companies shared information "all the time," and they did so for the "specific reason" of "trying to screw the union."

323.    The Exelon former labor manager stated that he "was aware of routine compensation information sharing directly between competing nuclear power companies. Specifically, multiple nuclear power companies, including Exelon, directly exchanged current and future compensation information with one another on a regular basis." He added that his "superiors" directed him "to regularly request current and future compensation rates from, and exchange current and future compensation rates with, competing nuclear power companies." When the labor manager "requested such compensation data, labor relations and human resources personnel at competing nuclear power companies" were "willing to share and exchange that compensation data" with him.

324.    The labor manager stated that he "regularly contacted labor relations and human resources personnel at competing nuclear power companies to gather compensation data regarding hourly worker wages." He "would ask labor relations and human resources personnel at competing nuclear power companies to provide current and/or future wage rates for their hourly paid workers" and, in response, they "would provide the requested compensation data." The labor manager stated that "labor relations and human resources personnel at competing nuclear power companies often contacted me to request the current and future compensation rates paid by Exelon to hourly paid worker[s]." In response, he "routinely provided the requested compensation data."

325.    The Nuclear Defendants and coconspirators had a give-to-get policy for exchanging compensation information. A former compensation executive at DTE Energy stated that DTE Energy agreed with other nuclear power companies: "We'll share information if you'll share with us."

326.    A former HR executive at Progress and Duke Energy stated that Progress contacted human resources representatives at other nuclear power companies directly to obtain compensation

information. Compensation and human resources personnel at Progress had "relationships" with personnel at other nuclear power companies where they would "pick up the phone" and call their counterpart at another Nuclear Defendant or coconspirator. The Progress representatives asked the other Nuclear Defendants and coconspirators whether they would be willing to share "average salary, minimum and maximum, and incentives" information. The other Nuclear Defendants and coconspirators readily shared critical salary information with Progress, and in exchange, Progress shared its compensation information with them. When exchanging compensation data with other nuclear power companies, Progress shared the salary range adjustments that it planned to propose in the future (i.e., non-finalized changes to Progress's salary ranges). Progress typically conducted these compensation data exchanges once per year before its human resources personnel proposed "salary range adjustments." This and similar practices allowed Progress and other Nuclear Defendants to confirm alignment with other industry participants before finalizing their compensation changes.

327.    According to a former labor manager at Exelon, he would contact executives at other nuclear power companies prior to union negotiations to "gather" confidential wage information. He stated that he "would literally call up HR folks at all nuclear facilities . . . and ask them their rates." Often, the executives at other nuclear power companies provided this information to him orally over the telephone.

328.    A former compensation executive at DTE Energy stated that he contacted other nuclear power companies to inquire about pay for specific positions. He explained that he would ask another nuclear power company, "What are you paying your operators?" The other company would respond, "We are paying x." The former DTE Energy compensation executive stated that he would obtain from other nuclear power companies: the number of full-time employees the other

plant had in a position at a particular level (e.g., nuclear operator 1) and the pay range for those jobs (e.g., $22 per hour minimum to $54 per hour maximum). The former compensation executive stated that he would typically report to his superiors that he "had a conversation with someone in St. Louis [where Ameren is headquartered] or Chicago [where Exelon Corporation is headquartered] and their ranges are similar to ours."

329.    A former labor manager at Ameren Missouri stated that he would "get copies of [union] contracts from other utilities to get a sense of their wages and benefits." To obtain another company's CBA, he would "call the plant up and ask for a copy." Among others, the former HR manager stated that he obtained union CBAs containing wage and benefits information from Wolf Creek, WEC Energy, and plants formerly operated by Commonwealth Edison (a predecessor to Exelon Corporation). He used the wages and benefits information from these other plants to inform his own labor negotiations.

330.    A former HR executive at FirstEnergy Service Company stated that labor managers at FirstEnergy contacted counterpart labor managers at other nuclear power companies to ask them directly to share union CBAs. According to this former executive, members of NHRG corresponded regularly by phone and email to exchange best practices and data.

331.    A former labor manager at STP stated that he "would interface with other HR managers" and "sometimes exchanged copies of our [collective bargaining] agreements." Another employee at STP "would sometimes poll [competing] plants for their bargaining unit compensation" and that information was shared with the "corporate labor relations people" at STP. This employee "contact[ed] her compensation peers at other plants" for both bargaining unit and non-bargaining unit compensation information.

332.    A former labor manager for the Callaway Energy Center said that he "typically call[ed]" competing nuclear plants to "ask for a copy" of their union contracts "to get a sense of their wages and benefits."

333.    A former labor manager at Exelon, who was familiar with compensation survey results exchanged between nuclear power companies, said that the survey results included a "combination" of both blinded and unblinded data but "the bottom line" was that "if you called" participating companies, "you could get" which data they reported.

334.    According to Maria Korsnick, former Senior Vice President of Operations at Exelon and Chief Nuclear Officer ("CNO") at Constellation Energy Nuclear Group, LLC, "you have all the CNOs on speed dial. And that's sort of one compliment that I would give sort of the US and the whole US fleet is that at any moment, I could call another CNO."

335.    Outside of the conspiratorial agreement to exchange information and stabilize wages, the compensation information shared in these direct exchanges was highly confidential. According to a former HR employee at Talen, sharing compensation information would be "divulging confidential or proprietary information" and he would "question whether [it] was appropriate" to "divulge[] rates to someone else."

### 6.    The Conspiracy Resulted in Parallel Limits on Defendants' Wage Increases and Harmonization of Defendants' Wages

336.    As a direct consequence of their conspiracy to suppress compensation, the Nuclear Defendants simultaneously and in parallel limited their annual compensation and compensation increases to Class Members employed in nuclear power generation. Absent this conspiracy in a competitive market, Defendants would not have aligned their compensation and would have paid higher annual wages and wage increases to Class Members.

337.     Defendants' parallel conduct included Defendants working "together to make sure [they] were in alignment" on compensation, according to a former HR executive employed by Progress and Duke Energy.

338.     At this preliminary stage, Nuclear Defendants' compensation data is not public. But based on the small amount of information available to the Plaintiffs at this stage, Defendant Processors' compensation alignment is further evidence of the conspiracy.

339.     During the Class Period, the Nuclear Defendants and coconspirators made parallel increases to wages. For example:

- In 2008, Exelon paid wage increases of 3% to nuclear power plant workers at the Nine Mile Point plant. These 3% wage increases matched exactly the wage increases at both ENOI's Fitpatrick plant and Ameren Missouri's Callaway plant that same year.

