**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| Leo Dorrell, *et al.*, ) <br><br> Plaintiffs, ) <br><br> v. ) <br><br> Constellation Energy Corporation, *et al.*, ) <br><br> Defendants. ) | **CIVIL ACTION** <br> **No. 1:25-cv-02251-ABA** |

**REPLY IN SUPPORT OF DEFENDANTS' OMNIBUS MOTION TO DISMISS**
**PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT PURSUANT TO FEDERAL**
**RULE OF CIVIL PROCEDURE 12(B)(6)**

**TABLE OF CONTENTS**

Page

Introduction ........................................................................................................................ 1

Argument ............................................................................................................................ 2

I.  The Information Defendants Allegedly Exchanged Was Not Competitively Sensitive, Which Undermines The Plausibility of Plaintiffs' Alleged Conspiracy .......................................................................................................... 2

II.  Plaintiffs Fail To Allege A Per Se Compensation-Fixing Claim .................................. 4

    A.  Plaintiffs Do Not Allege Direct Evidence Of An Agreement To Fix Compensation. ........................................................................................ 4

    B.  Plaintiffs Do Not Allege Circumstantial Evidence Of An Agreement To Fix Compensation. .................................................................................... 9

        1.  None Of The Three Alternative Legal Frameworks Proposed By Plaintiffs Excuse Their Failure To Plausibly Allege Parallel Conduct. ................................................................................ 10

            a.  The Fourth Circuit Requires Parallel Conduct For A Sherman Act Claim Relying On Circumstantial Evidence. .......... 10

            b.  Plaintiffs Cannot Overcome Their Failure To Plead Parallel Conduct By Purportedly "Linking" Each Defendant To The Conspiracy. ................................................................. 11

            c.  Information Exchanges Are Insufficient To Allege Parallel Conduct Necessary To Support A Wage-Fixing Claim ................ 12

        2.  Plaintiffs Do Not Allege Parallel Conduct By Defendants ........................ 14

        3.  Plaintiffs Fail To Allege "Plus Factors" That Plausibly Show A Conspiracy To Fix Compensation. ............................................................. 16

III.  Plaintiffs Fail To State A Rule Of Reason Claim .......................................................... 18

    A.  Plaintiffs' Alleged Market Is Implausible ................................................................ 18

        1.  Plaintiffs' Allegations Do Not Substantiate Their Facially Implausible Labor Market .................................................................. 18

        2.  Plaintiffs' Alleged Geographic Market Is Implausible. ............................ 20

        3.  Plaintiffs Misapply The Hypothetical Monopsonist Test ("HMT") To Try To Salvage Their Facially Implausible Market. ........................... 21

    B.  Plaintiffs Have Not Plausibly Alleged Anticompetitive Effects ............................ 23

IV.  Plaintiffs' Claims Are Time-Barred .............................................................................. 26

    A.  Plaintiffs Cannot Satisfy The Continuing Violation Doctrine With Generalized, Undated Allegations. ....................................................................... 26

i

B.    Plaintiffs Fail To Plead Affirmative Acts Of Fraudulent Concealment Or Due Diligence. .................................................................................................... 26

1.    Plaintiffs Do Not Allege Affirmative Acts That Imply Fraud. .................. 27

2.    Plaintiffs Fail To Allege Due Diligence. ................................................... 29

**Conclusion** ...................................................................................................................... **29**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Dairy Farmers of Am., Inc.*,
748 F. Supp. 2d 323 (D. Vt. 2010)........................................................................26

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
367 F.3d 212 (4th Cir. 2004) ..................................................................................4

*In re Animation Workers Antitrust Litigation*,
123 F. Supp. 3d 1175 (N.D. Cal. 2015) ................................................................28

*B & R Supermarket, Inc. v. Visa Inc.*,
No. 17-CV-2738, 2024 WL 4334075 (E.D.N.Y. Sep. 27, 2024) ............................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................................10

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979)..................................................................................................16

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)..............................................................................................21

*Brown v. JBS USA Food Co.*,
No. 22-cv-02946, 2023 WL 6294161 (D. Colo. Sep. 27, 2023)............................7, 11, 13, 14

*Brown v. Pro Football, Inc.*,
518 U.S. 231 (1996)................................................................................................9

*Coley v. Nat'l Collegiate Athletic Ass'n*,
792 F. Supp. 3d 634 (E.D.N.C. 2025)...................................................................24

*Compliance Mktg., Inc. v. Drugtest, Inc.*,
No. 09-cv-01241, 2010 WL 1416823 (D. Colo. Apr. 7, 2010) ...............................6

*Courthouse News Serv. v. Smith*,
126 F.4th 899 (4th Cir. 2025) .................................................................................3

*Deslandes v. McDonald's USA, LLC*,
No. 17 C 4857, 2021 WL 3187668 (N.D. Ill. July 28, 2021) ................................20

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002) ...........................................................................23, 24

*In re Domestic Airline Travel Antitrust Litig.*,
    221 F. Supp. 3d 46 (D.D.C. 2016) ...........................................................................11

*In re Domestic Airline Travel Antitrust Litig.*,
    691 F. Supp. 3d 175 (D.D.C. 2023) ........................................................................25

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ...................................................................................20

*Edmonson v. Eagle Nat'l Bank*,
    922 F.3d 535 (4th Cir. 2019) ...................................................................................29

*Fed. Trade Comm'n v. Advoc. Health Care Network*,
    841 F.3d 460 (7th Cir. 2016) ...................................................................................21

*Gibson v. Cendyn Grp., LLC*,
    No. 23-cv-00140, 2024 WL 2060260 (D. Nev. May 8, 2024) .............................4, 8

*In re GSE Bonds Antitrust Litigation,*
    396 F. Supp. 3d 354 (S.D.N.Y. 2019).......................................................................5

*In re Int. Rate Swaps Antitrust Litig.*,
    261 F. Supp. 3d 430 (S.D.N.Y. 2017).................................................................6, 13

*Jien v. Perdue Farms, Inc.*,
    No. 19-CV-2521, 2020 WL 5544183 (D. Md. Sep. 16, 2020) ....................... *passim*

*Kleen Prods. LLC v. Int'l Paper*,
    276 F. Supp. 3d 811 (N.D. Ill. 2017) ........................................................................5

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997).................................................................................................26

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ....................................................................22

*Okla. Firefighters Pension & Ret. Sys. v. Deutsche Bank Aktiengesellschaft*,
    No. 23-cv-5095, 2024 WL 4202680 (S.D.N.Y. Sep. 13, 2024) ..............................11

*Oksanen v. Page Mem'l Hosp.*,
    945 F.2d 696 (4th Cir. 1991) ...................................................................................23

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
    767 F. Supp. 3d 681 (N.D. Ohio 2025).....................................................................16

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
    632 F. Supp. 3d 1108 (S.D. Cal. 2022)....................................................................13

*PharmacyChecker.com, LLC v. Nat'l Assoc. of Boards of Pharm.*,
530 F. Supp. 3d 301 (S.D.N.Y. 2021)............................................................5

*Polley v. Nw. Univ.*,
560 F. Supp. 3d 1197 (N.D. Ill. 2021) .........................................................16

*In re Pork Antitrust Litig.*,
781 F. Supp. 3d 758 (D. Minn. 2025)..........................................................25

*Robertson v. Sea Pines Real Est. Cos., Inc.*,
679 F.3d 278 (4th Cir. 2012) .................................................................23, 24

*Rock v. Nat'l Collegiate Athletic Ass'n*,
928 F. Supp. 2d 1010 (S.D. Ind. 2013) ........................................................24

*Scharpf v. Gen. Dynamics Corp.*,
137 F.4th 188 (4th Cir. 2025) ...............................................................27, 28

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) .............................................10, 14, 15, 18

*Stenlund v. Marriott Int'l, Inc.*,
172 F. Supp. 3d 874 (D. Md. 2016) .............................................................15

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)..............................................................19, 20, 25

*United States v. Allstate Ins. Co.*,
620 F. Supp. 3d 674 (E.D. Mich. 2022).........................................................3

*United States v. H&R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) ..............................................................21

*In re Urethane Antitrust Litigation*,
913 F. Supp. 2d 1145 (D. Kan. 2012)........................................................4, 5

**Statutes**

Sherman Act, 15 U.S.C. § 1.................................................................... *passim*

**Rules**

Fed. R. Civ. P. 9(b) ....................................................................26, 27, 28

**Other Authorities**

Am. Compl., *Jien v. Perdue Farms, Inc.*,
No. 19-cv-2521 (D. Md. Dec. 23, 2019), Dkt. No. 258.......................................19

Corrected Compl., *Brown v. JBS USA Food Co.*,
No. 22-cv-02946 (D. Colo. Nov. 14, 2022), Dkt. No. 23-1 ..................................................... 14

*Justice Department and Federal Trade Commission Seek Public Comment for
Guidance on Business Collaborations* (Feb. 23, 2026),
https://downloads.regulations.gov/ATR-2026-0001-0001/content.pdf ................................... 5

Order Granting Defs.' Mot. to Dismiss, *Morgan v. Kroger Co.*,
No. 25-cv-00837 (D. Colo. Feb. 6, 2026), Dkt. No. 74 ............................................................. 9

Tr. of Mot. Hr'g, *Haff Poultry, Inc. v. Tyson Foods, Inc.*, No. 17-cv-0033 (E.D.
Okla. Jan. 6, 2020), Dkt. No. 268 ......................................................................................... 13

**INTRODUCTION**

Plaintiffs have brought two antitrust claims: (1) a per se claim alleging an agreement to fix compensation, and (2) a rule of reason claim alleging an agreement to share compensation information. Plaintiffs allege these conspiracies based on the sharing of sensitive and confidential information and ask this Court to infer a conspiracy because there is no other explanation for sharing such information. But Plaintiffs admit in their Opposition that each of these conspiracies is *actually* based on the exchange of information that is demonstrably public and not competitively sensitive. The exchange of such information does not plausibly suggest a conspiracy.

