**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

LEO DORRELL, *et al.*,

    *Plaintiffs,*

    v.

CONSTELLATION ENERGY
CORPORATION, *et al.*,

    *Defendants.*

Case No. 25-cv-2251-ABA

**MEMORANDUM OPINION**

In this putative class action, Plaintiffs Leo Dorrell, John Dunn, and Davion Chapel allege that the companies comprising the U.S. nuclear power generation industry have conspired to suppress the wages they pay their employees. Plaintiffs assert two claims under the Sherman Antitrust Act. In Count I, they allege that Defendants agreed to fix and suppress the amounts paid in compensation, giving rise to a *per se* horizontal price fixing claim. Count II alleges an information-sharing agreement: that Defendants agreed to exchange "timely, competitively sensitive, and non-public information about the compensation being paid or to be paid," which Plaintiffs contend gives rise to a rule-of-reason claim because Defendants possess market power in the labor market for employment in nuclear power generation. Plaintiffs seek to represent a class of nearly every individual employed in nuclear power generation in the United States since 2003.

Defendants have collectively filed an Omnibus Motion to Dismiss both counts, arguing that the complaint fails to state a claim and is barred by the Sherman Act's four-year statute of limitations. Several individual Defendants or groups of Defendants have filed other motions to dismiss: Defendant Tennessee Valley Authority ("TVA") for lack

1

of subject matter jurisdiction; several Defendants who do not operate in Maryland for lack of personal jurisdiction; and others for failure to state a claim making arguments similar to, but more specific than, those outlined in the Omnibus Motion.

For the reasons explained below, both counts in the Complaint will be dismissed because they are untimely and do not plausibly support application of the continuing violation or fraudulent concealment exceptions, at least as presently alleged. Count I will be dismissed for the additional reason that the complaint does not allege facts supporting a per-se wage fixing claim. (The Court does not decide at this juncture whether, if timely, Count II states a claim on which relief can be granted.) Those dismissals are without prejudice.

Because the dismissal as to the Omnibus Motion is without prejudice, the Court also considers the other motions to dismiss to the extent any of them give rise to a dismissal with prejudice. Only TVA's motion does, and only as to Count II. Accordingly, the Court will dismiss all claims without prejudice except for Plaintiffs' information-exchange claims against TVA, which will be dismissed with prejudice.

## Table of Contents

I.    Background................................................................................................4
      A.    The nuclear energy industry..............................................................4
      B.    Alleged anticompetitive conduct......................................................6
            i.    Collective bargaining agreements............................................7
            ii.   Compensation Comparison Reports.........................................8
            iii.  Meetings....................................................................................8
            iv.   Direct communication..............................................................9
            v.    Suppression of compensation.................................................10
      C.    Procedural history..............................................................................11
II.   Legal standards.........................................................................................12
      A.    Rule 12(b)(6).....................................................................................12

B.     Rule 12(b)(1) ................................................................................. 12

C.     Rule 12(b)(2) ................................................................................. 13

III.   Omnibus Motion to Dismiss ..................................................................... 14

     A.     Count I ......................................................................................... 15

        i.     Direct evidence ...................................................................... 17

        ii.     Circumstantial evidence ........................................................ 21

     B.     Count II ....................................................................................... 35

     C.     Statute of limitations ................................................................... 37

        i.     Named Plaintiffs' injuries ..................................................... 38

        ii.     Continuing violation doctrine ................................................ 41

        iii.     Fraudulent concealment ........................................................ 42

     D.     With vs. without prejudice ........................................................... 49

IV.   Tennessee Valley Authority's Motion ....................................................... 51

     A.     Sovereign immunity ..................................................................... 52

     B.     Antitrust immunity ...................................................................... 55

V.   Nonresident defendants .............................................................................. 59

VI.   Other motions to dismiss for failure to state a claim ............................... 62

     A.     FirstEnergy Defendants ............................................................... 63

     B.     Southern California Edison Company ......................................... 63

     C.     Bankruptcy Defendants ............................................................... 66

VII. Conclusion .................................................................................................. 69

## I.   BACKGROUND[1]

### A.   The nuclear energy industry

As noted above, there are three Named Plaintiffs (Dorrell, Dunn, and Chapel) who have filed this case, on behalf of a putative class. The Named Plaintiffs were employed in the nuclear power industry by four of the Defendant companies (Constellation Energy Generation, LLC, Entergy Nuclear Operations, Inc., Virginia Electric & Power Company, and Florida Power & Light). ECF No. 306 (hereinafter, "Am. Compl.") ¶¶ 25–27. They worked at those companies at some point "during the Class Period"—meaning between 2003 and the present—but do not specify when. *Id.* Plaintiffs have sued not just the companies they worked for, but a total of 45 entities involved in the production of nuclear power in the United States (the "Nuclear Defendants") and one consulting firm, Accelerant Technologies LLC ("Accelerant"). *Id.* ¶ 2. Plaintiffs also identify 13 "agent[] and co-conspirator[]" companies that are not defendants but allegedly furthered the antitrust conspiracy. *Id.* ¶¶ 190–206. The Nuclear Defendants operate most, but not all, of the 54 nuclear power plants in the United States (those plants not operated by the Nuclear Defendants are operated by certain alleged co-conspirator companies). *Id.* ¶¶ 216–17. Some nuclear power companies are owned by private investors, some are publicly owned, and some are jointly held by private investors and public entities. *Id.* ¶ 218. The number of participants in the nuclear power industry is limited by the high cost of building and operating nuclear plants, as well as

---

[1] At the pleadings stage, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

by the complex regulatory environment overseen by the Nuclear Regulatory Commission ("NRC"). *Id.* ¶¶ 343–44.

Plaintiffs seek to represent a class comprised of "workers employed in nuclear power generation by the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States." *Id.* ¶ 225. This encompasses both employees paid hourly and those who receive an annual salary. *Id.* ¶ 231. The proposed class excludes current or former employees of Defendants in the following positions: "human-resources executives, labor managers, human-resources managers, human-resources staff, human-resources officers, human-resources directors, and bookkeepers." *Id.* ¶ 411. Roughly one-third of the proposed class are union members. *Id.* ¶ 227. The International Brotherhood of Electrical Workers ("IBEW") represents most, but not all, of the union member subset. *Id.* Plaintiffs allege that the Nuclear Defendants' plants operate in largely similar ways, and thus the proposed class members can be "easily categorized into a limited set of discrete job positions" and that employees holding equivalent positions are "treated as interchangeable." *Id.* ¶¶ 228, 347.

Plaintiffs allege that the Nuclear Defendants made compensation decisions via structured schedules, which were determined centrally by senior executives. *Id.* ¶ 238–40. In the nuclear power industry, education and licensure are important to hiring and compensation decisions; "[f]or example, licensed nuclear operators—who are required to take classes and acquire a license from the Nuclear Regulatory Commission—are generally paid higher wages than unlicensed nuclear operators." *Id.* ¶ 235. Plaintiffs also contend that prior experience in nuclear power "was generally a prerequisite" for employment, and thus the Nuclear Defendants "often needed to recruit employees from other nuclear power companies because the only workers with necessary skills and

experience worked in nuclear power generation." *Id.* ¶ 244. Plaintiffs also allege that "[t]he largest recurring cost at nuclear power plants is labor," and that the Nuclear Defendants therefore sought to reduce labor costs. *Id.* ¶ 236–37.

The Nuclear Human Resources Group ("NHRG") is a central figure in the alleged conspiracy. *Id.* ¶ 7. NHRG is a trade association that includes all U.S. and Canadian commercial nuclear power entities. *Id.* ¶ 253. Plaintiffs allege that NHRG "was designed in part to coordinate . . . previously disparate compensation practices" and "align[] compensation practices across the industry." *Id.* ¶ 255. NHRG is run by an executive committee (or "steering committee") comprised of nuclear energy company executives. *Id.* ¶ 258. NHRG is currently managed by David Heler, who is also the "head" of Defendant Accelerant and the "principal officer" of co-conspirator Human Resource Consultants ("HRC"). *Id.* ¶¶ 187–89, 204, 236, 254.

## B.    Alleged anticompetitive conduct

Plaintiffs contend that the Nuclear Defendants engaged in two different conspiracies. The first, articulated in Count 1, was an agreement to fix and suppress the compensation of nuclear power generation workers. Am. Compl. ¶ 423–28. The second, articulated in Count 2, was an agreement to exchange information about compensation, which had the effect of reducing and suppressing compensation. *Id.* ¶¶ 429–49. The conspiracies allegedly took place between May 1, 2003 and the present day (the "Class Period."). *Id.* at 10.[2] Plaintiffs allege that, during the Class Period, the Nuclear Defendants engaged in five categories of acts to carry out this conspiracy: (1) exchanging confidential collective bargaining agreements ("CBAs"); (2) contributing to and

---

[2] Citations to page numbers for case documents are to the page number provided in the ECF header, not the page number native to the document itself.

exchanging compensation comparison reports ("CCRs") that contained various Nuclear Defendants' compensation information for unionized employees; (3) exchanging compensation information and fixing compensation levels at in-person conferences and meetings; (4) exchanging compensation information and fixing compensation levels through direct written and telephonic communications; and (5) suppressing compensation in accordance with the alleged agreement. *Id.* ¶ 251. Plaintiffs support their allegations as to these facts with numerous corroborating statements by both named and unnamed executives in the nuclear power industry.

### i. Collective bargaining agreements

Plaintiffs allege that NHRG maintained a repository of CBAs that it made available to certain Nuclear Defendants for the purpose of exchanging confidential compensation information. The repository was maintained by NHRG's "Labor Relations Project," and was made available on websites only accessible with a "confidential password." *Id.* ¶¶ 267–68. Plaintiffs allege that the compensation information contained within the CBAs was "competitively sensitive and confidential," including "current and future wages and benefits." *Id.* ¶¶ 264, 271. The password was only provided on a "give-to-get" basis, meaning that companies could only access the repository if they provided updated CBAs for inclusion. *Id.* ¶ 272. Plaintiffs allege that the compensation information within the CBAs was not publicly disclosed and that the IBEW did not disclose the information from one CBA with management at other plants. *Id.* ¶¶ 274–76. Defendants disagree specifically with this alleged fact, asking the Court to take judicial notice of several sources of publicly available CBAs. *See* ECF No. 427-1 at 18–20.

### ii.    Compensation Comparison Reports

Plaintiffs allege that Defendant Constellation Energy Generation, LLC ("CEG") created reports comparing current and future confidential wage and benefit information across the nuclear industry and distributed them twice each year. Am. Compl. ¶ 281. CEG allegedly created these reports by conducting surveys of other nuclear power companies and disseminating the information via CCRs, which consisted of spreadsheets "that contained detailed disaggregated and deanonymized current and future compensation data, organized by both company and plant." *Id.* ¶ 282. Similar to the CBA repository, the CCRs were available to participating Nuclear Defendants digitally via a "confidential password." *Id.* ¶ 285. Plaintiffs allege that the CCRs included "planned wage increases up to six years into the future." *Id.* ¶ 288.

### iii.    Meetings

In addition to exchanging compensation information through centralized resources, Plaintiffs also allege that the Nuclear Defendants participated in numerous in-person meetings at which they exchanged compensation data and "discuss[ed], suppress[ed], and fix[ed]" compensation. *Id.* ¶¶ 12–14. The complaint discusses three types of meetings, all connected to NHRG. *Id.* The first was NHRG's general annual conference, which has taken place since 1995. *Id.* ¶ 294. Plaintiffs also allege that conspiracy activity took place at meetings and conferences for the Labor Relations Project and another NHRG project, the "Total Rewards Project." *Id.* ¶¶ 300–19. The Labor Relations and Total Rewards Project meetings occurred during the general NHRG conference in some years, and in other years occurred before the general conference. *Id.* ¶¶ 301, 307.

Plaintiffs allege that at both the general NHRG conference and the Project meetings, various Nuclear Defendants discussed compensation, exchanged CBAs, reviewed compensation surveys, and coordinated approaches to compensation and labor issues. *See, e.g., id.* ¶ 313 (alleging, based upon a statement from a former compensation analyst of one of the Nuclear Defendants, that participants at Total Rewards Project meetings would participate in round table sessions to review compensation report surveys and "confirm whether their compensation practices aligned with the survey results[]"). Plaintiffs also assert that, during Total Rewards Project meetings, the Nuclear Defendants not only discussed certain compensation surveys conducted by Willis Towers Watson (the "WTW Surveys"), which aggregate compensation information across the industry, but also effectively disaggregated those surveys by disclosing how their compensation compared to the medians listed in the surveys. *Id.* ¶ 14, 312–13. Plaintiffs also allege that further conspiratorial acts took place at other trade industry conferences and meetings, including those hosted by the American Nuclear Society, the Edison Electric Institute, the Nuclear Energy Institute, and the United States Nuclear Industry Council. *Id.* ¶ 350.

### iv.    Direct communication

Plaintiffs allege that some senior executives of the Nuclear Defendants contacted each other directly, via email and phone, to exchange information and coordinate approaches to compensation. These exchanges were allegedly made on a quid pro quo basis. Executives would provide compensation rates and details (with the explicit encouragement of their supervisors) in exchange for comparable information from their counterparts. *Id.* ¶¶ 320–35. Plaintiffs allege that these conversations typically took

9

place in advance of union negotiations, as a means for the Nuclear Defendants to strengthen their negotiating positions. *Id.* ¶¶ 322, 329–31.

