# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

LEO DORRELL,
4608 Watson Way
Chesapeake, VA 23321

JOHN DUNN, and
1318 Browns Mill Court
Herndon, VA 20170

DAVION CHAPEL,
24481 Broad Creek Drive
Hollywood, MD 20636

on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

CONSTELLATION ENERGY CORPORATION,
1310 Point Street
Baltimore, Maryland 21231
County of Residence: Baltimore County

CONSTELLATION ENERGY GENERATION, LLC,
1310 Point Street
Baltimore, Maryland 21231
County of Residence: Baltimore County

AMEREN CORPORATION,
1901 Chouteau Avenue
St. Louis, Missouri 63103

UNION ELECTRIC COMPANY (d/b/a AMEREN MISSOURI),
1901 Chouteau Avenue
St. Louis, Missouri 63103

AMEREN SERVICES COMPANY,
1901 Chouteau Avenue
St. Louis, Missouri 63103

CIVIL ACTION NO. 1:25-CV-2251

**SECOND AMENDED CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

AMERICAN ELECTRIC POWER COMPANY INC.,
1 Riverside Plaza
Columbus, Ohio 43215

INDIANA MICHIGAN POWER COMPANY,
1 Riverside Plaza
Columbus, Ohio 43215

AMERICAN ELECTRIC POWER SERVICE CORPORATION,
1 Riverside Plaza
Columbus, Ohio 43215

ARIZONA PUBLIC SERVICE COMPANY,
400 North 5th Street
Phoenix, Arizona 85004

DOMINION ENERGY, INC.,
600 East Canal Street
Richmond, Virginia 23219

VIRGINIA ELECTRIC & POWER COMPANY,
600 East Canal Street
Richmond, Virginia 23219

DOMINION ENERGY SERVICES, INC.,
600 East Canal Street
Richmond, Virginia 23219

DTE ENERGY COMPANY,
One Energy Plaza
Detroit, Michigan 48226

DTE ELECTRIC COMPANY,
One Energy Plaza
Detroit, Michigan 48226

DTE ENERGY CORPORATE SERVICES, LLC,
One Energy Plaza
Detroit, Michigan 48226

DUKE ENERGY CORPORATION,
525 South Tryon Street
Charlotte, North Carolina 28202

DUKE ENERGY CAROLINAS, LLC,
525 South Tryon Street
Charlotte, North Carolina 28202

DUKE ENERGY BUSINESS SERVICES, LLC,
525 South Tryon Street
Charlotte, North Carolina 28202

PROGRESS ENERGY, INC.,
411 Fayetteville Street
Raleigh, North Carolina 27601

ENERGY NORTHWEST,
76 North Power Plant Loop
Richland, Washington 99354

ENTERGY CORPORATION,
639 Loyola Avenue
New Orleans, Louisiana 70113

ENTERGY OPERATIONS, INC.,
1340 Echelon Parkway
Jackson, MS 39213

ENTERGY NUCLEAR OPERATIONS, INC.,
1340 Echelon Parkway
Jackson, MS 39213

FIRSTENERGY CORPORATION,
341 White Pond Drive
Akron, Ohio 44320

FIRSTENERGY SERVICE COMPANY,
341 White Pond Drive
Akron, Ohio 44320

NEXTERA ENERGY, INC.,
700 Universe Boulevard
Juno Beach, Florida 33408

NEXTERA ENERGY RESOURCES, LLC,
700 Universe Boulevard
Juno Beach, Florida 33408

FLORIDA POWER & LIGHT COMPANY,
700 Universe Boulevard
Juno Beach, Florida 33408

PG&E CORPORATION,
300 Lakeside Drive
Oakland, California 94612

PACIFIC GAS & ELECTRIC COMPANY,
300 Lakeside Drive
Oakland, California 94612

PUBLIC SERVICE ENTERPRISE GROUP INC.,
80 Park Plaza
Newark, New Jersey 07102

PSEG POWER LLC,
80 Park Plaza
Newark, New Jersey 07102

PSEG NUCLEAR, LLC,
80 Park Plaza
Newark, New Jersey 07102

PSEG SERVICES CORPORATION,
80 Park Plaza
Newark, New Jersey 07102

SOUTHERN CALIFORNIA EDISON COMPANY,
2244 Walnut Grove Avenue
Rosemead, California 91770

THE SOUTHERN COMPANY,
30 Ivan Allen Jr. Boulevard, N.W.
Atlanta, Georgia 30308

SOUTHERN NUCLEAR OPERATING COMPANY, INC.,
3535 Colonnade Parkway
Birmingham, Alabama 35243

STP NUCLEAR OPERATING COMPANY,
12090 FM-521
Wadsworth, Texas 77483

TENNESSEE VALLEY AUTHORITY,
400 West Summit Hill Drive
Knoxville, Tennessee 37902

VISTRA CORPORATION,
6555 Sierra Drive
Irving, Texas 75039

LUMINANT GENERATION COMPANY, LLC,
6555 Sierra Drive
Irving, Texas 75039

WOLF CREEK NUCLEAR OPERATING CORPORATION,
1550 Oxen Lane
Burlington, Kansas 66839

XCEL ENERGY, INC.,
414 Nicollet Mall
Minneapolis, Minnesota 55401

NORTHERN STATES POWER COMPANY,
414 Nicollet Mall
Minneapolis, Minnesota 55401

XCEL ENERGY SERVICES, INC.,
414 Nicollet Mall
Minneapolis, Minnesota 55401

ACCELERANT TECHNOLOGIES LLC, and
1715 Indian Wood Circle, Suite 200
Maumee, Ohio 43537

INSTITUTE OF NUCLEAR POWER OPERATIONS
700 Galleria Parkway, SE, Suite 100
Atlanta, Georgia 30339

Defendants.

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 12

III. PARTIES ..... 14

A. Plaintiffs ..... 14

B. Defendants ..... 15

1. Constellation Defendants ..... 15
2. Ameren Defendants ..... 19
3. AEP Defendants ..... 22
4. APS ..... 25
5. Dominion Defendants ..... 27
6. DTE Defendants ..... 29
7. Duke Energy Defendants ..... 33
8. EnergyNW ..... 37
9. Entergy Defendants ..... 39
10. FirstEnergy Defendants ..... 43
11. NextEra Defendants ..... 45
12. PG&E Defendants ..... 48
13. PSEG Defendants ..... 52
14. SCE ..... 55
15. Southern Company Defendants ..... 57
16. STP ..... 60
17. TVA ..... 62
18. Vistra Defendants ..... 64
19. Wolf Creek ..... 67

20. Xcel Defendants ........ 68

21. Accelerant Solutions ........ 71

22. Institute of Nuclear Power Operations ........ 72

IV. AGENTS AND COCONSPIRATORS ........ 73

1. Dominion Co-Conspirators ........ 74

2. Duke Co-Conspirators ........ 74

3. Vistra Co-Conspirators ........ 74

4. Exelon Business Services Company ........ 75

5. Bruce Power ........ 75

6. Nebraska Public Power District ........ 75

7. Ontario Power Generation ........ 75

8. OPPD ........ 76

9. Talen Energy ........ 76

10. WEC ........ 76

11. Human Resource Consultants ........ 77

12. WTW ........ 77

13. ScottMadden ........ 77

V. TRADE AND COMMERCE ........ 78

VI. FACTUAL ALLEGATIONS ........ 78

A. Background ........ 78

1. The Commercial Nuclear Power Industry ........ 78

2. Nuclear Power Plants ........ 79

3. The Nuclear Power Industry's History and Culture of Collaboration ........ 79

4. Nuclear Power Generation Workers ........ 82

5. Compensating Nuclear Power Generation Workers ........ 83

6. Nuclear Power Companies Aimed to Reduce Labor Costs ...................... 84

7. Centralized Determination of Compensation for Nuclear Power Generation Workers ........................................................................ 84

8. Nuclear Power Generation Employment Qualifications.......................... 85

B. Conspiracy to Align Worker Compensation ........................................................ 86

1. The Nuclear Human Resources Group ................................................... 89

2. The Nuclear Defendants Unlawfully Exchanged Compensation Information through a Collective Bargaining Agreement Repository ................................................................................. 91

3. The Nuclear Defendants Unlawfully Exchanged Compensation Information through Compensation Comparison Reports ................................................................................ 96

4. The Nuclear Defendants Discussed and Suppressed Compensation at Annual Meetings ........................................................ 100

5. The Nuclear Defendants Discussed and Suppressed Compensation through Direct Email and Telephone Communications .......................................................................... 108

6. The Conspiracy Resulted in Parallel Limits on Defendants' Wage Increases and Harmonization of Defendants' Wages.................. 113

7. Plus Factors That Render the Nuclear Power Industry Susceptible to Collusion ...................................................................... 123

C. Market Power of the Nuclear Defendants and Coconspirators.......................... 134

1. Direct Evidence of Market Power......................................................... 134

2. Indirect Evidence of Market Power ...................................................... 135

D. Anticompetitive Effects and Injury Suffered by Class Members ....................... 140

VII. STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS.................. 142

A. Fraudulent Concealment ...................................................................................... 142

1. Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct ....................................................................... 142

2. Defendants Actively Concealed the Conspiracy.................................... 144

VIII. CLASS ACTION ALLEGATIONS ..... 161

IX. CAUSES OF ACTION ..... 164

X. PRAYER FOR RELIEF ..... 171

XI. JURY TRIAL DEMAND ..... 172

Based on the investigation of counsel, Plaintiffs Leo Dorrell, John Dunn, and Davion Chapel (collectively, "Plaintiffs") bring this action on behalf of themselves individually and on behalf of a class (the "Class") consisting of all persons employed in nuclear power generation by the Nuclear Defendants[1] and their subsidiaries and related entities in the United States from May 1, 2003 to the present day (the "Class Period").

## I. INTRODUCTION

1. Since at least May 2003, Defendants have conspired and combined to fix and suppress the compensation paid to persons employed in nuclear power generation in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

2. Defendants consist of the 45 Nuclear Defendants, which operate nuclear power plants that produce nuclear-generated electricity sold to consumers in the United States; a consulting company, Accelerant Technologies LLC ("Accelerant"), which helped the Nuclear Defendants exchange compensation data and conduct in-person meetings to align compensation;

[1] The term "Nuclear Defendants" refers to the following companies: Constellation Energy Corporation; Constellation Energy Generation, LLC; Ameren Corporation; Union Electric Company; Ameren Services Company; American Electric Power Company Inc.; Indiana Michigan Power Company; American Electric Power Service Corporation; Arizona Public Service Company; Dominion Energy, Inc.; Virginia Electric & Power Company; Dominion Energy Services, Inc.; DTE Energy Company; DTE Electric Company; DTE Energy Corporate Services, LLC; Duke Energy Corporation; Duke Energy Carolinas, LLC; Duke Energy Business Services, LLC; Progress Energy, Inc.; Energy Northwest; Entergy Corporation; Entergy Operations, Inc.; Entergy Nuclear Operations, Inc.; FirstEnergy Corporation; FirstEnergy Service Company; NextEra Energy, Inc.; NextEra Energy Resources, LLC; Florida Power & Light Company; PG&E Corporation; Pacific Gas & Electric Company; Public Service Enterprise Group Inc.; PSEG Power LLC; PSEG Nuclear LLC; PSEG Services Corporation; Southern California Edison Company; The Southern Company; Southern Nuclear Operating Company, Inc.; STP Nuclear Operating Company; Tennessee Valley Authority; Vistra Corporation; Luminant Generation Company, LLC; Wolf Creek Nuclear Operating Corporation; Xcel Energy, Inc.; Northern States Power Company; and Xcel Energy Services, Inc.

and the Institute of Nuclear Power Operations ("INPO"), which provided the Nuclear Defendants with private email accounts to implement and conceal the conspiracy off their company servers.

3. The Nuclear Defendants, coconspirators, and their related entities own and/or operate all 54 commercial nuclear power plants in the United States. During the Class Period, the Nuclear Defendants employed hundreds of thousands of Class Members at those plants. Those Class Members worked in various positions in nuclear power generation, including as nuclear operators, nuclear engineers, and nuclear technicians.

4. The Nuclear Defendants compensated Class Members with hourly wages or annual salaries, supplemental forms of monetary compensation such as shift premiums and bonuses, and employment benefits. During the Class Period, each Nuclear Defendant established schedules for hourly wages, annual salaries, other monetary compensation, and employment benefits based on the specific positions and years of experience of the Class Members. This regimented process for determining compensation allowed the Nuclear Defendants and coconspirators to readily compare compensation rates—and collectively suppress compensation—across their workforces.

5. The Defendants and coconspirators engaged in a multi-faceted conspiracy to align, fix, and suppress Class Members' compensation. The conspiracy and its objectives were confirmed by multiple witnesses. For example, according to a former HR executive employed by Progress Energy, Inc. and Duke Energy Corporation, the Nuclear Defendants "collaborated" and compensation decisions were "never made in a silo." The witness said that nuclear power companies would ***"all work together to make sure [they] were in alignment"*** on salaries. She routinely contacted her counterparts at other nuclear power companies "before we did our proposal for salary range adjustments" and, during those calls, "we would talk about what we were

proposing." The explicit purpose of this coordination was to avoid paying higher-than-necessary compensation to employees. The witness explained: "we didn't want to pay outrageous salaries."

6. Another witness who was a former labor manager at Exelon Generation Company, LLC ("Exelon") attested that "there was significant collaboration and information sharing between nuclear power companies . . . with regards to compensation rates and union contracts." He asserted that nuclear power companies shared compensation data "all the time" and did so for the "specific reason" of "trying to screw the union." He stated that "***multiple nuclear power companies, including Exelon, directly exchanged current and future compensation information with one another on a regular basis***." He explained: "During my tenure at Exelon, I initiated and conducted bi-annual surveys to gather current and future compensation data from, and exchange current and future compensation data between, approximately 20 other companies in the nuclear power generation industry." He further elaborated: "Twice a year, I disseminated the results of the surveys to each of the participating nuclear power companies in the form of excel spreadsheets that contained detailed disaggregated and deanonymized current and future compensation data, organized by both company and plant." He stated that the compensation data he gathered and distributed "was highly valuable to Exelon and was routinely used by Exelon to determine the compensation rates it paid nuclear power generation employees." He attested that "[o]btaining compensation data directly from competing nuclear power companies allowed Exelon to avoid paying higher hourly wages than it actually paid its nuclear power generation employees."

7. Another witness, a former Senior Compensation Analyst at Southern Company, said that she helped design compensation surveys of nuclear power companies and then led roundtable discussions at annual compensation meetings about the survey results. She said that during those meetings, representatives from the Nuclear Defendants would discuss the survey and

confirm to other attendees whether their company's compensation rates aligned with the survey results, often saying: "that's in line with what we do." She said that a goal of those meetings was to "harmonize" pay practices because "you don't want one person doing what the others aren't."

8. And a fourth witness, a former Labor Relations Manager at Entergy Operations, Inc., said that an investigation into wage-fixing in the nuclear power industry was warranted because "there's something going on here."

9. Each Nuclear Defendant or one of its affiliates was a member of the Nuclear Human Resources Group ("NHRG"), which was a human-resources association that consisted of all the nuclear power companies in the United States and Canada. NHRG provided the organizational structure through which the Nuclear Defendants and coconspirators implemented the conspiracy, including facilitating information exchanges, organizing in-person meetings, and maintaining contact lists.

10. Defendants implemented, monitored, and enforced their conspiracy to fix and suppress compensation paid to Class Members through a series of mutually reinforcing overt acts, including:

11. *Secret Collective Bargaining Agreement Repository*. From at least May 2003 to the present, the Nuclear Defendants *directly exchanged* highly sensitive compensation data—including the amount and dates of planned *future* wage increases—through a digital repository of union collective bargaining agreements ("CBA Repository"). The CBA Repository was organized and updated by NHRG with the assistance of Defendant Accelerant Technologies, LLC, coconspirator Human Resource Consultants, LLC and the now-defunct consultancy HR Strategies & Solutions, Inc., which collected current CBAs from the Nuclear Defendants and coconspirators

and posted them to a password-protected website accessible only to participating Nuclear Defendants and coconspirators.

12. A former Workforce Relations Manager at Nuclear Management Company, which was owned by Defendant Xcel Energy, Inc. and operated multiple nuclear power plants until 2008, stated that "one of the big projects" of NHRG "was to put together a library of CBAs that were part of the group." He said, "We shared our collective bargaining agreements among ourselves" so that "we had an idea of what other companies were doing outside of our own" regarding compensation and knew "what was going on at facilities as far as negotiations w[ere] concerned." The CBAs exchanged between Nuclear Defendants were highly confidential and inaccessible to the Nuclear Defendants absent the unlawful exchange.

13. *Compensation Comparison Reports.* Defendant Constellation Energy Generation, LLC (f/k/a Exelon Generation Company, LLC) collected detailed compensation data directly from the Nuclear Defendants and created spreadsheets containing plant-specific compensation rates ("Compensation Comparison Reports") that were distributed to participating nuclear power companies twice a year. Critically, the Compensation Comparison Reports included disaggregated and deanonymized information about Nuclear Defendants' *current* wages and *future* wage increases. Consistent with the competitively sensitive nature of the wage data, the Compensation Comparison Reports were accessible only to Defendants and coconspirators through a password-protected website. The Compensation Comparison Reports allowed the Nuclear Defendants to easily compare and coordinate their current and future compensation rates at each unionized nuclear power plant and provided them with a significant bargaining advantage when negotiating wages and benefits with unions.

14. *Annual Meetings to Exchange Compensation Information and Suppress Wages.* Each year, the Nuclear Defendants held in-person meetings immediately before the annual NHRG conference to extensively discuss, suppress, and fix Class Members' compensation. NHRG operated two Projects that involved compensation: the Labor Relations Project, which focused on compensation for unionized workers, and the Total Rewards Project, which focused on compensation for non-unionized workers. On the eve of annual NHRG conferences, each of those Projects held meetings in which participants discussed compensation rates for nuclear power generation employees.

15. During the annual Labor Relations Project meetings, the Nuclear Defendants collectively reviewed the CBA Repository and Compensation Comparison Reports, and used that data to discuss and agree on how to negotiate with unions and what wage rates to set. A former Labor Relations Manager of Entergy Operations, Inc. said, "[o]f course, wages would be discussed" at those meetings. She stated that a central purpose of the Labor Relations Project meetings was to report "data points" and "outcomes" of recent and ongoing labor negotiations. She explained that members of the Labor Relations Project "would share what those outcomes were," such as the specific amount that a particular plant's bonuses would increase. Similarly, a former Labor Relations Manager at Exelon said that, during Labor Relations Project meetings, attendees "give each other information on wages and benefits" and "there is always a sharing of information relative to benefits and wages." He explained, "It was always nice to know what percentage increases people were averaging or putting out there to their employees," and that if a particular nuclear utility increased wages by a specific amount, then "that was probably something we should shoot for" when proposing Exelon's increases to hourly wages. A former HR Manager at Southern Company added that during Labor Relations Project meetings, "we actually shared

CBAs because it's always good to see someone else's CBAs" and that the exchange and review of CBAs "helped [nuclear utilities] get ready for union negotiations."

16. During the annual Total Rewards Project meetings, the Nuclear Defendants and coconspirators reviewed surveys of hourly and salaried compensation in the nuclear power industry administered by Willis Towers Watson ("WTW Surveys"). While the WTW Surveys were assembled by an independent third party and provided *aggregated* compensation information ostensibly to prevent the unlawful disclosure of any one company's compensation rates, the Nuclear Defendants extensively discussed WTW Survey results and disclosed their own company's *disaggregated* compensation rates during the Total Rewards Project meetings. In particular, meeting attendees revealed their particular company's compensation rates and whether they were "in line" with the WTW Survey figures. Thus, once the Nuclear Defendants obtained the aggregated WTW Survey results designed to keep individual companies' rates confidential, they orally disaggregated those results, exchanged sensitive current and future compensation rates, and collaborated to align their compensation rates.

17. *Direct Telephone and Email Coordination Concerning Compensation.* The Nuclear Defendants directly exchanged compensation information and stabilized wages through telephone and email communications during the Class Period. Corporate executives and human resources personnel at the Nuclear Defendants and coconspirators frequently contacted one another to exchange current and future compensation information and to agree on and suppress the wages of Class Members.

18. According to an HR executive formerly employed by Progress Energy, Inc. and Duke Energy Corporation, human resources personnel at the Nuclear Defendants had special "relationships" with personnel at other nuclear power companies through which they exchanged

compensation information and ensured alignment. She explained that she would regularly "pick up the phone" and exchange "average salary, minimum and maximum, and incentives" data with her human resources counterparts at other nuclear power companies. Likewise, a former labor manager at Exelon said he would contact executives at other nuclear power companies prior to union negotiations to "gather" confidential wage information. He stated that he "would literally call up HR folks at all nuclear facilities . . . and ask them their rates."

19. The Nuclear Defendants typically contacted each other directly to exchange compensation information at least once per year, and they often did so before their human resources personnel proposed adjustments to salary ranges. During these communications, the Nuclear Defendants shared the salary range adjustments they were contemplating implementing in the future and confirmed their alignment with the rest of the industry before finalizing the salary ranges. This facilitated Nuclear Defendants' scheme to keep compensation—in the words of one HR executive formerly employed by Progress Energy, Inc. and Duke Energy Corporation—"in line" across the industry.

20. *Nature of Compensation Data Exchanged.* The compensation data exchanged between the Nuclear Defendants during the implementation of their wage-fixing conspiracy—including through the CBA Repository, Compensation Comparison Reports, annual in-person meetings, and telephonic and email communications—was not compliant with the antitrust guidelines of the Department of Justice ("DOJ") and Federal Trade Commission ("FTC"). Specifically, the exchanged compensation data was *not* historical, aggregated to conceal the identities of the underlying sources, or managed by a neutral third party. Rather, in furtherance of their conspiracy, the Nuclear Defendants *directly* exchanged data about their *current* and *future*

compensation rates, paid to workers at *particular nuclear power plants* by *particular nuclear power companies*.

21. Indeed, the Nuclear Defendants' own executives believed that their information exchanges were anticompetitive and unlawful. For example:

- A former Vice President of Compensation at Constellation Energy Generation, LLC said that human resources staff at the company were trained to understand the antitrust laws in frequent training sessions; that "we were made aware by our employer not to share wage information"; and if a competing nuclear power company had ever reached out to her requesting specific data about Constellation's wage rates, she would have responded: "Are you crazy?"
- A former Director of Compensation at Dominion Energy, Inc. stated that meetings between competing nuclear utilities to compare wages and discuss collective bargaining agreements would be unlawful. She explained, "Professional ethics would say that is definitely not okay" and "as a professional standard, companies know that's against the law." She said that discussions between HR professionals at different nuclear power companies "to figure out what you're going to pay" was "salary fixing which is illegal."
- A former HR executive at Duke Energy Corporation said the company instructed employees not to discuss specific pay rates with competitors. She said that "if someone had been exchanging specific data, heads would have rolled," and if she had been made aware of another nuclear utility requesting specific wage data, she would have raised it to Duke's legal department. She said that HR executives of competing nuclear power companies did not communicate about wages because of the legal implications of doing so.

- A former Labor Relations Manager for Entergy Operations, Inc. said that NHRG's Executive Committee instructed members to "stay in their lanes" and not to "discuss any compensation" with other nuclear power companies.
- A former HR executive at Florida Power & Light Company stated that sharing collective bargaining agreements with other nuclear power companies was a "no go" and "the line" that should not be crossed. She also said that sharing compensation data at in-person meetings of nuclear power companies was another "line" that should not be crossed.
- A former Compensation and Benefits Manager at PSEG Nuclear LLC (who was unaware that his former employer participated in the CBA Repository) stated that union CBAs were "maintained internally" and "never shared . . . with anyone else." He further stated he would not have shared "what we were paying operating engineers" if someone had called from another nuclear power company and asked him to "divulge" that information, noting "I just wasn't allowed to do that."
- A former HR Director at Entergy Corporation said that "all of the utilities consider" CBAs "to be proprietary and confidential" and "there was an unspoken agreement not to share that information" between nuclear power companies.
- According to a former HR employee at Talen Energy Corporation, sharing compensation information with other nuclear power companies would be "divulging confidential or proprietary information" and he would "question whether [it] was appropriate" to "divulge[] rates to someone else."
- A former Senior HR Advisor of NextEra Energy, Inc. said that "our wage information was guarded, not to be discussed or released."

22. For that reason, the Defendants went to great lengths to fraudulently conceal their conspiracy to exchange compensation data and to fix wages. For example, Operations Managers from each of the Nuclear Defendants who helped set compensation were provided private email addresses by INPO so that they could communicate covertly and without detection. A former employee of Defendants Dominion Energy, Inc., Energy Northwest, Tennessee Valley Authority, and Exelon said, “INPO staff encouraged and recommended that Operations Managers employed by competing nuclear power companies communicate through their INPO email accounts so that those communications could not and would not be monitored or retained on any nuclear power company’s servers.” He explained, “By communicating through INPO email accounts, Operations Managers at nuclear power companies were able to prevent nuclear power generation workers, unions that represent those workers, government regulators, and the general public from learning that those nuclear power companies were collaborating, including on matters relating to compensation.” And Nuclear Defendants’ HR executives without INPO email addresses often conspired to depress compensation through telephonic communications to avoid leaving a discoverable paper trail.

23. Moreover, the Nuclear Defendants concealed both the CBA Repository and the Compensation Comparison Reports with electronic passwords that were only provided to select personnel employed by them. While ostensibly prohibiting the exchange of compensation data or CBAs with other nuclear power companies, the Nuclear Defendants did precisely that behind electronic passwords. A former HR Manager for FirstEnergy Nuclear Operating Company explained: “Officially,” nuclear power plants didn’t exchange CBAs with one another, but he saw competing nuclear plants’ CBAs at FirstEnergy and if he “wanted to get a copy of a CBA, he would contact one of the other HR Managers” at a competing plant and ask for it. Similarly, a

former Director of HR Business Partners at Entergy Corporation said, "it's absolutely not appropriate to share CBAs" with competitors, but he would not be surprised if his colleagues at Entergy exchanged CBAs with other nuclear power companies "under the table."

24. The nuclear power industry has numerous characteristics that facilitated the formation and implementation of Defendants' conspiracy to depress compensation. These characteristics include but are not limited to: (1) extraordinarily high barriers to entry; (2) industry concentration; (3) fungibility of nuclear power generation labor; (4) inelastic labor supply; (5) numerous opportunities to collude; and (6) a history and culture of collaboration across the industry.

25. The Nuclear Defendants engaged in the conspiracy to increase their profits by reducing labor costs. The intended and actual effect of Defendants' conspiracy has been to reduce and suppress the compensation paid to Class Members since May 2003 to levels materially lower than they would have been in a competitive market.

26. The agreement entered by Defendants to fix and suppress compensation paid to employees who worked in nuclear power generation has unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. § 1. Plaintiffs, on their own behalf and on behalf of the Class, bring this antitrust action to enjoin Defendants from continuing their unlawful agreement and to recover actual, compensatory, and treble damages, as well as costs, attorneys' fees, and interest. Plaintiffs demand a trial by jury.