- In 2010, Exelon paid wage increases of 3% to nuclear power plant workers at the Nine Mile Point plant. These 3% wage increases matched exactly the wage increases at both Ameren Missouri's Callaway plant and DTE Electric's Fermi 2 plant that same year.

- In 2011, Ameren Missouri paid wage increases of 3% to nuclear power plant workers at its Callaway plant. These 3% wage increases matched the increases at DTE Electric's Fermi 2 plant that same year.

- In 2013, DTE Electric paid wage increases of 3% to nuclear power plant workers at its Fermi 2 plant. These 3% wage increases matched the increases at Susquehanna Nuclear, LLC's Susquehanna plant that same year.

- In 2014, Exelon paid wage increases of 2.5% to nuclear power plant workers at its Illinois plants. These 2.5% wage increases matched the increases at Susquehanna Nuclear LLC's Susquehanna plant that same year.

- In 2016, ENOI paid wage increases of 3% to nuclear power plant workers at its Palisades plant. These 3% increases exactly matched the increases at FPL's St. Lucie and Turkey Point plants, PG&E Company's Diablo Canyon plant, and DTE Electric's Fermi 2 plant that same year.

- In 2017, ENOI paid wage increases of 3% to nuclear power plant workers at its Palisades plant. These 3% increases exactly matched the increases at FPL's St. Lucie and Turkey Point plants, PG&E Company's Diablo Canyon plant, and DTE Electric's Fermi 2 plant that same year.

- In 2019, Exelon paid wage increases of 2.5% to nuclear power plant workers at its Illinois plants and Oyster Creek plant. These 2.5% increases matched exactly the increases at Susquehanna Nuclear LLC's Susquehanna plant and ENOI's plant that same year.

- In 2020, Exelon paid wage increases of 2.5% to nuclear power plant workers at its Illinois plants and Oyster Creek plant. These 2.5% increases matched exactly the increases at Susquehanna Nuclear LLC's Susquehanna plant and ENOI's Palisades plant that same year.

340.    As a further example, in 2020, Exelon paid non-licensed nuclear operators at its Oyster Creek plant $43.84 per hour, which is exactly the same rate—to the penny—as FPL paid its non-licensed nuclear operators at its Saint Lucie and Turkey Point plants. And, in 2019, Exelon paid electrical maintenance workers $43.63 per hour, which is exactly the same rate—to the penny—as FPL paid its electrical maintenance workers that year.

341.    Defendants' parallel conduct also included Defendants' collaboration on compensation via simultaneous overt acts in furtherance of the conspiracy alleged throughout this

Amended Complaint: simultaneous participation in the CBA Repository, simultaneous contribution to and receipt of Compensation Comparison Reports, simultaneous attendance at annual NHRG and Project Team meetings, and simultaneous exchange of compensation information directly between Defendants.

### 7. Plus Factors That Render the Nuclear Power Industry Susceptible to Collusion

342. The nuclear power industry is characterized by numerous features, or plus factors, that render the industry particularly susceptible to collusion and bolster the plausibility of the conspiracy alleged herein. These include: (1) extraordinarily high barriers to entry; (2) industry concentration; (3) fungibility of nuclear power plant labor; (4) inelastic labor supply; (5) numerous opportunities to collude, and (6) a history and culture of collaboration among the Nuclear Defendants.

343. The nuclear power industry is characterized by extraordinarily high barriers to entry. To construct a new nuclear power plant, a company must engage in an arduous and bureaucratic process before regulatory agencies approve the plant. Nuclear power plants are licensed and regulated by the Nuclear Regulatory Commission ("NRC"). To obtain a license for a new plant, NRC requires that a nuclear power company complete a safety review, an environmental review, and an antitrust review. After NRC receives an application to license a new power plant, it holds several public meetings and hearings. Depending on the type of plant, license applications take approximately 42 months to be approved by NRC. Even after NRC grants a license, it continues to oversee the construction and operation of the plant for its entire lifetime.

344. A nuclear power plant is also extremely costly to build, and capital costs can generally only be recouped after decades of operations. The cost of constructing a single nuclear

reactor is approximately $5 to $10 billion. As a result, only three new nuclear power reactors and no new nuclear power plants have been built in the last two decades in the United States.

345.    Other barriers to entry include the high costs of operating nuclear power plants; intense competition from increasingly efficient non-nuclear power sources, including natural gas, coal, wind, and solar; the challenge of finding a workforce that requires extensive and specific training; and compliance with onerous federal and state government mandates and regulations. It is exceptionally expensive and logistically complex for new nuclear power companies to emerge and compete with the Nuclear Defendants.

346.    The nuclear power industry is highly concentrated. The top ten nuclear power companies control more than 70 percent of the market for nuclear-generated electricity. Those ten companies correspondingly demand approximately 75 percent of the total demand for nuclear power generation labor.

347.    Because nuclear power generation workers possess specialized knowledge and skills specific to the nuclear power industry, nuclear power companies view the power generation workers that comprise the Class as fungible within the industry. Workers within the same positions are generally treated as interchangeable among Nuclear Defendants, permitting the Nuclear Defendants to readily compare and match each other's compensation levels.

348.    The market for nuclear power generation workers is characterized by inelastic labor supply. Industry-wide changes in compensation rates do not substantially affect the rate of participation in nuclear power positions. Nuclear power jobs are highly specialized to the operations of nuclear power plants, which makes the skills possessed by a nuclear engineer or nuclear operator non-transferable to other types of employment. Many of the jobs in nuclear power

generation also require nuclear-specific licenses, which command a premium in pay that cannot be transferred to other types of employment.

349.    The nuclear power industry is ripe with opportunities for Defendants to collude. The nuclear power industry coordinates extensively on matters of operating nuclear plants, complying with laws and regulations, and lobbying government decision-makers. Its executives maintain frequent contact in connection with these joint efforts, which gives rise to countless opportunities for collusion.