Additionally, as to the per se claim, while Plaintiffs cite numerous unidentified witness statements, they do not identify one that amounts to direct evidence of a compensation-fixing conspiracy. At most, these allegations reflect collaboration and information exchanges among the Nuclear Defendants. Exchanging information *does not* equate to fixing employee compensation. That is especially so in the heavily regulated nuclear industry, where exchanging information is expected, encouraged, and sometimes required. Plaintiffs also fail to sufficiently plead parallel conduct and plus factors required to allege a circumstantial compensation-fixing claim.

Plaintiffs' information-sharing claim likewise fails. Plaintiffs fail to plead a plausible, relevant labor market in which the alleged conspiracy occurred and caused anticompetitive harm. Plaintiffs' alleged labor market would require the implausible assumption that a single labor market exists for security guards and nuclear reactor operators and that a single geographic market exists spanning from Florida to Washington State. Plaintiffs also fail to sufficiently plead anticompetitive harm because their allegations of harm apply to only a handful of class members and do not plausibly suggest harm across the entire class.

Finally, Plaintiffs fail to overcome the statute of limitations for harm alleged to have occurred prior to July 11, 2021, four years before the complaint was filed. They do not sufficiently

allege continuing antitrust violations or that Defendants fraudulently concealed the alleged conspiracy.

For all of these reasons, Plaintiffs' Amended Complaint—which is already Plaintiffs' best attempt at a revised complaint—should be dismissed with prejudice.

**ARGUMENT**

**I.    THE INFORMATION DEFENDANTS ALLEGEDLY EXCHANGED WAS NOT COMPETITIVELY SENSITIVE, WHICH UNDERMINES THE PLAUSIBILITY OF PLAINTIFFS' ALLEGED CONSPIRACY**

The information Defendants allegedly exchanged primarily relates to (1) information found in CBAs about union employees, and (2) Willis Towers Watson ("WTW") benchmarking surveys.[1] Although Plaintiffs label this information "confidential" or "sensitive" over seventy times in their Opposition, in fact they admit the opposite.

In a footnote in their Opposition, Plaintiffs acknowledge "the supposedly public nature of some information contained in" CBAs. Opp. at 52 n.21. This concession acknowledges the public availability of CBAs and the wage information contained within them.

Plaintiffs try to argue that CBAs are not *really* publicly available because current public availability does not mean these CBAs were public when entered, and they are hidden within legal-specific, subscription-based services. *Id.* Plaintiffs also argue that these CBAs are not applicable to this case because they do not relate to class members. But these arguments are misplaced. *First*,

---

[1] Plaintiffs' allegations confirm that, regardless of the alleged mechanism of information exchange, Plaintiffs essentially allege the exchange of union or WTW information. Compensation Comparison Reports allegedly "allowed the Nuclear Defendants to easily compare and coordinate their current and future compensation rates at each **unionized** nuclear power plant." Am. Compl. ¶ 11 (emphasis added). The CBA Repository allegedly contained "**union** collective bargaining agreements." *Id.* ¶ 9 (emphasis added). Attendees of the NHRG Labor Relations Committee meetings supposedly "reviewed the CBA Repository and Compensation Reports," and attendees of NHRG Total Rewards Committee meetings purportedly "reviewed surveys of hourly and salaried compensation in the nuclear power industry" prepared by WTW. *Id.* ¶¶ 13–14, 301. Finally, while Plaintiffs are generally vague about what information Nuclear Defendants allegedly directly exchanged, the Amended Complaint says these communications were similarly designed to promote "collaboration and information sharing between many big nuclear companies in regards to **union** details." *Id.* ¶ 17 (emphasis added).

the overwhelming number of public CBAs cannot be reconciled with Plaintiffs' claim that they are "secret," regardless of when they were made available. Moreover, because CBAs generally have a multi-year term, CBAs do not need to be made available *when entered* to provide publicly available information about current and future wages. Indeed, many CBAs available today include wages through 2027. *See, e.g.*, Dkt. Nos. 427-3–427-6. *Second*, publicly available information does not become "confidential" or "sensitive" just because it is available through paid subscription services. *See United States v. Allstate Ins. Co.*, 620 F. Supp. 3d 674, 685 (E.D. Mich. 2022) (rejecting plaintiffs' argument that subscription requirements rendered information not "readily available"); *see also Courthouse News Serv. v. Smith*, 126 F.4th 899, 908 (4th Cir. 2025). *Third*, if Plaintiffs were right (which they are not) that these CBAs do not relate to class members, then Plaintiffs would indisputably lack any allegation of parallel conduct because these are the very same CBAs Plaintiffs rely on in their Amended Complaint to allege parallel conduct that affected putative class members. *See* Section II.B, *infra.* At bottom, Plaintiffs cannot allege a conspiracy based on sharing "secret," "sensitive," or "confidential" information when the information allegedly shared is, or is contained within, publicly available CBAs.

Just as critically, in a footnote in Plaintiffs' response to TVA's individual motion to dismiss, Plaintiffs admit that they "do not challenge the contents of [the WTW] surveys." TVA Opp. at 10 n.5. Nor could they—the WTW surveys contain only anonymized, aggregated compensation information, and Plaintiffs do not allege otherwise. As antitrust law recognizes, this type of information is not "sensitive" or "confidential," and this type of benchmarking is lawful

and routine because it can be procompetitive and facilitate efficient economic activity. *See* Mot. at 18.[2] The same is true here.

Plaintiffs' admissions require the conclusion that CBAs and WTW surveys are neither confidential nor sensitive, undermining the entire theory of Plaintiffs' alleged conspiracy. Plaintiffs' conspiracy theory rests on the assumption that the information exchanged between Defendants was "sensitive" and "confidential," and for that reason, this Court should assume that what appears to be nothing more than routine, and lawful, benchmarking activity should instead be considered an antitrust conspiracy. But "consulting public sources" to obtain information about "competitors' rates" to use in reaching *independent* decisions "about how to price [or set wages] does not violate the Sherman Act." *Gibson v. Cendyn Grp., LLC*, No. 23-cv-00140, 2024 WL 2060260, at *4 (D. Nev. May 8, 2024). As such, Plaintiffs' allegations do not plausibly plead a compensation-fixing or information sharing conspiracy.

## II.    PLAINTIFFS FAIL TO ALLEGE A PER SE COMPENSATION-FIXING CLAIM

Plaintiffs cannot plausibly plead a compensation-fixing claim through direct or circumstantial evidence. Accordingly, their claim should be dismissed with prejudice.

### A.    Plaintiffs Do Not Allege Direct Evidence Of An Agreement To Fix Compensation.

Plaintiffs do not contest that evidence is only "direct" if it is "explicit" and does not require "inferences" to establish the existence of the alleged agreement—and such evidence "is extremely rare." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004). For instance, in *In re Urethane Antitrust Litigation*, the court identified direct evidence of an agreement via testimony that a defendant's global director "met with competitors Bayer and BASF and

---

[2] All citations and references to "Motion" or "Mot." refer to Defendants' Omnibus Motion to Dismiss Plaintiffs' Amended Class Action Complaint, filed December 19, 2025, Dkt. No. 427-1.

reached agreements to set prices and make price increases stick" on more than ten occasions. 913 F. Supp. 2d 1145, 1153 (D. Kan. 2012). Similarly, in *In re GSE Bonds Antitrust Litigation*, the court held that chats in which traders discussed a specific price at which they would sell bonds constituted direct evidence of a price-fixing agreement. 396 F. Supp. 3d 354, 361 (S.D.N.Y. 2019).

Plaintiffs do not point to any allegations in their Amended Complaint that come close to these examples. At most, Plaintiffs allege information sharing between Defendants. But information sharing is *not* the same as a compensation-fixing agreement. *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 835 (N.D. Ill. 2017) ("[T]he mere fact that Defendants were in constant communication with one another does not, without more, suggest that Defendants agreed to fix prices. This is particularly so when the defendants have legitimate reasons to talk to one another . . . .") (citations omitted). None of Plaintiffs' allegations describe a compensation-fixing agreement through direct evidence.

***Statements Referring to "Collaboration."*** Plaintiffs allege that a small number of unidentified former employees of Defendants made statements using the terms "collaboration" or "collaborated" and said Defendants would "work together." *See* Am. Compl. ¶¶ 5, 6, 17, 240, 249, 322, 370, 396. But many courts—and the federal government—recognize that "collaboration" is not direct evidence of an antitrust conspiracy; indeed, it can be *procompetitive. See* U.S. Dep't of Justice, *Justice Department and Federal Trade Commission Seek Public Comment for Guidance on Business Collaborations* (Feb. 23, 2026), https://downloads.regulations.gov/ATR-2026-0001-0001/content.pdf ("Many collaborations . . . among competitors are procompetitive and benefit the economy and consumers"); *PharmacyChecker.com, LLC v. Nat'l Assoc. of Boards of Pharm.*, 530 F. Supp. 3d 301, 336–37 (S.D.N.Y. 2021) (email that stated one of the defendants was "working with other key stakeholders to . . . collaborate to address the problem of online drug sellers" was

circumstantial, not direct evidence); *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 465–71 (S.D.N.Y. 2017) (rejecting allegations of "collaboration" as direct evidence of conspiracy); *Compliance Mktg., Inc. v. Drugtest, Inc.*, No. 09-cv-01241, 2010 WL 1416823, at *12 (D. Colo. Apr. 7, 2010) (same).