### v.      Suppression of compensation

Plaintiffs allege that, as a result of the information exchanges and agreements discussed above, the Nuclear Defendants "simultaneously and in parallel limited their annual compensation and compensation increases to Class Members employed in nuclear power generation." *Id.* ¶ 336. They allege that "[a]bsent this conspiracy in a competitive market, Defendants would not have aligned their compensation and would have paid higher annual wages and wage increases to Class Members." *Id.*

But as explained further below, when the complaint turns to what the Nuclear Defendants allegedly agreed *to do* when it came to compensation—the actual terms of the alleged agreement—it becomes far more vague than other aspects of the complaint. Plaintiffs allege, for example, that Defendants "aligned their compensation," *id.* ¶ 336, and that "Defendants work[ed] 'together to make sure [they] were *in alignment' on compensation*, according to a former HR executive employed by Progress and Duke Energy." *Id.* ¶ 337 (emphasis added).

But in context, it appears that Plaintiffs do not allege that Defendants agreed, for example, that they would all pay the same rates of compensation for particular positions. Instead, the allegation is that the Nuclear Defendants "shared the salary range adjustments they were contemplating implementing in the future and confirmed their alignment with the rest of the industry before finalizing the salary ranges." *Id.* ¶ 18. In other words, the complaint clearly and concretely alleges an agreement to share compensation information—including down to the level of particular salary ranges for particular categories of employees. *Id.*; *see also, e.g.*, ¶¶ 248, 318, 326, 328. Then, as

evidence of the actual impact on wages, the complaint relies principally on "parallel increases" of *aggregated* compensation rates, pointing to plants owned by four Defendants implementing identical 2–3% annual aggregate wage increases in multiple years during the Class Period. *Id.* ¶ 339. Plaintiffs also cite two examples of a position offering exactly the same hourly rate across a pair of Nuclear Defendants. *Id.* ¶ 340. Plaintiffs further generally allege that the proposed class members were injured by this activity because it suppressed compensation below what it would have been absent the Nuclear Defendants' agreements. *Id.* ¶¶ 377–81.

Plaintiffs emphasize that, "[a]t this preliminary stage, Nuclear Defendants' compensation data is not public," and that the empirical evidence in the complaint is thus necessarily limited. *Id.* ¶ 338. But they contend that their witness statements and observations regarding aligning or harmonizing amounts paid in compensation further constitute circumstantial evidence of a wage-fixing agreement among the Nuclear Defendants, at least in the aggregate.

## C.     Procedural history

Plaintiffs filed their initial class action complaint on July 11, 2025, ECF No. 1, and an amended class action complaint on November 5, 2025, ECF No. 306. All Defendants have moved to dismiss for failure to state a claim, ECF No. 427, and five additional groups of Defendants have moved to dismiss on separate grounds, ECF Nos. 415, 418, 422, 424, 426. All of the motions are fully briefed, and the Court held a hearing on May 13, 2026. ECF No. 524 (hearing transcript).

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level" by containing "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although a court reviewing a 12(b)(6) motion must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff," *King*, 825 F.3d at 212, bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim. *Iqbal*, 556 U.S. at 679.

### B.    Rule 12(b)(1)

One of the motions to dismiss—filed by Defendant Tennessee Valley Authority—contends this Court lacks subject matter jurisdiction. A motion to dismiss based on lack of subject matter jurisdiction raises questions regarding the Court's authority to adjudicate a case, and so the Court generally must first determine whether it has jurisdiction over the claims before ruling on the merits. Fed. R. Civ. P. 12(b)(1); *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007)

12

(citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102 (1998)); *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). "[I]f the [defendant] challenges jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of persuasion, and the court is free to consider exhibits outside the pleadings 'to resolve factual disputes concerning jurisdiction.'" *Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 205 (4th Cir. 2002) (quoting *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995)).

### C.     Rule 12(b)(2)

The motion filed by Defendants Southern California Edison Company, Nextera Energy, Inc., Nextera Energy Resources, LLC, Florida Power & Light Company, and Luminant Generation Company LLC contends that this Court lacks personal jurisdiction. A motion to dismiss based on a lack of personal jurisdiction "raises an issue for the court to resolve, generally as a preliminary matter." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016) (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). "Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Id.* (citing *Combs*, 886 F.2d at 676). "The plaintiff must establish personal jurisdiction by a preponderance of the evidence but need only make a prima facie showing." *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350 (4th Cir. 2020) (citing *Combs*, 886 F.2d at 676). "When personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, . . . the district court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211,

13

226 (4th Cir. 2019) (citing *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 196–97 (4th Cir. 2018)).

## III.    OMNIBUS MOTION TO DISMISS

As noted, Plaintiffs assert two claims for violations of Section 1 of the Sherman Act: (1) conspiracy to fix or suppress compensation and (2) conspiracy to exchange compensation information. Am. Compl. at 139, 141.

Section 1 of the Sherman Act prohibits any "conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. A Section 1 claim requires "a contract, combination, or conspiracy . . . that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002) (citing *Oksanen v. Page Mem'l Hosp.,* 945 F.2d 696, 702 (4th Cir. 1991) (en banc)). A plaintiff's allegations must "invest[] either the action or inaction alleged with a plausible suggestion of a conspiracy." *Twombly*, 550 U.S. at 566. "While § 1 could be interpreted to proscribe all contracts, the [Supreme] Court has never 'taken a literal approach to [its] language'"; rather, "§ 1 'outlaw[s] only unreasonable restraints.'" *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (quoting *Texaco Inc. v. Dagher,* 547 U.S. 1, 5 (2006); *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997); citing *Bd. of Trade of Chi. v. United States,* 246 U.S. 231, 238 (1918)) (internal citations omitted). And if a plaintiff "is able to prove a violation of § 1, it then must prove the existence of '*antitrust* injury, which is to say injury of the type the anti-trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Dickson*, 309 F.3d at 202–03 (quoting *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990) & *Cont'l Airlines, Inc. v. United Airlines, Inc.,* 277 F.3d 499, 508 (4th Cir. 2002); *Oksanen*, 945 F.2d at 708) (emphasis in original).

14

All claims under Section 1 require allegations of a contract or conspiracy, but some types of agreements, such as horizontal price fixing agreements, are deemed *per se* unlawful, eliminating the need to study the reasonableness of the restraint. *Leegin,* 551 U.S. at 886 (citing *State Oil*, 522 U.S. at 10; *Texaco*, 547 U.S. at 5). "The *per se* rule[] treat[s] categories of restraints as necessarily illegal" based on the fact that the restraint has "'manifestly anticompetitive' effects, and 'lack[s] . . . any redeeming virtue.'" *Id*. (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977); *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985); citing *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)). Plaintiffs' Count I, alleging a horizonal conspiracy to fix or suppress compensation, asserts a *per se* claim.

Other restraints must be evaluated under the "rule of reason" standard. *Id*. at 885 (citing *Texaco,* 547 U.S. at 5). "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Id*. (quoting *Cont'l T.V.*, 433 U.S. at 49) (internal quotations omitted). Plaintiffs' Count II, alleging a conspiracy to exchange compensation information, asserts a rule of reason claim.

Defendants argue that the amended complaint fails to state a claim for either count and that, even if it did, the claims are nonetheless time-barred. ECF No. 427.

### A.    Count I

Certain categories of restraints on trade are deemed to be *per se* illegal and thus eliminate the need for the Court to consider the reasonableness of the restraint. *Leegin,* 551 U.S. at 886 (citing *State Oil*, 522 U.S. at 10). "*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" *Texaco*, 547 U.S. at 5 (quoting *Nat'l Soc.*

*of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). One such category is a horizontal agreement between competitors to fix prices charged to customers or wages paid to employees. *Id.* ("Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful.") (citing *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980)); *United States v. Brewbaker*, 87 F.4th 563, 575 & n.7 (4th Cir. 2023) (restating the rule that horizontal price-fixing agreements are a *per se* violation) (citing *Leegin*, 551 U.S. at 886). There are some exceptions. *See Nat'l Collegiate Athletic Assoc. v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100–101 (1984) (exception for industries where "horizontal restraints on competition are essential if the product is to be available at all"); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) (exception for certain blanket license fees). But in general, when a plaintiff plausibly pleads that competitors have joined together and agreed how much they will charge for goods or services, or how much they will pay employees, such a plaintiff may assert a *per se* § 1 claim.

A *per se* claim requires "direct or circumstantial evidence that reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). Whether through direct or circumstantial evidence, a plaintiff must also plausibly allege that "the challenged anticompetitive conduct"—here, the setting of compensation rates allegedly below the levels that would be paid absent the alleged compensation fixing agreement—"stems from . . . an agreement, tacit or express," as opposed to from "independent decision[s]." *Twombly*, 550 U.S. at 553 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)) (internal quotations

16

omitted). That is because, among other things, "conscious parallelism" is not necessarily unlawful. *Id*. (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227 (1993)).

Here, Plaintiffs contend that Count I adequately alleges a *per se* claim both based on direct evidence and circumstantial evidence. The Court will address each in turn.

### i.      Direct evidence

"[D]irect evidence in this context is 'explicit and requires no inferences to establish the proposition or conclusion being asserted'" "and is usually referred to as the 'smoking gun.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (quoting *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003); citing *United Mine Workers of Am. v. Pennington*, 381 U.S. 676, 720 (1965) (Goldberg, J., dissenting)). "Direct evidence is extremely rare in antitrust cases." *Id.*; *see Jien v. Perdue Farms, Inc.*, Case No. 19-cv-2521-SAG, 2020 WL 5544183, at *5 (D. Md. Sept. 16, 2020) (quoting *Am. Chiropractic Ass'n*, 367 F.3d at 226). "Conspiracies are often tacit or unwritten in an effort to escape detection, thus necessitating resort to circumstantial evidence to suggest that an agreement took place." *Robertson v. Sea Pines Real Estate Co., Inc.*, 679 F.3d 278, 289–90 (4th Cir. 2012).

In the amended complaint, Plaintiffs' asserted direct evidence of a compensation-fixing agreement comprises certain statements by industry insiders. Plaintiffs rely in particular on statements from four witnesses:

- A former HR executive employed by Progress Energy and Duke Energy allegedly stated that the companies would "all work together to make sure [they] were ***in alignment***" regarding compensation. Am. Compl. ¶ 247 (emphasis in original)("According to the former HR executive: 'We would

all work together to make sure we were ***in alignment***' on compensation."). The witness "stated that [Nuclear Defendant] Progress's goal in collaborating with other nuclear power companies was to pay just the industry average salary and no greater. She explained: 'We didn't want to pay outrageous salaries.'" *Id.*

- A former labor manager at Exelon allegedly stated that "there was significant collaboration and information sharing between nuclear power companies . . . with regards to compensation rates and union contracts." *Id.* ¶ 6. This same witness attested that "[o]btaining compensation data directly from competing nuclear power companies allowed Exelon to avoid paying higher hourly wages than it actually paid its nuclear power generation employees." *Id.* ¶¶ 6, 249.

- A former labor manager at Exelon allegedly stated that "there was a lot of collaboration and information sharing between big nuclear companies in regards to union details." *Id.* ¶¶ 17, 322. "He stated that nuclear power companies shared information 'all the time' and did so for the 'specific reason' of 'trying to screw the union.'" *Id.*

- A former HR executive at APS allegedly stated that the nuclear power industry is one of the only industries in which "information sharing is not only encouraged but mandatory." *Id.* ¶ 223.

Defendants argue that these statements do not rise to the level of direct evidence of an agreement to fix wages. ECF No. 427-1 at 29–33. Specifically, they argue that none of the witness statements specifically allege that Defendants *agreed* to fix compensation or to use the benchmarking data at all and that only two of the seventy paragraphs

18

referring to witness statements describe the witness's tenure, which is especially insufficient to prove a twenty-three-year long conspiracy period. *Id.* at 29–32. Defendants also argue that Plaintiffs did not allege "whether there was an agreement to keep compensation flat, to grow only by certain amounts, or to pay only certain rates" or what form of compensation was allegedly fixed (*i.e.*, hourly wages, salaries, bonuses, premiums, overtime, or benefits)." *Id.* at 29–30. Finally, Defendants argue that none of Plaintiffs' evidence is "direct" evidence because "direct evidence is the proverbial 'smoking gun'" from which no further inferences are needed to establish the evidence—but that such inferences are required for any of the alleged witness statements to support a *per se* claim (or a rule of reason claim, for that matter). *Id.* at 29 (quoting *Am. Chiropractic Ass'n*, 367 F.3d at 226).

Plaintiffs respond that their witness statements do provide direct evidence of an anticompetitive agreement as the statements unequivocally state that Defendants collaborated to "align" certain aspects of compensation. ECF No. 465 at 23–28 (describing those allegations, and citing cases including *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 998 (N.D. Ill. 2011), and *Jien*, 2020 WL 5544183, at *6, for their reliance on witness statements at the pleading stage).[3] Plaintiffs argue that the direct evidence here is even stronger than was present in *Jien*, in which Judge Gallagher held that plaintiffs had adequately alleged direct evidence of a wage-fixing conspiracy in the poultry processing industry. *Id.* at 25–27.

---

[3] The terms "align" and "harmonize" are vital to Plaintiffs' theories for both counts, at least as to their reliance on witness statements. The word "align" or a variation thereof appears twenty-nine times in Plaintiffs' complaint. The word "harmonize" (or variations thereof) appear another seven times.

Finally, Plaintiffs argue that Defendants' assertion that the complaint did not specify whether the conspiracy was to keep compensation flat or limit growth is requiring a level of detail not required at the motion to dismiss stage. *Id.* at 29.