## II. JURISDICTION AND VENUE

27. The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

28. This Court has personal jurisdiction over each of the Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and Maryland's

long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1) and (3). Defendants Constellation Energy Corporation ("Constellation") and Constellation Energy Generation, LLC ("CEG") reside in this District and used their headquarters in Baltimore, Maryland, to implement and coordinate the restraints of trade described below. In addition, Defendants (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, Class Members located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District. For example:

- Each Nuclear Defendant regularly generated electricity to be sold on wholesale or regional markets in the United States, and Defendants CEG, Indiana Michigan Power Company, PSEG Nuclear LLC, and Virginia Electric & Power Company generated electricity to be sold on the PJM wholesale market, which serves consumers in the state of Maryland;
- Defendants Constellation and CEG are headquartered in the state of Maryland;
- Defendant CEG operates a nuclear power plant in the state of Maryland;
- Each Nuclear Defendant attended the 2012 NHRG annual conference in Maryland;
- The Nuclear Energy Institute held a Regulatory Affairs Forum at the Bethesda North Marriott in Maryland from September 12 to September 14, 2023. Representatives from the following Nuclear Defendants attended the meeting: Arizona Public Service Company; CEG; Dominion Energy, Inc.; Duke Energy Corporation; Energy Northwest; Entergy Operations, Inc.; Florida Power & Light Company; NextEra Energy, Inc.; Pacific Gas & Electric Company; PSEG Nuclear LLC; Southern Nuclear

Operating Company; STP Nuclear Operating Company; Tennessee Valley Authority; and Xcel Energy, Inc.

- Accelerant Technologies, LLC provided services to Nuclear Defendants in the state of Maryland during the Class Period, including Constellation and CEG;
- Each Defendant conspired with the other Defendants, including Constellation and CEG located in Maryland, to fix and suppress the compensation paid to persons employed in nuclear power generation, including such person employed in Maryland;
- Each Nuclear Defendant transmitted confidential compensation information to Defendants in Maryland, including Constellation and CEG;
- Each Defendant reasonably expected that the conspiracy would result in the suppression of the compensation of nuclear power generation workers in Maryland;
- The non-resident Defendants' overt acts subject them to personal jurisdiction under Maryland's long-arm statute.

29. Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)–(d) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein was carried out in this District.

## III. PARTIES

### A. Plaintiffs

30. Leo Dorrell was employed by Virginia Electric & Power Company from September 2008 until December 2012. As an employee, he was paid an hourly wage and benefits by Virginia Electric & Power Company. He is a resident of the state of Virginia.

31. John Dunn was employed by Entergy Nuclear Operations, Inc. from September 2008 until May 2016. As an employee, he was paid an hourly wage and benefits by Entergy Nuclear Operations, Inc. He is a resident of the state of Virginia.

32. Davion Chapel was employed by Entergy Nuclear Operations, Inc. from October 2008 until September 2010, Florida Power & Light from September 2010 until April 2015, and CEG from April 2015 until September 2020. As an employee, he was paid an hourly wage and benefits by Entergy Nuclear Operations, Inc., Florida Power & Light Company, and CEG. He is a resident of the state of Maryland.

## B. Defendants

### 1. Constellation Defendants

33. Constellation Energy Corporation ("Constellation") is a publicly traded Pennsylvania corporation headquartered in Baltimore, Maryland.

34. Constellation was formed in 2021 when Exelon Corporation elected to spin off its nuclear power generation division. As part of a "Separation Agreement By and Between Exelon Corporation and Constellation Energy Corporation" dated January 31, 2022 ("Separation Agreement"), Exelon Corporation transferred ownership of subsidiary Exelon Generation Company, LLC to Constellation, and Exelon Generation Company, LLC was renamed "Constellation Energy Generation, LLC."

35. Constellation Energy Generation, LLC ("CEG"), formerly known as Exelon Generation Company, LLC, is a Pennsylvania limited liability company headquartered in Baltimore, Maryland. CEG is a wholly owned subsidiary of Constellation. In documents filed with the U.S. Department of Energy in 2024, CEG stated that its "principal executive offices" and "principal place of business" were located in Baltimore, Maryland. In a document submitted to the

Maryland Department of the Environment in 2023, CEG stated that it "recently chose to locate its headquarters in Baltimore."

36. CEG owns and/or operates 12 nuclear power plants in the United States: Braidwood Clean Energy Center in Braceville, Illinois; Byron Clean Energy Center in Byron, Illinois; Calvert Cliffs Clean Energy Center in Lusby, Maryland; Clinton Clean Energy Center in Clinton, Illinois; Dresden Clean Energy Center in Morris, Illinois; James A. FitzPatrick Clean Energy Center in Scriba, New York; LaSalle Clean Energy Center in Marseilles, Illinois; Limerick Clean Energy Center in Limerick, Pennsylvania; Nine Mile Point Clean Energy Center in Oswego, New York; Peach Bottom Clean Energy Center in Delta, Pennsylvania; R.E. Ginna Clean Energy Center in Ontario, New York; and Quad Cities Clean Energy Center in Cordova, Illinois. During the Class Period, CEG employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

37. As part of the Separation Agreement, Constellation and CEG each assumed liability associated with Exelon Corporation's former nuclear power generation subsidiary, Exelon Generation Company, LLC, and Constellation agreed to indemnify Exelon Corporation for pre-separation liabilities associated with Exelon Generation Company, LLC's business.

38. According to Constellation's website, the Executive Committee of Constellation "sets strategy and direction for the company." The Executive Committee includes Susie Kutansky, Executive Vice President and Chief Human Resources Officer for Constellation and CEG. According to Constellation's website, Ms. Kutansky is "responsible for the company's human resource operations, compensation, benefits, employee and labor relations, respect, belonging, diversity and inclusion, workforce development, talent management, human resources systems, recruiting, and organizational effectiveness." In addition to her current role, Kutansky was

formerly Director of Employee and Labor Relations at Exelon and a member of NHRG. Kutansky is a signatory to collective bargaining agreements between Exelon and the union responsible for negotiating wages and benefits for nuclear generation workers at Exelon's Illinois nuclear plants. Ms. Kutansky has directed and supervised compensation practices at Constellation and CEG.

39. Two other members of Constellation's Executive Committee—Bryan C. Hanson, Executive Vice President and Chief Generation Officer, and David O. Daris, Executive Vice President and General Counsel—serve as Principal Officers of CEG.

40. CEG (f/k/a/ Exelon) negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, CEG relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

41. Multiple former or current employees of CEG (f/k/a/ Exelon) were members of NHRG during the Class Period, including: Ann Marie Harris, former Talent Management and Organizational Development Specialist; Jaime Parsons, Vice President of Employee and Labor Relations; Philip Brzozowski, former Director of Employee and Labor Relations; Scott Bartnick, former Director and Senior Manager of Employee and Labor Relations; Mark Gridley, former Labor Relations Liaison; Alan Siegman, former Labor Relations Principal; Julie Jacovec, HR Director; Lisa Ross, former Senior HR Business Partner; LeAnn Vizza, Senior Manager of HR; Kimberly Seymour, former Senior HR Generalist; Katie Manis, Director of HR; and Karen Greig, Vice President of HR.

42. During each year of the Class Period, CEG, which was previously known as Exelon Generation Company, LLC until 2022, directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- CEG directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Employees of Exelon implemented the Compensation Comparison Reports. CEG knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. CEG exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- CEG exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. CEG knew and understood that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, CEG employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- During the Class Period, CEG employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, CEG employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions in nuclear power generation.
- As part of the conspiracy, CEG established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

43. After the Separation Agreement was executed, CEG participated in the conspiracy to fix and suppress compensation to nuclear power generation workers at the direction of Constellation.

**2. Ameren Defendants**

44. Ameren Corporation ("Ameren") is a publicly traded Missouri corporation headquartered in St. Louis, Missouri.

45. Union Electric Company (doing business as "Ameren Missouri") is a Missouri corporation headquartered in St. Louis, Missouri. Ameren Missouri is a wholly owned subsidiary of Ameren which owns and operates the Callaway Energy Center in Fulton, Missouri. During the Class Period, Ameren Missouri employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

46. Ameren Services Company ("Ameren Services") is a Missouri corporation headquartered in St. Louis, Missouri. Ameren Services is a wholly owned subsidiary of Ameren.

47. According to documents filed with the United States Nuclear Regulatory Commission, Ameren "exercises control and oversight of Ameren Missouri and its subsidiaries through its holding company structure, including appointing the directors and officers of its subsidiaries."

48. According to Ameren's 2024 10-K, Ameren's Chief Executive Officer, Martin J. Lyons, Jr., and Chief Human Resources Officer, Mark C. Lindgren, "with the support of other leaders of the Ameren Companies, are responsible for developing and executing [Ameren's] workforce strategy."

49. Mark C. Lindgren is Executive Vice President of Communications and Chief Human Resources Officer for Ameren and Ameren Services. He serves on Ameren's Executive Leadership Team and, according to Ameren's website, is "responsible for Ameren's workforce strategy, human resources, and corporate communications." He has directed and supervised compensation practices at Ameren, Ameren Missouri, and Ameren Services.

50. Michael L. Moehn is Senior Executive Vice President and Chief Financial Officer of Ameren; President of Ameren Services; and Interim Chairman and President of Ameren Missouri.

51. Ameren Missouri and Ameren Services negotiate collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, Ameren Missouri and Ameren Services relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

52. The following employees of Ameren Missouri were members of NHRG: John Neudecker, former Superintendent of Labor Relations; and Jay Quattlebaum, former Manager of Labor Relations.

53. Ameren was a member of NHRG.

54. During the Class Period, Ameren, Ameren Missouri, and Ameren Services directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Ameren, Ameren Missouri, and Ameren Services directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Ameren, Ameren Missouri and Ameren Services knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Ameren, Ameren Missouri and Ameren Services exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- Ameren, Ameren Missouri and Ameren Services exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Ameren, Ameren Missouri and Ameren Services knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, Ameren and Ameren Missouri employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- During the Class Period, Ameren and Ameren Missouri employees regularly attended meetings of the Labor Relations Project, where labor relations executives

from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Ameren and Ameren Missouri executives directly contacted other Nuclear Defendants' and coconspirators' executives through email and telephonic communications to exchange compensation data and discuss, compare, and fix compensation.
- As part of the conspiracy, Ameren, Ameren Missouri and Ameren Services established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**3. AEP Defendants**

55. American Electric Power Company Inc. ("AEP") is a publicly traded New York corporation headquartered in Columbus, Ohio.

56. Indiana Michigan Power Company ("IMPC") is an Indiana corporation headquartered in Columbus, Ohio. IMPC is a wholly owned subsidiary of AEP, and IMPC owns and operates the Donald C. Cook Nuclear Plant in Bridgman, Michigan. During the Class Period, IMPC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

57. American Electric Power Service Corporation ("AEPSC") is a New York corporation headquartered in Columbus, Ohio. AEPSC is a wholly owned subsidiary of AEP. The executive officers of AEP are employees of AEPSC.

58. According to AEP's website, Phil Ulrich, Executive Vice President and Chief Human Resources Officer at AEP, "is responsible for aligning human resources functions, processes, and company culture to support AEP's overall business strategy including oversight of

labor and employee relations, leadership and organizational development, benefits and compensation, culture and well-being for AEP's employees." Mr. Ulrich has directed and supervised compensation practices at AEP, IMPC, and AEPSC.

59. William J. Fehrman is Chairman of the Board of Directors, President and Chief Executive Officer for AEP, IMPC and AEPSC. Trevor I. Mihalik is Executive Vice President and Chief Financial Officer for AEP, IMPC, and AEPSC. Matthew Fransen is Senior Vice President and Treasurer for AEP, IMPC and AEPSC.

60. IMPC and AEPSC negotiate collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, IMPC and AEPSC relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

61. The following employees of IMPC were members of NHRG: Kathryn Wozniak, Director of Business HR, and Tiffany Rydwelski, former Organizational Development Leader and Senior HR Consultant.

62. AEP was a member of NHRG.

63. During the Class Period, AEP, IMPC, and AEPSC directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- AEP, IMPC, and AEPSC directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. AEP, IMPC, and AEPSC knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and

coconspirators. AEP, IMPC, and AEPSC exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- AEP, IMPC, and AEPSC exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. AEP, IMPC, and AEPSC knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, AEP and IMPC employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- During the Class Period, AEP and IMPC employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- As part of the conspiracy, AEP, IMPC, and AEPSC established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**4. APS**

64. Arizona Public Service Company ("APS") is an Arizona corporation headquartered in Phoenix, Arizona. APS operates, and jointly owns, the Palo Verde Generating Station in Wintersburg, Arizona.

65. During the Class Period, APS and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

66. APS is responsible for negotiating collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, APS relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

67. The following employees of APS were members of NHRG: Tony Marco, former Director of Nuclear HR; James Hettel, HR Operations Director; and David DuBey, former HR Manager of Employee and Labor Relations.

68. During the Class Period, APS directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- APS directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. APS knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. APS exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- APS exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. APS knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, APS employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels. For example, APS hosted the 2000 Annual NHRG Conference in April 2000 in Phoenix, Arizona; the 2011 NHRG, EU-HRMG & EU-TAG Joint Conference in May 2011 in Phoenix, Arizona; and the 2019 NHRG-HR Metric and OR Working Group Annual Meetings from May 20 to May 22, 2019 at the Kimpton Hotel in Phoenix, Arizona.
- During the Class Period, APS employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- During the Class Period, APS employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions in nuclear power generation.

- As part of the conspiracy, APS established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**5. Dominion Defendants**

69. Dominion Energy, Inc. ("Dominion") is a publicly traded Virginia corporation headquartered in Richmond, Virginia.

70. Virginia Electric & Power Company ("VEPCO") is a Virginia corporation headquartered in Richmond, Virginia. VEPCO is a wholly owned subsidiary of Dominion, and VEPCO owns and operates the North Anna Power Station in Louisa, Virginia, and the Surry Power Station in Surry, Virginia. During the Class Period, VEPCO employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

71. Dominion Energy Services, Inc. ("DES") is a Virginia corporation headquartered in Richmond, Virginia. DES is a wholly owned subsidiary of Dominion.

72. Regina J. Elbert is Senior Vice President and Chief Legal and Human Resources Officer for Dominion, DES and VEPCO. She oversees the human resources functions for Dominion and its nuclear operating subsidiaries, including "employee and labor relations, employee compensation and payroll, benefits design and administration, talent acquisition, learning and development, and human resources information systems." Ms. Elbert has directed and supervised compensation practices at Dominion, DES, and VEPCO.

73. Steven D. Ridge is Executive Vice President and Chief Financial Officer for Dominion, DES and VEPCO. Carlos M. Brown is Executive Vice President, Chief Administrative and Projects Officer, and Corporate Secretary for Dominion, DES and VEPCO. Eric S. Carr is Chief Nuclear Officer and President of Nuclear Operations and Contracted Energy for Dominion, DES and VEPCO.

74. VEPCO negotiates collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, VEPCO relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

75. Christina Spence, Director of Compensation & Payroll at DES, was a member of NHRG.

76. The following individuals who identified Dominion as their employer were members of NHRG: Kathy Payne, Senior HR Specialist of Labor Relations, and Calvin Callahan, former HR Manager and Employee Relations Consultant.

77. During the Class Period, Dominion, DES, and VEPCO directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Dominion and VEPCO directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Dominion and VEPCO knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Dominion and VEPCO exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- Dominion and VEPCO exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Dominion and VEPCO knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data

would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Dominion and DES employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- During the Class Period, Dominion and DES employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- During the Class Period, Dominion and DES employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions at nuclear power plants.
- As part of the conspiracy, Dominion, DES, and VEPCO established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**6. DTE Defendants**

78. DTE Energy Company ("DTE Energy") is a publicly traded Michigan corporation headquartered in Detroit, Michigan.

79. DTE Electric Company ("DTE Electric") is a Michigan corporation headquartered in Detroit, Michigan. DTE Electric is a wholly owned subsidiary of DTE Energy, and DTE Electric

owns and operates the Fermi 2 Power Plant in Newport, Michigan. During the Class Period, DTE Electric employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

80. DTE Energy Corporate Services, LLC ("DTE Services") is a Michigan limited liability company headquartered in Detroit, Michigan. DTE Services is a wholly owned subsidiary of DTE Energy.

81. Diane Antishin is Senior Vice President of Human Resources and Chief Diversity, Equity & Inclusion Officer at DTE Energy and DTE Electric. She is a member of DTE Energy's Executive Committee and, according to DTE Energy's website, "responsible for the design, development, and execution of enterprise-wide strategy for workforce planning and development, talent acquisition, talent and succession planning, executive and employee compensation and benefits, payroll, health and wellness, and labor and employee relations." She is a signatory to collective bargaining agreements between DTE Electric, DTE Services and local unions. She has directed and supervised compensation practices at DTE Energy, DTE Electric and DTE Services.

82. JoAnn Chavez is Senior Vice President and Executive Committee member at DTE Energy, and she is also a Director at DTE Electric. Lisa A. Muschong is Vice President and Executive Committee member at DTE Energy, and she is also a Director at DTE Electric and Manager at DTE Services. Matthew Paul is an Executive Committee member at DTE Energy and also President & Chief Operating Officer of DTE Electric. David Ruud is Executive Vice President, Chief Financial Officer, and Executive Committee member at DTE Energy, and he is also a Treasurer and Director at DTE Electric. Peter Dietrich is a Corporate Officer at DTE Energy and also Senior Vice President and Chief Nuclear Officer at DTE Electric.

83. DTE Electric and DTE Services negotiate collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, DTE Electric and DTE Services relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

84. DTE Energy was a member of NHRG.

85. The following individuals who identified DTE Energy as their employer were members of NHRG: Amy Zangara, former HR Manager and HR Client Relations Consultant; Mary Ann Casha, Chief of Staff; and Laurie Washington, former Program Manager of Workforce Development.

86. Emily Wood-Keel, former Nuclear HR Manager and Nuclear Principal Planning Analyst at DTE Electric, was a member of NHRG.

87. During the Class Period, DTE Energy, DTE Electric, and DTE Services directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- DTE Energy, DTE Electric, and DTE Services directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. DTE Energy, DTE Electric, and DTE Services knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. DTE Energy, DTE Electric, and DTE Services exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- DTE Energy, DTE Electric, and DTE Services exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. DTE Energy, DTE Electric, and DTE Services knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, DTE Energy and DTE Electric employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- During the Class Period, DTE Energy and DTE Electric employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- During the Class Period, DTE Energy and DTE Electric executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.
- As part of the conspiracy, DTE Energy, DTE Electric, and DTE Services established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**7. Duke Energy Defendants**

88. Duke Energy Corporation ("Duke Energy") is a publicly traded Delaware corporation headquartered in Charlotte, North Carolina.

89. Duke Energy Carolinas, LLC ("DEC") is a North Carolina limited liability company headquartered in Charlotte, North Carolina. DEC is a wholly owned subsidiary of Duke Energy, and DEC owns and operates three nuclear power plants in the United States: Catawba Nuclear Station in York, South Carolina; McGuire Nuclear Station in Huntersville, North Carolina; and Oconee Nuclear Station in Seneca, South Carolina. During the Class Period, DEC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

90. Duke Energy Business Services, LLC ("DEBS") is a Delaware limited liability company headquartered in Charlotte, North Carolina. DEBS is a wholly owned subsidiary of Duke Energy.

91. According to its 2024 10-K, Duke Energy's "Human Resources organization is responsible for … human capital management strategy, which includes recruiting and hiring, onboarding and training, diversity and inclusion, workforce planning, talent and succession planning, performance management and employee development."

92. Cameron D. McDonald is Senior Vice President and Chief Human Resources Officer for Duke Energy and Senior Vice President of DEC and DEBS. She is a member of Duke Energy's Senior Management Committee and, according to Duke Energy's website, "responsible for human resources policy and strategy, leadership and talent development, diversity and inclusion, employee and labor relations, total rewards strategies and programs, and delivery of business partner services." She has directed and supervised compensation practices at Duke Energy, DEC, and DEBS. She was also a member of NHRG.

93. Kodwo Ghartey-Tagoe is a member of Duke Energy's Senior Management Committee, and also Executive Vice President and Chief Executive Officer for DEC and an Executive Officer for DEBS. T. Preston Gillespie is Executive Vice President, Chief Generation Officer, and Senior Management Committee member at Duke Energy, and he is also an Executive Officer of DEC and DEBS. R. Alexander Glenn is Executive Vice President, Chief Legal Officer and Senior Management Committee member at Duke Energy, and he is also an Executive Officer of DEC and DEBS. Brian L. Savoy is Executive Vice President, Chief Financial Officer, and Senior Management Committee member at Duke Energy, and he is also an Executive Officer of DEC and DEBS. Bonnie Titone is Executive Vice President, Chief Administrative Officer, and Senior Management Committee member at Duke Energy, and he is also a Senior Vice President of DEC and DEBS. Kelvin Henderson is Senior Vice President and Chief Nuclear Officer for Duke Energy, and also a Senior Vice President of DEC and DEBS.

94. The following employees of Duke Energy, DEC, and DEBS were members of NHRG: Anthony Rose, HR Director at Duke Energy; Jake Stewart, Managing Director of Executive Compensation, Compensation & HR Integration at Duke Energy; Lori Ingle, former Director of HR Business Partners at Duke Energy; Carla Deck, HR Business Partners at Duke Energy; Angela Waters, Senior Manager of HR Business Partners at Duke Energy; Phyllis Ivey, Director of Nuclear HR at Duke Energy; Jay Alvaro, Vice President of Employee and Labor Relations at DEC; Shannon Caldwell, Director of HR Operations at DEBS; and Misty Easton, Director of HR Consulting Services at DEBS.

95. During the Class Period, Duke Energy, DEC, and DEBS directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- During the Class Period, Duke Energy, DEC, and DEBS employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- Duke Energy hosted the 1999 Annual NHRG Conference in April 1999 in Charlotte, North Carolina, and the 2010 NHRG, EU-HRMG & EU-TAG Joint Conference in May 2010 in Charlotte, North Carolina.
- During the Class Period, Duke Energy, DEC, and DEBS employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions in nuclear power generation.
- During the Class Period, Duke Energy, DEC, and DEBS executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.
- As part of the conspiracy, Duke Energy, DEC, and DEBS established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

96. Progress Energy, Inc. ("Progress") is a North Carolina corporation headquartered in Raleigh, North Carolina. Progress was an independent company until it merged with and became a wholly owned subsidiary of Duke Energy in July 2012. During the Class Period, Progress employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

97. During the Class Period, Progress directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Progress directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Progress knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Progress exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- Progress exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Progress knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, Progress employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- During the Class Period, Progress employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, Progress employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions in nuclear power generation.
- During the Class Period, Progress executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.
- As part of the conspiracy, Progress established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**8. EnergyNW**

98. Energy Northwest ("EnergyNW") is a municipal corporation and joint operating agency of the state of Washington. EnergyNW owns and operates the Columbia Generating Station in Richland, Washington.

99. During the Class Period, EnergyNW and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

100. EnergyNW negotiates collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, EnergyNW relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

101. The following employees of EnergyNW were members of NHRG: Juliet Gaffney, HR Director; Diane Draper, HR Professional; Cindy Way, former Senior Compensation and Benefits Administrator; Julie Marboe, Manager of Employee and Labor Relations; Kim Morris,

former Supervisor of HR, Compensation and Benefits; and Steve Lorence, former Vice President of Corporate Support Services and HR Manager.

102. During the Class Period, EnergyNW directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- EnergyNW directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. EnergyNW knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. EnergyNW exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- EnergyNW exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. EnergyNW knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, EnergyNW employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- During the Class Period, EnergyNW employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear

utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, EnergyNW employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions in nuclear power generation.
- As part of the conspiracy, EnergyNW established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**9. Entergy Defendants**

103. Entergy Corporation ("Entergy") is a publicly traded Delaware corporation headquartered in New Orleans, Louisiana.

104. Entergy Operations, Inc. ("EOI") is a Delaware corporation headquartered in Jackson, Mississippi. EOI is a wholly owned subsidiary of Entergy, and it operates four nuclear power plants in the United States: Arkansas Nuclear One in Russellville, Arkansas; Grand Gulf Nuclear Station in Port Gibson, Mississippi; River Bend Station in St. Francisville, Louisiana; and Waterford Steam Electric Station in Killona, Louisiana. During the Class Period, EOI employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

105. Entergy Nuclear Operations, Inc. ("ENOI") is a Delaware corporation headquartered in Jackson, Mississippi. ENOI is a wholly owned subsidiary of Entergy, and it operated five nuclear power plants in the United States during the Class Period: Indian Point Energy Center in Buchanan, New York; Palisades Nuclear Plant in Covert, Michigan; Pilgrim Nuclear Power Station in Plymouth, Massachusetts; Vermont Yankee Nuclear Power Plant in

Vernon, Vermont; and James A. Fitzpatrick Nuclear Power Plant in Scriba, New York. All the nuclear power plants operated by ENOI, with the exception of James A. Fitzpatrick, are currently being, or have been, decommissioned. The James A. Fitzpatrick plant was acquired by Exelon in 2017 and is currently part of the CEG nuclear fleet. During the Class Period, ENOI employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

106. According to Entergy's 2024 10-K, the "Office of the Chief Executive, which includes Entergy's Chief Human Resources Officer, ensures annual business plans are designed to support Entergy's talent objectives, reviews workforce-related metrics, and regularly discusses the development, succession planning, and performance of their direct reports and other company officers." Kathryn Collins, Senior Vice President and Chief Human Resources Officer for Entergy, is a member of the Office of the Chief Executive, and according to Entergy's website, she "oversees human resources strategy, including talent management, talent acquisition, business partnership, compensation, benefits, labor relations and workforce strategies." She has directed and supervised compensation practices at Entergy, EOI, and ENOI.

107. Kimberly Cook-Nelson is Executive Vice President and Chief Operating Officer for Entergy and also President and Chief Executive Officer for EOI and ENOI. John Dinelli is Executive Vice President, Chief Nuclear Officer, and Office of the Chief Executive member for Entergy, and he is also a Director at EOI and ENOI. Marcus Brown is Executive Vice President and General Counsel for Entergy and also Vice President for EOI and ENOI. David Hahn is Senior Vice President of Engineering and Technical Services for Entergy, and also a Director and Vice President at EOI and ENOI.

108. Both EOI and ENOI negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, EOI and ENOI

relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

109. The following employees of EOI and ENOI were members of NHRG: Allison Brewer Thurman, former Manager of HR and Labor Relations at EOI; and Brenda Gailes, former HR Manager at the Pilgrim Nuclear Power Station for ENOI.

110. Kim Dargin, who listed her position as Manager of HR Business Partners at Entergy, was a member of NHRG.

111. During the Class Period, Entergy, EOI, and ENOI directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Entergy, EOI, and ENOI directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Entergy, EOI, and ENOI knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Entergy, EOI, and ENOI exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- Entergy, EOI, and ENOI exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Entergy, EOI and ENOI knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Entergy, EOI, and ENOI employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- Entergy hosted the 2004 Annual NHRG Conference in April 2004 in New Orleans, Louisiana and the 2018 NHRG-HR Metric and OR Working Group Annual Meetings from May 7 to May 10, 2018 at the Hyatt Regency in New Orleans, Louisiana.
- During the Class Period, Entergy, EOI, and ENOI employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- During the Class Period, Entergy, EOI, and ENOI employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions in nuclear power generation.
- During the Class Period, Entergy, EOI, and ENOI executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.
- As part of the conspiracy, Entergy, EOI, and ENOI established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**10. FirstEnergy Defendants**

112. FirstEnergy Corporation ("FirstEnergy") is a publicly traded Ohio corporation headquartered in Akron, Ohio. FirstEnergy, through its former subsidiary FirstEnergy Nuclear Operating Company, operated three nuclear power plants in the United States: Beaver Valley Power Station in Shippingport, Pennsylvania; Davis-Besse Nuclear Power Station in Oak Harbor, Ohio; and Perry Nuclear Power Plant in Perry, Ohio.

113. FirstEnergy Service Company ("FESC") is an Ohio corporation headquartered in Akron, Ohio. FESC is a wholly owned subsidiary of FirstEnergy, and it provided human resources services, including compensation and benefits administration, to FENOC.