350.    In addition to attending the annual NHRG conferences and the regular meetings of the Labor Relations Project and Total Rewards Project, the senior executives of Nuclear Defendants responsible for determining compensation attended multiple other in-person meetings during the Class Period. Many of those meetings were sponsored by trade associations that advocate for the interests of the Nuclear Defendants. Those meetings include:

a.    *American Nuclear Society:* American Nuclear Society ("ANS") is an organization that advocates for using nuclear science and technology for civilian purposes. Defendants Constellation, Duke Energy, Vistra, and Southern Company are members of ANS. ANS hosts the annual Utility Working Conference and Vendor Technology Expo, which is attended by human resources executives from many of the Nuclear Defendants. Beginning in 2022, NHRG began hosting meetings in conjunction with ANS at this annual conference. On August 9, 2022, NHRG hosted a roundtable discussion during ANS's annual Expo titled "Nuclear Pay & Benefits / Roundtable Discussion." In 2023, NHRG hosted a session titled "Total Rewards Roundtable" during ANS's annual Expo. This session included presentations on "competitive salaries, and hiring strategies."

b.   *Edison Electric Institute:* Edison Electric Institute ("EEI") is a trade association that represents all U.S. investor-owned electric companies. Nearly all Nuclear Defendants are members of EEI.  EEI hosts several meetings and conferences every year that are attended by executives of the Nuclear Defendants and coconspirators. For example, the following Nuclear Defendants attended EEI's 2024 annual conference: Steve Powell, President and CEO of SCE; Patti Poppe, CEO of PG&E Corporation; Chris Womack, Chairman President and CEO of Southern Company; and Jose Esparza, Senior Vice President of Public Policy of APS.

c.   *Nuclear Energy Institute:* NEI is a U.S. policy and technical organization focused on the commercial nuclear power industry. NEI hosts several meetings and conferences every year that are attended by executives of the Nuclear Defendants and coconspirators. Some of those meetings are focused on compensation. All the Nuclear Defendants or one of their affiliates are also members of NEI.

d.   *United States Nuclear Industry Council:* The United States Nuclear Industry Council ("USNIC") is a business advocate for advanced nuclear energy. USNIC hosts several working groups, congresses, and conferences, some of which may only be attended by members, every year. Defendants Constellation, Duke Energy, Southern Company, Xcel Energy, and TVA are members of USNIC.

351.   The nuclear power industry is characterized by a unique culture of collaboration across its operations and management functions. Before deregulation, each nuclear power utility was entitled to an exclusive monopoly on the provision of electricity in its allotted region. For that reason, nuclear power plants historically did not compete in the product market for electricity. This culture of cooperation in the nuclear power industry persists and remains strong. As explained by

Maria Korsnick, former Chief Nuclear Officer at Constellation Energy Nuclear Group, LLC, there is a "camaraderie" among nuclear power companies: "If you're running a nuclear plant, I want you to run that nuclear plant the best way that you can, right? And so it's at the heart of why are we being so transparent? Why do we share that information? It is literally because, yeah, we might be competing in the marketplace, but you know what? I want you to have a really effective and efficiently running power plant."

## C.    Market Power of the Nuclear Defendants and Coconspirators

### 1.    Direct Evidence of Market Power

352.    The strongest evidence that the Nuclear Defendants and coconspirators collectively possessed the requisite *power* to suppress compensation for nuclear power generation workers is that they *actually* suppressed such compensation during the Class Period. As detailed above in section VI.B, numerous former employees confirmed that Defendants used a multi-faceted strategy—including the CBA Repository, Compensation Comparison Reports, three annual in-person meetings, compensation surveys, and direct communications between executives—to suppress wages, salaries, benefits, and other compensation paid to nuclear power generation workers.

353.    The Nuclear Defendants regularly participated in and accessed the CBA Repository to exchange detailed current and future information about, and facilitate the fixing of, compensation provided to their nuclear power generation workers in the United States.

354.    The Nuclear Defendants regularly participated in Compensation Comparison Reports organized by CEG (formerly Exelon) to exchange detailed current and future information about, and facilitate the fixing of, compensation provided to their nuclear power generation workers in the United States.

355.    The Nuclear Defendants convened annual NHRG conferences and annual meetings of the Total Rewards Project and Labor Relations Project, where their executives exchanged and discussed current and future compensation rates and reached agreements to suppress Class Members' compensation.

356.    Executives from the Nuclear Defendants discussed, compared, and further suppressed compensation through direct communications. Those conspiratorial communications consisted of telephonic discussions between the Nuclear Defendants' executives to disclose and harmonize their current compensation rates and projected compensation increases.

357.    Finally, the Nuclear Defendants' and coconspirators' meetings and data exchanges were costly: they paid for membership in NHRG, the annual NHRG conference, and the WTW survey; spent time and money answering detailed survey questions, exchanging CBAs, and calling each other on the phone to solicit compensation information; and exposed themselves to legal liability. The Nuclear Defendants and coconspirators would not have assumed these costs and legal risks unless they collectively had the power to use these meetings and data exchanges to suppress compensation. This indicates that the Nuclear Defendants and coconspirators believed and acted as though they had the market power to profitably suppress salaries, wages, benefits, and other compensation.

### 2.    Indirect Evidence of Market Power

#### a.    Product or Services Market

358.    The relevant market is the labor market for employment in commercial nuclear power generation in the United States ("Relevant Market").

359.    A cartel that controlled all of the Relevant Market, as the Nuclear Defendants and coconspirators collectively do here, could profitably suppress compensation paid to nuclear power generation workers to levels below those that a competitive labor market would set. In such

circumstances, nuclear power generation workers would not be able to defeat artificial compensation suppression by switching their employment to other non-conspiring nuclear power companies, as there are no such companies.

360. There are no close economic and/or functional substitutes for employment in nuclear power generation from the perspective of nuclear power generation workers.

361. Nuclear power generation jobs are highly specialized and require extensive training. Many nuclear power generation employees require specialized, advanced scientific or technical degrees before they are hired.

362. Every nuclear power plant has site access standards that a prospective employee must satisfy to even gain access to the nuclear power plant. To gain access, nuclear power plants typically require an employment history review, military history review, criminal history review, credit history review, education history review, interviews with provided references, drug and alcohol screening, and psychological screening.

363. Once they are hired, nuclear power generation employees must undergo extensive security training and job-specific training. Some nuclear power generation positions, such as licensed nuclear officers, require licenses from the Nuclear Regulatory Commission.

364. Unskilled and low-skilled jobs are not reasonable substitutes for work in nuclear power generation. Nuclear power generation employees make well above the national median pay and could not move to employment at non-nuclear companies without an appreciable drop in pay. The annual mean wage for all occupations in the United States as of May 2023 was $65,470. The annual mean wage for nuclear operators in the United States as of May 2023 was $121,240. This wage premium reflects the extensive education, licensure, training, and security requirements of working in nuclear power generation.