Nonetheless, Plaintiffs anchor their argument on *Jien v. Perdue Farms, Inc.*, No. 19-CV-2521, 2020 WL 5544183, at *5–6 (D. Md. Sep. 16, 2020), to argue that the use of the term "collaborate" is direct evidence of a conspiracy. Opp. at 16–17. But Plaintiffs ignore three key distinctions between this case and *Jien*. *First*, unlike the broiler chicken industry in *Jien* where there was no expectation of collaboration among the defendants, in the nuclear power industry, significant government-sanctioned collaboration occurs regularly. *See* Mot. at 11. Therefore, "collaborate" means something entirely different here than it did in *Jien*. *Second*, unlike here, the *Jien* plaintiffs did not concede that the compensation information at issue was public or not competitively sensitive. *See* Section I, *supra*. *Finally*, statements about collaboration were not the "smoking gun" direct evidence in *Jien*. Rather, the court explained that the "most important direct evidence" was a statement by a senior Tyson executive admitting that "discussions about wages, salaries and benefits at the 'off the books' meetings . . . were so inappropriate and improper that the company would no longer attend them." *Jien*, 2020 WL 5544183, at *5. Plaintiffs have nothing similar here.[3]

***Statements Referring to Alignment.*** Plaintiffs also allege statements made by unidentified witnesses regarding "aligning," acting "in line with," or "harmonizing" with other nuclear power

---

[3] Plaintiffs claim that an unidentified witness saying that an investigation was warranted because "there's something going on here" is similar to the senior Tyson executive's statement in *Jien*. Opp. at 17. First, the vague reference to "something" going is in stark contrast to the *Jien* witness's statement made about a particular discussion at a particular meeting attended by particular defendants. The number of inferences and assumptions that are required to leap from "there's something going on here" to a compensation-fixing agreement across dozens of defendants for twenty-plus years is staggering. This statement is no "smoking gun."

companies. *See, e.g.*, Am. Compl. ¶¶ 5, 247, 248, 255, 313, 314, 337. However, exchanging compensation information "to align [] compensation schedules" is not direct evidence because it "require[s] an inference to establish an agreement." *Brown v. JBS USA Food Co.*, No. 22-cv-02946, 2023 WL 6294161, at *8 (D. Colo. Sep. 27, 2023); *see also B & R Supermarket, Inc. v. Visa Inc.*, No. 17-CV-2738, 2024 WL 4334075, at *16 (E.D.N.Y. Sep. 27, 2024) (document that said "[t]he four major payment networks have aligned" not direct evidence of an agreement).

Moreover, Plaintiffs' Opposition reveals exactly what Plaintiffs mean by "align"—and it is not a compensation-fixing agreement. Plaintiffs argue "Defendants admitted they had a practice of aligning wages," but the evidence they cite in support consists of statements from five witnesses who claim their employers each used the WTW survey to set compensation for their individual companies. Opp. at 27. That merely describes benchmarking, which is not a compensation-fixing agreement. Moreover, these statements undermine Plaintiffs' claim because they indicate that these companies independently chose to take different approaches to setting compensation. *Compare* Am. Compl. ¶ 316 (Xcel pays at the 50th percentile) *with id.* (PSEG pays between the 45th and 55th percentile) *and id.* ¶ 317 (STP pays above the 50th percentile). These allegations contradict Plaintiffs' claim of any agreement to fix compensation.

***Statements Plaintiffs Argue Reflect an Intent to Reduce Compensation.*** Plaintiffs assert that three statements made by unidentified witnesses indicate "the purpose of the conspiracy was to keep compensation low." Opp. at 18 (citing Am. Compl. ¶¶ 5, 6, 322). Paragraph 5 is a statement from an unidentified former employee of Progress and Duke who said, "we didn't want to pay outrageous salaries." Am. Compl. ¶ 5. But a desire to pay competitive market rates does not reflect an antitrust conspiracy; it reflects rational economic behavior. Paragraph 6 is a statement from an unidentified former employee of Exelon who said "[o]btaining compensation data directly from

7

competing nuclear power companies allowed Exelon to avoid paying higher hourly wages than it actually paid its nuclear power generation employees." *Id.* ¶ 6. At most, this statement reflects a unilateral decision by Exelon about how to use benchmarking information—it does not reflect any *agreement* with other companies about what to pay employees. Finally, paragraph 322 is a statement from an unidentified former employee of Exelon who stated nuclear power companies shared information "all the time" for the "specific reason" of "trying to screw the union." *Id.* ¶ 322. This statement does not specify what information was shared, with whom, or when. It does not even establish, without inference, that compensation information was shared, let alone the existence of a compensation-fixing agreement among all of Defendants spanning decades. None of these statements, therefore, are direct evidence of any compensation-fixing agreement.

>    ***Statements Claiming Exchanges of Future Compensation Information.*** Finally, Plaintiffs point to alleged statements from unidentified witnesses indicating that certain Defendants had "conversations" and "would talk about" future compensation information contained in executed and unexecuted CBAs. Opp. at 15, 19. This is not direct evidence of a conspiracy, either. Again, "[t]here is nothing unreasonable about consulting public sources to determine how to price your product." *Gibson*, 2024 WL 2060260, at *5. And it takes inference to jump from the allegation that certain Defendants had "discussions" and "would talk about" CBAs (whether executed or unexecuted) to the conclusion that they reached a compensation-fixing agreement. Indeed, if those Defendants really did agree on setting wages based on these discussions, why wouldn't these witnesses say so? Moreover, to the extent Plaintiffs are now claiming that unexecuted CBA negotiations should be considered discussing non-public information, such discussions during ongoing union negotiations are subject to the non-statutory

labor exemption,[4] so this would be a "labor dispute that is not cognizable under antitrust law." *See* Order Granting Defs.' Mot. to Dismiss at 5, *Morgan v. Kroger Co.*, No. 25-cv-00837 (D. Colo. Feb. 6, 2026), Dkt. No. 74 (holding that an alleged no-poach agreement between Kroger and Albertsons was subject to the non-statutory labor exemption because the alleged agreement "arose directly from a collective bargaining process as the employers' response to union strategy").

None of Plaintiffs' allegations constitute direct evidence of a conspiracy. All require some inferential leap, so, as a matter of law, none can be considered direct evidence.

**B.      Plaintiffs Do Not Allege Circumstantial Evidence Of An Agreement To Fix Compensation.**

Plaintiffs also fail to allege circumstantial evidence of a conspiracy. In the Fourth Circuit, to allege a conspiracy through circumstantial evidence, "Plaintiffs must allege both 1) parallel conduct by the Defendants, and 2) 'plus factors' suggesting that the parallel conduct resulted from concerted action." *Jien*, 2020 WL 5544183, at *7. Seemingly recognizing their Amended Complaint does not sufficiently allege parallel conduct, Plaintiffs ask this Court to apply one of three alternative legal standards to obviate or water down the requirement to plead parallel conduct. None have any basis in Fourth Circuit law. Red herrings aside, the only alleged parallel conduct is a cherry-picked handful of instances of similar wages and annual wage increases among a few Defendants. Because Plaintiffs cannot sufficiently allege parallel conduct, the analysis ends there. *Id.* at *9. But Plaintiffs' claims also fail because they do not sufficiently allege plus factors establishing that any parallel conduct resulted from conspiracy.

---

[4] In describing the non-statutory labor exemption, the Supreme Court explained, "[i]n the 1930's, when it subsequently enacted the labor statutes, Congress … hoped to prevent judicial use of antitrust law to resolve labor disputes—a kind of dispute normally inappropriate for antitrust law resolution. . . . Thus, the implicit exemption recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 235–37 (1996) (citations omitted).

**1.      None Of The Three Alternative Legal Frameworks Proposed By Plaintiffs Excuse Their Failure To Plausibly Allege Parallel Conduct.**

Plaintiffs advance three alternative legal frameworks for pleading circumstantial evidence. None has any basis in Fourth Circuit law.

        a.      The Fourth Circuit Requires Parallel Conduct For A Sherman Act Claim Relying On Circumstantial Evidence.

Plaintiffs claim they are not required to allege parallel conduct, Opp. at 20, but instead only the "who, what, where, when, and why of the conspiracy." *Id.* at 23–25. This position contradicts Fourth Circuit law. *Twombly* held that parallel conduct and plus factors are required to plead facts that reflect "plausible grounds to infer an agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Absent any allegations of parallel conduct—i.e., that participants in the conspiracy in fact moved or maintained compensation in parallel—much less plus factors, one cannot infer an agreement to fix compensation. Therefore, following *Twombly*, "***[t]he rule in the Fourth Circuit is clear: parallel conduct is required for a Sherman Act, 15 U.S.C. § 1 claim resting on circumstantial evidence.***" *Jien*, 2020 WL 5544183, at *7 n.8 (emphasis added) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.,* 801 F.3d 412, 424 (4th Cir. 2015)). Indeed, the *Jien* court rejected the same argument made by Plaintiffs in this case, explaining "Plaintiffs' arguments . . . cite non-controlling case law, and urge this Court to interpret *Twombly* in a manner at odds with *SD3*." *Id. Twombly* and *SD3* require the same here.

While Plaintiffs argue *SD3* applied the "who, what, where, when, and why" standard, Opp. at 23, they are wrong. The Fourth Circuit evaluated those allegations as part of its consideration of the plaintiff's alleged plus factors only *after* concluding that the plaintiff adequately alleged parallel conduct based on separate allegations. *SD3,* 801 F.3d at 430. Therefore, *SD3* directly contradicts, rather than supports, Plaintiffs' argument, as *Jien* recognized.

                b.       Plaintiffs Cannot Overcome Their Failure To Plead Parallel Conduct By Purportedly "Linking" Each Defendant To The Conspiracy.

Plaintiffs argue that "examples of parallel wage increases that involve some—but not all—of the Nuclear Defendants is sufficient to allege parallel conduct," if "the Complaint links each Nuclear Defendant to the conspiracy" in some other way. Opp. at 29. But this is merely another way of asking the Court to absolve Plaintiffs of their responsibility to allege parallel conduct.

As even the cases cited by Plaintiffs in support of this novel legal theory explain, antitrust plaintiffs must *first* plausibly allege a conspiracy through either direct or circumstantial evidence. *See Brown*, 2023 WL 6294161, at *8; *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 68–69 (D.D.C. 2016). Only if there are allegations of a plausible conspiracy will the analysis continue to the second step—whether the complaint plausibly links each defendant to the conspiracy. The language Plaintiffs cite from *Brown* and *Domestic Airline Travel* comes from sections of those opinions addressing whether the plaintiffs had sufficiently linked individual defendants to the conspiracy—but the courts reached that question only *after* concluding that the plaintiffs had plausibly alleged parallel conduct and plus factors. *Brown*, 2023 WL 6294161, at *8; *Domestic Airline Travel*, 221 F. Supp. 3d at 68–69. Therefore, parallel conduct is a predicate requirement that cannot be avoided by alleging Defendants are "linked" to the conspiracy.