Although the witness statements potentially show a pattern or practice among some of the Defendants to share information and collaborate and that at least some of the Defendants may have used the information provided for the purpose of avoiding paying "outrageous salaries," none of these statements constitute *direct* evidence of a wage-*fixing* agreement. For example, the statement that the companies "work[ed] together to make sure [they] were in alignment" because they "didn't want to pay outrageous salaries" does not, without inference, explicitly state how the companies were in alignment. *See* Am. Compl. ¶¶ 5, 247. The witness did not state, for example, that the companies agreed to pay specific wages or to cap wages for particular positions at specific amounts. Companies ensuring "alignment" can mean many different things that are not *per se* violations of the Sherman Act. That vagueness matters in assessing whether Plaintiffs have alleged *direct* evidence of a wage *fixing* agreement (as opposed to circumstantial evidence for Count I, or as opposed to allegations supporting a rule-of-reason claim in Count II). Of significance is that when Plaintiffs introduce the Nuclear Human Resources Group, they describe it as having been "designed in part to coordinate the previously disparate compensation *practices* of the Nuclear Defendants and coconspirators"—in other words to "'improve pay practices,'" such as regarding "'recertification pay, license renewal pay, and shift pay.'" *Id.* ¶ 255. Plaintiffs allege that "[i]mproving pay practices *meant* aligning compensation practices across the industry," but even in the context of the statement of the former Senior Compensation Analyst at Southern Company quoted in paragraph 255, "pay practices" was *not* synonymous with

20

fixing or capping wages at particular agreed-upon dollar figures, or fixing or capping wage increases at particular annual percentages. Similarly, the statements that "there was significant collaboration and information sharing between nuclear power companies . . . with regards to compensation rates and union contracts," *id.* ¶ 249, indicates an agreement to *share information* (thus relevant to Count II), not an agreement to *fix or suppress* wages (to be relevant to Count I). *Id.* ¶ 6; *see id.* ¶¶ 17, 223 (also discussing collaboration for information sharing).

None of the witness statements *explicitly* relate to an agreement to fix or suppress wages regardless of whether the allegation is related to keeping compensation flat or limiting wage or salary growth. These statements are insufficient to constitute direct evidence of "an agreement, tacit or express," to fix or suppress wages as opposed to "independent decision[s]" or even "conscious parallelism." *Twombly*, 550 U.S. at 553 (quotations and citations omitted). The Court would have to infer from these statements an agreement, not only to use shared data but specifically to fix or suppress compensation, which would go beyond the standard for *direct* evidence. *See Am. Chiropractic Ass'n,* 367 F.3d at 226. These statements and the other facts alleged in the complaint do not sufficiently constitute direct evidence of a horizontal wage-fixing agreement to support Count I (though the witness statements and other allegations are considered below as a part of the circumstantial evidence).

### ii.    Circumstantial evidence

To state a *per se* claim in Count I, Plaintiffs do not necessarily have to allege direct evidence; allegations based on circumstantial evidence can suffice for a *per se* claim to survive a motion to dismiss. *Monsanto Co.*, 465 U.S. at 768 (explaining that a *per se* claim requires "direct or circumstantial evidence that reasonably tends to prove

. . . a conscious commitment to a common scheme designed to achieve an unlawful objective"); *Robertson*, 679 F.3d at 289–90 (explaining that antitrust claims based on conspiracies often rely on circumstantial evidence).

As an initial matter, however, the parties disagree on the standard for assessing circumstantial evidence in this context. Defendants contend that "parallel conduct and plus factors are required to plead facts that reflect 'plausible grounds to infer an agreement.'" ECF No. 500 at 17 (quoting *Twombly*, 550 U.S. at 556). *See also Jien,* 2020 WL 5544183, at *7 ("In order to support a circumstantial inference of conspiracy, [p]laintiffs must allege both 1) parallel conduct by the [d]efendants, and 2) 'plus factors' suggesting that the parallel conduct resulted from concerted action.") (citing *Twombly*, 550 U.S. at 567; *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015)). Plaintiffs contend that, although parallel conduct and plus factors are the typical approach, an alternative is to plead the "who, what, when and where" of the claimed antitrust misconduct. ECF No. 465 at 29–30 (citing *SD3*, 801 F.3d at 424–25, 430). Plaintiffs further contend that they need not allege parallel conduct at all to establish circumstantial evidence of a *per se* antitrust claim. *See* ECF No. 465 at 30–31 (citing *In re Benco Dental Supply Co.*, 2019 FTC LEXIS 76, at *26–28 (2019); *Anderson News, LLC v. Am. Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999); and *InterVest*, 340 F.3d at 163–65). The Court need not resolve those disputes about the legal standard, however, because, under any of these formulations, Count I does not state a claim based on circumstantial evidence on which relief can be granted.

### a.      Parallel conduct and plus factors

Defendants contend that Plaintiffs' parallel conduct/plus factors theory fails at both steps, because Plaintiffs do not allege facts that constitute parallel conduct or that support plus factors. ECF No. 427-1 at 34–46.

"'A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted similarly,' or that their actions were uniform." *Jien*, 2020 WL 5544183, at *8 (quoting *SD3*, 801 F.3d at 427). The conduct "need not be exactly simultaneous and identical in order to give rise to an inference of agreement." *SD3*, 801 F.3d at 429 (quoting *LaFlamme v. Societe Air France,* 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010)) (internal quotations omitted).

In addition to parallel conduct, a plaintiff relying on circumstantial evidence of an agreement must allege "plus factors," consisting of "'further circumstance[s] pointing toward a meeting of the minds'"—evidence "that the parallel behavior 'would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties.'" *Id.* at 424 (quoting *Twombly*, 550 U.S. at 556 n.4, 557). These facts must be evaluated holistically rather than parsing each "plus factor" individually. *Id.* at 424–25 (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007)). One plus factor is market concentration as "[a] market in which sales power is concentrated in the hands of the few can [] facilitate coercion." *Id.* at 432 (citing *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 48 (1st Cir. 2013); *Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002)). Generally, where a complaint has alleged the "who, what, when, and where" of the

23

alleged antitrust misconduct, the allegations are sufficient to state a claim at the pleadings stage. *Id.* at 430 (citing William Holmes & Melissa Mangiaracina, *Antitrust Law Handbook* § 9:14 (2014 supp.)) (citing cases).

As to parallel conduct, Plaintiffs argue that the amended complaint sufficiently "alleges: 1) parallel alignment of compensation; and 2) parallel information exchange through documents and in-person meetings." ECF No. 465 at 34. As to the former, the amended complaint alleges that "in 2020, Exelon paid non-licensed nuclear operators at its Oyster Creek plant $43.84 per hour, which is exactly the same rate—to the penny—as FPL paid its non-licensed nuclear operators at its Saint Lucie and Turkey Point plants" and that "in 2019, Exelon paid electrical maintenance workers $43.63 per hour, which is exactly the same rate—to the penny—as FPL paid its electrical maintenance workers that year." Am. Compl. ¶ 340. The amended complaint also alleges that, in nine years between 2008 and 2020, two or three Defendants increased wages at their plants by the same percentage (at least when rounded to the nearest 0.5%)—all ranging between 2% and 3%. *Id.* ¶ 339. As to the alleged parallel information exchange—which, in addition to forming the factual basis for Count II, also is alleged to constitute circumstantial evidence of an agreement to fix wages for Count I—the amended complaint alleges that Defendants attended annual NHRG conferences and annual meetings of the Total Rewards Project and Labor Relations Project, *id.* ¶ 12–14, participated in the Compensation Comparison Reports, *id.* ¶ 11, exchanged CBAs through the CBA Repository, *id.* ¶¶ 9–10, and exchanged current and future wage information directly with one another through telephone and email communications, *id.* ¶¶ 15–16.

The 2019 wage rate Plaintiffs identify for Exelon ($43.63) is for employees in the classification "ELECTRICAL MAINTENANCE "A" — NUCLEAR" who have been in the

role for six to twelve months. *Collective Bargaining Agreement & Supplements between Exelon Generation Co. & Loc. Union 1289 (Clerical & Operating) of the Int'l Bhd. of Elec. Workers*, Feb. 1, 2015–Jan. 31, 2021, https://www.local1289ibew.org/wp-content/uploads/2022/04/oyster_creek_2015-2021.pdf [https://perma.cc/CW9E-3TXQ] (hereinafter, "*Exelon CBA*"), at 115, 118.[4] Employees in that position start off at a pay rate of $38.79 during their first six months. *Id.* at 115. The CBA does not define the job responsibilities of this classification, but it is differentiated from "ELECTRICAL MAINTENANCE "B" — NUCLEAR" and "ELECTRICAL MAINTENANCE JUNIOR — NUCLEAR," which are at different pay rates. *Id.* at 115–16.

The alleged comparative 2019 wage rate Plaintiff identifies for FPL is for employees in the classification "MECHANIC-N" under the "MECHANICAL MAINT & CONSTRUCTION" group who have been in the role for less than six months. *Memorandum of Agreement 2020–2022 between Int'l Bhd. of Elec. Workers & Fla. Power & Light Co.*, http://scu4ibew.unionactive.com/2020-2022%20FPL%20SC%20U-4%20MOA%20FINAL.pdf [https://perma.cc/32G7-7F3P] (hereinafter, "*FPL CBA*"), at 76 (Nuclear 20). Employees in that position who have been in the role for six to twelve months are paid at a rate of $43.83. *Id.* ($43.63 plus $0.20 increase after six months). The CBA does not define the job responsibilities of this classification, but this classification is differentiated from "APPR MECHANIC-N" under

---

[4] Plaintiffs refer to and rely on the CBAs containing these wage rates in the amended complaint, and thus the Court may consider them without converting Defendants' motion to a motion for summary judgment for purposes of deciding whether the allegations regarding the wage rates satisfy the standard for pleading parallel conduct. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

the same group or other "MECHANIC-N" classification under other groups like "ITINERANT." *Id.*

The 2020 wage rate Plaintiffs identify for Exelon ($43.84) is for employees in the classification "NUCLEAR PLANT OPERATOR" under "STEP 2" who have been in the role for six to twelve months. *Exelon CBA*, at 119, 122. Employees in this position start off at a pay rate of $39.00 during their first six months. *Id*. at 119. The CBA includes three "Steps" under "NUCLEAR PLANT OPERATOR," each with different pay rates but does not explain what each step means, including whether these operators are licensed or unlicensed. *Id.*

The alleged comparative 2020 wage rate Plaintiffs identify for FPL is for employees in the classification "(1) NON-LICENSE OP- (S)" under the "PLANT OPERATION" group who have been in the role for less than six months. *FPL CBA*, at 76. Employees in this position who have been in the role for six to twelve months are paid at a rate of $44.04. *Id.*

These wage rates are insufficient to constitute parallel conduct as Plaintiffs selected two examples of pay rates that relate to employees of different tenures and without clear alignment of job responsibilities. It is unclear from the CBAs whether "MECHANIC-N" under the "MECHANICAL MAINT & CONSTRUCTION" group at the FPL plants has the same responsibilities as "ELECTRICAL MAINTENANCE "A" — NUCLEAR" at Exelon in order to properly compare their pay rates rather than comparing to "ELECTRICAL MAINTENANCE "B" — NUCLEAR" or "ELECTRICAL MAINTENANCE JUNIOR — NUCLEAR" at Exelon. Similarly, given that Exelon's "NUCLEAR PLANT OPERATOR" includes three "steps" for this position at different pay rates, it is unclear whether "Step 2" aligns with the job responsibilities of non-licensed

26

plant operators at FPL to properly compare these pay rates. But, even accepting Plaintiffs' assertion that these two positions in Exelon and FPL have similar duties and responsibilities, Plaintiffs do not and cannot assert that employees in those positions earn the same pay rate during the same tenure (less than six months vs. between six and twelve months). Plaintiffs' position is further undermined by the fact that the pay rates for these positions do not align in the other years included in the CBAs. *Compare, e.g., Exelon CBA*, at 119 (for 2020, the electrical maintenance pay rate is $39.76 during the first six months and $44.72 between six and twelve months) *with FPL CBA*, at 76 (for 2020, the electrical mechanic pay rate is $44.96 during the first six months and $45.16 between six and twelve months). Therefore, these pay rates do not constitute parallel conduct for Count I.

As to the pay rate increases, Plaintiffs' allegations relate to six Defendants regarding nine years selected within a twelve-year period (2008–2020) in order to support an inference of an agreement between forty-five Defendants across a 23-year class period. Am. Compl. ¶¶ 339, 409. The district court in *In re Concrete & Cement Additives Antitrust Litigation* held that "the fact that out of the alleged Class Period of over one hundred months, the Plaintiffs are able to isolate a ten-month period during which most of the Defendants raised prices does little to establish parallel conduct." Case No. 24-md-3097(LJL), 2025 WL 1755193, at *16 (S.D.N.Y. June 25, 2025). It further explained that "[s]uch disconnected increases are just as indicative of inflation as they are of collusion and do not constitute 'plausible grounds to infer an agreement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556; citing *id.* at 554). Isolating less than one-fourth of the Defendants here with matching increase rates during less than half of the alleged class period—particularly when rounded to 2, 2.5 or 3 percent, *see* Am. Compl. ¶ 339—is

insufficient to allege parallel conduct, particularly where, as here, the percentage increases align with average inflation rates. Plaintiffs are correct that determining whether these increases align with inflation is a fact-intensive inquiry and it may be difficult for Plaintiffs to know whether other Defendants increased their pay at similar rates without discovery. ECF No. 465 at 39–41. But because of this combination of deficiencies, the allegations simply do not rise to the level of parallel conduct that supports an inference that the reason for the observed conduct was a horizontal wage-fixing agreement. (Whether the allegations are sufficient to constitute circumstantial evidence of an agreement to share *information* for Count II is a different question, addressed in § III.B below.)