114. During the Class Period, Charles E. Jones was President and Chief Executive Officer for both FirstEnergy and FESC; James F. Pearson was Executive Vice President and Chief Financial Officer for both FirstEnergy and FESC; K. Jon Taylor was Vice President, Controller and Chief Accounting Officer for both FirstEnergy and FESC; Leila L. Vespoli was Executive Vice President of Corporate Strategy, Regulatory Affairs and Chief Legal Officer for both FirstEnergy and FESC; and Ebony Yeboah-Amankwah was Vice President, Corporate Secretary and Chief Ethics Officer for both FirstEnergy and FESC.

115. FESC negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, FESC relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

116. The following employees of FESC were members of NHRG: Margaret Breetz, former Director of Generation HR, and Ryan Clegg, Manager of Talent Acquisition.

117. FirstEnergy was a member of NHRG.

118. During the Class Period, FirstEnergy and FESC directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- FirstEnergy and FESC directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. FirstEnergy and FESC knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. FirstEnergy and FESC exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- FirstEnergy and FESC exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. FirstEnergy and FESC knew and understood, when they shared their current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, FirstEnergy and FESC employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- During the Class Period, FirstEnergy and FESC employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing

nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.

- During the Class Period, FirstEnergy and FESC employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions in nuclear power generation.
- During the Class Period, FirstEnergy and FESC executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.
- As part of the conspiracy, FirstEnergy and FESC established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**11. NextEra Defendants**

119. NextEra Energy, Inc. ("NextEra") is a publicly traded Florida corporation headquartered in Juno Beach, Florida.

120. NextEra Energy Resources, LLC ("NEER") is a Delaware limited liability company headquartered in Juno Beach, Florida. NEER is an indirect wholly owned subsidiary of NextEra, and it indirectly owns and operates the Point Beach Nuclear Plant in Two Rivers, Wisconsin, and the Seabrook Station in Seabrook, New Hampshire. NEER previously owned and operated the Duane Arnold Energy Center in Palo, Iowa, which ceased operations in August 2020. During the Class Period, NEER employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

121. Florida Power & Light Company ("FPL") is a Florida corporation headquartered in Juno Beach, Florida. FPL is a wholly owned subsidiary of NextEra, and it owns and operates the

St. Lucie Nuclear Power Plant in Jensen Beach, Florida and the Turkey Point Nuclear Power Plant in Florida City, Florida. During the Class Period, FPL employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

122. John W. Ketchum is Chairman, President and Chief Executive Officer of NextEra and Chairman of FPL. Michael Dunne is Executive Vice President of Finance and Chief Financial Officer for NextEra and Vice President, Director and Treasurer for FPL. Nicole J. Daggs is Executive Vice President of Human Resources and Corporate Services for NextEra and Vice President of FPL. Mark Lemasney is Executive Vice President of the Power Generation Division for NextEra and, according to NextEra's website, "directs power production activities for all renewable and clean-energy powerplants of NextEra Energy's principal subsidiaries, FPL and NEER." Bob Coffey is Executive Vice President of the Nuclear Division for NextEra and Vice President of FPL.

123. NEER and FPL negotiate collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, NEER and FPL relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

124. The following employees of NEER and FPL were members of NHRG: Karen Sprang, former Senior Compensation Consultant at NEER; Christine Cassina, former HR Labor Relations Manager at NEER; Lisa Perino, former Senior HR Business Partner and Director of Human Resources Operations at FPL; Kelly Tveter, Director of Labor Relations at FPL; and Brendan Callaghan, Director of Corporate Safety and Labor Relations at FPL.

125. Tim Garman, who listed his position as former Senior HR Business Partner for the Nuclear Fleet at NextEra, was a member of NHRG.

126. Ms. Tveter and Mr. Callaghan are signatories to collective bargaining agreements between FPL and the union local responsible for negotiating wages and benefits for nuclear generation workers at FPL's nuclear plants in Florida.

127. During the Class Period, NextEra, NEER, and FPL directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- NextEra, NEER, and FPL directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. NextEra, NEER, and FPL knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. NextEra, NEER, and FPL exchanged compensation data through the CBA Repository during the Class Period.
- NextEra, NEER, and FPL exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. NextEra, NEER, and FPL knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, NextEra, NEER, and FPL employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and

fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- FPL hosted the 2006 Annual NHRG Conference in May 2006 in Palm Beach, Florida, and the 2017 NHRG-HR Metric and OR Working Group Annual Meeting in May 2017 in Jupiter, Florida.
- During the Class Period, NextEra, NEER, and FPL employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- During the Class Period, NextEra, NEER, and FPL employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions in nuclear power generation.
- During the Class Period, NextEra, NEER, and FPL executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.
- As part of the conspiracy, NextEra, NEER, and FPL established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**12. PG&E Defendants**

128. PG&E Corporation is a publicly traded California corporation headquartered in Oakland, California.

129. Pacific Gas & Electric Company ("PG&E Company") is a California corporation headquartered in Oakland, California. PG&E Company is a wholly owned subsidiary of PG&E Corporation, and it owns and operates the Diablo Canyon Nuclear Power Plant in Avila Beach, California. During the Class Period, PG&E Company employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

130. According to PG&E Corporation's 2024 Form 10-K, "PG&E [Corporation's] and [PG&E Company's] executive teams meet regularly to discuss and evaluate the state of employee talent, determine which programs are driving engagement and performance, and clarify the specific skills, behaviors, and virtues that should be cultivated."

131. Alejandro T. Vallejo is Executive Vice President and Chief People Officer for both PG&E Corporation and PG&E Company. According to PG&E Corporation's website, he is "responsible for attracting, cultivating, and retaining a high-performing workforce" as well as "labor relations." Mr. Vallejo has directed and supervised compensation practices at PG&E Corporation and PG&E Company.

132. Ajay Waghray is Executive Vice President and Chief Information Officer for both PG&E Corporation and PG&E Company. Maureen R. Zawalick is Chief Risk Officer and Senior Vice President for both PG&E Corporation and PG&E Company. Mari Becker is Vice President, Internal Audit and Treasurer for both PG&E Corporation and PG&E Company. Matt Hayes is Vice President and Chief Safety Officer for both PG&E Corporation and PG&E Company. Stephanie Williams is Vice President and Controller for PG&E Corporation and also Vice President, Chief Financial Officer and Controller for PG&E Company. Brian M. Wong is Vice President, Deputy General Counsel and Corporate Secretary for PG&E Corporation and also Vice President, General Counsel, and Corporate Secretary for PG&E Company.

133. PG&E Company negotiates collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, PG&E Company relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

134. PG&E Corporation and PG&E Company were members of NHRG.

135. During the Class Period, PG&E Corporation and PG&E Company directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- PG&E Corporation and PG&E Company directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. PG&E Corporation and PG&E Company knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. PG&E Corporation and PG&E Company exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- PG&E Corporation and PG&E Company exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. PG&E Corporation and PG&E Company knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, PG&E Corporation and PG&E Company employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels. For example, PG&E Company hosted the 1997 Annual NHRG Conference in April 1997 in San Francisco, California.
- During the Class Period, PG&E Corporation and PG&E Company employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- During the Class Period, PG&E Corporation and PG&E Company employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions in nuclear power generation.
- As part of the conspiracy, PG&E Corporation and PG&E Company established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

136. PG&E Corporation and PG&E Company commenced Chapter 11 bankruptcy proceedings in the United State Bankruptcy Court for the Northern District of California on January 29, 2019. On July 1, 2020, the court discharged claims against PG&E Corporation and PG&E Company that arose before the petition date and for which proofs of claim were not filed. PG&E Corporation and PG&E Company participated in the conspiracy alleged herein throughout

the Class Period, including before and after the January 29, 2019 petition date. Neither PG&E Corporation nor PG&E Company withdrew from the conspiracy after the bar date.

137. This Complaint seeks to recover damages from PG&E Corporation and PG&E Company only for the post-petition-date conduct of PG&E Corporation and PG&E Company. However, by operation of law, the damages arising from the post-petition-date conduct of PG&E Corporation and PG&E Company include damages incurred by Plaintiffs and other Class Members throughout the Class Period, including from before the petition date. In addition, this Complaint also seeks to recover damages from other Defendants for pre-petition-date conspiratorial conduct of PG&E Corporation and PG&E Company throughout the Class Period.

**13. PSEG Defendants**

138. Public Service Enterprise Group Inc. ("PSEG") is a publicly traded New Jersey corporation headquartered in Newark, New Jersey.

139. PSEG Power LLC ("PSEG Power") is a Delaware limited liability company headquartered in Newark, New Jersey. PSEG Power is a wholly owned subsidiary of PSEG.

140. PSEG Nuclear LLC ("PSEG Nuclear") is a Delaware limited liability company headquartered in Newark, New Jersey. PSEG Nuclear is a wholly owned subsidiary of PSEG Power, and it owns and operates the Hope Creek Generating Station in Hancock's Bridge, New Jersey, and the Salem Generating Station also in Hancock's Bridge, New Jersey. During the Class Period, PSEG Nuclear employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

141. PSEG Services Corporation ("PSEG Services") is a New Jersey corporation headquartered in Newark, New Jersey. PSEG Services is a wholly owned subsidiary of PSEG that provides PSEG and its "operating subsidiaries with certain management, administrative and general services at cost."

142. Sheila J. Rostiac is a member of the PSEG Senior Executive Team and the Senior Vice President, Chief Human Resources Officer and Chief Diversity Officer for PSEG Services. According to PSEG's website, she "leads the Human Resources team" and "serves as a strategic partner to the business in developing a talent pipeline to drive organizational success." Ms. Rostiac has directed and supervised compensation practices at PSEG, PSEG Services, and PSEG Nuclear.

143. Ralph A. LaRossa is Chair of the Board, President and Chief Executive Officer of both PSEG and PSEG Power. Daniel J. Cregg is Executive Vice President and Chief Financial Officer of both PSEG and PSEG Power and a member of the PSEG Senior Executive Team. Grace H. Park is Executive Vice President and General Counsel for both PSEG and PSEG Power and a member of the PSEG Senior Executive Team. Rose M. Chernick is Vice President and Controller for both PSEG and PSEG Power.

144. Charles V. McFeaters is a member of the PSEG Senior Executive Team and serves as President and Chief Nuclear Officer for PSEG Nuclear.

145. PSEG Power and PSEG Services negotiate collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, PSEG Power and PSEG Services relied upon compensation data obtained from their competitors through the CBA Repository and Compensation Comparison Reports.

146. The following employees of PSEG Power, PSEG Nuclear, and PSEG Services were members of NHRG: Mark Relken, HR Director for PSEG Power; Sharon Rhoads, HR Manager at PSEG Nuclear; Terri Robinson, former Senior Recruiter at PSEG Nuclear; Christopher Munyan, Labor Relations Manager at PSEG Services; and Christine Kenny, former Nuclear HR Business Partner at PSEG Services.

147. During the Class Period, PSEG Power, PSEG Nuclear, and PSEG Services, at the direction of PSEG, directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- PSEG Power and PSEG Services directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. PSEG Power and PSEG Services knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. PSEG Power and PSEG Services exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- PSEG Power and PSEG Services exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. PSEG Power and PSEG Services knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, PSEG Power, PSEG Nuclear, and PSEG Services employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, PSEG Power, PSEG Nuclear, and PSEG Services employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- As part of the conspiracy, PSEG Power, PSEG Nuclear, and PSEG Services established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**14. SCE**

148. Southern California Edison Company ("SCE") is a California corporation headquartered in Rosemead, California. SCE previously substantially owned and operated the San Onofre Nuclear Generating Station in San Clemente, California. The San Onofre facility ceased operations in June 2013 and is currently being decommissioned.

149. According to the U.S. Nuclear Regulatory Commission ("NRC"), when a "company decides to close a nuclear power plant permanently, the facility must be decommissioned by safely removing it from service and reducing residual radioactivity to a level that permits release of the property and termination of the operating license." The NRC has "strict rules governing nuclear power plant decommissioning, involving cleanup of radioactively contaminated plant systems and structures, and removal of the radioactive fuel." Decommissioning a nuclear facility can take up to 60 years.

150. During the Class Period, SCE and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

151. SCE was responsible for negotiating collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, SCE relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

152. SCE was a member of NHRG.

153. During the Class Period, SCE directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- SCE directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. SCE knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. SCE exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- SCE exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. SCE knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, SCE employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.

- During the Class Period, SCE employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- As part of the conspiracy, SCE established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**15. Southern Company Defendants**

154. The Southern Company ("Southern Company") is a publicly traded Delaware corporation headquartered in Atlanta, Georgia.

155. Southern Nuclear Operating Company, Inc. ("Southern Nuclear") is a Delaware corporation headquartered in Birmingham, Alabama. Southern Nuclear is a wholly owned subsidiary of Southern Company, and it operates three nuclear power plants in the United States: Joseph M. Farley Nuclear Plant in Columbia, Alabama; Edwin I. Hatch Nuclear Plant in Baxley, Georgia; and Alvin W. Vogtle Electric Generating Plant in Waynesboro, Georgia. During the Class Period, Southern Nuclear employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

156. Southern Nuclear negotiates collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, Southern Nuclear relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports. Mark Wolfe, former Labor Relations Manager at Southern Nuclear and former Chair of the NHRG Labor Relations Committee, was signatory to agreements between Southern Nuclear and the local union.

157. Shane Camp is Vice President of Human Resources for Southern Nuclear and has served as chair of NHRG.

158. The following employees of Southern Company and Southern Nuclear were members of NHRG: Joshua Burroughs, former Compensation Manager at Southern Company; Paul Mullen, former HR Business Consultant and HR Manager for Southern Company; David Slicker, Talent Acquisition Operations Manager at Southern Company; Kevin Gillenwater, Labor Relations Consultant at Southern Nuclear; Lisa Kidd, former Senior Compensation Analyst at Southern Company; David Bandy, Regional Manager of Labor Relations at Southern Company; Sharon Dawkins, former Labor Relations Coordinator at Southern Nuclear; and Marty Ingels, former Regional HR Labor and Relations Manager at Southern Nuclear.

159. During the Class Period, Southern Company and Southern Nuclear directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Southern Company and Southern Nuclear directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Southern Company and Southern Nuclear knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Southern Company and Southern Nuclear exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- Southern Company and Southern Nuclear exchanged current and future compensation information with competing nuclear power companies through Compensation

Comparison Reports. Southern Company and Southern Nuclear knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Southern Company and Southern Nuclear employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- During the Class Period, Southern Company and Southern Nuclear employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- During the Class Period, Southern Company and Southern Nuclear employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions in nuclear power generation.
- During the Class Period, Southern Company and Southern Nuclear executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.

- As part of the conspiracy, Southern Company and Southern Nuclear established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**16. STP**

160. STP Nuclear Operating Company ("STP") is a Texas corporation headquartered in Wadsworth, Texas. STP operates the South Texas Project Electric Generating Station in Bay City, Texas.

161. During the Class Period, STP and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

162. STP negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, STP relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

163. The following employees of STP were members of NHRG: Kevin Knox, Senior Compensation Analyst and Strategic HR Business Partner; and Shawn Flaherty, former HR Manager.

164. During the Class Period, STP directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- STP and its predecessors, wholly owned and/or controlled subsidiaries, and/or other affiliates directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation

Comparison Reports. STP knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. STP exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- STP exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. STP knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, STP employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- STP co-hosted the 2008 NHRG & EU-TAG Joint Conference in May 2008 in Fort Worth, Texas, and hosted the 2013 NHRG, EU-HRMG & EU-TAG Joint Conference in May 2013 in Houston, Texas.
- During the Class Period, STP employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- As part of the conspiracy, STP established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**17. TVA**

165. Tennessee Valley Authority ("TVA") is a corporate agency of the United States headquartered in Knoxville, Tennessee. TVA owns and operates three nuclear power plants in the United States: Browns Ferry Nuclear Plant in Athens, Alabama; Sequoyah Nuclear Plant in Soddy-Daisy, Tennessee; and Watts Bar Nuclear Plant in Spring City, Tennessee.

166. During the Class Period, TVA and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

167. TVA negotiates collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, TVA relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

168. The following employees of TVA were members of NHRG: Audreial Beard, former HR Generalist; Haleigh Maynor, HR Director; Tara Crane, HR Business Partner; Glen Powell, former Senior Project Manager and former Senior Compensation Consultant; Tina Shelton, former Director of HR; Matthew Faulkner, Director of Labor Relations; Kim McCormick, Program Manager for HR Support Services; Wes Wingo, Labor Relations Manager; Debra Keil, former Senior Manager of Nuclear HR and former HR Manager; Sue Collins, former Executive Vice President, Chief Human Resources Officer and Chief Administrative Officer; and Megan Flynn, former Vice President of HR.

169. During the Class Period, TVA directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- TVA directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. TVA knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. TVA exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- TVA exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. TVA knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, TVA employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- TVA hosted the 2015 Annual NHRG Conference from May 18 to 21, 2015 in Chattanooga, Tennessee.
- During the Class Period, TVA employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- During the Class Period, TVA employees regularly attended meetings of the Total Rewards Project, where compensation executives from competing nuclear utilities

gathered in-person to discuss and review the WTW Surveys and compare and align compensation for positions in nuclear power generation.

- During the Class Period, TVA executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.
- As part of the conspiracy, TVA established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**18. Vistra Defendants**

170. Vistra Corporation ("Vistra") is a publicly traded Delaware corporation headquartered in Irving, Texas.

171. Luminant Generation Company, LLC ("Luminant") is a Texas limited liability company headquartered in Irving, Texas. Luminant is an indirect, wholly owned subsidiary of Vistra, and Luminant previously operated the Comanche Peak Nuclear Power Plant. During the Class Period, Luminant employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

172. Carrie Kirby is Executive Vice President and Chief Administrative Officer for Vistra and an Officer of Luminant. According to Vistra's website, she has "oversee[n] the functions of human resources" at Vistra and Vistra's predecessor, Energy Future Holdings Corp. ("EFHC"), "leading the human resources functions across EFH corporate and its subsidiaries, Luminant." Ms. Kirby has directed and supervised compensation practices at Vistra and Luminant.

173. James Burke is President and Chief Executive Officer of Vistra and a Manager and Officer of Luminant. Stacey Dore is Chief Strategy & Sustainability Officer and Executive Vice President of Public Affairs for Vistra and an Officer of Luminant. Carrie Kirby is Executive Vice

President and Chief Administrative Officer for Vistra and an Officer of Luminant. Kris Moldovan is Executive Vice President and Chief Financial Officer for Vistra and a Manager and Officer of Luminant. Stephanie Zapata Moore is Executive Vice President and General Counsel for Vistra and an Officer of Luminant.

174. Luminant negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, Luminant relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

175. The following employees of Luminant were members of NHRG: Curtis Willmon, HR Manager; Christopher Tackett, former HR Director; and Justin McCloskey, former HR Manager.

176. During the Class Period, Luminant, at the direction of Vistra, directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Luminant directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Luminant knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Luminant exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.
- Luminant exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Luminant knew

and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.

- During the Class Period, Luminant employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- Luminant co-hosted the 2008 NHRG & EU-TAG Joint Conference in May 2008 in Fort Worth, Texas.
- During the Class Period, Luminant employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- As part of the conspiracy, Luminant established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

177. Vistra and Luminant commenced voluntary Chapter 11 bankruptcy proceedings in the United State Bankruptcy Court for the District of Delaware on April 29, 2014. On October 3, 2016, the court established a November 2, 2016 bar date for filing proofs of claim against Vistra and Luminant. Vistra and Luminant participated in the conspiracy alleged herein throughout the Class Period, including before and after the November 2, 2016 bar date. Neither Vistra nor Luminant withdrew from the conspiracy after the bar date.

178. This Complaint seeks to recover damages from Vistra and Luminant only for the post-bar-date conduct of Vistra and Luminant. However, by operation of law, the damages arising

from the post-bar-date conduct of Vistra and Luminant include damages incurred by Plaintiffs and other Class Members throughout the Class Period, including from before the bar date. In addition, this Complaint also seeks to recover damages from other Defendants for pre-bar-date conspiratorial conduct of Vistra and Luminant throughout the Class Period.

**19. Wolf Creek**

179. Wolf Creek Nuclear Operating Corporation ("Wolf Creek") is a Delaware corporation headquartered in Burlington, Kansas. Wolf Creek operates the Wolf Creek Generating Station in Burlington, Kansas.

180. During the Class Period, Wolf Creek and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

181. Wolf Creek negotiated collective bargaining agreements, including wages and benefits, with union representatives. During collective bargaining negotiations, Wolf Creek relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

182. Kelly Ledom, HR Staff Specialist at Wolf Creek, was a member of NHRG.

183. During the Class Period, Wolf Creek directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Wolf Creek directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Wolf Creek knew and understood that when it shared its CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Wolf Creek exchanged compensation

data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Wolf Creek exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Wolf Creek knew and understood, when it shared its current and future compensation data with Exelon, that its compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, Wolf Creek employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- During the Class Period, Wolf Creek employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensations information for their unionized nuclear power generation workers.
- During the Class Period, Wolf Creek executives discussed, compared, and fixed compensation through email and telephonic communications directly with other Nuclear Defendants' and coconspirators' executives.
- As part of the conspiracy, Wolf Creek established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**20. Xcel Defendants**

184. Xcel Energy, Inc. ("Xcel Energy") is a publicly traded Minnesota corporation headquartered in Minneapolis, Minnesota.

185. Northern States Power Company ("NSPC") is a Minnesota corporation headquartered in Minneapolis, Minnesota. NSPC is a wholly owned subsidiary of Xcel Energy, and it owns and operates the Monticello Nuclear Generating Plant in Monticello, Minnesota, and the Prairie Island Nuclear Generating Plant in Welch, Minnesota. During the Class Period, NSPC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

186. Xcel Energy Services, Inc. ("XES") is a Delaware corporation headquartered in Minneapolis, Minnesota. XES is a wholly owned subsidiary of Xcel Energy.

187. Patricia Correa is Senior Vice President of Human Resources & Employee Services and Chief Human Resources Officer for Xcel Energy and NSPC. According to Xcel Energy's website, she "leads Human Resources & Employee Services functions including human resources, workforce relations, safety, enterprise learning and technical training." She has directed and supervised compensation practices at Xcel Energy, NSPC, and XES.

188. Robert Frenzel is Chairman, President and Chief Executive Officer of Xcel Energy, NSPC, and XES. Brian Van Abel is Executive Vice President and Chief Financial Officer for Xcel Energy and NSPC and Director of XES. According to Xcel Energy's website, he "leads the finance functions of Xcel Energy and its subsidiary companies." Amy Schneider is Vice President and Corporate Secretary for Xcel Energy and NSPC and Secretary and Director of XES. Scott Sharp is Executive Vice President and Chief Generation Officer for Xcel Energy and, according to Xcel Energy's website, "responsible for the operations of electric production and energy trading across Xcel Energy's eight-state footprint."

189. NSPC negotiated collective bargaining agreements, including wages and benefits, with union representatives. According to Xcel Energy's 2012 response to the South Dakota Public

Utilities Commission, NSPC's "negotiating committee for each contract is usually led by an Xcel Energy Workforce Relations Consultant and also includes the site Plant Manager and the department manager. Representatives from other Xcel Energy areas (i.e., Legal, Benefits, Human Resources and Finance) may be brought in to support the negotiations team as needed." During collective bargaining negotiations, NSPC relied upon compensation data obtained from its competitors through the CBA Repository and Compensation Comparison Reports.

190. Christine Cocchiarella, former HR Director and Director of EEO & Employee Relations at XES, was a member of NHRG.

191. The following individuals who identified themselves as employees of Xcel Energy were members of NHRG: Nancy Diekmann, former Compensation Consultant at Xcel Energy; Ann Shama, former Senior Compensation Consultant; Michael Deselich, Senior Compensation Consultant; Jeremy May, former Senior Workforce Analytics & Planning Consultant; and Valorie Vasquez, former Director of Workforce Strategy and Consulting.

192. During the Class Period, Xcel Energy, NSPC and XES directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, doing the following:

- Xcel Energy and NSPC directly exchanged current and future compensation information with competing nuclear power companies through the CBA Repository and Compensation Comparison Reports. Xcel Energy and NSPC knew and understood that when they shared their CBAs with NHRG, those confidential documents would be distributed to and examined by other Nuclear Defendants and coconspirators. Xcel Energy and NSPC exchanged compensation data through the CBA Repository and Compensation Comparison Reports during the Class Period.

- Xcel Energy and NSPC exchanged current and future compensation information with competing nuclear power companies through Compensation Comparison Reports. Xcel Energy and NSPC knew and understood, when they shared their current and future compensation data with Exelon, that their compensation data would be distributed in fully disaggregated and deanonymized form to and examined by other Nuclear Defendants and coconspirators.
- During the Class Period, Xcel Energy and XES employees regularly attended annual NHRG Conferences where executives from competing nuclear power companies gathered in-person to exchange information about, discuss, agree upon, and fix Class Members' wages, salaries, benefits, and other compensation at artificially depressed levels.
- During the Class Period, Xcel Energy and XES employees regularly attended meetings of the Labor Relations Project, where labor relations executives from competing nuclear utilities gathered in-person to exchange and discuss compensation information for their unionized nuclear power generation workers.
- As part of the conspiracy, Xcel Energy, NSPC, and XES established compensation schedules for, and directed payments to, Class Members at artificially depressed and fixed rates.

**21. Accelerant Solutions**

193. Accelerant Technologies LLC d/b/a Accelerant Solutions ("Accelerant") is an Ohio limited liability company headquartered in Maumee, Ohio. In 2023, Accelerant managed NHRG and facilitated its conferences, including the Labor Relations Project and Total Rewards Project sessions.

194. During the Class Period, Accelerant directly participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, facilitating the NHRG Labor Relations Project and Total Rewards Project meetings where executives from competing nuclear utilities discussed, compared, and fixed the compensation paid to nuclear generation workers.

195. In 2024, Accelerant hosted the nuclear-hr.com website, which provided an overview of the NHRG and a list of nuclear company members. The website included sections for "Labor Management" and "Total Rewards" that could only be accessed with a username and password.

**22. Institute of Nuclear Power Operations**

196. INPO is a Delaware corporation headquartered in Atlanta, Georgia.

197. INPO is a membership nonprofit organization. Every company licensed to operate or construct a commercial nuclear plant in the United States continuously maintained INPO membership during the Class Period. Each of the Nuclear Defendants has been a member of INPO throughout the Class Period.

198. INPO states that it was "Created by the industry, for the industry." INPO claims that it "gives members the support they need to achieve exemplary results" and "strives to shape and serve a united nuclear industry and enable member success." INPO notes that the nuclear industry itself "assumed the function of overseeing INPO activities."

199. INPO is governed by a Board of Directors, and that board is dominated by the chief executives of the Nuclear Defendants. Thirteen of the 14 directors also served as CEOs of a Nuclear Defendant.

200. During the Class Period, INPO participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, supplying executives

of each Nuclear Defendant with a private email address so that they could communicate about current and future compensation rates without such communications being monitored, detected, or discovered. A former employee of Dominion, Energy Northwest, Tennessee Valley Authority, and Exelon said, "INPO staff encouraged and recommended that Operations Managers employed by competing nuclear power companies communicate through their INPO email accounts so that those communications could not and would not be monitored or retained on any nuclear power company's servers." He noted that communications through the covert INPO email system were "definitely" intended to suppress compensation paid to nuclear power generation workers below what it would have been in a competitive market. He explained, "The secretive INPO email system provided an opportunity for Operations Managers at competing nuclear power companies to collaborate to limit the salaries and wages of nuclear power plant workers, without those workers, unions that represent those workers, government regulators, and the general public finding out."