365.    The Nuclear Defendants and coconspirators value the skills possessed by nuclear power generation workers and recognize that such skills are differentiated from those necessary for other jobs. Hiring labor from unskilled or low-skilled positions was not desirable or feasible because of the highly technical requirements of working in nuclear power generation. A former HR executive at FirstEnergy Service Company stated that FirstEnergy was not interested in benchmarking its positions against non-utility employers such as Walmart or Amazon.

366.    Nuclear power companies do not tend to hire engineers from other types of electric utilities. According to Bryan Hanson, Executive Vice President and Chief Generation Officer at Constellation, "we have a propensity to hire nuclear engineers."

367.    Nuclear power companies needed to recruit employees from other nuclear power companies because only such workers possessed the necessary skills and experience. A former labor manager at Exelon stated that "the only way to get experienced nuclear operators" was to recruit them from other nuclear facilities. He explained that nuclear operators were "not a dime a dozen" and were recruited from other nuclear plants throughout the United States "as long as they had experience."

368.    A former compensation employee at DTE Energy explained that DTE Energy, a Michigan-based utility, wanted to know the compensation for nuclear operators around the country, including in Minnesota, Arizona, and Florida. He explained that DTE Energy "used that data" to determine compensation for nuclear workers because "there aren't that many nuclear plants" in the country.

369.    In setting compensation for their employees, the focus of the Nuclear Defendants was on compensation paid to employees at other nuclear power companies.

370.    The compensation departments for nuclear power generation employees at Nuclear Defendants and coconspirators were siloed from the rest of the companies both to keep the conspiratorial conduct a secret and because of the unique and specialized nature of nuclear power positions. A former HR executive at Progress stated that the nuclear division had a "separate compensation function" from the rest of the company that "collaborated" with other nuclear companies. As a former labor manager at Entergy Operations, Inc. put it, the nuclear power industry was "such a specific, specialized world," which naturally resulted in a nuclear-specific human resources organization (i.e., NHRG).

371.    Each Nuclear Defendant materially increases wages paid to nuclear power generation workers as they gain greater skill levels. For example, the Nuclear Defendants increase wages systematically for unionized nuclear power generation employees upon reaching certain levels of seniority. The Nuclear Defendants also pay a premium for nuclear operators who are licensed compared to nuclear operators who are not licensed. The wage premium associated with greater skill and experience reduces the substitutability of jobs outside of the Relevant Market and makes remaining in nuclear power generation positions more attractive to workers. In other words, those higher wages make it costly for a nuclear power generation worker to seek a position outside the Relevant Market, where a prospective employer would not value the skills the worker obtained while working in nuclear power generation.

### b.    Geographic Market

372.    The relevant geographic market is the United States. A small but significant decrease in compensation from the competitive level could be profitably imposed collectively by the nuclear power companies in the United States without causing too many nuclear power generation workers to leave the United States or move to a different occupation.

373.    The Nuclear Defendants set their compensation and recruiting policies for nuclear power generation workers largely on a nationwide basis, and therefore treat such workers as if they were participating in a nationwide labor market. Each Nuclear Defendant establishes compensation for nuclear power generation workers at identical or near identical levels, regardless of the region, state, county, or locality in which those workers are located. Because each Nuclear Defendant and coconspirator establishes the same, or nearly the same, compensation for nuclear power generation workers regardless of geographic region, state, county or locality, conduct that suppresses compensation for those nuclear power generation workers in one location would necessarily suppress compensation for nuclear power generation workers employed by all of the other Nuclear Defendants and coconspirators, their subsidiaries, and related entities throughout the United States.

374.    The nationwide geographic market is further supported by Nuclear Defendants' practice of seeking wage information on a nationwide basis. For example, a former labor manager at Exelon explained that he would contact other executives at nuclear power companies throughout the United States to obtain wage information. A former compensation employee at DTE Energy stated that the survey data DTE Energy used to compare its own employees' compensation to other nuclear companies reflected nationwide data. A former HR employee at Talen stated that nuclear engineers were recruited from around the country. And a former HR executive at APS stated that nuclear power companies competed for nuclear operators on a nationwide basis.

### c.    Collective Market Share and Monopsony Power

375.    The Nuclear Defendants collectively possess market and monopsony power in the Relevant Market in that they have the power, collectively, and through the challenged conduct, to profitably suppress compensation paid to nuclear power generation workers below competitive levels.

376.    The Nuclear Defendants and coconspirators pay compensation to nuclear power generation workers that comprise 100% percent of the Relevant Market. Every company that hires commercial nuclear power generation labor in the United States participated in the conspiracy.

**D.    Anticompetitive Effects and Injury Suffered by Class Members**

377.    As a result of Defendants' anticompetitive conduct alleged herein, competition between the Nuclear Defendants over compensation was restrained or eliminated in the market for workers in nuclear power generation in the United States during the Class Period.

378.    As a result of Defendants' anticompetitive conduct alleged herein, the compensation of workers in nuclear power plants in the United States was fixed, stabilized, or maintained at artificially suppressed levels during the Class Period.

379.    The purpose of the conspiratorial conduct of Defendants was to suppress, fix, or maintain the compensation of workers in nuclear power plants in the United States and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiffs and the Class received compensation at artificially suppressed rates during the Class Period.

380.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having received lower compensation during the Class Period than they would have received in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiffs and the Class have suffered damages.

381.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

382.    In a competitive market, the Nuclear Defendants and coconspirators would have competed to recruit, hire, and retain workers during the Class Period by offering higher wages, higher salaries, and superior benefits, and many more Class Members would have switched employment to other nuclear power companies as a result of that competition for labor. Yet by entering into the alleged conspiracy and suppressing competition on compensation, the Nuclear

Defendants and coconspirators were able to reduce and stabilize the number of Class Members switching employment to other Defendants. Defendants' scheme harmonized compensation to Class Members across the nuclear power industry and thus reduced the incentives for Class Members to switch employment between Nuclear Defendants or coconspirators.

383.    The effects and injuries caused by Defendants' anticompetitive agreement commonly impacted all nuclear power generation workers employed by the Nuclear Defendants and the coconspirators, their subsidiaries, and related entities in the United States because the Nuclear Defendants valued internal equity, the principle that similarly situated employees should be compensated similarly. Each Nuclear Defendant and coconspirator established a pay structure to accomplish internal equity. Each Nuclear Defendant and coconspirator established narrow compensation ranges for nuclear power generation workers in the United States with similar job positions and similar levels of experience and also maintained certain compensation differentials between different nuclear power generation positions.