Indeed, Plaintiffs cite no example of a court allowing a claim to proceed where parallel conduct was not pled as to each defendant alleged to have fixed wages or prices. *See Brown*, 2023 WL 6294161, at *10 (parallel conduct adequately pled as to all pork processor defendants); *Domestic Airline Travel*, 221 F. Supp. 3d at 68–69 (parallel conduct adequately pled as to all defendant airlines); *see also Okla. Firefighters Pension & Ret. Sys. v. Deutsche Bank Aktiengesellschaft*, No. 23-cv-5095, 2024 WL 4202680, at *7–8 (S.D.N.Y. Sep. 13, 2024)

("plaintiff must somehow establish parallel conduct *in which each defendant participated*") (emphasis added). This Court should decline Plaintiffs' invitation to be the first.

Finally, Plaintiffs also argue, incorrectly, that *Jien* supports their novel theory that parallel conduct is not required in a circumstantial case. Plaintiffs are right that the court in *Jien* "did not rule that specific wage information was a necessary part of plaintiffs' claim for each defendant." Opp. at 28. But that was because the court concluded the plaintiffs had alleged *direct evidence* of the conspiracy as to most defendants, and thus there was no need to *also* allege circumstantial evidence as to each defendant. The court's analysis in *Jien*, however, goes further and contradicts Plaintiffs' proposed legal standard. As to the defendants in *Jien* for whom the court concluded the plaintiffs did not allege direct evidence, the court held, "[w]ithout information regarding how wages actually moved during the relevant period for specific Defendants, or how Defendants actually acted in concert together to set wages, parallel alignment of compensation has not been plausibly alleged." 2020 WL 5544183, at *8. In other words, as to those defendants, the court required the plaintiffs to plead allegations about parallel wages. *See id.* Because they did not, the court granted the motion to dismiss as to those defendants. *Id.* at *9. The court did not alternatively consider evidence that may have "linked" those defendants to the conspiracy, as Plaintiffs ask the Court to do here. Plaintiffs' second novel legal theory, therefore, has no basis in law.

          c.       Information Exchanges Are Insufficient To Allege Parallel Conduct Necessary To Support A Wage-Fixing Claim.

Plaintiffs claim that their allegations about Defendants' information exchanges reflect parallel conduct. While parallel conduct may take many forms, "it is not enough to simply show that companies were acting similarly in any limited way." *Id.* at *8. Rather, the alleged parallel conduct must support an inference of the alleged per se conspiracy.

For that reason, courts hold that allegations of parallel information exchanges are *not* sufficient to show parallel conduct reflecting a wage-fixing agreement. The *Jien* court is one example. After concluding the plaintiffs failed to allege direct evidence of a wage-fixing conspiracy as to two defendants, the court evaluated whether the plaintiffs alleged sufficient circumstantial evidence as to those same two defendants. *Id.* at *7. As here, the plaintiffs in *Jien* argued that they alleged two types of parallel conduct: (1) parallel wages, and (2) parallel information exchanges. *Id.* After concluding that the allegations of parallel wages were insufficient, the court evaluated the theory of parallel information exchanges. *Id.* The court acknowledged, "[i]t is clear that at least some of the Defendants acted in parallel, insofar as they gathered data about their competitors and shared their own data as well." *Id.* at *8. But "such conduct is neither illegal nor inherently collusive, particularly given the lack of facts alleging that the information sharing resulted in largely uniform or otherwise coordinated wages amongst the alleged conspirators." *Id.* The court explained that this type of "parallel conduct" was insufficient to support an inference of wage-fixing because "[t]he mere existence of available competitor information, without more, does not plausibly support an inference of collusion." *Id.*

Consistent with *Jien,* courts routinely evaluate allegations of information exchanges as a plus factor, relevant only after parallel conduct has been established—rather than as evidence of parallel conduct. Such cases include those cited in Plaintiffs' Opposition. *See, e.g.*, *Brown*, 2023 WL 6294161, at *10 (after finding sufficient allegations of parallel conduct, court evaluated evidence of information exchanges as a plus factor); *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1136 (S.D. Cal. 2022) (same); *see also In re Int. Rate Swaps*, 261 F. Supp. 3d at 471 (same); Tr. of Mot. Hr'g at 32, *Haff Poultry, Inc. v. Tyson Foods, Inc.*, No. 17-cv-0033 (E.D. Okla. Jan. 6, 2020), Dkt. No. 268 (same). To hold otherwise would allow plaintiffs to reframe

any rule of reason information exchange claim into a per se price or wage fixing claim. Therefore, allegations of information exchanges among Defendants do not constitute parallel conduct that can support Plaintiffs' alleged compensation-fixing claim in this case.

### 2.    Plaintiffs Do Not Allege Parallel Conduct By Defendants.

Setting aside Plaintiffs' erroneous legal theories, Plaintiffs must rely on their allegations about certain Defendants' wages to allege parallel conduct. These allegations are insufficient.

Of the forty-five Nuclear Defendants, Plaintiffs only identify allegedly parallel annual wage increases paid by *six* and specific wage rates paid by *two*. *See* Am. Compl. ¶¶ 339–40. And while Plaintiffs need not allege that each Defendant acted identically, Plaintiffs must plead uniformity and sufficient similarity to show parallel conduct. *SD3*, 801 F.3d at 427. Plaintiffs have not done so here. Indeed, Plaintiffs' complete lack of allegations as to the wages of *thirty-nine* Nuclear Defendants demonstrates the weakness of their claims. Plaintiffs are alleging an *industry-wide* conspiracy to fix wages over a *twenty-three-year* period in an industry with large swaths of publicly available information about compensation. Yet these threadbare allegations about compensation in two paragraphs of their Amended Complaint are all that Plaintiffs offer, even after Defendants directed Plaintiffs' attention to eighty publicly available CBAs full of compensation information, *see* Dkt. Nos. 303-4–303-22. These allegations do not plausibly allege the conspiracy Plaintiffs claim exists.

In fact, Plaintiffs' allegations do not suffice even under their cited precedent. In *Brown*, the plaintiffs alleged specific compensation data related to seven of the fifteen meat processor defendants—nearly half of them—despite the fact that the defendants' compensation data was *not* public. Corrected Compl. ¶ 318, *Brown*, No. 22-cv-02946 (D. Colo. Nov. 14, 2022), Dkt. No. 23-1. Here, by contrast, despite having access to publicly available CBAs, compensation data through pay transparency laws, and numerous unidentified witnesses, Plaintiffs allege only six of the forty-

14

five Nuclear Defendants had instances of parallel wages. And when class years and the numerous job titles at issue in the purported class are also considered, Plaintiffs allege less than 1% of the total wages paid to class members by Nuclear Defendants over the putative class period were parallel. No precedent supports a conclusion of parallel conduct with allegations such as these.

In an effort to fill this gap, Plaintiffs argue that allegations about how five Nuclear Defendants used the WTW survey also reflect parallel conduct. Opp. at 27. But as explained in Section II.A, *supra*, these examples cut against Plaintiffs' conspiracy theory by demonstrating that each of these Defendants relied on benchmarking through the WTW survey to make *independent* and *different* decisions about what to pay vis-à-vis the market. Thus, these allegations also do not reflect parallel conduct.[5]

Finally, Plaintiffs ask the Court to disregard Exhibit 3 of Defendants' opening brief, which shows different compensation practices among Defendants based on publicly available CBAs, on the ground that these CBAs were "never mentioned in the Complaint." Opp. at 30. But this is incorrect. *First*, the Amended Complaint references CBAs nearly 150 times. CBAs are not only *mentioned* in the Amended Complaint; they are at *the core* of Plaintiffs' alleged conspiracy. Therefore, Plaintiffs' argument that CBAs are not integral to the Amended Complaint is wrong.

---

[5] Further, in their Opposition, Plaintiffs do not address the points made in Defendants' Motion that many of their allegations undermine the existence of a wage-fixing conspiracy, and that Plaintiffs' Amended Complaint excised numerous allegations that reinforced the absence of "circumstances pointing toward a meeting of the minds" or a "conscious commitment to a common scheme designed to achieve an unlawful objective." *SD3*, 801 F.3d at 424 (citations omitted); Mot. at 20–21. Defendants' Motion highlighted allegations (and excised allegations) that set out that certain Defendants engaged in survey analysis with the aim of providing higher compensation than half of the market, Am. Compl. ¶ 317, and that Defendant STP devoted "[a] lot of time and effort" to analyzing WTW survey data to determine compensation, Compl. ¶ 242—effort that would not be required if they had reached a meeting of the minds to fix compensation. Mot. at 20–21. Plaintiffs' election not to contend with these counter-conspiratorial allegations concedes the point. *See, e.g.*, *Stenlund v. Marriott Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016) (collecting authority). Ultimately, it is Plaintiffs' burden to plead facts sufficient to "allay[] the suspicion" that they are "merely speculating a conspiracy into existence . . . ." *SD3*, 801 F.3d at 430. But, here, Plaintiffs' cited allegations confirm that suspicion. Not only do their survey analysis allegations suggest the absence of a conspiracy, but in opposing TVA's separate motion to dismiss, Plaintiffs acknowledge that such survey analysis is ubiquitous and "mirrors the compensation-setting process at private corporations." *See* TVA Opp. at 7.

15

*Second*, while Plaintiffs do not cite the CBAs, their allegations about parallel wages in paragraphs 339 and 340 of the Amended Complaint come from the same CBAs. Plaintiffs cannot rely on these CBAs to try to show parallel conduct and then argue Defendants cannot use the same documents to illustrate why Plaintiffs have not alleged parallel conduct. The doctrine of incorporation by reference is foreclose this very strategy of "artful pleading" "by failing to attach relevant documents." *Polley v. Nw. Univ.*, 560 F. Supp. 3d 1197, 1204 (N.D. Ill. 2021). Thus, materials referenced in pleadings "as circumstantial evidence of the alleged conspiracy" are "incorporated by reference." *See, e.g.*, *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 694 (N.D. Ohio 2025).[6]

### 3. Plaintiffs Fail To Allege "Plus Factors" That Plausibly Show A Conspiracy To Fix Compensation.

Because Plaintiffs fail to plausibly allege parallel conduct, "no discussion of 'plus factors' is required." *Jien*, 2020 WL 5544183, at *9. However, Plaintiffs' plus factor allegations also do not suggest that Defendants' conduct resulted from a compensation-fixing conspiracy.