Similarly, to the extent Plaintiffs allege that Defendants shared information in an effort "to improve pay practices," whether considered as parallel conduct or as plus factors, improving pay practices does not necessarily mean an agreement to *align* compensation rates and thus is insufficient to constitute circumstantial evidence for Count I. *Id.* ¶ 255. To the extent Plaintiffs rely upon their witness statements as circumstantial evidence for Count I, none of those statements imply an agreement to suppress or fix compensation rather than a general consensus to share information (and then for each company to use the information as it saw fit). Although Plaintiffs allege a "give-to-get policy for the CBA Repository," which "restricted access to the CBA Repository only to participating Nuclear Defendants and coconspirators" (essentially penalizing those that chose not to share their CBAs), assuming there was an agreement to share information, each Defendant was still free to increase wages or set a different compensation schedule without violating any agreement or receiving any penalty. Therefore, to the extent Plaintiffs have asserted circumstantial evidence based on

witness statements, meeting attendance, or participation in the surveys, the conduct relates merely to the exchange and individualized use of information rather than conduct that indicates an agreement to fix or suppress compensation.

As to "plus factors," Plaintiffs contend that, evaluated holistically, they have alleged "compelling" plus factors to sufficiently state a claim. ECF No. 465 at 43. They contend that the three plus factors that they have alleged align with the three factors "on which courts most often rely to determine whether an inference of conspiracy is permissible: (1) evidence that the defendant had a motive to enter into a price fixing conspiracy, (2) evidence that the defendant acted contrary to its interests, and (3) evidence implying a traditional conspiracy, such as non-economic evidence that there was an actual manifest agreement not to compete." *Id*. at 43 (quoting *In re Titanium Dioxide Antitrust Litig*., 959 F. Supp. 2d 799, 822 (D. Md. 2023); *In re Flat Glass Antitrust Litig*., 385 F.3d 350, 360–61 (3d Cir. 2004)). Plaintiffs specifically contend that the degree of market concentration in the nuclear power generation industry, and the inelasticity of the labor supply for that industry, provide evidence of "clear motives to conspire to suppress compensation." *Id*. at 43–45. They also argue that Defendants acted contrary to their own interests (discussed more below). *Id*. at 46. Finally, Plaintiffs compare the "non-economic evidence that suggests a traditional conspiracy" in *Titanium Dioxide* to the circumstances here to assert that the witness statements and industry conferences constitute "extraordinary traditional conspiracy evidence." *Id*. at 47–48 (citing *Titanium Dioxide*, 959 F. Supp. 2d at 829–30).

As to motive to conspire, courts have held that an industry is susceptible to collusion where it relates to a commodity-like product with few substitutes, where the industry is one with high barriers to entry, as well as other market concentration factors.

*See Titanium Dioxide*, 959 F. Supp. 2d at 826–27 (citing *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012)); *Publ'n Paper*, 690 F.3d at 65 (finding an industry conducive to collusion where the product had "few substitutes" and high barriers to entry). Plaintiffs have sufficiently asserted that Defendants operate all nuclear power generation plants in the United States, that the labor market in this industry is "characterized by extraordinarily high barriers to entry," and that compensation constituted one of Defendants' biggest costs. Am. Compl. ¶¶ 3, 236, 343, 346. Plaintiffs have also adequately alleged that the labor market within the nuclear power generation industry is "a text book example of an industry susceptible to efforts to maintain supracompetitive [wages]." *Titanium Dioxide*, 959 F. Supp. 2d at 827 (quoting *Flat Glass*, 385 F.3d at 361) (quotations omitted).

As for the question of whether Defendants acted against their self-interests, Plaintiffs get close to the mark. Plaintiffs allege that that Defendants acted contrary to their own interests because, "in a competitive [labor] market, no Nuclear Defendant would risk losing employees who are costly to replace by regularly sharing sensitive compensation data with rival nuclear power companies" because sharing the data allowed competitors to know exactly how much compensation to offer to lure an employee away. ECF No. 465 at 46. But to the extent Plaintiffs base this assertion on the sharing of CBAs that are publicly available and the WTW Surveys, which provide aggregated values, these are insufficient to show that Defendants' sharing and use of this information was contrary to their self-interests. With respect to the alleged sharing of *non-public* compensation data, even accepted as true (as with all of Plaintiffs' factual allegations at the pleading stage), those allegations are insufficient to establish a plausibly alleged agreement *to fix compensation rates*. After all, the sharing of wage

information, without an agreement to fix wages, can be procompetitive rather than anticompetitive—particularly, but not exclusively, where the shared information is public and/or aggregated. *See Todd*, 275 F.3d at 212 (explaining that "[p]rice exchanges that identify particular parties, transactions, and prices are seen as potentially anticompetitive because they may be used to police a secret or tacit conspiracy to stabilize prices," and so "[c]ourts prefer that information be aggregated in the form of industry averages, thus avoiding transactional specificity") (citing *United States v. Container Corp. of Am.*, 393 U.S. 333, 334–38 (1969); *Maple Flooring Mfrs' Ass'n v. United States*, 268 U.S. 563, 573–74 (1925); *Am. Column & Lumber Co. v. United States*, 257 U.S. 377, 410 (1921)); *In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 679 (N.D. Ill. 2023) (reports comparing a supplier's production to industry averages do not represent an illegal information exchange). Again, those allegations may be sufficient to state a rule-of-reason claim (which the Court does not decide at this stage, as explained below). But the possibility that sharing non-public compensation data with competitors may be contrary to how competitors would operate in the absence of an agreement is insufficient to convert Count I into a plausible claim that Defendants conspired to not only *share* compensation data but to bind themselves to pay agreed-upon rates.

Finally, any evidence implying a traditional conspiracy here hardly reaches the levels found in *Titanium Dioxide*. Evidence implying a traditional conspiracy "includes 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'" *Titanium Dioxide*, 959 F. Supp. 2d at 829 (quoting *Flat Glass*, 385 F.3d at 361). Ambiguous statements by defendants, such as "referring to

31

'an understanding within the industry not to undercut each other's prices' and 'support' for efforts to limit pricing," can support an inference of a price-fixing conspiracy. *Id.* (quoting *High Fructose Corn Syrup*, 295 F.3d at 662). This is particularly true where there is evidence of statements about disciplining companies that failed to follow the understanding or where price increases by multiple sellers immediately followed communications between competitors. *Id.* at 829–30 (considering statements of industry "discipline" and that 88 percent of price increase announcements occurred within thirty days of an industry meeting, suggesting industry coordination) (citing *High Fructose Corn Syrup*, 295 F.3d at 662 (statements that companies needed to "play by the rules" showed discipline implying a conspiracy); *Flat Glass*, 385 F.3d at 364–67 (analyzing communications between competitors prior to three price increase announcements); *Publ'n Paper*, 690 F.3d at 57–59 (same)). Plaintiffs' assertion that the industry conferences and statements about "collaboration" and "alignment" are sufficient to imply a traditional conspiracy falls well short of what is required, including at the pleading stage. Unlike in *Titanium Dioxide*, *Flat Glass*, and *Publication Paper*, there are no allegations of any close-in-time wage changes that align with any of the industry conferences or any discipline for companies that did not adjust their wages according to a specific formula or rate within a specific time. None of the witness statements imply an agreement to set their wages at particular rates, for example, or within certain percentages of the median wages set forth in the surveys. None of the alleged "statements by the Defendants [] are suggestive of cartel behavior" as Plaintiffs assert. *Titanium Dioxide*, 959 F. Supp. 2d at 810; ECF No. 465 at 47. Therefore, the alleged facts here are insufficient for this plus factor to apply.

32

These allegations of circumstantial evidence, taken together (including considering the allegedly direct evidence of an agreement), do not rise to the level of plausibly alleging an agreement regarding *how much* would be paid in compensation or any agreed-upon formula to determine this amount among the Nuclear Defendants. An agreement to exchange information alone does not give rise to a *per se* claim. "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *United States v. U. S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). In some cases, "dissemination of [salary] information to the employees could have helped mitigate any anticompetitive effects of the exchange and possibly enhanced market efficiency by making employees more sensitive to salary increases." *Todd*, 275 F.3d at 213. A consequence of Defendants' alleged sharing of compensation data was that each Defendant could, if they so chose, "make sure they were in line with other nuclear utilities." Am. Compl. ¶ 248. But the fact that Defendants allegedly agreed to *share* compensation data falls short of conduct showing an agreement to *align compensation rates*.

Further, while Plaintiffs have sufficiently alleged a motive to conspire, their other alleged plus factors fail. "[C]ommon motive does not suggest an agreement. Any firm that believes that it could increase profits by raising prices [or lowering costs] has a motive to reach an advance agreement with its competitors." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). Because the other plus factors fail, and because common motive alone is insufficient to infer an agreement to

33

fix compensation, Plaintiffs fail to state a claim for Count I based on circumstantial evidence under the parallel conduct and plus factors test.

### b.   "Who, What, When, and Where" test

Even if the Court were to accept Plaintiffs' contention that parallel conduct is not required for circumstantial evidence and that the Court should instead evaluate whether they have sufficiently alleged the "who, what, when and where" of the alleged conduct, Plaintiffs' claim would fail for the same reason—failure to allege facts relate to "what" the alleged conspiracy was for (to fix or suppress compensation).

Plaintiffs contend that they have sufficiently asserted facts to answer the "what" question as "[t]he Complaint alleges Defendants conspired to unlawfully exchange compensation data and to fix compensation—including wages, salaries, benefits, and bonuses—paid to nuclear power generation workers in the United States." ECF No. 465 at 33. They then refer to some of the statements made by former HR executives of Defendants. *Id.* As the Court has previously explained, all of the "what" of Plaintiffs' allegations relate to a potential agreement to share information and individual Defendants' choices to use (or not use) that information—rather than an agreement to fix or otherwise suppress amounts they paid in compensation.

Therefore, even if parallel conduct were not required (which the Court does not decide), the allegations of the complaint would still fail to adequately allege circumstantial evidence of an agreement to fix or suppress wages.

\*     \*     \*

In short, Plaintiffs do not allege facts that constitute direct evidence of an agreement to fix or suppress wages. And their allegations fall short of stating a claim based on circumstantial evidence of such an agreement because they do not establish

34

parallel conduct, plus factors, or (insofar as permissible as an alternative circumstantial evidence theory) other circumstantial evidence of a wage-fixing agreement. Accordingly, Count I fails to state a claim on which relief can be granted.

### B.    Count II

"[E]xchanges of information do not constitute a *per se* violation of the Sherman Act" and are instead evaluated under the "rule of reason" standard. *Gypsum*, 438 U.S. at 441 n.16 (citing cases). Under this standard, a court must "examine[] all of the circumstances to determine whether a practice unreasonably restrains competition." *Valuepest.com of Charlotte, Inc. v. Bayer Corp.*, 561 F.3d 282, 287 (4th Cir. 2009) (citing *Leegin*, 551 U.S. at 885). "A number of factors including most prominently the structure of the industry involved and the nature of the information exchanged are generally considered in divining the procompetitive or anticompetitive effects of this type of interseller communication." *Gypsum*, 438 U.S. at 441 n.16 (citations omitted).

A "rule of reason" antitrust claim based on an information-sharing theory requires (1) an agreement to exchange information, (2) a plausibly defined labor market, and (3) anticompetitive effects. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541–42 (2018); *Dickson*, 309 F.3d at 205 n.15, 206; *Robinson v. Nat'l Collegiate Athletic Ass'n*, 172 F.4th 271, 292–93 (4th Cir. 2026) ("Before the court can assess whether the challenged rules have a substantial anticompetitive effect (i.e., reach the first step of the rule of reason analysis), on this record, it 'must first define the relevant market'"); *see also Princo Corp. v. ITC*, 616 F.3d 1318, 1353 n.17 (Fed. Cir. 2010) (Dyk, J., dissenting) ("If a restraint does not qualify as inherently suspect, the plaintiff will need to demonstrate anticompetitive effect either 'indirectly by proving that the defendant possessed the requisite market power within a defined market or directly by showing

actual anticompetitive effects'") (quoting *Law v. Nat'l Collegiate Athletic Assoc.*, 134 F.3d 1010, 1019 (10th Cir. 1998)). "To have an 'anticompetitive effect,' conduct 'must harm the competitive process.'" *Dickson*, 309 F.3d at 206 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)).

Plaintiffs sufficiently allege, and Defendants do not appear to dispute (at least at the pleadings stage), that there was an agreement to exchange information. Instead, Defendants argue that Plaintiffs have failed to allege an *unlawful* agreement to exchange information. ECF No. 427-1 at 46–60.

Defendants contend that Plaintiffs' alleged relevant market is implausibly broad given its overinclusion of unrelated roles and Plaintiffs' failure to distinguish between employment elasticity for these different roles. *Id.* at 13–14, 47. They also argue that a nationwide geographic market covering plants in twenty-eight different states is overbroad as these are distinct job markets. *Id.* at 16–17. Finally, Defendants argue that the amended complaint fails to establish anticompetitive effects because it fails to allege that the type of information exchanged would tend to suppress wages or that wages were in fact suppressed. *Id.* at 53, 59. They specifically assert that Plaintiffs' allegations regarding the sharing of information through the CBA Repository involved information that is largely publicly available either to the general public or at least to union leadership and employees, *id.* at 54–55, and that the allegations regarding the WTW Surveys fail because this was an exchange of aggregated information, which without more is not unlawful. *Id.* at 55–56 (citing *Maple Flooring Mfrs.' Ass'n*, 268 U.S. at 586; *Todd*, 275 F.3d at 212; *Broiler Chicken*, 702 F. Supp. 3d at 679).