201. INPO hosted at least two annual NHRG conferences. Jeff Wheelock, Director of HR at INPO, was a member of NHRG.

## IV. AGENTS AND COCONSPIRATORS

202. The entities named below participated as coconspirators with Defendants and performed acts and made statements in furtherance of the conspiracy to fix and suppress compensation alleged herein.

203. Defendants are jointly and severally liable for the acts of the coconspirators named below, whether or not those coconspirators are named as defendants in this Complaint.

204. Each coconspirator named below acted as the agent or joint-venturer of, or for, the other Defendants and coconspirators with respect to the acts, violations, and common course of conduct alleged herein.

**1. Dominion Co-Conspirators**

205. Dominion Energy Nuclear Connecticut, Inc. ("DENC") is a Delaware corporation headquartered in Manchester, Connecticut. DENC is a wholly owned subsidiary of Dominion, and DENC owns and operates the Millstone Power Station in Waterford, Connecticut. During the Class Period, DENC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

206. Dominion Energy South Carolina, Inc. ("DESC") is a South Carolina corporation headquartered in Cayce, South Carolina. DESC is an indirect, wholly owned subsidiary of Dominion, and DESC owns and operates the Virgil C. Summer Power Station in Jenkinsville, South Carolina. During the Class Period, DESC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

**2. Duke Co-Conspirators**

207. Duke Energy Progress, LLC ("DEP") is a North Carolina limited liability company headquartered in Raleigh, North Carolina. DEP is a wholly owned subsidiary of Progress, and DEP owns and operates three nuclear power plants in the United States: Brunswick Nuclear Plant in Southport, North Carolina; Shearon Harris Nuclear Plant in New Hill, North Carolina; and H.B. Robinson Nuclear Plant in Hartsville, South Carolina. During the Class Period, DEP employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

**3. Vistra Co-Conspirators**

208. Vistra Operations Company, LLC ("VOC") is a Delaware limited liability company headquartered in Irving, Texas. VOC is an indirect, wholly owned subsidiary of Vistra, and VOC operates four nuclear power plants in the United States: Beaver Valley Power Station in Shippingport, Pennsylvania; Comanche Peak Nuclear Power Plant in Glen Rose, Texas; David-

Besse Nuclear Power Station in Oak Harbor, Ohio; and Perry Nuclear Power Plant in Perry, Ohio. During the Class Period, VOC employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

**4. Exelon Business Services Company**

209. Exelon Business Services Company, LLC ("Exelon BSC") is a Delaware limited liability company headquartered in Chicago, Illinois. Exelon BSC provided human resources support services to CEG after its separation from Exelon Corporation. During the Class Period, employees of Exelon BSC regularly attended meetings of the Total Rewards Project at NHRG, where executives from competing nuclear utilities gathered in-person to review and discuss the WTW Surveys and compare and align compensation for positions in nuclear power generation.

**5. Bruce Power**

210. Bruce Power L.P. ("Bruce") is a Canadian limited partnership headquartered in Tiverton, Ontario. Bruce operates the Bruce A and B Nuclear Generating Stations in Kincardine, Ontario. During the Class Period, Bruce was a member of NHRG.

**6. Nebraska Public Power District**

211. Nebraska Public Power District ("NPPD") is a public corporation and political subdivision of the State of Nebraska. NPPD owns and operates the Cooper Nuclear Station in Brownville, Nebraska. During the Class Period, NPPD and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States. During the Class Period, NPPD was a member of NHRG.

**7. Ontario Power Generation**

212. Ontario Power Generation, Inc. ("OPG") is a Canadian public corporation headquartered in Toronto, Ontario. OPG owns and operates Pickering Nuclear Generating Station

in Pickering, Ontario, and the Darlington Nuclear Generating Station in Clarington, Ontario. During the Class Period, OPG was a member of NHRG.

**8. OPPD**

Omaha Public Power District ("OPPD") is a public corporation and political subdivision of the state of Nebraska. OPPD previously owned and operated the Fort Calhoun Nuclear Generating Station in Fort Calhoun, Nebraska, which ceased operations in October 2016. During the Class Period, OPPD and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States. During the Class Period, OPPD was a member of NHRG.

**9. Talen Energy**

213. Talen Energy Corporation ("Talen") is a publicly traded Delaware corporation headquartered in Houston, Texas. During the Class Period, Talen and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States. During the Class Period, Talen was a member of NHRG.

214. Susquehanna Nuclear, LLC ("Susquehanna") is a Delaware limited liability company headquartered in Berwick, Pennsylvania. Susquehanna is an indirect wholly owned subsidiary of Talen, and Susquehanna operates the Susquehanna Steam Electric Station in Salem Township, Pennsylvania. During the Class Period, Susquehanna employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

**10. WEC**

215. WEC Energy Group, Inc. ("WEC Energy") is a publicly traded Wisconsin corporation headquartered in Milwaukee, Wisconsin. Wisconsin Electric Power Company ("WEP") is a wholly owned subsidiary of WEC Energy, and WEP previously owned the Point

Beach nuclear power plant in Two Rivers, Wisconsin. WEP sold the Point Beach nuclear power plant to FPL in September 2007. During the Class Period, WEP and/or its predecessors, wholly owned or controlled subsidiaries, or other affiliates employed and paid wages, salaries, other compensation, and/or benefits to Class Members in the United States.

**11. Human Resource Consultants**

216. Human Resource Consultants, LLC ("HRC") is an Arizona limited liability company headquartered in Mesa, Arizona. From 2015 to 2019, HRC and its principal officer, David Heler, managed NHRG and facilitated its conferences, including the Labor Relations Project and Total Rewards Project sessions, during which executives from competing nuclear utilities discussed, compared, and fixed the compensation paid to nuclear generation workers. After Accelerant assumed management of NHRG in 2019, Heler served as a consultant to Accelerant.

**12. WTW**

217. Willis Towers Watson PLC is an Ireland public limited company headquartered in London, England. During the Class Period, WTW administered the WTW Surveys utilized by Defendants to help fix and suppress the compensation paid to employees of the Nuclear Defendants, their subsidiaries, and related entities at commercial nuclear power plants in the United States.

**13. ScottMadden**

218. ScottMadden, Inc. ("ScottMadden") is a North Carolina corporation headquartered in Raleigh, North Carolina. During the Class Period, ScottMadden served as a consultant to NHRG and its members. ScottMadden participated in the conspiracy to fix and suppress compensation to nuclear power generation workers by, among other things, facilitating the electronic exchange of nuclear power plant CBAs between the Nuclear Defendants.

## V. TRADE AND COMMERCE

219. The conspiracy formed, implemented, and enforced by Defendants was intended to suppress, and did in fact suppress, the compensation of Class Members nationwide.

220. The conspiracy restrained competition between the Nuclear Defendants for the payment of wages, salaries, benefits, and other compensation to, and the hiring of, Class Members nationwide, including Class Members located in states other than the states in which the nuclear power plants that employed them were located.

221. The Nuclear Defendants made payments to Class Members by mailing or transmitting funds across state lines.

222. The Nuclear Defendants employed Class Members to generate electricity for sale in interstate and foreign commerce.

223. Accelerant provided services to the Nuclear Defendants located in multiple different states and exchanged confidential, proprietary, and competitively sensitive data among the Nuclear Defendants across state lines.

224. Defendants' activities were carried out within the flow of interstate commerce of the United States and were intended to have, and did have, direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## VI. FACTUAL ALLEGATIONS

### A. Background

#### 1. The Commercial Nuclear Power Industry

225. The United States is the world's largest producer of nuclear power, generating approximately 30% of all nuclear power. In 2022, the United States's nuclear reactors produced 772 terawatt-hours of energy.

226. Each commercial nuclear power plant in the United States is operated by and at least partially owned by a Nuclear Defendant or coconspirator. All full-time commercial nuclear power generation workers in the United States are employed by the Nuclear Defendants or coconspirators.

227. The Nuclear Defendants earn billions of dollars in annual revenue from generating and selling electricity. For example, Constellation alone generated 182 terawatt-hours of zero-emissions electricity, enough to power 16 million homes, resulting in sales of $23.6 billion in 2024.

**2. Nuclear Power Plants**

228. There are 94 operating commercial nuclear reactors at 54 nuclear power plants in the United States.

229. The Nuclear Defendants and coconspirators collectively operate and control all of the nuclear power plants in the United States.

230. Some nuclear power plants are investor-owned utilities which issue stocks to investors, sell bonds, and are regulated by state regulatory commissions. Other nuclear power plants are publicly owned utilities (though most publicly owned nuclear power plants are operated by an investor-owned operating company). And others are partly owned by governments and partly by for-profit companies.

**3. The Nuclear Power Industry's History and Culture of Collaboration**

231. Utilities that transmit electricity to homes and businesses are regulated natural monopolies. Historically, electric utilities were vertically integrated and owned most of the generation, transmission, and distribution functions of the electricity supply chain. Because particular utilities owned the only transmission and distribution lines within particular areas, these utilities enjoyed an exclusive right to sell electricity to retail customers in those areas. In other

words, electric utilities did not compete with other electric utilities for the sale of electricity to consumers.

232. Beginning in the early 1990s, certain states deregulated the electricity markets by giving consumers direct access to wholesale suppliers. Deregulation created power exchanges whereby electricity could be bought and sold in a market environment. It also required that electricity generators be given open access to transmission lines so they could be connected to buyers. As a result of deregulation in some states, nuclear power companies became competitors with one another and with other electric utilities for the sale of electricity to consumers.

233. Prior to deregulation, the nuclear power companies extensively collaborated with each other as non-competitors, especially through various organizations, such as the Edison Electric Institute and the Nuclear Energy Institute ("NEI").

234. As a legacy of its natural monopoly status in which market participants did not compete for consumers, the commercial nuclear power industry is still characterized by an extraordinary culture of cooperation. In 2022, Maria Korsnick, the president and CEO of NEI, former Senior Vice President of Operations at Exelon, and former Chief Nuclear Officer at Constellation Energy Nuclear Group, LLC, stated on the "Titans of Nuclear" podcast that the nuclear power industry is unique in its industry-wide collaboration:

> Maria Korsnick: I could say, send some people to my plant and evaluate what we're doing and insert problem here, maintenance, operations, etc. Or I could say, I want to send some of my guys to your plant. I have a question on this. Or I could say, I have some procedures for how we do X, Y, Z. Can I see yours and I'll send you mine and I'd like to do some benchmarking. That's the kind of camaraderie, if you will, or sort of transparency that we have today amongst our nuclear plants.
>
> Interviewer: And I'm just going to remind everyone, these are separate companies, like competitors, one might even say.
>
> Maria Korsnick: That's right.

> Interviewer: And yet they're just opening the books, collaborating.
>
> Maria Korsnick: That's right.
>
> Interviewer: Isn't that, I mean, that's incredible. Does any other industry do this? I think nuclear's got to be the best.
>
> Maria Korsnick: I don't know of another industry that does that.
>
> . . .
>
> Maria Korsnick: At the heart of this is we appreciate, you know, if you're running a nuclear plant, I want you to run that nuclear plant the best way that you can, right? And so it's at the heart of why are we being so transparent? Why do we share that information? It is literally because, yeah, we might be competing in the marketplace, but you know what? I want you to have a really effective and efficiently running power plant.
>
> Interviewer: Yeah, a rising tide floats all boats, makes everyone look good.
>
> Maria Korsnick: That's right. And we're willing to help each other out.

235. A former HR executive at FPL said the nuclear industry was "very open as far as sharing" information and that she was "blown away" by how much the nuclear industry "helped each other." According to a former HR executive at APS, the nuclear power industry is one of the only industries in which "information sharing is not only encouraged but mandatory." And according to Paula Maguire, a former Training Manager at Ontario Power Generation, "there is a lot of sharing" and it is a "big world but a small community." A former Labor Relations Manager at Entergy Operations, Inc. explained that "external partnerships" and "sharing knowledge" with other nuclear utilities in the industry was "encouraged" and "an advantage for companies when done right." A former Entergy HR employee who was responsible for organizing and hosting the 2018 NHRG conference said that attendees "made relationships" with one another at the conference and called each other "to ask for advice."

**4. Nuclear Power Generation Workers**

236. Each Nuclear Defendant and coconspirator employs nuclear operators, nuclear engineers, nuclear technicians, and other staff who work at nuclear power plants or in central offices. Some of these staff are hourly paid workers and others receive a salary.

237. The Class is comprised of such workers employed in nuclear power generation by the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States.

238. Each year during the Class Period, the Nuclear Defendants and coconspirators, their subsidiaries and related entities employed tens of thousands of workers at their U.S. nuclear power plants.

239. Approximately one third of workers in nuclear power generation are union members, and the International Brotherhood of Electrical Workers ("IBEW") represents most of them. The IBEW and other unions bargained for workers' wages with the Nuclear Defendants' and coconspirators' labor relations representatives.

240. Because the Nuclear Defendants and coconspirators, their subsidiaries, and related entities generate electricity in a similarly efficient manner, their nuclear power plants were and are characterized by highly similar operations and thus similar labor requirements. Accordingly, the nuclear power generation workers employed by the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States during the Class Period—i.e., Class Members—were easily categorized into a limited set of discrete job positions.

241. For example, in their nuclear power plants, each Nuclear Defendant and coconspirator employs "nuclear engineers" and "nuclear operators" or equivalent positions.

242. In a competitive labor market, many employees of the Nuclear Defendants and coconspirators could and would switch their employment to rival nuclear power companies when offered higher wages, higher salaries, and/or superior benefits.

**5. Compensating Nuclear Power Generation Workers**

243. Nuclear power generation employees of the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States were paid either hourly wages or annual salaries, depending on their position.

244. Most nuclear power generation employees operated nuclear power plants or performed maintenance. These workers were generally paid hourly wages according to their specific position and experience level and were categorized into different positions.

245. Some nuclear power generation employees were paid annual salaries. These employees included management-level employees and certain engineers or scientists.

246. Both hourly paid and salaried nuclear power generation employees of the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States received a similar set of employment benefits. Those benefits typically included health insurance, paid time off, a retirement-savings plan, disability insurance, and life insurance.

247. Some positions in nuclear power generation at the Nuclear Defendants and coconspirators, their subsidiaries, and related entities were paid higher wages than other positions at the same nuclear power companies, largely due to the greater skill, experience, licensing and/or education required for those higher-paying positions. For example, licensed nuclear operators—who are required to take classes and acquire a license from the Nuclear Regulatory Commission—are generally paid higher wages than unlicensed nuclear operators. Nonetheless, each Nuclear Defendant and coconspirator systematically determined the compensation for all positions in nuclear power generation that they, their subsidiaries, and related entities owned and/or operated

using compensation schedules or salary ranges that accounted for workers' skill, experience, licensing, and/or education. Those schedules were aligned with compensation schedules that other Nuclear Defendants and coconspirators had established for the same positions.

#### 6. Nuclear Power Companies Aimed to Reduce Labor Costs

248. The largest recurring cost at nuclear power plants is labor. According to Ed Kee, an economist at the Nuclear Economics Consulting Group: "If you look at the cost of nuclear power . . . O&M is by far the largest part of that. . . . operations and maintenance is mostly people." David Heler, the manager of NHRG and Principal Advisor at Human Resource Consultants, LLC, said that the nuclear power industry is "about 60% people heavy . . . whereas in almost every other industry it's about 20% people 80% capex [capital expenditure] . . . it's just flip-flopped here in the nuclear industry . . . so it's unique and we have to continue to ask our questions about why is that what can we do about that."

249. All Nuclear Defendants, regardless of whether they are private entities or government entities, sought to reduce labor costs during the Class Period. Public nuclear power utilities face budgetary constraints and are thus incentivized to contain costs. For example, TVA employees stated in news articles that TVA engaged new technologies in part to "save[] labor costs."

#### 7. Centralized Determination of Compensation for Nuclear Power Generation Workers

250. Decisions regarding the compensation of nuclear power generation workers employed by the Nuclear Defendants and coconspirators were made by and at each Nuclear Defendant or coconspirator's corporate headquarters during the Class Period. For example, a former labor manager at Ameren Missouri's Callaway power plant stated that salary decisions were made by the company's corporate offices in St. Louis, Missouri. Senior executives at the

Nuclear Defendants and coconspirators' corporate headquarters ultimately determined and approved workers' hourly wages, annual salaries, other compensation, and employment benefits.

251. During the Class Period, the Nuclear Defendants' and coconspirators' senior executives determined the hourly wages, annual salaries, bonuses, premium and shift pay, employment benefits, and other compensation for Class Members across the country in a formulaic way, establishing schedules that compensated employees according to their specific positions in nuclear power generation at the Nuclear Defendants or coconspirators and their levels of proficiency, experience, licensure, and education.

252. Many Nuclear Defendants maintained separate compensation departments dedicated solely to nuclear power generation employees, which facilitated the conspiracy to fix and suppress wages. According to a former HR executive at Progress and Duke Energy, Progress had a "separate compensation function" from the rest of the company that "collaborated" with other nuclear power companies concerning the compensation offered to employees. FPL similarly had a compensation division for FPL's employees that was handled by an entirely separate department from the company's human resources department.

**8. Nuclear Power Generation Employment Qualifications**

253. To obtain a position in nuclear power generation, an applicant must satisfy certain education, licensing, and/or experience requirements.

254. For example, when recruiting applicants for a position as a nuclear operator, the Nuclear Defendants often sought the following qualifications: a bachelor of science degree in engineering, engineering technology, or related science program, or advanced math, physics, chemistry, and/or engineering coursework; and one year power plant experience or two years of non-generating nuclear power facility experience.

255. When recruiting applicants for a position as a nuclear engineer, the Nuclear Defendants often required a bachelor of science degree in engineering and several years of related engineering experience.

256. Nuclear power experience was generally a prerequisite for positions in nuclear power generation. For that reason, nuclear power companies often needed to recruit employees from other nuclear power companies because the only workers with necessary skills and experience worked in nuclear power generation. A former labor manager at Exelon stated that "the only way to get experienced nuclear operators" was to recruit them from other nuclear facilities. He explained that nuclear operators were "not a dime a dozen."

257. As a result of the Nuclear Defendants' strong interest in recruiting and hiring each other's employees, Class Members' wage rates would have been substantially higher during the Class Period absent Defendants' and their coconspirators' conspiracy to suppress and stabilize compensation.

**B. Conspiracy to Align Worker Compensation**

258. Beginning by at least May 2003 and continuing to the present day, Defendants and their coconspirators have conspired with each other to fix and suppress the compensation paid to nuclear power generation employees of the Nuclear Defendants and coconspirators, their subsidiaries, and related entities in the United States.

259. A former Progress and Duke Energy HR executive stated that compensation decisions at Progress were "never made in a silo"—i.e. they were made in partnership with other nuclear power companies. According to the former HR executive: "We would all work together to make sure we were ***in alignment***" on salaries. The former Progress HR executive explained that coordination of compensation in the nuclear power industry was necessary because the nuclear power companies in her region "were all competing for the same talent." She stated that Progress's

goal in collaborating with other nuclear power companies was to pay just the industry average salary and no greater. She explained: "We didn't want to pay outrageous salaries."

260. The same former Progress HR executive described examples of how Nuclear Defendants would "work together" to make sure they were in "alignment" on salaries: She explained that HR personnel at Progress had "relationships" with counterparts at other nuclear utilities "where we could pick up the phone" and ask them to "share with us your average salary, minimum and maximum, and incentives." She contacted her counterparts at other nuclear utilities once a year "before we did our proposal for salary range adjustments" and, during those calls, "we would talk about what we were proposing." She also explained that Progress and the other Nuclear Defendants participated in detailed compensation surveys, covering a range of positions, so that the nuclear company participants could "make sure they were in line with other nuclear utilities."

261. A former labor manager at Exelon stated that "there was significant collaboration and information sharing between nuclear power companies, including Exelon, with regards to compensation rates and union contracts." He stated that "multiple nuclear power companies, including Exelon, directly exchanged current and future compensation information with one another on a regular basis." The compensation data obtained "from competing nuclear power companies was highly valuable to Exelon and was routinely used by Exelon to determine the compensation rates it paid nuclear power generation employees." The goal and result of the collaboration was lower compensation for nuclear power generation workers: the labor manager stated that "***[o]btaining compensation data directly from competing nuclear power companies allowed Exelon to avoid paying higher hourly wages than it actually paid its nuclear power generation employees.***"

262. Another witness who was a former Labor Relations Manager at EOI noted that an investigation into wage-fixing in the nuclear power industry was warranted because "there's something going on here."

263. The Nuclear Defendants and coconspirators carried out their conspiracy to suppress compensation through several mutually reinforcing overt acts, including:

- Directly exchanging confidential union CBAs containing current and future wages and benefits information through a CBA Repository only accessible to Nuclear Defendants and coconspirators;
- Directly exchanging current and future wages and benefits information through Compensation Comparison Reports that were coordinated by Defendant CEG (formerly Exelon);
- Conducting annual in-person meetings between Nuclear Defendants' senior executives, during which they reviewed compensation survey results, CBAs, and the Compensation Comparison Reports and discussed and fixed the compensation paid to Class Members; and
- Engaging in direct bilateral and multilateral email and telephonic communications among the Nuclear Defendants' and coconspirators' executives to exchange current and future compensation data and align Class Members' compensation.

264. Defendants formed and implemented the conspiracy in order to reduce the Nuclear Defendants' labor costs and maximize their profits. In the absence of the conspiracy, the Nuclear Defendants, their subsidiaries, and related entities would have competed with each other for labor during the Class Period by offering higher wages, higher salaries, and superior benefits to Class

Members. The conspiracy permitted the Nuclear Defendants to restrain competition for nuclear power generation workers and thus reduce labor costs.

**1. The Nuclear Human Resources Group**

265. During the Class Period, each Nuclear Defendant or one of its affiliates was an active member of NHRG, an industry organization that consists of all the commercial nuclear power companies in the United States and Canada. NHRG provided the organizational structure through which the Nuclear Defendants and coconspirators implemented the conspiracy.

266. NHRG was originally formed in 1988 by Rick Habegger, then a Human Resources Manager at FPL, as a committee of the industry association Edison Electric Institute ("EEI"). In 1995, NHRG separated from EEI, and Habegger's consulting firm, HRS&S, was retained to manage NHRG. That same year, NHRG began hosting annual benchmarking conferences. In 2014, David Heler, head of the consultancies Human Resource Consultants, LLC and Accelerant, took over as manager of NHRG.

267. NHRG was designed in part to coordinate the previously disparate compensation practices of the Nuclear Defendants and coconspirators. According to a former Senior Compensation Analyst at Southern Company who was an NHRG member for approximately 20 years, when NHRG was formed as an independent organization in 1995, "everybody [was] all over the board with recertification pay, license renewal pay, and shift pay." She stated that NHRG was "designed to improve pay practices." Improving pay practices meant aligning compensation practices across the industry: she explained that "harmoniz[ing]" pay practices "sort of is the goal" of NHRG. She added: "You don't want one person doing what the others aren't."

268. During the Class Period, each Nuclear Defendant or one of its affiliates was a member of NHRG and routinely participated in NHRG's surveys, projects, and meetings.

269. Each member of NHRG paid to participate in the group and its annual conference.

270. NHRG is governed by an executive committee (also referred to as a "steering committee") composed only of executives employed by Nuclear Defendants and coconspirators. NHRG executive committee membership includes only the highest-level human resources personnel, such as vice presidents, directors, or managers at the Nuclear Defendants and coconspirators. According to a former executive at Southern Company, NHRG's steering committee determined the location and "overarching theme" for the following year's conference. The steering committee also "hash[ed] out ideas for roundtables" and sent out proposed topics for the conference. NHRG members voted on which topics were to be discussed at that year's conference.

271. The steering committee met independently of NHRG "to establish the purpose" of the group and determine what they "were going to try to accomplish" for the group.

272. NHRG operated multiple "Projects." Two of those projects—the "Labor Relations Project" and the "Total Rewards Project"—played instrumental roles in implementing the conspiracy. The Labor Relations Project relied on CBAs and data contained therein to discuss and harmonize unionized wages and salaries across the industry, and the Total Rewards Project relied on surveys to discuss and align non-unionized wages and salaries. Both the Labor Relations Project and the Total Rewards Project conducted (at least) annual in-person meetings, during which Nuclear Defendants' executives discussed and aligned compensation rates.

273. During part or all of the Class Period, all Nuclear Defendants or one of their affiliates had at least one representative who served on both the Labor Relations and Total Rewards Projects.

274. The Labor Relations Project and the Total Rewards Project have their own steering committees and establish their own agendas, objectives, and programs.

275. NHRG—and its Labor Relations Project and Total Rewards Project—facilitated Defendants' conspiracy to suppress compensation in the following manner:

- Creating and maintaining a password-protected online repository of CBAs containing current and future compensation data that was only accessible to nuclear power companies that contributed their operative CBAs to the repository;
- Maintaining and distributing confidential Compensation Comparison Reports among Nuclear Defendants to facilitate the alignment of wages;
- Managing compensation surveys, which were only accessible to Nuclear Defendants and coconspirators, to help align compensation rates and monitor the conspiracy;
- Coordinating annual in-person meetings among Nuclear Defendants' executives, during which they reviewed compensation data and fixed compensation rates; and
- Maintaining a contact list of executives responsible for compensation at each NHRG member to facilitate bilateral and multilateral compensation discussions between them.

### 2. The Nuclear Defendants Unlawfully Exchanged Compensation Information through a Collective Bargaining Agreement Repository

276. During the Class Period, Defendants maintained a repository of current collective bargaining agreements that contained current *and future* wages and benefits for positions in nuclear power generation at the Nuclear Defendants and coconspirators. The goal and result of the CBA Repository was to stabilize and suppress Class Members' compensation.

277. NHRG's Labor Relations Project maintained the CBA Repository. The Labor Relations Project was designed to establish and maintain the CBA Repository and provide a forum for human resources executives to communicate among each other regarding compensation and other issues relating to labor relations.

278. Each of the following Nuclear Defendants participated in the Labor Relations Project: CEG, Ameren, Ameren Missouri, AEP, IMPC, APS, Dominion, DES, DTE Energy, DTE Electric, Progress, EnergyNW, Entergy, EOI, ENOI, FirstEnergy, FESC, NextEra, NEER, FPL, PG&E Corporation, PG&E Company, PSEG Power, PSEG Nuclear, PSEG Services, SCE, Southern Company, Southern Nuclear, STP, TVA, Luminant, Wolf Creek, Xcel Energy, and XES.

279. The CBA Repository maintained by the Labor Relations Project was a digital collection of CBAs for nuclear power plants with a unionized workforce. Each CBA contained detailed information concerning wages and benefits paid to employees in specific positions at specific nuclear power plants.

280. Each of the following Nuclear Defendants participated in the CBA Repository during the Class Period: CEG, Ameren, Ameren Missouri, Ameren Services, AEP, IMPC, AEPSC, APS, Dominion, VEPCO, DTE Energy, DTE Electric, DTE Services, Progress, EnergyNW, Entergy, EOI, ENOI, FirstEnergy, FESC, NextEra, NEER, and FPL, PG&E Corporation, PG&E Company, PSEG Power, PSEG Services, SCE, Southern Company, Southern Nuclear, STP, TVA, Luminant, Wolf Creek, Xcel Energy, and NSPC.

281. The CBA Repository allowed the Nuclear Defendants to readily identify current and future hourly wages paid by a particular Nuclear Defendant or coconspirator at each of its individual unionized nuclear power plants. A former Workforce Relations Manager at Nuclear Management Company stated that the CBAs in the Repository were current, updated contracts and reported "benefits and hourly wages paid to their employees."