## VII.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.    Continuing Violation

384.    During the Class Period, Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiffs' and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreement described herein.

385.    Defendants' continuing adherence to, enforcement of, and reaffirmation of the anticompetitive agreement throughout the Class Period was and is consummated through, among other conspiratorial acts: direct exchanges of current and future compensation data in fully disaggregated form through the CBA Repository and Compensation Comparison Reports; regular, in-person NHRG conferences, Labor Relations Project meetings, and Total Rewards Project meetings during which the Nuclear Defendants discussed and fixed compensation to Class

Members; email and telephonic communications between Defendants to directly exchange and discuss compensation information and align compensation; and continuing to pay artificially-suppressed compensation to Class Members.

**B.     Fraudulent Concealment**

**1.     Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct**

386.    Plaintiffs and other Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.

387.    Defendants engaged in a secret conspiracy. No facts were revealed publicly or to Plaintiffs that would have put them or the Class on inquiry notice that they were the victims of a conspiracy to suppress compensation paid to nuclear power generation workers.

388.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Commercial nuclear power companies are not exempt from antitrust regulation concerning their conduct in the labor market, and thus Plaintiffs reasonably considered the market for labor in the nuclear power industry to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of wages, salaries, benefits, and other compensation paid by the Nuclear Defendants and coconspirators to nuclear power generation workers in the United States.

389.    Plaintiffs exercised reasonable diligence. Plaintiffs and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and coconspirators to conceal their combination.

390.    Until the filing of this complaint, nuclear power generation workers and their union representatives were not on notice that the Nuclear Defendants and coconspirators were sharing competitively sensitive wage information. In 2025, a former Director of the Utility Department at the International Brotherhood of Electrical Workers who was responsible for supporting over 200,000 utilities workers, stated that the hourly wages and benefits included in union CBAs were highly confidential. He stated in 2025 that, to his knowledge, nuclear power companies did not share wages or benefits information with their competitors because they were concerned that they may lose valuable employees to other companies.

### 2.    Defendants Actively Concealed the Conspiracy

391.    Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the other Class Members.

392.    The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to: requiring a username and confidential password limited to NHRG members to access the CBA Repository; requiring a username and confidential password limited to NHRG members to access Compensation Comparison Reports; requiring a username and confidential password limited to NHRG members to access the web pages for the Labor Relations Project and the Total Rewards Project; conducting secret meetings that excluded non-conspirators; engaging in surreptitious communications that did not create or involve written records; instituting give-data-to-get-data requirements so that no company could access the sensitive compensation data exchanges unless it provided data of its own; and concealing the existence and results of compensation surveys.

393.    During the Class Period, Defendants affirmatively and falsely represented that the nuclear power industry paid wages, salaries, benefits, and other compensation reflecting a

competitive market for labor. For example, in a February 2024 report to the Minnesota Public Utilities Commission, Xcel Energy claimed: "[t]he compensation levels necessary to recruit and retain experienced nuclear employees are increasing due to the limited number of nuclear plants in the United States and the highly competitive practices employed by other nuclear companies in pursuit of the same experienced personnel."

394.    The Nuclear Defendants also advertised to potential nuclear power generation employees that the compensation offered and provided was "competitive"—i.e., the result of competition in the labor market for nuclear power generation employees. The examples below were promoted on the Nuclear Defendants' websites and in job postings for nuclear power generation positions:

- *AEP.* AEP's Careers website states: "AEP is a premier place to work, with great jobs, competitive pay and benefits, and an inclusive culture that encourages diversity."

- *Ameren*. Ameren's Careers website states: "Ameren's co-workers are our most valuable resource. We offer a competitive and comprehensive benefits package as well as a variety of programs to support work-life balance, well-being and flexible and collaborative work environments for our co-workers."

- *APS*. APS's Careers website states: "APS employees deliver extraordinary service to our customers and communities every day. We do what's right for the people and prosperity of our state. We recognize these efforts by offering competitive compensation packages, in addition to an array of employee benefits and rewards."

- *Constellation.* Constellation's job postings state: "We provide competitive compensation and benefits that support both employees and their families, helping them prepare for the future."

- *Dominion*. Dominion's job postings state: "We offer excellent plans and programs for employees. Employees are rewarded with a competitive salary and comprehensive benefits package which may include: health benefits with coverage for families and domestic partners, vacation, retirement plans, paid holidays, tuition reimbursement, and much more."

- *DTE Energy*. DTE Energy's Employees website states: "To maintain our high-performing workforce now and into the future, we offer our employees a competitive compensation and benefits package."

- *Duke Energy*. Duke Energy's Careers website states: "We know the strength of our company depends upon a high-performing, diverse workforce. That's why we offer a comprehensive rewards package of competitive pay and benefits that allows us to attract the talent we need to succeed."

- *Entergy*. Entergy's Jobs website states: "For our employees, we create value by achieving top-quartile organizational health, providing a safe, rewarding, engaging, diverse and inclusive work environment, fair compensation and benefits, and opportunities to advance their careers."

- *FirstEnergy*. FirstEnergy's Careers website states: "Our employees make important contributions to meeting the challenges of our changing business environment. We are committed to rewarding individual and business unit efforts through our compensation program that includes competitive base and incentive pay."

- *SCE*. SCE's Careers website states: "We offer a competitive Total Rewards Package including a wide selection of health plans, preventive health reimbursement, 401(k) savings plan with company match and automatic company contributions, wellness

programs and initiatives, tuition reimbursement, competitive vacation/holiday program, professional development, volunteer programs, employee assistance program, philanthropy and matching contribution program, electric service discount, and many other perks!"

- *Southern Company*. Southern Company's job postings state: "Southern Company invests in the well-being of its employees and their families through a comprehensive total rewards strategy that includes competitive base salary, annual incentive awards for eligible employees and health, welfare and retirement benefits designed to support physical, financial, and emotional/social well-being."

- *STP*. STP's Opportunities website states: "STP offers a competitive salary and comprehensive benefits program."

- *Talen*. Talen's job postings state: "Talen Energy offers its employees a generous and progressive array of compensation, benefits and growth opportunities."

- *Xcel Energy*. Xcel Energy's Total Rewards website states: "Our employees are critical to our success. That's why we offer a competitive pay package based on performance, skills and experience for contributions aligned with our values and goals."

395.    Defendants took affirmative and specific steps to fraudulently conceal each component of the compensation-suppressing conspiracy. Defendants formed and implemented the combination and conspiracy in a manner specifically designed to avoid detection.