*First*, Plaintiffs argue that Defendants had a motive to conspire because (1) of the nature of the nuclear power generation labor market, and (2) Defendants supposedly had an incentive to reduce labor costs. Opp. at 34–36. But, as explained in Defendants' opening brief, courts view these as weak plus factors because they could apply to a whole host of industries. Mot. at 31–34. Moreover, reducing costs can be procompetitive. *See, e.g.*, *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 21 (1979) (the "substantial lowering of costs . . . is of course potentially beneficial to both sellers and buyers").[7]

---

[6] The Court may also take judicial notice of these documents, a point Plaintiffs ignore. *See* Mot. at 8 n.5.

[7] Additionally, the conclusory assertion that Defendants had a common motive to conspire is overly facile in such a complex industry. As Defendants explained in their opening brief, their economic incentives differ widely according to their ownership structure and how applicable regulations impact their ability to profit.

*Second*, Plaintiffs argue that it was against Defendants' self-interest to share CBAs and aggregated WTW benchmarking surveys. Opp. at 37–38. But as explained in Section I, *supra*, CBAs are publicly available, and Plaintiffs do not challenge the contents of the WTW surveys. Therefore, Defendants were not sharing "confidential and commercially sensitive information," as Plaintiffs claim. Opp. at 37. Moreover, the uncontested procompetitive benefits of benchmarking, Mot. at 18, 35, are uniquely salient here. Americans depend upon a robust nuclear energy sector that is adequately staffed by qualified professionals. Benchmarking ensures that nuclear generation companies—which must compete with other industries for skilled workers—are paying enough to attract and retain the necessary talent to operate nuclear plants safely. Accordingly, sharing this information was entirely in line *with* Defendants' self-interest, not against it.

*Finally*, Plaintiffs argue that non-economic evidence—like statements attributed to former employees, Defendants' participation in trade associations, and sharing information through a third party—also suggests conspiracy. But the former employee statements refer to collaboration in the nuclear power industry to ensure the safe and efficient operation of nuclear power plants and the use of benchmarking surveys. *See supra*, Section II.A. None of this reflects cartel behavior. As to trade associations, Plaintiffs claim that NHRG meetings are not ordinary course trade association meetings because exchanges of sensitive compensation data occurred at these meetings. Opp. at 39 n.13. But as explained in Section I, *supra*, exchanging CBAs and WTW surveys or discussing or exchanging information contained therein does not amount to an exchange of sensitive compensation data.[8] Plaintiffs also argue that the presence of an "industry consultant" through

---

[8] Plaintiffs' Opposition asserts that each individual Defendant identified specifics about their own compensation during discussions about the WTW survey at NHRG meetings. Opp. at 51 n.20. But the cited allegation merely says: "If we were reviewing survey results, people might say 'That's in line with what we do.'" Am. Compl. ¶ 313. Saying "[t]hat's in line with what we do" comes nowhere close to disaggregating the WTW survey data. Rather, it merely confirms the accuracy of the benchmarking survey in identifying the general representation of pay ranges in the marketplace, as it should.

which Defendants exchanged CBAs is indicative of a conspiracy. Opp. at 39. But a third party hosting a website for publicly available information to be stored—even a password protected website—does not suggest an antitrust conspiracy.

Plaintiffs' "plus factors," therefore, do nothing to "nudge" Plaintiffs' allegation of agreement "across the goal line" to plausibly plead a compensation-fixing conspiracy. *SD3*, 801 F.3d at 452. Plaintiffs' per se compensation-fixing claim should be dismissed with prejudice.

## III.    PLAINTIFFS FAIL TO STATE A RULE OF REASON CLAIM

Plaintiffs fail to state a rule of reason claim based on alleged information exchange because they have not alleged a plausible relevant market or advanced plausible allegations of anticompetitive effects within the relevant market. Each defect independently requires dismissal.

### A.    Plaintiffs' Alleged Market Is Implausible.

Plaintiffs' alleged labor market is not facially plausible because it excludes countless firms that compete with Defendants for labor. And it is geographically overbroad because it is obvious that rural Pennsylvania is not in the same labor market as Arizona. To argue otherwise, Plaintiffs rely on conclusory allegations and misuse an economic tool called the hypothetical monopsonist test. Neither is sufficient to plausibly support Plaintiffs' market definition.

#### 1.    Plaintiffs' Allegations Do Not Substantiate Their Facially Implausible Labor Market.

To support their market definition arguments, Plaintiffs primarily rely on (1) factual allegations about a handful of roles, among dozens, in their proposed labor market, and (2) conclusory allegations claiming that these factual characteristics apply "across the board" in the nuclear industry. These allegations are not sufficient to plausibly support their alleged market.

Plaintiffs claim they have alleged "*across the board*, nuclear power generation jobs are highly specialized and require extensive training," Opp. at 43, but they have not actually alleged

*facts* to support this claim. Plaintiffs' allegations regarding specialization and training are in fact limited to three discrete positions: nuclear engineers, nuclear operators, and licensed nuclear officers. *See* Am. Compl. ¶¶ 243–44, 363. There are innumerable other occupations in the nuclear industry and in their putative class. Yet Plaintiffs lack any allegations about any other positions, aside from conclusory, sweeping claims.[9]

Similarly, Plaintiffs claim that outside employment would be an "imperfect substitute" for nuclear power workers because of the wage premium for nuclear power workers. Opp. at 43. But Plaintiffs have only alleged that a wage premium exists for a single position—nuclear operators. Am. Compl. ¶ 364. That falls well short of establishing that *all* employees in their putative class lack reasonable alternatives for employment outside of the industry because of a wage premium.

Finally, Plaintiffs argue that Defendants "were all competing for the same talent." Opp. at 6. But their only specific allegations concerning recruitment relate to two positions—nuclear operators and engineers. Am. Compl. ¶¶ 242–44; *see also id*. ¶ 374. The remainder of Plaintiffs' allegations concerning recruitment say nothing about other positions beyond unsupported and conclusory assertions. Plaintiffs have not plausibly alleged that Defendants were in fact competing for the same talent for all positions in the putative market.

Recognizing these weaknesses, Plaintiffs try to analogize this case with *Jien* and *Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001), but the allegations in those cases just spotlight what is missing here. In *Jien*, the plaintiffs alleged that 90% of the class was hourly employees, Am. Compl. ¶ 107, No. 19-cv-2521 (D. Md. Dec. 23, 2019), Dkt. No. 258, many of whom "do not

---

[9] As another example, Plaintiffs argue that security guards require specialized skills, "which include protecting radioactive material and preventing catastrophic radiation release," Opp. at 47, but those allegations do not appear in their Amended Complaint. If industry specialization is the reason that jobs outside of the industry are not viable substitutes for all employees, Plaintiffs have to plead facts to explain why that is the case for ***all*** employees to support their alleged market. They have not done so.

speak English and lack significant education" and therefore "have limited alternative options for employment." *Id*. ¶ 123. At the other end of the spectrum, in *Todd*, the class was composed of "nonunion managerial, professional, and technical employees," 275 F.3d at 195, who had each allegedly acquired industry-specific skills and expertise, *see id*. at 203. Neither *Jien* nor *Todd* addressed the plausibility of a labor market that combines both highly skilled, technical positions and less-skilled, lower-level positions, as Plaintiffs have done here. And the plaintiffs in both *Jien* and *Todd* also alleged key impediments to potential alternative employment opportunities that are not present here.

### 2.      Plaintiffs' Alleged Geographic Market Is Implausible.

Plaintiffs claim that a complaint may only be dismissed for a deficient geographic market if the alleged market is "implausibly narrow" rather than implausibly broad. Opp. at 48. But Plaintiffs cite no case to support the notion that a plaintiff may plead an implausibly broad market and avoid dismissal. For example, the Fourth Circuit explained in *Kolon* that dismissals at the pleading stage are *appropriate* for "glaring deficiencies." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 444 (4th Cir. 2011). In this case, Plaintiffs offer no factual basis for why a nationwide labor market is plausible—and common sense confirms it is not. *See Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2021 WL 3187668, at *12 (N.D. Ill. July 28, 2021) (it "defies logic" for low-skill workers to rely on a national labor market for their Section 1 labor monopsony claim).

Plaintiffs argue their putative nationwide market is plausible because they have alleged that "compensation for nuclear power generation workers [is] at identical or near identical levels, regardless of the region, state, county, or locality in which those workers are located." Am. Compl. ¶ 373; Opp. at 48. Publicly available CBAs confirm this conclusion is false. For example, in 2022, Assistant Nuclear Operators at DTE's Fermi 2 Plant in Michigan were paid $33.53 an hour, while

Associate Nuclear Plant Operators at FPL's St. Lucie & Turkey Point plants in Florida were paid $45.70 an hour—a differential of more than 35 percent. Dkt. Nos. 303-15 at 563, 572; 303-21 at 563. In 2019, PG&E nuclear plant operators in California were paid $42.18 per hour for their first six months of employment, and $42.59 per hour for the next six months, while nuclear plant operators at Talen Energy's Susquehanna facility in Pennsylvania were paid $53.58—a differential of more than 25 percent. Dkt. Nos. 303-12 at 197; 303-21 at 1112, 1122. As these examples illustrate, it is not plausible that all plants operating across the country with such significant wage differentials are in the same geographic market.

### 3.    Plaintiffs Misapply The Hypothetical Monopsonist Test ("HMT") To Try To Salvage Their Facially Implausible Market.