Plaintiffs contend that they have properly established the relevant market as they have sufficiently pled that Defendants' "'employees are reasonably limited' to nuclear

power generation jobs" because "across the board, '[n]uclear power generation jobs are highly specialized and require extensive training,'" and because "[n]uclear power generation employees must also satisfy rigorous background checks, and some employees must have nuclear-specific degrees or licenses." ECF No. 465 at 52 (quoting *Jien*, 2020 WL 5544183, at \*11; Am. Compl. ¶ 361; citing *id.* ¶¶ 361–363). They also contend that they have sufficiently alleged a nationwide geographic market given the alleged interconnectivity of Defendants across various states. *Id.* at 56–58. Finally, Plaintiffs contend that they have directly pled anticompetitive effects of the alleged agreement to exchange information based on the alleged suppression of compensation and have also indirectly pled anticompetitive effects based on market concentration and the exchange of current and future as well as disaggregated compensation data. *Id.* at 58–61.

*   *   *

At this time, the Court need not reach the question of whether, on the merits, Count II states a claim on which relief can be granted. That is because, as explained below, Plaintiffs' claims are time-barred. *See* § III.C., *infra*. If Plaintiffs seek leave to file an amended complaint and the Court concludes that such complaint adequately alleges timeliness, at that time the Court will consider the merits of whether Plaintiffs' rule-of-reason claim (Count II) states a claim on which relief can be granted.

## C.   Statute of limitations

As noted above, the Sherman Act's limitations period is four years. 15 U.S.C. § 15b. The complaint in this case was filed on July 11, 2025; four years earlier was July 11, 2021. ECF No. 1. The Named Plaintiffs have not alleged that they were employed by any Defendant during the limitations period. For that reason, and because the

37

continuing violations and fraudulent concealment doctrines (discussed below) do not apply, Plaintiffs' claims are untimely, at least as alleged in the operative complaint.

### i.      Named Plaintiffs' injuries

The limitations analysis begins with whether Named Plaintiffs Dorrell, Dunn, or Chapel have alleged that they personally suffered a cognizable and *timely* antitrust injury. Antitrust plaintiffs must sue within four years of the time their claim accrues, meaning they "must sue within four years after the date of the injury." *Kearse v. Kaplan, Inc.*, 692 F. Supp. 2d 398, 400 & n.15 (S.D.N.Y. 2010) (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.,* 401 U.S. 321, 338 (1971)). The complaint alleges that each named Plaintiff "was" employed at one or more of the Nuclear Defendants, indicating that they are no longer employed there. Am. Compl. ¶¶ 25–27. Plaintiffs allege that their employment was "during the Class Period" (which stretches back to 2003, *see id.* at 10) but do not state which years during that period they were employed by one or more of the Nuclear Defendants. *Id.* Specifically, the amended complaint does not allege that any of the Named Plaintiffs worked at any Defendant—or even within the nuclear power industry in any capacity—on or after July 11, 2021. This is a fundamental flaw that requires dismissal of the amended complaint on limitations grounds.

Plaintiffs allege that "[d]uring the Class Period," including during the four years prior to the filing of the complaint (*i.e.*, after July 11, 2021), Defendants engaged in acts that "adher[ed] to, enforce[d], and reaffirm[ed] the anticompetitive agreement." *Id.* ¶ 384. They allege that this was done through the same "conspiratorial acts" of meetings and communication outlined above, which Plaintiffs allege were part of the same, continuing practice of anticompetitive behavior. *Id.* ¶ 385. The specific facts alleged to have occurred after July 11, 2021 include: (1) "On August 9, 2022, NHRG hosted a

roundtable discussion during ANS's annual Expo titled 'Nuclear Pay & Benefits / Roundtable Discussion,'" *id*. ¶ 350(a); (2) "In 2023, NHRG hosted a session titled 'Total Rewards Roundtable' during [American Nuclear Society]'s annual Expo. This session included presentations on 'competitive salaries, and hiring strategies,'" *id*.; (3) "The Nuclear Energy Institute held a Regulatory Affairs Forum at the Bethesda North Marriott in Maryland from September 12 to September 14, 2023," which some of the Nuclear Defendants attended, *id*. ¶ 23; (4) "In a February 2024 report to the Minnesota Public Utilities Commission, Xcel Energy stated that when setting compensation Xcel Energy 'leverages a membership through the Nuclear Human Resource Group (NHRG) for survey participation and industry peer benchmarking,'" specifically by "set[ting] compensation rates that 'matched to the market median, or 50th percentile' of the WTW Surveys," *id*. ¶ 316; and (5) Edison Electric Institute hosted a 2024 annual conference, which some Nuclear Defendants attended, *id*. ¶ 350(b).

If one or more of the Named Plaintiffs were employed by one or more of the Defendants during the 4-year limitations period, those events might be sufficient to render these Plaintiffs' claims timely (or they might not; the Court need not decide that). But because they have not alleged that they were employed by Defendants during the limitations period, a necessary element is missing: the complaint does not allege that any named Plaintiff *himself* suffered harm as a result of anticompetitive acts that took place after July 2021. A plaintiff, including an antitrust plaintiff, cannot use an injury that may have accrued to someone else to salvage the plaintiff's own untimely claims. *See In re Cotton Yarn Antitrust Litig*., 505 F.3d 274, 290 (4th Cir. 2007) ("[A]n antitrust claim arises and the statute of limitations 'begins to run when a defendant commits an act that injures a *plaintiff's* business'") (quoting *Zenith Radio*, 401 U.S. at

338) (emphasis added); *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 25 (2d Cir. 1985) ("[S]everal courts have held that an employee who has been discharged pursuant to a discriminatory policy may not take advantage of later discriminatory acts against other employees for the purpose of postponing the running of the statutory period as to him on a continuing violation theory") (citations omitted).

If Plaintiffs were not employed by the Nuclear Defendants after July 2021, they could not have experienced harms in the form of lower wages from anticompetitive acts that took place during the statutory period. Further, contrary to Plaintiffs' arguments at the hearing, *see* ECF No. 524 at 131–133, the fact that Plaintiffs propose to represent a putative class of employees that includes people who did work for the Nuclear Defendants during the statutory period cannot fix this deficiency at the pleading stage because "the Court can only consider allegations related to the named plaintiffs . . . and not generalized allegations concerning unnamed plaintiffs or putative class members." *McCants v. Nat'l Collegiate Athletic Ass'n*, 201 F. Supp. 3d 732, 740 (M.D.N.C. 2016) (citing *Crissen v. Gupta*, 994 F. Supp. 2d 937, 945–46 (S.D. Ind. 2014)); *see also Scharpf v. Gen. Dynamics Corp.*, 137 F.4th 188, 199 (4th Cir. 2025) ("As no *named* Plaintiff has worked for Defendants since 2013, Plaintiffs must adequately plead affirmative acts of fraudulent concealment to avoid their claims being time-barred") (emphasis added), *petition for cert. filed*, Case No. 25-293 (Sept. 11, 2025).

Accordingly, even accepting all the facts in the complaint as true, Plaintiffs have not plausibly alleged that they suffered an antitrust injury from an act that occurred during the statutory period; they have only alleged that they suffered an injury occurring at some unknown point after May 2003 (the beginning of the alleged class period). Thus, their claims as alleged are not timely unless they have plausibly alleged an

40

exception to the statute of limitations. Plaintiffs have cited two such exceptions: the continuing violation and fraudulent concealment doctrines. The complaint does not plausibly allege facts to support either.

### ii.     Continuing violation doctrine

Plaintiffs allege a "Class Period" that began in May 1, 2003 and continues to run today. Am. Compl. ¶¶ 1, 409, 424, 430. But just as the named Plaintiffs may not rely on injuries to absent class members to render their own claims timely, without a timely injury to Plaintiffs themselves (or one that was fraudulently concealed from them, discussed below), the continuing violations doctrine does not render the named Plaintiffs' claims timely either.

The continuing violation doctrine allows plaintiffs to sue for wrongful conduct that took place outside the statute of limitations in certain circumstances if the conduct recurred during the statutory period. "'In the context of a *continuing conspiracy* to violate the antitrust laws,' a cause of action accrues '*each time* a plaintiff is injured by an act of the defendants.'" *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 286 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1921 (2025) (quoting *Zenith Radio,* 401 U.S. at 338) (emphasis in original). Thus, for the continuing violation doctrine to apply, both an overt act and resultant antitrust injury to the plaintiff must occur during the statutory period. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period.") (citing *Zenith Radio*, 401 U.S. at 338) (citations omitted). "[O]nce Defendants illustrate that the claims are untimely *but for* the application of the continuing violation exception, [Plaintiff] bears the burden of establishing that the exception applies." *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 648

F. Supp. 3d 679, 693 (E.D. Va. 2023), *aff'd*, 114 F.4th 280 (4th Cir. 2024) (citations omitted).

Plaintiffs allege that Defendants committed anticompetitive acts of information sharing during the Class Period, which stretches from May 2003 through the present day. Am. Compl. at 10. Thus, they do broadly allege that Defendants engaged in a pattern of anticompetitive *conduct* that continued past July 2021. *See, e.g.*, *id.* ¶ 301 (alleging that "Labor Relations Project" meetings at which certain Nuclear Defendants would unlawfully exchange wage information took place "each year during the Class Period," which would include the years following 2021). Plaintiffs further argue that "each time Nuclear Defendants paid class members wages suppressed by the conspiracy, the statute of limitations refreshed." ECF No. 465 at 66 (citing *Mayor of Balt. v. Actelion Pharms. Ltd.*, 995 F.3d 123, 131 (4th Cir. 2021), and *Turner v. McDonald's USA LLC*, Case No. 19-C-5524, 2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020)). But the named Plaintiffs do not allege that *they* were paid "wages suppressed by the conspiracy" during the limitations period. Without an alleged antitrust injury to Named Plaintiffs themselves within the limitations period, then, an allegedly continuous (and even allegedly continuing) violation that harms other people does not render Plaintiffs' own claims timely. And if their personal claims are not timely, then in the absence of named Plaintiffs who do have timely claims (and there are none in the operative complaint), the complaint must be dismissed.

### iii.   Fraudulent concealment

For these reasons, the timeliness of the amended complaint comes down to whether the Named Plaintiffs have adequately alleged that Defendants fraudulently

concealed from them the facts that are the basis of their claims, and that such concealment continued until sometime after July 11, 2021. They have not.

"[I]f a defendant engages in fraudulent concealment, the limitations period does not begin to run until the plaintiff discovers the violation." *Scharpf*, 137 F.4th at 195 (citing *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995)). "To toll a limitations period through fraudulent concealment, 'a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence.'" *Id.* (quoting *Marlinton,* 71 F.3d at 122).

To satisfy the first element, a plaintiff must allege "'affirmative acts of concealment' by the defendants." *Id.* (quoting *Marlinton*, 71 F.3d at 126). Such proof "'may include acts of concealment involved in the antitrust violation itself.'" *Id.* at 196 (quoting *Marlinton*, 71 F.3d at 122). In addition, a plaintiff must demonstrate that the affirmative acts were undertaken with fraudulent intent. At the pleading stage, this means a plaintiff must "allege facts sufficient [for the court] to infer that the defendants performed the acts *with the intent to* prevent or deceive others from discovering their scheme" and thus "did more than engage in 'mere silence.'" *Id.* at 201 (quoting *Wood v. Carpenter*, 101 U.S. 135, 143 (1879)) (emphasis in original). In deciding whether allegations in a complaint are sufficient to support such an inference, "[c]ourts should first consider whether the affirmative acts themselves imply fraudulent intent." *Id.* Courts must also consider "whether the underlying violation—the violation that the affirmative acts are intended to cover up—is obviously illegal." *Id.* "When the alleged violation presents 'extremely difficult and particularly close questions of law,' it is more

43

difficult to infer that an affirmative act was intended to avoid detection, as defendants may have not even realized that their actions were illegal." *Id.* (quoting *Boland v. Consol. Multiple Listing Serv., Inc.*, 868 F. Supp. 2d 506, 516 (D.S.C. 2011) *aff'd and remanded sub nom. Robertson*, 679 F.3d 278). "[S]ecret agreements and covert price-setting sessions . . . could count as proof of fraudulent concealment." *Id.* at 197 (quoting *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1531–32 (5th Cir. 1988)) (cleaned up). And "conspirators who 'are *careful not to write down* evidence of their antitrust violations in the first place' can be held accountable," because "[f]or allegations of unwritten agreements, it will sometimes be difficult to infer fraudulent intent." *Id.* at 197, 201 (quoting *Marlinton*, 71 F.3d at 125).

In addition to the substantive tests for fraudulent concealment, the analysis must also consider the appropriate pleading standard. "The normal pleading standards are heightened for allegations of fraudulent concealment as Federal Rule of Civil Procedure 9(b) states that parties must allege 'fraud . . . with particularity.'" *Id.* at 195. But courts in the Fourth Circuit apply a "relaxed" Rule 9(b) standard for fraudulent concealment because in such cases, "it is well-nigh impossible for plaintiffs to plead all the necessary facts with particularity, given that those facts will often be in the sole possession of the defendant." *Corder v. Antero Res. Corp.*, 57 F.4th 384, 402 (4th Cir. 2023). "[A] court considering a fraudulent-concealment argument 'should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.'" *Sharpf*, 137 F.4th at 195 (quoting *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 553 (4th Cir. 2019)). Furthermore, because fraudulent *intent* "may be alleged generally" under Rule 9(b),

44

courts "do not apply a heightened pleading standard to the intent elements of fraudulent allegations." *Id.* at 201 (citing *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 197 n.14 (4th Cir. 2022)).