282. The compensation information contained in the CBA Repository was competitively sensitive and confidential. According to a former Director of Compensation at Exelon BSC, information about employees' compensation was sensitive because the nuclear power industry was

a smaller industry with a dearth of qualified candidates. The CBA Repository was restricted only to Nuclear Defendants and coconspirators, and the information contained in the CBA Repository was proprietary and could only be used with the participants' permission.

283. NHRG and the Nuclear Defendants took unusual precautions to conceal the CBA Repository from other entities and individuals. During the Class Period, the CBA Repository was accessible on NHRG's or its consultants' websites only with a confidential password that was only distributed to participating Nuclear Defendants. In addition, unlike the vast majority of documents maintained by NHRG for its members, the CBA Repository could only be accessed by those nuclear power companies who regularly supplied updated, unexpired CBAs to the Repository. And even internally within the Nuclear Defendants that were allowed to access the CBA Repository, only a very limited number of HR executives were permitted to know about or access the Repository.

284. The Nuclear Defendants and coconspirators maintained a give-to-get policy for the CBA Repository. Habegger restricted access to the CBA Repository only to participating Nuclear Defendants and coconspirators, each of which provided (and was required to provide) updated CBAs to Habegger for inclusion in the Repository.

285. The CBA Repository was also restricted only to select personnel at each Nuclear Defendant and coconspirator. A former HR executive at FPL who was unaware that her former employer participated in the CBA Repository stated that sharing collective bargaining agreements with other nuclear power companies was a "no go" and "the line" that should not be crossed. Likewise, a former Compensation and Benefits Manager at PSEG Nuclear, who was also unaware that his former employer participated in the CBA Repository, stated that union CBAs were

"maintained internally" and "never shared . . . with anyone else." A former HR executive at Entergy said that "all of the utilities consider" CBAs to be "proprietary and confidential."

286. Indeed, CBAs that contained compensation information for unionized nuclear plants were not publicly disclosed and were closely guarded until the data became outdated.[2] For example, the website of the Department of Labor's Office of Labor-Management Standards ("OLMS"), which maintains a publicly accessible database of CBAs from a wide range of industries, only contains a limited number of CBAs from the nuclear industry, and each one of them expired years ago. Even when collective bargaining agreements are made publicly available, the appendices containing sensitive wage schedules are frequently omitted.

287. A former director at IBEW, who was responsible for nuclear bargaining units during the Class Period, explained that IBEW does not share CBAs or wage information contained in CBAs with nuclear power companies that are not parties to the CBA. According to the former IBEW director, IBEW "understood that you don't share information outside of your negotiations" because it was both confidential and advantageous to the utility negotiating against the union. He explained that "[i]f I give that information to another company that's negotiating with a different local, then I'm giving that company an advantage over the brothers and sisters in that local." There is "no reason for someone to do that," and the policy within IBEW of declining to share nuclear CBAs with nuclear power companies was "absolute." This was confirmed by a former HR executive at FirstEnergy Service Company, who stated that "unions aren't very sharing with

[2] The vast majority of CBAs containing current and future compensation data about nuclear power generation workers are publicly *unavailable*. There are 45 local unions representing nuclear power generation workers, meaning that at any given time, there are 45 CBAs containing current and future wages of nuclear power generation workers. At least 40 of those local unions conceal current wage rates included in their CBAs from public disclosure. Thus, when the Nuclear Defendants were exchanging those CBAs through the CBA Repository, they were exchanging non-public, confidential compensation data.

management." When a labor manager at FirstEnergy needed a CBA from another plant, she contacted her human resources counterpart at the other nuclear power company and asked for it.

288. The compensation information exchanged through the CBA Repository was immensely useful to the Nuclear Defendants. It allowed the Nuclear Defendants and coconspirators to exchange *confidential* data regarding *current* and *future* wages at their respective nuclear power plants that otherwise was not practically accessible to their competitors. And that data was entirely disaggregated, identifying specific wages for specific positions at particular nuclear power plants operated by the Nuclear Defendants.

289. A former Workforce Relations Manager at Nuclear Management Company stated that "one of the big projects" of the NHRG "was to put together a library of CBAs that were part of the group." He said, "[w]e shared our collective bargaining agreements among ourselves" so "we had an idea of what other companies were doing outside of our own" and knew "what was going on at facilities as far as negotiations w[ere] concerned." His role involved "gathering a bunch of contracts so that [NMC] could compare and contrast."

290. The Nuclear Defendants and coconspirators routinely relied on the CBA Repository to determine and stabilize hourly wages for nuclear power generation workers. Specifically, the Nuclear Defendants used the CBA Repository both when conducting internal wage reviews to modify their compensation schedules and also when establishing wage schedules in collective bargaining agreements.

291. The CBA Repository impacted non-unionized employees because each Nuclear Defendant sought to maintain wage parity across the company. When the Nuclear Defendants employed both unionized and non-unionized employees in the same position, they sought to keep compensation levels the same or similar—i.e. maintain internal equity. A former labor manager at

Entergy Operations, Inc. explained that Entergy "kept a careful eye on bargaining and non-bargaining wages to the extent we didn't want to disenfranchise our non-bargaining workers." According to a former HR executive at FirstEnergy Service Company, FirstEnergy carefully reviewed compensation across the country to ensure that non-union employees were paid commensurately with union employees. When a negotiated wage increase would apply to unionized employees based on their CBA, FirstEnergy imposed a commensurate increase in wages for non-unionized employees.

292. Compensation offered for unionized positions also informed non-union compensation for supervisory positions. According to a former labor manager at Ameren Missouri, non-bargaining "exempt" salaried employees were impacted by negotiated CBA wages because Ameren "would look to those nonexempt people as a feeder for [non-union] supervisor jobs." This was confirmed by a former compensation executive at Exelon BSC who stated that Exelon paid attention to compensation paid to union employees when setting compensation for supervisor positions.

### 3. The Nuclear Defendants Unlawfully Exchanged Compensation Information through Compensation Comparison Reports

293. Using data obtained directly from other Nuclear Defendants and from the CBA Repository, Defendant CEG (formerly Exelon) created Compensation Comparison Reports, which included tables in an Excel spreadsheet that compared nuclear power generation employees' current and future wages and benefits across the industry. The Compensation Comparison Reports were published twice per year.

294. A former labor manager at Exelon stated that he personally "initiated and conducted bi-annual surveys to gather current and future compensation data from, and exchange current and future compensation data between, approximately 20 other companies in the nuclear power

generation industry." After collecting the data, he stated that twice per year, he "disseminated the results of the surveys to each of the participating nuclear power companies in the form of excel spreadsheets that contained detailed disaggregated and deanonymized current and future compensation data, organized by both company and plant."

295. The former Exelon labor manager stated that he assembled the Compensation Comparison Reports by "directly contact[ing] labor relations and human resources personnel at approximately 20 other competing nuclear power companies, both by phone and email, to request current and future hourly wage rates and benefits data." The specific nuclear power companies that the labor manager recalls contacting "to obtain those companies' current and future compensation rates" included: "Ameren, American Electric Power, Arizona Public Service, Dominion Energy, DTE Energy, Duke Energy, Entergy, FirstEnergy, NextEra Energy, Pacific Gas & Electric, Southern California Edison, Southern Company, Tennessee Valley Authority, Wolf Creek Nuclear, and Xcel Energy." He stated that, in response, "those human resources and labor relations personnel at competing nuclear power companies supplied the requested current and future hourly wage rates and benefits data to me, knowing that such data would subsequently be included in excel spreadsheets distributed to all participating nuclear power companies."

296. Importantly, the Compensation Comparison Reports created by Exelon not only displayed Nuclear Defendants' current and future wages, but also provided an analysis of industry-wide wages and identified compensation trends across the nuclear power industry.

297. NHRG and the Nuclear Defendants took unusual precautions to conceal the Compensation Comparison Reports from other entities and individuals. During the Class Period, the Compensation Comparison Reports were accessible on NHRG's or its consultants' websites only with a confidential password that was exclusively distributed to participating Nuclear

Defendants. In addition, unlike the vast majority of documents maintained by NHRG, the Compensation Comparison Reports could only be accessed by those nuclear power companies who regularly supplied current and future wage information to those Reports. And even internally within the Nuclear Defendants that were allowed to access the Compensation Comparison Reports, only a very limited number of executives were permitted to know about or access the Reports. For example, a former HR Manager of Wolf Creek said she was not aware of any spreadsheets containing wage information provided by various nuclear power companies.

298. Each of the following Nuclear Defendants participated in the Compensation Comparison Reports: CEG, Ameren, Ameren Missouri, Ameren Services, AEP, IMPC, AEPSC, APS, Dominion, VEPCO, DTE Energy, DTE Electric, DTE Services, Progress, EnergyNW, Entergy, EOI, ENOI, FirstEnergy, FESC, NextEra, NEER, and FPL, PG&E Corporation, PG&E Company, PSEG Power, PSEG Services, SCE, Southern Company, Southern Nuclear, STP, TVA, Luminant, Wolf Creek, Xcel Energy, and NSPC.

299. For each nuclear power plant, the Compensation Comparison Reports identified: current wages for key positions, future percentage increases for those wages, and detailed benefits information. A former labor manager at Exelon explained that the Reports "contained detailed compensation data points concerning numerous job classifications in the nuclear power generation industry, including hourly wages, health insurance premiums, number of sick days, call out pay, overtime pay, travel pay, shift differential pay, and the expiration date for active union contracts."

300. The wage increase information contained in the Compensation Comparison Reports included planned wage increases up to six years into the future. Accordingly, the Compensation Comparison Reports allowed the Nuclear Defendants not only to compare their

*current* hourly wages at each of their respective nuclear power plants, but also to compare planned *future* wage increases at those plants.

301. The Compensation Comparison Reports contained compensation information that was competitively sensitive and highly confidential. That data consisted of fully disaggregated *current* and *future* wages, identifying specific wages and salaries for specific positions at particular nuclear power plants operated by the Nuclear Defendants.

302. The Compensation Comparison Reports also contained confidential information about ongoing collective bargaining negotiations between Nuclear Defendants and unions. As explained by a former HR executive at FPL, the information contained in the Compensation Comparison Reports about ongoing negotiations was especially sensitive: "Whatever is going on from a negotiation standpoint is confidential information." Union negotiations were so sensitive and private at FPL that many human resources employees were not informed of the terms until a CBA was ratified. According to the former HR executive, any nuclear power company that shared information about ongoing collective bargaining negotiations outside of the company showed "poor judgment."

303. The Compensation Comparison Reports allowed the Nuclear Defendants and coconspirators to easily compare current and future wage information when setting wages and negotiating with unions. The compensation analysis presented by Exelon facilitated coordination and stabilization of compensation by the Nuclear Defendants and coconspirators.

304. The Compensation Comparison Reports allowed the Nuclear Defendants to readily identify the current and future hourly wages paid by a particular Nuclear Defendant or coconspirator at each of its individual unionized nuclear power plants. A former labor manager at Exelon explained that the Compensation Comparison Reports provided "unblinded" compensation

data, including the "hourly rate for each [job] classification." He stated that the Compensation Comparison Reports he generated "did not anonymize or aggregate the compensation data obtained from the survey participants." He confirmed that the Compensation Comparison Reports "identified current and future compensation data on a per company and per plant basis, and specific compensation data was provided for each participating nuclear power company."

305. The Nuclear Defendants used the data exchanged through the Compensation Comparison Reports to implement their conspiracy to suppress wages, both when conducting internal wage reviews to modify their compensation schedules and when negotiating with unions to establish wage schedules in collective bargaining agreements. According to a former labor manager at Exelon, Exelon "relied" on the Compensation Comparison Reports when negotiating its own wages with unions because Exelon knew "that info [was] pretty accurate."

**4. The Nuclear Defendants Discussed and Suppressed Compensation at Annual Meetings**

306. The Nuclear Defendants and coconspirators exchanged confidential current and future compensation data, and discussed and aligned compensation rates, during two in-person meetings held annually in conjunction with NHRG's annual conference. One of those compensation meetings was held by NHRG's Labor Relations Project and involved discussion of hourly wage rates and salaries for unionized labor. The other compensation meeting was held by NHRG's Total Rewards Project and involved discussion of compensation levels for nonunionized labor, including annual salaries.

307. Since 1995, NHRG has held annual conferences that facilitated the sharing of compensation information between Nuclear Defendants and the coordinated suppression of compensation by the Nuclear Defendants. The annual conference was hosted by a Nuclear Defendant or INPO, as set forth below:

| Conference Date | Host | Location |
|---|---|---|
| April 1995 | CP&L (predecessor to Duke Energy Carolinas) | Raleigh, North Carolina |
| April 1996 | PECO (predecessor to CEG) | Philadelphia, Pennsylvania |
| April 1997 | PG&E Company | San Francisco, California |
| April 1998 | Consumers Energy & DTE | Ypsilanti, Michigan |
| April 1999 | Duke Energy | Charlotte, North Carolina |
| April 2000 | APS | Phoenix, Arizona |
| March 2001 | NEI | Orlando, Florida |
| May 200 | TVA | Nashville, Tennessee |
| May 2003 | Southern Company | Mobile, Alabama |
| April 2004 | Entergy | New Orleans, Louisiana |
| April 2005 | INPO | Atlanta, Georgia |
| May 2006 | FPL | Palm Beach Gardens, Florida |
| May 2007 | Exelon | Chicago, Illinois |
| May 2008 | Luminant / STP | Fort Worth, Texas |
| May 2009 | INPO | Atlanta, Georgia |
| May 2010 | Duke Energy | Charlotte, North Carolina |
| May 2011 | APS | Phoenix, Arizona |
| May 2012 | Constellation | Baltimore, Maryland |
| May 2013 | STP | Houston, Texas |
| May 2014 | FirstEnergy | Cleveland, Ohio |
| May 18-21, 2015 | TVA | The Chattanoogan Hotel, Chattanooga, TN |
| May 1-4, 2017 | NextEra | Wyndham Grand Jupiter, Jupiter, Florida |

| Conference Date | Host | Location |
| --- | --- | --- |
| May 7-10, 2018 | Entergy | Hyatt Regency Hotel, New Orleans |
| May 21-22, 2019 | APS | Kimpton Hotel, Phoenix, Arizona |

308. While attendance at the NHRG conference itself was not restricted to the Nuclear Defendants, only members of the Labor Relations Project could attend the annual meetings of the Labor Relations Project, and only members of the Total Rewards Project could attend the annual meetings of the Total Rewards Project. In fact, the annual meetings of these projects were typically held during the two days preceding the NHRG annual conference, before many conference attendees have even arrived, which allowed the Nuclear Defendants to restrict participation.

309. During both meetings held annually, the Nuclear Defendants did not merely exchange historic or publicly available data that had been aggregated by a neutral third-party to conceal any one company's wages. Rather, during both meetings, executives of the Nuclear Defendants directly and regularly exchanged and openly discussed fully disaggregated current and future compensation data, which identified specific current and future wages and salaries for specific positions at particular nuclear power plants operated by the Nuclear Defendants.

310. A former HR executive at FirstEnergy Service Company said that the information obtained from the Labor Relation Project and Total Rewards Project meetings was "invaluable" to FirstEnergy's compensation team.

**a. The Labor Relations Project and Meetings**

311. NHRG's Labor Relations Project conducted its own meetings between Nuclear Defendants' executives to discuss and align wage rates. Those meetings focused on discussing and aligning compensation for unionized workers.

312. Participants in the Labor Relations Project met each year for benchmarking and to exchange nuclear power CBAs and review Compensation Comparison Reports. The Labor Relations Project meetings took place in-person each year during the Class Period, prior to or during the annual NHRG conference.

313. Members of the Labor Relations Project discussed compensation during their annual meetings. A former Labor Relations Manager of Entergy Operations, Inc., who participated in the Labor Relations Project meetings, said: "Of course, wages would be discussed" and that the purpose of meetings was to report "data points" and "outcomes" of labor negotiations. The Labor Relations Manager said that "it mattered" to Entergy when other utilities "negotiated new bonuses with reactor operators." She said, "[w]e paid a lot of attention to that and made decisions accordingly." She also stated that members of the Labor Relations Project "would share what those outcomes were" including decisions regarding pay, such as the amount that a particular plant's bonuses would increase.

314. A former HR executive at FirstEnergy Service Company stated that the CBAs contained in the CBA Repository were discussed during Labor Relations Project meetings. The Project members were "asked to share their collective bargaining agreements so [conference participants] could look at them."

315. A former HR Manager at Southern Company stated that during Labor Relations Project meetings, "we actually shared CBAs because it's always good to see someone else's CBAs" and that the exchange and review of CBAs "helped [nuclear utilities] get ready for union negotiations."

316. A former Workforce Relations Manager at Nuclear Management Company stated that the Labor Relations Project met annually and compared compensation across the nuclear

power companies. He confirmed that current CBAs for both hourly and salaried employees were exchanged and reviewed during Labor Relations Project meetings. He explained, "We shared our collective bargaining agreements among ourselves" so "we had an idea of what other companies were doing outside of our own" and knew "what was going on at facilities as far as negotiations w[ere] concerned."

317. A former labor relations manager at Exelon, who facilitated a Labor Relations Project meeting, said that participants "give each other information on wages and benefits" and that "there is always a sharing of information relative to benefits and wages." He explained that spreadsheets of wage and benefits data "were sent back and forth within the group" and that those spreadsheets were compiled by a rotating member of the group who sent out "information requests" to all the Nuclear Defendants. "It was always nice to know what percentage increases people were averaging or putting out there to their employees," and that if a particular nuclear utility increased wages by a specific amount, then "that was probably something we should shoot for" when proposing Exelon's increases to hourly wages at nuclear plants. He also said it was "good to know from a company standpoint what other companies were doing to develop strategies that were cost efficient" for labor relations and that they "always talked about all the different elements of collective bargaining." He ultimately used the compensation data and negotiating strategies learned from the Labor Relations Project meetings to "put together a strategy" for negotiating with the labor union "to present to the senior executives" at Exelon.

318. Wage discussions during Labor Relations Project meetings were not limited to executed union contracts and also addressed future wages in *draft* CBAs that were not yet final or approved by the unions. According to a former labor manager at Entergy Operations, Inc., "[e]very time we met there was some cluster of [nuclear] plants that would have contract expirations come

up and new negotiations happening," and members of the Labor Relations Project would discuss and coordinate the anticipated compensation outcomes of "pending" labor negotiations that were not yet complete.

319. The former Entergy Operations, Inc. labor manager further stated that the Labor Relations Project discussed other methods to improve the employers' negotiating positions during union bargaining sessions, including topics relating to "arbitration," "union organizing," and general "lessons learned" from negotiating with unions.

320. A former Senior Compensation Analyst at Southern Company also explained that she used insights gathered from discussions at meetings of the Labor Relation Project to inform her collective bargaining negotiations with labor unions.

**b. The Total Rewards Project and Meetings**

321. NHRG's Total Rewards Project conducted its own meetings between Nuclear Defendants' executives to discuss and align compensation rates. Those meetings focused on discussing and aligning compensation for non-unionized workers.

322. The Total Rewards Project held annual meetings in the same location as the NHRG annual conference, and sometimes held additional meetings in between NHRG conferences. Typically, the Total Rewards Project meetings occurred just before the NHRG annual conference.

323. The Total Rewards Project provided a forum for nuclear power companies to benchmark and discuss current and future compensation rates for nuclear power positions, including with the assistance of compensation surveys.

324. NHRG first commissioned WTW to conduct a compensation survey in the nuclear power industry in 2001. NHRG and its members developed and designed these compensation surveys, and WTW implemented them. For example, a Senior Compensation Analyst at Southern

Company said she "helped to design" the nuclear pay practices survey, which focused on compensation for "nuclear operators" and "nuclear security."

325. WTW conducted surveys of hourly paid workers, exempt salaried employees, and non-exempt salaried employees. The WTW Surveys included entry level positions such as mechanics and more senior level positions such as control room operators and site vice presidents. A former Progress and Duke Energy HR executive stated that the WTW Surveys pertained to "whatever classifications" Progress employed at the time, including engineering positions and nuclear technicians.

326. The WTW Surveys provided percentile and average compensation information for various positions in the nuclear power industry. Each reported position had a specific letter code and number assigned to it such that different "tiers" of each position were reported by respondents, depending on seniority level. The WTW Surveys also provided detailed benefits information.

327. While the WTW Surveys were assembled by an independent third party and provided only aggregated compensation information ostensibly to prevent the unlawful disclosure of any one company's compensation rates, the Nuclear Defendants discussed WTW Survey results and freely disclosed their own company's disaggregated compensation rates during the Total Rewards Project meetings. In particular, meeting attendees would reveal their particular company's compensation rates and whether they were "in line" with the WTW Survey figures. In other words, once the Nuclear Defendants obtained the aggregated WTW Survey results designed to maintain individual company's rates confidential, they orally disaggregated those results, exchanged highly sensitive current and future compensation rates, and collaborated to align their compensation rates.

328. A former Senior Compensation Analyst at Southern Company who led a compensation round table session at a Total Rewards Project meeting stated that the conversation during the session was "pay-focused" and that members would review survey results, including the WTW Surveys, during the session. She stated that participants would confirm whether their compensation practices aligned with the survey results: "If we were reviewing survey results, people might say 'That's in line with what we do.'"

329. According to a former HR executive at Progress and Duke Energy, survey administrators "massage[d]" data from the Nuclear Defendants into a survey report so that each Nuclear Defendant could "make sure they were ***in line*** with other nuclear utilities."

330. A former HR executive at APS stated that NHRG members discussed general merit increases for salaried employees during the meetings of the Total Rewards Project.

331. The Nuclear Defendants relied on survey data secured by the Total Rewards Project, in combination with their discussions of their own disaggregated compensation rates during the Project's annual meetings, to set and collectively align their compensation rates and compensation rate increases for nonunionized labor.

332. In a February 2024 report to the Minnesota Public Utilities Commission, Xcel Energy stated that when setting compensation Xcel Energy "leverages a membership through the Nuclear Human Resource Group (NHRG) for survey participation and industry peer benchmarking." Specifically, Xcel Energy set compensation rates that "matched to the market median, or 50th percentile" of the WTW Surveys. PSEG likewise kept their salaries to the survey median, stating that they, "benchmark our industry peers to ensure we are within five percent of the group average and adjust as the market changes."

333. STP used WTW Survey data to establish "midpoints" aligned with the average salary reported in the WTW Surveys. A former compensation employee at STP stated that she would never "exceed a certain percentage of the midpoint" established by the WTW Survey when recommending salary adjustments.

334. A former compensation employee at DTE Energy adhered to the company's practice of "controlling to the midpoint," which was a "euphemism" for not paying more than the midpoint of a specific salary range. For example, if the salary range was $20 per hour to $40 per hour, "you weren't supposed to rise above 30."

**5. The Nuclear Defendants Discussed and Suppressed Compensation through Direct Email and Telephone Communications**

335. Throughout the Class Period, the Nuclear Defendants' senior executives with the authority to determine or influence compensation of Class Members directly contacted one another to obtain information about and align their current and future compensation rates and practices.

336. NHRG provided members with a robust contact list, designed to facilitate communications and benchmarking throughout the year between individual nuclear power companies. According to a former HR executive at FPL, NHRG's contact list was created so that human resources executives could reach out to one another.

337. The Nuclear Defendants and coconspirators had a give-to-get policy for exchanging compensation information. A former compensation executive at DTE Energy stated that DTE Energy agreed with other nuclear power companies: "We'll share information if you'll share with us."

338. A former labor manager at Exelon stated: "there's no doubt in my mind that there was a lot of collaboration and information sharing between many big nuclear companies in regards

to union details." He stated that nuclear power companies shared information "all the time," and they did so for the "specific reason" of "trying to screw the union."

339. The Exelon former labor manager stated that he "was aware of routine compensation information sharing directly between competing nuclear power companies. Specifically, multiple nuclear power companies, including Exelon, directly exchanged current and future compensation information with one another on a regular basis." He added that his "superiors" directed him "to regularly request current and future compensation rates from, and exchange current and future compensation rates with, competing nuclear power companies." When the labor manager "requested such compensation data, labor relations and human resources personnel at competing nuclear power companies" were "willing to share and exchange that compensation data" with him.

340. The labor manager stated that he "regularly contacted labor relations and human resources personnel at competing nuclear power companies to gather compensation data regarding hourly worker wages." He "would ask labor relations and human resources personnel at competing nuclear power companies to provide current and/or future wage rates for their hourly paid workers" and, in response, they "would provide the requested compensation data." The labor manager stated that "labor relations and human resources personnel at competing nuclear power companies often contacted me to request the current and future compensation rates paid by Exelon to hourly paid worker[s]." In response, he "routinely provided the requested compensation data."

341. A former HR executive at Progress and Duke Energy stated that Progress's HR personnel contacted HR representatives at other nuclear power companies directly to obtain compensation information. Compensation and HR personnel at Progress had "relationships" with personnel at other nuclear power companies where they would "pick up the phone" and call their

counterpart at another Nuclear Defendant. Progress's HR personnel asked other Nuclear Defendants' personnel whether they would be willing to share "average salary, minimum and maximum, and incentives" information. The other Nuclear Defendants' HR personnel readily shared critical salary information with Progress's personnel, and in exchange, Progress's personnel shared its compensation information with them. When exchanging compensation data with other nuclear power companies, Progress's HR personnel shared the salary range adjustments that they planned to propose in the future (i.e., non-finalized changes to Progress's salary ranges), and they and their counterparts at competing nuclear power companies discussed their respective proposals for salary range adjustments during telephone conversations. Progress conducted these compensation data exchanges once per year before its HR personnel proposed "salary range adjustments." This and similar practices allowed Progress and other Nuclear Defendants to confirm alignment with other industry participants before finalizing their compensation changes.

342. According to a former labor manager at Exelon, he would contact executives at other nuclear power companies prior to union negotiations to "gather" confidential wage information. He stated that he "would literally call up HR folks at all nuclear facilities . . . and ask them their rates." Often, the executives at other nuclear power companies provided this information to him orally over the telephone.

343. A former compensation executive at DTE Energy stated that he contacted other nuclear power companies to inquire about pay for specific positions. He explained that he would ask another nuclear power company, "What are you paying your operators?" The other company would respond, "We are paying x." Specifically, the former DTE Energy compensation executive stated that he would obtain from other nuclear power companies: the number of full-time employees the other plant had in a position at a particular level (e.g., nuclear operator 1) and the

pay range for those jobs (e.g., $22 per hour minimum to $54 per hour maximum). The former compensation executive stated that he would typically report to his superiors that he "had a conversation with someone in St. Louis [where Ameren is headquartered] or Chicago [where Exelon Corporation is headquartered] and their ranges are similar to ours."

344. A former labor manager at Ameren Missouri stated that he would "get copies of [union] contracts from other utilities to get a sense of their wages and benefits." To obtain another company's CBA, he would "call the plant up and ask for a copy." He obtained union CBAs containing wage and benefits information from Wolf Creek, WEC Energy, and plants formerly operated by Commonwealth Edison (a predecessor to Exelon Corporation). He used the wages and benefits information from these other plants to inform his own labor negotiations.

345. A former HR executive at Entergy said she regularly called competing nuclear power companies to obtain their CBAs so that she could review their hourly wages. She "gathered as many union contracts as [she] could" by "call[ing] the companies and ask[ing] to see their contracts."

346. A former HR executive at FirstEnergy Service Company stated that labor managers at FirstEnergy contacted counterpart labor managers at other nuclear power companies to ask them to share CBAs.

347. A former labor manager at STP stated that he "would interface with other HR managers" and "sometimes exchanged copies of our [collective bargaining] agreements." Another employee at STP "would sometimes poll [competing] plants for their bargaining unit compensation" and that information was shared with the "corporate labor relations people" at STP.

348. A former labor manager for the Callaway Energy Center said that he "typically call[ed]" competing nuclear plants to "ask for a copy" of their union contracts "to get a sense of their wages and benefits."