396.    *Insular Compensation Departments Designed to Keep the Conspiracy Secret.* The Nuclear Defendants kept their nuclear power generation compensation departments entirely siloed from the rest of the company to keep their conspiratorial conduct a secret. For example, a former HR executive at Progress stated that the nuclear division had a "separate compensation function"

from the rest of the company that "collaborated" with other nuclear companies, including Southern Company, FPL, Entergy, and TVA.

397.    Nuclear Defendants also affirmatively restricted access to the confidential compensation information on a need-to-know basis to conceal the conspiracy. Only specific personnel at each Nuclear Defendant were told about or given access to the exchanges of confidential compensation information between Nuclear Defendants and coconspirators. Specifically, the CBA Repository, Compensation Comparison Reports, and direct exchanges of wage information were restricted only to select compensation personnel at each Nuclear Defendant and coconspirator, and other human resources personnel at Nuclear Defendants were not told about those exchanges. For example, one former HR executive at FPL was completely unaware of FPL's longtime participation in the CBA Repository, stating that while she worked at FPL from 2012 through 2024, she had believed that sharing collective bargaining agreements with other nuclear power companies was a "no go" and "the line" that should not be crossed. FPL's participation in the CBA Repository was so confidential that this former HR executive did not even know that FPL's contracts were shared outside of the company. Similarly, PSEG's restrictions on access to the CBA repository were so effective that a former Compensation and Benefits Manager at PSEG Nuclear stated he believed that union CBAs were "maintained internally" and "never shared . . . with anyone else."

398.    The select compensation executives who participated in these conspiratorial exchanges hid from other human resources personnel at their companies that they discussed ongoing union negotiations and not-yet-ratified wage schedules with other Nuclear Defendants. For example, union negotiations were so sensitive and private at FPL that non-compensation human resources employees were not informed of negotiation details until a CBA was ratified.

According to the former FPL HR executive, "Whatever is going on from a negotiation standpoint is confidential information."

399.    *CBA Repository and Compensation Comparison Reports*. The Nuclear Defendants took great care to ensure that the information exchanges through the CBA Repository and Compensation Comparison Reports were kept secret and operated secretly.

400.    To conceal the CBA Repository and Compensation Comparison Reports, the Nuclear Defendants provided their sensitive compensation information directly to Rick Habegger while he managed NHRG from 2003 through 2014, who then uploaded the data into a protected electronic file that could only be accessed with a confidential password. After Habegger was replaced as manager of NHRG through the present, the Nuclear Defendants provided their compensation information directly to HRC and Accelerant, including to David Heler, who also uploaded the sensitive data into a protected electronic file that could only be accessed with a confidential password.

401.    Habegger, HRC, and Accelerant shared the confidential password only with human resources executives at Nuclear Defendants and coconspirators. It was a policy of the NHRG that the CBA Repository and Compensation Comparison Reports were only available to plants that participated in the CBA Repository.

402.    Throughout the Class Period, the CBA Repository and Compensation Comparison Reports were only accessible online through a confidential, password-protected web page made available only to the Defendants.

403.    *NHRG, Labor Relations Project, and Total Rewards Meetings*. NHRG is highly secretive. The NHRG website contains only three pages accessible to the public: a "home" page providing a brief description of the organization; a "contact us" page with an email address for

Shane Camp, Vice President of Human Resources at Defendant Southern Nuclear; and a page to pay membership dues. The rest of NHRG's website is hidden from the public through a login link requiring a username and password restricted to members.

404.    Each annual NHRG conference and each meeting of the Labor Relations Project and Total Rewards Project from 2003 through the present were limited to NHRG members who were employed by the Nuclear Defendants and coconspirators and paid dues to participate. The exchange of current and future compensation information and related discussions about optimal compensation rates at those annual conference and meetings were highly secretive and undertaken behind closed doors. Total Rewards Project presentations were not posted on NHRG's website due to confidentiality.

405.    The Nuclear Defendants also hired third-party WTW in part to conceal their misconduct. The retention of WTW imparted a veneer of legality to the Nuclear Defendants' illicit exchange of compensation data. Despite hiring third-party WTW throughout the Class Period to conduct compensation surveys, the Nuclear Defendants used those surveys as benchmarks to facilitate and guide their unlawful discussions conducted during the NHRG conference and meetings of the Total Rewards Project. During those discussions, the Nuclear Defendants readily disclosed and exchanged company-specific compensation information that had been concealed in the WTW surveys themselves.

406.    *Direct Communications among Nuclear Defendants and coconspirators.* The Nuclear Defendants frequently exchanged compensation data through telephone communications to avoid the creation of a paper trail and thus avoid detection. A former employee of Exelon said that during his tenure at Exelon from 2009 through 2015, "if you called" participating companies (i.e., all Nuclear Defendants), "you could get" their confidential data.

407.    The Nuclear Defendants adopted a give-data-to-get-data policy on their provision of compensation information. A former compensation employee at DTE Energy confirmed that DTE Energy would only share salary information with other nuclear power companies if DTE Energy also received salary information in return.

408.    By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## VIII.    CLASS ACTION ALLEGATIONS

409.    Plaintiffs bring this action on behalf of themselves, and on behalf of the members of the following class, under Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3):

> All persons employed in nuclear power generation by the Nuclear Defendants and coconspirators, their subsidiaries, and/or related entities in the United States from May 1, 2003 until the present.

410.    The claims of the Class are brought against all the Defendants.

411.    Persons currently or formerly employed in the following positions by Defendants, co-conspirators or any of their subsidiaries or predecessors are excluded from the proposed Class: human-resources executives, labor managers, human-resources managers, human-resources staff, human-resources officers, human-resources directors, and bookkeepers. The Class definition provides clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Class.

412.    Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

413. The Class is so numerous that joinder of all members of the Class in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains tens of thousands of similarly situated workers.

414. The Class is readily identifiable and is one for which records should exist.

415. Plaintiffs' claims are typical of those of the Class. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

416. Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in compensation for working in nuclear power generation than they would have in a competitive market.

417. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are aligned with, and not antagonistic to, the Class.