To compensate for the gaps in their factual allegations, Plaintiffs misapply the HMT. The HMT is an iterative tool that should start with the smallest possible set of products that could make up a relevant market (e.g., an individual job title) and then expand to larger sets of products until the relevant market is identified. *See Fed. Trade Comm'n v. Advoc. Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016). This requirement ensures that the relevant market does not become meaningless for purposes of assessing the presence—or absence—of market power. As an illustrative example: the HMT would be satisfied for a putative market composed of all modes of transportation (e.g., walking, biking, cars, trains, airplanes), but such a market would provide no value in antitrust analysis because air travel and walking are not substitutes by any measure.

The purpose of defining relevant markets using the HMT is to identify the set of firms that are capable of substantially constraining each other's behavior. *Advoc. Health Care Network*, 841 F.3d at 469; *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 59 (D.D.C. 2011) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). In labor markets, if companies within a particular industry meaningfully compete for labor with employers in other industries, outside

employers must be part of the relevant market. In this case, Plaintiffs have not alleged facts that plausibly suggest firms within the nuclear power industry do not substantially compete with other employers—presumably because it is obvious that many positions in the alleged market have different alternative employers available outside of the nuclear industry.

Under Plaintiffs' incorrect formulation of the HMT, "the test asks, if a hypothetical company controlling ***all jobs*** *in a particular industry* reduced compensation five percent below competitive levels, would so many workers quit (and move to other industries) that the five percent reduction in compensation would be unprofitable?" Opp. at 42 (emphasis added). Plaintiffs argue their putative market satisfies this test because they alleged: "A cartel that controlled all of the Relevant Market, as the Nuclear Defendants and coconspirators collectively do here, could profitably suppress compensation paid to nuclear power generation workers to levels below those that a competitive labor market would set." Am. Compl. ¶ 359; Opp. at 42. But that is just a conclusory reformulation of Plaintiffs' version of the test with no supporting factual allegations.

Applying the HMT to different, narrower categories of employees at the outset—as the HMT methodology requires—illustrates the flaws in Plaintiffs' approach. For example, applying the HMT to a putative labor market for security guards would invariably lead to the conclusion that Defendants compete with countless employers in other industries to hire and retain security guards. Because Plaintiffs' approach ignores narrower labor markets that would satisfy the HMT, they have not properly applied the test. *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 988 (C.D. Cal. 2012) (the "failure even to consider the possibility of a narrower product market is also contrary to the [HMT] approach"). Plaintiffs strain to exclude obvious employers for many positions by lumping employees with significantly different wages and alternative employment options into a single labor market. Under this flawed approach, even if there was a

22

"mass exodus" of lower-wage employees from the nuclear power industry in response to a change in wages, the HMT could still be satisfied if enough highly paid, skilled employees were retained at lower wages. Accordingly—by design—Plaintiffs' application of the HMT provides no insight into the reasonable substitute employers for many employees and sheds no light on whether Defendants could plausibly exercise market power when setting wages for most employees.

### B.    Plaintiffs Have Not Plausibly Alleged Anticompetitive Effects.

In addition to pleading a properly defined market, Plaintiffs must also plausibly allege that Defendants' conduct had anticompetitive effects that had an "impact on competition as a whole within the relevant market." *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991). "An inquiry into the lawfulness of the restraint begins 'by identifying the ways in which a challenged restraint might possibly impair competition.'" *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002) (citation omitted). "After identifying the type of possible harm to competition alleged," the court must "determine whether that harm is not only possible but likely and significant." *Id.* Assessed through this lens, Plaintiffs' allegations fall short.

*First*, to support their claim that they have directly pled anticompetitive effects, Plaintiffs point to a statement from a former Exelon labor manager that the exchange of compensation data with competitors "allowed Exelon to avoid paying higher hourly wages than it actually paid its nuclear power generation employees." Am. Compl. ¶ 249. But a single witness's claim about the effect of an information exchange on one company's historical compensation practices does not plausibly plead market-wide anticompetitive effects. Plaintiffs attempt to excuse this deficiency by citing *Robertson* to argue that "the bar for pleading actual adverse effects on competition is low." Opp. at 49. But in *Robertson*, the plaintiffs asserted "facts which plausibly suggest[ed] that the [challenged conduct] harmed market competition." *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 290 (4th Cir. 2012). Specifically, the plaintiffs alleged that two real estate multiple

listing services ("MLS") had market power because they made "membership in the MLS necessary for a brokerage . . . to successfully compete," and they adopted rules to "exclude lower-cost brokerages from effectively competing in the local real estate markets." *Id.* at 290–91. The inferential leap that is required to connect Plaintiffs' allegations in this case to market-wide harm was not needed in *Robertson*, where the plaintiffs had alleged facts suggesting an entire class of competitors had been excluded from the market. *See Dickson*, 309 F.3d at 207 ("Theorizing about conceivable impairments of competition does not, of course, prove that any such impairment has occurred or is likely, or much less is substantial in magnitude.") (internal quotation marks omitted) (citation omitted).

*Second*, Plaintiffs also assert that "data" provides direct evidence of the anticompetitive effects of the alleged information exchange. Opp. at 49. But Plaintiffs' "data" consists of only a handful of similar wage increases over the course of a twenty-three-year class period, involving only six of the forty-five Nuclear Defendants. *See* Section II.B.2, *supra*. These isolated examples of similarity in wages do not demonstrate anticompetitive effects at all, let alone market-wide anticompetitive effects. *See Rock v. Nat'l Collegiate Athletic Ass'n,* 928 F. Supp. 2d 1010, 1024 (S.D. Ind. 2013) (plaintiff failed to allege anticompetitive effects "across divisions and in all sports" because allegations of harm only referenced "three Division I men's basketball teams and one Division I FBS football team"); *Coley v. Nat'l Collegiate Athletic Ass'n*, 792 F. Supp. 3d 634, 648 (E.D.N.C. 2025) ("the anecdotal experiences of two Division I college football players do not show that the Challenged Bylaws have a substantial anticompetitive effect on the labor market for Division I college football players").

*Third*, Plaintiffs insist they also indirectly pled anticompetitive effects by "alleg[ing] that Nuclear Defendants and coconspirators have market power" and they "control 100 percent of the

Relevant Market." Opp. at 50. But a properly defined relevant market is an essential predicate to alleging anticompetitive effects based on market shares. *Jien*, 2020 WL 5544183, at *10. Even though Plaintiffs have alleged all the companies in the nuclear power industry were involved in the alleged conspiracy, if the appropriate relevant market is something other than the nuclear power industry, then Defendants would not control 100 percent of the relevant market (and might actually make up much less). Because Plaintiffs' relevant market is fundamentally deficient, their market power arguments necessarily fail as well.

Plaintiffs also point to *Todd*, arguing that "[t]he nature of the compensation data exchanged between Defendants made it highly likely that it would be used to suppress compensation." Opp. at 51. But Plaintiffs ignore a key distinction between this case and *Todd*: there, the class was limited to ***non***-union employees and wage "information was not disclosed to the public nor to the employees whose salaries were the subject of the exchange." *Todd*, 275 F.3d at 213. Not so here. The information that was allegedly exchanged between Defendants was made available to, or generated in conjunction with, unions and their members, among many others. Mot. at 44–45; Section I, *supra*. That is a critical distinction because "[a] court is . . . more likely to approve a data exchange where the information is made public." *Todd*, 275 F.3d at 213. Plaintiffs do not and cannot explain how the exchange of publicly available information would suppress competition. Indeed, they do not cite a single case in which a court has held that the exchange of publicly available information can plausibly reduce competition.[10]

---

[10] The two cases Plaintiffs do cite are inapposite; both hold only that public statements made by a defendant may be considered circumstantial evidence of an alleged conspiracy. *In re Pork Antitrust Litig*., 781 F. Supp. 3d 758, 820 (D. Minn. 2025) ("Though the Court does not completely discount Defendants' legitimate business reasons for some of their public statements, the Court nevertheless finds that as a whole Defendants' public statements support an inference of a conspiracy."); *In re Domestic Airline Travel Antitrust Litig*., 691 F. Supp. 3d 175, 214–15 (D.D.C. 2023) ("[I]n the instant case, where the class . . . presents independent evidence tending to exclude an inference that the defendants acted independently, then, it may use these public communications for whatever additional evidence of conspiracy they may provide.") (internal quotation marks omitted) (brackets omitted).

## IV.    PLAINTIFFS' CLAIMS ARE TIME-BARRED

Plaintiffs' Opposition confirms their claims are untimely. Their continuing violation theory fails because they allege no injury within the four-year limitations period, relying instead on allegations of generalized overt acts during the class period. Plaintiffs' fraudulent concealment theory fares no better under Rule 9(b)'s heightened pleading standard because none of the alleged "affirmative acts" evidence fraudulent intent.

### A.    Plaintiffs Cannot Satisfy The Continuing Violation Doctrine With Generalized, Undated Allegations.

Despite acknowledging that the continuing violation doctrine requires a new overt act causing injury within the limitations period, *see* Opp. at 56, Plaintiffs fail to allege either. Crucially, Plaintiffs do not address, and therefore concede, Defendants' argument that the Amended Complaint fails to allege a single injury to any named Plaintiff during the limitations period. *See id.* at 56–57. That ends the inquiry, because the continuing violation doctrine "does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitation period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997). Furthermore, none of the purported overt acts highlighted in the Opposition bear a specific date. Opp. at 56–57. Plaintiffs' contention that it is sufficient to allege that acts occurred "until the filing of the Complaint," *id.* at 56, is wrong: "generalized, undated allegations are insufficient to meet [the continuing violation doctrine's] pleading requirement." *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 351 (D. Vt. 2010). Plaintiffs do not meaningfully respond to this argument. *See* Mot. at 51–53.

### B.    Plaintiffs Fail To Plead Affirmative Acts Of Fraudulent Concealment Or Due Diligence.

Plaintiffs also fail to demonstrate that Defendants fraudulently concealed the alleged conspiracy in a manner that prevented Plaintiffs from discovering it.