Here, in support of their fraudulent concealment theory, Plaintiffs allege that the Nuclear Defendants committed affirmative acts of concealment in at least four ways, many of which are discussed above: (1) maintaining HR departments that are separate from other employees and, for some Nuclear Defendants, compensation groups that are separate from the rest of HR, *see, e.g.*, Am. Compl. ¶¶ 396–98; (2) using passwords to protect the CBA Repository and CCRs and exchanging them only on a "give-to-get" basis, *e.g.*, *id.* ¶ 399–402; (3) exchanging information in secret at "closed door" sessions during the NHRG conferences and related meetings and through direct phone conversations, *e.g.*, *id.* 403–08; and (4) making allegedly false statements on their websites that they offer "competitive pay and benefits," *e.g.*, *id.* ¶ 394. *See* ECF No. 465 at 62–64. Plaintiffs maintain that they had no "actual [or] constructive knowledge" of the alleged conspiracy until sometime after July 11, 2021, and that that delay was due to Defendants' actions to keep their agreements and information exchanges secret. *Id.* ¶ 386–87.

Even if these actions did constitute acts that concealed the alleged conspiracy, the complaint lacks non-conclusory allegations that they were taken with the *intent* to fraudulently conceal their alleged antitrust conspiracy. The Court's dismissal of Count I is an important predicate to this conclusion. Count I alleged that the Nuclear Defendants affirmatively agreed among themselves to suppress wages. Such an agreement is obviously illegal, hence why it is considered a *per se* violation of antitrust law. But with Count I dismissed for failure to state a claim, that leaves only Count II,

45

which alleges a conspiracy to exchange compensation information that had the alleged effect of lowering wages. Although such a conspiracy *can* be unlawful, the exchange of compensation information for benchmarking purposes is not obviously so. *See Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 517 F. Supp. 3d 458, 464 (D. Md. 2021) ("[T]here is nothing inherently anticompetitive or illegal about using data benchmarking services . . . . Similarly, trade association meetings where confidential data are exchanged are not inherently anticompetitive either.") (citing *Jien*, 2020 WL 5544183, at *8; *Musical Instruments*, 798 F.3d at 1196). As the Fourth Circuit emphasized in *Scharpf*, it is easier to ascribe fraudulent intent to the secretive actions of a defendant who has done something obviously wrong, as opposed to one who has taken action that is arguably lawful. *Scharpf*, 137 F.4th at 201 ("When the alleged violation presents 'extremely difficult and particularly close questions of law,' it is more difficult to infer that an affirmative act was intended to avoid detection, as defendants may have not even realized that their actions were illegal.") (quoting *Boland*, 868 F. Supp. 2d at 516). Because Plaintiffs have not plausibly alleged a *per se* price-fixing claim, they have a steeper hill to climb to plausibly allege fraudulent intent for concealment/limitations purposes.

Keeping this principle in mind, the Court must "first consider" whether "the affirmative acts" of concealment that Plaintiffs have alleged "themselves imply fraudulent intent." *Id.* at 201.

The central problem for Plaintiffs is that the complaint, stripped of the conclusory labels of secrecy or deceptive intent, primarily alleges normal business activities. Plaintiffs allege, for example, that Defendants' "siloing" of HR and compensation departments and using password protection when exchanging

46

compensation information implies fraudulent intent. But there is another potential explanation for such confidentiality practices that is at least equally plausible: private companies do not generally broadcast facts about what each employee is paid. *See Behler v. Hanlon*, 199 F.R.D. 553, 561 (D. Md. 2001) ("Most people are sensitive about their income, and who knows the details about it"). Plaintiffs have not alleged any facts indicating intent to *fraudulently* conceal the Nuclear Defendants' information-exchanging practices, as opposed to a general corporate policy of keeping compensation information confidential. The Court would have to speculate that these relatively standard practices were undertaken with fraudulent intent as opposed to ordinary care for sensitive information. *See McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 586 (4th Cir. 2015) (dismissing a complaint where "[o]nly speculation [could] fill the gaps").

Regarding Plaintiffs' allegations concerning the NHRG conferences and related meetings and communications, it is true that "secret meetings" can be evidence of fraudulent intent. In *Jien*, for example, the plaintiffs "specifically allege[d] that Defendants required in-person attendance at the secret meetings to avoid leaving a paper trail, with expulsion from the group as the penalty for non-compliance with this clandestine practice." 2020 WL 5544183, at *13. But here, Plaintiffs have not claimed that the meetings involved a deliberate lack of paper trail or enforceable code of silence like in *Jien*—allegations that might render plausible the otherwise-conclusory statements that Defendants acted in an intentionally clandestine or deceptive fashion. They contend instead that the meetings were essentially standard trade association fare, limited to those employed at nuclear power companies that "paid dues." Am. Compl. ¶ 404. Plaintiffs also do not allege, for example, that the participants enforced a "no

47

notes" policy to avoid possible detection. To the contrary, it appears that the exchange of compensation information left a significant electronic paper trial, through the CBA Repository and CCRs that were apparently distributed via some form of written communication. *See id.* ¶ 400 (explaining that the compensation information was uploaded and stored onto an electronic file). Plaintiffs may not themselves have been invited to the Nuclear Defendants' meetings regarding compensation, but they have not plausibly alleged that these meetings were any more secretive than an ordinary trade association breakout session, let alone that Defendants knowingly kept these meetings secret in order to avoid detection of their alleged antitrust scheme.

In the same vein, though Plaintiffs have alleged that Nuclear Defendant employees used telephone conversations to communicate directly about compensation and avoid documentary evidence, they have alleged no other signs of fraud or deception to plausibly transform this standard practice into anything nefarious. To be sure, efforts to avoid written communication can imply fraudulent intent, as in *Scharpf*, 137 F.4th 202. But again, the complaint here alleges that the Nuclear Defendants *did* engage in written communication, such as by exchanging the CBA Repository and CCRs. What's more, Plaintiffs allege that even the direct communications about compensation that took place over the phone also occurred over email. *See, e.g.*, Am. Compl. ¶ 385 (alleging that the Nuclear Defendants undertook both "email and telephonic communications . . . to directly exchange and discuss compensation information"). Merely alleging that competitors sometimes called one another is not enough to plausibly allege fraudulent intent, particularly when combined with what appears to be significant written communications.

That leaves Plaintiffs' allegations that the Nuclear Defendants posted false statements on their websites regarding the competitiveness of their compensation. *Id.* ¶ 394. As explained earlier, the allegations regarding Count II do not amount to conduct that was obviously unlawful, given that benchmarking is permitted. The statements on the website merely assert that the Nuclear Defendants' compensation is "competitive" with the industry. These boilerplate statements amount only to an assertion of what the Nuclear Defendants apparently believed to be true based upon the benchmarking—that their compensation was not substantially below market rates. *See Robertson*, 679 F.3d at 291 n.2 (explaining that "a failure to admit to wrongdoing . . . does not suffice" to show fraudulent intent to conceal) (quoting *Pocahontas Supreme Coal Co., Inc. v. Bethlehem Steel Corp.,* 828 F.2d 211, 218–19 (4th Cir. 1987)) (internal quotations omitted). In other words, Plaintiffs have plausibly alleged that the statements were inaccurate, but not that they were fraudulent.

*     *     *

Because Plaintiffs have alleged no acts and resultant injuries that occurred during the statutory period, the continuing violation doctrine does not apply, and they have not plausibly alleged fraudulent concealment, their claims as pled are barred by the statute of limitations.

### D.    With vs. without prejudice

In summary, the Court concludes that the complaint does not state a claim under either Count I or II on which relief can be granted: as to both counts on limitations grounds, and as to Count I as a Rule 12(b)(6) matter. (The Court does not decide one way or the other whether Count II, if it were timely, alleges sufficient facts to make out a rule-of-reason claim.)

That leaves the question of whether to dismiss Plaintiffs' first amended complaint with prejudice or without, which turns in part of whether "the district court believes a deficiency in a complaint can be cured." *Britt v. DeJoy*, 45 F.4th 790, 796 (4th Cir. 2022); *see also United States ex rel. Nicholson v. MedCom Carolinas, Inc.*, 42 F.4th 185, 196 (4th Cir. 2022) (explaining that "plaintiffs do not get a dry run as a matter of right" and a district court is "not required to give plaintiffs one without-prejudice ruling on the merits before dismissing with prejudice") (citing *Abdul-Mumit v. Alexandria Hyundai*, 896 F.3d 278, 292 (4th Cir. 2016)).

This dismissal will be without prejudice because an amendment could potentially cure the complaint's deficiencies. For example, if any named Plaintiff *did* work for the Nuclear Defendants during the statutory period (or if another named plaintiff were added who did), that would potentially alter the Court's timeliness analysis. To be clear, the Court will not rule in advance on whether Plaintiffs will be granted leave to amend; Plaintiffs, if they wish to amend, must file a motion justifying leave to amend. But because the Court lacks sufficient information at this time to rule definitively that amendment would be futile, the Court will dismiss the amended complaint without prejudice and grant Plaintiffs 45 days to file a motion for leave to amend.

The Court will consider the other motions to dismiss below to determine whether the claims against any individual Defendants should be dismissed with prejudice and/or whether to make any alternative rulings for dismissal without prejudice. *See Woodfolk v. Maynard*, 857 F.3d 531, 545 (4th Cir. 2017) ("[C]ourts frequently provide alternative bases for rejecting a claim, and may do so without undermining reliance on either ground"). *But see Lowy v. Daniel Def., LLC*, 167 F.4th 175, 201–04 (4th Cir. 2026)

50

(explaining that a court should not make alternative rulings if it finds that it lacks subject matter jurisdiction).

## IV.    TENNESSEE VALLEY AUTHORITY'S MOTION

TVA is "a wholly owned public corporation of the United States" that mixes "traditionally governmental functions with typically commercial ones." *Thacker v. Tenn. Valley Auth.*, 587 U.S. 218, 220–21 (2019) (quotations omitted). Several provisions of TVA's enabling statute (the TVA Act, 16 U.S.C. § 831, *et seq.*) dictate the manner in which TVA must compensate its employees. Of most relevance to the claims here, Congress expressly requires TVA to develop "compensation plans" for its employees that are "based on an annual survey of the prevailing compensation for similar positions in private industry." 16 U.S.C. § 831a(i)(2). Moreover, all of TVA's contracts that "require the employment of laborers and mechanics in . . . construction, alteration, maintenance, or repair" must "contain a provision that not less than the prevailing rate of wages for work of a similar nature prevailing in the vicinity shall be paid to such laborers or mechanics." *Id.* § 831b(b). Concerning these laborer and mechanic wages, "[i]n the event any dispute arises as to what are the prevailing rates, the question shall be referred to the Secretary of Labor for determination, and his decision shall be final." *Id.*

Largely because of these statutes, TVA advances three arguments for why the claims against it should be dismissed. First, TVA argues that it is a governmental entity entitled to sovereign immunity and that its compensation-related activities are governmental in nature and not commercial (and that there is no applicable waiver of sovereign immunity). Second, TVA contends that it is not a "person" for Sherman Act purposes because it is an "instrumentality" of the U.S. government. Third, TVA contends

that it is entitled to "antitrust immunity" under a preemption-like doctrine barring antitrust claims that conflict with statutory or regulatory duties.

The Court concludes that TVA lacks sovereign immunity, and is a "person" for Sherman Act purposes. The Court further finds no conflict between the TVA Act and Plaintiffs' allegations regarding Count I. But the Court does conclude that Count II as pled is barred under the doctrine of antitrust immunity and thus will dismiss Count II with prejudice as to TVA only.

### A.    Sovereign immunity

"Absent a waiver of sovereign immunity, the Federal Government is immune from suit." *Loeffler v. Frank*, 486 U.S. 549, 554 (1988) (citing *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). The TVA Act contains such a waiver in 16 U.S.C. § 831c(b), under which TVA "[m]ay sue and be sued in its corporate name." The Supreme Court held in *Thacker* that this provision serves as a "broad" waiver of sovereign immunity allowing TVA to be sued in many circumstances. 587 U.S. at 220. To determine whether such a "sue-and-be-sued" waiver applies to preclude a particular lawsuit, the *Thacker* Court outlined a two-step analysis. First, a court must ask whether the conduct at issue is "governmental or commercial in nature." *Id.* at 229. Activities such as the use of eminent domain or the exercise of law enforcement authority (both powers that TVA possesses in some circumstances) are governmental. *Id.* at 228. But where "TVA acts like any other company producing and supplying electric power," its conduct is commercial in nature and not entitled to sovereign immunity. *Id.* Even if the conduct is governmental, that does not end the analysis. Instead, at step 2, TVA must "clearly show[]" that "prohibiting the 'type[ ] of suit [at issue] is necessary to avoid grave

interference' with a governmental function's performance." *Id.* at 228 (quoting *Fed. Hous. Admin., Region No. 4 v. Burr*, 309 U.S. 242, 245 (1940)).

The analysis here ends at step one: TVA's decisions regarding how to compensate its employees are commercial, not governmental, in nature. Deciding how much to pay employees is not an exclusively or traditionally governmental function. Such activities are exactly the kind of activity "any power company" might do. *Thacker*, 587 U.S. at 229. Indeed, all of the other Nuclear Defendants have been sued for the same conduct. TVA's primary argument to the contrary is that it has unique statutory duties regarding compensation, such as the requirement to establish a "compensation plan" by surveying comparable rates. ECF No. 415-1 at 13–14 (citing 16 U.S.C. §§ 831a(i), 831b(b)). But the test laid out in *Thacker* does not turn on whether the given conduct is directed or authorized by statute. Instead, the relevant question is whether the conduct is (a) "the kind of thing any power company might do," and thus commercial, or (b) reflective of traditional governmental functions such as law enforcement. *Thacker*, 587 U.S. at 229. Under that test, TVA's conduct in determining how much to pay employees of its nuclear power-generating business is clearly a commercial act. *See N. Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344, 350 n.4 (4th Cir. 2008) (concluding that "TVA's power-generating activities are commercial in nature and thus are not immune to suit"). Thus, regardless of whether its compensation activities are directed by statute, the statutory immunity waiver applies.