349. A former labor manager at Exelon said that compensation survey results included a "combination" of both blinded and unblinded data but "the bottom line" was that "if you called" participating companies, "you could get" which data they reported.

350. According to Maria Korsnick, former Senior Vice President of Operations at Exelon and Chief Nuclear Officer ("CNO") at Constellation Energy Nuclear Group, LLC, "you have all the CNOs on speed dial. And that's sort of one compliment that I would give sort of the US and the whole US fleet is that at any moment, I could call another CNO."

351. A former Labor Relations Manager at Ameren said that HR employees of Nuclear Defendants would "pick up the phone and call a competitor" and "ask them wage and bargaining questions," as well as request to trade collective bargaining agreements. He said, "You could pick up the phone and ask a buddy, 'How much do you pay for this job?'" He noted that such phone calls were often made around the time of collective bargaining negotiations.

352. A former Labor Relations Director at TVA and Exelon said he would pick up the phone and call people he knew from other nuclear power companies to obtain wage rates and copies of operative CBAs. "It was easy enough to call up" another member and ask them to "send me a copy of (your) CBA. I could get virtually any contract" from anywhere in the country.

353. Outside of the conspiratorial agreement to exchange information and stabilize wages, the compensation information shared in these direct exchanges was highly confidential. According to a former HR employee at Talen, sharing compensation information would be

"divulging confidential or proprietary information" and he would "question whether [it] was appropriate" to "divulge[] rates to someone else."

354. The compensation data routinely exchanged between Nuclear Defendants through telephonic and email communications was not public, historical, or aggregated by a neutral third party. Rather, the compensation data was concealed from the public, fully disaggregated, reflected current and future wage rates, and was exchanged directly between Nuclear Defendants.

**6. The Conspiracy Resulted in Parallel Limits on Defendants' Wage Increases and Harmonization of Defendants' Wages**

355. As a direct consequence of their conspiracy to suppress compensation, the Nuclear Defendants simultaneously and in parallel limited their annual compensation and compensation increases to Class Members employed in nuclear power generation. Absent this conspiracy in a competitive market, Defendants would not have aligned their compensation and would have paid higher annual wages and wage increases to Class Members.

356. Defendants' parallel conduct included Defendants working "together to make sure [they] were in alignment" on salaries, according to a former HR executive employed by Progress and Duke Energy.

357. Such a conspiracy to align compensation does not require an agreement to pay identical wages to be anticompetitive or illegal. In their most recent guidance about "wage-fixing" that can lead to "criminal charges," the DOJ and FTC explained: "The Agencies focus on the substance of a wage-fixing . . . agreement regardless of its precise form. If companies agree to ***align, stabilize, or otherwise coordinate*** the wages they set, including by agreeing to a range, ceiling, or benchmark for calculating wages, ***it does not matter if they do not agree on a specific wage***." U.S. Department of Justice and the Federal Trade Commission, *Antitrust Guidelines for Business Activities Affecting Workers*, 4 (revised January 2025). As such, the policy of the nation's

antitrust enforcers is that such agreements are *per se* unlawful. And the policy reflects the consensus among economists. Because labor markets are not the same as product markets, economists have recognized that it is possible for employers to sustain a high-level agreements to align, stabilize, or suppress wages, even if the employers are not paying their workers exactly the same amount. *See, e.g.*, Jose Azar and Ioana Marinescu, *Monopsony Power in the Labor Market: From Theory to Policy*, 16 Annual Review of Economics 491, 501-02 (2024).

358. Economic and social science literature supply the explanation. In a basic price-fixing case involving a commodity product, conspiring producers must agree to charge identical or nearly identical prices for their products because it is easy for consumers to respond to changes in price. *See, e.g.*, George J. Stigler, *A Theory of Oligopoly*, 72 J. Pol. Econ. 44 , 46-59 (1964) (explaining the necessity of homogenous pricing and the detection of price-cutting in a price-fixing conspiracy); Zach Y. Brown and Alexander MacKay, *Competition in Pricing Algorithms*, 15 Am. Econ. J. 109, 145-46 (analyzing online retailers to show that "when the price of a product increases, consumers are more likely to substitute toward similar firms"); Margaret C. Levenstein and Valerie Y. Suslow, *What Determines Cartel Success?*, 44 J. Econ. Lit. 43, at 64-79 (2024) (examining the impact of demand and cheating on cartels).

359. For example, imagine that two companies—Company A and Company B—agree to raise prices for a widget. If Company A charges $3.10 for a widget and Company B charges $3, consumers will switch from buying Company A's widget to Company B's widget. As a result, to reach a stable, price-fixing agreement (that benefits both companies), Company A and Company B may have to agree to charge exactly the same price for the widget, leaving consumers with no choice but to pay the higher price. *See* Stigler, 46-59.

360. While switching commodity products may be easier for consumers, switching jobs is not. Imagine that Company A pays its workers $31,000 while Company B pays its workers $30,000 for doing nearly identical work. An employee of Company B might want to switch to Company A, but: (1) the employee may not know of the opportunity to move to Company A and make more money (e.g., because the employee is not actively searching for jobs or checking for job openings); or (2) the employee might decide that the inconveniences and costs associated with switching jobs, such as accepting an inferior commute or acclimating to a new work environment and new co-workers, are not worth the small gain in salary. *See, e.g.*, V. Bhaskar, Alan Manning, and Ted To, *Oligopsony and Monopsonistic Competition in Labor Markets*, 16 J. Econ. Perspectives 155 (2002) (finding that employees are less likely to change jobs based on mobility costs and imperfect information, in addition to preference heterogeneity); Tyler Ransom, *Labor Market Frictions and Moving Costs of the Employed and Unemployed*, IZA Institute of Labor Economics Discussion Paper Series No. 12139 (2019) (examining the barriers to job mobility associated with job search, moving, and inconveniences of changing jobs for those already employed). Economic literature confirms that information gaps about available jobs and the inconveniences associated with switching jobs are significant enough that employers can successfully suppress worker pay, even if they are not paying their workers exactly the same thing. *See, e.g.*, Ransom (finding monopsony power associated with the frictions of changing jobs); *see also* Michael R. Ransom, *Seniority and Monopsony in the Academic Labor Market*, 83 Am. Econ. R. 221 (1993) (analyzing the suppression of wages in the academic labor market and finding that "universities offer lower wages to those who find it most costly to move").

361. Recent economic modeling confirms that wage-fixing conspiracies can exist, even where employers are not agreeing to pay exactly the same wage. For example, in a working paper

on wage fixing for the National Bureau of Economic Research, Axel Gottfries and Gregor Jarosch model the economic impact of a wage-fixing cartel in which employers agree not to a specific wage but to a wage ceiling. Axel Gottfries & Gregor Jarosch, *Wage Fixing* (Nat'l Bureau of Econ. Rsch., Working Paper No. 33501 (2025)). Despite not agreeing to a specific wage, this type of wage-fixing conspiracy depresses wages. *Id.* at 32.

362. A review of the very limited, publicly accessible, historic compensation data in the nuclear power generation industry supports allegations of a wage-fixing conspiracy consistent with the recent Antitrust Guidance published by the DOJ and FTC.

363. At this preliminary pre-discovery stage, the vast majority of Nuclear Defendants' disaggregated compensation data is not public. Only a portion of historical CBAs are available, and only one-third of the Class is even unionized and thus covered by those CBAs. Within the available historic CBAs, there is no compensation data available for approximately two-thirds of the nuclear power plants in the industry (i.e., 37 of the 54 plants) and no compensation data for 10 of the 20 Nuclear Defendant families.

364. Nevertheless, considering that wage-fixing conspiracies need not agree to the exact same wages to be anti-competitive, and based on the limited amount of compensation information available to the Plaintiffs at this stage, there is significant evidence indicative that Defendant Processors' conspired to align their compensation to be highly similar. The available data shows alignment in at least four ways: (1) annual increases to plant-wide wages; (2) actual wages paid to job positions, (3) annual wage increases for job positions; and (4) collective simultaneous alignment to compensation survey midpoints.

365. During the Class Period, the Nuclear Defendants and coconspirators made parallel increases to plant-wide wages. For example:

- In 2004, PSEG paid wage increases of 3.5% to nuclear power plant workers at its Hope Creek and Salem plants. These 3.5% wage increases matched exactly the 3.5% wage increases at Talen's Susquehanna plant that same year.
- In 2007, Entergy paid wage increases of 3% to nuclear power plant workers at its Fitzpatrick plant. These 3% wage increases matched exactly the wage increases at Exelon's Nine Mile Point plant.
- In 2008, Exelon paid wage increases of 3% to nuclear power plant workers at its Nine Mile Point plant. These 3% wage increases matched exactly the wage increases at both ENOI's Fitpatrick plant and Ameren Missouri's Callaway plant that same year.
- In 2009, Exelon paid wage increases of 3% to nuclear power plant workers at the Nine Mile Point and Three Mile Island plants. These 3% wage increases matched exactly the wage increases at Ameren Missouri's Callaway plant.
- In 2010, Exelon paid wage increases of 3% to nuclear power plant workers at the Nine Mile Point plant. These 3% wage increases matched exactly the wage increases at both Ameren Missouri's Callaway plant and DTE Electric's Fermi 2 plant that same year.
- In 2011, Ameren Missouri paid wage increases of 3% to nuclear power plant workers at its Callaway plant. These 3% wage increases matched the increases at DTE Electric's Fermi 2 plant that same year.
- In 2012, NextEra paid wage increases of 2.75% to nuclear power plant workers at its Point Beach plant. That same year, PG&E paid its workers the exact same 2.75% wage increase at its Diablo Canyon plant.

- In 2013, DTE Electric paid wage increases of 3% to nuclear power plant workers at its Fermi 2 plant. These 3% wage increases matched the increases at Susquehanna Nuclear, LLC's Susquehanna plant that same year.
- In 2014, Exelon paid wage increases of 2.5% to nuclear power plant workers at its Illinois plants. These 2.5% wage increases matched the increases at Susquehanna Nuclear LLC's Susquehanna plant that same year.
- In 2015, ENOI paid wage increases of 3% to nuclear power plant workers at its Palisades plant. These 3% increases exactly matched the increases at FPL's St. Lucie and Turkey Point plants and DTE Electric's Fermi 2 plant that same year.
- In 2016, ENOI paid wage increases of 3% to nuclear power plant workers at its Palisades plant. These 3% increases exactly matched the increases at FPL's St. Lucie and Turkey Point plants, PG&E Company's Diablo Canyon plant, and DTE Electric's Fermi 2 plant that same year.
- In 2017, ENOI paid wage increases of 3% to nuclear power plant workers at its Palisades plant. These 3% increases exactly matched the increases at FPL's St. Lucie and Turkey Point plants and PG&E Company's Diablo Canyon plant.
- In 2018, ENOI paid wage increases of 3% to nuclear power plant workers at its Palisades plant. These 3% increases exactly matched the increases at FPL's St. Lucie and Turkey Point plants.
- In 2019, Exelon paid wage increases of 2.5% to nuclear power plant workers at its Illinois plants and Oyster Creek plant. These 2.5% increases matched exactly the increases at Susquehanna Nuclear LLC's Susquehanna plant and ENOI's Palisades plant that same year.

- In 2020, Exelon paid wage increases of 2.5% to nuclear power plant workers at its Illinois plants and Oyster Creek plant. These 2.5% increases matched exactly the increases at Susquehanna Nuclear LLC's Susquehanna plant and ENOI's Palisades plant that same year.
- In 2021, PSEG paid 2.75% wage increases to nuclear power plant workers at its Hope Creek and Salem plants. These 2.75% increases matched exactly the increases at Talen Energy's Susquehanna plant and DTE Energy's Fermi 2 plant.
- In 2022, ENOI paid 2.5% wage increases to nuclear power plant workers at its Palisades plant. These 2.5% wage increases matched the increases at Exelon's Illinois nuclear power plants.
- In 2023, DTE Energy paid a 2.75% wage increase to nuclear power plant workers at its Fermi 2 plant. These 2.75% wage increases matched exactly the increases at Entergy's Arkansas Nuclear One plant.

366. During the Class Period, the Nuclear Defendants paid highly similar wages to the same job positions in the same year—**even when their plantwide wage increases were not identical**. For example, *although their plantwide wage increases were not identical*, Exelon's Oyster Creek plant and FPL's Saint Lucie and Turkey Point plants paid electrical maintenance workers on the job for 6-12 months hourly wage rates that were within 1% of each other, for four years in a row, from 2017 until 2020. These positions—Exelon's "Electrical Maintenance A – Nuclear" position and FPL's "Elect Plant-N" position—are the same, and the following shows the similarity of the hourly wages rates paid to those occupying those positions for 6-12 months, which remain within 1% of each other:

| Electrical Maintenance Workers Employed for 6-12 Months | | |
|---|---|---|
| Year | Exelon's Oyster Creek Plant | FPL's St. Lucie and Turkey Point plants |
| 2017 | $41.53 | $41.28 |
| 2018 | $42.57 | $42.54 |
| 2019 | $43.63 | $43.83 |
| 2020 | $44.72 | $45.16 |

367. As another example, *although their plantwide wage increases were not identical*, Exelon's Oyster Creek plant and FPL's Saint Lucie and Turkey Point plants paid Instrument & Control Technicians who had been on the job for 6-12 months hourly wage rates that were within 1% of each other, for three years in a row, from 2018 until 2020. These positions—Exelon's "Instrument & Control Technician – Nuclear" position and FPL's "I&C Spec-N" position—are the same, and the following shows the similarity of the hourly wages rates paid to those occupying those positions for 6-12 months, which remain within 1% of each other:

| Instrument & Control Technicians Employed for 6-12 Months | | |
|---|---|---|
| Year | Exelon's Oyster Creek Plant | FPL's St. Lucie and Turkey Point plants |
| 2018 | $44.26 | $43.91 |
| 2019 | $45.37 | $45.25 |
| 2020 | $46.50 | $46.63 |

368. As another example, *although their plantwide wage increases were not identical*, DTE Electric's Fermi 2 plant and FPL's Saint Lucie and Turkey Point plants paid Radiation Protection Operations technicians who had been on the job for more than 30 months hourly wage

rates that were within 1% of each other, for four years in a row, from 2017 until 2020. These positions—DTE Electric's "RPO Technician" position and FPL's "RAD PROT TECH" position—are the same, the following shows the similarity of the hourly wages rates paid to those occupying those positions for more than 30 months, which remain within 1% of each other:

| **Radiation Protection Operations Technicians Employed for 30+ Months** | | |
|---|---|---|
| Year | DTE Electric's Fermi 2 plant | FPL's St. Lucie and Turkey Point plants |
| 2017 | $42.21 | $41.88 |
| 2018 | $43.46 | $43.14 |
| 2019 | $44.74 | $44.43 |
| 2020 | $46.06 | $45.76 |

369. Even when Nuclear Defendants' plantwide wage increases did not perfectly match, their increases for identical job positions were often highly similar or identical. For example, in 2017, DTE Electric increased starting hourly wages at its Fermi 2 plant for both its Nuclear Chemistry Technicians and Radiation Protection Operations Technicians by exactly 2.49% (from $36.88 to $37.80 for both Nuclear Chemistry Technicians and Radiation Protection Operations Technicians). That same year, for those same two positions, Exelon also increased starting hourly wages at its Oyster Creek plant by exactly 2.49% as well (from $36.18 to $37.08 for Nuclear Chemistry Technicians, and from $36.58 to $37.49 for Radiation Protection Operations Technicians).

370. Consistent with an ongoing wage-fixing conspiracy, executives of multiple Nuclear Defendants stated that they have an established practice of aligning their wages to the industry

median, as reflected in the WTW Surveys and discussed at meetings of the Total Rewards Project. For example:

- PSEG stated that we "ensure we are within five percent of the group average."
- Xcel Energy stated that it set compensation rates that "matched to the market median, or 50th percentile" of the WTW Surveys.
- A former STP executive said that she would never "exceed a certain percentage of the midpoint" in the WTW Survey.
- A former DTE Energy executive said that the company had a practice of "controlling to the midpoint," which meant not paying more than the midpoint of the salary range in the WTW Survey.
- A former Progress executive said the company sought to "pay just the industry average salary and no greater."

371. Defendants' conspiracy to align and depress compensation resulted in anticompetitive restraints on wage growth during the Class Period. For example, from May 2016 through May 2025 (which is the period for which such data is available), the median wages paid to nuclear engineers employed at nuclear power plants increased approximately 3.7 percentage points *less* than the rate of inflation, and median wages for nuclear power reactor operators employed at nuclear power plants increased approximately 2.0 percentage points *less* than the rate of inflation.[3]

372. Defendants' parallel conduct also included Defendants' collaboration on compensation via simultaneous overt acts in furtherance of the conspiracy alleged throughout this Amended Complaint: simultaneous participation in the CBA Repository, simultaneous contribution to and receipt of Compensation Comparison Reports, simultaneous attendance at

[3] Even if industry wages had increased at a higher rate than inflation, those wages may have risen even faster in a competitive market absent the wage-fixing.

annual Labor Relations Project and Total Rewards Project meetings, and simultaneous exchange of compensation information directly between Defendants.

**7. Plus Factors That Render the Nuclear Power Industry Susceptible to Collusion**

373. Numerous features of Defendants' behavior and the nuclear power industry render the conspiracy to depress compensation more plausible.

**a. Motive to Conspire**

374. The Nuclear Defendants had a motive to fix and suppress compensation: labor was the single largest recurring cost at nuclear power generation plants. According to the Nuclear Energy Institute's August 2026 "Nuclear Costs in Context" report, "industry labor costs totaled nearly $8.8 billion … accounting for more than half of" total operating costs. All Nuclear Defendants, regardless of whether they are private entities or government entities, sought to reduce labor costs during the Class Period.

375. The nuclear power generation labor market is also particularly conducive to collusion: there are high barriers to entry because building a nuclear power plant costs billions of dollars and requires obtaining licenses; the labor market is concentrated, with the ten largest Nuclear Defendants controlling approximately 75% of the labor market; Nuclear Defendants perceive nuclear power generation workers as fungible and interchangeable; and the market for nuclear power generation workers is characterized by inelastic labor supply. *See, e.g.*, Axel Gottfries and Gregor Jarosch, *Wage Fixing* (Nat'l Bureau of Econ. Rsch., Working Paper No. 33501 (2025)) (finding that "[c]artels are . . . more likely to arise, be stable, and do substantial damage where the competitive response from outsiders is limited either due to technological reasons, product market conduct, or because of the local market structure").

376. The nuclear power industry is characterized by extraordinarily high barriers to entry. To construct a new nuclear power plant, a company must engage in an arduous and bureaucratic process before regulatory agencies approve the plant. Nuclear power plants are licensed and regulated by the NRC. To obtain a license for a new plant, NRC requires that a nuclear power company complete a safety review, an environmental review, and an antitrust review. After NRC receives an application to license a new power plant, it holds several public meetings and hearings. Depending on the type of plant, license applications take approximately 42 months to be approved by NRC. Even after NRC grants a license, it continues to oversee the construction and operation of the plant for its entire lifetime.

377. A nuclear power plant is also extremely costly to build, and capital costs can generally only be recouped after decades of operations. The cost of constructing a single nuclear reactor is approximately $5 to $10 billion. As a result, only three new nuclear power reactors and no new nuclear power plants have been built in the last two decades in the United States.

378. Other barriers to entry include the high costs of operating nuclear power plants; intense competition from increasingly efficient non-nuclear power sources, including natural gas, coal, wind, and solar; the challenge of finding a workforce that requires extensive and specific training; and compliance with onerous federal and state government mandates and regulations. It is exceptionally expensive and logistically complex for new nuclear power companies to emerge and compete with the Nuclear Defendants.

379. The nuclear power industry is highly concentrated. The top ten nuclear power companies control more than 70 percent of the market for nuclear-generated electricity. Those ten companies correspondingly demand approximately 75 percent of the total demand for nuclear power generation labor.

380. Because nuclear power generation workers possess specialized knowledge and skills specific to the nuclear power industry, nuclear power companies view the power generation workers that comprise the Class as fungible within the industry. Workers within the same positions are generally treated as interchangeable among Nuclear Defendants, permitting the Nuclear Defendants to readily compare and match each other's compensation levels.

381. The market for nuclear power generation workers is characterized by inelastic labor supply. Industry-wide changes in compensation rates do not substantially affect the rate of participation in nuclear power positions. Nuclear power jobs are highly specialized to the operations of nuclear power plants, which makes the skills possessed by a nuclear engineer or nuclear operator non-transferable to other types of employment. Many of the jobs in nuclear power generation also require nuclear-specific licenses, which command a premium in pay that cannot be transferred to other types of employment.

**b. Inconsistent with Competition**

382. In a competitive market, no Nuclear Defendant would risk losing their valuable nuclear power generation employees by sharing current and future compensation rates with a competing nuclear power company, because that competitor would then know how much it needed to offer to lure those employees away. In such a competitive market, a Nuclear Defendant informed of its competitors' current or future wage rates would know precisely how much in hourly wages or salaries to offer—without overpaying—to recruit or poach nuclear power generation workers. Thus, in a competitive market, Nuclear Defendants who disclosed their current or future wage rates to other nuclear power companies faced a substantial risk of losing their valuable employees to their competitors and also paying even higher compensation to retain them or win them back. A former Senior HR Manager at NextEra explained, "Sharing wages puts you at a competitive

disadvantage. If someone sees that we are paying more than them, then they will raise their wages and steal our employees."

383. For that reason, federal agencies and the courts have repeatedly recognized the serious anticompetitive risks posed by exchanges of current or future compensation data between competitors. In October 2016, the DOJ and FTC issued a joint "Antitrust Guidance for Human Resource Professionals," updating and building upon Safe Harbor guidelines issued in 1996. That 2016 Antitrust Guidance states, "Even if an individual does not agree explicitly to fix compensation or other terms of employment, exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement." The Antitrust Guidance explains that data exchanges between competitors *may* be lawful and fall under a Safe Harbor carveout if:

- "a neutral third party manages the exchange,"
- "the exchange involves information that is relatively old,"
- "the information is aggregated to protect the identity of the underlying sources," and
- "enough sources are aggregated to prevent competitors from linking particular data to an individual source."[4]

384. If the Nuclear Defendants had merely contracted with third-party WTW to conduct an annual compensation survey and to distribute survey results containing only aggregated compensation data figures based on months-old data, the Nuclear Defendants would have complied with the Safe Harbor Guidelines established by the DOJ and FTC while also accomplishing lawful benchmarking goals. But the Nuclear Defendants did *not* simply

[4] In January 2025, the DOJ and FTC strengthened their antitrust guidelines in publishing a new version titled "Antitrust Guidelines for Business Activities Affecting Workers." The new version omits the Safe Harbor carve-out identified in the 2016 Antitrust Guidance; the DOJ explained that those Safe Habor guidelines could be "overly permissive." This confirms that even information exchanges concerning compensation that comply with the former Safe Harbor guidelines may nevertheless violate federal antitrust law.

commission the WTW Survey and otherwise refrain from exchanging compensation rates between themselves. On the contrary, on a regular basis throughout the Class Period and through multiple means, the Nuclear Defendants *directly* exchanged both *current* and *future* compensation rates that were fully disaggregated and thus disclosed how much workers were and would be paid at each of the Nuclear Defendants' nuclear power plants. Specifically, the Nuclear Defendants *directly* exchanged *current and future disaggregated* compensation rates through the Compensation Comparison Reports, the CBA Repository, the twice annual in-person meetings (of the Labor Relations Project and Total Rewards Project), and telephonic and email communications. In fact, even the WTW Survey was not left aggregated and anonymized by the Nuclear Defendants; during annual Total Rewards Project meetings, the Nuclear Defendants' executives discussed the WTW Survey results and disclosed both their particular company's wage rates and whether those rates aligned with the Survey results.

385. The compensation data exchanged by the Nuclear Defendants—through the Compensation Comparison Reports, the CBA Repository, twice annual in-person compensation meetings, and telephonic and email communications—did not comply with the antitrust guidelines established by the DOJ and FTC. The exchanged compensation data was not "relatively old"; rather; it concerned current and future compensation rates. The exchanged compensation data was not "aggregated to protect the identity of the underlying sources"; rather, it was disaggregated, providing specific rates for distinct nuclear power plants operated by each Nuclear Defendant. The exchanged compensation data was not presented in a manner "to prevent competitors from linking particular data to an individual source"; rather, it was shared in a manner that explicitly identified the wages paid by particular Nuclear Defendants at particular nuclear power plants. The

information exchanges were not managed by a neutral third party; rather, they were managed by the Nuclear Defendants themselves.

386. Nor was the compensation data exchanged between the Nuclear Defendants in furtherance of the conspiracy public. The hourly wage rates and salaries contained in the Compensation Comparison Reports exchanged twice a year between Nuclear Defendants were not public. The vast majority of CBAs in the password-protected CBA Repository were not public. The wages and salaries discussed during the annual meetings of the Labor Relations Project and Total Rewards Project were not public; they even discussed non-final, draft CBAs during some of those meetings. The wages and salaries discussed during telephonic and email communications between Nuclear Defendants' executives were not public.

387. The only publicly-available compensation data covering nuclear power generation workers around the country was provided by the federal Bureau of Labor Statistics, and that data was entirely aggregated (i.e. combining data from many reporting nuclear power companies), fully anonymized (i.e. it was impossible to reverse engineer the data to identify any particular nuclear company's wage rates), and historical (e.g. the May 2024 compensation data was not reported by the agency until April 2025).

388. The purpose of the compensation data exchange between the Nuclear Defendants was not pro-competitive; rather, it was to align, restrain and suppress compensation rates. A former Labor Relations Manager of Exelon said the purpose of Nuclear Defendants exchanging compensation data was to "avoid paying higher hourly wages" and to "screw the union." A former HR executive of Progress and Duke said the goal was to prevent Nuclear Defendant paying "outrageous salaries." A former Senior Compensation Analyst for Southern Company said Nuclear

Defendants sought to "harmonize" pay practices because "you don't want one person doing what the others aren't."

389. Not only was it inconsistent with competition for Nuclear Defendants to exchange disaggregated, current and future, non-public compensation rates, but it was also inconsistent with competition for them to pay artificially-depressed compensation rates. In a competitive market, Nuclear Defendants would have paid higher wages to ensure they could recruit and retain their nuclear power generation workers. Nuclear Defendants could only pay depressed compensation rates because they had conspired to align their compensation rates and thus extinguished the risk of losing employees by paying such depressed rates.

### c. Non-Economic Evidence Suggesting a Traditional Conspiracy

390. Multiple executives of Nuclear Defendants made statements suggestive of a traditional conspiracy. For example:

- A former HR executive employed by Progress and Duke said that the Nuclear Defendants "collaborated" and compensation decisions were "never made in a silo." The witness said that nuclear power companies would ***"all work together to make sure [they] were in alignment"*** on salaries.
- A former labor manager at Exelon said that "there was significant collaboration and information sharing between nuclear power companies . . . with regards to compensation rates and union contracts."
- A former Senior Compensation Analyst at Southern Company said that a goal of those meetings was to "harmonize" pay practices because "you don't want one person doing what the others aren't."

- A former Labor Relations Manager at EOI said that an investigation into wage-fixing in the nuclear power industry was warranted because "there's something going on here."

391. Like many traditional antitrust conspiracies, the Nuclear Defendants implemented the wage-fixing conspiracy with the assistance of an industry trade group that had the veneer of legitimacy. The Nuclear Defendants alone governed the NHRG, which focused on a range of human resources issues, and used the entity as a vehicle to collectively exchange sensitive compensation data and fix and depress wages. At the direction of the Nuclear Defendants, the NHRG stored and maintained the Compensation Comparison Reports; stored and maintained the CBA Repository; created the Labor Relations Project and Total Rewards Project; and conducted annual meetings of those projects to discuss and fix compensation.