418. Questions of law and fact common to Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to Class Members.

419. Questions of law and fact common to the Class include:

    a.    Whether Defendants engaged in an agreement, combination, or conspiracy to fix, suppress, maintain, or stabilize the compensation paid to Class Members;

    b.    Whether Defendants' exchange of nonpublic, competitively sensitive information about compensation paid to Class Members constituted, or furthered, an agreement, combination, or conspiracy in restraint of trade;

     c.      Whether such agreements constituted violations of the Sherman Antitrust Act;

     d.      The identity of the participants of the alleged conspiracy;

     e.      The duration of the conspiracy alleged herein and the acts performed by Defendants and their coconspirators in furtherance of the conspiracy;

     f.      Whether Defendants fraudulently concealed their misconduct;

     g.      Whether and to what extent Defendants' anticompetitive scheme suppressed compensation paid to Class Members below competitive levels;

     h.      The nature and scope of injunctive relief necessary to restore competition; and

     i.      The measure of damages suffered by Plaintiffs and the Class.

420.     Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

421.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other benefits, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Furthermore, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing

incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that is not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

422.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## IX.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### CONSPIRACY TO SUPPRESS COMPENSATION IN VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT
### (Against All Defendants)

423.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

424.    Beginning as of May 1, 2003, and continuing through the present, Defendants and their coconspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, suppress, maintain, and stabilize the compensation paid to nuclear power generation workers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

425.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their coconspirators did those things that they combined and conspired to do, including but not limited to:

- Reached agreements—through exchanges of information, in-person meetings, and other communications—to fix, suppress, maintain, and stabilize the compensation paid to nuclear power generation workers in the United States;

- Implemented, monitored, and enforced that conspiracy to suppress compensation through the regular exchange of competitively sensitive, nonpublic, and detailed compensation data; and

- Paid the fixed, suppressed, and stabilized compensation to nuclear power generation employees in the United States.

426.    The conspiracy to fix, suppress, maintain, and stabilize compensation is a *per se* violation of Section 1 of the Sherman Act.

427.    The combination and conspiracy alleged herein has had the following effects, among others:

- Competition for the hiring and retaining of nuclear power generation workers employed by the Nuclear Defendants, coconspirators, their subsidiaries, and/or related entities has been restrained, suppressed, and/or eliminated in the United States; and

- Compensation paid to nuclear power generation workers employed by the Nuclear Defendants, coconspirators, their subsidiaries, and/or related entities has been fixed, suppressed, maintained, and stabilized at artificially low, noncompetitive levels throughout the United States.

428.    Plaintiffs and the other Class Members have been injured in their business and property by receiving less compensation from the Nuclear Defendants and coconspirators, their subsidiaries, and/or related entities than they would have in the absence of the combination and conspiracy.

## SECOND CLAIM FOR RELIEF

## CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION
## IN VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT
### (Against All Defendants)

429.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

430.    Beginning as of May 1, 2003, and continuing through the present, Defendants and their coconspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their nuclear power generation employees in the United States. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

431.    The relevant market is the labor market for employment in nuclear power generation in the United States, and the relevant geographic market is the United States.

432.    The Nuclear Defendants and coconspirators collectively possess market power in the Relevant Market. The Nuclear Defendants and coconspirators together control 100 percent of the Relevant Market. The Nuclear Defendants' and coconspirators' collective market power includes the power to jointly set compensation for nuclear power generation workers in the United States below competitive levels. This joint power clearly exists because it has been used by the Nuclear Defendants and coconspirators to pay Class Members sub-competitive compensation.

433.    Defendants could and did profitably suppress compensation paid to nuclear power generation workers in the United States below competitive levels. In such circumstances, nuclear power generation workers would not be able, and were not able, to defeat such artificial compensation suppression by switching their employment to non-conspiring nuclear power companies, as there were no such companies.

434. A slight decrease in compensation to nuclear power generation workers in the United States from a competitive level could be imposed collectively by the Nuclear Defendants without causing too many such workers to switch employment to non-nuclear occupations.

435. The Nuclear Defendants view workers that comprise the Class as fungible. Workers within the same positions are generally interchangeable, permitting the Nuclear Defendants to readily compare and match each other's compensation.

436. The information regularly exchanged by and between the Nuclear Defendants pursuant to the agreement has consisted of detailed, competitively sensitive, disaggregated, deanonymized, and non-public information about current and future compensation to nuclear power generation workers. The information exchanges specifically included:

- The exchange multiple times per year, through the CBA Repository and Compensation Comparison Reports, of current and future salaries, wages and benefits provided to positions in nuclear power generation in the United States by the Nuclear Defendants and coconspirators;

- The oral exchange at annual in-person NHRG Conferences, annual Labor Relations Project meetings, and annual Total Rewards Project meetings, of current and future compensation rates, including the scope and timing of future compensation increases, paid to nuclear power generation workers employed by the Nuclear Defendants and coconspirators; and

- Regular email and telephonic exchanges directly between the Nuclear Defendants' executives regarding compensation practices and plans, including current and future compensation rates and the scope and timing of future compensation

increases, paid to nuclear power generation workers employed by the Nuclear Defendants and coconspirators.

437.    The Nuclear Defendants' regular compensation information exchanges (directly and through Accelerant, HRC, and ScottMadden) reflected concerted action between horizontal competitors in the Relevant Market.

438.    Each Nuclear Defendant furnished competitively sensitive information to other Nuclear Defendants with the understanding that it would be reciprocated. That is, one Nuclear Defendant would not have provided information to Accelerant, HRC, ScottMadden or directly to another Nuclear Defendant without the understanding that it would receive comparable information from other Nuclear Defendants.

439.    The exchanging of such compensation information by Nuclear Defendants is inconsistent with the joint guidance during the Class Period provided by the DOJ and the FTC. In October 2016, the two agencies issued a joint "Antitrust Guidance for Human Resource Professionals," updating and building upon the Safe Harbor guidelines issued in 1996. That 2016 Antitrust Guidance states:

> Sharing information with competitors about terms and conditions of employment can also run afoul of the antitrust laws. Even if an individual does not agree explicitly to fix compensation or other terms of employment, exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement. While agreements to share information are not per se illegal and therefore not prosecuted criminally, they may be subject to civil antitrust liability when they have, or are likely to have, an anticompetitive effect. Even without an express or implicit agreement on terms of compensation among firms, evidence of periodic exchange of current wage information in an industry with few employers could establish an antitrust violation because, for example, the data exchange has decreased or is likely to decrease compensation. …

> However, not all information exchanges are illegal. It is possible to design and carry out information exchanges in ways that conform with the antitrust laws. For example, an information exchange may be lawful if:

> • a neutral third party manages the exchange,

- the exchange involves information that is relatively old,

- the information is aggregated to protect the identity of the underlying sources, and

- enough sources are aggregated to prevent competitors from linking particular data to an individual source.