26

### 1.    Plaintiffs Do Not Allege Affirmative Acts That Imply Fraud.

Plaintiffs seek to reframe everyday business practices as affirmative acts of fraudulent concealment, *see* Opp. at 53–55, but overlook that Rule 9(b) requires facts "sufficient to infer that the defendants performed the acts *with the intent to* prevent or deceive others from discovering their scheme." *Scharpf v. Gen. Dynamics Corp.*, 137 F.4th 188, 201 (4th Cir. 2025). None of the purported affirmative acts Plaintiffs allege come close to meeting this standard.

*Separate HR Departments*. Plaintiffs point to a single unidentified witness who alleges that one Defendant had a "separate compensation function" that "collaborated" with other nuclear companies. *See* Opp. at 53–54 (quoting Am. Compl. ¶ 396). But in evaluating claims of concealment, "[c]ourts should first consider whether the affirmative acts themselves imply fraudulent intent." *Scharpf*, 137 F.4th at 201. Maintaining a separate HR department for a particular business unit is a far cry from conduct like "backdat[ing] documents that would have revealed [the] conspiracy." *Id.*

*Password-Protected Data*. Plaintiffs contend Defendants' alleged use of passwords was an "affirmatively fraudulent act" intended to conceal the sharing of compensation data. Opp. at 54. But Plaintiffs allege that Rick Habegger and the NHRG—not Defendants—created the password-protection system. *See* Am. Compl. ¶¶ 272, 400–01. Moreover, companies regularly use passwords in ordinary course activities that have no indicia of fraud (e.g., social media accounts, job application sites). Choosing to password-protect something does not "imply fraudulent intent." *Scharpf*, 137 F.4th at 201. Further, courts must "consider whether the underlying violation—the violation that the affirmative acts are intended to cover up—is obviously illegal" when inferring fraudulent intent. *See id.* Exchanging information is not inherently unlawful (as Plaintiffs acknowledge, Opp. at 51). That is why the Fourth Circuit has emphasized that with "particularly close questions of law," such as information exchanges, "it is more difficult to infer that an

27

affirmative act was intended to avoid detection, as defendants may have not even realized their actions were illegal." *Scharpf*, 137 F.4th at 201.

*Communications Between Defendants*. Plaintiffs rely on *Scharpf* to argue that non-public meetings and phone calls establish fraudulent intent. *See* Opp. at 54–55. But *Scharpf* concerned an "agreement that [Defendants] deliberately kept non-ink-to-paper." 137 F.4th at 200. Plaintiffs make no such allegation here and instead acknowledge that Defendants communicated over email. Am. Compl. ¶¶ 15, 49, 82, 90, 92, 106, 113, 122, 153, 163, 177, 251, 283, 322–36. Even *Scharpf* recognized that unwritten communications, which could potentially constitute affirmative acts, do not necessarily reflect intent to defraud. *See* 137 F.4th at 201 ("For allegations of unwritten agreements, it will sometimes be difficult to infer fraudulent intent . . . ."). Rule 9(b) requires, but Plaintiffs do not offer, particularized allegations of fraudulent intent.

*Public Compensation Statements*. Finally, general statements on Defendants' websites about competitive compensation are insufficient to plausibly plead fraudulent concealment. Plaintiffs do not explain how these statements, were inaccurate or related to the alleged conspiracy, as none were specific to compensation *in the nuclear industry* and thus also address industries not subject to the alleged conspiracy. *See* Am. Compl. ¶ 394. Plaintiffs' reliance on *In re Animation Workers Antitrust Litigation* is misplaced because the court there identified affirmative acts of fraudulent concealment based on statements made via email and communicated through managers to employees that provided explanation for compensation decisions without any mention of the alleged conspiracy. 123 F. Supp. 3d 1175, 1200 (N.D. Cal. 2015).[11] No such conduct is alleged

---

[11] Moreover, the fraudulent concealment allegations in *In re Animation Workers* were buoyed because "Plaintiffs have made specific factual allegations with an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations," detail entirely lacking in Plaintiffs' Amended Complaint. 123 F. Supp. 3d at 1202 (internal quotation marks omitted) (brackets omitted).

here. Because the alleged compensation statements here are neither deceptive nor specific to nuclear power, they cannot possibly support Plaintiffs' fraudulent concealment theory.

### 2.    Plaintiffs Fail To Allege Due Diligence.

Plaintiffs concede that the Court may conclude that Plaintiffs failed to exercise due diligence if they cannot establish they were *unaware* of facts that should have excited further inquiry. *See* Opp. at 55–56. Here, nearly every aspect of the alleged conspiracy was public—from dozens of publicly available CBAs to the NHRG's website outlining meeting topics. *See* Mot. at 54–55. Plaintiffs attempt to downplay this wealth of public information, Opp. at 55, citing *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535 (4th Cir. 2019), to argue there was a lack of sufficient notice to trigger investigation. But in *Edmonson*, the "record [was] devoid of any reason for a Plaintiff to look at [relevant] records." *Id.* at 555 (citation omitted). Here, by contrast, the very CBAs Plaintiffs claim demonstrate parallel wage increases were publicly available. Plaintiffs offer no explanation for how publicly available CBAs suffice to establish the existence of a conspiracy yet were insufficient to put them on notice of that same alleged conspiracy. Because Plaintiffs did not adequately conduct due diligence, their fraudulent concealment theory fails.

### CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' Amended Complaint with prejudice.

Date: March 16, 2026

Respectfully submitted,

/s/ Arthur E. Schmalz

(signed by Catie Ventura with permission of Arthur E. Schmalz)
Arthur E. Schmalz (D. Md. Bar No. 20359)
Wendell Taylor (*pro hac vice*)
Leslie Kostyshak (*pro hac vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (202) 955-1500
aschmalz@hunton.com
wtaylor@hunton.com
lkostyshak@hunton.com

Richard B. Walsh (*pro hac vice*)
Winthrop B. Reed III (*pro hac vice*)
Edward T. Pivin (*pro hac vice*)
LEWIS RICE LLC
600 Washington Avenue, Suite 2500
St. Louis, MO 63101
Phone: (314) 444-7600
rwalsh@lewisrice.com
wreed@lewisrice.com
epivin@lewisrice.com

*Attorneys for Defendants Ameren Corporation, Union Electric Company (d/b/a Ameren Missouri) and Ameren Services Company*

/s/ Catie Ventura

Catie Ventura (D. Md. Bar No. 19848)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 389-5000
Fax: (202) 389-5200
catie.ventura@kirkland.com

Daniel E. Laytin, P.C. (*pro hac vice*)
Christa C. Cottrell, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Phone: (312) 862-2000
Fax: (312) 862-2200
dlaytin@kirkland.com
ccottrell@kirkland.com

*Attorneys for Defendants Constellation Energy Corporation and Constellation Energy Generation, LLC*

/s/ Stacey VanBelleghem

(signed by Catie Ventura with permission of Stacey VanBelleghem)
Stacey VanBelleghem (D. Md. Bar No. 28893)
Marguerite Sullivan (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Phone: (202) 637-2200
stacey.vanbelleghem@lw.com

/s/ Douglas E. Litvack

(signed by Catie Ventura with permission of Douglas E. Litvack)
Douglas E. Litvack (D. Md. Bar No. 31773)
Jariel A. Rendell (D. Md. Bar No. 32066)
Joshua J.W. Armstrong (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001
Phone: (202) 639-6000
Fax: (202) 639-6066

30

marguerite.sullivan@lw.com

Lawrence E. Buterman (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Phone: (212) 906-1200
lawrence.buterman@lw.com

Meaghan Thomas-Kennedy (*pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Phone: (415) 391-0600
meaghan.thomas-kennedy@lw.com

*Attorneys for Defendant Arizona Public Service Company*

_____
/s/ Lindsey T. Levy

(signed by Catie Ventura with permission of Lindsey T. Levy)
Lindsey T. Levy (D. Md. Bar No. 22144)
Joshua M. Goodman (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 739-3000
Fax: (202) 739-3001
lindsey.levy@morganlewis.com
joshua.goodman@morganlewis.com

R. Brendan Fee (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market St.
Philadelphia, PA 19103
Phone: (215) 963-5136
Fax: (215) 963-5001
brendan.fee@morganlewis.com

*Attorneys for Defendants DTE Energy Company, DTE Electric Company, and DTE Energy Corporate Services, LLC*

dlitvack@jenner.com
jrendell@jenner.com
jarmstrong@jenner.com

Nicole A. Allen (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Phone: (312) 222-9350
Fax: (312) 527-0484
nallen@jenner.com

*Attorneys for Defendants American Electric Power Company Inc., American Electric Power Service Corporation, and Indiana Michigan Power Company*

_____
/s/ Nicholas J. Giles

(signed by Catie Ventura with permission of Nicholas J. Giles)
Nicholas J. Giles (Fed. Bar No. 12725)
J. Brent Justus (*pro hac vice*)
Rebecca Jewel Watson (*pro hac vice*)
George E. Rudebusch (*pro hac vice*)
MCGUIRE WOODS LLP
800 East Canal Street
Richmond, VA 23219
Phone: (804) 775-1018
Fax: (804) 698-2026
ngiles@mcguirewoods.com
bjustus@mcguirewoods.com
rwatson@mcguirewoods.com
grudebusch@mcguirewoods.com

Megan S. Lewis (*pro hac vice*)
MCGUIRE WOODS LLP
888 16th Street NW, Suite 500
Washington, DC 20006
Phone: (202) 857-1700
Fax: (202) 857-1737
mlewis@mcguirewoods.com

*Attorneys for Defendants Dominion Energy, Inc., Dominion Energy Services, Inc., and Virginia Electric and Power Company*

/s/ Alvin Dunn

(signed by Catie Ventura with permission of Alvin Dunn)
Alvin Dunn (D. Md. Bar No. 29068)
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
Phone: (202) 663-8000
Fax: (202) 663-8007
alvin.dunn@pillsburylaw.com

Jacob R. Sorensen (*pro hac vice*)
Lee Brand (*pro hac vice*)
PILLSBURY WINTHROP SHAW
PITTMAN LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111
Phone: (415) 983-1000
Fax: (415) 983-1200
jake.sorensen@pillsburylaw.com
lee.brand@pillsburylaw.com