The Court also rejects TVA's argument that it is entitled to sovereign immunity because it is an instrumentality of the federal government rather than a separate "person." The Sherman Act only allows antitrust claims to be brought against "persons." 15 U.S.C. § 1. Drawing largely on *United States Postal Service v. Flamingo Industries*

*(USA) Limited*, which held that USPS is not subject to antitrust claims, TVA argues that it is not a "person" existing separately from the U.S. government and thus cannot be sued. 540 U.S. 736, 746 (2004).

But *Flamingo Industries* is readily distinguishable because TVA (unlike USPS) is a federal corporation. In fact, the *Flamingo Industries* court made that exact distinction:

> The Sherman Act defines "person" to include corporations, and had the Congress chosen to create the Postal Service as a federal corporation, we would have to ask whether the Sherman Act's definition extends to the federal entity under this part of the definitional text. Congress, however, declined to create the Postal Service as a Government corporation, opting instead for an independent establishment.

*Id.* at 746. The TVA was established as a separate federal corporation in 16 U.S.C. § 831c, and thus unlike USPS it is a distinct entity subject to antitrust liability. Before finding that TVA was shielded by implied immunity (as discussed below), the Sixth Circuit reached the same conclusion in *McCarthy v. Middle Tennessee Electric Membership Corporation*: "Although some prior cases have recognized that the TVA is immune from antitrust liability, the *Flamingo Industries* analysis casts doubt on such a conclusion" because although "[t]he TVA . . . has certain public characteristics," it "is organized as a corporation." 466 F.3d 399, 413–14 (6th Cir. 2006) (citing 16 U.S.C. § 831); *see also Galette v. N.J. Transit Corp.*, 607 U.S. 509, 530 (2026) (holding that a state public transit entity "is a corporation that has all the hallmarks of separate legal personhood, such as the power to sue and be sued, make contracts, and hold property in its own name, which all indicate that it is not an arm of the State and does not share in its immunity from suit"). Because TVA is a distinct corporate entity, it is a "person" for

54

purposes of the Sherman Act and cannot evade antitrust liability by claiming to be synonymous with the federal government.

### B. Antitrust immunity

That leaves TVA's argument that it is entitled to so-called "antitrust immunity" because the duties imposed by the Sherman Act that form the basis of Plaintiffs' claims irreconcilably conflict with its duties under the statutes quoted above, which require TVA to develop "compensation plans . . . based on an annual survey of the prevailing compensation for similar positions in private industry," 16 U.S.C. § 831a(i)(2), require it to pay certain laborers and mechanics "not less than the prevailing rate of wages for work of a similar nature prevailing in the vicinity," *id*. § 831b(b), and provide that any disputes regarding such "prevailing rates" be resolved by the Secretary of Labor, *id*.

"Where regulatory statutes are silent in respect to antitrust . . . courts must determine whether, and in what respects, they implicitly preclude application of the antitrust laws." *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 271 (2007). To make this determination, a court must "decid[e] whether, given context and likely consequences, there is a 'clear repugnancy' between the [other statute] and the antitrust complaint—or . . . whether the two are 'clearly incompatible.'" *Id*. at 275. Drawing heavily on *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 689 (1975), the Supreme Court in *Credit Suisse* outlined a conjunctive list of four elements that, where satisfied, indicate implied antitrust immunity:

> (1) the existence of clear and adequate regulatory authority to supervise the activity in question; (2) evidence that the responsible regulatory entities exercise that authority in an active and ongoing manner; (3) a resulting risk that the antitrust laws and those governing the challenged activity, if both applicable, would produce conflicting guidance,

> requirements, duties, privileges, or standards of conduct; and
> (4) . . . the questioned activity lies squarely within the
> heartland of the regulated area.

*U.S. Futures Exch., LLC v. Bd. of Trade of Chi., Inc.*, 953 F.3d 955, 967 (7th Cir. 2020)

(citing *Credit Suisse*, 551 U.S. at 275–77); *see also Energy Mktg. Servs., Inc. v.*

*Columbia Gas Transmission Corp.*, 639 F. Supp. 2d 643, 648 (S.D. W. Va. 2009)

(applying *Credit Suisse*'s four-factor test). A finding of antitrust immunity "is not

favored" and should "not casually . . . be allowed." *Gordon*, 422 U.S. at 682.[5]

    *Credit Suisse* and its predecessors dealt with the context of a conflict between

securities law and antitrust law. The parties here have identified only one case squarely

addressing implied antitrust immunity stemming from the TVA statute (and the Court's

own research has not revealed any further cases either): *McCarthy*, 466 F.3d 399. In

*McCarthy*, which was decided the year before *Credit Suisse*, the Sixth Circuit applied

*Gordon* and concluded that TVA was entitled to antitrust immunity against claims that

it had entered into contracts with local energy cooperatives in restraint of trade. 466

F.3d at 403–04, 412–14. The court reasoned as follows:

> The TVA is authorized to enter into contracts for the purpose
> of "promot[ing] the wider and better use of electric power for

---

[5] Though TVA characterizes both its sovereign immunity and antitrust immunity arguments as jurisdictional, antitrust immunity is best understood as a failure-to-state-a-claim argument. The "immunity" referred to in antitrust immunity is misleading—the doctrine is typically applied, as in *Gordon* and *Credit-Suisse*, to private actors who are supervised by regulatory authority that would conflict with private antitrust lawsuits. The scenario is different here because TVA is a quasi-governmental actor and the question is whether the requirements of its own enabling statute conflict with antitrust law. But that is not an immunity derived from privileged status as a government actor, as would be the case for sovereign immunity. Thus, the Court's evaluation of TVA's argument is for failure to state a claim, not for lack of jurisdiction. *See McCarthy*, 466 F.3d at 405, 414 (affirming the dismissal of claims against TVA on antitrust immunity grounds under Rule 12(b)(6)).

> agricultural and domestic use, or for small or local industries."
> 16 U.S.C. § 831i. *Gordon's* rationale is applicable to § 831i,
> because the TVA's primary concern is to provide services, and
> concerns about competition would conflict with the
> fulfillment of TVA's purpose. Thus, the TVA is entitled to
> antitrust immunity on the basis of the rationale explicated in
> *Gordon*.

*Id.* at 414.

*McCarthy* did not have the benefit of *Credit Suisse*'s four-factor standard, and thus it essentially only examined factor 3: the conflict between the Sherman Act and the TVA Act. But under *Credit Suisse*, the result is the same. *Credit Suisse* examined whether the activities of non-governmental underwriting firms that were already regulated by the Securities and Exchange Commission may also be regulated by private antitrust plaintiffs. Thus, it made sense to focus upon the potential conflict between the SEC's regulatory authority and antitrust law. Here, however, the defendant entity is not a private party, but a quasi-governmental one. Rather than asking whether government regulation of a private party conflicts with antitrust enforcement, the question in *McCarthy* and here is whether the statutory duties of the government *itself* conflict with TVA's obligations under the antitrust laws. For that reason, mechanical application of the four-factor test makes little sense in this context—the "regulatory authority" in question here is the TVA itself. Instead, the key question is under factor 3: whether there is a "clear repugnancy" between the TVA Act and the Sherman Act such that the enforcement of both would "produce conflicting guidance, requirements, duties, privileges, or standards of conduct." *Credit Suisse*, 551 U.S. at 275–76.

Regarding Count I, the answer is no. The TVA Act does require the TVA to conduct "an annual survey of the prevailing compensation . . . in private industry." 16

U.S.C. § 831a(i)(2). But as Plaintiffs note, conducting a survey is a far cry from explicitly agreeing with its competitors to fix and suppress wages. ECF No. 470 at 15–16. Nothing in the TVA Act obligates the TVA to do so, as Count I alleges.

The answer is different for Count II. In Count II, Plaintiffs allege a conspiracy based upon the exchange of compensation information that had the effect of suppressing compensation. Plaintiffs contend again that the TVA could engage in lawful survey-conducting by, for example, contracting with a third party to carry out an aggregated, anonymized survey. But even if it is technically possible to satisfy both statutes, that alone does not resolve the conflict. The Court in *Credit Suisse* held that a conflict existed in part because a "serious legal line-drawing problem remain[ed] unabated," as "only a fine, complex, detailed line separates activity that the SEC permits or encourages (for which respondents must concede antitrust immunity) from activity that the SEC must (and inevitably will) forbid (and which, on respondents' theory, should be open to antitrust attack)." *Credit Suisse*, 551 U.S. at 279. Further, the Supreme Court explained that a conflict is more likely to exist where "evidence tending to show unlawful antitrust activity and evidence tending to show lawful securities marketing activity may overlap, or prove identical." *Id.* at 281. These factors are present here as well, with respect to Count II. The very conduct that forms the bulk of the factual foundation for Count II is the same conduct that TVA is statutorily *required* to undertake. There is a "clear repugnancy" between the TVA Act's requirement to, for example, use compensation surveys and pay "prevailing rates," and Plaintiffs' claim that by sharing compensation information and allegedly matching competitors' compensation, TVA violated the Sherman Act.

58

Accordingly, the Court will grant TVA's motion as to Count II, but not as to Count I. The dismissal of Count II will be *with* prejudice as to TVA only. Because of the inherent conflict between the requirements of the TVA Act and Plaintiffs' antitrust liability theory for Count II, the Court concludes that the flaw with Plaintiffs' claims against TVA in Count II cannot be cured.

## V.  NONRESIDENT DEFENDANTS

Five of the Nuclear Defendants have moved to dismiss Plaintiffs' claims against them for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2): Southern California Edison Company ("SCE"), NextEra Energy, Inc. ("NEE"), NextEra Energy Resources, LLC ("NEER"), Florida Power & Light Company ("FPL"), and Luminant Generation Company LLC ("Luminant") (collectively, the "Nonresident Defendants" or, for purposes of this subsection only, "Defendants").

Federal Rule of Civil Procedure 4(k)(1)(A) authorizes personal jurisdiction over a nonresident defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Personal jurisdiction under this rule is permissible if (1) "such jurisdiction is authorized by the long-arm statute of the state in which [the Court] sits" and (2) "the application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment." *Khashoggi v. NSO Grp. Techs. Ltd.*, 138 F.4th 152, 159 (4th Cir. 2025) (quoting *UMG Recordings*, 963 F.3d at 350) (internal quotations omitted). Because Maryland's long-arm statute is "coextensive with the limits of personal jurisdiction set by the due process clause," these two requirements merge. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (citing *Mohamed v. Michael*, 279 Md. 653, 657 (1977)).

To determine whether an exercise of personal jurisdiction satisfies due process, courts ask whether a defendant has "such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–317 (1945)). There are two types of personal jurisdiction under this analysis. "General jurisdiction lies in the forum where the defendant is domiciled or 'fairly regarded as at home,'" and allows the court to "hear *any* claim against that defendant." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 12 (2025) (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Ca., San Francisco Cnty.*, 582 U.S. 255, 262 (2017)). Specific jurisdiction is permitted when the claims "arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb*, 582 U.S. at 262 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)) (cleaned up). In other words, for specific personal jurisdiction "there must be 'an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State.'" *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)) (cleaned up).

Plaintiffs do not allege that any of the Nonresident Defendants are domiciled or are otherwise at home in Maryland, so the issue here is whether Plaintiffs have made a *prima facie* showing of specific jurisdiction. Defendants begin by contending that the few in-Maryland activities and connections that Plaintiffs have alleged do not make out a prima facie showing of minimum contacts. ECF No. 422-1 at 10–11. Because of this, Defendants argue, jurisdiction would only be proper under either (a) conspiracy jurisdiction, through the Maryland-related acts of Defendants' alleged co-conspirators;

or (b) under Section 12 of the Clayton Act, which allows for broader personal jurisdiction regarding antitrust co-defendants. *Id.* at 11–17. As to the former, Defendants contend that the doctrine of conspiracy jurisdiction is unconstitutional and, in any event, does not apply. As to the latter, Defendants argue that Clayton Act jurisdiction only applies where a defendant does business, and so it does not apply to the Nonresident Defendants here. Plaintiffs disagree on all fronts: they contend that they do not have to rely on conspiracy jurisdiction because they have adequately pled minimum contacts, or, in the alternative, that either co-conspirator or Clayton Act jurisdiction is appropriate. ECF No. 468.

As explained above, the Court concluded that both Counts of the complaint are untimely and that Count I fails to state a claim but dismissed both Counts without prejudice because the deficiencies may be curable (except, so far, as to Count II against TVA). The question here is thus whether a failure to adequately plead personal jurisdiction as to the Nonresident Defendants (insofar as there *was* a failure) is incurable in all respects. The Court concludes that any such failure may be curable due at least to the doctrine of conspiracy jurisdiction.