392. The timing of Nuclear Defendants' confidential communications about wage rates also indicates a traditional conspiracy. Nuclear Defendants directly contacted each other to exchange sensitive compensation information at least once per year, and they typically did so before their human resources personnel proposed adjustments to salary ranges. During these communications, the Nuclear Defendants disclosed the salary range adjustments they were contemplating for the future and made range modifications to confirm alignment with their competitors before finalizing the salary ranges. For example, a former HR executive of Progress explained that once a year "before we did our proposal for salary range adjustments," she would call her counterparts at competing nuclear utilities, exchange salary data with them, and then "talk about what we were proposing" to avoid paying "outrageous salaries." A former HR executive at Ameren said that he would call competitors to exchange current wage rates and CBAs and that he specifically did so on the eve of collective bargaining negotiations.

393. The Nuclear Defendants also held Labor Relations Project meetings while they were in the midst of, or immediately prior to, entering into collective bargaining negotiations. According to a former labor manager at Entergy Operations, Inc., "[e]very time we met there was some cluster of [nuclear] plants that would have contract expirations come up and new negotiations happening," and members of the Labor Relations Project would discuss and coordinate the anticipated compensation outcomes of "pending" labor negotiations that were not yet complete.

394. Like a traditional conspiracy, the Nuclear Defendants shrouded their exchanges and discussions of compensation data in secrecy. Operations Managers from competing nuclear power companies communicated about compensation rates through private email addresses provided by INPO to avoid detection and prevent copies of their conspiratorial emails from being stored on their employers' servers. In-person meetings of the Labor Relations Project and Total Rewards Project were restricted to members of those projects and typically held *before* the annual NHRG conference and arrival of other conference attendees. The Compensation Comparison Reports and CBA Repository were stored behind electronic passwords that were only provided to select personnel at Nuclear Defendants. And HR executives often exchanged and aligned hourly wages and salaries through telephonic communications that left no paper trail.

395. Like a traditional conspiracy, the Nuclear Defendants conducted in-person compensation meetings twice a year during which executives responsible for compensation disclosed their disaggregated current and future wage rates and aligned those rates at artificially depressed levels. One of those annual meetings focused on compensation for unionized labor, and the other annual meeting focused on compensation for non-unionized labor.

396. The nuclear power industry is also rife with other opportunities for Defendants to collude. The nuclear power industry coordinates extensively on matters of operating nuclear

plants, complying with laws and regulations, and lobbying government decision-makers. Its executives maintain frequent contact in connection with these joint efforts, which gives rise to countless opportunities for collusion.

397. In addition to attending the annual NHRG conferences and the regular meetings of the Labor Relations Project and Total Rewards Project, the senior executives of Nuclear Defendants responsible for determining compensation attended multiple other in-person meetings during the Class Period. Many of those meetings were sponsored by trade associations that advocate for the interests of the Nuclear Defendants. Those meetings include:

a. *American Nuclear Society:* American Nuclear Society ("ANS") is an organization that advocates for using nuclear science and technology for civilian purposes. Defendants Constellation, Duke Energy, Vistra, and Southern Company are members of ANS. ANS hosts the annual Utility Working Conference and Vendor Technology Expo, which is attended by human resources executives from many of the Nuclear Defendants. Beginning in 2022, NHRG began hosting meetings in conjunction with ANS at this annual conference. On August 9, 2022, NHRG hosted a roundtable discussion during ANS's annual Expo titled "Nuclear Pay & Benefits / Roundtable Discussion." In 2023, NHRG hosted a session titled "Total Rewards Roundtable" during ANS's annual Expo. This session included presentations on "competitive salaries, and hiring strategies."

b. *Edison Electric Institute:* Edison Electric Institute ("EEI") is a trade association that represents all U.S. investor-owned electric companies. Nearly all Nuclear Defendants are members of EEI. EEI hosts several meetings and conferences every year that are attended by executives of the Nuclear Defendants and coconspirators.

For example, the following Nuclear Defendants attended EEI's 2024 annual conference: Steve Powell, President and CEO of SCE; Patti Poppe, CEO of PG&E Corporation; Chris Womack, Chairman President and CEO of Southern Company; and Jose Esparza, Senior Vice President of Public Policy of APS.

c. *Nuclear Energy Institute:* NEI is a U.S. policy and technical organization focused on the commercial nuclear power industry. NEI hosts several meetings and conferences every year that are attended by executives of the Nuclear Defendants and coconspirators. Some of those meetings are focused on compensation. All the Nuclear Defendants or one of their affiliates are also members of NEI.

d. *United States Nuclear Industry Council:* The United States Nuclear Industry Council ("USNIC") is a business advocate for advanced nuclear energy. USNIC hosts several working groups, congresses, and conferences, some of which may only be attended by members, every year. Defendants Constellation, Duke Energy, Southern Company, Xcel Energy, and TVA are members of USNIC.

398. The nuclear power industry is characterized by a unique culture of collaboration across its operations and management functions. Before deregulation, each nuclear power utility was entitled to an exclusive monopoly on the provision of electricity in its allotted region. For that reason, nuclear power plants historically did not compete in the product market for electricity. This culture of cooperation in the nuclear power industry persists and remains strong. As explained by Maria Korsnick, former Chief Nuclear Officer at Constellation Energy Nuclear Group, LLC, there is a "camaraderie" among nuclear power companies: "If you're running a nuclear plant, I want you to run that nuclear plant the best way that you can, right? And so it's at the heart of why are we being so transparent? Why do we share that information? It is literally because, yeah, we might be

competing in the marketplace, but you know what? I want you to have a really effective and efficiently running power plant."

## C. Market Power of the Nuclear Defendants and Coconspirators

### 1. Direct Evidence of Market Power

399. The strongest evidence that the Nuclear Defendants and coconspirators collectively possessed the requisite *power* to suppress compensation for nuclear power generation workers is that they *actually* suppressed such compensation during the Class Period. As detailed above in section VI.B, numerous former employees confirmed that Defendants used a multi-faceted strategy—including the CBA Repository, Compensation Comparison Reports, two annual in-person meetings, and direct communications between executives—to suppress wages, salaries, benefits, and other compensation paid to nuclear power generation workers.

400. The Nuclear Defendants regularly participated in and accessed the CBA Repository to exchange detailed current and future information about, and facilitate the fixing of, compensation provided to their nuclear power generation workers in the United States.

401. The Nuclear Defendants regularly participated in Compensation Comparison Reports organized by CEG (formerly Exelon) to exchange detailed current and future information about, and facilitate the fixing of, compensation provided to their nuclear power generation workers in the United States.

402. The Nuclear Defendants convened annual meetings of the Total Rewards Project and Labor Relations Project, where their executives exchanged and discussed current and future compensation rates and reached agreements to suppress Class Members' compensation.

403. Executives from the Nuclear Defendants discussed, compared, and further suppressed compensation through direct communications. Those conspiratorial communications

consisted of telephonic discussions between the Nuclear Defendants' executives to disclose and harmonize their current compensation rates and projected compensation increases.

404. Finally, the Nuclear Defendants' and coconspirators' meetings and data exchanges were costly: they paid for membership in NHRG, the annual NHRG conference, and the WTW survey; spent time and money answering detailed survey questions, exchanging CBAs, and calling each other on the phone to solicit compensation information; and exposed themselves to legal liability. The Nuclear Defendants and coconspirators would not have assumed these costs and legal risks unless they collectively had the power to use these meetings and data exchanges to suppress compensation. This indicates that the Nuclear Defendants and coconspirators believed and acted as though they had the market power to profitably suppress salaries, wages, benefits, and other compensation.

### 2. Indirect Evidence of Market Power

#### a. Product or Services Market

405. The relevant market is the labor market for employment in commercial nuclear power generation in the United States ("Relevant Market").

406. A cartel that controlled all of the Relevant Market, as the Nuclear Defendants and coconspirators collectively do here, could profitably suppress compensation paid to nuclear power generation workers to levels below those that a competitive labor market would set. In such circumstances, nuclear power generation workers would not be able to defeat artificial compensation suppression by switching their employment to other non-conspiring nuclear power companies, as there are no such companies.

407. There are no close economic and/or functional substitutes for employment in nuclear power generation from the perspective of nuclear power generation workers.

408. Nuclear power generation jobs are highly specialized and require extensive training. Many nuclear power generation employees require specialized, advanced scientific or technical degrees before they are hired.

409. Every nuclear power plant has site access standards that a prospective employee must satisfy to even gain access to the nuclear power plant. To gain access, nuclear power plants typically require an employment history review, military history review, criminal history review, credit history review, education history review, interviews with provided references, drug and alcohol screening, and psychological screening.

410. Once they are hired, nuclear power generation employees must undergo extensive security training and job-specific training. Some nuclear power generation positions, such as licensed nuclear officers, require licenses from the Nuclear Regulatory Commission.

411. Unskilled and low-skilled jobs are not reasonable substitutes for work in nuclear power generation. Nuclear power generation employees make well above the national median pay and could not move to employment at non-nuclear companies without an appreciable drop in pay. The annual mean wage for all occupations in the United States as of May 2023 was $65,470. The annual mean wage for nuclear operators in the United States as of May 2023 was $121,240. This wage premium reflects the extensive education, licensure, training, and security requirements of working in nuclear power generation.

412. The Nuclear Defendants and coconspirators value the skills possessed by nuclear power generation workers and recognize that such skills are differentiated from those necessary for other jobs. A former employee of Dominion, EnergyNW, TVA, and Exelon explained, "Nuclear power plant employees have specialized skills and knowledge that are not comparable to employees in other kinds of power plants or other types of companies. The industry considers

nuclear power plant employees to be special and unique. Nuclear power plant employees require specific licensing and many months of training to become technical experts on the operations of nuclear power plants."

413. Even security guards protecting nuclear power plants have specialized skills that are not readily transferable to other industries. They are trained to protect radioactive material, prevent radioactive release, and to guard against particular threats to nuclear power plants. They undergo extensive training, including in nuclear and radiation safety and involving force-on-force exercises in which they respond to simulated attacks on vital plant equipment.

414. Hiring labor from unskilled or low-skilled positions was not desirable or feasible because of the highly technical requirements of working in nuclear power generation. A former HR executive at FirstEnergy Service Company stated that FirstEnergy was not interested in benchmarking its positions against non-utility employers such as Walmart or Amazon.

415. Nuclear power companies do not tend to hire engineers from other types of electric utilities. According to Bryan Hanson, Executive Vice President and Chief Generation Officer at Constellation, "we have a propensity to hire nuclear engineers."

416. Nuclear power companies needed to recruit employees from other nuclear power companies because only such workers possessed the necessary skills and experience. A former labor manager at Exelon stated that "the only way to get experienced nuclear operators" was to recruit them from other nuclear facilities. He explained that nuclear operators were "not a dime a dozen" and were recruited from other nuclear plants throughout the United States "as long as they had experience."

417. A former compensation employee at DTE Energy explained that DTE Energy, a Michigan-based utility, wanted to know the compensation for nuclear operators around the

country, including in Minnesota, Arizona, and Florida. He explained that DTE Energy "used that data" to determine compensation for nuclear workers because "there aren't that many nuclear plants" in the country.

418. In setting compensation for their employees, the focus of the Nuclear Defendants was on compensation paid to employees at other nuclear power companies.

419. The compensation departments for nuclear power generation employees at Nuclear Defendants and coconspirators were siloed from the rest of the companies both to keep the conspiratorial conduct a secret and because of the unique and specialized nature of nuclear power positions. A former HR executive at Progress stated that the nuclear division had a "separate compensation function" from the rest of the company that "collaborated" with other nuclear companies. As a former labor manager at Entergy Operations, Inc. put it, the nuclear power industry was "such a specific, specialized world," which naturally resulted in a nuclear-specific human resources organization (i.e., NHRG).

420. Each Nuclear Defendant materially increases wages paid to nuclear power generation workers as they gain greater skill levels. For example, the Nuclear Defendants increase wages systematically for unionized nuclear power generation employees upon reaching certain levels of seniority. The Nuclear Defendants also pay a premium for nuclear operators who are licensed compared to nuclear operators who are not licensed. The wage premium associated with greater skill and experience reduces the substitutability of jobs outside of the Relevant Market and makes remaining in nuclear power generation positions more attractive to workers. In other words, those higher wages make it costly for a nuclear power generation worker to seek a position outside the Relevant Market, where a prospective employer would not value the skills the worker obtained while working in nuclear power generation.

**b. Geographic Market**

421. The relevant geographic market is the United States. A small but significant decrease in compensation from the competitive level could be profitably imposed collectively by the nuclear power companies in the United States without causing too many nuclear power generation workers to leave the United States or move to a different occupation.

422. The Nuclear Defendants set their compensation and recruiting policies for nuclear power generation workers largely on a nationwide basis, and therefore treat such workers as if they were participating in a nationwide labor market. Each Nuclear Defendant establishes compensation for nuclear power generation workers at identical or near identical levels, regardless of the region, state, county, or locality in which those workers are located. Because each Nuclear Defendant and coconspirator establishes the same, or nearly the same, compensation for nuclear power generation workers regardless of geographic region, state, county or locality, conduct that suppresses compensation for those nuclear power generation workers in one location would necessarily suppress compensation for nuclear power generation workers employed by all of the other Nuclear Defendants and coconspirators, their subsidiaries, and related entities throughout the United States.

423. The nationwide geographic market is further supported by Nuclear Defendants' practice of seeking wage information on a nationwide basis. For example, a former labor manager at Exelon explained that he would contact other executives at nuclear power companies throughout the United States to obtain wage information. A former compensation employee at DTE Energy stated that the survey data DTE Energy used to compare its own employees' compensation to other nuclear companies reflected nationwide data. A former HR employee at Talen stated that nuclear engineers were recruited from around the country. And a former HR executive at APS stated that nuclear power companies competed for nuclear operators on a nationwide basis.

### c. Collective Market Share and Monopsony Power

424. The Nuclear Defendants collectively possess market and monopsony power in the Relevant Market in that they have the power, collectively, and through the challenged conduct, to profitably suppress compensation paid to nuclear power generation workers below competitive levels.

425. The Nuclear Defendants and coconspirators pay compensation to nuclear power generation workers that comprise 100% percent of the Relevant Market. Every company that hires commercial nuclear power generation labor in the United States participated in the conspiracy.

## D. Anticompetitive Effects and Injury Suffered by Class Members

426. As a result of Defendants' anticompetitive conduct alleged herein, competition between the Nuclear Defendants over compensation was restrained or eliminated in the market for workers in nuclear power generation in the United States during the Class Period.

427. As a result of Defendants' anticompetitive conduct alleged herein, the compensation of workers in nuclear power plants in the United States was fixed, stabilized, or maintained at artificially suppressed levels during the Class Period.

428. The purpose of the conspiratorial conduct of Defendants was to suppress, fix, or maintain the compensation of workers in nuclear power plants in the United States and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiffs and the Class received compensation at artificially suppressed rates during the Class Period.

429. Nuclear Defendants' own former executives stated that their exchange of compensation data lowered wage rates for nuclear power generation workers. For example, a former Exelon executive said that exchanging current and future wage data with other Nuclear Defendants "allowed Exelon to avoid paying higher hourly wages than it actually paid its nuclear power generation employees." Similarly, a former HR executive employed by two defendants—

Progress and Duke Energy—said that the exchanges of wage data helped Nuclear Defendants avoid paying "outrageous salaries."

430. The Nuclear Defendants and coconspirators collectively possess market power in the Relevant Market, as they together control 100 percent of the Relevant Market. Accordingly, nuclear power generation workers could not have escaped the wage suppression stemming from the conspiracy by switching to non-conspiring nuclear power companies. While controlling 100% of the Relevant Market, the Nuclear Defendants regularly exchanged non-public, current and future compensation rates, on a granular plant-by-plant level, without concealing any company's name, which had anticompetitive effects. The Nuclear Defendants heavily relied on such exchanges to help set compensation. A former FirstEnergy Service Company executive said that the information obtained from the in-person compensation meetings was "invaluable" for setting wages, and a former Exelon executive said that the data he exchanged through the Compensation Comparison Reports "was highly valuable to Exelon and was routinely used by Exelon to determine the compensation rates it paid nuclear power generation employees."

431. By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having received lower compensation during the Class Period than they would have received in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiffs and the Class have suffered damages.

432. This is an injury of the type that the antitrust laws were meant to punish and prevent.

433. In a competitive market, the Nuclear Defendants and coconspirators would have competed to recruit, hire, and retain workers during the Class Period by offering higher wages, higher salaries, and superior benefits, and many more Class Members would have switched employment to other nuclear power companies as a result of that competition for labor. Yet by

entering into the alleged conspiracy and suppressing competition on compensation, the Nuclear Defendants and coconspirators were able to reduce and stabilize the number of Class Members switching employment to other Defendants. Defendants' scheme harmonized compensation to Class Members across the nuclear power industry and thus reduced the incentives for Class Members to switch employment between Nuclear Defendants or coconspirators.

434. The effects and injuries caused by Defendants' anticompetitive agreement commonly impacted all nuclear power generation workers employed by the Nuclear Defendants and the coconspirators, their subsidiaries, and related entities in the United States because the Nuclear Defendants valued internal equity, the principle that similarly situated employees should be compensated similarly. Each Nuclear Defendant and coconspirator established a pay structure to accomplish internal equity. Each Nuclear Defendant and coconspirator established narrow compensation ranges for nuclear power generation workers in the United States with similar job positions and similar levels of experience and also maintained certain compensation differentials between different nuclear power generation positions. For example, a former HR Business Partner at Dominion said that he was responsible for ensuring "internal equity" for the company's nuclear facilities. Likewise, a former HR Business Partner at Southern Company said that salary ranges and hourly wages at each of the company's nuclear power plants were the same as those at all of the other company's nuclear power plants.

## VII. STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A. Fraudulent Concealment

#### 1. Plaintiffs Did Not and Could Not Have Discovered Defendants' Misconduct

435. Plaintiffs and other Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiffs and Class Members did not discover, and

could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint.

436. Defendants engaged in a secret conspiracy. No facts were revealed publicly or to Plaintiffs that would have put them or the Class on inquiry notice that they were the victims of a conspiracy to suppress compensation paid to nuclear power generation workers.

437. Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Commercial nuclear power companies are not exempt from antitrust regulation concerning their conduct in the labor market, and thus Plaintiffs reasonably considered the market for labor in the nuclear power industry to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of wages, salaries, benefits, and other compensation paid by the Nuclear Defendants and coconspirators to nuclear power generation workers in the United States.

438. Plaintiffs exercised reasonable diligence. Plaintiffs and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and coconspirators to conceal their combination.

439. Until the filing of this complaint, nuclear power generation workers and their union representatives were not on notice that the Nuclear Defendants and coconspirators were sharing competitively sensitive wage information. In 2025, a former Director of the Utility Department at the International Brotherhood of Electrical Workers who was responsible for supporting over 200,000 utilities workers, stated that the hourly wages and benefits included in union CBAs were highly confidential. He stated in 2025 that, to his knowledge, nuclear power companies did not

share wages or benefits information with their competitors because they were concerned that they may lose valuable employees to other companies.

**2. Defendants Actively Concealed the Conspiracy**

440. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the other Class Members.

**a. Defendants Believed their Conduct Was Unlawful**

441. During the Class Period, NHRG conducted antitrust trainings for its members, including the Nuclear Defendants, during which the organization explicitly presented and addressed the Antitrust Guidance and Safe Harbor guidelines established by the DOJ and FTC as well as key antitrust cases. Multiple Nuclear Defendants also conducted internal antitrust trainings during the Class Period. A former Vice President of Compensation at CEG, for example, explained that human resources staff at the company were carefully trained to understand antitrust law and that the staff reviewed and discussed antitrust cases during those trainings.

442. The October 2016 Antitrust Guidance issued by DOJ and FTC explains that data exchanges may fall under the Safe Harbor carveout if: "a neutral third party manages the exchange," "the exchange involves information that is relatively old," "the information is aggregated to protect the identity of the underlying sources," and "enough sources are aggregated to prevent competitors from linking particular data to an individual source." Consistent with those criteria, the Supreme Court held that "[e]xchanges of current price information" have "the greatest potential for generating anticompetitive effects" and "have consistently been held to violate the Sherman Act," *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16 (1978), and the Second Circuit explained in the landmark *Todd v. Exxon* case that exchanges of future wage information "are considered especially anticompetitive." 275 F.3d 191, at 211 (2d Cir. 2001).

443. The compensation data exchanged between the Nuclear Defendants during the implementation of their conspiracy—including through the CBA Repository, Compensation Comparison Reports, twice annual in-person compensation meetings, and telephonic and email communications—failed to comply with the Safe Harbor requirements of the DOJ and FTC. Specifically, the exchanged compensation data was *not* historical, aggregated to conceal the identities of the underlying sources, or managed by a neutral third party. Rather, throughout the Class Period, the Nuclear Defendants directly exchanged disaggregated and deanonymized data about their current and future compensation rates at particular nuclear power plants operated by particular nuclear power companies.

444. The Nuclear Defendants believed that their information exchanges were anticompetitive and unlawful. For example:

- A former Vice President of Compensation at CEG said that human resources staff at the company were trained to understand the antitrust laws in frequent training sessions; that "we were made aware by our employer not to share wage information"; and if a competing nuclear power company had ever reached out to her requesting specific data about Constellation's wage rates, she would have responded: "Are you crazy?"
- A former Director of Compensation of Dominion stated that meetings between competing nuclear utilities to compare wages and discuss collective bargaining agreements would be unlawful. She explained, "Professional ethics would say that is definitely not okay" and "as a professional standard, companies know that's against the law." She said that discussions between HR professionals from different nuclear power companies "to figure out what you're going to pay" was "salary fixing which is illegal."

- A former HR executive of Duke said the company instructed employees not to discuss specific pay rates with competitors. She said, "If someone had been exchanging specific data, heads would have rolled," and if she had been made aware of another nuclear utility requesting specific wage data, she would have raised it to Duke's legal department. She said that HR executives of competing nuclear power companies did not communicate directly with each other about wages because of the legal implications of doing so.
- A former Labor Relations Manager for EOI claimed that NHRG's Executive Committee instructed members to "stay in their lanes" and not to "discuss any compensation" with other nuclear power companies.
- A former Director of HR Business Partners at Entergy said, "It's absolutely not appropriate to share CBAs" with competing nuclear power companies.
- A former HR executive at FPL stated that sharing collective bargaining agreements with other nuclear power companies was a "no go" and "the line" that should not be crossed. She also said that sharing compensation data at in-person meetings of nuclear power companies was another "line" that should not be crossed.
- A former Compensation and Benefits Manager at PSEG Nuclear (who was unaware that his former employer participated in the CBA Repository) stated that union CBAs were "maintained internally" and "never shared . . . with anyone else." He further stated he would not have shared "what we were paying operating engineers" if someone had called him from another nuclear power company and asked him to "divulge" that information, noting "I just wasn't allowed to do that."

- A former HR Director at Entergy said that "all of the utilities consider" CBAs "to be proprietary and confidential" and "there was an unspoken agreement not to share that information" between nuclear power companies.
- According to a former HR employee at Talen, sharing compensation information with other nuclear power companies would be "divulging confidential or proprietary information" and he would "question whether [it] was appropriate" to "divulge[] rates to someone else."
- A former Senior HR Advisor of NextEra said that "our wage information was guarded, not to be discussed or released."

445. Because they were aware that their exchanges of sensitive compensation data and discussions to align compensation rates were unlawful, Defendants took affirmative and specific steps to fraudulently conceal each component of the compensation-suppressing conspiracy. Defendants formed and implemented the combination and conspiracy in a manner specifically designed to avoid detection.

#### b. Defendants Concealed Direct Communications about Compensation with Email Accounts Outside their Organization

446. Nuclear Defendants sought to conceal their direct communications about compensation with competing nuclear power companies by using email accounts from outside their organizations. Operations Managers from each of the Nuclear Defendants who helped set compensation were provided email addresses by INPO so that they could communicate covertly and without detection. A former employee of Dominion, EnergyNW, TVA, and Exelon, who was also a member of INPO, explained, "Operations Managers representing every nuclear power plant in the United States were members of INPO and were provided with their own private INPO email addresses." He said, "The Operations Managers who were provided with their own private INPO

email address had responsibility for helping to determine the compensation paid to nuclear power generation employees at their respective companies."

447. He attested, "INPO staff actively encouraged and recommended that Operations Managers employed by nuclear power companies conduct direct communications with one another using their private INPO email accounts, rather than the email accounts supplied by their employers. INPO staff encouraged and recommended that Operations Managers employed by competing nuclear power companies communicate through their INPO email accounts so that those communications could not and would not be monitored or retained on any nuclear power company's servers. Emails sent through INPO's accounts were VPN-protected and exclusively located on INPO's servers."

448. He explained, "While I served as a Supervisor of Nuclear Training Operations at Dominion, INPO provided me with a private email account that was separate from the email account provided by Dominion. I was told by an INPO representative that private INPO email accounts were provided so that communications between Operations Managers employed by competing nuclear power companies could not and would not be monitored or retained on any nuclear power company's servers."

449. He attested, "I was instructed by senior executives at Dominion that certain communications should not be retained on the company's servers. Senior executives at Dominion encouraged me to use INPO email accounts to communicate with competitors about sensitive company matters, including hiring practices."

450. He stated that Operations Managers "participated in communications with other Operations Managers from competing nuclear power companies through those private INPO email addresses, including communications about compensation." He stated that "compensation

and hiring practices were absolutely discussed across company borders without regards to law or company policies."

451. He provided the example that, when an employee applied for a position at a competing nuclear power plant, the Operations Manager receiving the application would request the applicant's salary amount from the Operations Manager at the candidate's current employer. He said that INPO communications had the effect of "stifling" workers' "salaries," as well as their "promotions and their ability to move plants."

452. He stated, "INPO email accounts allowed competing nuclear power companies to conceal communications between their Operations Managers, including any communications regarding compensation, from nuclear power generation workers, unions that represent those workers, government regulators, and the general public." He explained, "By communicating through INPO email accounts, Operations Managers at nuclear power companies were able to prevent nuclear power generation workers, unions that represent those workers, government regulators, and the general public from learning that those nuclear power companies were collaborating, including on matters relating to compensation."

453. He attested, "The secretive INPO email system provided an opportunity for Operations Managers at competing nuclear power companies to collaborate to limit the salaries and wages of nuclear power plant workers, without those workers, unions that represent those workers, government regulators, and the general public finding out." He explained that containing labor costs was a priority and that discussions between Operations Managers through INPO emails were "definitely" intended to keep the compensation rates of nuclear plant workers lower than they would have been in a competitive market.

### c. CBA Repository

454. The Nuclear Defendants fraudulently concealed the CBA Repository. While publicly and ostensibly prohibiting the exchange of current or draft CBAs with other nuclear power companies, the Nuclear Defendants did precisely that behind electronic passwords. A former HR Manager for FirstEnergy Nuclear Operating Company explained: "Officially," nuclear power companies didn't exchange CBAs with one another, but he saw competing nuclear plants' CBAs at FirstEnergy and if he "wanted to get a copy of a CBA, he would contact one of the other HR Managers" at a competing plant and ask for it. Similarly, a former Director of HR Business Partners at Entergy said that "it's absolutely not appropriate to share CBAs" with competitors, but he would not be surprised if his colleagues at Entergy exchanged CBAs with other nuclear power companies "under the table."

455. Nuclear Defendants fraudulently concealed the CBA Repository in five ways. First, their "official" policies claimed that it was impermissible to exchange CBAs with other nuclear power companies.