440. The compensation information exchanges by the Nuclear Defendants did not comply with the above criteria established by the DOJ and FTC and violated the federal antitrust laws. The exchanged compensation information was not "relatively old" or historical; rather; the information concerned current and future compensation. The exchanged compensation information was not "aggregated to protect the identity of the underlying sources"; rather, the information was disaggregated, as distinct compensation information was provided for nuclear power plants operated by each Nuclear Defendant and coconspirator. The exchanged compensation information was not presented in a manner "to prevent competitors from linking particular data to an individual source"; rather, the information was shared in a manner that identified the wages paid by particular Nuclear Defendants and coconspirators at particular nuclear power plants. The information exchanges were not managed by a neutral third party; rather, they were managed by the Nuclear Defendants themselves or the NHRG, which the Nuclear Defendants fully controlled.

441. In January 2025, the DOJ and FTC strengthened their antitrust guidelines in publishing a new version titled "Antitrust Guidelines for Business Activities Affecting Workers" which omits the above Safe Harbor carve-out. This omission confirms that even information-exchanges concerning compensation that comply with the former Safe Harbor Guidelines may nevertheless violate federal antitrust law.

442. The agreement to exchange compensation information eliminated a major incentive for the Nuclear Defendants and coconspirators to increase compensation to nuclear power

generation workers in the United States during the Class Period. The advantage of raising compensation is to retain and attract more such workers by exceeding the compensation paid by competing nuclear power companies.

443.   The agreement to regularly exchange detailed and non-public information about current and prospective compensation to nuclear power generation workers in the United States assured that the provision of superior compensation by any Nuclear Defendant or coconspirator would be timely and specifically known by its competitors. Such an agreement, therefore, eliminated the incentive of each Nuclear Defendant or coconspirator to outbid its competitors during the Class Period.

444.   When nuclear power companies that are competing for the same workers exchange their compensation plans and levels, comfort replaces uncertainty and reduces incentives to raise wages, salaries, other compensation, or benefits. Accordingly, each Nuclear Defendant and coconspirator used the compensation data obtained through the information exchanges to reduce the uncertainty that they should have faced from not knowing what their competitors were offering and providing in the labor market. This strategic information was a material factor in the Nuclear Defendants' and coconspirators' decisions to suppress and stabilize compensation paid to nuclear power generation workers in the United States during the Class Period.

445.   The exchange of compensation information between the Nuclear Defendants during the Class Period increased their relative bargaining power in setting wages, salaries, benefits, and other compensation for nuclear power generation workers employed by Defendants, coconspirators, their subsidiaries, and related entities in the United States.

446.   The regularity and detail of the compensation information exchanged, the related communications about compensation between individuals exchanging the information, the

relationships of trust developed among the individuals exchanging the information, and the pervasive desire to control and restrain labor costs, allowed Defendants and their coconspirators to use the information to suppress each other's compensation levels for nuclear power generation workers in the United States during the Class Period.

447.    Defendants' unlawful agreement to exchange, and the actual exchanges of, nonpublic, timely, and detailed compensation data was not reasonably necessary to further any procompetitive purpose. The information exchanged between the Nuclear Defendants and their high-level executives was disaggregated, company-specific, current and forward-looking, deanonymized, confidential, and related to a core characteristic of competition between them.

448.    The information-exchange agreement has had the effect of (1) reducing and suppressing competition among the Nuclear Defendants, their subsidiaries, and related entities for the compensation of nuclear power generation workers in the United States and (2) suppressing the compensation of such employees.

449.    As a result of the unlawful agreement alleged herein to exchange compensation information during the Class Period, Plaintiffs and the other Class Members have been injured in their business or property by receiving artificially suppressed compensation.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A.    The Court declare, adjudge, and decree this action to be a proper class action under Rule of Civil Procedure 23 on behalf of the Class defined herein, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class once certified;

B.    Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    Plaintiffs and the other Class Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled under 15 U.S.C. § 15(a);

D.    Plaintiffs and the other Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, and from entering into any other conspiracy or combination having a similar purpose or effect;

F.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information concerning compensation, benefits, or the hiring or recruiting of employees;

G.    Plaintiffs and the other Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

H.    Plaintiffs and the other Class Members be granted such other relief as the case may require and deemed proper to this Court.

## XI.    JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: November 5, 2025                    Respectfully submitted,

                                            /s/ *Matthew K. Handley*
                                            Matthew K. Handley (D. Md. Bar # 18636)
                                            HANDLEY FARAH & ANDERSON PLLC
                                            1050 Connecticut Avenue, NW, Suite 500
                                            Washington, DC 20036
                                            Telephone: (202) 559-2433
                                            mhandley@hfajustice.com

                                            George F. Farah (*pro hac vice*)
                                            Nicholas J. Jackson (*pro hac vice*)
                                            Rebecca P. Chang (*pro hac vice*)
                                            Simon Wiener (*pro hac vice*)
                                            HANDLEY FARAH & ANDERSON PLLC
                                            33 Irving Place
                                            New York, NY 10003
                                            Telephone: (212) 477-8090
                                            gfarah@hfajustice.com
                                            njackson@hfajustice.com
                                            rchang@hfajustice.com
                                            swiener@hfajustice.com

                                            William H. Anderson (*pro hac vice*)
                                            HANDLEY FARAH & ANDERSON PLLC
                                            1434 Spruce Street, Suite 301
                                            Boulder, CO 80302
                                            Telephone: (202) 559-2433
                                            wanderson@hfajustice.com

                                            Shana E. Scarlett (*pro hac vice*)
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            715 Hearst Avenue, Suite 202
                                            Berkeley, CA 94710
                                            Telephone: (510) 725-3000
                                            Facsimile: (510) 725-3001
                                            shanas@hbsslaw.com

                                            Steve W. Berman (*pro hac vice*)
                                            Breanna Van Engelen (*pro hac vice*)
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            1301 Second Avenue, Suite 2000
                                            Seattle, WA 98101
                                            Telephone: (206) 623-7292
                                            steve@hbsslaw.com
                                            breannav@hbsslaw.com

Brent W. Johnson (*pro hac vice*)
Daniel H. Silverman (*pro hac vice*)
Alison S. Deich (*pro hac vice*)
Sabrina Merold (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
bjohnson@cohenmilstein.com
dsilverman@cohenmilstein.com
adeich@cohenmilstein.com
smerold@cohenmilstein.com

*Counsel for Plaintiffs and the Proposed Class*