*Attorneys for Defendants Energy Northwest, Pacific Gas & Electric Company, and PG&E Corporation*

/s/ Chantale Fiebig

(signed by Catie Ventura with permission of Chantale Fiebig)
Chantale Fiebig (D. Md. Bar No. 31983)
Meagan K. Bellshaw (D. Md. Bar No. 31992)
WEIL, GOTSHAL & MANGES LLP
2001 M Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 682-7000
Facsimile: (202) 857-0940
chantale.fiebig@weil.com
meagan.bellshaw@weil.com

Diane P. Sullivan (*pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
diane.sullivan@weil.com

*Attorneys for Defendants Duke Energy Corporation, Duke Energy Carolinas, LLC, Duke Energy Business Services, LLC, and Progress Energy, Inc.*

/s/ Amanda Flug Davidoff

(signed by Catie Ventura with permission of Amanda Flug Davidoff)
Amanda Flug Davidoff (Bar No. 20125)
Daniel J. Richardson (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue
Washington, DC 20006
davidoffa@sullcrom.com
richardsond@sullcrom.com
Telephone: (202) 956-7500

Kyle W. Mach (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP

/s/ Philip M. Andrews

(signed by Catie Ventura with permission of Philip M. Andrews)
Philip M. Andrews (Federal Bar No. 00078)
Justin A. Redd (Federal Bar No. 18614)
KRAMON & GRAHAM, P.A.
750 East Pratt Street, Suite 1100
Baltimore, MD 21202
Phone: (410) 752-6030
Fax: (410) 539-1269
pandrews@kg-law.com
jredd@kg-law.com

Sanford I. Weisburst (admitted *pro hac vice*)

32

550 Hamilton Avenue
Palo Alto, CA 94301
machk@sullcrom.com
Telephone: (650) 461-5600

Nikko B. Price (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
pricenb@sullcrom.com
Telephone: (212) 558-4000

*Attorneys for Defendants FirstEnergy Corp.
and FirstEnergy Service Company*

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
295 Fifth Avenue
New York, NY 10016
Phone: (212) 849-7000
Fax: (212) 849-7100
sandyweisburst@quinnemanuel.com

Michael D. Bonanno (admitted *pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
555 13th Street NW, Suite 600
Washington, D.C. 20004
Phone: (202) 538-8000
Fax: (202) 538-8100
mikebonanno@quinnemanuel.com

*Attorneys for Defendants Entergy
Corporation, Entergy Nuclear Operations,
Inc., and Entergy Operations, Inc.*

/s/ Jonathan I. Gleklen

(signed by Catie Ventura with permission of
Jonathan I. Gleklen)
Jonathan I. Gleklen (D. Md. Bar No. 21350)
Sonia K. Pfaffenroth (*pro hac vice*)
Ryan Z. Watts (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Avenue NW
Washington, DC 20001-3743
Phone: (202) 942-5000
Fax: (202) 942-5999
jonathan.gleklen@arnoldporter.com
sonia.pfaffenroth@arnoldporter.com
ryan.watts@arnoldporter.com

C. Scott Lent (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019-9710
Phone: (212) 836-8000
Fax: (212) 836-8689
scott.lent@arnoldporter.com

/s/ Paul A. Solomon

(signed by Catie Ventura with permission of
Paul A. Solomon)
Paul A. Solomon (D. Md. Bar No. 19920)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue NW
Washington, DC 20005
Phone: (202) 371-7000
Fax: (202) 393-2760
paul.solomon@skadden.com

Karen Hoffman Lent (*pro hac vice*)
Boris Bershteyn (*pro hac vice*)
Thomas J. Smith (*pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
karen.lent@skadden.com
boris.bershteyn@skadden.com
thomas.smith@skadden.com

33

*Counsel for Defendants Public Service Enterprise Group Incorporated, PSEG Power LLC, PSEG Nuclear LLC, and PSEG Services Corporation*

*Attorneys for Defendants NextEra Energy, Inc., NextEra Energy Resources, LLC, and Florida Power & Light Company*

*/s/ Robert K. Hur*

(signed by Catie Ventura with permission of Robert K. Hur)
Robert K. Hur (D. Md. Bar No. 04761)
M. Sean Royall (*pro hac vice*)
Robert M. Cooper (*pro hac vice*)
Emily Blackburn (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, DC 20006
Phone: (202) 737-0500
rhur@kslaw.com
sroyall@KSLAW.com
rcooper@kslaw.com
eblackburn@kslaw.com

Ross E. Elfand (*pro hac vice*)
Sean Murray (*pro hac vice*)
KING & SPALDING LLP
1290 Avenue of the Americas, 14th Floor
New York, NY 10104
Phone: (212) 556-2100
relfand@kslaw.com
smurray@kslaw.com

*Attorneys for Defendants The Southern Company and Southern Nuclear Operating Company, Inc.*

*/s/ William S. D. Cravens*

(signed by Catie Ventura with permission of William S. D. Cravens)
William S. D. Cravens (D. Md. Bar No. 17342)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
Phone: (202) 739-3000
Fax: (202) 739-3001
william.cravens@morganlewis.com

Brian C. Rocca (*pro hac vice*)
Rishi P. Satia (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Phone: (415) 442-1000
Fax: (415) 442-1001
brian.rocca@morganlewis.com
rishi.satia@morganlewis.com

*Attorneys for Defendant Southern California Edison Company*

*/s/ Indira K. Sharma*

(signed by Catie Ventura with permission of Indira K. Sharma)
Indira K. Sharma (D. Md. Bar No. 28269)
Christy A. Matelis (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
401 9th Street NW, Suite 1000
Washington, DC 20004
Phone: (202) 274-2950

*/s/ Colin S. Harris*

(signed by Catie Ventura with permission of Colin S. Harris)
Colin S. Harris (D. Md. Bar No. 30603)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004-2541
Phone: (202) 739-3000
Fax: (202) 739-3001
colin.harris@morganlewis.com

34

indira.sharma@troutman.com
christy.matelis@troutman.com

Bradley C. Weber (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
Phone: (214) 740-8497
brad.weber@troutman.com

Jason D. Evans (*pro hac vice*)
Anna C. Yarbrough (*pro hac vice*)
TROUTMAN PEPPER LOCKE LLP
301 S. College Street, 34th Floor
Charlotte, North Carolina 28202
Phone: (704) 998-4050
jason.evans@troutman.com
anna.yarbrough@troutman.com

*Attorneys for Defendant Tennessee Valley Authority*

Daniel S. Savrin (*pro hac vice*)
Noah J. Kaufman (*pro hac vice*)
Stephen LaBrecque (*pro hac vice*)
Caitlin Zeytoonian (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
Phone: (617) 341-7700
Fax: (617) 341-7701
daniel.savrin@morganlewis.com
noah.kaufman@morganlewis.com
stephen.labrecque@morganlewis.com
caiti.zeytoonian@morganlewis.com

*Attorneys for Defendant STP Nuclear Operating Company*

---

/s/ Brian P. Quinn

(signed by Catie Ventura with permission of Brian P. Quinn)
Brian P. Quinn (D. Md. Bar No. 31847)
Emily Murphy (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
Phone: (202) 383-5300
bquinn@omm.com
emurphy@omm.com

Michael F. Tubach (*pro hac vice*)
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Phone: (415) 984-8700
mtubach@omm.com

Alexandra Wolter (*pro hac vice*)
O'MELVENY & MYERS LLP
400 S. Hope Street, 19th Floor
Los Angeles, CA 90071
Phone: (213) 430-6000

---

/s/ Jacquelyn E. Fradette

(signed by Catie Ventura with permission of Jacquelyn E. Fradette)
Jacquelyn E. Fradette (D. Md. Bar No. 20884)
Carrie C. Mahan (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
Phone: (202) 736-8000
Fax: (202) 736-8711
jfradette@sidley.com
carrie.mahan@sidley.com

Yvette Ostolaza (*pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Phone: (214) 981-3300
Fax: (214) 981-3400
yvette.ostolaza@sidley.com

Benjamin R. Nagin (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019
Phone: (212) 839-5300

awolter@omm.com

*Attorneys for Defendant Wolf Creek Nuclear Operating Corporation*

/s/ Stephen J. Marshall

(signed by Catie Ventura with permission of Stephen J. Marshall)
Stephen J. Marshall, Esq (Fed Bar No.: 29632)
Bruce S. Schoenberger (*pro hac vice*)
Samuel R. Harden (*pro hac vice*)
Ali A. Nour (*pro hac vice*)
The B&O Building
Two North Charles Street, Suite 600
Baltimore, Maryland 21201
Phone: (410) 752-8700
Fax: (410) 752-6868
smarshall@fandpnet.com
bschoenberger@gkplaw.net
samharden@gkplaw.net
anour@gkplaw.net

*Attorneys for Defendant Accelerant Technologies LLC*

Fax: (212) 839-5599
bnagin@sidley.com

*Attorneys for Defendants Vistra Corp. and Luminant Generation Company, LLC*

/s/ Robert S. Brennen

(signed by Catie Ventura with permission of Robert S. Brennen)
Robert S. Brennen (Federal Bar No. 04499)
MILES & STOCKBRIDGE P.C.
100 Light Street
Baltimore, Maryland 21202
Phone: (410) 385-3653
rbrennen@milesstockbridge.com

Kevin J. Orsini (*pro hac vice*)
Omid H. Nasab (*pro hac vice*)
Brittany L. Sukiennik (*pro hac vice*)
CRAVATH, SWAINE & MOORE LLP
375 Ninth Avenue
New York, NY 10001
Phone: (212) 474-1000
Fax: (212) 474-3700
korsini@cravath.com
onasab@cravath.com
bsukiennik@cravath.com

*Attorneys for Defendants Xcel Energy Inc., Northern States Power Company, and Xcel Energy Services Inc.*

36

**CERTIFICATE OF ELECTRONIC SERVICE**

I hereby certify that the foregoing pleading was filed on this, the 16th day of March, 2026, with the Clerk of the Court via ECF, and that service on all counsel of record is accomplished by electronic means.

/s/ Catie Ventura
Catie Ventura (D. Md. Bar # 19848)