Contrary to Defendants' arguments, the constitutionality of conspiracy jurisdiction in the Fourth Circuit is not an open question. The Fourth Circuit "has endorsed the conspiracy theory of personal jurisdiction"—though it has "emphasized the need to 'plead with particularity' concrete facts supporting the existence of a conspiracy." *Mobilization Funding, LLC v. Stokes*, 163 F.4th 55, 63 (4th Cir. 2025) (quoting *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)); *see also id.* at 63 n.1 (referring to "our precedents on [the] conspiracy theory [of] jurisdiction"). As Plaintiffs note, several other judges of this District have also held that conspiracy-

based personal jurisdiction does not violate due process. ECF No. 468 at 12 (collecting cases); *see, e.g.*, *Jien v. Perdue Farms, Inc.*, Case No. 19-cv-2521-SAG, 2022 WL 2818950, at \*8 (D. Md. July 19, 2022) (hereinafter, "*Jien II*") ("Plaintiffs have met their burden of presenting a prima facie showing of personal jurisdiction . . . under the conspiracy theory of jurisdiction"). To successfully plead co-conspirator personal jurisdiction, a plaintiffs must "make a *plausible* claim (1) that a conspiracy existed; (2) that [the defendant] participated in the conspiracy; and (3) that a coconspirator's activities in furtherance of the conspiracy . . . had sufficient contacts with [the forum state] to subject that conspirator to jurisdiction in [the forum state]." *Mobilization Funding*, 163 F.4th at 63 (quoting *Unspam Techs.*, 716 F.3d at 322) (internal quotations omitted and emphasis in original).

The Court will not dismiss the claims against the Nonresident Defendants with prejudice at this juncture. Conspiracy jurisdiction has been endorsed by the Fourth Circuit, and the Court will consider whether to grant Plaintiffs leave to file an amended complaint that pleads an antitrust conspiracy that involved the Nonresident Defendants' participation and contacts with Maryland-based Defendants. Defendants do not dispute that several other Nuclear Defendants have minimum contacts with Maryland, such as Constellation and CEG (which are headquartered in Baltimore). *See* Am. Compl. ¶ 23. Any deficiency as to personal jurisdiction at this stage thus remains potentially curable. The Court will deny the Nonresident Defendants' motion as moot without prejudice to their ability to raise their arguments again.

## VI.   OTHER MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Three other Defendants or groups of Defendants filed additional motions to dismiss for failure to state a claim. All of these Defendants contend that the arguments

regarding the insufficiency of the pleadings outlined in the Omnibus Motion apply to them specifically with more force than other Defendants, for varying reasons. Because the Court has granted the Omnibus Motion, it will only discuss these separate motions briefly.

### A.     FirstEnergy Defendants

Defendants FirstEnergy Corp. and FirstEnergy Service Company (collectively, the "FirstEnergy Defendants") filed a separate motion to dismiss, arguing that (1) the amended complaint lacks any allegations regarding the FirstEnergy Defendants' direct involvement in any conspiracy, (2) Plaintiffs have not sufficiently alleged vicarious liability of the FirstEnergy Defendants based on any actions by the FirstEnergy Nuclear Operating Company ("FENOC"), its bankrupt subsidiary, and (3) any claims against FENOC would be discharged due to the bankruptcy. ECF No. 418. Plaintiffs clarify that they are not asserting any vicarious liability claim against the FirstEnergy Defendants, ECF No. 467 at 12; therefore, the FirstEnergy Defendants' second and third arguments are moot. To the extent the FirstEnergy Defendants assert a failure to state a claim argument for claims against them directly, the argument largely echoes the merits of what was argued in the Omnibus motion to dismiss, which the Court has already addressed above. *See* § III.A–B, *supra*. Therefore, the FirstEnergy Defendants' motion to dismiss will be denied as moot.

### B.     Southern California Edison Company

Defendant Southern California Edison Company ("SCE") has also moved to dismiss separately for failure to state a claim. SCE does not currently operate a nuclear power facility. As pleaded in the amended complaint, SCE ceased operating the San Onofre Nuclear Generating Station ("SONGS") in 2013 and the plant is "currently being

decommissioned." Am. Compl. ¶ 143. Plaintiffs allege that during the class period, presumably meaning prior to the 2013 closing, SCE participated in the exchange of information through the CBA Repository, CCRs, and attendance at NHRG conferences and Labor Relations Project meetings, and that they suppressed wages. Am. Compl. ¶ 147.

SCE essentially makes two arguments for dismissal. First, it contends that the decommissioning of SONGS constituted a withdrawal from any alleged conspiracy and thus a "complete defense against liability." ECF No. 424-1 at 9. Second, SCE argues that the complaint's allegations regarding the statute of limitations are particularly defective as to SCE given that it ceased operations 13 years ago. *Id*. at 11–12.

Regarding the statute of limitations argument, Plaintiffs cannot rely on the continuing violation doctrine to preserve their claims against SCE. The proposed class consists of "all persons employed in nuclear power *generation* by the Nuclear Defendants and their subsidiaries[.]" Am. Compl. at 10. Plaintiffs allege that SCE ceased operations, acknowledging that SONGS ceased to *generate* nuclear power, in 2013. The continuing violation doctrine thus cannot apply to toll the statute of limitations as to SCE because Plaintiffs cannot allege any wrongdoing by SCE in the four years prior to the complaint's filing.

The claims against SCE would therefore only be timely if the doctrine of fraudulent concealment applies. The Court has already concluded that, as to the Nuclear Defendants generally, Plaintiffs have not plausibly alleged fraudulent concealment. That analysis applies equally to SCE, and thus the Court will grant SCE's motion to dismiss to the extent it has already granted the omnibus motion. This dismissal will be without prejudice.

Regarding withdrawal, SCE contends that it "withdrew" from any conspiracy when it ceased operations at the SONGS plant in 2013, and that its withdrawal "coupled with the defense of the statute of limitations" is a "complete defense to a charge of conspiracy." ECF No. 424-1 at 7 (quoting *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 837 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000)). That argument, if accepted, would lead to a dismissal with prejudice, as no amendment would be able to re-apply liability to SCE following its withdrawal. Plaintiffs contend that merely ceasing operation at the plant was not withdrawal, because withdrawal from a conspiracy requires "evidence that the defendant acted to defeat or disavow the purposes of the conspiracy." *United States v. Duncan*, 578 F. App'x 183, 190 (4th Cir. 2014) (citing *United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989)). Plaintiffs also argue that because withdrawal requires more than mere cessation, it is a factual question that should not be resolved at the pleadings stage. *See Hengle v. Asner*, 433 F. Supp. 3d 825, 893 (E.D. Va. 2020), ("Whether there was an effective withdrawal is typically a question of fact for the jury") (quotations omitted), *aff'd sub nom. Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021).

The Court will deny the motion as moot regarding withdrawal as a "complete defense" leading to dismissal with prejudice. Even assuming that SCE *did* withdraw, it would still be liable for its pre-withdrawal conduct if Plaintiffs *could* show fraudulent concealment. Withdrawal is not a "complete defense" against all liability, as a defendant remains liable for its pre-withdrawal conduct. *See United States v. Boyd*, 972 F.2d 342 (Table), 1992 WL 192675, at *3 n.* (4th Cir. 1992) ("Even if [Defendant] had shown withdrawal, this could not erase his earlier participation in the conspiracy . . . nor immunize him from responsibility as a co-conspirator for his actions in pursuance of the

conspiracy prior to withdrawal. By contending at oral argument that withdrawal was a complete defense to the charge of conspiracy, [Defendant] appears to have misunderstood the law of conspiracy.") (internal quotations and citations omitted); *Smith v. United States*, 568 U.S. 106, 111 (2013) ("Withdrawal achieves more modest ends than exoneration. . . . Withdrawal terminates the defendant's liability for postwithdrawal acts of his co-conspirators, but he remains guilty of conspiracy."). Thus, even if it did withdraw by closing SONGS, SCE remains potentially liable for any participation in the conspiracy from 2003 (the start of the class period) to 2013 if the conspiracy was fraudulently concealed during this time period and after. Indeed, in one of the primary cases that SCE relies upon, *Morton's Market*, the Eleventh Circuit issued a correction to its opinion to add language making this very point:

> we hold that [Defendant] effectively withdrew from the conspiracy in 1985 and, as to it, these actions are not timely-filed *unless the statute was equitably tolled by fraudulent concealment. If so, [Defendant] would be liable for any price-fixing activity prior to its withdrawal.*

211 F.3d 1224 (Mem) (emphasis in original).

Thus, the claims against SCE will be dismissed without prejudice on the basis that Plaintiffs have failed to allege fraudulent concealment.

### C.    Bankruptcy Defendants

Four of the Nuclear Defendants have moved to dismiss related to their prior bankruptcy: Pacific Gas and Electric Company ("PG&E Co."), PG&E Corporation ("PG&E Corp."), Vistra Corp. ("Vistra"), and Luminant Generation Company, LLC ("Luminant") (collectively, "Bankruptcy Defendants" or, for purposes of this subsection

66

only, "Defendants"). Two bankruptcies are relevant as to these four defendants.[6] PG&E Corp. and its subsidiary PG&E Co. commenced bankruptcy proceedings in 2019. By court order, all claims against them prior to January 29, 2019 were discharged. Am. Compl. ¶ 131. Vistra and its subsidiary Luminant commenced bankruptcy proceedings in 2014, and the bankruptcy court approved a plan with a discharge date of October 3, 2016. ECF No. 426-1 at 10; *see also* ECF No. 466 at 8 n.5 ("Plaintiffs do not dispute Defendants' statement that the correct discharge date for purposes of assessing post-discharge conduct is October 3, 2016).

The parties agree that the Bankruptcy Defendants themselves cannot be liable for alleged antitrust activity that took place before the discharge dates, and the amended complaint only seeks damages for the post-discharge conduct of the Bankruptcy Defendants. Am. Compl. ¶¶ 132, 172. The parties likewise agree that the Bankruptcy Defendants are liable for acts that took place after the discharge. *See* ECF No. 426-1 at 13 ("A defendant who allegedly rejoined a conspiracy after bankruptcy could be held jointly and severally liable for the entire conspiracy, including pre-discharge conduct,

---

[6] The Bankruptcy Defendants request that the Court take judicial notice of the dockets in their bankruptcy cases. *See* ECF No. 426-1 at 5 n.2, 16–17. Though Plaintiffs do provide the relevant discharge date for PG&E Co. and PG&E Corp. in their complaint, they provide only the bar date (not the discharge date) for Vistra and Luminant. *See* Am. Compl. ¶¶ 131 (PG&E), 171 (Vistra and Luminant). The Court will thus take judicial notice of the relevant records for Vistra and Luminant for purposes of obtaining the correct discharge date (which Plaintiffs do not dispute, ECF No. 466 at 8 n.5).

Additionally, the Bankruptcy Defendants' motion refers to the bankruptcies of two other entities, FENOC and Talen Energy. ECF No. 426-1 at 7–9. But Talen Energy is not a party in this case (as Defendants' acknowledge, *id.* at 9 n.5). And while FENOC was later acquired by Defendant Vistra, Plaintiffs have clarified that they "do not allege Vistra has successor liability as to FENOC." ECF No. 466 at 8. Thus, only the PG&E and Vistra/Luminant bankruptcies are relevant for purposes of this motion.

based on its post-discharge participation."); *see also Holcombe v. US Airways, Inc.*, 369 F. App'x 424, 429 (4th Cir. 2010) ("[A]ny claims arising from allegedly discriminatory acts and omissions occurring after the Confirmation Date have not been discharged; any such claim remains open for full adjudication on remand."). Defendants argue, however, that the complaint fails to sufficiently plead "concrete, affirmative conduct by the Bankruptcy Defendants to plausibly show they rejoined or continued any alleged conspiracy after their applicable dates of discharge and release." ECF No. 426-1 at 6. They therefore have moved for dismissal under Rule 12(b)(6) for failure to state a claim.

Defendants contend that Plaintiffs' allegations regarding post-discharge conduct are "nebulous" and fail to allege specific acts constituting participation in the conspiracy, such as "agreements, communications, or wage decisions." ECF No. 426-1 at 15. But Plaintiffs did plead several allegations related to the Bankruptcy Defendants' post-discharge conduct that are identical to their allegations of pre-discharge conduct. For example, Plaintiffs alleged that the Nuclear Defendants, including the Bankruptcy Defendants, attended NHRG conferences in May of 2017, 2018, and 2019. Am. Compl. ¶ 294. The first two of these conferences were after Vistra and Luminant's discharge date, and the third was after all four Bankruptcy Defendants' discharge dates. As discussed above, Plaintiffs allege that Defendants exchanged compensation information at all of these meetings. *Id*. Similarly, Plaintiffs contend that various subsets of the Bankruptcy Defendants attended Labor Relations Project and Total Rewards Project meetings, participated in the exchange of CBAs and CCRs, directly exchanged compensation information, and suppressed wages—both before *and after* the discharge dates. *See* ECF No. 466 at 9–10. The Bankruptcy Defendants contend that these allegations are too broad, applying to large groups of Defendants without distinction.

68

*See Jien*, 2020 WL 5544183, at *4 ("Fourth Circuit case law holds that a complaint cannot rely on 'indeterminate assertions against all defendants,' a fact that holds true even when some of those defendants are corporate subsidiaries or affiliates of one another.") (quoting *SD3,* 801 F.3d at 423). But though Plaintiffs' allegations against the Bankruptcy Defendants are targeted to a smaller time window given the discharge dates, they are of the same nature as the allegations prior to the discharge date, relating to attendance at meetings, exchanging documents, and direct communication. Accordingly, nothing about the deficiencies in the allegations as to the Bankruptcy Defendants are substantively distinct from the other Nuclear Defendants. Thus, the Court concludes that any deficiencies as to the Bankruptcy Defendants are not incurable. Therefore, insofar as the motion requests dismissal with prejudice, the motion will be denied, and the motion will otherwise be denied as moot.

## VII.  CONCLUSION

For the foregoing reasons, the Court will dismiss all claims against all Defendants without prejudice except for Plaintiffs' claims under Count II as to Defendant TVA, which shall be dismissed with prejudice. A separate order follows.


Date: August 5, 2026                                        /s/
                                          Adam B. Abelson
                                          United States District Judge