456. Second, the CBA Repository was concealed behind an electronic password. From 2003 until 2014, the Nuclear Defendants provided their sensitive compensation information directly to Rick Habegger while he managed NHRG, who then uploaded the data into a protected electronic file that could only be accessed with a confidential password. After Habegger was replaced as manager of NHRG through the present, the Nuclear Defendants provided their compensation information to HRC and Accelerant, including to David Heler, who also uploaded the sensitive data into a protected electronic file that could only be accessed with a confidential password.

457. Third, the password to access the CBA Repository was not provided to all members of NHRG. Rather, it was only given to those nuclear power companies who regularly provided updated CBAs to the CBA Repository. As a consequence, only Nuclear Defendants and coconspirators could access the CBA Repository.

458. Fourth, even within each Nuclear Defendant that accessed the CBA Repository, only select personnel were informed of the existence of the CBA Repository (and the password to access it). A former Compensation and Benefits Manager at PSEG Nuclear—who was unaware that his former employer participated in the CBA Repository—stated that union CBAs were "maintained internally" and "never shared . . . with anyone else." Likewise, a former HR executive at FPL—who was also unaware that her former employer participated in the CBA Repository—stated that sharing collective bargaining agreements with other nuclear power companies was a "no go" and "the line" that should not be crossed.

459. Fifth, the *existence* of the CBA Repository was hidden from the public, not only its content. NHRG's website contains only three pages accessible to the public: a "home" page providing a brief description of the organization; a "contact us" page with an email address for Shane Camp, Vice President of Human Resources at Defendant Southern Nuclear; and a page to pay membership dues. The rest of NHRG's website is hidden from the public through a login link requiring a username and password restricted to members.

460. The CBA Repository was not treated like an ordinary business document. Unlike other NHRG materials jointly accessed by its competing members (such as safety reports), the CBA Repository contained information that was considered unlawful: disaggregated current and future compensation data exchanged between direct competitors. And unlike other NHRG materials, the CBA Repository was *not* accessible to NHRG members unless they were nuclear

power companies that supplied updated data to the Repository, meaning that only participants in the conspiracy with unclean hands could access the database.

461. While it is an ordinary business practice for a company to unilaterally maintain the confidentiality of its compensation data, including by establishing passwords to protect that data, it is *not* an ordinary business practice for *direct competitors* to exchange disaggregated current and future compensation data behind an electronic password that is inaccessible to workers, regulators and the general public. In a competitive market, companies protect their compensation data with passwords precisely to *prevent competitors* from accessing that data and using it to cost-effectively outbid them in the labor market—not, as here, to *allow* competitors to secretly access that data so they can collectively restrain wages.

**a. Compensation Comparison Reports**

462. Like the CBA Repository, the Nuclear Defendants concealed the Compensation Comparison Reports behind an electronic password that was only accessible to select executives employed by nuclear power companies that regularly shared their current and future compensation rates to update the Reports.

463. The Compensation Comparison Reports were created twice a year by Exelon, which requested and gathered current and future wage rates directly from the other Nuclear Defendants and compiled that plant-specific and disaggregated data into spreadsheets that were not anonymized. The spreadsheets were then stored and maintained by NHRG, which shielded them from disclosure to workers or the public with an electronic password.

464. Like the CBA Repository, Nuclear Defendants fraudulently concealed the Compensation Comparison Reports in five ways. First, they claimed it was impermissible to directly exchange compensation with other nuclear power companies, while secretly doing so

through the Reports. A former Vice President of Compensation at CEG—which is the current name for Exelon—said that human resources staff at the company "were made aware by our employer not to share wage information" and that if a competing nuclear power company had reached out to request specific data about Constellation's wage rates, she would have responded: "Are you crazy?" Despite these representations, that very same company secretly created and managed the Compensation Comparison Reports to systematically exchange specific wage rates between the Nuclear Defendants.

465. Second, the Compensation Comparison Reports were concealed behind an electronic password established by NHRG.

466. Third, the password to access the Compensation Comparison Reports was not provided to all members of NHRG. Rather, it was only given to those nuclear power companies that, twice a year, provided compensation data to update the Reports. As a consequence, only Nuclear Defendants and coconspirators could access the Compensation Comparison Reports.

467. Fourth, even within each Nuclear Defendant that accessed the Compensation Comparison Reports, only select personnel were informed of the existence of Reports and had the password to access them.

468. Fifth, like the CBA Repository, the *existence* of the Compensation Comparison Reports was hidden from the public, not only their content. The substance of NHRG's website is concealed from the public through a login link requiring a username and password restricted to members.

469. Like the CBA Repository, Compensation Comparison Reports were not treated like an ordinary business document. Unlike other innocuous NHRG materials jointly accessed by its members, the Compensation Comparison Reports contained information considered unlawful:

disaggregated current and future compensation data exchanged between direct competitors. And unlike other innocuous NHRG materials, the Compensation Comparison Reports were *not* accessible to NHRG members unless they were nuclear power companies that supplied updated data to the Reports, meaning that only participants in the conspiracy with unclean hands could access them.

470. Like the CBA Repository, the Compensation Comparison Reports were inaccessible to workers and the public while simultaneously accessible to the very entities—competing nuclear power companies—that would have taken advantage of such data in a competitive market to poach employees from and outbid each other. Such an anticompetitive wage exchange, and concealment of that exchange, is only logical in the context of a conspiracy to suppress compensation.

**b. Two Annual Compensation Meetings**

471. Nuclear Defendants fraudulently concealed the conspiratorial discussions that transpired at the annual compensation meetings held by the Labor Relations Project and the Total Rewards Project. Those NHRG-sponsored discussions involved the unlawful disclosure of plant-specific current and future compensation rates as well as concerted efforts to align and suppress those rates. The conspiratorial nature of those discussions was fraudulently concealed through four means.

472. First, NHRG purported to comply with the antitrust laws, even while hosting meetings of the Labor Relations Project and the Total Rewards Project to implement the conspiracy to depress compensation. According to a former Labor Relations Manager for EOI, NHRG's Executive Committee instructed members to "stay in their lanes" and not to "discuss any compensation" with other nuclear power companies. Moreover, NHRG conducted antitrust

trainings that cautioned nuclear power companies not to collaborate to fix and depress compensation.

473. Second, each meeting of the Labor Relations Project and Total Rewards Project from 2003 through the present was restricted to only members of those projects. While attendance at the NHRG conference itself was not restricted only to the Nuclear Defendants, and often included vendors who worked in the industry, only members of the Labor Relations Project could attend the annual meetings of the Labor Relations Project, and only members of the Total Rewards Project could actually attend the annual meetings of the Total Rewards Project. Thus, the exchange of current and future compensation information and related discussions about optimal compensation rates at those meetings were secretive and undertaken behind closed doors.

474. Third, the meetings of the Labor Relations Project and Total Rewards Project were typically held during the two days *before* the annual NHRG conference, before many conference attendees had even arrived, in order to restrict participation.

475. Fourth, presentations made during meetings of the Labor Relations Project and Total Rewards Project were not posted on NHRG's website due to confidentiality. This was the case even though presentations made during other NHRG meetings, including those conducted during the annual conference, were often posted on the organization's website for members to access.

**c. WTW Surveys Provided a Veneer of Legality**

476. The Nuclear Defendants hired third-party WTW to conduct legitimate compensation surveys in part to conceal their misconduct. The retention of WTW imparted a veneer of legality to the Nuclear Defendants' illicit exchange of compensation data. WTW conducted surveys for the Nuclear Defendants that complied with the Safe Harbor guidelines

established by the DOJ and FTC: the compensation data was collected by a neutral third-party; the data was aggregated in the survey results; and the survey results alone did not allow the participants to ascertain any particular company's wage rates.

477. The Nuclear Defendants point to the WTW Surveys to indicate their compliance with the antitrust laws. By claiming to obtain sufficient compensation data for pro-competitive benchmarking from the lawful WTW Surveys alone, Defendants can disclaim accusations of antitrust misconduct. However, behind closed doors, the Nuclear Defendants directly exchanged disaggregated, current and future wage rates—the very information that had been concealed in the WTW Surveys themselves—between each other through the CBA Repository, Compensation Comparison Reports, in-person compensation meetings, and telephonic and email communications.

478. In fact, during the Total Rewards Project meetings, the Nuclear Defendants extensively discussed WTW Survey results, disclosed their own company's disaggregated compensation rates, and confirmed whether they were "in line" with the WTW Survey figures. In other words, once the Nuclear Defendants obtained the aggregated WTW Survey results designed to maintain the confidentiality of individual company's wage rates, they orally disaggregated those results, thus exchanging sensitive current and future wage data, to align their compensation rates.

**d. Telephonic Communications**

479. The Nuclear Defendants frequently exchanged compensation data and compensation rate targets through telephone communications to avoid the creation of a paper trail and thus avoid detection. For example, a former Progress HR executive stated that her team had "relationships" with counterparts at other nuclear utilities "where we could pick up the phone" and ask them to "share with us your average salary, minimum and maximum, and incentives." She

contacted her counterparts at other nuclear utilities once a year "before we did our proposal for salary range adjustments" and, during those calls, "we would talk about what we were proposing."

480. Conducting conspiratorial conversations about compensation rates over the phone was an effective means of concealing the conspiracy, especially for HR executives who had not been provided a private INPO email address that allowed for written communications off of the Nuclear Defendants' servers.

**e. Siloed Compensation Departments**

481. The Nuclear Defendants kept their nuclear power generation compensation departments siloed from the other HR departments of their respective companies to keep their conspiratorial conduct a secret. For example, a former HR executive at Progress stated that its nuclear division had a "separate compensation function" from the rest of the company that "collaborated" with other nuclear companies, including Southern Company, FPL, Entergy, and TVA. Similarly, a former HR executive at FPL said that setting compensation for the company's nuclear power plant workers was handled by a separate department from the HR department.

482. By siloing their compensation divisions focused solely on nuclear power generation workers, the Nuclear Defendants effectively restricted access to the confidential compensation information exchanged between them on a need-to-know basis. Only specific personnel at each Nuclear Defendant were informed of the exchanges of confidential compensation data between the Nuclear Defendants, including the CBA Repository, Compensation Comparison Reports, in-person compensation meetings, and direct telephonic and email exchanges. Other HR personnel at Nuclear Defendants were not told about those exchanges.

483. The select compensation executives who participated in these exchanges concealed from other HR personnel that they discussed compensation rates, ongoing union negotiations and

not-yet-ratified wage schedules with other Nuclear Defendants. For example, union negotiations were so sensitive and private at FPL that non-compensation HR employees were not informed of negotiation details until a CBA was ratified. According to a former FPL HR executive, "Whatever is going on from a negotiation standpoint is confidential information."

**i. Misrepresentations about Compensation**

484. During the Class Period, Defendants affirmatively and falsely represented that the nuclear power industry paid wages, salaries, benefits, and other compensation reflecting a competitive market for labor. For example, in a February 2024 report to the Minnesota Public Utilities Commission, Xcel Energy claimed: "[t]he compensation levels necessary to recruit and retain experienced nuclear employees are increasing due to the limited number of nuclear plants in the United States and the highly competitive practices employed by other nuclear companies in pursuit of the same experienced personnel."

485. The Nuclear Defendants also advertised to potential nuclear power generation employees that the compensation offered and provided was "competitive." "Competitive" is defined as "relating to, characterized by, or based on competition."[5] In this context, it means relating to, characterized by, or based on competition in the labor market for nuclear power generation employees. This was false given the Defendants' collaboration on compensation detailed above. Defendants intended to use the word "competitive" to conceal that collaboration from Class Members who sought employment with the Defendants.

486. The examples below were promoted on the Nuclear Defendants' websites and in job postings for nuclear power generation positions:

[5] https://www.merriam-webster.com/dictionary/competitive.

- *AEP*. AEP's Careers website states: "AEP is a premier place to work, with great jobs, competitive pay and benefits, and an inclusive culture that encourages diversity."
- *Ameren*. Ameren's Careers website states: "Ameren's co-workers are our most valuable resource. We offer a competitive and comprehensive benefits package as well as a variety of programs to support work-life balance, well-being and flexible and collaborative work environments for our co-workers."
- *APS*. APS's Careers website states: "APS employees deliver extraordinary service to our customers and communities every day. We do what's right for the people and prosperity of our state. We recognize these efforts by offering competitive compensation packages, in addition to an array of employee benefits and rewards."
- *Constellation.* Constellation's job postings state: "We provide competitive compensation and benefits that support both employees and their families, helping them prepare for the future."
- *Dominion*. Dominion's job postings state: "We offer excellent plans and programs for employees. Employees are rewarded with a competitive salary and comprehensive benefits package which may include: health benefits with coverage for families and domestic partners, vacation, retirement plans, paid holidays, tuition reimbursement, and much more."
- *DTE Energy*. DTE Energy's Employees website states: "To maintain our high-performing workforce now and into the future, we offer our employees a competitive compensation and benefits package."
- *Duke Energy*. Duke Energy's Careers website states: "We know the strength of our company depends upon a high-performing, diverse workforce. That's why we offer a

comprehensive rewards package of competitive pay and benefits that allows us to attract the talent we need to succeed."

- *Entergy*. Entergy's Jobs website states: "For our employees, we create value by achieving top-quartile organizational health, providing a safe, rewarding, engaging, diverse and inclusive work environment, fair compensation and benefits, and opportunities to advance their careers."
- *FirstEnergy*. FirstEnergy's Careers website states: "Our employees make important contributions to meeting the challenges of our changing business environment. We are committed to rewarding individual and business unit efforts through our compensation program that includes competitive base and incentive pay."
- *SCE*. SCE's Careers website states: "We offer a competitive Total Rewards Package including a wide selection of health plans, preventive health reimbursement, 401(k) savings plan with company match and automatic company contributions, wellness programs and initiatives, tuition reimbursement, competitive vacation/holiday program, professional development, volunteer programs, employee assistance program, philanthropy and matching contribution program, electric service discount, and many other perks!"
- *Southern Company*. Southern Company's job postings state: "Southern Company invests in the well-being of its employees and their families through a comprehensive total rewards strategy that includes competitive base salary, annual incentive awards for eligible employees and health, welfare and retirement benefits designed to support physical, financial, and emotional/social well-being."

- *STP*. STP's Opportunities website states: "STP offers a competitive salary and comprehensive benefits program."
- *Talen*. Talen's job postings state: "Talen Energy offers its employees a generous and progressive array of compensation, benefits and growth opportunities."
- *Xcel Energy*. Xcel Energy's Total Rewards website states: "Our employees are critical to our success. That's why we offer a competitive pay package based on performance, skills and experience for contributions aligned with our values and goals."

487. By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## VIII. CLASS ACTION ALLEGATIONS

488. Plaintiffs bring this action on behalf of themselves, and on behalf of the members of the following class, under Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3):

> All persons employed in nuclear power generation by the Nuclear Defendants and coconspirators, their subsidiaries, and/or related entities in the United States from May 1, 2003 until the present.

489. The claims of the Class are brought against all the Defendants.

490. Persons currently or formerly employed in the following positions by Defendants, co-conspirators or any of their subsidiaries or predecessors are excluded from the proposed Class: human-resources executives, labor managers, human-resources managers, human-resources staff, human-resources officers, human-resources directors, and bookkeepers. The Class definition provides clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Class.

491. Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

492. The Class is so numerous that joinder of all members of the Class in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains hundreds of thousands of similarly situated workers.

493. The Class is readily identifiable and is one for which records should exist.

494. Plaintiffs' claims are typical of those of the Class. Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the Class and the relief sought is common to the Class.

495. Plaintiffs and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in compensation for working in nuclear power generation than they would have in a competitive market.

496. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are aligned with, and not antagonistic to, the Class.

497. Questions of law and fact common to Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to Class Members.

498. Questions of law and fact common to the Class include:

a. Whether Defendants engaged in an agreement, combination, or conspiracy to fix, suppress, maintain, or stabilize the compensation paid to Class Members;

b. Whether Defendants' exchange of nonpublic, competitively sensitive information about compensation paid to Class Members constituted, or furthered, an agreement, combination, or conspiracy in restraint of trade;

c. Whether such agreements constituted violations of the Sherman Antitrust Act;

d. The identity of the participants of the alleged conspiracy;

e. The duration of the conspiracy alleged herein and the acts performed by Defendants and their coconspirators in furtherance of the conspiracy;

f. Whether Defendants fraudulently concealed their misconduct;

g. Whether and to what extent Defendants' anticompetitive scheme suppressed compensation paid to Class Members below competitive levels;

h. The nature and scope of injunctive relief necessary to restore competition; and

i. The measure of damages suffered by Plaintiffs and the Class.

499. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

500. Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other benefits, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that absent a class action, it would not be feasible for members of the Class to

seek redress for the violations of law herein alleged. Furthermore, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that is not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

501. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## IX. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### CONSPIRACY TO SUPPRESS COMPENSATION IN VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT (Against All Defendants)

502. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

503. Beginning as of May 1, 2003, and continuing through the present, Defendants and their coconspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to fix, suppress, maintain, and stabilize the compensation paid to nuclear power generation workers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

504. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their coconspirators did those things that they combined and conspired to do, including but not limited to:

- Reached agreements—through exchanges of information, in-person meetings, and other communications—to fix, suppress, maintain, and stabilize the compensation paid to nuclear power generation workers in the United States;
- Implemented, monitored, and enforced that conspiracy to suppress compensation through the regular exchange of competitively sensitive, nonpublic, and detailed compensation data; and
- Paid the fixed, suppressed, and stabilized compensation to nuclear power generation employees in the United States.

505. The conspiracy to fix, suppress, maintain, and stabilize compensation is a *per se* violation of Section 1 of the Sherman Act.

506. The combination and conspiracy alleged herein has had the following effects, among others:

- Competition for the hiring and retaining of nuclear power generation workers employed by the Nuclear Defendants, coconspirators, their subsidiaries, and/or related entities has been restrained, suppressed, and/or eliminated in the United States; and
- Compensation paid to nuclear power generation workers employed by the Nuclear Defendants, coconspirators, their subsidiaries, and/or related entities has been fixed, suppressed, maintained, and stabilized at artificially low, noncompetitive levels throughout the United States.

507. Plaintiffs and the other Class Members have been injured in their business and property by receiving less compensation from the Nuclear Defendants and coconspirators, their

subsidiaries, and/or related entities than they would have in the absence of the combination and conspiracy.

**SECOND CLAIM FOR RELIEF**

**CONSPIRACY TO EXCHANGE COMPENSATION INFORMATION IN VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT (Against All Defendants)**

508. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

509. Beginning as of May 1, 2003, and continuing through the present, Defendants and their coconspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the compensation being paid or to be paid to their nuclear power generation employees in the United States. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

510. The relevant market is the labor market for employment in nuclear power generation in the United States, and the relevant geographic market is the United States.

511. The Nuclear Defendants and coconspirators collectively possess market power in the Relevant Market. The Nuclear Defendants and coconspirators together control 100 percent of the Relevant Market. The Nuclear Defendants' and coconspirators' collective market power includes the power to jointly set compensation for nuclear power generation workers in the United States below competitive levels. This joint power clearly exists because it has been used by the Nuclear Defendants and coconspirators to pay Class Members sub-competitive compensation.

512. Defendants could and did profitably suppress compensation paid to nuclear power generation workers in the United States below competitive levels. In such circumstances, nuclear power generation workers would not be able, and were not able, to defeat such artificial

compensation suppression by switching their employment to non-conspiring nuclear power companies, as there were no such companies.

513. A slight decrease in compensation to nuclear power generation workers in the United States from a competitive level could be imposed collectively by the Nuclear Defendants without causing too many such workers to switch employment to non-nuclear occupations.

514. The Nuclear Defendants view workers that comprise the Class as fungible. Workers within the same positions are generally interchangeable, permitting the Nuclear Defendants to readily compare and match each other's compensation.

515. The information regularly exchanged by and between the Nuclear Defendants pursuant to the agreement has consisted of detailed, competitively sensitive, disaggregated, deanonymized, and non-public information about current and future compensation to nuclear power generation workers. The information exchanges specifically included:

- The exchange multiple times per year, through the CBA Repository and Compensation Comparison Reports, of current and future salaries, wages and benefits provided to positions in nuclear power generation in the United States by the Nuclear Defendants and coconspirators;
- The oral exchange at annual in-person Labor Relations Project meetings and annual Total Rewards Project meetings of current and future compensation rates, including the scope and timing of future compensation increases, paid to nuclear power generation workers employed by the Nuclear Defendants and coconspirators; and
- Regular email and telephonic exchanges directly between the Nuclear Defendants' executives regarding compensation practices and plans, including current and future compensation rates and the scope and timing of future compensation

increases, paid to nuclear power generation workers employed by the Nuclear Defendants and coconspirators.

516. The Nuclear Defendants' regular compensation information exchanges (directly and through Accelerant, HRC, and ScottMadden) reflected concerted action between horizontal competitors in the Relevant Market.

517. Each Nuclear Defendant furnished competitively sensitive information to other Nuclear Defendants with the understanding that it would be reciprocated. That is, one Nuclear Defendant would not have provided information to Accelerant, HRC, ScottMadden or directly to another Nuclear Defendant without the understanding that it would receive comparable information from other Nuclear Defendants.

518. The exchanging of such compensation information by Nuclear Defendants is inconsistent with the joint antitrust guidance provided by the DOJ and the FTC during the Class Period. In October 2016, the two agencies issued a joint "Antitrust Guidance for Human Resource Professionals," updating and building upon the Safe Harbor guidelines issued in 1996. That 2016 Antitrust Guidance states:

> Sharing information with competitors about terms and conditions of employment can also run afoul of the antitrust laws. Even if an individual does not agree explicitly to fix compensation or other terms of employment, exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement. While agreements to share information are not per se illegal and therefore not prosecuted criminally, they may be subject to civil antitrust liability when they have, or are likely to have, an anticompetitive effect. Even without an express or implicit agreement on terms of compensation among firms, evidence of periodic exchange of current wage information in an industry with few employers could establish an antitrust violation because, for example, the data exchange has decreased or is likely to decrease compensation. …
>
> However, not all information exchanges are illegal. It is possible to design and carry out information exchanges in ways that conform with the antitrust laws. For example, an information exchange may be lawful if:
>
> - a neutral third party manages the exchange,

- the exchange involves information that is relatively old,
- the information is aggregated to protect the identity of the underlying sources, and
- enough sources are aggregated to prevent competitors from linking particular data to an individual source.

519. The compensation information exchanges by the Nuclear Defendants did not comply with the above criteria established by the DOJ and FTC and violated the federal antitrust laws. The exchanged compensation information was not "relatively old" or historical; rather; the information concerned current and future compensation. The exchanged compensation information was not "aggregated to protect the identity of the underlying sources"; rather, the information was disaggregated, as distinct compensation information was provided for each nuclear power plant operated by each Nuclear Defendant and coconspirator. The exchanged compensation information was not presented in a manner "to prevent competitors from linking particular data to an individual source"; rather, the information was shared in a manner that identified the specific wages paid by particular Nuclear Defendants and coconspirators at particular nuclear power plants. The information exchanges were not managed by a neutral third party; rather, they were managed by the Nuclear Defendants themselves or the NHRG, which the Nuclear Defendants fully controlled.

520. In January 2025, the DOJ and FTC strengthened their antitrust guidelines in publishing a new version titled "Antitrust Guidelines for Business Activities Affecting Workers" which omits the above Safe Harbor carve-out. This omission confirms that even information-exchanges concerning compensation that comply with the former Safe Harbor Guidelines may nevertheless violate federal antitrust law.

521. The agreement to exchange compensation information eliminated a major incentive for the Nuclear Defendants and coconspirators to increase compensation to nuclear power

generation workers in the United States during the Class Period. The advantage of raising compensation is to retain and attract more such workers by exceeding the compensation paid by competing nuclear power companies.

522. The agreement to regularly exchange detailed and non-public information about current and prospective compensation to nuclear power generation workers in the United States assured that the provision of superior compensation by any Nuclear Defendant or coconspirator would be timely and specifically known by its competitors. Such an agreement, therefore, eliminated the incentive of each Nuclear Defendant or coconspirator to outbid its competitors during the Class Period.

523. When nuclear power companies that are competing for the same workers exchange their compensation plans and levels, comfort replaces uncertainty and reduces incentives to raise wages, salaries, other compensation, or benefits. Accordingly, each Nuclear Defendant and coconspirator used the compensation data obtained through the information exchanges to reduce the uncertainty that they should have faced from not knowing what their competitors were offering and providing in the labor market. This strategic information was a material factor in the Nuclear Defendants' and coconspirators' decisions to suppress and stabilize compensation paid to nuclear power generation workers in the United States during the Class Period.

524. The exchange of compensation information between the Nuclear Defendants during the Class Period increased their relative bargaining power in setting wages, salaries, benefits, and other compensation for nuclear power generation workers employed by Defendants, coconspirators, their subsidiaries, and related entities in the United States.

525. The regularity and detail of the compensation information exchanged, the related communications about compensation between individuals exchanging the information, the

relationships of trust developed among the individuals exchanging the information, and the pervasive desire to control and restrain labor costs, allowed Defendants and their coconspirators to use the information to suppress each other's compensation levels for nuclear power generation workers in the United States during the Class Period.

526. Defendants' unlawful agreement to exchange, and the actual exchanges of, nonpublic, timely, and detailed compensation data was not reasonably necessary to further any procompetitive purpose. The information exchanged between the Nuclear Defendants and their high-level executives was disaggregated, company-specific, current and forward-looking, deanonymized, confidential, and related to a core characteristic of competition between them.

527. The information-exchange agreement has had the effect of (1) reducing and suppressing competition among the Nuclear Defendants, their subsidiaries, and related entities for the compensation of nuclear power generation workers in the United States and (2) suppressing the compensation of such employees.

528. As a result of the unlawful agreement alleged herein to exchange compensation information during the Class Period, Plaintiffs and the other Class Members have been injured in their business or property by receiving artificially suppressed compensation.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

A. The Court declare, adjudge, and decree this action to be a proper class action under Rule of Civil Procedure 23 on behalf of the Class defined herein, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class once certified;

B. Defendants' actions alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C. Plaintiffs and the other Class Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled under 15 U.S.C. § 15(a);

D. Plaintiffs and the other Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, and from entering into any other conspiracy or combination having a similar purpose or effect;

F. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information concerning compensation, benefits, or the hiring or recruiting of employees;

G. Plaintiffs and the other Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

H. Plaintiffs and the other Class Members be granted such other relief as the case may require and deemed proper to this Court.

## XI. JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this case.

Dated: September 21, 2026

Respectfully submitted,

/s/ *Matthew K. Handley*

Matthew K. Handley (D. Md. Bar # 18636)
HANDLEY FARAH & ANDERSON PLLC
1050 Connecticut Avenue, NW, Suite 500
Washington, DC 20036
Telephone: (202) 559-2433
mhandley@hfajustice.com

George F. Farah (*pro hac vice*)
Nicholas J. Jackson (D. Md. Bar # 32520)
HANDLEY FARAH & ANDERSON PLLC
33 Irving Place
New York, NY 10003
Telephone: (212) 477-8090
gfarah@hfajustice.com
njackson@hfajustice.com

William H. Anderson (*pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
1434 Spruce Street, Suite 301
Boulder, CO 80302
Telephone: (202) 559-2433
wanderson@hfajustice.com

Shana E. Scarlett (*pro hac vice*)
Abby R. Wolf (*pro hac vice*)
John Michael Grant (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
abbyw@hbsslaw.com
john.grant@hbsslaw.com

Steve W. Berman (*pro hac vice*)
Breanna Van Engelen (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

breannav@hbsslaw.com

Brent W. Johnson (*pro hac vice*)
Alison S. Deich (*pro hac vice*)
Sabrina Merold (*pro hac vice*)
Nina L. Haug (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
bjohnson@cohenmilstein.com
adeich@cohenmilstein.com
smerold@cohenmilstein.com
nhaug@cohenmilstein.com

*Interim Co-Lead Class Counsel*